UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

MATTHEW BRENT GOETTSCHE,
[DEFENDANT TWO REDACTED],
JOBADIAH SINCLAIR WEEKS,
JOSEPH FRANK ABEL, and
SILVIU CATALIN BALACI

Hon. Claire C. Cecchi

CRIMINAL NO.:  19-cr-877-CCC

**Oral Argument Requested**

**Defendant Jobadiah Sinclair Weeks' Reply in Support of
His Motion to Revoke the Pretrial Detention Order**

# TABLE OF CONTENTS

PROPOSED CONDITIONS OF RELEASE.................................................................... 1

INTRODUCTION............................................................................................................ 2

DISCUSSION……......................................................................................................…...4

**I. The Conditions of Release will Reasonably Assure Mr. Weeks' Appearance**.................... 4

   A.   The Bail Reform Act has a presumption in favor of pretrial release. ................................ 4

   B.   GPS monitoring is reliable.............................................................................................. 5

   C.   Mr. Weeks will be subject to tripartite monitoring by Peter Gallic,  Pretrial Services, and a third-party monitoring service................................................................................. 6

   D.   Sale of the Airplane and Surrender of Jet Smarter Membership. ...................................... 6

**II.  Mr. Weeks' History and Characteristics Support Release**. ............................................... 7

   A.   Mr. Weeks has strong ties to the United States and his family.......................................... 7

   B.   Prior lawful travel to foreign countries does not demand detention................................... 8

   C.   Mr. Weeks' ID documents and a single Facebook chat boasting of the ability to obtain a foreign passport does not support his detention............................................................... 9

   D.   Mr. Weeks' access to wealth is misunderstood and overstated. ........................................ 9

   E.   Views and "rhetoric" are irrelevant to risk of flight. ........................................................ 11

      1.   Mr. Weeks should not be punished for his free expression. ...................................... 11

      2.   Mr. Weeks' association with Liberland and Atlantis is harmless............................... 11

   F.   Mr. Weeks has no history of disobeying a condition of release. ...................................... 12

   G.   Mr. Weeks genuinely intended to cooperate with the IRS. .............................................. 12

**III.The Government's Focus on the Nature and Circumstances of the Alleged Offenses Fails to Address Any Risk of Flight Posed by Mr. Weeks**. ............................................... 13

   A.   Courts regularly release defendants facing significant sentences..................................... 14

   B.   The fugitive status of a co-defendant is irrelevant to the bond decision. ......................... 17

**IV.The Weight of the Evidence Favors Mr. Weeks' Release on Conditions**. ....................... 17

**V.  The Speedy Trial Act and Due Process Concerns Favor Release on Conditions**. .......... 18

CONCLUSION ................................................................................................................. 20

# AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ................................................................................................ 19

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................................................ 11

*United States v. Alvarez*,
    567 U.S. 709 (2012) ................................................................................................ 11

*United States v. Collado*,
    975 F.2d 985 (3d Cir. 1992) .................................................................................... 15

*United States v. Cosmo*,
    Case No. 2:09-cr-00255-DRH-ETB (E.D.N.Y. 2009) ............................................ 14

*United States v. Dehmer*,
    Case No. 2:10-cr-00851-CCC (D.N.J. Jan. 20, 2011) ............................................. 5

*United States v. Depiro*,
    Case No. 2:10-cr-00851-CCC (D.N.J. Mar. 8, 2001) .............................................. 5

*United States v. Dreier*,
    596 F. Supp. 2d 831 (S.D.N.Y. 2009) .................................................................... 14

*United States v. Giampa*,
    904 F. Supp. 235 (D.N.J. 1995) ............................................................................... 4

*United States v. Harry*,
    Case No. 2:19-CR-246 (D.N.J. Nov. 15, 2019) ..................................................... 14

*United States v. Himler*,
    797 F.2d 156 (3d Cir. 1986) ..................................................................................... 5

*United States v. Kachkar*,
    701 F. App'x 744 (11th Cir. 2017) ........................................................................... 8

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) ..................................................................................... 16

*United States v. Madoff*,
    Case No. 1:09-CR-213, Dkt No. 22 (S.D.N.Y. Jan. 16, 2009) ............................... 14

*United States v. Motamedi*,
    767 F.2d 1403 (9th Cir. 1985) ........................................................................... 13

*United States v. Noel*,
    Case No. 2:06-mj-04050-CCC (D.N.J. Nov. 3, 2006) ............................................ 5

*United States v. Oliver*,
    Criminal No. 16-40, 2016 WL 1746853 (W.D. Pa. May 3, 2016) ......................... 17

*United States v. Paul Burks*,
    Case No. 3:14-cr-208-MOC-DSC (W.D.N.C. 2016) ............................................. 14

*United States v. Paulino*,
    335 F.Supp.3d 600 (S.D.N.Y. 2018) .................................................................... 17

*United States v. Renzulli*,
    Cr. No. 87–258–7, 1987 WL 17562 (E.D. Pa. Sept. 28, 1987) ............................ 20

*United States v. Webb*,
    Case No. 15-CR-252 (PKC) (E.D.N.Y.) ................................................................ 14

*Wolfish v. Levi*,
    573 F.2d 118 (2d Cir. 1978) ................................................................................ 19

**Statutes**

18 U.S.C. § 3142(c) ...................................................................................................... 2

18 U.S.C. § 3142(e) ...................................................................................................... 4

18 U.S.C. § 3142(f) ....................................................................................................... 7

18 U.S.C. § 3145(b) .................................................................................................... 20

18 U.S.C. § 3164 ..................................................................................................... 18-19

U.S.S.G. § 2B1.1 .................................................................................................... 14, 16

