# EXHIBIT H

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| v. | **Criminal Action No. 19-CR-246 (JAD)** |
| **CREAGHAN HARRY,** | **OPINION** |
| Defendant. | |

**JOSEPH A. DICKSON, U.S.M.J.**

This matter comes before the Court upon Defendant Creaghan Harry's application for release pending trial, pursuant to 18 U.S.C. § 3142. The undersigned held hearings on this issue on May 30, 2019, July 11, 2019, August 5, 2019, and September 5, 2019. After carefully considering Defendant's application, the United States of America's objections, and for good cause shown; and

**I.   PROCEDURAL HISTORY**

On or about April 5, 2019, a Grand Jury returned a six-count Indictment charging Defendant Harry with: (1) one count of Conspiracy to Defraud the United States and Pay and Receive Kickbacks, in violation of 18 U.S.C. § 371; (2) four counts of Soliciting and Receiving of Health Care Kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1)(B) and 18 U.S.C. § 2; and (3) one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). Authorities arrested Defendant, who had an initial appearance before the Hon. Michael A. Hammer, U.S.M.J. on May 23, 2019. (Minutes of May 23, 2019 Hr'g, ECF No. 13). Magistrate Judge Hammer set the matter for a bail hearing before the undersigned. (Id.).

This Court held an initial bail hearing on May 30, 2019. (See generally, Tr. of May 30, 2019 Hr'g, ECF No. 22). The Government moved for detention and Defendant cross-moved for release pending trial. Following that hearing, the undersigned reserved on Defendant's bail application, granted the Government's motion for detention, and Ordered that Defendant be detained without prejudice to Defendant's pending bail application. (May 30, 2019 Order of Detention Pending Trial, ECF No. 21). This Court held another hearing on Plaintiff's bail application on July 11, 2019. At the conclusion of that proceeding, the Court reserved its decision and Ordered the parties to submit additional briefing on various, discrete issues. (Minutes of July 11, 2019 Hr'g, ECF No. 30). The Court also once again Ordered that Defendant remain in detention. (Id.).

The parties submitted supplemental letter briefing on or about July 23, 2019 (Defendant), July 30, 2019 (the Government), August 1, 2019 (the Government), and August 4, 2019 (Defendant). The Court held a third hearing on Defendant's bail application on August 5, 2019. The Court once again reserved on Defendant's application so as to have the opportunity to fully consider and evaluate the parties' positions, and to allow time for the completion of inquiries regarding Defendant's potential third-party custodians. The Court conducted a fourth and final hearing on Defendant's application on September 5, 2019, at which time it directed the parties to submit additional briefing on several discrete issues. Defendant and the Government submitted that briefing by letters dated September 19, 2019 and September 30, 2019, respectively. Defendant filed a supplemental response on October 24, 2019.

## II.   **LEGAL STANDARD**

The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required . . ." U.S. Const. Amend. VIII. Although the Eighth Amendment does not

"grant an absolute right to bail, there is a substantive liberty interest in freedom from confinement." United States v. Perry, 788 F. 2d 100, 112 (3d Cir. 1986). Consistent with these principles, the Bail Reform Act of 1984 (the "Act") favors pretrial release and imposes a duty on federal courts to make determinations regarding the bail status of federal criminal defendants. 18 U.S.C. §3142(a). Moreover, in the context of such bail determinations, the Act's provisions "effectively limit judicial consideration . . . to two relevant criteria: the risk that the defendant will flee and the risk that he will pose a danger if admitted to bail." United States v. Provenzano, 605 F.2d 85, 93 (3d Cir. N.J. Aug. 21, 1979). The court must not only determine whether an applicant poses such a risk, but also measure them "in terms of conduct that cannot be reasonably safeguarded against by an imposition of conditions upon the release." Id. at 93-94. "Whenever a court can fashion the conditions of an applicant's release in such a manner that the danger may be averted, it must do so and grant the motion for release." Id. at 94 (emphasis added). It is therefore clear that the Court must only deny bail "as a matter of last resort." Id.

When evaluating the sufficiency of potential conditions of release, "the Court will consider the so-called '3142(g) factors': 1) the nature and circumstances of the offense charged, including whether the offense involves a controlled substance or firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." United States v. McIntyre, No. 16-13 (KM), 2018 U.S. Dist. LEXIS 5269, at *8 (D.N.J. Jan. 10, 2018) (citing 18 U.S.C. § 3142(g); United States v. Traitz, 807 F.2d 322, 324 (3d Cir. 1986); United States v. Coleman, 777 F.2d 888, 892 (3d Cir. 1985)). "Pursuant to 18 U.S.C. §3142(e), however, if after a detention hearing a court determines that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the

safety of any other person and the community,' the court must Order the detention of the person before trial." United States v. Vargas, No. 13-2044 (JS), 2013 U.S. Dist. LEXIS 88944, at *12 (D.N.J. June 25, 2013). The Court notes that, "[i]f the government or court believes detention is appropriate because there is a risk of flight, this must be proved by a preponderance of the evidence." Id. (citing United States v. Himler, 797 F.2d 156, 161 (3d Cir. 1986)). "The preponderance of the evidence standard requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." Id. (citing U.S. v. Abdullahu, 488 F. Supp. 2d 433, 438 (D.N.J. 2007)).

