

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

_____

*970 Broad Street, 7th floor*                                                 973-645-2700
*Newark, New Jersey 07102*

March 24, 2020

**<u>Filed Via ECF</u>**
The Honorable Claire C. Cecchi
United States District Judge

The Honorable Michael A. Hammer
United States Magistrate Judge

Martin Luther King Jr. Federal Building and U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

> Re:  *United States v. Matthew Brent Goettsche, et al.*,
> <u>Crim. No. 19-877</u>

Your Honors:

Defendants Matthew Brent Goettsche and Jobadiah Sinclair Weeks seek temporary release from federal pretrial custody pursuant to 18 U.S.C. § 3142(i) in light of the COVID-19 crisis. Dkt. #65 (Goettsche) & 68 (Weeks).[1] The Government submits that the Court should reject Defendants' petitions.

Defendants argue that the onset of the COVID-19 pandemic has particularly harmful implications for pretrial detainees. They complain that they are exposed to increased health risks and that the measures undertaken to curb the spread of the virus will prevent them from working with counsel to prepare for trial. They also contend that the curtailment of international travel has rendered flight all but impossible and that the conditions of confinement that Judge Hammer previously rejected are sufficient under these new realities to assure their attendance at future proceedings.

---

[1] "GB__" refers to Goettsche's brief and "GB Ex. __" to exhibits to Goettshe's brief. "WB__" refers to Weeks's brief and "WB Ex. __" to exhibits to Weeks's brief.

Although the pandemic has prompted a national conversation about whether to release certain low-level offenders to mitigate health risks to the inmate population and the community at large, the measures being adopted generally do not apply to pretrial detainees like Goettsche and Weeks. And an "individualized assessment of the factors" applicable to Defendants is required, not a categorical release on broadly-formulated criteria. *United States v. Martin*, Crim. No. 19-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020) (denying release pending appeal on COVID-19 grounds).

After extensive briefing and argument, Defendants twice have been ordered detained as flight risks pursuant to 18 U.S.C. § 3142(d)(2). The facts that compelled their detention have not changed—they maintain, among other things, unaccounted for wealth, overseas contacts, and strong incentives to flee. Although the pandemic has curtailed international commercial air travel, there remain numerous flights out of the country. It is also unclear to what extent the pandemic has complicated Pretrial Services' monitoring of released defendants under the conditions Defendants propose.

In addition, government efforts to reduce pretrial inmate populations on COVID-19 grounds have centered on low-risk minor offenders or probation violators, not those, like Defendants, who face felony charges and potentially lengthy terms of imprisonment. Goettsche does not present the other risk factors that would otherwise make him a candidate for release. He is 37 years old with no disclosed health conditions. Weeks, who is 38 years old, indicates that he has an asthmatic condition that evidently has moderated during adulthood. Moreover, Essex County Correctional Facility ("ECCF") has implemented reasonable precautionary and monitoring practices in an effort to protect detainees from excessive exposure to the COVID-19 virus.

The COVID-19 crisis is challenging, but its effects are not so compelling in the specialized circumstances of this case, as applied to each Defendant, so as to warrant a change in their pretrial status at this time. The Government also urges the Court to consider the floodgates potential of a decision to release Defendants twice-detained on risk of flight grounds, charged as part of a nine-figure fraud, and facing lengthy federal prison sentences.

## I.      Background

### A.      Indictment and Arrest

On December 5, 2019, a federal grand jury returned a two-count Indictment charging Goettsche, Weeks, and three other defendants with crimes related to the BitClub Network—a bitcoin fraud scheme that Goettsche developed and operated from 2014 through the date of his arrest and that Weeks promoted beginning in 2015. Count One charged Goettsche, Weeks, and

others with a wire fraud conspiracy that took at least approximately $722 million of investor money in bitcoin, in violation of 18 U.S.C. § 1349. Count Two charged Goettsche, Weeks, and others with conspiring with others to offer or sell unregistered securities in BitClub Network, contrary to 15 U.S.C. §§ 77e and 77x, in violation of 18 U.S.C. § 371.

