UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

MATTHEW BRENT GOETTSCHE,
[DEFENDANT TWO REDACTED],
JOBADIAH SINCLAIR WEEKS,
JOSEPH FRANK ABEL, and
SILVIU CATALIN BALACI

Hon. Claire C. Cecchi

Case No.:  19-cr-877-CCC

**Oral Argument Requested**

**Defendant Jobadiah Sinclair Weeks' Memorandum
in Support of Motion for Appeal, Review, and Revocation of
Magistrate Judge's Detention Order**

CARLTON FIELDS

Michael L. Yaeger
405 Lexington Avenue, 36th Floor
New York, NY 10174
Telephone: 212.785.2577
Facsimile: 860.392.5058

Simon Gaugush
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, FL  33607
&
180 Park Avenue, Ste. 106
Florham Park, NJ  07932-1054

*Counsel for Jobadiah Sinclair Weeks*

# CONTENTS

Authorities ........................................................................................................................... iii

Introduction ........................................................................................................................... 1

Proposed Conditions of Release .......................................................................................... 4

Standard of Review ............................................................................................................... 5

Discussion .............................................................................................................................. 5

I.   The Conditions of Release Will Reasonably Assure Mr. Weeks' Appearance ....................... 5

   A.   The Bail Reform Act has a presumption in favor of pretrial release. ................................. 5

   B.   Mr. Weeks' proposed bond includes substantial assets of his family................................ 6

   C.   GPS monitoring is reliable.................................................................................................. 7

   D.   Mr. Weeks will be subject to tripartite monitoring by Peter Gallic,
       Pretrial Services, and a third-party monitoring service. ................................................... 8

   E.   Judge Arleo's Order granting release in *United States v. Harry* is Instructive................ 8

II.  Mr. Weeks' History and Characteristics Support Release ....................................................... 10

   A.   Mr. Weeks has strong ties to the United States and his family.......................................... 10

   B.   Mr. Weeks has used the Arvada house as his primary residence for years. ..................... 11

   C.   Past lawful foreign travel does not outweigh the presumption of release. ....................... 12

      1.   Mr. Weeks' travel is lawful and tied to his legitimate business and charitable
         purposes ....................................................................................................................... 14

      2.   Mistaken assertions regarding Mr. Weeks' ties to Defendant Two do not provide
         grounds for detention. ................................................................................................. 16

      3.   Mr. Weeks' ID documents and a single Facebook boast of the ability to obtain
         a foreign passport do not support his detention. ......................................................... 18

      4.   Misinformation regarding foreign bank accounts and money kept in a belt
         does not provide grounds for detention. ..................................................................... 19

      5.   The COVID-19 pandemic and America's response to it has lowered any risk
         of flight........................................................................................................................ 20

   D.   Mr. Weeks' access to wealth is misunderstood and overstated. ....................................... 20

   E.   Views and "rhetoric" are irrelevant to risk of flight. ........................................................ 22

      1.   Mr. Weeks should not be punished for his free expression. ....................................... 22

      2.   Mr. Weeks' association with Liberland and Atlantis is harmless................................ 23

   F.   Mr. Weeks has no history of disobeying court orders or conditions of release................ 23

   G.   Mr. Weeks genuinely intended to cooperate with the IRS. .............................................. 23

H.   Mr. Weeks was cooperative with the government at the time of his arrest ..................... 24

III. The Nature & Circumstances of the Charges Do Not Support Pretrial Detention ................ 25

A.   The pending charges do not demand detention ................................................................. 25

B.   Bitcoin and BitClub Operations ....................................................................................... 25

C.   Courts regularly release defendants facing significant sentences. .................................... 26

IV. The Magistrate's and Government's Focus on the Weight of the Alleged Offenses
Fails To Address Any Risk of Flight Posed by Mr. Weeks ..................................................... 31

A.   The weight of the evidence is the least important statutory factor in assessing
risk of flight ........................................................................................................................ 31

V.  The Speedy Trial Act and Due Process Concerns Favor Release on Conditions ................... 36

VI. Mr. Weeks' Ability to Prepare a Defense Will Be Impaired if He is Detained
in Jail During the Pandemic .................................................................................................... 38

Conclusion ...................................................................................................................................... 40

# AUTHORITIES

**Page(s)**

**Cases**

*Benjamin v. Fraser*,
  264 F.3d 175 (2d Cir. 2001)...................................................................................... 38

*In the Matter of the Extradition of Alejandro Toledo Manrique*,
  Case No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109
  (N.D. Cal. Mar. 19, 2020) .......................................................................................... 20

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .................................................................................................. 23

*United States v. Alvarez*,
  567 U.S. 709 (2012) .................................................................................................. 23

*United States v. Benhamou*,
  Case No. 11-CR-336 (S.D.N.Y. Nov. 17, 2010)........................................................ 16

*United States v. Bergrin*,
  No. CRIM. 09-369 (WJM), 2009 WL 1560039 (D.N.J. May 29, 2009) .................... 7

*United States v. Bodmer*,
  Case No. 03-CR-947 (SAS), 2004 WL 169790 (S.D.N.Y. Jan. 28, 2004) .............. 11

*United States v. Cirillo*,
  Case No. 99-1514, 1999 WL 1456536 (3d Cir. July 13, 1999) .................................. 5

*United States v. Collado*,
  975 F.2d 985 (3d Cir. 1992)...................................................................................... 27

*United States v. Cosmo*,
  Case No. 2:09-cr-00255-DRH-ETB (E.D.N.Y. 2009) (ECF 61) .............................. 27

*United States v. Davis*,
  Case No.: ELH-20-09, 2020 WL 1529158 (D. Md. Mar. 30, 2020)........................ 39

*United States v. Dehmer*,
  Case No. 2:10-cr-00851-CCC (D.N.J. Jan 20, 2011)................................................. 7

*United States v. Depiro*,
  Case No. 2:10-cr-00851-CCC (D.N.J. Mar. 8, 2001) (ECF 91) ................................ 7

*United States v. Dreier*,
  596 F. Supp. 2d 831 (S.D.N.Y. 2009)...................................................................... 26

iii

*United States v. Edson*,
    487 F.2d 370 (1st Cir.1973) ........................................................................... 32

*United States v. Fama*,
    Case No. 13 Cr. 234(JFK), 2013 WL 2467985 (S.D.N.Y. June 7, 2013)............................... 31

*United States v. Griffith*,
    Case No. 1:20-CR-15 (S.D.N.Y. Dec. 30, 2019) ............................................... 15, 16

*United States v. Hansen*,
    108 F. App'x 331 (6th Cir. 2004) ....................................................................... 16

*United States v. Harry*,
    Case No. 2:19-CR-246, Dkt. No. 85 (D.N.J. Nov. 15, 2019) ............................... 8, 26

*United States v. Himler*,
    797 F.2d 156, 158 (3d Cir. 1986)........................................................... 6, 16, 19

*United States v. Jones*,
    566 F.Supp.2d 288 (S.D.N.Y. 2008)..................................................................... 31

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008)................................................................................. 29

*United States v. Lopez*,
    827 F. Supp. 1107 (D.N.J. 1993) ................................................................... 5, 8

*United States v. Madoff*,
    Case No. 1:09-CR-213, Dkt No. 22 (S.D.N.Y. January 16, 2009) ........................... 27

*United States v. Motamedi*,
    767 F.2d 1403 (9th Cir. 1985)........................................................................ 31, 32

*United States v. Noel*,
    Case No. 2:06-mj-04050-CCC (D.N.J. Nov. 3, 2006) (ECF 10) ............................... 7

*United States v. Oliver*,
    Criminal No. 16-40, 2016 WL 1746853 (W.D. Pa. May 3, 2016)........................... 18

*United States v. Paul Burks*,
    Case No. 3:14-cr-208-MOC-DSC (W.D.N.C. 2016)............................................ 27

*United States v. Perry*,
    788 F.2d 100 (3d Cir. 1986)............................................................................. 37

*United States v. Persico*,
    No. 84-cr-809 (JFK), 1986 WL 3793, (S.D.N.Y. Mar. 27, 1986) ........................... 39

*United States v. Renzulli*,
  Cr. No. 87–258–7, 1987 WL 17562 (E.D. Pa. Sept. 28, 1987) .................................. 38

*United States v. Robinson*,
  603 F.3d 230 (3d Cir. 2010) .................................................................................... 27

*United States v. Sabhnani*,
  493 F.3d 63 (2d Cir. 2007) ....................................................................................... 6

*United States v. Salerno*,
  481 U.S. 739, 755 (1987) ...................................................................................... 4, 5

*United States v. Santos-Flores*,
  794 F.3d 1088 (9th Cir. 2015) ................................................................................. 36

*United States v. Stephens*,
  Case No. 1:15-cr-00095-AJN, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) ....... 39

*United States v. Webb*,
  Case No. 15-CR-252 (PKC) (E.D.N.Y. Dec. 29, 2015) .................................... 16, 26

*Wolfish v. Levi*,
  573 F.2d 118 (2d Cir. 1978) .................................................................................... 37

**Statutes**

18 U.S.C. § 3142(c)(1)(B) ............................................................................................ 6

18 U.S.C. § 3142(c)(1)(B)(i) ................................................................................. 39, 40

18 U.S.C. § 3145(b) ............................................................................................ 1, 5, 40

18 U.S.C. § 3161 ........................................................................................................ 36

18 U.S.C. § 3164 ........................................................................................................ 36

18 USC § 3142(c) ......................................................................................................... 6

U.S.S.G. § 2B1.1 ....................................................................................................... 27

**Other Authorities**

Glenn A. Grant, J.A.D., *Jan. 1. – Dec. 31 2018 Report to the Governor and the Legislature*,
  Criminal Justice Reform (Apr. 2019), available at
  https://njcourts.gov/courts/assets/criminal/2018cjrannual.pdf .................................. 7

Samuel R. Wiseman, *Pretrial Detention and the Right to Be Monitored*, 123 Yale L.J. 1344,
  1369 (2014) ............................................................................................................... 7

Sophia Ankel, *From kissing bans to the death penalty: Here's how seriously different countries are taking the coronavirus outbreak*, Business Insider (March 5, 2020), https://www.businessinsider.com/coronavirus-how-us-china-italy-other -countries-handling-outbreaks-2020-3. ................................................................. 20

Jobadiah Sinclair Weeks, pursuant to 18 U.S.C. § 3145(b), respectfully requests that the Court review and revoke the pretrial detention order issued by U.S. Magistrate Judge Michael A. Hammer on February 14, 2020 and release Mr. Weeks on conditions.

## INTRODUCTION

The magistrate's decision[1] to detain Mr. Weeks as a flight risk relied on mistaken facts and circumstances that have since changed.

First, Mr. Weeks did not have access to fiat currency in foreign bank accounts to assist with flight. The Emirates NBD Bank account on which the magistrate's decision relied had been closed months before the hearing, and another account had no funds. In fact, the funds in the Emirates account were used to purchase a prop plane housed in the U.S. that Mr. Weeks has since sold.

