# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>CREAGHAN HARRY,<br><br>*Defendant.* | Criminal Action No. 19-246<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court on Defendant Creaghan Harry's ("Harry") Motion to Revoke, ECF No. 99 an order of detention entered by the Magistrate Judge. Harry also seeks to reopen his detention hearing pursuant to 18 U.S.C. § 3142(f) to have this Court consider the effect of Covid-19 on his detention. Harry Supp. Ltr. at 6, ECF No. 104. The Government opposes both Motions. ECF Nos. 103, 111. For the reasons that follow, Harry's Motion is **GRANTED IN PART** and **DENIED IN PART**, and Harry is ordered released subject to certain conditions.

**I.     BACKGROUND**

**A.     The Indictment**

The Indictment charges that Harry is the mastermind of an elaborate, international Medicare fraud, kickback and money laundering scheme. It alleges that Harry, using telemedicine companies, paid doctors to write unnecessary medical brace orders and solicited bribes from the brace suppliers, often using international telemarketers in the Dominican Republic and other foreign jurisdictions. See Indictment ¶ 9, ECF No. 1; Gov't Mem. at 5, ECF No. 103. In total, Harry's organization "caused the providers to submit" more than $424 million in brace orders, of which the Medicare program paid "approximately in excess of $200

1

million." Id. ¶¶ 9(k)-(l). The Indictment further charges that Harry and two codefendants conspired to shield the source of their income from this scheme. Id. ¶¶ 15-16. Harry is charged with (1) one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, id. ¶ 12; (2) four counts of soliciting and receiving healthcare kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(1)(B) and 18 U.S.C. § 2, id. ¶ 14; and (3) one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956, id. ¶ 16. Harry is 51 years old and faces a potential term of imprisonment of 40 plus years. Harry has entered a plea of not guilty and denies the charges.

### B.     Procedural History

Harry was arrested in the Southern District of Florida on April 9, 2019. He was transferred to this District and first appeared before a Magistrate Judge on May 23, 2019. ECF No. 13. Harry subsequently participated in five hearings, at which the government repeatedly sought detention. See May 30, July 11, Aug. 5, Sept. 10, & Dec. 16, 2019 Hr'g Trs., ECF Nos. 22, 31, 49, 93, 100. Initially, concerned with a risk of flight, the Magistrate Judge ordered detention, but invited Harry to return if he could propose a bail package that would address the risk of flight issue and ensure his appearance at trial.

By Opinion and Order dated November 15, 2019, the Magistrate Judge set bail on the economic terms proposed by Harry— a $2.5 million dollar bond, secured by two cosigners, a Mr. Batmasian, represented to be a "wealthy businessman" and Monte Harry, a cousin, and three properties: (1) the home of the mother of Harry's three minor children, having $323,524 in equity; (2) the home of the mother of his adult child, having $145,402 in equity; and (3) the home of his friend Keith Loring, having $924,000 in equity. Release Opinion at 10, ECF No. 85; Release Order, ECF No. 86. In addition, Harry would be released to the custody of his cousin and uncle Monte and Carlyle Harry, who would serve as third party custodians and

2

would reside with one of them in Brooklyn, New York; his travel would be limited to New York and New Jersey; he would surrender his and his children's passports; he would be prohibited from accessing the internet; and he would be subject to home incarceration. Release Order at 1-2. These properties and co-signers were all approved by Pretrial Services. Id.

Thereafter, the government sought reconsideration of the bail set by the Magistrate Judge, and sought detention. See ECF No. 82. Harry cross-moved for reconsideration, seeking relief from the non-economic terms imposed. See ECF No. 83. The court held another hearing on December 16, 2019. Dec. 16, 2020 Hr'g Tr., ECF No. 93. Since setting bail, the package that Harry proposed and the Court imposed essentially fell apart- Mr. Batmasian no longer wished to be a co-signer on the bond, and the two of the properties were no longer available as security. Id. at 30:1-15. Both the mother of Harry's three minor children and Harry's friend, Mr. Loring, no longer wished to pledge the equity in their homes. Id. Thus, a bond which was to be secured by $1.4 million in equity was now only secured by one property, with less than $150,000 in equity.

On January 31, 2020 the Magistrate Judge ordered Harry detained. See Detention Order at 5, ECF No. 97. The Magistrate Judge found that the "bulk of the security proposed for Mr. Harry's bond is no longer viable" for the reasons noted during the prior hearing, and that the presence of his yacht in Mexico is "not only . . . a significant source of funds abroad, but also a physical means of absconding." Id. at 4. Harry now moves to revoke the Detention Order. ECF No. 99.