**Other Authorities**

*Connecticut-Based Bitcoin Mining Fraudster Sentenced to Prison*,
    SEC Litigation Release No. 24281 (Sept. 20, 2018) ........................................... 18

Glenn A. Grant, J.A.D., *Jan. 1. – Dec. 31 2018 Report to the Governor and the Legislature*,
    Criminal Justice Reform (Apr. 2019) ................................................................... 5

Nathaniel Popper, *Identity Thieves Hijack Cellphone Accounts to Go After Virtual Currency*, The New York Times (Aug. 21, 2017) ............................................................................... 13

Samuel R. Wiseman, *Pretrial Detention and the Right to Be Monitored*, 123 Yale L.J. 1344 (2014) ......................................................................................................................... 5

## PROPOSED CONDITIONS OF RELEASE

The parties agree that Mr. Weeks is *not* a danger to the community, and the rebuttable presumption of pretrial detention *does not* apply.  The only matter the government disputes is whether Mr. Weeks poses a serious risk of flight.  But the government's categorical approach to detention in this case—that all of the defendants, including Mr. Weeks, pose a serious risk of flight—does not withstand scrutiny.  Ultimately, the government cannot carry its burden to show there "is no condition or combination of conditions" of release that will reasonably assure Mr. Weeks' appearance at trial.  Even the government's opposition memorandum fails to articulate how the proposed conditions of release, at least in their view, fall short.  Simply put, the government cannot prove that jail is the *only* answer to its flight concerns.

Mr. Weeks proposes the following bail package:

**A. Secured Bond** - Jobadiah Weeks and his family members will post a substantial bond. It will be signed by Jobadiah Weeks, Stephanie Weeks (his wife), Nat Weeks (his father), and Silence Weeks (his mother), collateralized by any combination of properties deemed acceptable to the Court, including:[1]

1. The family home in Arvada, Colorado (Nat and Silence Weeks)
2. The family log cabin in Buena Vista, Colorado (Nat and Silence Weeks)
3. The Sangre de Cristo Ranch in Coaldale, Colorado (Jobadiah Weeks)
4. A timeshare in Breckenridge, Colorado (Stephanie and Jobadiah Weeks)
5. A timeshare in Vail, Colorado (Jobadiah Weeks)

**B. Third-Party Custodian** - Mr. Weeks will be released to the custody of his close friend Peter Gallic, who lives with his wife and children in Far Hills, New Jersey.[2]

**C. Home Detention** - Mr. Weeks will be subject to home detention at Peter Gallic's house in Far Hills, New Jersey.

**D. GPS Monitoring** - Mr. Weeks will wear an electronic monitoring device issued by the Pretrial Services Office, and will follow all conditions that Pretrial specifies.

---

[1]   Originally, Mr. Weeks proposed using his fractional interest in a property in St. Kitts and Nevis and a house in Mexico as collateral for bond.  Pretrial Services has stated that foreign properties are not acceptable collateral.  Nevertheless, Mr. Weeks is making efforts to divest himself of these properties.

[2]   Alternatively, Nat and Silence Weeks are able to serve as third-party custodians if Mr. Weeks is released to their custody at the family home in Arvada, Colorado.

**E.  Third-Party Monitoring Service** - Mr. Weeks will be subject to, and incur the cost of, additional monitoring by a third-party service, such as Shadowtrack.[3]  Shadowtrack will use cell tower triangulation, voice verification, and facial recognition to ensure Mr. Weeks is at the detention location.

**F.  Travel Restrictions** - Mr. Weeks' travel will be restricted to the District of New Jersey, and to and from his lawyers' offices in Manhattan.

**G.  Surrender of Passport** – Mr. Weeks has already surrendered his passports.  Mr. Weeks' wife, Stephanie Weeks, will surrender her passport and her daughter's passport to undersigned counsel (or Pretrial Services) for the duration of this case.

**H.  Sale of Airplane/Aircraft Membership** – Mr. Weeks will divest himself of a 1978 Rockwell Turbo Commander 690B turbo prop airplane in Peoria, IL.  At present, the prop plane is not airworthy.  He will also sell or surrender membership in Jet Smarter, which provides access to aircraft at certain airports based on availability.

**I.  Extradition Waivers** – Mr. Weeks has executed and hereby provides the Court with extradition waivers for Mexico and St. Kitts and Nevis.  He will also execute waivers for any other country requested by the Court, Pretrial Services, or the government.[4]

**J.  Any Other Conditions Imposed by the Court or Pretrial Services**, such as (1) maintaining employment unrelated to the BitClub Network; (2) alcohol abuse counseling; and (3) no contact with potential victims.

These substantial conditions of release will more than "reasonably assure" that Mr. Weeks appears for all hearings and trial in this case.  *See* 18 U.S.C. § 3142(c).

## INTRODUCTION

The government misunderstands Mr. Weeks' work and life.  To be sure, he travels a great deal, and his work is not a traditional job.  But the government confuses a non-traditional life for an unstable one.  Just because Mr. Weeks doesn't commute every day to work from the same house in the same city to the same job, doesn't mean his life is unstable, or that he has no ties to the United States.  His life has actually been very consistent.  His travel is almost always with his wife and child, he routinely visits other family members, and he regularly returns to Colorado, where

---

[3]   *See Exhibit A*, Shadowtrack Home Incarceration Pre-Approval for Jobadiah Weeks.

[4]   *See Exhibit B*, Extradition Waiver for Mexico; *Exhibit C*, Extradition Waiver for St. Kitts and Nevis.

he grew up and his parents still live. His travel is extensive, but not different in kind from many other entrepreneurs who travel the globe searching for new products, ideas, and opportunities. That activity is quintessentially American.  As is Mr. Weeks.