### III.  THE PARTIES' ARGUMENTS

The Government argues, in essence, that Defendant is a flight risk and that no set of conditions on his release would be sufficient to reasonably assure his appearance at trial, given his substantial, potential criminal liability, foreign ties (dual Canadian/U.S. citizenship, extensive foreign travel and business dealings resulting in Defendant having developed a level of comfort living abroad), and financial means (potentially millions of dollars that remain unaccounted for, and a suspicion that Defendant has hidden funds in offshore accounts). (Tr. of May 30, 2019 Hr'g at 4:8-18:20). Moreover, the Government argues that Defendant's release would create an ongoing danger of economic harm, as he may continue to engage in the conduct with which he has been charged. (Id. at 12:14-20; 18:10-24). With regard to the "3142(g) factors", the Government contends that each favors detention. (Id. at 11:12-15:22).

Defendant argues that he has neither the means nor the inclination to flee, as the Government has frozen all of his accounts, and his four children, with whom he maintains active, close relationships, live in Florida. (Id. at 22:23-23:1; 23:9-20; 27:22-28:23). Defendant also points to his ties to his community and charitable endeavors, (id. at 24:4-10), and argues that his

4

release is essential to allow him to assist in the defense of his case, which will be complex and involve "six terabytes of discovery." (Id. at 22:18-22). Defendant requests pretrial release subject to a $2.5 million bond co-signed by multiple suretors and secured by three pieces of real estate owned by third-parties (in which the owners have a combined equity of nearly $1.4 million). Defendant also initially offered to "subject himself to the most restrictive of conditions" of release, such as home incarceration, the appointment of a third-party custodian, and anything else that the Court deems necessary. (Id. at 29:2-16). When, during the September 5, 2019 hearing, the Court indicated that it was considering releasing Defendant subject to several specific conditions, however, Defendant sought (and was granted) leave to object to each those conditions.

The Government objects to several of Defendant's proposed suretors, on the grounds that certain of them may be witnesses to the crimes charged, have criminal records, or, with respect to the mothers of Defendant's children, may have received money from "tainted" accounts. The Government also objects to one of Defendant's proposed third-party custodians, Richard Schaffer, on the grounds that Mr. Schaffer has a prior criminal history. (Tr. of July 11, 2019 Hr'g at 28:17-20).

## IV. THE COURT'S FINDINGS

The Court finds, based on a preponderance of the evidence presented to date, that there would be a high risk of flight associated with Defendant's pretrial release. The Court likewise understands that there could also be a risk that Defendant might engage in fraudulent activity, similar to that charged in the Indictment, if released. The Court must, therefore, consider the factors enumerated in 18 U.S.C. § 3142(g) to determine "whether there are conditions of release that will reasonably assure" Defendant's appearance at trial and the safety of the community. 18 U.S.C. § 3142(g).

Considering factors 1 (the nature and circumstances of the offense charged) and 2 (the weight of the evidence against the person), the Court notes that Defendant is charged with orchestrating and participating in a massive fraudulent scheme involving, potentially, hundreds of millions of dollars. Given the severity of the charges and their associated penalties, and considering Defendant's current age (51), Defendant may, if convicted, face a de facto life sentence. Moreover, based on the Government's proffer, the Court finds that the weight of the evidence against Defendant is considerable. These factors suggest a high risk of flight, and weigh against release.

The Court must next examine Defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, [and] past conduct," among other things. 18 U.S.C. § 3142(g)(3)(A). The record reflects that Defendant has lived in Florida since at least 1996, has resided at the same address since 2001, and has been an active member of his community. The record further reflects that Defendant has strong familial ties in Florida, including four children who reside with him part-time. The record does not indicate that Defendant has any prior criminal history.

With regard to Defendant's financial resources, it appears that the Government has taken steps to freeze his domestic bank accounts. While the Government has repeatedly suggested that Defendant may have access to significant funds in offshore accounts or elsewhere, that appears to be mere speculation. Defendant has explicitly denied that this was the case. (Tr. of May 30, 2019 Hr'g at 22:23-23:1). While the Government contends that it recently discovered that Defendant willfully failed to disclose over a million dollars in available assets (i.e., suggesting that Defendant intended to hide those assets in order to fund an absconsion), (Gov't Sept. 30, 2019 Letter at 1-2,

ECF No. 61), that argument appears to be factually incorrect. (See Def. Oct. 24, 2019 Letter at 2, ECF No 71).