On December 10, 2019, Goettsche was arrested in Colorado and Weeks was arrested in Florida. Another defendant, Joseph Frank Abel, was arrested in California and is detained pending trial. Codefendant Silviu Catalin Balaci was arrested and detained in the Frankfurt, Germany area and is awaiting extradition. The remaining defendant—Goettsche's business partner whose identity remains under seal and is being called Defendant 2—remains at large and is believed to be residing in a country that does not have an extradition treaty with the United States.

### B.    Prior Pretrial Detention Proceedings

Both Defendants had two detention hearings, one in their district of arrest and the other before Judge Hammer in more than six hours of hearings conducted on February 13 and 14, 2020.

Judge Hammer found, "[a]s to Mr. Goettsche," "that the Government has carried its burden of establishing by a preponderance of the evidence that no condition or combination of conditions will reasonably assure his appearance at trial." 2/14/20 Tr. at 144. Judge Hammer found that:

- the Government's proofs at trial would "include texts and emails that includes a number of statements directly by Mr. Goettsche that at least could be interpreted as inculpatory," *id.* at 148;

- "a review of the messages and the accounts leads to a very concerning likelihood that Mr. Goettsche has other significant assets that he would be able to be access either directly or through others to fund a risk of flight," *id.* at 149; and

- the involvement of Goettsche's brother in BitClub "does raise some concerns," as does Goettsche's relationship with Defendant 2, who remains at large, *id.* at 159-60.

The Court similarly found that "no condition or combination of conditions will reasonably assure Mr. Weeks' appearance at trial." *Id.* at 163. The Court found that:

- the Government's evidence indicated that Weeks communication went "to the core of the operations of the BitClub Network," *id.* at 164;

- Weeks "disguise[d] the purpose of the investment money," *id.* at 166;

- Weeks "did not pay federal income taxes" and set "up schemes to avoid IRS detection," *id.*;

- he "has access to both money, both digitally and fiat currency that could well fund a risk of flight," *id.* at 169; and

- Weeks "has affiliations all over the world" and would not be "deterred from fleeing because of his wife and child given their own extensive travel," *id.* at 173.

## II.    The Bail Reform Act

The Government articulated the legal standards applicable to pretrial detention proceedings in its prior submission. Dkt. #36 at 1-3; Dkt. #39 at 8-9.

In short, under the Bail Reform Act, the Court "shall order the pretrial release" of a defendant "unless the judicial officer determines that such release will not reasonably assure the appearance" of the defendant. 18 U.S.C. § 3142(b). When a case involves "a serious risk" that the defendant "will flee," *id.* § 3142(d)(2), the Government may move for a hearing, *id.* § 3142(f)(2)(A), at which it must show by a preponderance of the evidence that no condition or set of conditions of release will reasonably assure his appearance at trial, *see United States v. McIntyre*, Crim. No. 16-13, 2018 WL 385034, at *3 (D.N.J. Jan. 10, 2018) (citing *United States v. Himler*, 797 F.2d 156, 160-61 (3d Cir. 1986)).

In assessing whether "there are conditions of release that will reasonably assure the appearance of the person" at trial, the Court must consider:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591 [sex trafficking of children or by force, fraud, or coercion], a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person; [and]
>
> (3) the history and characteristics of the person, including—(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings.

- 4 -

18 U.S.C. § 3142(g). If the Court finds "that no condition or combination of conditions of release will reasonably assure" the defendant's presence at trial, it "shall order the detention of the person before trial." *Id.* § 3142(e)(1).

After a defendant has been detained, a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). A defendant has the burden of showing that compelling circumstances make temporary release "necessary" under Section 3142(i). *See United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011); *United States v. Jeffries*, Crim. No. 10-100, 2011 WL 182867, at *4 (E.D. Tenn. Jan. 20, 2011) ("the Defendant has failed to show that his release is necessary for the preparation of his defense").

## III.   Analysis

### A.   Defendants remain flight risks.

As multiple judges have found, Defendants pose serious flight risks. They were members of an international conspiracy to defraud countless victims as part of an internet-enabled pyramid scheme. They traveled frequently and maintained close contacts overseas. Both sought foreign citizenship. Both maintain considerable unseizable—and, in Goettsche's circumstance—unaccounted for assets in various forms of currency.