Second, Mr. Weeks does not have a friendly relationship with Defendant Two, who is currently a fugitive. Their relationship soured two years ago, when Defendant Two became angry with Mr. Weeks over delays in the build-out of a data mining center in Montana, and Mr. Weeks was cheated out of a business opportunity. On April 19, 2019, Mr. Weeks met with IRS agents to discuss his interest in assisting the government. As the agents' notes reflect, Mr. Weeks informed the government that he had a falling out with Defendant Two over a year earlier (in 2018). But on January 15, 2020, when Mr. Weeks had not spoken with Defendant Two in almost two years, the government filed an opposition warning of Mr. Weeks' friends abroad, and specifically an "uncaptured coconspirator" who could be none other than Defendant Two. ECF 24 at 9.[2] The warning resonated with the magistrate so much that he mentioned it in his decision denying Mr. Weeks

---

[1]   *See* **Exhibit A**, Excerpt from Transcript of Bail Hearing Before the Honorable Michael A. Hammer on February 14, 2020 (hereinafter "T. [page number]") explaining his detention decision.

[2]   Reference to page numbers in the government's original opposition to Mr. Weeks' motion to revoke the pretrial detention order is based on the CM/ECF time-stamped page number at the top of each page.

pretrial release. T. 168. In reality, the two men don't even speak to each other, much less coordinate flight plans. Yet the incorrectly presumed "relationship" with Defendant Two was the only concrete and sinister foreign "contact" or "affiliation" to which the magistrate's decision could point. Everything else was conjecture derived from Mr. Weeks' ownership of property in Mexico.

Third, Mr. Weeks no longer has access to private flights. Before the hearing he terminated his JetSmarter membership, and after the hearing he kept his promise to sell his turbo-prop plane.

Fourth, the bond has been enhanced with an additional surety and property.

Fifth, the COVID-19 pandemic has caused major changes since the magistrate's February decision. The jail where Mr. Weeks is detained has made it harder for him to prepare and participate in his defense, and the wider societal response to the pandemic has radically reduced any risk of flight. The jail has reduced visitation hours and prevented lawyers from talking to their clients except through glass windows and an intra-facility video screen, 20 minutes at a time. This makes it far harder to review and analyze electronic evidence; holding a laptop up to the glass is an absurd way to review millions of pages of documents. Dismissing speedy trial issues and prolonging pretrial detention is no answer to this problem. More fundamentally, the pandemic has directly affected the risk of flight analysis. The ordinary availability of international travel has changed utterly. Countries across the globe have imposed mandatory quarantines for incoming travelers. Airlines offer fewer flights, as the schedule at Newark Liberty International Airport (EWR) attests. On February 1, 136 flights departed EWR; on May 23, only 8.

Even more fundamentally, the pandemic has changed views on international travel. Past travel by Mr. Weeks and his wife with their baby does not suggest they would want to travel, especially as the pandemic rages. Stephanie and the baby are sheltering in place with her parents. And international travel itself poses a risk of infection as it puts travelers in close quarters. In sum,

the risk of flight has decreased substantially since the magistrate's decision on February 14.

Even then, the risk was far lower than the government asserts, for it misunderstands Mr. Weeks' work and life. His travel was not different in kind from many other entrepreneurs who search the globe for new products, ideas, and opportunities. That activity is quintessentially American. As is Mr. Weeks. His great-grandfather was Secretary of Commerce for President Eisenhower and his great-great grandfather served as Secretary of War for Presidents Harding and Coolidge. He's taken part in U.S. politics, too, including as a volunteer for former Congressman and presidential candidate Ron Paul, who has written a letter of support. *See* **Exhibit B**, Letter from Ron Paul. And all his trips end in the same place: the U.S., and usually Colorado.

The Weeks family is firmly rooted in Colorado. That's where Mr. Weeks grew up, went to school, and had his first job; it's where his parents live and where he met his wife. His parents own a house and log cabin there. He owns a ranch and two timeshares in Colorado. Mr. Weeks has called Colorado home for over 20 years. That's why the FBI executed a search warrant at the Weeks' family home in Arvada, Colorado on December 10, 2019. In fact, the affidavit seeking that warrant represented to a magistrate that the Arvada house served as Mr. Weeks' primary residence, and had throughout the existence of BitClub. But 11 days after the FBI obtained that warrant, the government asserted that Mr. Weeks has virtually no ties to Colorado. The strength of his ties should not depend on whether a court is considering a search warrant or a detention order.

In sum, the magistrate's February decision to detain Mr. Weeks as a flight risk cannot withstand *de novo* review. The decision was mistaken about Mr. Weeks' assets and "contacts" abroad; his ties to the U.S. are stronger than the government would like to admit; since the hearing he has given up all access to private flights; the jail's response to the pandemic has made it harder for him to prepare and participate in his defense; the pandemic has reduced any risk of flight and

3

changed any incentive to flee; and the bail package was already substantial and has been enhanced.

The presumption is that a man not deemed dangerous should remain at liberty before his case is tried. As the Supreme Court has stated plainly, detention "is the carefully limited exception," and "[l]iberty is the norm." *United States v. Salerno*, 481 U.S. 739, 755 (1987). When the law is applied dispassionately to Mr. Weeks, the necessary conclusion is that he should be released.

## PROPOSED CONDITIONS OF RELEASE

The parties agree that Mr. Weeks poses no danger, and that the rebuttable presumption of pretrial detention does not apply. The government argues that Mr. Weeks poses a serious risk of flight, but cannot carry its burden to show there is "no condition or combination of conditions" of release that will reasonably assure his appearance. Mr. Weeks proposes the following bail package:

A.  **Secured Bond** – Mr. Weeks will post a bond in the amount of $1.8 million signed by Mr. Weeks, Stephanie Weeks (wife), Silence and Nat Weeks (mother and father), Brad Weeks (uncle), and collateralized by any property the Court accepts, including:[3]

   1.  The family home in Arvada, Colorado (Nat and Silence Weeks)
   2.  The family log cabin in Buena Vista, Colorado (Nat and Silence Weeks)
   3.  The Sangre de Cristo Ranch in Coaldale, Colorado (Jobadiah Weeks)
   4.  A property in Clinton Washington (Brad Weeks)

B.  **Third-Party Custodian** – Mr. Weeks will be released to the custody of his close friend Peter Gallic, who lives with his family in Far Hills, New Jersey.[4]

C.  **Home Detention** – Mr. Weeks will be detained at Peter Gallic's house in Far Hills.

D.  **GPS Monitoring** – Mr. Weeks will wear a GPS device issued by Pretrial Services.

E.  **Third-Party Monitoring Service** – Mr. Weeks will be subject to, and pay for, additional monitoring by Shadowtrack,[5] which will use cell tower triangulation, voice verification, and facial recognition to ensure Mr. Weeks is at the detention location.

F.  **Travel Restrictions** – Mr. Weeks' travel will be restricted to the District of New Jersey,

---

[3]   Originally, Mr. Weeks proposed using his fractional interests in a property in St. Kitts and Nevis and a house in Mexico as collateral.  Pretrial stated that foreign properties are not acceptable collateral.

[4]   Alternatively, Mr. Weeks' parents could serve as third-party custodians in Arvada, Colorado.

[5]   *See* **Exhibit C**, Shadowtrack Home Incarceration Pre-Approval for Jobadiah Weeks and letter explaining their services.

and to and from his lawyers' offices in Manhattan.

**G.**    **Surrender of Passport** – Mr. Weeks surrendered his passports.  Mr. Weeks' wife will surrender her passport and her daughter's passport for the duration of this case.

**H.**    **Sale of Airplane/Aircraft Membership** – Mr. Weeks has sold a turbo prop airplane in Peoria, IL, and surrendered his membership in JetSmarter, which provides access to air-craft. At the time his February detention hearing, he was still in the process of divestiture.

**I.**    **Extradition Waivers** – Mr. Weeks has executed and hereby provides the Court with extradition waivers for Mexico and St. Kitts & Nevis.  He will also execute waivers for any other country requested by the Court, Pretrial Services, or the government.[6]

**J.**    **Any Other Conditions Imposed by the Court**, such as maintaining employment unrelated to BitClub, alcohol abuse counseling, and no contact with potential victims.

These conditions of release will more than "reasonably assure" Mr. Weeks' appearance.

## STANDARD OF REVIEW

Pursuant to 18 U.S.C. § 3145(b), a district judge reviews a magistrate judge's decision on bail *de novo*. *United States v. Lopez*, 827 F. Supp. 1107, 1108 (D.N.J. 1993). The Court must make an independent determination regarding a defendant's eligibility for release on bail. *Id.*

## DISCUSSION

**I.**    **The Conditions of Release Will Reasonably Assure Mr. Weeks' Appearance**

**A.**    **The Bail Reform Act has a presumption in favor of pretrial release.**

 "Liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Unless a defendant is charged with a crime carrying a rebuttable presumption of detention, *see* 18 U.S.C. § 3142(e), which Mr. Weeks is not, the law presumes he will be released on conditions. *See United States v. Cirillo*, Case No. 99-1514, 1999 WL 1456536, at \*1 (3d Cir. July 13, 1999) ("A defendant may not be detained

---

[6]    *See* **Exhibit D**, Extradition Waiver for Mexico; **Exhibit E**, Extradition Waiver for St. Kitts & Nevis.

pending trial unless "no condition or combination of conditions will reasonably assure the appearance of the person as required…."). Further, the Bail Reform Act demands the release of a defendant "subject to the least restrictive…combination of conditions…that such judicial officer determines will reasonably assure the appearance of the person…." *See* 18 U.S.C. § 3142(c)(1)(B). Therefore, Mr. Weeks is entitled to the presumption of release on the least restrictive conditions.

The government has the dual burden of proving both that Mr. Weeks is a serious risk of flight and that no conditions will reasonably assure his appearance at future hearings. *See United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) ("Because the law thus generally favors bail release, the government carries a dual burden in seeking pre-trial detention."); *United States v. Himler*, 797 F.2d 156, 158, 160–61 (3d Cir. 1986) (recognizing government must prove both that a defendant is a risk of flight and that no conditions will reasonably assure his appearance at trial). Appearance does not have to be absolutely assured by the conditions, just "reasonably assure[d]." *See* 18 USC § 3142(c). And the proof of risk of flight and insufficient conditions must be a "preponderance of the evidence," *Himler*, 797 F.2d at 161, which the government lacks.

## B. Mr. Weeks' proposed bond includes substantial assets of his family.

Mr. Weeks has pledged every piece of real estate he owns in his bond. (That includes four properties rejected by Pretrial as ineligible for bond: two timeshares in Colorado, a house in Mexico, and a fractional interest in a property in St. Kitts & Nevis.) Immediate and close family members continue to support Mr. Weeks, as shown by letters of support and offers to pledge properties to reasonably assure his appearance. *See* **Exhibit F**, Letters of Support. Mr. Weeks' parents, Nat and Silence Weeks, have offered their properties: the family home and log cabin, both in Colorado. Mr. Weeks' uncle, Brad Weeks, pledges property in Washington State. Mr. Weeks would not flee and leave his parents homeless and his uncle suffering a financial loss.