While his Motion to Revoke was pending, Harry submitted a supplemental letter requesting release on the grounds that Covid-19 presented a risk to his health and safety. See Harry Supp.

3

Ltr. at 1-2, ECF No. 104. As the Covid-19 pandemic spread to the Newark area where he is detained, Harry argued that his age and medical conditions weighed in favor of release. Id. at 6-7. The Government opposed the motion. Gov't Supp. Opp., ECF No. 111.

## II.  LEGAL STANDARD

A person ordered detained by a magistrate judge "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). A court reviewing a detention order under Section 3145(b) must make a de novo assessment of whether bail is warranted. United States v. Perry, 788 F.2d 100, 107 (3d Cir. 1986); United States v. Caba, No. 88-435, 1989 WL 200447, at *2 (D.N.J. Feb. 14, 1989). Although a district court reviewing an order of detention may hold a new hearing on bail, United States v. Delker, 757 F.2d 1390, 1395 (3d Cir. 1985), it "is not required to hold a new evidentiary hearing." United States v. Mitan, No. 08-760, 2009 WL 604695, at *2 (E.D. Pa. Mar. 6, 2009).

Under the Bail Reform Act, a court must impose the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and of the community. 18 U.S.C. § 3142(c)(1)(B). That subsection then lists a number of conditions a court may impose, including release to the custody of a designated person, restrictions on travel and place of abode, execute a bail bond with solvent sureties, or to "satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community." § 3142(c)(1)(B)(i), (iv), (xii), (xiv).

In determining which conditions to impose, the court must consider four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the

4

person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)-(4). The Government bears the burden of demonstrating that, by a preponderance of the evidence, the person presents a substantial risk of flight. United States v. Himler, 797 F.2d 156, 161 (3d Cir. 1986).

> A court that has issued a detention order may reopen a detention hearing
> 
> at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. § 3142(f)(2)(B). To reopen a hearing, the movant must proffer information that "was 'not known' at the time of the earlier ruling and is 'material.'" United States v. McIntyre, No. 16-13, 2018 WL 385034, at *1 (D.N.J. Jan. 10, 2018). Whether to reopen a hearing is determined at the court's discretion. United States v. Schwamborn, 249 F. App'x 906, 907 (2d Cir. 2007); United States v. Mathes, 593 F. App'x 391, 392 (5th Cir. 2015). Similarly, a court may order a detained person released "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

### III. ANALYSIS

#### A. Harry May Be Released On Conditions Under Section 3142(c)

Harry now seeks release on a totally new bond which is essentially an unsecured one: a single unnamed co-signer, with a new third party custodian, Lena Jarborg (his adult child's mother). See Harry Mem. at 1 n.1, ECF 99. He offers now to live in Florida without any home confinement and to surrender only his passport. Id. Although the parties have participated in

5

five bail hearings with the Magistrate Judge, where terms, co-signers, and properties were carefully reviewed by the Court and Pretrial Services, Harry now casually asserts that he has "additional sureties, including those willing to post properties," but neglects to even mention them. Id. The government, on the other hand, continues to seek detention. Gov't Mem., ECF No. 103.

After a careful review of the extensive record, and a consideration of the Section 3142(g) factors, this Court finds that while Harry presents a risk of flight, a series of substantial conditions (similar to what the Magistrate Judge initially imposed) and discussed below can reasonably assure his appearance at trial.

Considering the nature and circumstance of the offense charged, the Court finds that Harry is charged with a serious offense that carries a substantial penalties. At 51 years old, even a 20 year sentence (substantially less than the government estimates) would be a de facto life sentence, which supports a finding of a risk of flight. United States v. Schenberger, 498 F. Supp. 2d 738, 745 (D.N.J. 2007) (defendant facing "substantial prison sentence" found to support risk of flight).

The second Section 3142(g) factor, the weight of the evidence against Harry, also supports finding a risk of flight. Harry argues that the Government's statements on the weight of the evidence have been conclusory and unsupported by specific facts. But at the five prior hearings in this case, the Government proffered evidence against Harry that consists of information from his codefendants, two of whom have already pled guilty, and also includes emails and text messages concerning the scheme that Harry himself sent or received, and even a recorded call on which Harry seeks to offer doctors' orders in exchange for payments, behavior at the heart of this scheme. Gov't Mem. at 20-21. In addition to their proffers, the

Government provided some of this evidence to the Court, including emails demonstrating that Harry was involved in the day-to-day operations of the alleged scheme. ECF Nos. 103.5, 103.12.

The third factor, the personal history and circumstances of the defendant, cuts both ways. On the one hand, Harry points to substantial community ties, three minor children in Florida, relatives both there and near this District, the fact that he has no prior criminal history, never used aliases, does not own property overseas, and although a dual citizen of the United States and Canada, only maintains a U.S. passport (which he has surrendered), and has provided his children's passports to his counsel. Harry Mem. at 6-7.