Mr. Weeks' roots in our country are deep.  His great grandfather was Secretary of Commerce for President Eisenhower and his great-great grandfather served as Secretary of War for Presidents Harding and Coolidge.  When Mr. Weeks' daughter, aptly named "Liberty," was born in October 2018, he took her to every state in the Union during a two-month period of time. If Mr. Weeks cared so little about the United States and had no ties to it, that trip would have never occurred.  His travel may lead him to places abroad, but all his trips end in the same place—the United States, and usually Colorado.

The Weeks family is firmly rooted in Colorado.  That's where Mr. Weeks grew up, went to school, had his first job, where his parents live, and where he met his wife.  His family owns a house and log cabin in Colorado.  Mr. Weeks owns a ranch and two timeshares in Colorado—one in Vail and another in Breckenridge.  Mr. Weeks calls Arvada, Colorado home; he has called it home for over 20 years.  And, if Colorado is not Mr. Weeks' home, it's hard to explain why federal law enforcement officers executed a search warrant at the family home in Arvada, Colorado and the federal agents executing that warrant described the locations of seizure as "Jobys dresser," "Jobys desk," and "Jobys closet," and seized items belonging to "Joby."

The government takes issue with Mr. Weeks' political and societal views.  The word "anarchist" has been loosely thrown around, admittedly by both Mr. Weeks and the government. But words mean different things to different people.  When Mr. Weeks *says* the word "anarchist" he is referring to libertarianism and radical capitalism.  When the government *hears* the word "anarchist" it seems to envision a group of degenerates throwing rocks at some disorganized

protest.  It's a classic case of parties talking past each other.  Discussing the micro-settlements of "Liberland" and "Atlantis" would actually be humorous if someone's liberty were not at stake. Here, Mr. Weeks is at risk of being detained, at least in part, because of his classically American inclination toward self-expression and his eccentricity.  No doubt, the government doesn't see it that way.  But their brief is peppered with references to Mr. Weeks' views. Although some of Mr. Weeks' neo-hippie views may be objectionable to the government, they don't signify a risk of flight or have any bearing on the proposed conditions of release.

A more comprehensive look at Mr. Weeks' life shows the government has misperceived the risk.  Although the government has the advantage of access to all the documents gathered in its investigation, the defense has the advantage of access to Mr. Weeks.  And detention is more about the person, and less about the charge.  Here, the person has been overlooked, or at least misunderstood.  Even if consensus cannot be reached on whether Mr. Weeks poses a serious risk of flight, conditions of release can be fashioned to give this Court the reasonable assurance it needs to release Mr. Weeks.  Rest assured, Mr. Weeks will be back for trial.

## DISCUSSION

**I.     The Conditions of Release will Reasonably Assure Mr. Weeks' Appearance.**

**A.     The Bail Reform Act has a presumption in favor of pretrial release.**

Unless charged with a crime carrying a rebuttable presumption of detention, *see* 18 U.S.C. § 3142(e), which Mr. Weeks is not, the law presumes a defendant will be released on conditions. *See United States v. Giampa*, 904 F. Supp. 235, 357 (D.N.J. 1995) ("a defendant who has not yet been convicted" receives "a presumption for bail except in certain circumstances").  Mr. Weeks is entitled to the *presumption of release*.  The government has the dual burden of proving that he is a serious risk of flight and that no conditions will assure his appearance at future hearings. *See United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) ("Because the law thus generally favors

4

bail release, the government carries a dual burden in seeking pre-trial detention."); *United States v. Himler*, 797 F.2d 156, 158, 160–61 (3d Cir. 1986) (recognizing government must prove both that a defendant is a risk of flight and that no conditions will reasonably assure his appearance at trial). The government has not carried its burden.

### B.      GPS monitoring is reliable.

The government's challenge to the reliability of GPS monitoring is unwarranted. (D.E. 24, at 34–35).[5] This technology has advanced significantly in the last decade. (D.E. 12, at 17). Courts, prosecutors, and Pretrial Services Officers nationwide rely on GPS monitoring in setting conditions of release. *See e.g.*, *United States v. Dehmer,* Case No. 2:10-cr-00851-CCC (D.N.J. Jan 20, 2011) (D.E. 38) (Order Setting Conditions of Release with GPS monitoring); *United States v. Noel*, Case No. 2:06-mj-04050-CCC (D.N.J. Nov. 3, 2006) (D.E. 10) (same); *United States v. Depiro*, Case No. 2:10-cr-00851-CCC (D.N.J. Mar. 8, 2001) (D.E. 91) (same).

GPS monitoring must be reliable, not foolproof. *See* 18 U.S.C. § 3142(f) (requiring release conditions that "reasonably assure" appearance). And it is reliable. According to a 2018 report on New Jersey Criminal Justice Reform, defendants released with pretrial monitoring were "not ignoring reporting or court dates" and monitored defendants "appear, on average, at nearly 90 percent of their court hearings."[6] Pretrial Services has the experience and capability to effectively monitor Mr. Weeks using GPS technology (*e.g.,* using an ankle bracelet). Overall, GPS monitoring is a reliable and trusted technology giving this Court reasonable assurances Mr. Weeks will appear at trial. *See* Samuel R. Wiseman, *Pretrial Detention and the Right to Be Monitored*,

---

[5]      Reference to page numbers in the government's Response is based on the CM/ECF time-stamped page number at the top of each page.

[6]      Glenn A. Grant, J.A.D., *Jan. 1. – Dec. 31 2018 Report to the Governor and the Legislature*, Criminal Justice Reform (Apr. 2019), available at https://njcourts.gov/courts/assets/criminal/2018cjrannual.pdf.

123 Yale L.J. 1344, 1369 (2014) ("Federal courts have generally been positive in their assessment of the Federal Pretrial Services location-based implementation of monitoring").

### C. Mr. Weeks will be subject to tripartite monitoring by Peter Gallic, Pretrial Services, and a third-party monitoring service.