In examining the "nature and seriousness of the danger to any person or the community that would be posed by [Defendant's] release", 18 U.S.C. § 3142(g)(4), the Court acknowledges that, given the nature of Defendant's alleged criminal activity, he would have the opportunity to engage in similar activity post-release. The Court finds, however, that it would be possible to minimize that risk through the imposition of home incarceration and the removal of Defendant's internet access.

After evaluating these risks, and considering Defendant's proposed bail package, as well as Pretrial Service's investigation and recommendations, the Court finds that it is appropriate to release Defendant from custody pending his trial, subject to several conditions that will reasonably assure both his return for trial and the safety of the community. First, the Court finds that Defendant's release must be secured by a bond in the amount of $2,500,000.00. That bond will be co-signed or otherwise secured by several suretors, including individuals who have agreed to post real estate with a total equity value of approximately $1,393,000.00. The Court acknowledges that Pretrial Services recommended that Defendant's appearance bond be set in the amount of $5,000,000.00. At this point, Defendant has been able to raise nearly $1,400,000.00 in partial security, and others have agreed to co-sign a bond in the amount of $2,500,000.00. Defendant argues that setting his bond at $5,000,000.00 would most likely render him unbailable, because potential suretors would be afraid of the potential risk. The Court observes that this situation raises two significant issues. First, courts should avoid setting a bond so high that a defendant has no meaningful chance of ever making bail. Doing so would, in this Court's opinion, violate the Eighth Amendment to the Constitution. Second, the bond amount will impact potential suretors'

willingness to step forward. In this case, the Court agrees that a $5,000,000.00 bond would be an unreasonably high number. Even if the government is correct that Defendant orchestrated a scheme that has resulted in in hundreds of millions of dollars in ill-gotten gains, that does not mean that the people around Defendant who may serve as suretors must risk a relatively similar exposure.

On the subject of suretors, the Court declines to adopt the Government's proposed bright-line rule that would disqualify people from serving as suretors if there is a chance they may also be witnesses to the alleged criminal conduct at issue. The case the Government has cited for that proposition, United States v Martin, No. 13-CR-466-JSW-2 (KAW), 2015 WL 3464937, at *3 (N.D. Cal. May 29, 2015), mentions the witness issue in passing (along with the same proposed suretor's multiple prior felony convictions), without any analysis or other discussion. This Court believes that the more appropriate inquiry is whether a defendant's absconsion might significantly jeopardize the suretor in some fashion, which serves to encourage the defendant to refrain from placing his/her family, friends, and colleagues in such jeopardy. Put simply, in the limited amount of time a court has to learn about and consider a defendant's characteristics, it must determine whether that defendant would be more or less likely to visit significant harm upon his family and friends by absconding. The Court therefore finds that the best approach would be to consider each potential suretor on a case-by-case basis. Here, three suretors have offered to pledge their homes as partial security for an appearance bond. Two of those suretors, Lena Jarborg and Shawn Maley, are the mothers of Defendant's children. If Defendant fails to appear for trial, Jarborg, Maley, and their children (three of whom are minors), may lose their homes. That provides a strong motivation for both Jarborg and Maley to ensure that Defendant does not abscond. Similarly, given Defendant's close relationship with his children, this would also provide an equally strong motivation for Defendant himself. Indeed, when combined with the other restrictions described

8

herein, the fact that Defendant's absconsion could have such a devastating effect on his minor children gives the Court adequate assurance that Defendant will appear for trial, notwithstanding the Government's argument that certain of Jarborg and/or Maley's home equity may have been acquired with tainted assets. The Government has not raised any objections with regard to Keith Loring, the third proposed suretor who has offered to post his property as partial security. (Tr. of July 11, 2019 Hr'g at 17:13-16).

The Court must also address James Batmasian and Monte Harry, who have agreed to co-sign an appearance bond. The Government objects to Batmasian serving as a co-signor, arguing that he may be a potential witness to the criminal activity charged in the Indictment, and that he also has a criminal record. (Government July 30, 2019 Letter at 3-4). With regard to the witness issue, the Government argues that Batmasian's dual role as a witness and suretor would necessarily jeopardize either Batmasian's truthfulness (e.g., Batmasian may be loathe to provide incriminating information, as that may make Defendant more likely to flee, to Batmasian's financial detriment)[1] or Defendant's appearance at trial (e.g., if Batmasian provides incriminating evidence, Harry will lose any previous allegiance to Batmasian and, in turn, be less likely to care that his absconsion would harm Batmasian). (Id.). While the Court appreciates the logic behind the Government's argument, it would apply with equal force to every witness/suretor situation, and create the same sort of bright line rule that this Court rejected above. With regard to Mr. Batmasian's criminal record, the Government argues that, because Batmasian was previously convicted of a felony, his promise to ensure that Defendant attends hearings "means little." (Id. at 4). The Court notes that Mr. Batmasian is not simply offering the Court his promise. As a co-signor, Mr. Batmasian is also

---

[1] There is a countervailing thought: Defendant may be motivated to refrain from fleeing if he believes that Batmasian is a witness who would might volunteer information out of anger if Defendant's absconsion causes him financial hardship.