Weeks cites *In re Extradition of Manrique*, Mag. No. 19-71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020), in which a federal magistrate judge released an extradition detainee. But that holding is distinguishable. The court first noted that the detainee was a "vulnerable" "74 years old" "at risk of serious illness or death . . . in custody." *Id.* The court then observed that the risk of flight was "mitigated by the existing pandemic," that "international travel is hard now," and that "release conditions" would help mitigate the risk. *Id.*

Here, the Court already has found that the mitigating value of the stringent release conditions proposed by Defendants was not sufficient to deter flight. Moreover, unlike the "74 year old" in *Manrique*, Defendants are young and seasoned world travelers, having gone so far as to seek resident status in other countries. The Government also respectfully disagrees that the pandemic is the deterrent to international flight found by the court in *Manrique*. There were commercial flights from Newark Liberty International Airport to a variety of international destinations yesterday. Connecting flights through other

- 5 -

domestic destinations would have landed them in Belize and St. Kitts. And, as U.S. citizens, Defendants can cross the land border with Canada.

Goettsche repeatedly claims in his submission that Judge Hammer found that Goettsche had no "proclivity" or "inclination" to flee. GB1, 2, 5, 7. The phrase "proclivity to flee" is an invention of Goettsche's counsel, *see* 2/14/20 Tr. at 5, 13, 41, and is not part of the standard under 18 U.S.C. § 3142. Judge Hammer made no ruling that Goettsche lacked a proclivity to flee. Instead, Judge Hammer focused on the "significant assets" that Goettsche "would be able to . . . access either directly or through others to fund a risk of flight." 2/14/20 Tr. at 149. He found concerning, for example, that Goettsche referred to having made "hundreds of mil[lions] in the past two years," *id.*, and that his accounts are "scattered throughout the world and very possibly beyond the reach of the Government to seize," *id.* at 150. Implicit in that holding is Judge Hammer's valid concern that Goettsche would use his "vast sums of money," *id.* at 156, to leave the country rather than have a jury consider an array of evidence that includes his own "inculpatory" statements, *id.* at 148.

By "proclivity," Goettsche may be suggesting that he lacks a history of flight, although his lack of prior significant criminal exposure would mean that he has never had a reason to flee. But Judge Hammer noted that Goettsche undertook "efforts to avoid detection by U.S. law enforcement." *Id.* at 147. Judge Hammer was concerned that Goettsche's own brother was involved in BitClub, *id.* at 159-60, and that Goettsche had relationships with the at-large Defendant 2 and the accountant that was helping Defendant 2 evade tax liability, *id.* at 160. Despite the Government's requests, Goettsche still has not filled the roughly $30 million gap between his self-disclosed assets and an accounting prepared by his accountant in August 2019. *Id.* at 49-50. Finally, further investigation has revealed that Goettsche obtained foreign citizenship for his wife and children, indicating an interest in relocation.

Defendants remain considerable flight risks, and, although the pandemic may have reduced public access to international air travel, Defendants have strong incentives to exhaust all means—and financial options—to evade prosecution.

### B.    Defendants are not among the categories of detainees indicated for release on COVID-19 grounds.

Defendants highlight the health risks associated with COVID-19, which can be exacerbated in detention facilities. The Government does not take issue with that commonsense proposition. "But those risks are not the sole determinant of whether detention is appropriate." *United States v. Jones*, Crim. No. 17-582, 2020 WL 1323109, at *1 (D. Md. Mar. 20, 2020) (rejecting release

requested by incarcerated pregnant detainee on grounds that she is "at increased risk of contracting COVID-19"). Reducing the overall detainee population does not require the abandonment of the standards that apply in detention matters. Rather, the courts thus far have taken and should continue to take a measured approach focused on the individual factors applicable to each pretrial detainee. The Government submits that those factors, applied to Defendants, do not warrant temporary release.