### C.      GPS monitoring is reliable.

The government's challenge to the reliability of GPS monitoring is unwarranted. ECF 24 at 34–35. Every day, judges, prosecutors, and pretrial services offices nationwide recommend and rely on GPS monitoring to ensure appearances in court. *See e.g.*, *United States v. Dehmer*, Case No. 2:10-cr-00851-CCC (D.N.J. Jan 20, 2011) (ECF 38) (ordering release with GPS monitoring); *United States v. Noel*, Case No. 2:06-mj-04050-CCC (D.N.J. Nov. 3, 2006) (ECF 10) (same); *United States v. Depiro*, Case No. 2:10-cr-00851-CCC (D.N.J. Mar. 8, 2001) (ECF 91) (same); Samuel R. Wiseman, *Pretrial Detention and the Right to Be Monitored*, 123 Yale L.J. 1344, 1369 (2014) ("Federal courts have generally been positive in their assessment of the Federal Pretrial Services location-based implementation of monitoring").

Citing a 2009 opinion by Judge Arleo, the magistrate notes correctly that electronic monitoring is not "fool-proof" (T. 174),[7] but that is not the standard. Reliability is. *See* 18 U.S.C. § 3142(c) (conditions must "reasonably assure" appearance). Moreover, GPS monitoring has advanced significantly in the last decade. According to a 2018 report on New Jersey criminal justice reform, defendants released with GPS monitoring were "not ignoring reporting or court dates" and monitored defendants "appear, on average, at nearly 90 percent of their court hearings."[8]

Pretrial Services has the experience and ability to effectively monitor Mr. Weeks using GPS technology (*e.g.,* using an ankle bracelet). The technology has proven reliable in other cases, and there is no reason to think it will be less reliable when attached to Mr. Weeks' ankle.

---

[7]     Although Judge Hammer described the case as "U.S. v. Bergman," we are certain that Judge Hammer meant *United States v. Bergrin*, No. CRIM. 09-369 (WJM), 2009 WL 1560039, at *10 (D.N.J. May 29, 2009), which notes that GPS monitoring is not a "guarantee" against flight.

[8]     *See* Glenn A. Grant, J.A.D., *Jan. 1. - Dec. 31 2018 Report to the Governor and the Legislature*, Crim. Justice Reform (Apr. 2019), available at https://njcourts.gov/courts/assets/criminal/2018cjrannual.pdf.

### D.    Mr. Weeks will be subject to tripartite monitoring by Peter Gallic, Pretrial Services, and a third-party monitoring service.

To allay any lingering concerns regarding risk of flight, Mr. Weeks proposes an additional condition of release to include supervision by a third-party monitoring service. Mr. Weeks has received approval from Shadowtrack (www.shadowtrack.com), which offers a host of monitoring services, including electronic monitoring and random or scheduled home detention verification. *See* **Exhibit C.** Shadowtrack will ensure that Mr. Weeks remains at Peter Gallic's home in Far Hills, monitoring his location with cell tower triangulation. If Mr. Weeks' cell phone leaves the zone of detention, the Pretrial Services Officer and any other designated recipient, such as the case agent, will be alerted. Throughout the day, Shadowtrack will contact Mr. Weeks on his cell phone and, through voice verification and facial recognition, ensure he is with his cell phone in the right location. He will pay approximately $175 to enroll and $70 per week for the monitoring service. Further, we have spoken to Shadowtrack more than once since the Coronavirus pandemic began, and they have assured us they have continued to provide the same service without interruption.

Courts have endorsed the use of third-party monitoring services to assist with supervision on pretrial release. *See, e.g.*, *United States v. Lopez*, 827 F. Supp. 1107, 1113 (D.N.J. 1993) (ordering monitoring by third-party service to place at least six random calls daily). With a third-party service, Mr. Weeks will be separately monitored by three different entities: (1) Pretrial Services; (2) Peter Gallic, as third-party custodian; and (3) Shadowtrack. Even without any of the other proposed conditions of release, that would be more than enough to assure Mr. Weeks' appearance.

### E.    Judge Arleo's Order granting release in *United States v. Harry* is Instructive

A federal grand jury in Newark charged Harry as the mastermind of a $424 million fraud in which doctors were paid kickbacks to order medically unnecessary devices. *United States v.*

8

*Harry*, Case No. 2:19-CR-246 (D.N.J. April 23, 2020), ECF 119 at 1. After his arrest in South Florida, Harry was ordered detained and transported to Newark. *Id.* at 2. Four times Harry applied for pretrial release, and four times he remained detained. ECF 22, 31, 49, 93, 100, 119.  On his <u>fifth</u> application, Judge Arleo released him on conditions. ECF 119 at 6, 11 (**Exhibit G**).

The government raised many of the same arguments in *Harry* as it has here. Harry's charges allow for 40 years in prison (a life sentence given Harry's age of 51), and his guidelines loss amount is $424 million. ECF 119, at 2, 6. Harry is a dual citizen of the U.S. and Canada. *Id.* at 7. He has extensive foreign travel, including prior residency in Panama and the Dominican Republic. *Id.* Harry maintained bank accounts in at least six foreign countries, including Switzerland, and kept a yacht in Mexico. *Id.* at 7. The government alleged that Harry tried to aid someone in avoiding U.S. jurisdiction and made statements regarding flight. *Id.* As to weight of the evidence, there is a recorded call where Harry solicited kickbacks in exchange for doctors' orders. *Id.* at 6. Last, the government has two co-defendants who are cooperating against Harry. *Id.*

Nevertheless, on April 23, 2020, "[a]fter a careful balancing of the factors in 18 U.S.C. § 3142(g)," Judge Arleo found that Harry's "risk of flight can be significantly mitigated through a stringent set of conditions." *Id.* at 8. Those included: (1) a $2.5 million bond secured by $1.4 million of property; (2) home detention in Florida or New York; (3) a third-party custodian; (4) travel restrictions; (5) surrender of his children's passports; (6) monitoring by Pretrial Services; and (7) surrender of his yacht or posting of an additional $1.1 million to fully secure the bond.

Mr. Weeks has much stronger grounds for release than Harry. Mr. Weeks is not the mastermind of any scheme. He didn't create or operate BitClub, and didn't control its funds. Rather, Mr. Weeks promoted BitClub, earning between $1 to 1.5 million, and sold cryptocurrency mining equipment to BitClub. Unlike Harry, Mr. Weeks will not be responsible for the full loss

amount if he is convicted. He joined BitClub late and stopped promoting it in 2018. Conse-

quently, he is not looking at the combined statutory maximum (25 years). And Mr. Weeks is 38

years old, so the worst case scenario is not a life sentence. He has extensive, lawful foreign

travel, but he only has U.S. citizenship. Mr. Weeks' bond package is very similar to the one

Judge Arleo approved in *Harry*: $1.8 million secured bond (compared to $1.4 million for Harry);

home detention; third-party custodian; GPS monitoring; Shadowtrack monitoring; surrender of

children's passports; and travel restrictions. Like Harry, he should be released on conditions.

## II.  Mr. Weeks' History and Characteristics Support Release

### A.  Mr. Weeks has strong ties to the United States and his family.

The government misunderstands Mr. Weeks' ties to the U.S. His ties to his country and his

family are strong, as shown by the numerous letters of support submitted on behalf of Mr. Weeks.

*See* **Exhibit F**, Letters of Support for Jobadiah Sinclair Weeks. He was born and raised in Colo-

rado, and he continues to return there on average of 3 to 6 times a year to visit family and friends.

Colorado is where Mr. Weeks' parents reside, the location of his first job, and his first civic activ-

ities—including serving as vice-chairman of the Summit County Republicans in 2012. As noted

above, Colorado is also where he owns a ranch and two timeshares (one in Vail and one in

Breckenridge), and the family home in Arvada, Colorado had significant enough ties to Mr. Weeks

that law enforcement officers executed a search warrant there, seizing items from what they de-

scribed as "Jobys dresser," "Jobys desk," and "Jobys closet."  Indeed, in the FBI's view, as it

represented to U.S. Magistrate Judge Scott T. Varholak, District of Colorado, in its December 6,

2019 affidavit in support of a search warrant for the Arvada house, "The Subject Premises serves

as Weeks' primary residence and has throughout [BitClub Network's] existence." The government

has now switched its position, claiming Mr. Weeks has virtually no connection with the Arvada

10

house, or Colorado for that matter. *See infra* Section II.B.  But that's not the case.

Mr. Weeks has a traditional, tightknit immediate family. He and his wife, Stephanie, have been together for more than 12 years and married for the past 10. They have a young daughter, Liberty. *See* **Exhibit H**, Photograph of Stephanie and Liberty Weeks. They don't want to be apart. In fact, before he was detained, Joby and Stephanie spent nearly every day of the last 12 years together, and the longest Mr. Weeks was separated from his daughter was two weeks. Mr. Weeks is also close to his parents, who have lived in Arvada, Colorado for decades. Further, Mr. Weeks is a beloved "Uncle Joby" to his two nieces and nephew, his brother's kids, in Tennessee. *See* **Exhibit I**, Letter of support from Emily Weeks.

Mr. Weeks also has ties to the District of New Jersey. ECF 12 at 7. The defense proposes he be released to the custody of his close friend, Peter Gallic, who has agreed to serve as a third-party custodian and make his home in Far Hills, N.J. available for Mr. Weeks' detention. *See, e.g.*, *United States v. Bodmer*, Case No. 03-CR-947 (SAS), 2004 WL 169790, at *1 (S.D.N.Y. Jan. 28, 2004) (granting bail to Swiss national and permitting him to reside with friends in D.C. pending trial). Mr. Gallic is especially well-suited to act as a custodian during the coronavirus pandemic. He owns and operates a telemedicine provider that has access to COVID-19 tests, and his wife owns The Vine restaurant in Basking Ridge. Mr. Gallic's house is large enough to allow for social distancing and Mr. Weeks would have his own bedroom.

### B.    Mr. Weeks has used the Arvada house as his primary residence for years.

In its opposition, the government challenged Mr. Weeks' ties to Colorado. More pointedly, the government stated, "curiously, when law enforcement officers went to Weeks' purported 'home' in Arvada, Colorado on December 10, 2019, they were met not by members of the Weeks family, but instead by several individuals who said that they rarely see Weeks at that residence, that he certainly did not live at that residence, and that he visited the residence only a few times a

year." ECF 24, at 27. Joby's parents, the owners of the Arvada house, were not there because they were in Florida visiting with Mr. Weeks, Stephanie, and Liberty. The "several individuals" at the house were three friends of Nat and Silence. One of them is going through difficult times, so the Weeks family opened their home to her. She moved in to the Arvada house a week or so before the search warrant was executed. The other couple has a disabled son who lives nearby. The Weeks family has invited this couple to stay in their house when they visit their son each month for two or three nights. None of the people who were encountered in the Arvada house at the time of the search were in any position to speak to how often Mr. Weeks stays in the house.