But this is not the full picture. The Government has shown that Harry's history of involvement in allegedly fraudulent schemes with international components, history of maintaining bank accounts in the Dominican Republic, Panama, Cyprus, Columbia, Sweden and Switzerland, misrepresentations to Pretrial Services concerning the extent of his foreign travel, his alleged attempts to aid another in avoiding the jurisdiction of the United States and his own statements regarding flight further suggest that Harry presents a risk of flight. See Gov't Mem. at 24-25 & Exs. P, Q. He also has ties to the Dominican Republic and Panama, where he resided and is an international traveler. The risk is great that he has the means and the know-how to flee.

One of the issues which troubled the Magistrate Judge and caused him to reconsider bail was Harry's yacht. This Court shares those concerns. Despite counsel's protestations to the contrary, Harry has been less candid about this property. At the time of his arrest, the yacht was in Florida and since September 2019, has been subject to a seizure order. Defense counsel and Harry claim to have been cooperating with the U.S. Marshal as to its whereabouts. But in

7

November, 2019, in the midst of bail hearings (during which Harry has consistently represented that he has no source of income and no foreign property) the Government learned that the yacht had been moved to Cancun, Mexico. Upon questioning from the Magistrate Judge as to why he had not reported it stolen, counsel stated that a "friend removed it without his knowledge," yet also disclosed that it is now "used to charter and to get income to Mr. Harry" and his children. Dec. 16, 2019 Hr'g Tr. at 22:3-5. That disclosure raises more questions than it answers. Why wasn't that income disclosed to the court and to Pretrial Services during the bail hearings? When was the yacht moved and when did Harry begin receiving income? Why wasn't the government advised of this earlier? At a minimum, this demonstrates a lack of candor with the Court and raises the same concerns first articulated by the Magistrate Judge: the yacht is both a significant foreign asset that Harry could use to support himself after any flight and a means of flight itself.

The final Section 3142(g) factor, the nature and seriousness of Harry's danger to the community, is neutral here. Although Harry's history of involvement in fraudulent or unlawful schemes conducted either over the internet or using foreign call centers suggests that Harry could again engage in such a scheme if released, this is not certain. While the Government has detailed Harry's significant foreign travel and business ties, they have not proffered information suggesting Harry would engage in similar schemes were he able to flee.

After a careful balancing of the factors in 18 U.S.C. § 3142(g), the Court finds that risk of flight can be significantly mitigated through a stringent set of conditions. Harry has suggested that he be released on conditions significantly less demanding than those in the release order. Harry Mem. at 1 n.1. The Court strongly disagrees that such conditions could reasonably assure Harry's future appearance at trial. In fact, this is a very close call on bail. However, setting bail on conditions similar to those in the initial Release Order, with certain

modifications to account for changed circumstances, should insure against risk of flight.

Harry will be released on the same $2.5 million bond, secured by $1.4 million in equity and two financially responsible co-signers. The Court will remand this matter to the Magistrate Judge to determine which potential properties and suretors are appropriate for this purpose, as well as the third party custodians. Release will also require travel restrictions, home incarceration, and surrender of his and his children's passports. He can access the internet, subject to monitoring by Pretrial Services.

As set forth above, the Court has serious concerns about the yacht. Since his "friend" has the vessel and is sending him "income" from its charter use, it is still, to some degree, under Harry's control. Because Harry has not been candid about the yacht's location and income source, and the very real risk that it could aid in flight, he will not be released until the yacht returned to the United States to the custody of the Government. In lieu of surrendering the yacht, Harry can post an additional $1,100,000 million in equity to fully secure the bond.

### B. Covid-19 Does Not Require Harry's Immediate Release

Finally, Harry also seeks to reopen his detention hearing on the grounds that his age (in his 50s) and diagnosis of an irregular heartbeat make him more likely to contract Covid-19 during the present pandemic and that he should therefore be released. Harry Supp. Ltr. at 6-7.