Mr. Weeks has received approval from Shadowtrack,[7] which offers a host of monitoring services, including electronic monitoring and random or scheduled home detention verification. *See Exhibit A.* Shadowtrack will ensure that Mr. Weeks remains at Peter Gallic's residence in Far Hills, New Jersey, monitoring his location using cell tower triangulation of his cell phone. If Mr. Weeks' cell phone leaves the zone of detention, the Pretrial Services Officer and any other designated recipient, such as the case agent, will be alerted. Throughout the day, Shadowtrack will contact Mr. Weeks on his cell phone and, through voice verification and facial recognition, ensure that he is with his cell phone in the location of detention. He will pay approximately $175 for enrollment in this program and $70 per week for the monitoring service. Courts have endorsed the use of third-party monitoring services to assist with supervision on pretrial release. *See, e.g.*, *United States v. Lopez*, 827 F. Supp. 1107, 1113 (D.N.J. 1993) (ordering monitoring by third-party service to place a minimum of six random calls daily to verify defendant's presence at the location of home detention). By including a third-party monitoring service, Mr. Weeks will be separately monitored by three different entities: (1) Pretrial Services; (2) Peter Gallic, as third-party custodian; and (3) Shadowtrack. Even without any of the other proposed conditions of release, that would be more than sufficient to assure Mr. Weeks' appearance in Court.

### D. Sale of the Airplane and Surrender of Jet Smarter Membership.

Mr. Weeks is in the process of divesting himself of any means to travel abroad. His passports have been seized. He is also in the process of divesting himself of a small, turbo-prop

---

[7]    *See* https://www.shadowtrack.com/

airplane that he has had access to – a 1978 Rockwell Turbo Commander 690B currently in Peoria, Illinois. At present, the prop plane is not airworthy because it did not complete its annual inspection by December 31, 2019 as required by FAA regulations (14 C.F.R. § 91.409). Further, the prop plane cannot be flown because it is in a state of disrepair with multiple components removed for purposes of inspection. Finally, Mr. Weeks will also sell or surrender a Jet Smarter membership, which provides access to aircraft at certain airports based on schedules and space availability. In any event, without a passport, he could not use this service to leave the country.[8]

## II.     Mr. Weeks' History and Characteristics Support Release.

### A.     Mr. Weeks has strong ties to the United States and his family.

As noted above, the government misunderstands Mr. Weeks' ties to the United States. His ties to his country and his family are strong.[9] He was born and raised in Colorado, and he continues to return there on average of 3 to 6 times a year to visit family and friends. Colorado is where his parents reside, the location of his first job, and his first civic activities—including serving as vice-chairman of the Summit County Republicans in 2012.

Mr. Weeks has a traditional, tightknit immediate family. He and his wife, Stephanie, have been together for more than 12 years and married for the past 10. They have a young daughter, Liberty.[10] The family travels, but almost always *together*. In fact, before he was detained, Joby and Stephanie spent nearly every day of the last 12 years together, and the longest Mr. Weeks was separated from his daughter was two weeks. Mr. Weeks is also close to his parents, who have lived in Arvada, Colorado for decades. Nat and Silence Weeks have pledged their home and log

---

[8]     JetSmarter, now rebranded as FlyXO, complies with TSA requirements and requires valid passports on international charters. *See* https://docs.flyxo.com/legal/general/charter-terms.html, at Section 12.

[9]     *See Exhibit D*, Letters of Support for Jobadiah Weeks.

[10]    *See Exhibit E*, Photograph of Stephanie and Liberty Weeks.

cabin to secure their son's bond.  Further, Mr. Weeks is a beloved "Uncle Joby" to his two nieces and nephew, his brother's children, in Tennessee.

Mr. Weeks also has ties to the District of New Jersey. (D.E. 12, at 7).  The defense proposes Mr. Weeks' release to the custody of his close friend, Peter Gallic, who has agreed to serve as a third-party custodian and make his house available for Mr. Weeks' home detention in Far Hills, New Jersey. *See, e.g., United States v. Bodmer,* Case No. 03-CR-947 (SAS), 2004 WL 169790, at *1 (S.D.N.Y. Jan. 28, 2004) (granting bail to Swiss national charged with bribery and money laundering and permitted to reside with friends in the District of Columbia pending trial).

### B.    Prior lawful travel to foreign countries does not demand detention.

Mr. Weeks' passion for travel began some 20 years ago when his father grounded him in high school until he could identify every country on Earth, including their location, capital, and flag.[11]  While Mr. Weeks' passions have included travel and the promotion of his libertarian views, *i.e.,* peaceful coexistence, freedom for all, innovation, and entrepreneurship, his first and foremost passion has been, and always will be, his family.   He understands that his love of travel is subordinate to his obligation to comply with the proposed travel restrictions.  His wife understands, too.   Before the hearing on Mr. Weeks' motion (D.E. 12), Ms. Weeks will surrender to the undersigned her U.S. passport and her daughter's passport.

The government cites *Kachkar* to show that Mr. Weeks' "extensive history of foreign travel and substantial ties to individuals abroad counsel against releas[e]." (D.E. 24, at 28).  However, Kachkar was born in Syria and was a Canadian citizen—not a U.S. citizen like Mr. Weeks. *United States v. Kachkar*, 701 F. App'x 744, 745 (11th Cir. 2017).  And Mr. Weeks' most notable foreign ties—two Mexico and St. Kitts & Nevis, where he owns property and a fractional interest in

---

[11]   ***See Exhibit F***, Weeks Abroad publication reflecting foreign travel; ***Exhibit G***, Photographs of charity events supported by Jobadiah Weeks in Haiti, Moldova, Cambodia, Mexico, and the Bahamas.

property, respectively—are to countries that *have* extradition treaties with the U.S.  In fact, he left Mexico to return to the U.S. to meet with IRS agents before his arrest.  There's no pattern of travel showing that the Weeks family is avoiding countries with extradition treaties, and Mr. Weeks has already signed an extradition waiver from Mexico and St. Kitts & Nevis, and will sign a waiver for any other country the Court identifies. ***See Exhibits B*** and ***C***.