9

taking on a substantial financial commitment to Defendant's appearance. Moreover, Mr. Batmasian is not the only person motivated to ensure Defendant's appearance at trial. Several suretors and, as described below, two third-party custodians, will also assist in that effort. The Court is satisfied with Mr. Batmasian's status as a co-signor. It does not appear that the Government has any objection to Defendant's cousin, Monte Harry, serving as a co-signor. The Court finds that Monte Harry is an appropriate co-signer.

The Court therefore finds that Defendant's appearance bond shall be co-signed by James Batmasian and Monte Harry, and shall be partially secured by the following pieces of real estate:

1.) Lena Jarborg's property located at 136 Barefoot Cove, Hypoluxo, Florida, 33462 (approximately $145,402 in equity)

2.) Shawn Malley's property located at 19354 Skyridge Circle, Boca Raton, Florida, 33498 (approximately $323,524 in equity)

3.) Keith Loring's property located at 960 S. Shore Drive, Miami Beach, Florida, 33141 (approximately $924,092 in equity).

The Court further finds that, given the circumstances of this case, a third-party custodian is necessary to reasonably assure Defendant's appearance at trial. While Defendant has proposed potential third-party custodians in both the New Jersey/New York area and in Florida (while expressing a strong preference for Florida, given the location of his children), the Court finds that a custodian based in either New Jersey or New York would be most appropriate. The Court understands that Defendant's cousin, Monte Harry, and uncle, Carlyle Harry, who reside at the same location in Brooklyn, New York, have offered to serve as third-party custodians, and that both are acceptable to Pretrial Services. They are likewise acceptable to the Court, which will appoint them both as third-party custodians. The Court also understands that Monte Harry may

potentially move out of the residence at some point within the coming year. That is likewise acceptable to the Court, as long as Carlyle Harry continues to reside with Defendant.

Next, the Court finds that Defendant must be subject to home incarceration (24 hour lock down) with location monitoring, and that his travel must be limited to medical necessities, court appearances, and other activities specifically approved by the Court and Pretrial Services. Defendant's travel is further restricted to New York and New Jersey. Defendant must be accompanied by a third-party custodian or his lawyers anytime he leaves the residence. Defendant must surrender his passport(s) and any other travel documents, as well as those of his children, and neither Defendant nor his children may apply for any new travel documents. Moreover, Defendant may not engage in any employment at this time. Despite Defendant's arguments to the contrary, (see Def. Sept. 19, 2019 Letter at 2-5), the Court finds that these conditions are necessary because, as described above, Defendant's circumstances create a very real, and very substantial, risk of flight. The Court further finds that a combination of restrictive conditions, including home incarceration (with a concomitant ban on leaving the third party custodians' residence for employment purposes), are necessary to ensure Defendant's appearance at trial. The Court also finds, based on the record to date, that these conditions represent the least restrictive means of ensuring Defendant's appearance.

Finally, the Court finds that, given the nature of the offenses charged in the Indictment and the potential for Defendant to endanger the community by engaging in similar behavior if released from custody, Defendant shall not be permitted to access the internet during his release. Any "connected" devices in his residence must be password-protected and subject to monitoring by Pretrial Services. Defendant argues that a computer ban would be unjustified, as "[t]here is not one reference in the 15-page Indictment here to computer or Internet usage" and "no showing

11

otherwise that Mr. Harry's access to a computer or the Internet poses a risk to the safety of the community." (Id. at 3). Regardless of whether the Indictment in this matter contains the words "computer" or "internet", it alleges an extensive, complex, international conspiracy that spanned years, (see generally Indictment, ECF No. 1), and, the Government proffers, involved hundreds of millions of dollars. (See Tr. of May 30, 2019 Hr'g at 4:19-25). For the Court to find that computers or other connected devices played no role in that alleged endeavor would be to ignore the realities of the modern world. In any event, the Government's proffer includes e-mails that Defendant allegedly sent in furtherance of the conspiracy. The Court finds that, in order to reasonably assure the safety of the community from economic danger, it must restrict Defendant's internet access.

### V.  CONCLUSION

Based on the foregoing, Defendant's application for release pending trial is **GRANTED**. An appropriate form of Order Setting Conditions of Release accompanies this Opinion.

**SO ORDERED**

JOSEPH A. DICKSON, U.S.M.J.