Defendants are not among the types of detainees that have been designated for release in light of the pandemic. They are not elderly and, with the exception of Weeks' asthma condition, which apparently has moderated in adulthood, they do not present with health conditions that make them particularly susceptible to COVID-19 complications.[2] Courts have detained even defendants with exacerbating medical conditions, like asthma. *See Martin*, 2020 WL 1274857, at *4. In addition, Defendants are not low-level offenders, contemnors, or probation violators. They are charged with significant federal felonies arising from their involvement in a scheme that resulted in hundreds of millions of dollars in fraudulently obtained victim funds. Their Guidelines exposures based on the calculations and allegations in the Indictment would top the loss table at U.S.S.G. § 2B1.1.

None of the writings cited by Defendants call for the release of similarly situated detainees. For example, Weeks cites the Declaration of Dr. Chris Breyer to support the proposition that undertaking certain common preventative measures is "extremely difficult" in jails. JW8 n.8 & Ex. G. The Breyer Declaration, however, lists certain categories of inmates for release, none of which would include Defendants:

> Pre-trial detention should be considered only in genuine cases of security concerns. Persons held for non-payment of fees and fines, or because of insufficient funds to pay bail, should be prioritized for release. Immigrants awaiting decisions on their removal cases *who are not a flight risk* can be monitored in the community and should be released from immigration detention centers. Older inmates and those with chronic conditions predisposing to severe COVID-19 disease (heart disease, lung disease, diabetes, immune-compromise) should be considered for release.

---

[2] The Government notes that Weeks does not complain of suffering from respiratory distress while confined at ECCF on account of his asthma. Rather, Weeks described symptoms of indigestion. WB13. The Government requests additional information regarding the nature of and treatments for Weeks's asthma diagnosis.

JW8 & Ex. G (emphasis added). Weeks also cites the Declaration of Dr. Jaimie Meyer regarding the spread of COVID-19 in New York area immigration detention facilities, including ECCF. JW9 & n.9. Dr. Meyer recommends that inmates be released who can "safely and reasonably remain in the community," and found that this recommendation is "more important still for individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes) or who are over the age of 60." JW Ex. H.

Public appeals for reductions in detention facilities similarly call for the release of limited categories of detainees into which Defendants do not fall. Senator Harris, for example, urged "the release of low-risk individuals who are in pretrial detention because of money bail." GB4 & n.15. The joint prosecutor letter cited by Goettsche similarly called for the release of, among other categories, those "being detained solely because they can't afford cash bail" and those "in local jails who are within 6 months of completing their sentence." GB5 & n.17.

Communities experiencing COVID-19 outbreaks are beginning to institute detainee reductions, but Defendants would not be candidates for those programs. Weeks cites a Los Angeles Times article in which local law enforcement was considering bail reductions for nonviolent offenders. WB9 & n.10. The article identifies specific categories of inmates being considered for release, including inmates with less than 30 days of jail time left to serve, pregnant women, and older adults at a higher risk for contracting the virus. WB Ex. I. Weeks also cites a tampabay.com article regarding the release of 164 inmates "accused of low-level, non-violent crimes," including: "A 34-year-old hotel housekeeper charged with cocaine possession. A 19-year-old student facing burglary and petty theft charges. An unemployed man with no home address picked up on a trespassing offense." WB9, n.12, & Ex. K.

Weeks considers himself "likewise a non-violent offender" and likens himself to the petty offenders listed in the tampabay.com article. WB9. But none of the articles cited by Weeks regarding efforts to reduce prison populations deal with inmates like Weeks, who have already been found to be a flight risk (twice) and who are charged with very serious offenses carrying significant guidelines ranges.

Finally, on March 22, 2020, Chief Judge Rabner of the New Jersey Supreme Court ordered the release of inmates currently serving county jail sentences under one of two limited circumstances: (1) as a condition of probation following conviction of an indictable offense; or (2) as the result of a

municipal conviction (*i.e.*, trespassing or simple assault).[3] In order to receive a county jail sentence as a condition of probation after being convicted of an indictable offense in New Jersey, a defendant must be (a) convicted of a 3rd or 4th degree crime where the presumption of imprisonment does not apply; or (b) convicted of a more serious offense but able to overcome the presumption of imprisonment by demonstrating that "imprisonment would be a serious injustice which overrides the need to deter such conduct by others." *N.J.S.A.* 2C:44-1(d). The courts' power under 2C:44-1(d) to overcome the presumption of imprisonment is reserved to the " 'truly extraordinary and unanticipated' cases where the 'human cost' of punishing a particular defendant to deter others from committing his offense would be 'too great.' " *State v. Evers*, 175 N.J. 355, 389 (2003). Those circumstances "rarely exist." *State v. Johnson*, 118 N.J. 10, 16 (1990). Therefore, the defendants being released as a result of New Jersey's order are likely non-violent offenders convicted of the state's most minor offenses.