Like the misunderstanding about Defendant Two, noted *infra*, the guests at the Weeks family home in Arvada featured prominently in the magistrate's decision, even though this matter was not raised at the detention hearing on February 14.  In his opinion, the magistrate stressed:

> In terms of Mr. Weeks' ties to Colorado, I do note that when law enforcement went to Mr. Weeks' home in Colorado, the Weeks family did not meet the law enforcement.  Instead, agents apparently were met by others living in the house who said they rarely see Mr. Weeks at that residence, that Mr. Weeks has not lived there, and that he visited only a few times a year.

T. 172. That was pulled directly from the government's opposition memorandum, which gave the erroneous impression that even Nat and Silence Weeks did not live in the Arvada house. But they do. The houseguests visiting the Arvada residence had rarely seen Nat and Silence's son, Mr. Weeks, because they had only been at the house for a short period.

### C.    Past lawful foreign travel does not outweigh the presumption of release.

At the core of the magistrate's decision is an excessive discomfort with Mr. Weeks' past travel. The magistrate repeated that there is nothing inherently wrong with travel, but there just seemed too much of it. T. 172, 173. The magistrate felt Mr. Weeks' travel showed he has global connections. *Id*. Although the magistrate recognized that Mr. Weeks is married with a young

child, and "[t]hat is always a significant consideration," T. 168, he noted Mr. Weeks' wife and

child have themselves traveled extensively. T. 173. Every step of the way, travel was the issue.

It seems the magistrate believed that if Mr. Weeks was released from detention he would

feel comfortable leaving everything behind because of his experience with international travel.

What the magistrate failed to recognize is that Mr. Weeks already had his big chance to flee and

decided not to take it. On April 19, 2019, Mr. Weeks met with two IRS agents from the criminal

division. These agents interviewed Mr. Weeks for 3 hours and 20 minutes, spending at least 75%

of their time quizzing Mr. Weeks about BitClub. When they went on to another topic, the agents

brought Mr. Weeks back to BitClub. It was not lost on Mr. Weeks that the IRS was conducting a

criminal investigation against BitClub; that was a conclusion anyone would have reached. During this interview, Mr. Weeks volunteered that he had not paid his income taxes in years. Mr.

Weeks also expressed that he believed he was the target of a criminal investigation.[9] Mr. Weeks

was right on all points. Once this interview concluded, Mr. Weeks went back to traveling abroad.

This was Mr. Weeks' chance to make his great escape. But instead of running away, Mr. Weeks

traveled abroad and returned home to the United States at least 6 times after April 2019; the last

time was to meet with the IRS in West Palm Beach, where he was arrested. The very thing the

magistrate was concerned about already happened. Mr. Weeks had his chance to run, but didn't

take it. Mr. Weeks came back to the United States repeatedly despite knowing that BitClub was

under investigation and believing he was personally a target of a criminal investigation.

The government indulged the magistrate's unwarranted fear of lawful travel with unsupported claims of a fugitive co-conspirator, anarchists in Mexico, and money secreted in a belt. The

magistrate then seized on these phantom issues. In particular, the magistrate believed there might

---

[9]   All of this is corroborated by the notes of the IRS agents who interviewed Mr. Weeks that day. *See Gov. Disc.* USA_19877_04006418 through 6433.  Mr. Weeks received the notes on March 24, 2020.

be like-minded people in Mexico willing to help Mr. Weeks (T. 171); that Defendant Two, a fugitive, might help Mr. Weeks escape (T. 160, 168); that Mr. Weeks maintains a bank account in Dubai, arguably to fund his life on the run (T. 169); and that at the time of his arrest Mr. Weeks was carrying a few thousand dollars in his travel belt. (T. 170-71). Only the claim about the belt is true. Mr. Weeks has no relationship or contact with Defendant Two, much less unspecified people in Mexico; it's not unusual for travelers to carry cash in a way that prevents pick-pocketing; and his bank account in Dubai was actually closed months before the detention hearing. The magistrate fueled his fear of travel with these untruths and concluded they outweighed the presumption of release, property for bond, third-party custodian, GPS monitoring, Shadowtrack monitoring, house arrest, travel restrictions, and other conditions of the bond package. Aside from these errors, since the magistrate's decision on February 14, any risk of flight has been dramatically reduced because of the COVID-19 pandemic and the country's response to it. Mr. Weeks' history of lawful travel does not show a desire to become a fugitive, much less a family of fugitives.

### 1.     Mr. Weeks' travel is lawful and tied to his legitimate business and charitable purposes

Mr. Weeks' interest in travel began some 20 years ago when his father grounded him in high school and, as punishment, had him learn to identify every country on Earth, including their location, capital, and flag.[10] As a result, he developed a desire to explore the world.  By nature, Mr. Weeks has an entrepreneurial spirit. His passion for entrepreneurial ventures mixed with his love of travel has drawn him to invest in projects around the world.[11]  For example, Mr. Weeks traveled to New Zealand several years ago to invest in a company planning to bottle water using

---

[10]   *See* **Exhibit J**, Weeks Abroad Publication regarding the Weeks Family's foreign travel; **Exhibit K**, Photographs of philanthropic events in Haiti, Moldova, Cambodia, Mexico, and the Bahamas.

[11]   *See Real Leaders* article entitled "Sustainable Development Goal Impact Hero: Joby Weeks," dated December 27, 2018, https://real-leaders.com/sdg-impact-hero-joby-weeks/.

plant-based, decomposable water bottles. By invitation, on September 27, 2019, Mr. Weeks par-

ticipated in Pope Francis' forum on "The Common Good in the Digital Age" at the Vatican; the

forum's purpose was to find ethical ways to innovate with digital technology. *See* **Exhibit L**.

For her part, Stephanie Weeks has made a business tied to her travel and wellness blogs,

like "Weeks Abroad." Through Weeks Abroad, Stephanie has supported scientific research such

as Fabien Cousteau's Expedition to the Blue Hole of Belize, featured on the Discovery Channel.

*See* **Exhibit M**. She writes for various food and travel outlets, and has authored the book Food of

the Spirit: World Travel and the Everyday Miracles of Personal Transformation, a best seller on

Amazon.com. *See* **Exhibit N**. As a couple, Stephanie and Mr. Weeks have visited orphanages

across the globe and numerous regions ravaged by natural disasters to deliver supplies. *See* **Exhibit

K**. Mr. Weeks' travel has included efforts to fight malnutrition and promote his Sun Exchange

project, which crowd-funds solar farms in Africa. As the government can attest, all of the Weeks'

travel was public, not clandestine. They freely shared their explorations and efforts with the world.

Mr. Weeks' most notable foreign ties—to Mexico and St. Kitts & Nevis, where he owns

property and a fractional interest in property, respectively—are with countries that *have* extradition

treaties with the U.S. *See United States v. Griffith*, No. 1:20-CR-15 (S.D.N.Y. Dec. 30, 2019) (ECF

12, at 22) (extradition treaty with St. Kitts, where defendant thought of moving, considered in

favor of release). In fact, he left Mexico to return to the U.S. to meet with IRS agents before his

arrest. There's no pattern of travel showing that the Weeks family is avoiding countries with ex-

tradition treaties. Mr. Weeks has already signed extradition waivers from Mexico and St. Kitts &

Nevis and will sign a waiver for any other country the Court identifies. *See* **Exhibits D** and **E**.

Moreover, Courts regularly release people with significant foreign travel and ties, and even

foreign citizens, with access to significant assets abroad. *See, e.g., United States v. Webb*, Case

No. 15-CR-252 (PKC) (E.D.N.Y. Dec. 29, 2015) (ECF 142) (granting bail over government's objection to majority of defendants in 18-defendant FIFA corruption case, almost all of whom were foreign nationals, and some of whom were foreign nationals with citizenship in more than one country); *United States v. Griffith*, Case No. 1:20-CR-15 (S.D.N.Y. Dec. 30, 2019) (ECF 12, at 53) (reversing order of detention for defendant despite his dual U.S. and Singapore Citizenship); *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004) (affirming release of Danish citizen and resident charged with bulk-cash smuggling, and permitting him to stay in Denmark pending trial); *United States v. Benhamou*, Case No. 11-CR-336 (S.D.N.Y. Nov. 17, 2010) (Minute Entry) (granting bail over the government's objection to wealthy French national charged with insider trading and ordering defendant to rent a suitable apartment in New York City).

And of course, a fondness for foreign travel does not indicate a preference for life as a fugitive, much less a family of fugitives. *See Himler*, 797 F.2d at 162 ("Mere opportunity for flight is not sufficient grounds for pretrial detention."). Stephanie and Liberty have not secreted away to some remote foreign location awaiting Mr. Weeks' release. They are in Iowa with Stephanie's parents, aiding in Mr. Weeks' defense. Before the hearing on Mr. Weeks' motion, Stephanie will surrender to the undersigned her U.S. passport and her daughter's passport. For his part, Mr. Weeks has already surrendered his passport and done everything in his power to assure the court that he will not travel abroad. Most notably, he sold the turbo-prop plane and rescinded his JetSmarter membership, thereby depriving himself of any access to non-commercial flights.

### 2. Mistaken assertions regarding Mr. Weeks' ties to Defendant Two do not provide grounds for detention.

The magistrate's decision relied on the government's unsupported claim that Mr. Weeks has sinister "contacts" or "affiliations" abroad (T. 173, 175) that would harbor him as a fugitive. ECF 24 at 9. Specifically, it relied on sweeping assertions about what Defendant Two might do:

> Finally, Weeks' involvement in BitClub Network was significant enough that he had business relationships with several coconspirators around the world. *One of those coconspirators has been charged, remains at large, is believed to be residing in a country that does not have extradition with the United States, and has access to enormous wealth and two private planes.* Weeks not only has significant incentive to flee, the means to finance it, and the example of his *uncaptured coconspirator* of the benefits of flight, he has the contacts around the world—*including coconspirators who likely would prefer to keep Weeks out of Court.*

ECF 24 at 9 (emphasis added). Without a doubt, the government was referring to Defendant Two.

Although the magistrate did not raise concerns about Mr. Weeks and Defendant Two during oral argument at the detention hearing, his oral decision highlighted these concerns:

> But it is also the case that Mr. Weeks's work with the BitClub Network allowed him to form relationships with people around the world. In fact, Defendant 2, as we noted, is a fugitive and the Government believes is outside the country -- or in a country with no extradition treaty with the U.S

T. 168. In fact, even in its decision on co-defendant Matthew Goettsche, the magistrate emphasized Mr. Weeks' supposed ties to Defendant Two: Equally concerning, if not more so, is the fact that *Defendant 2 with whom at least Mr. Weeks has a relationship,* is a fugitive and the Government believes that he's residing in a country for which there's no extradition treaty. T. 160 (emphasis added). But the ties aren't there.