As an initial matter, the Court finds that the Covid-19 pandemic does qualify as an event that could have a "material bearing" on Harry's conditions of release under Section 3142(f)(2)(B). See United States v. Martin, Case No. 19-140-13 2020 WL 1274857 (D Md. March 17, 2020). The pandemic has upended lives across the country and the world, resulting in states of emergency both in New Jersey and nationwide, and requiring aggressive "social distancing" measures to prevent the transmission of the virus from person to person. See Executive Orders Nos. 103 & 104, 52 N.J.R. 549(a), 550(a) (April 6, 2020) (declaring statewide

9

emergency, imposing social distancing orders and mandating closure of most businesses and educational institutions in New Jersey). All courts to consider whether to release defendants facing pending charges during the Covid-19 pandemic have conducted their analysis under the Section 3142(g) factors, and have noted the precautions that detention facilities have been taking to combat the pandemic. See Martin, 2020 WL 1274857, at *3 ("[b]ut as concerning as the COVID-19 pandemic is, resolving an appeal of an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act"); United States v. Jefferson, No. CR 19-487, 2020 WL 1332011, at *1 (D. Md. Mar. 23, 2020) (faced with motion for release on Covid-19 grounds "[t]he first step is to undertake an individualized assessment of the factors identified by the Bail Reform Act"); accord United States v. Stephens, No. 15-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (releasing pretrial detainee after concluding he had rebutted Bail Reform Act's presumption of detention in his case, in evaluating impact of Covid-19).

Here, Harry has not shown that he should be immediately released due to the impact of Covid-19. As an initial matter, Harry has not demonstrated that he was diagnosed with an irregular heartbeat. In a supplemental submission, Harry included medical records from a consultation with a cardiologist on August 20, 2018. Harry Mar. 31, 2020 Ltr. & Encl. Harry sought treatment for recent heart palpitations, and after an exam the doctor found a "[r]egular heart rate and rhythm," but detected a heart murmur. Harry Mar. 31, 2020 Ltr. Encl. at 2-3. The cardiologist prescribed further monitoring, which allegedly did not occur due Harry's arrest. Id. & Harry Mar 31, 2020 Ltr.

Second, according to the Government, Harry has not sought treatment for any heart condition while detained. Gov't Mar. 31, 2020 Supp. at 2-3. Although medical records from

10

the Essex County Correctional Facility where Harry is detained do mention that he sought a "health checkup" including "heart health and blood levels, if available," the records do not reflect that Harry ever mentioned any irregular heartbeat, heart palpitations or murmur condition to any healthcare provider at the jail, despite seeking, and receiving, treatment for other ailments. Id. Ex. A at 26, 32.

Third, although Harry contends that his age places him at higher risk of either contracting Covid-19 or suffering serious consequences were he to contract it, this is insufficient to require Harry's immediate release. He is still relatively young and not in a high risk group because of his age. The Government has proffered a list of measures that the Essex County Correctional Facility is taking to mitigate the risk of Covid-19 to inmates. These measures should mitigate any risk Harry faces solely due to his age and a minor health concern, pending his release on the conditions noted above.

The court addressed the Section 3142 factors above in detail, and set a reasonable bail, along the lines initially suggested by Harry, with the additional requirement of the surrender of the yacht. That analysis also guides the analysis based on the Covid-19 factor pursuant to Section 3142(f)(2)(B). To the extent that his health or the circumstances of his detention change and he cannot meet the bail set, he can renew this application.

**IV. CONCLUSION**

Based on the foregoing, Harry's Motion to Revoke, ECF No. 99, is **GRANTED in part and DENIED in part**. An appropriate order follows.

*/s Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

11

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES,**<br><br>v.<br><br>**CREAGHAN HARRY,**<br><br>*Defendant.* | **Criminal Action No. 19-246**<br><br>**ORDER** |

**ARLEO, UNITED STATES DISTRICT JUDGE**

    **THIS MATTER** comes before the Court on Defendant Creaghan Harry's ("Harry") Motion to Revoke, ECF No. 99 an order of detention entered by the Magistrate Judge, and on Harry's request to reopen his detention hearing pursuant to 18 U.S.C. § 3142(f), ECF No. 104;

    and for the reasons set forth in the accompanying Opinion;

    **IT IS** on this 22nd day of April, 2020,

    **ORDERED** that Harry's Motion, ECF No. 99, is **GRANTED IN PART and DENIED IN PART**, and that Harry will be ordered released on a $2.5 million bond, secured by $1.4 million in equity and two financially responsible co-signers, and it is further

    **ORDERED** that this matter is remanded to the Magistrate Judge to determine which potential properties, suretors and third party custodians are appropriate, and it is further

    **ORDERED** that Harry's release will also require travel restrictions, home incarceration, and surrender of his and his children's passports, and that Harry may access the internet, subject to monitoring by Pretrial Services, and it is further

    **ORDERED** Harry will not be released until the yacht returned to the United States to the custody of the Government, or in lieu of surrendering the yacht, Harry can post an additional

$1.1 million in equity to fully secure the bond.

          */s Madeline Cox Arleo*_____
          **HON. MADELINE COX ARLEO**
          **UNITED STATES DISTRICT JUDGE**