### C.    Mr. Weeks' ID documents and a single Facebook chat boasting of the ability to obtain a foreign passport does not support his detention.

At the time of his arrest, Mr. Weeks had a Mexican voter card and two passports—one American and another from the World Sports Alliance.  But these documents do not bear on the questions before this Court.  First and foremost, all these identification documents were in Mr. Weeks' name.  He didn't use a false identity, or an altered photo; he wasn't trying to be somebody else.  Second, a Mexican voter card is not a travel document.

The government also overstates the import of Mr. Weeks' glib Facebook remark about being able to obtain a Mexican passport for a third party. (D.E. 24, at 34).  First, Mr. Weeks never obtained a Mexican passport for himself or someone else.  Second, even if he had access to someone who claimed the ability to produce a fake Mexican passport, mere access does not render someone a flight risk.  *See Himler*, 797 F.2d at 162 (no evidence to deny bail although defendant "clearly capable of obtaining false identification," because "no direct evidence to suggest that he would flee from prosecution in the future.").

### D.    Mr. Weeks' access to wealth is misunderstood and overstated.

The government argues that Mr. Weeks has access to considerable wealth based on an Exhibit attached to its Response generated by a blockchain explorer[12] purporting to show that $560

---

[12]    Blockchain explorers are web pages that extract and display information from the blockchain in a human readable form. *See generally* https://en.bitcoin.it/wiki/BlockExplorer.

million worth of bitcoin flowed into and out of a bitcoin public key address used by Mr. Weeks. (D.E. 24-3, Ex. C).[13]  The "total received" displayed on the Exhibit does not accurately represent the value of the transactions when they were made, or the cumulative value of Mr. Weeks' financial activity, and does not reflect the value of Mr. Weeks' current assets.[14]

Much of the value that passed through the wallet address at issue includes payments made by others to purchase mining equipment through Mr. Weeks in his capacity as a cryptocurrency mining equipment broker.  Mr. Weeks was paid to broker the sale of computer equipment; in the ordinary course of that business, Mr. Weeks would accept large transfers of cryptocurrency as payment from equipment buyers, and then remit that cryptocurrency, less his brokering fee, to the equipment seller.  Thus, the document shows transactions of bitcoin, but it does not reflect Mr. Weeks' net worth, or his access to funds in February 2020, or show any unlawful behavior.

While the transactions through the wallet at issue occurred over several years, the government's Exhibit indicates the "total received" or the total value of all assets transferred into and out of the wallet, using the U.S. Dollar price of a bitcoin on a single date.  That does not accurately reflect the price of those transactions when they occurred.[15]  An example is instructive.  Today, the price of a bitcoin is approximately $9,400.  If we assume that 60,000 bitcoins passed through Mr. Weeks' wallet, at today's value, it would appear that $564,000,000 is the "total received" through the wallet.  However, four years ago, in February 2016, bitcoin was worth approximately $575.  Using this earlier price, it would appear that about $34,500,000 was

---

[13]   The Exhibit indicates that 426 transactions occurred into or out of that wallet, but only includes partial information about 50 of those transactions.

[14]   The wallet at issue currently controls about 23.63 bitcoin valued at about $221,385 USD.

[15]   Blockchain explorers query the blockchain for information and use the market price of bitcoin at the time of query to calculate the "total received" amount. The amount changes with each query. The "value when transacted" information found in an explorer's records of specific transactions shows the value of the bitcoins at the time of the transaction, and does not fluctuate based on later changes in bitcoin's price.

the "total received" through the wallet.  Both figures are inaccurate because they fail to account for the fluctuations in the price of bitcoin over time, which ranged from less than $500 to over $19,000 in the last four years.  Thus, if next week, the price of bitcoin shoots back up to $19,000, the blockchain explorer record of "total received" would reflect $1.14 billion.  The "total received" indicated on the government's exhibit is a moving target. Nothing suggests that the "total received" on the government's Exhibit ever belonged to Mr. Weeks, or is presently available to him.

### E.     Views and "rhetoric" are irrelevant to risk of flight.

The government argues that Mr. Weeks is a flight risk because he "has a demonstrated history of refusing to follow rules that do not suit his needs and has a demonstrated *streak of anti-government rhetoric*." (D.E. 24, at 23) (emphasis added).  However, the government's basis for this argument is not significant conduct, but mere words.  None of this speech and participation in activity protected by the First Amendment demonstrates that Mr. Weeks will abandon his family and friends and cause them to lose property pledged to secure his bond.

### 1.     Mr. Weeks should not be punished for his free expression.

Mr. Weeks is an outspoken American libertarian.  Citing his "views," "rhetoric," or "anti-Government streak" as reason to detain him veers uncomfortably close to punishing him for his thoughts and speech.  "The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964).  Content-based restrictions on speech are presumed invalid. *United States v. Alvarez*, 567 U.S. 709, 717 (2012).  Mr. Weeks should not be punished or detained for his "views" and "rhetoric," which are irrelevant to the Court's determination.