Defendants are not entitled to relief under § 3142, which "has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." *United States v. Hamilton*, Crim. No. 19-54 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020). Defendants simply do not present with the age, health, or sentencing exposure profiles of those who have been released to reduce the inmate population in these extraordinary times.

**C.    Conditions at ECCF.**

Efforts undertaken to combat COVID-19 and news of its spread are rapidly evolving, so the observations in this section should be understood as reflecting conditions on March 23, 2020. The Government is endeavoring to obtain real time information from the U.S. Marshal's Service and ECCF officials regarding mitigation efforts.

Officials at ECCF are combatting COVID-19. According to an online update:

- Additional measures to medically screen detainees entering and being released from the ECCF have been implemented.

- Face-to-face attorney visits have been suspended.

---

[3] https://www.aclu-nj.org/files/5415/8496/4744/2020.03.22_-_Consent_Order_Filed_Stamped_Copy-1.pdf.

- Effective Monday, March 23, to protect the inmate/detainee population and the staff of the Essex County Correctional Facility, the Family and Friend Visitation Program is suspended until further notice.[4]

Consistent with the worldwide experience, however, the Government recognizes these measures may not stop the spread of the virus, including at ECCF. Indeed, on March 23, 2020, the New York Times reported that "an inmate in an Essex County detention center in Newark [not ECCF] tested positive for the coronavirus after showing symptoms. The inmate has been isolated from the general jail population and is responding well to treatment, Essex County officials said."[5] Local media reported on an update from the director of the Office of Public Information for Essex County, which said:

> On Sunday, March 22nd, the Essex County administration and Essex County Correctional Facility leadership were notified by the GEO Group that an Essex County inmate residing in Delaney Hall in Newark has tested positive for and is exhibiting symptoms of the novel coronavirus (COVID-19).
>
> The inmate has been isolated from the general population at Delaney Hall and is responding well to the treatment being provided to him by the medical staff at Delaney Hall. In addition, the GEO Group has notified all staff who have come into contact with the inmate, and the seven inmates who were housed in the same dorm with the one inmate have been quarantined at the facility. None have exhibited any symptoms of the virus at this time. Working with the GEO Group, Essex Corrections staff are taking necessary precautions to ensure the ECCF is not impacted.[6]

There are pretrial detainees in the federal system and elsewhere who have contracted COVID-19. Unfortunately, there will be others. But that inevitability does not justify wholesale release. The decision of whether or not Defendants should be released should not turn solely or even primarily on the

---

[4] https://essexcountynj.org/essex-county-update-on-the-novel-coronavirus-covid-19/.

[5] https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html.

[6] https://www.tapinto.net/sections/health-and-wellness/articles/covid-19-diagnosed-at-essex-county-correctional-facility-8.

fact that they may eventually contract it. Rather, the courts must undertake an individualized assessment guided by the factors and standards articulated in Section 3142. The Government submits that Defendants should continue to be detained.

**D.    The current conditions will not have a more serious impact on Defendants' Sixth Amendment rights than on those of similarly situated detainees.**

The COVID-19 pandemic and the measures instituted in ECCF and other facilities to mitigate its spread undoubtedly will impede the ability of pretrial detainees like Defendants to meet with counsel and participate in their defense. But, under the circumstances, the courts must consider how those unfortunate burdens will affect individual detainees. Here, Defendants are comparatively well-situated. Defendants are represented by "extremely sophisticated, capable criminal counsel," 2/14/20 Tr. at 162 & 174, from major law firms who are well-situated to process and review discovery, prepare motions (including those addressed by this letter), and construct a defense.