What the government left out of its presentation and briefing is that on February 14, 2020, when the bond hearing was held, Mr. Weeks had no "relationship" with Defendant Two. In fact, Mr. Weeks had no relationship with Defendant Two for the *two years* preceding the detention hearing in February 2020. And law enforcement knew it. As Mr. Weeks explained to the case agents for this investigation on April 19, 2019, his relationship with Defendant Two ended a year before (that is, in 2018) because Defendant Two blamed Mr. Weeks for a delay in the build-out of the Montana data mining center. That is reflected in the agents' notes, which Mr. Weeks received for the first time on March 24, 2020. *See Gov. Disc.* USA_19877_04006420, 6421, and 6429. Mr.

Weeks also felt alienated from Defendant Two and his associates after being cheated out of a business opportunity. Given that history, it is fanciful to assume Defendant Two would crawl out of hiding and risk exposure to help Mr. Weeks—a person he dislikes.[12]

Beyond mistakenly relying on a nonexistent relationship with Defendant Two, the magistrate's decision also indulged in speculation based on Mr. Weeks' ownership of property in Mexico: "[I]f, as the Government alleges, the Mexico mansion was a sanctuary of sorts for like-minded people, it causes the Court concern whether those are individuals who might aid Mr. Weeks." T.171. A "sanctuary" for "like-minded people" sounds like a polite euphemism for a cult. In reality, it's just a vacation home for Mr. Weeks' and his family. For several years, he has participated in a conference in Acapulco called "Anarcopulco." The conference attracts libertarians from around the world, including people like former Congressman Ron Paul. But Mr. Weeks doesn't have legions of followers who obey his commands; he has a vacation home. Unfounded fears do not rise to the preponderance required to defeat the presumption of release.

**3.    Mr. Weeks' ID documents and a single Facebook boast of the ability to obtain a foreign passport do not support his detention.**

At the time of his arrest, Mr. Weeks had a Mexican identification card, an American passport, and an identification document from the World Sports Alliance, a group that supports sustainable development. These documents do not bear on the questions before this Court. First and foremost, all the documents were in Mr. Weeks' name. He didn't use a false identity, or an altered photo; he wasn't trying to be somebody else. Second, a Mexican voter card is not a document used to facilitate travel. In this context, it shows little more than Mr. Weeks owns property in Mexico.

---

[12]    That one member of an alleged conspiracy is at large should not be held against Mr. Weeks. ECF 24 at 9. Defendant Two's status has nothing to do with Mr. Weeks. The Court must separately assess the risks for each defendant. *United States v. Oliver*, Crim. No. 16-40, 2016 WL 1746853, at *10 (W.D. Pa. May 3, 2016) (whether coconspirators are in custody "is <u>not</u> a specific factor under section 3142(g)").

The magistrate essentially agreed to their minimal importance, concluding that the card was essentially just more proof of travel abroad. T. 173. That's hardly a revelation in this case.

The government also overstates the import of Mr. Weeks' glib Facebook remark about being able to obtain a Mexican passport for a third party. ECF 24 at 34. Mr. Weeks never obtained a Mexican passport for himself or someone else. And even if he had access to someone claiming the ability to produce a fake Mexican passport, mere access would not render him a flight risk. *See Himler*, 797 F.2d at 162 (no evidence to deny bail although defendant "clearly capable of obtaining false identification," because there was "no direct evidence to suggest that he would flee").

### 4. Misinformation regarding foreign bank accounts and money kept in a belt does not provide grounds for detention.

The magistrate's decision erroneously relied on an account at Emirates NBD Bank and an account at Bank of Georgia in concluding that Mr. Weeks had access to foreign fiat currency. T. 169. In fact, by November 13, 2019, one account had been closed and the other had no money in it. *See* **Exhibits O**, Bank Account Statements. The funds in the Emirates NBD account were used in 2019 to purchase a turbo-prop plane that was hangered in the U.S. Mr. Weeks sold that plane in March 2020. The Emirates account was closed on or about November 13, 2019. Mr. Weeks used the Bank of Georgia account in the name of Geo Servers LLC when he brokered the sale of cryptocurrency mining equipment made by Bitfury, which is located in Georgia. When Mr. Weeks shut down Geo Servers he emptied the account. The magistrate's concerns about these accounts were not raised at the detention hearing on February 14, yet it was featured in his order of detention.

Mr. Weeks did travel "wearing a belt that carried thousands of dollars in cash in concealed fashion" (T. 171), but that is hardly unusual; an experienced traveler knows it is wise to carry cash for places that may not accept credit cards, and it is wise to carry cash (in this case, $3,000) in a place that is less accessible to pick-pockets. Whether Mr. Weeks keeps money in a wallet in his

back pocket or a belt to avoid thievery really has no bearing on the risk of flight analysis.

### 5. The COVID-19 pandemic and America's response to it has lowered any risk of flight.

Since the magistrate's February 14 decision, the COVID-19 pandemic has lowered any risk of flight dramatically. As a practical matter, there is nowhere for Mr. Weeks to go. *See, e.g.*, *In the Matter of the Extradition of Alejandro Toledo Manrique*, Case No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) ("The Court's concern was that Toledo would flee the country, but international travel is hard now. Travel bans are in place, and even if Toledo got into another country, he would most likely be quarantined in God-knows-what conditions, which can't be all that tempting. …But escape is riskier and more difficult now.").

Since February 1, 2020, the worldwide number of daily departures plunged from just under 30,000 flights to barely 2,000. And the average number of daily departures from Newark during this period fell from 136 to just 9. *See* www.icao.int/safety/Pages/COVID-19-Airport-Status.aspx (last updated May 23, 2020). No U.S. Citizen can travel to Europe, and international travel in general has been curtailed. On the borders between the U.S., Mexico, and Canada, crossings in either direction are restricted to essential travelers. Even if Mr. Weeks could get himself on a plane to another country (which he will not), many countries now have stiff border-crossing rules.[13]

### D. Mr. Weeks' access to wealth is misunderstood and overstated.

The government's claim that Mr. Weeks has access to significant wealth is based on information from a blockchain explorer[14] purporting to show that bitcoin worth $560 million flowed

---

[13]   Sophia Ankel, *From kissing bans to the death penalty: Here's how seriously different countries are taking the coronavirus outbreak*, Business Insider (March 5, 2020).

[14]   Blockchain explorers are web pages that extract and display information from the blockchain in a human readable form. *See generally* https://en.bitcoin.it/wiki/BlockExplorer.com.

into and out of a public key address ("wallet") he used. ECF 24-3, Ex. C. But the "total received" figure in the Exhibit does not show the value of transactions when they were made, or the cumulative value of Mr. Weeks' financial activity, and does not reflect the value of his current assets.[15]

Many of the bitcoins that passed through the wallet were payments for Bitfury's cryptocurrency mining equipment; Mr. Weeks worked as a broker for Bitfury. In the ordinary course of that business, Mr. Weeks would accept large transfers of cryptocurrency into his bitcoin wallet as payment for the purchase of cryptocurrency mining equipment. Mr. Weeks would then remit the cryptocurrency, less his brokering fee, to Bitfury. The vast majority of funds for these sales that Mr. Weeks arranged between BitClub and Bitfury went to Bitfury; Mr. Weeks did not keep that money for himself.  For example, on or about October 13, 2017, Mr. Weeks brokered the sale of $53,000,000 worth of B8 cryptocurrency miners from Bitfury to BitClub. *See* **Exhibit P**, Customer Purchase Order. BitClub paid for these B8 miners by sending bitcoins worth $58,000,000 to Bitfury through Mr. Weeks' bitcoin wallet. *See* **Composite Exhibit Q**, Blockchain Explorer Records. As the records reflect, Mr. Weeks kept about $5 million in bitcoin as his fee for brokering this sale.[16] The remaining $53 million in bitcoin went to one of Bitfury's bitcoin wallets.

These transfers may give the false impression that Mr. Weeks was personally receiving these funds, when, in truth, his bitcoin wallet was used as a pass-through account to the manufacturer of the cryptocurrency mining equipment. Thus, the document relied upon by the government shows transactions of bitcoin; it does not represent Mr. Weeks' net worth, it does not show his

---

[15]   The wallet at issue contains about 23.63 bitcoin currently valued at about $212,437.95 USD.

[16]  Mr. Weeks introduced competition to BitClub's process of buying mining equipment and thereby lowered costs. Originally, BitClub obtained its mining equipment from BitMain. Mr. Weeks introduced BitClub to another mining equipment manufacturer, Bitfury. This competition drove down the cost of mining equipment for BitClub, which inured to the benefit of BitClub's members.  When Mr. Weeks joined BitClub, it was paying approximately $220,000 per petahash for BitMain mining equipment. Through Bitfury, BitClub paid $120,000 per petahash: a savings of about $30 million.

access to funds in May 2020, and it does not reflect any unlawful behavior.

The transactions at issue occurred over several *years*, yet the government's Exhibit calculates their value using the U.S. Dollar price of a bitcoin on a single *day*. That misrepresents the value of transactions when they occurred. As of May 24, the price of a bitcoin is approximately $8,990.18. So, if we assume that 60,000 bitcoins passed through Mr. Weeks' wallet at that value, the "total received" would be over $539 million. However, four years ago, in February 2016, a bitcoin was worth about $575. Using that earlier price, the "total received" through the wallet would be only $34.5 million. I.e., less than 8%. But in fact *both* figures are inaccurate because they fail to account for the fluctuations in the price of bitcoin over the last four years from $500 to over $19,000. If the price of bitcoin shoots back up to $19,000 next week, then the government's method would have $1.14 ***billion*** passing through Mr. Weeks' wallet. The "total received" on the government's Exhibit is thus a moving target. Nothing suggests that the "total received" on the government's Exhibit ever belonged to Mr. Weeks, or is now available to him.

### E.    Views and "rhetoric" are irrelevant to risk of flight.

#### 1.    Mr. Weeks should not be punished for his free expression.

The government argues that Mr. Weeks is a flight risk because he has "a demonstrated streak of anti-government rhetoric." ECF 24, at 23. But none of his speech or association shows he will abandon his family or cause them to lose their assets. Mr. Weeks is an outspoken American libertarian. He believes in the non-aggression principle: all human interaction should be voluntary and it is illegitimate to use force, fraud, or coercion to get your way. The Weeks family's political inclinations run deep. Mr. Weeks is no exception. He was active for years in the Republican Party, serving as a 2008 delegate to the National Convention before becoming a devoted libertarian. Mr. Weeks then volunteered in Congressman Ron Paul's presidential run. *See* **Exhibit B**, Letter of Support from Ron Paul. Citing Mr. Weeks' "views," "rhetoric," or "anti-Government streak" as

reason to detain him veers uncomfortably close to punishing him for his thoughts and speech. "[F]reedom of expression upon public questions is secured by the First Amendment." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964).