### 2.     Mr. Weeks' association with Liberland and Atlantis is harmless.

The government seems preoccupied with Mr. Weeks' association with "Liberland" and "Atlantis."  But Mr. Weeks' interest in these micronations is irrelevant.  Liberland is an island on

the Danube River between Croatia and Serbia.  Although it is not a sovereign nation, free-spirited people around the globe have flirted with the idea of it becoming so.  Mr. Weeks has associated with some of these people, which include former Presidential contender and Congressman Ron Paul.  Similarly, "Atlantis" is a tiny island off the coast of Portugal.  The micronation exemplifies "micro" with a population of four people on about 2,000 square feet of rock: a couple and their two children.  It was "established" before Mr. Weeks' Facebook chat about the island in 2015. (D.E. 24, at 25).  Mr. Weeks has never disclaimed his U.S. citizenship and his interest in micronations should not factor into this Court's flight analysis.

### F.     Mr. Weeks has no history of disobeying a condition of release.

The government argues that Mr. Weeks has a "demonstrated history of refusing to follow rules" (D.E. 24, at 23), but can show no history of Mr. Weeks disobeying court orders to appear. Indeed, Mr. Weeks has three minor criminal cases—a juvenile arrest from 20 years ago that was expunged, a citation for reckless driving over the speed limit, and a citation for driving under the influence—but his behavior in these cases actually demonstrates his compliance with court directives, not the opposite.  All of these cases were completed without incident.  It would be different if the government had evidence of bail jumping, failures to appear, or violations of conditions of a bail or release order.  But they don't, because those things never happened.

### G.     Mr. Weeks genuinely intended to cooperate with the IRS.

Mr. Weeks did not, and does not, characterize his arrest as akin to "turning himself in." (D.E. 24, at 26).  Rather, he has highlighted his willingness to cooperate with law enforcement after affirmatively approaching the IRS in April 2019 to address his tax liability.  He voluntarily approached the IRS without a lawyer, and without requesting immunity. As the government's Response outlines, Mr. Weeks believed his cryptocurrency expertise and network could assist the

U.S. government's investigation of cyber criminals. (D.E. 24, at 26).  The Response attempts to turn Mr. Weeks' intent to make positive use of his expertise, his network of other cryptocurrency experts, and his attempts to address his tax liabilities into something nefarious by alleging that Mr. Weeks has "admitted familiarity with international criminals." (*Id.* at 27).  Not true.

Mr. Weeks was previously a victim of cryptocurrency hacking[16] and has a vested interest in assisting any investigation and prosecution of such hackers.  In fact, Mr. Weeks hired a team of investigators to find the hacker, which they successfully did.  That information was then turned over to the FBI, which opened an investigation.  Mr. Weeks wants to prevent hackers from targeting and victimizing crypto-innovators like himself.

Mr. Weeks further cooperated with the government after his arrest, voluntarily answering their questions without a lawyer.  He even provided law enforcement with access to his mobile devices which would otherwise have been protected by unbreakable encryption. (D.E. 12, at 10–11, 12).  Mr. Weeks is not overstating these overtures to the IRS.  He is merely pointing out the fact that people who seek to voluntarily cooperate with the government tend not to flee.

### III.  The Government's Focus on the Nature and Circumstances of the Alleged Offenses Fails to Address Any Risk of Flight Posed by Mr. Weeks.

Almost half of the government's Response (12 out of 32 pages) addresses the nature and circumstances of the offense and the weight of the evidence, but those are the two *least* important 3142(g) factors.  *See United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (nature and circumstances of the charges and the weight of the evidence are not the most important of the 3142(g) factors).  They do not prove that Mr. Weeks is a serious risk of flight.

---

[16]  *See* Nathaniel Popper, *Identity Thieves Hijack Cellphone Accounts to Go After Virtual Currency*, The New York Times (Aug. 21, 2017), available at https://www.nytimes.com/2017/08/21/business/dealbook/phone-hack-bitcoin-virtual-currency.html.

## A.    Courts regularly release defendants facing significant sentences.

The government unduly focuses on the potential sentence for Mr. Weeks.  First, even accepting the government's unexplained advisory guidelines calculation of 15 years for Mr. Weeks (D.E. 24, at 7), courts have frequently released defendants charged in serious white collar cases which carry potentially long prison sentences. *See, e.g., United States v. Harry,* Case No. 2:19-CR-246, Dkt. No. 85 at 4-6 (D.N.J. Nov. 15, 2019) (denying motion for pretrial detention despite charge defendant "orchestrat[ed]" a "massive fraud scheme involving, potentially, hundreds of millions of dollars," and despite defendant's significant foreign ties, foreign travel, and business dealings abroad); *United States v. Webb,* Case No. 15-CR-252 (PKC) (E.D.N.Y.) (granting bail to majority of defendants in 18-defendant FIFA corruption case, including foreign nationals with citizenship in more than one country); *United States v. Griffith*, Case No. 1:20-CR-15, Dkt. 12 at 19 (S.D.N.Y. Dec. 30, 2019) (reversing order of detention for defendant despite dual citizenship, efforts to obtain St. Kitts citizenship, and assistance to North Korea in digital currency scheme); *United States v. Dreier,* 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009) (granting bail to defendant accused of running a $400 million Ponzi scheme); *United States v. Madoff,* Case No. 1:09-CR-213, Dkt No. 22 (S.D.N.Y. January 16, 2009) (releasing defendant in multi-billion dollar Ponzi scheme facing life in prison); *United States v. Paul Burks*, Case No. 3:14-cr-208-MOC-DSC (W.D.N.C. 2016) (Dkt. 6, 7) (Ordering release despite charges of $900 million internet Ponzi scheme); *United States v. Cosmo*, Case No. 2:09-cr-00255-DRH-ETB (E.D.N.Y. 2009) (D.E. 61) (releasing defendant charged with $370 million Ponzi scheme).

Second, at this time, calculating an advisory guidelines offense level is the legal equivalent of throwing darts at a dartboard.  Especially with respect to U.S.S.G. § 2B1.1, there are so many factors that play into the advisory guidelines score, that calculations are closer to guesstimates.