There also is less of an immediate need for extensive consultation, at least compared to other cases with more urgent deadlines. As a district court judge in the Central District of California ruled in denying release on COVID-19 grounds, "the fact of the matter is that no jury trial will be conducted until conditions in the Central District normalize. Notwithstanding any current limitations on attorney visits, there will be an adequate opportunity to prepare once conditions normalize." *United States v. Avenatti*, Crim. No. 19-61 (JVS), at 2-3 (C.D. Cal. Mar. 21, 2020). Here, there is no scheduled trial date, and there are no pretrial evidentiary hearings scheduled at this time. There is a considerable amount of discovery in this matter, and Defendants doubtless would prefer to review that discovery as soon and as seamlessly as possible. But they are not alone in dealing with this level of disruption.

**E.    The federal courts have not ordered the temporary release of pretrial detainees like Defendants.**

Defendants cite a number of decisions in which federal courts have ordered pretrial release or other accommodations. None involves defendants like Goettsche and Weeks, who present and have adjudged as serious flight risks facing hefty potential prison sentences for their parts in an exceptionally lucrative fraud scheme. The Government submits that, releasing Defendants now—after multiple decisions to detain them and in the absence of substantial precedent on handling COVID-19-related filings—would signal that any non-violent offender detained on flight grounds should be entitled to temporary release.

- 11 -

Defendants' reliance on *United States v. Stephens*, Crim. No. 15-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020), is misplaced. *See* GB2; WB16. In *Stephens*, the defendant was accused of possessing a firearm while on supervised release. The court released the defendant, who previously had been detained, after finding that "the strength of the primary evidence relied upon by the Government to demonstrate the danger the Defendant poses to the community has been undermined by new information not available to either party at the time of [the prior detention] hearing." *Id.* at 1-2. Specifically, although the government previously had argued that the defendant had possessed a loaded firearm in proximity to drugs, new facts showed that the arresting officer had "identified a different individual as holding the bag that contained the firearm." *Id.* at 2. Finding that the defendant lacked a "violent background," the court ruled that—without the possession evidence—"the weight of the evidence" tipped in the defendant's favor.

As for the risks to the defendant from the COVID-19 pandemic, the court in *Stephens* specifically declined to rule on whether the health risks from the pandemic presented a "compelling reason necessitating [the defendant's] release." *Id.* at 6 n.3. Rather, the court found release appropriate under § 3142(i), because the defendant had proffered specific, unrebutted facts demonstrating that the precautions taken by the BOP were impeding his ability to prepare for a hearing scheduled for March 25, 2020. *Id.* at 5-6.

Defendants face a very different set of circumstances. The factual underpinnings of Defendants' detention on risk of flight grounds remain substantially unchanged. They are very wealthy, they previously have taken steps to avoid U.S. law enforcement by relocating overseas, and they face significant terms of imprisonment if convicted. As for the right to counsel, unlike the defendant in *Stephens*, who had demonstrated that he was unable to prepare for a hearing scheduled just one week in the future, Defendants here do not have a scheduled trial date. Nor do they have looming evidentiary hearings. As stated above, although the present conditions may make it more difficult to prepare a defense at present, that circumstance will apply to all pretrial detainees, as numerous state and federal facilities adjust to mitigate the spread of the virus.[7]

---

[7] The Government is attempting to obtain information about how the COVID-19 pandemic is affecting, if at all, the operations of the U.S. Pretrial Services offices, both in New Jersey (where Weeks proposes to reside) and Colorado (where Goettsche would live).

Accordingly, Defendants have not presented a "compelling reason" for release under Section 3142(i). Based on this information, and because Defendants pose a risk of flight, Defendants should remain detained.

## IV.   Conclusion

For the reasons set forth above, the Government respectfully submits that Defendants cannot overcome the prior findings of two federal magistrates that they are flight risks and that the new circumstances occasioned by the COVID-19 virus do not compel temporary release. The motions should be denied.

Respectfully submitted,

CRAIG CARPENITO
United States Attorney

_____

By:    David W. Feder
Jamie L. Hoxie
Anthony P. Torntore
Assistant U.S. Attorneys

- 13 -