### 2. Mr. Weeks' association with Liberland and Atlantis is harmless.

Mr. Weeks' interest in "Liberland" and "Atlantis" has turned into an unnecessary distraction in these detention proceedings. Liberland is an island on the Danube River between Croatia and Serbia.  It is not a sovereign nation. Mr. Weeks has associated with some people who would like it to become so, which includes Congressman Ron Paul. Similarly, "Atlantis" is a tiny island off the coast of Portugal. The micronation is 2,000 square ft. with four people living on it. Mr. Weeks' association with these micronations is irrelevant. But somehow, Liberland and Atlantis have become one of the grounds to detain Mr. Weeks. Notably, Mr. Weeks has never disclaimed his U.S. citizenship, nor will he. Mr. Weeks' fleeting interest in micronations, like Liberland and Atlantis, does not reflect an inclination to flee. It is not a basis to detain Mr. Weeks.

### F. Mr. Weeks has no history of disobeying court orders or conditions of release.

The government argues that Mr. Weeks has a "demonstrated history of refusing to follow rules" (ECF 24, at 23), but can show no history of Mr. Weeks disobeying court orders to appear. Indeed, Mr. Weeks has three minor criminal cases—a juvenile arrest from 20 years ago that was expunged, a citation for reckless driving over the speed limit, and a citation for driving under the influence—but his behavior in these cases actually demonstrates his compliance with court directives, not the opposite. Those cases were completed without incident. It would be different if the government had evidence of bail jumping. But they don't, because that never happened.

### G. Mr. Weeks genuinely intended to cooperate with the IRS.

Mr. Weeks' cooperation undermines the government's risk of flight analysis. Since April

2019, Mr. Weeks has been cooperative with the government. He approached the IRS, without a lawyer, in April 2019 to address his tax liability. Mr. Weeks approached them, not the other way around. For over 2 ½ hours he answered their questions. Mr. Weeks then kept in contact with the IRS right up through the day of his arrest, always willing to assist them.

As the government's original opposition brief outlines, Mr. Weeks believed his cryptocurrency expertise and network could assist the U.S. government's investigation of cyber criminals. ECF 24 at 27. Mr. Weeks was previously a victim of cryptocurrency hacking.[17] He has a vested interest in assisting the prosecution of such hackers. In fact, Mr. Weeks hired a team who found the hacker who victimized him. That information was shared with the FBI, who opened an investigation. Mr. Weeks wants to prevent hackers from victimizing others like him. People who approach the government and volunteer their services, as Mr. Weeks did, tend not to be the type to flee.

### H.     Mr. Weeks was cooperative with the government at the time of his arrest

On December 10, 2019, federal agents arrested Mr. Weeks. Post-arrest, federal agents interviewed Mr. Weeks for hours. Mr. Weeks answered all of their questions. He provided law enforcement with access to his laptop and cell phone, including the passwords. These devices were protected by virtually unbreakable encryption. But for Mr. Weeks' cooperation, law enforcement would not be able to access these devices.  Mr. Weeks' cooperative nature should also give the Court comfort that he looks forward to having his day in Court, not avoiding it.

---

[17]    *See* Nathaniel Popper, *Identity Thieves Hijack Cellphone Accounts to Go After Virtual Currency*, The New York Times (Aug. 21, 2017), https://www.nytimes.com/2017/08/21/business/dealbook/phone-hack-bitcoin-virtual-currency.html.

### III. The Nature & Circumstances of the Charges Do Not Support Pretrial Detention

#### A. The pending charges do not demand detention.

This case involves two standard fraud charges—a conspiracy to commit wire fraud (18 U.S.C. § 1349) and a conspiracy to offer or sell unregistered securities (18 U.S.C. § 371). The cryptocurrency subject matter of the indictment does not change the nature of the statutes. They do not carry mandatory minimum terms of imprisonment. *See* 18 U.S.C. §§ 371 and 1349. They do not raise a presumption of detention. *See* 18 U.S.C. § 3142(e)(2) and (3). People convicted of violating these statutes do not carry an elevated burden required to remain on release pending sentencing. *See* 18 U.S.C. § 3143(a)(2). And most defendants convicted of these offenses are allowed to self-surrender to the Bureau of Prisons to begin serving any sentence. Accordingly, there is nothing inherent in the charged offenses that demands pretrial detention.

#### B. Bitcoin and BitClub Operations

Bitcoin is a decentralized digital currency. It is not illegal or improper to own, use, or mine bitcoin. Transactions in bitcoin are regulated by many government agencies, including the Treasury Department. Businesses, like AT&T, accept bitcoin for goods and services.

Bitcoins are not issued by a government, but instead by the software as a reward for a process known as "mining." The "miners" act as the blockchain's (the ledger's) bookkeepers. When a miner confirms a block of transactions the confirmation is sent to computers that update their copies of the blockchain, and the miner receives newly issued bitcoins. The miners confirm new transactions with computers that require a tremendous amount of electricity. The "work" being done by these machines is a complex hashing algorithm. Mining is a zero sum game; all miners are competing for a limited number of new bitcoins given to the person who adds a block of

transactions to the blockchain ledger. As manufacturers make new, more efficient mining machines, miners must buy the latest equipment and find inexpensive electricity to stay competitive.

Some miners also join "mining pools" to pool their "work" and increase their odds of solving the complex equation that earns them new bitcoin. BitClub organized mining pools. During its operations, BitClub used multiple data mining centers housing huge networks of computers that made up its mining pools. Because of its size, BitClub was able to aggregate enough computing power to mine bitcoin and other cryptocurrencies, like Ethereum, on a large scale. BitClub purchased mining equipment from companies like Bitfury and Bitmain, paid for large amounts of electricity needed to run the mining equipment, and hired personnel to support BitClub's operations. Members received bitcoin and other cryptocurrencies mined by BitClub.

### C. Courts regularly release defendants facing significant sentences.

The magistrate and government placed undue focus on the potential sentence for Mr. Weeks. T. 167; ECF 24 at 7. From day one, the government has touted to the press that this is a $722 million Ponzi scheme, and that Mr. Weeks is facing 15 years in prison for his role in BitClub. First, even accepting the government's unexplained advisory guidelines calculation of 15 years for Mr. Weeks (ECF 24, at 7), courts have frequently released defendants charged in serious white-collar cases which carry potentially long prison sentences. *See, e.g., United States v. Harry*, Case No. 2:19-CR-246 (D.N.J. Nov. 15, 2019) (ECF 85, at 4-6) (denying motion for pretrial detention despite charge defendant "orchestrat[ed]" a "massive fraud scheme involving" a $424 million loss amount); *United States v. Webb*, Case No. 15-CR-252 (PKC) (E.D.N.Y. Dec. 29, 2015) (ECF 142) (granting bail over government's objection to majority of defendants in high profile, 18-defendant FIFA corruption case); *United States v. Dreier*, 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009) (granting bail to defendant accused of running a $400 million Ponzi scheme); *United States v. Madoff*,

Case No. 1:09-CR-213 (S.D.N.Y. January 16, 2009) (ECF 22) (releasing defendant in multi-billion dollar Ponzi scheme facing life in prison); *United States v. Paul Burks*, Case No. 3:14-cr-208-MOC-DSC (W.D.N.C. 2016) (ECF 6, 7) (granting bail despite charges of operating a $900 million internet Ponzi scheme); *United States v. Cosmo*, Case No. 2:09-cr-00255-DRH-ETB (E.D.N.Y. 2009) (ECF 61) (releasing defendant charged with $370 million Ponzi scheme).

Second, at this time, calculating an advisory guidelines offense level in this case is the legal equivalent of throwing darts at a dartboard. Especially with respect to loss under U.S.S.G. § 2B1.1, there are so many factors that play into the advisory guidelines score, that calculations are closer to guesstimates. Several facts suggest the government's loss calculation is inflated with respect to Mr. Weeks. The government alleges that BitClub was involved in a wire fraud conspiracy starting in April 2014. Mr. Weeks joined the company 16 months later in August *2015*. And the government appears to take the position that Mr. Weeks did not know about any fraud until early *2016*. T. 116. Mr. Weeks stopped promoting BitClub around the middle to latter part of 2018 because mining bitcoin became unprofitable due to bitcoin's declining value. Notably, a defendant is not responsible for any loss before joining a conspiracy. *See United States v. Collado*, 975 F.2d 985, 997 (3d Cir. 1992). Any losses that occur after a defendant joins a conspiracy must be reasonably foreseeable to that defendant. *See United States v. Robinson*, 603 F.3d 230, 233 (3d Cir. 2010). That is not a very high obstacle for the government to hurdle when a defendant is the leader of an enterprise. It's different when a defendant has a smaller, more subservient role in a business.

In this case, Mr. Weeks sold cryptocurrency mining equipment to and was a promoter of BitClub. Even on the scale of promoters, Mr. Weeks was not in the top tier.[18] Mr. Weeks was *one*

---

[18]   BitClub classified its participants by their roles and the size of their "downline" in ascending order: miner, builder, pro builder, master builder, monster builder, and mega monster builder.

of approximately 104 monster builders who promoted BitClub. Although the number of BitClub members is unknown at this time, given his place in the promotion hierarchy and the number of promoters at his level, it is likely Mr. Weeks sponsored a very small portion of BitClub's members. The potential loss associated with Mr. Week's activities is reduced by the fact that he stopped promoting BitClub in the middle to latter part of 2018. Further, Mr. Weeks did not have access to any BitClub wallet; he did not know the actual number of investors; and he did not have access to the back office data. Notably, Mr. Weeks' relationship with Defendant Two—one of the founders and operators of BitClub—disintegrated in early 2018. Even the agents who interviewed Mr. Weeks post-arrest asserted multiple times that Mr. Weeks asked questions of the BitClub operators, but he did not receive answers, or adequate ones. This lack of knowledge cuts directly against any foreseeability argument for loss calculation purposes, thereby reducing any potential sentence.

BitClub's compensation plan and allocation of incoming money are also relevant to loss calculation. The plan provided for: (1) a $99 membership fee; and (2) payment for participation in mining pools to be distributed with a 20/40/40 split. That is, 20% went to operate BitClub, 40% to purchase cryptocurrency mining equipment and set up data centers, and 40% to pay commissions to members. Thus, if BitClub brought in $722 million, a portion of that amount—about $99 for each new membership—went directly to the owners of BitClub, *not* Mr. Weeks. For ease of calculation, if $700 million remained, then 20% ($140 million) went to operate BitClub, *not* to Mr. Weeks. Another 40% ($280 million) went to pay commissions to members. For Mr. Weeks, his commissions amounted to approximately $1 to 1.5 million; that means about $278.5 million went to hundreds or thousands of *other* promotors, *not* Mr. Weeks. And the remaining 40% ($280 million) was used to pay for cryptocurrency mining equipment and data centers.