14

The government does not even know the total number of "victims" in this case. *See Government's Mtn. for Alt. Victim Notification Under 18 U.S.C. § 3771(d)(2)* (D.E. 34).

Notwithstanding the early stage of the case, several facts suggest the government's loss calculation is inflated with respect to Mr. Weeks. The government alleges that BitClub was involved in a wire fraud conspiracy starting in April 2014. Mr. Weeks joined the company 16 months later in August *2015*. And the government appears to take the position that Mr. Weeks did not know about any fraud until early *2016*. (D.E. 24, at 13-14). Notably, a defendant is not responsible for any loss before joining a conspiracy. *See United States v. Collado*, 975 F.2d 985, 997 (3d Cir. 1992). Any losses that occur after a defendant joins a conspiracy must be reasonably foreseeable to that defendant. *See United States v. Robinson*, 603 F.3d 230, 233 (3d Cir. 2010). That is not a very high obstacle for the government to hurdle when a defendant is the leader of an enterprise. It's different when a defendant has a smaller, more subservient role in a business.

In this case, Mr. Weeks sold mining equipment to and was a promoter of BitClub. Even on the scale of promoters, Mr. Weeks was not in the top tier.[17] Mr. Weeks was *one* of approximately 104 monster builders who promoted BitClub. Although the number of BitClub members is unknown at this time,[18] given his place in the promotion hierarchy and the number of promoters at his level, it is likely Mr. Weeks sponsored only 1% or less of BitClub's members.

BitClub's compensation plan, and how incoming money was allocated, is relevant for purposes of any loss calculation. The plan provided for: (1) a $99 membership fee; and (2) payment for shares in mining pools to be distributed with a 20/40/40 split. That is, 20% to operate

---

[17]   Bitclub classified its participants by their roles and the size of their "downline" in ascending order: miner, builder, pro builder, master builder, monster builder, and mega monster builder.

[18]   Because the BitClub Network website is inaccessible and discovery has not begun, Mr. Weeks does not have information about the total number of people who joined the network.

BitClub, 40% to pay commissions to members, and 40% to purchase mining equipment. Thus, if BitClub brought in $722 million, a portion of that amount—about $99 for each new membership—went directly to the owners of BitClub, not Mr. Weeks. For ease of calculation, if $700 million remained, then 20% ($140 million) went to operate BitClub, not to Mr. Weeks. Then 40% ($280 million) went to pay commissions to members. For Mr. Weeks, that commission amounted to approximately $1 million – 1.5 million. And, lastly, 40% ($280 million) went to pay for mining equipment.

Although Mr. Weeks brokered the sale of some, not all, of BitClub's mining equipment, he only collected a fee for those sales. The lion's share of money for the sale of that equipment went to the mining equipment manufacturers, not Mr. Weeks. The government seems to allege that, at least initially, BitClub was not buying and operating mining equipment, as advertised. Mr. Weeks' sale of mining equipment to BitClub to mine bitcoin—consistent with its representations to prospective and current members—was therefore an activity legitimizing the operations of BitClub. In fact, using that mining equipment, BitClub purportedly mined approximately 88,904 bitcoin and 508,695 Ethereum, and then distributed those cryptocurrencies to its members. Accordingly, Mr. Weeks' fee for the sale of this mining equipment, which generated money for members, should not be factored into the loss amount. And even if those mining equipment expenses were included in the loss amount, the guidelines commentary directs that the loss amount be reduced by the amount of funds paid out to investors. *See* U.S.S.G. § 2B1.1, cmt. n.3(E)(i) and (3)(F)(iv); *see, e.g.*, *United States v. Leonard*, 529 F.3d 83, 92–93 (2d Cir. 2008) (identifying the need to subtract the value of securities the investors received from the loss amount). Here, the payment of approximately 88,904 bitcoin and 508,695 Ethereum to BitClub members would be grounds for a large reduction in the loss amount.

With a potential loss between $1.5 and $3.5 million, the advisory guidelines range for Mr. Weeks, with acceptance of responsibility, would be 51 – 63 months.  This is hardly the type of potential sentence that militates in favor of pretrial detention.

**B.      The fugitive status of a co-defendant is irrelevant to the bond decision.**

The government's focus on the fugitive co-defendant is misplaced. (D.E. 24, at 9).  The redacted co-defendant's status has nothing to do with Mr. Weeks.  The court must take an individualized assessment of the risks presented by each defendant.  *United States v. Oliver*, Criminal No. 16-40, 2016 WL 1746853, at *10 (W.D. Pa. May 3, 2016) (whether coconspirators are in pretrial custody "is not a specific factor under section 3142(g)").  That one member of the alleged conspiracy is at large should not be held against Mr. Weeks.

**IV.   The Weight of the Evidence Favors Mr. Weeks' Release on Conditions.**

The government spends a great deal of time arguing about the evidence, but fails to show how that evidence demonstrates a serious risk of flight. *See United States v. Paulino*, 335 F.Supp.3d 600, 613 (S.D.N.Y. 2018) (recognizing that "many courts have suggested that the weight of the evidence is the ***least*** important of the various factors") (emphasis added).

For example, while the government views Mr. Weeks' involvement in brokering the sale of mining equipment to BitClub as raising his culpability over other promoters of BitClub (D.E. 24 at 7, 11-12), it actually leads to the opposite conclusion—Mr. Weeks had more reason to believe that BitClub was doing what it said it was doing.  BitClub represented to potential members, and existing members, that it was buying and operating data mining equipment.  By selling this mining equipment to BitClub, Mr. Weeks believed that to be the case.  Furthermore, Mr. Weeks either visited or was involved in the set-up of three data mining centers for BitClub:  (1) Iceland; (2)

Georgia (European nation); and (3) Butte, Montana.  These experiences proved to Mr. Weeks that BitClub was actually mining bitcoin and was accurately representing these activities to members.