Although Mr. Weeks brokered the sale of some, not all, of BitClub's cryptocurrency min-ing equipment, he only collected a fee for those sales. The lion's share of money for the sale of that equipment went to the mining equipment manufacturers, like Bitfury, not Mr. Weeks. The government seems to allege that, at least initially, BitClub was not buying and operating crypto-currency mining equipment, as advertised. Mr. Weeks' sale of mining equipment to BitClub to mine bitcoin—consistent with its representations to prospective and current members—was there-fore an activity legitimizing the operations of BitClub. In fact, using that mining equipment, BitClub mined approximately 88,904 bitcoin and 508,695 Ethereum, and then distributed those cryptocurrencies to its members. Accordingly, Mr. Weeks' fee for the sale of this mining equip-ment, which generated money for members, should not be factored into the loss amount. And even if those mining equipment expenses were included in the loss amount, the guidelines commentary directs that the loss amount be reduced by the amount of funds paid out to investors. *See* U.S.S.G. § 2B1.1, cmt. n.3(E)(i) and (3)(F)(iv); *see, e.g.*, *United States v. Leonard*, 529 F.3d 83, 92–93 (2d Cir. 2008) (identifying the need to subtract the value of securities the investors received from the loss amount). Here, the payment of approximately 88,904 bitcoin and 508,695 Ethereum to BitClub members would be grounds for a large—or total—reduction in the loss amount.

Further, the amount the government says BitClub took from its members is exceeded by the value of the bitcoin and Ethereum that the members received. The government asserts that the loss in this case is $722 million.[19] BitClub mined 88,904 bitcoin and 508,695 Ethereum. At today's

---

[19] It is unclear how the government reached this $722 million figure. BitClub did not accept U.S. currency as payment for membership or participation in its mining pools. BitClub *only* accepted *bitcoin* as pay-ment. That begs the question—did the government come up with its $722 million loss figure based on the value of bitcoin on the day each person paid to become a member of BitClub between 2014 and 2019, and the value of bitcoin on the day each member paid to participate in each mining pool, *or* did the govern-ment take the total number of bitcoin paid to BitClub over the course of five years for both membership and participation in mining pools and use the value of bitcoin on one day (out of 1,825 days to choose

value, 88,904 bitcoin would be worth $860,412,912, and 508,695 Ethereum would be worth $107,843,340.  Combined, during the course of its operations BitClub mined $968,256,252 worth of cryptocurrency for its members; that is almost $150 million *more than* the $722 million BitClub took in.  In which case, the loss is $0.

The government's likely retort is that bitcoin and Ethereum moved up and down in value over time, so there is no way to know if this $968 million figure is even accurate. But that would miss the larger point. Once mined and distributed, BitClub members could do what they pleased with this cryptocurrency. It was an individual decision on their part how to dispose of it. One member might have held onto it for a day and sold it for a huge gain; another might have held onto it for two years watching the price skyrocket, as it did in late 2017, and then fall, as it did in 2018, ultimately experiencing a loss; and another might still have it. The process of calculating "loss" in this case is excruciating. Even if a member paid 10 bitcoin to join a mining pool and only mined 6 back, there may be no loss; in fact, there may be a gain. For example, if the value of the 10 bitcoin was $1,000 (that is $100 per bitcoin) at the time the member purchased a space in a mining pool, but by the time the mine paid out 6 bitcoin, each bitcoin was worth $1,000, there would be no loss for this member. In fact, there would be a capital gain if the government's characterization of an interest in a mining pool constitutes a "security"; then it would be treated as a "capital asset" for tax purposes. The IRS would agree. In IRS Notice 2014-21, it advises that virtual currency is treated as "property" for tax purposes and that a "taxpayer generally realizes capital gain or loss on the sale or exchange of virtual currency that is a capital asset in the hands of the taxpayer." Calculating a reasonable estimate of loss in this case—if there is a loss—may be impossible.

---

from) to come up with this total loss figure? The former would generate an accurate figure for the total amount paid to BitClub (not loss) while the latter would likely create a massive inflation of this figure.

Mr. Weeks recognizes that the value of the cryptocurrency mined by BitClub, and distributed to its members, is a moving target. But the loss or gain experienced by the individual member is ultimately based on that member's decision when to cash-out the bitcoin or Ethereum. This is not member-blaming (or victim-blaming as the government might see it).  It is just recognizing that this case presents an incredibly challenging, if not impossible, situation for calculating loss.

A Court should view loss from the standpoint of gain where loss cannot reasonably be calculated. *See* U.S.S.G. § 2B1.1, cmt. n. 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."). Mr. Weeks would be responsible for what he made promoting BitClub—between $1 and $1.5 million.  Pursuant to the advisory guidelines, with acceptance of responsibility, this would produce a score of close to 51 – 63 months, not 15 years. That type of sentence does not favor pretrial detention; a 38-year-old man would not spend his life on the run to avoid such a sentence.

## IV.   The Magistrate's and Government's Focus on the Weight of the Alleged Offenses Fails To Address Any Risk of Flight Posed by Mr. Weeks

### A.   The weight of the evidence is the least important statutory factor in assessing risk of flight.

A disproportionate amount of the government's written and oral arguments, and the magistrate's decision, focused on the weight of the evidence, but that is the *least* important 3142(g) factor. *See United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) ("the weight of the evidence is the least important of the various factors") (Kennedy, J.); *United States v. Jones*, 566 F.Supp.2d 288, 292 (S.D.N.Y. 2008) (the "weight factor" is generally considered the least important consideration because "the Court's function in examining the weight of the evidence is not to determine guilt or innocence."); *United States v. Fama*, Case No. 13 Cr. 234(JFK), 2013 WL 2467985, at *3 (S.D.N.Y. June 7, 2013) ("some courts have described the weight of the evidence

factor as the 'least important' of the § 3142(g) factors" because it is inherently difficult to assess the Government's case before trial and a defendant is presumed innocent) (citations omitted).

The evidence against Mr. Weeks is not very strong. It is also the wrong focus. The weight of the evidence "may be considered **only** in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community." *Motamedi*, 767 F.2d at 1408 (emphasis added). Here, the government essentially assumes that arguments about guilt prove risk of flight. But Mr. Weeks must be presumed innocent, and when a court "impermissibly makes a preliminary determination of guilt, a refusal to grant release could become in substance a matter of punishment." *Id.* (citing *United States v. Edson*, 487 F.2d 370, 372 (1st Cir.1973)).

The magistrate relied on the government's faulty assumption that access to the owners of BitClub equaled culpability. First, the government mistakenly views Mr. Weeks' involvement in brokering the sale of mining equipment to BitClub as raising his culpability over other promoters of BitClub. ECF 24 at 10, 11-12. This resonated with the magistrate. T. 163. But this evidence actually leads to the opposite conclusion: Mr. Weeks' sale of mining equipment to BitClub and access to its operators gave him *more* reason to believe that BitClub was doing what it said it was doing. BitClub represented to potential members, and existing members, that it was buying and operating data mining equipment. Mr. Weeks was selling mining equipment to BitClub and either visited or was involved in the set-up of three data mining centers for BitClub: (1) Iceland; (2) Georgia (the country); and (3) Montana. *See* **Exhibit R** (Iceland center), **Exhibit S** (Georgia center), and **Exhibit T** (Montana center). These experiences proved to Mr. Weeks that BitClub was actually mining bitcoin and accurately representing these activities to its members.

Second, the government and the magistrate also err when they interpret an email by Mr. Weeks to BitClub, urging them to buy mining equipment, as proof that Mr. Weeks believed

32

BitClub was a fraud. ECF 9 at 10-11; ECF 24 at 12. Not so. A review of the actual email Mr. Weeks sent to BitClub shows that his comment about it being "not right" to decline to buy certain equipment was taken out of its real context, where it was part of a sales pitch. *See* **Exhibit U**, Email from Joby Weeks to Defendant Two and Matthew Goettsche, dated June 2, 2017. The exchange was Mr. Weeks' attempt to broker the sale of mining equipment to BitClub, not to shame them into ceasing some illegal activity. To read this allegation in the indictment, without the benefit of the underlying email, alters the meaning of Mr. Weeks' words.

And although the magistrate accepted Mr. Weeks' explanation of the "larger context" of this comment, he nevertheless concluded with the statement that "even as Mr. Weeks had protested it's not right, he continued to work with the co-conspirators and persuade others to invest." T. 164. That means the government's slanted view of Mr. Weeks' comment infected the court's analysis.

In fact, because Mr. Weeks sold mining equipment to BitClub, witnessed the operations at the data mining centers, and assisted with the buildout of the Montana data mining center, he actually had more reason than any other promoter to believe that BitClub was engaged in legitimate operations. In this case, access equals comfort, not culpability.

After considering these arguments by Mr. Weeks, the magistrate concluded: "I must give at least some reasonable deference to the fact that the grand jury has found probable cause enough to include Mr. Weeks in as a defendant in the fraud count." T. 165. Outside the context of an Information and plea agreement, every defendant who appears before a magistrate for a detention hearing is indicted. The existence of an indictment cannot swallow the presumption of release for a defendant who has not been charged with an offense carrying a rebuttable presumption of detention. If Mr. Weeks was featured in more than two paragraphs in Count One (*see* ECF 9, at ¶¶ 4(g)(xi) and (xii)), the magistrate might have a point. But Mr. Weeks was barely worth mentioning

in the Indictment, so there is no telling what the grand jury thought or what the government told the grand jury about Mr. Weeks' activities in BitClub. The government has not revealed whether it told the grand jury that Mr. Weeks sold cryptocurrency mining equipment to BitClub, or that he visited the data mining centers, or helped build out the Montana facility. Without knowing what the government told the grand jury, the magistrate was in no position to reject Mr. Weeks' explanation of his activities in favor of an assumption that the grand jury knew about such activities, but viewed them differently.

The magistrate (T. 164-65) and the government (ECF 24, at 15-16, and Ex. A) also misperceived Mr. Weeks' less-than-diplomatic email exchange with a BitClub member who complained about not being able to get in touch with BitClub about his account. Mr. Weeks' tone was designed to keep a BitClub member from making the same mistakes he has made in the past getting rid of his bitcoin too early. In fact, the member appears to have purchased shares in a bitcoin mining pool around August 11, 2017, when bitcoin was worth $3,884.71 and then had his unpleasant exchange with Mr. Weeks on November 22, 2017, after bitcoin appreciated 212% to $8,253.55. Although Mr. Weeks could have been less brusque, he was trying to get an important point across.