The Government tries to make much of Mr. Weeks' use of Virtual Private Networks (VPNs) to access his BitClub account and others to do the same. (D.E. 24, at 8).  But at worst, Mr. Weeks' use of VPNs was to thwart BitClub's *self-imposed* decision to block IP addresses.  VPNs are not illegal.  In this case, BitClub's self-imposed IP restriction indiscriminately blocked existing members, like Mr. Weeks, from their own accounts.  Without access to their account, members could not withdraw their bitcoin.  The use of VPNs was a common solution to this dilemma.

The government's arguments regarding Mr. Weeks' circulation of a 2015 article regarding problems at GAW Miners LLC are also unfounded, as his obvious reasons for doing so were to encourage BitClub to take a different and better path. (D.E. 24, at 12-13).  As the Facebook conversation shows, Mr. Weeks was seeking to attract sophisticated investors to BitClub by increasing transparency. (*Id.* at 12 ("Its not transparent enough for the big big money guys. Thats why they are giving [Third-Party] $100M and not us right now...").  He also wanted to goad BitClub into action and show investors how BitClub was different from GAW.  Accordingly, he circulated an article about GAW Miners, a company sued by the SEC because, contrary to GAW's representations, the SEC believed GAW never owned enough computing power to engage in large-scale mining of digital currency.[19]  Sending around that article on GAW and advocating transparency shows a desire to comply with the law, not circumvent it.

## V.    The Speedy Trial Act and Due Process Concerns Favor Release on Conditions.

The law requires that Mr. Weeks be tried "not later than ninety-days" following his detention, *see* 18 U.S.C. § 3164, but the enormous volume of discovery in this case virtually

---

[19]  *Connecticut-Based Bitcoin Mining Fraudster Sentenced to Prison*, SEC Litigation Release No. 24281 (September 20, 2018), https://www.sec.gov/litigation/litreleases/2018/lr24281.htm.

ensures that the pre-trial period of detention will be much longer. *See* 18 U.S.C. § 3161 (tolling provisions for both § 3161 and § 3164).  According to the government, anticipated discovery currently totals almost 1.8 million documents, *not including* the computers, iPhones, hard drives, thumb drives, and documents seized from Mr. Weeks and his co-defendants at the time of their arrests. Furthermore, the government will supply the defendants with a copy of the BitClub Network website. That website is so large it will require each defendant to provide the government with a hard drive sufficient to hold at least four *terabytes* of data.  To review this data will take a substantial amount of time, pretrial preparation, and, most importantly, access to Mr. Weeks.

Setting aside § 3164, the anticipated, prolonged detention of Mr. Weeks, and the resulting deprivation of meaningful consultation with counsel, also raise serious due process concerns. *See Wolfish v. Levi,* 573 F.2d 118, 133 (2d Cir. 1978) (noting that "one of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds, Bell v. Wolfish,* 441 U.S. 520 (1979); *United States v. Perry,* 788 F.2d 100, 112–13 (3d Cir. 1986) (constitutional ban on excessive pre-trial detention can be understood as a right guaranteed by substantive due process).

Contrary to the government's view, having an office in New Jersey (D.E. 24, at 11) addresses neither the § 3164 issues nor the due process concerns in this case.  Any time a white collar case is charged with millions of pages of documents, the defendant becomes a critical part of the defense team.  Especially here, where the charges relate to esoteric matters involving cryptocurrency mining, hash rates, blockchains, complex algorithms, and mining pools, client assistance is an absolute necessity.  It is simply not possible for Mr. Weeks to substantively participate and counsel to meaningfully confer with and prepare Mr. Weeks for trial from the confines of the Essex County Detention Center.  The need for resources only becomes evident

once deprived of them.  For example, regular, unfettered access to a telephone and a printer, although typically not considered a luxury, is nonexistent at the jail.  In some cases, that would not be an impediment to adequate preparation.  But in a serious white collar case with millions of records, it creates devastating inefficiencies and unnecessary challenges for a defendant.

Courts have no illusions about the hardships inflicted on pretrial detainees, and have released defendants in complex, document-intensive cases even when defendants are indisputably a risk of flight. *See, e.g.*, *United States v. Renzulli,* Cr. No. 87–258–7, 1987 WL 17562, at *4-5 (E.D. Pa. Sept. 28, 1987). This predicament is only magnified when that pretrial detention is expected to last more than a year. And that is where this case is headed. Because a combination of conditions exist that allow for Mr. Weeks' release while at the same time reasonably assuring the Court that Mr. Weeks will not flee, then, on balance, his release should be secured.

## CONCLUSION

For the foregoing reasons, this Court should revoke the pretrial detention order pursuant to 18 U.S.C. § 3145(b) and release Mr. Weeks based on the conditions outlined above.

Dated:  February 3, 2020                              CARLTON FIELDS

> /s/ Simon Gaugush
> Simon Gaugush, Esq.
> Fla. Bar No. 0440050
> Michael L. Yaeger, Esq.
> Andrew M. Hinkes, Esq.
> Adam P. Schwartz, Esq.
> 4221 W. Boy Scout Blvd., Ste. 1000
> Tampa, FL  33607
> Telephone: 813.223.7000 (Fla.)
> Facsimile:  813.229.4133 (Fla.)
> and
> 180 Park Avenue, Ste. 106
> Florham Park, NJ  07932-1054
> Telephone: 973.828.2600
> Facsimile:  973.828.2601
> *Counsels for Defendant Jobadiah Weeks*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 3, 2020, I filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will serve an electronic copy to all counsel of record.

*/s/ Simon Gaugush*
Simon Gaugush, Esq.