The Government tries to make much of Mr. Weeks' use of Virtual Private Networks (VPNs)[20] to access his BitClub account and his encouraging others to do the same. ECF 24 at 8. But at worst, Mr. Weeks' use of VPNs thwarted only BitClub's *self-imposed* decision to block IP addresses. VPNs are not illegal. BitClub's self-imposed IP restriction indiscriminately blocked ***existing*** members, such as Mr. Weeks himself, from their own accounts. Without access to their

---

[20]   A VPN allows secure connections between computers. Many businesses use VPNs so that their remote employees can connect to company servers without having to make them directly and publicly available over the internet. VPNs can be used to access region-restricted websites. E.g., many Chinese citizens use VPNs to access Facebook because their government blocks access to foreign media.

accounts, members could not withdraw their bitcoin. VPNs were a solution to this dilemma.

Mr. Weeks' advice to newly recruited members to wire funds to Manna Ministries[21] and avoid referring to "bitcoin" did not spring from any concern about BitClub. Rather, it was designed to help new members and Mr. Weeks avoid problems with their respective banks due to the banking industry's general paranoia about cryptocurrency. Mr. Weeks accepted bitcoin from prospective members in connection with a BitClub program called "Pay it Forward." This program was designed to address the problem confronted by some prospective members who wanted to immediately join BitClub, but did not have bitcoin on hand to pay for their membership or participation in a BitClub mining pool. Because BitClub only accepted bitcoin for payment, existing members like Mr. Weeks could use their own bitcoin to open a prospective member's account and receive traditional currencies as reimbursement from those prospective members. To avoid suffering a potential account closure, Mr. Weeks recommended that prospective members avoid telling their banks that the funds being wired to Mr. Weeks were connected to bitcoin. Mr. Weeks' warning to these prospective members concerned "bitcoin," *not* "BitClub."

Once again, the government viewed Mr. Weeks' conduct through a negative lens to fit its narrative. In its opposition brief to Mr. Weeks' request for release, the government asserted:

> Weeks sometimes told BitClub Network investors to wire investments to an account for "Manna Ministries," a corporate entity that he controlled, and gave instructions like:
> - Don't mention bitcoin though.  Put donation when sending wire
> - Say it's a donation and nothing to do with bitcoin
> - Put that it's for "Antarctica Trip"[22]
>
> This evidence suggests that Weeks knew he was engaged in fraud, that he knew he was promoting unregistered securities, and that he had good reason to hide his financial dealings relating to the BitClub Network.

---

[21]   Manna Ministries is a charitable organization that Mr. Weeks created almost 20 years ago to serve the underprivileged in the United States and abroad.

[22]   Mr. Weeks traveled to Antarctica in late December 2018 and used some of the funds for his trip.

ECF 24, at 17. The magistrate accepted the government's interpretation, noting Mr. Weeks' efforts to "disguise the purpose of investment money" in his detention order. T. 165-66. Contrary to the government's position and the magistrate's conclusion, evidence produced by the government on March 24, 2020, *after* the detention hearing, actually supports Mr. Weeks' explanation.

In its affidavit to justify the search of the Arvada house, the FBI offered *that* court different information. In the Arvada search warrant affidavit, the FBI explained:

> [O]n or about October 17, 2017, Weeks engaged in a series of emails with an individual regarding the transfer of bitcoin in exchange for cash, Weeks provided information regarding the Weeks Chase Account and wiring instructions as follows:
> Sure, just don't put Bitcoin in the wire, **banks hate bitcoin**
> PLEASE DO NOT MENTION BITCOIN
> Jobadiah Sinclair Weeks

*See* Gov. Disc. at USA_877_04004270 (emphasis added). This confirms Mr. Weeks' explanation. Mr. Weeks' advice only reflects a fear of account closure based on the banking industry's biased view of bitcoin in general, not an acknowledgement of fraud with BitClub.

In sum, in its prior submissions to the Magistrate, the government raised a number of concerns regarding risk of flight, but those concerns are based on faulty reasoning and unfounded fears. "Only in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015). The evidence reinforces Mr. Weeks' limited role in BitClub and belief that BitClub was operating a legitimate business. Critically, none of the allegations suggest that Mr. Weeks wants to flee. The Court can therefore fashion appropriate conditions of release.

## V.    The Speedy Trial Act and Due Process Concerns Favor Release on Conditions

The law requires that Mr. Weeks be tried "not later than ninety-days" following his detention, *see* 18 U.S.C. § 3164, but the enormous volume of discovery in this case virtually ensures that the pre-trial period of detention will be much longer. *See* 18 U.S.C. § 3161 (tolling provisions

for both § 3161 and § 3164). According to the government, anticipated discovery currently totals almost 1.8 million documents, *not including* the computers, iPhones, hard drives, thumb drives, and documents seized from Mr. Weeks and his co-defendants at the time of their arrests. More than three months after Mr. Weeks' arrest, the government provided Mr. Weeks with a hard drive containing approximately three *terabytes* of data from the BitClub website, and another hard drive with approximately 192 gigabytes of data, including search warrants, Facebook chats, videos of post-arrest interviews, photographs, and law enforcement reports. Recently, the government produced another hard drive containing an additional 200,000 records. To review this data will take a substantial amount of time, pretrial preparation, and, most importantly, access to Mr. Weeks.

The prolonged detention anticipated here, and the resulting loss of meaningful consultation with counsel, also raise serious due process concerns. *See Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978) ("one of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds, Bell v. Wolfish,* 441 U.S. 520 (1979); *United States v. Perry,* 788 F.2d 100, 112–13 (3d Cir. 1986) (constitutional ban on excessive pre-trial detention can be understood as right guaranteed by substantive due process).

In a white-collar case with millions of pages of documents, the defendant is a critical part of the defense team.  Especially here, where the charges relate to esoteric matters involving cryptocurrency mining, hash rates, blockchains, complex algorithms, and mining pools, client assistance is a necessity. It is simply not possible for Mr. Weeks to substantively participate and counsel to meaningfully confer with and prepare Mr. Weeks for trial from the confines of the Essex County Correctional Facility, especially not now.

Regular, unfettered access to a computer, telephone, and printer is nonexistent at the jail. Inmates have limited computer and phone time, and compete for it (including many who do not

need to communicate with counsel, but just want to watch pornography). In many cases, limited access to computers would not be an impediment to adequate preparation. But in a white-collar case with millions of records, it creates devastating inefficiencies and challenges for a defendant.

Courts have no illusions about the hardships inflicted on pretrial detainees, and have released defendants in complex, document-intensive cases even when defendants are indisputably a risk of flight. *See, e.g.*, *United States v. Renzulli,* Cr. No. 87–258–7, 1987 WL 17562, at *4-5 (E.D. Pa. Sept. 28, 1987). This predicament is only magnified when that pretrial detention is expected to last more than a year. And that is where this case is headed. Because a combination of conditions exist that allow for Mr. Weeks' release while at the same time reasonably assuring the Court that Mr. Weeks will not flee, then, on balance, his release should be secured.

## VI.   Mr. Weeks' Ability to Prepare a Defense Will Be Impaired if He is Detained in Jail During the Pandemic

In the midst of a global pandemic, preparing Mr. Weeks for trial has become even more challenging. Since March 20, 2020, the Essex County Correctional Facility has severely limited attorney visits, allowing guards complete discretion on a "case-by-case basis," after the attorney "communicate[s] the need and reason for the contact visit to the Visit Sergeant." *See* **Exhibit V**. Effective April 1, 2020, attorney visitation can occur by pre-scheduled 20-minute video teleconference booth visitation on Monday to Friday from 9:00am to 3:00pm, if availability exists. *See* **Exhibit W**. But in either scenario, there is no guarantee that counsel will be granted access to Mr. Weeks. And limited, 20-minute video conference sessions mean Mr. Weeks will be unable to meaningfully assist in reviewing discovery. *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001) (evaluating constitutionality of restrictions placed on attorneys visiting clients at Rikers Island and finding that pretrial detention conditions may violate the Sixth Amendment when "they unreasonably burden[ ] the inmate's opportunity to consult with his attorney and to prepare his defense").

Basically, defense counsel has been reduced to a telephone relationship with Mr. Weeks. At present, Mr. Weeks is kept in his cell 18 hours a day. The guards generally let him and half of his POD-mates out in two three-hour blocks during the day. This causes a mad-rush for the telephones and computers when everyone is let out of their cells. There are two computers and eight telephones for 30 inmates to share in a three-hour block of time. Mr. Weeks can make calls in 15-minute increments. That leaves the interaction between defense counsel and Mr. Weeks to several phone calls every other day. But this is insufficient to prepare for trial. Defense counsel needs to be side-by-side with Mr. Weeks in a room to review documents without the fear of getting sick from COVID-19. That cannot happen at the Essex County jail. In short, continued detention of Mr. Weeks during this pandemic cripples his ability to participate in the development of his defense. And prolonging Mr. Weeks' pretrial detention is a remedy that is worse than the problem.

The current circumstances with COVID-19 compel Mr. Weeks' release. *See, e.g., United States v. Davis*, Case No.: ELH-20-09, 2020 WL 1529158, at *7 (D. Md. Mar. 30, 2020) (granting release on conditions, in part, due to concerns over access to counsel during the pandemic); *see also United States v. Stephens*, Case No. 1:15-cr-00095-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (Nathan, J.) (granting temporary release after finding the defendant's inability to prepare for trial amid the BOP lockdown could hamper his defense) (citing *United States v. Persico*, No. 84-cr-809 (JFK), 1986 WL 3793, at *1 (S.D.N.Y. Mar. 27, 1986) (compiling temporary release orders of defendants "to facilitate the defendants' expeditious preparation for trial" where "[t]he concern in each case was that, given the admittedly limited access to telephones and attorney conference rooms at the detention facilities, the effective preparation of a defense might have been impossible in the short time available before the commencement of trial")).

Pursuant to 18 U.S.C. § 3142(c)(1)(B)(i), a third-party custodian is an "appropriate person"

who may take custody of a defendant. *See* 18 U.S.C. § 3142(c)(1)(B)(i) (judge presiding over detention hearing may order that defendant "remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court"). In this case, Peter Gallic can take custody of Mr. Weeks. Before the February detention hearing, the Pretrial Services Office in Newark determined that Mr. Gallic is qualified to serve as a third-party custodian for Mr. Weeks. In addition to Peter Gallic's supervision, Mr. Weeks will also be monitored by the Pretrial Services Office, a GPS monitoring device, and Shadowtrack's cell-tower triangulation monitoring system. The redundancies built into this tripartite approach make it reliable.

## CONCLUSION

For the foregoing reasons, this Court should revoke the pretrial detention order pursuant to 18 U.S.C. § 3145(b) and release Mr. Weeks based on the conditions outlined above.

Dated:  May 26, 2020

CARLTON FIELDS

*/s/ Michael L. Yaeger*
Michael L. Yaeger
405 Lexington Avenue, 36th Floor
New York, NY 10174

Simon Gaugush
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, FL  33607
          &
180 Park Avenue, Ste. 106
Florham Park, NJ  07932-1054

*Counsel for Jobadiah Sinclair Weeks*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 26, 2020, I filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will serve an electronic copy to all counsel of record.

/s/ Michael L. Yaeger
Michael L. Yaeger, Esq.