UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

MATTHEW BRENT GOETTSCHE,
RUSS ALBERT MEDLIN,
JOBADIAH SINCLAIR WEEKS,
JOSEPH FRANK ABEL, and
SILVIU CATALIN BALACI

Hon. Claire C. Cecchi

Crim No.  19-877

**UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION
TO DEFENDANT WEEKS' MOTION FOR APPEAL, REVIEW,
AND REVOCATION OF DETENTION ORDER**

CRAIG CARPENITO
United States Attorney

On the Brief:

Jamie L. Hoxie
Anthony P. Torntore
David W. Feder
Assistant United States Attorneys

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... i

PROCEDURAL POSTURE................................................................... 2

LEGAL FRAMEWORK ........................................................................ 3

ARGUMENT AND AUTHORITIES........................................................ 5

I.  The Nature and Circumstances of Weeks' Offense Conduct Reflect That He Is an Unreasonable Flight Risk. ........................................................................ 5

    A.  Weeks Was a Major Promoter of the BitClub Network, Had Access to Medlin and Goettsche About the Inner Workings of BitClub, Secured Contracts With Third-Party Vendors to Help Perpetrate the Fraud, and Never Paid Taxes On His Wealth. ............................................................ 5

    B.  Weeks' Arguments About Loss Amount Are Premature Sentencing Arguments and Do Not Change That Weeks is a Flight Risk. ................. 12

    C.  Although Russ Medlin Is Now in Custody, Weeks Has Foreign Contacts and Access to Wealth Around the World................................................. 14

II.  The Weight of the Evidence Against Weeks Highlights that He is a Flight Risk. 15

III. Weeks Is an Unreasonable Flight Risk Given His History and Characteristics. 23

    A.  Weeks' Substantial Travel and Foreign Contacts Render Him a Flight Risk................................................................................................. 23

    B.  Weeks' Lack of Ties to a Permanent Residence Renders Him a Flight Risk................................................................................................. 30

    C.  Weeks' Self-Proclaimed Anarchist Beliefs and Demonstrated Self-Serving Behavior Make Him a Flight Risk......................................................... 32

    D.  Weeks' Financial Resources and Access to Wealth Renders Him a Flight Risk................................................................................................. 36

IV. The Size and Complexity of the Case and COVID-19 Does Not Require Weeks' Pretrial Release ......................................................................... 40

CONCLUSION.................................................................................. 41

i

## TABLE OF AUTHORITIES

**Cases**

*SEC v. Homero Joshua Garza, et al.,*
Civ. No. 15- 01760 (JAM) (D. Conn) ............................................................. 20

*United States v. Abdullahu,*
488 F. Supp. 2d 433 (D.N.J. 2007) ........................................ 11, 12, 13, 27, 32

*United States v. Avenatti,*
Crim. No. 19-61 (JVS) (C.D. Cal. Mar. 21, 2020) ........................................... 41

*United States v. Bent,*
445 F. App'x 487 (3d Cir. 2011) .................................................................... 13

*United States v. Boustani,*
356 F. Supp. 3d 246 (E.D.N.Y. 2019) ............................................................ 15

*United States v. Caniglia,*
2002 WL 32351181 (E.D. Pa. 2002) .............................................................. 32

*United States v. Delker,*
757 F.2d 1390 (3d Cir. 1985) .......................................................................... 4

*United States v. Goba,*
240 F. Supp. 2d 242 (W.D.N.Y. 2003) ........................................................... 27

*United States v. Kachkar,*
701 F. App'x 744 (11th Cir. 2017) ................................................................. 23

*United States v. Livingston,*
2016 WL 1261464 (D.N.J. Mar. 31, 2016) .................................................. 3, 4

**Statutes**

15 U.S.C. § 77e ................................................................................................ 2

15 U.S.C. § 77x ................................................................................................ 2

18 U.S.C. § 371 ................................................................................................ 2

18 U.S.C. § 1349 .............................................................................................. 2

18 U.S.C. § 3142(g) .......................................................................................... 4

**Rules**

U.S.S.G. § 1B1.3(a)(B) .................................................................................. 13

U.S.S.G. § 2B1.1 ......................................................................................12, 13

The Government, through the undersigned, respectfully submits this opposition in response to Jobadiah Sinclair Weeks' motion submitted May 26, 2020, in which he seeks an order contrary to the determinations of two separate federal judges on three separate occasions that Weeks is a flight risk and should be detained pending his trial. Despite extensive briefing and several hours of argument in support of his prior, unsuccessful bail applications, Weeks now appeals to this Court to obtain a different result from the thoughtful determinations by those two federal judges.

In his brief, Weeks references, *inter alia*, his history of being a Republican, his great-grandfather's purported title, his relationship with Ron Paul (whose name Weeks uses in his brief *six times*), and his status as an American, in urging this Court to release him prior to trial. But Weeks' lengthy rhetoric lacks substance and does not meaningfully address the core concerns undoubtedly considered by the two other judges who have both already determined that Weeks—like his coconspirators—is an unreasonable risk of flight. Indeed, much of what Weeks characterizes as "mistaken facts" are no mistake at all—merely Weeks' self-serving gloss on factors that unquestionably underscore his flight risk.

As discussed in Part III below, Weeks' history and characteristics especially make him the consummate flight risk. His personal history reflects a life of near-constant foreign travel, so much so that he lacks meaningful ties to a permanent residence in the United States. He has undertaken much of this travel with his family members, not apart from them, such that he and his family are better prepared than others to embark on a life abroad. He owns property in foreign

1

countries and has made preparations to obtain foreign citizenship to evade U.S. authorities.  He has extensive overseas contacts, and he is adept at making new ones.  He is well-versed in the use of virtual currency, which can be used or exchanged around the world and online.  And, by his own admission, Weeks is highly skeptical of government oversight.  Weeks has the means and know-how to live abroad; by virtue of this prosecution, he now has a powerful reason to do so.

Weeks remains just as much an unreasonable risk of flight as he did when he was taken into custody in December, and this Court should find, consistent with the findings of the Honorable Michael A. Hammer of this Court and the Honorable William Matthewman of the U.S. District Court for the Southern District of Florida, that Weeks' pretrial detention remains appropriate.

## PROCEDURAL POSTURE

On December 5, 2019, a federal grand jury charged Weeks, Matthew Brent Goettsche, Russ Albert Medlin, and Silviu Catalin Balaci with conspiring to commit wire fraud, in violation of 18 U.S.C. § 1349 (the "Fraud Charge"), and charged Weeks, Goettsche, Medlin, Balaci, and Joseph Frank Abel with one count of conspiring to offer or sell unregistered securities, contrary to 15 U.S.C. §§ 77e and 77x, in violation of 18 U.S.C. § 371 (the "Promotion Charge").  The charged offense conduct involves Weeks and his coconspirators' illegal scheme called the "BitClub Network," and the offense conduct spans from 2014 through December 2019.  The Indictment alleges that the BitClub Network took in at least $722 million in bitcoin from its victims.

On December 10, 2019, Weeks was arrested in Florida on these charges. Weeks sought pretrial release on bail in Florida.  Following a hearing that lasted

2

several hours, on December 20, 2019, Judge Matthewman, the federal magistrate judge in Florida, determined that Weeks presented an unreasonable risk of flight. *See* Pretrial Detention Order at 4 (Mag. No. 19-08526-WM, ECF No. 11, S.D. Fl.), *attached hereto as* USA Ex. A (hereinafter, "Matthewman Order").   Weeks was ordered into Marshals' custody to be transferred to the District of New Jersey.

On January 3, 2020, Weeks filed a motion for pretrial release on bail, which was referred to Judge Hammer for resolution.   On January 15, 2020, Weeks appeared before this Court for his initial appearance in this District and his arraignment on the charges in the Indictment.

On February 13, 2020 and February 14, 2020, Judge Hammer presided over a detention hearing for Weeks and codefendant Goettsche.   Judge Hammer agreed with Judge Matthewman's determination that Weeks presented an unreasonable risk of flight and ordered Weeks detained pending trial.   *See* ECF No. 50.

On March 23, 2020, Weeks filed another motion seeking to be released on bail, arguing that the COVID-19 pandemic warranted his pretrial release.   On March 30, 2020, Judge Hammer presided over a second hearing, where he again determined that Weeks' pretrial release remained inappropriate.   *See* ECF No. 79.

On May 26, 2020, Weeks submitted the present motion with this Court, seeking to overturn the determinations of Judges Matthewman and Hammer that Weeks presents an unreasonable flight risk.

## LEGAL FRAMEWORK

"A district judge reviews a magistrate judge's decision regarding bail *de novo.*" *United States v. Livingston*, 2016 WL 1261464, at *1 (D.N.J. Mar. 31, 2016) (Cecchi,

J.) (citing *United States v. Delker*, 757 F.2d 1390, 1394-95 (3d Cir. 1985)).  "While the district court may find it useful to consider the decision and reasoning of the magistrate judge, the Court must make an independent determination regarding a defendant's eligibility for release on bail." *Id.*

The Court must take certain factors into account when determining whether "there are conditions of release that will reasonably assure the appearance of the person" at trial, such as:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591 [sex trafficking of children or by force, fraud, or coercion], a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person; [and]
>
> (3) the history and characteristics of the person, including—
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings.

18 U.S.C. § 3142(g).

**ARGUMENT AND AUTHORITIES**

I.  **The Nature and Circumstances of Weeks' Offense Conduct Reflect That He Is an Unreasonable Flight Risk.**

   A.  **Weeks Was a Major Promoter of the BitClub Network, Had Access to Medlin and Goettsche About the Inner Workings of BitClub, Secured Contracts With Third-Party Vendors to Help Perpetrate the Fraud, and Never Paid Taxes On His Wealth.**

Weeks' criminal conduct in this case is substantial. Weeks convinced unwitting investors to spend their money on investment products provided by the BitClub Network. He brokered contracts with third-party vendors in an effort to make the BitClub Network seem legitimate to victim investors. He shamed online skeptics who voiced their suspicions that the BitClub Network was a fraud. He made millions of dollars but admittedly has not paid a dime in taxes. In short, for years, Weeks manipulated BitClub Network victims and bent rules he found inconvenient to prolong the fraud and preserve his unjust profit. Weeks' offense conduct strongly demonstrates why he presents an unreasonable risk of flight.

This case involves the creation, operation, and promotion of the BitClub Network, an online fraud scheme whose operators sold victims shares in purported virtual currency mining pools. Weeks and his coconspirators preyed on people's limited familiarity with virtual currency mining operations and utilized tactics commonly employed in pyramid and Ponzi schemes to convince victims—many from developing countries and technologically unsavvy—to invest hundreds of millions of dollars in cash and virtual currency in the coconspirators' fraudulent mining enterprise.

Weeks attempts to cast himself in his brief as a tiny player in the BitClub Network fraud scheme, arguing that he joined late, he had, in his words, a "small, more subservient role," he sponsored only a "small portion" of the BitClub Network's victims, he did not know the actual number of investors in the scheme, and that he lacked access to the BitClub Network's internal, back office web platform.  *See* Weeks Br. at 27-28.  Weeks' self-serving characterization of his offense conduct is wrong, on several fronts, and Judge Hammer was correct in concluding that:

> [Weeks] analogizes himself to many other . . . individuals who promoted the BitClub Network.  And I understand that that very well may be a part of the defendant's presentation at trial. . . . But the Government has put forth or proffered evidence to believe that his position may have been [somewhat] unique.  And this is relevant to the risk of flight analysis[.].

Detention Hearing Tr. at 163 (Feb. 14, 2020) (Hammer, J.) (hereinafter, "Hammer Feb. 14 Tr.").

First, despite not originating the BitClub Network, Weeks played several key, often-public roles within the BitClub Network after joining it.  Soon after investing, Weeks recruited others to join the BitClub Network in his commission-generating "downchain"—*i.e.*, the list of victims under Weeks in the BitClub Network's pyramid structure—and promoted the purchase of shares in the BitClub Network's mining pools.  Relative to other investor-recruiters, Weeks had an exceptionally large promotional profile.  He traveled internationally to make BitClub Network presentations and established an outsized presence to tout the BitClub Network on social media.

While Weeks casts himself as a minor player who would not have understood the size or scope of the fraud, Weeks often told others how lucrative investment in

the BitClub Network would be.  For example, during a conversation in July 2018, Weeks claimed to several investors and/or potential investors that there were over 100 people invested in the BitClub Network making over $100,000 per month. Additionally, as reflected in an email Weeks sent to a reluctant and dissatisfied victim in November 2017, Weeks acknowledged that the BitClub Network was giving away nearly half a billion dollars' worth of "Clubcoin," a currency that the BitClub Network created and attempted to peddle to its victims during the course of the scheme.  In other words, Weeks understood in 2017 that the BitClub Network scheme was large enough that it was able to "give away" half a billion dollars to its members.  Suffice it to say that Weeks had plenty of notice that the scope of the BitClub Network's pyramid scheme, the number of victims, and the amount of money taken in, was substantial.

And, while he attempts to claim that he sponsored a "very small portion" of victims, Weeks understood that he was more influential and involved than a typical promoter of BitClub Network shares.  *See* Weeks Br. at 28.  For example, in a conversation Weeks had in October 2017, Weeks tried to convince employees of a third-party entity to allow him to use its name to create another business similar to the BitClub Network, claiming:

> You guys open to me doing www.[REDACTED]?? I could put 300,000 people in within a year probably.
>
> Half of bitclub would join me.
>
> Right away.

Obviously, Weeks' acknowledgement that he could convince half of the BitClub Network's victims to join his new venture runs contrary to the characterization in his brief that he had very little to do with attracting new victims into the scheme.

Unlike the vast majority of the BitClub Network's victims, Weeks had direct and frequent access to creators and codefendants Goettsche and Medlin. As discussed further below outlining the evidence against Weeks, Weeks was not someone who merely signed up for the BitClub Network and whose access or involvement was limited to promoting new investment. Weeks had conversations with Goettsche and Medlin about how to further the BitClub Network more generally. To place him in a benign context, he was not just selling knives or Tupperware door-to-door as an affiliate marketer; he was having frequent conversations with the equivalent of the CEO and COO about the future and operations of the entire enterprise. *See* Hammer Feb. 14 Tr. at 164 (reflecting that Weeks' statement in paragraph 4.g.xii of the Indictment "goes well beyond promotion in terms of soliciting investments, but goes to the core of the operations of the BitClub Network").

Weeks also worked on behalf of the BitClub Network to broker contracts with third-party companies to provide mining power and equipment. The BitClub Network, in turn, used the power and equipment that Weeks provided to falsely bolster the legitimacy of its mining operations in order to secure and maintain new investment needed to satisfy the more lucrative pyramid referral structure. To negotiate these business arrangements, which sometimes exceeded tens of millions

8

of dollars, Weeks had top-level access to information about the BitClub Network's operations and the size and scope of the fraud.

Weeks' offense conduct in this case is relevant to his risk of flight in several respects.  First, far from being one poor decision or one isolated incident, the heart of the case against Weeks and his coconspirators is that they lied over the course of several years and, based on those lies, amassed hundreds of millions of dollars from victims.  As discussed more fully below, evidence reflects that Weeks knew that victims were being provided with misinformation, but he nevertheless continued to promote the purchase of shares in the BitClub Network because he continued to reap a profit from the pyramid scheme.

Second, as Judge Hammer correctly noted as significant, Weeks evaded U.S. regulators and encouraged others to do the same.  *See* Hammer Feb. 14 Tr. at 166 (noting that Weeks "tried to thwart U.S. regulations, tax liabilities and detection and, in fact, encouraged others to do so as well").  When the BitClub Network's operators barred investment from U.S.-based IP addresses, Weeks urged domestic investors to use virtual private network ("VPNs") to access the BitClub Network website.  He claimed—falsely—that this strategy would shield investors from the reach of U.S. law enforcement.  He explained on social media that the scheme was designed to avoid detection by U.S. tax authorities.  And Weeks later admitted to law enforcement that he has never paid taxes.  *See* Hammer Feb. 14 Tr. at 166-67 (noting that Weeks failed to pay federal income taxes and set up schemes to avoid IRS detection).

9

For example, in September 2018, Weeks exchanged Facebook messages with a potential investor who asked about whether the BitClub Network was actually blocking U.S. residents from investing in BitClub Network shares:

| Person 1 | Bcn blocked ppl in the states from joining so they wouldn't have to deal with the US government hitting them up for money all the time |
| Person 1 | The US government sees mlm companies as their full time piggy bank |
| Investor | So the last line that says, "Do Not Join BitClub Network" is generated by whom? |
| Investor | and is there anything I need to do? |
| Weeks | No, youre good. |
| Weeks | When I see you, ill show you how it all works. |
| Weeks | We just change our ip addresses to ones outside USA. |
| Weeks | All the money you make is NOT reported to the tax man so...Its like having an offshore account growing for you tax free. |

Weeks instructed investors to mischaracterize their residency through an illogical chain of technicalities.  In November 2018, a U.S.-based investor emailed Weeks and questioned how she should respond to a purported "agreement" that the BitClub Network sent to investors, in which investors affirmed that they were not U.S. residents.  The investor implored:  "I have always been a residence of the US. How am I supposed to get around this."  Weeks provided the following explanation:

> UNITED STATES is Washington DC, Virgin Islands, Guam, Samoa, Puerto Rico. (Do you live there)

> US CITIZENS are corporations that are domiciled in the UNITED STATES. Are you a corporation or are you a human? Don't you live in the Republic of Utah, thats not THE UNITED STATES? You're a flesh and blood American right?

Weeks' explanation above suggests that he will go to great lengths to avoid complying with conditions of this Court.

Weeks also took steps to conceal his wealth from U.S. authorities. For example, in January 2016, Weeks scolded an individual on Facebook for touting

how much money they were making so as not to attract the attention of law enforcement:

| | |
|---|---|
| Weeks | can you please not use our spot to brag about how much money we are making? |
| Weeks | so that the IRS |
| Weeks | and FTC |
| Person 2 | Sure |
| Weeks | knows exactly who to target... |
| Weeks | What passport do you have? |
| Person 2 | not sure. how you can you tell? |
| Weeks | it probably says, US CITIZEN passport |
| Person 2 | let me check |
| Weeks | You don't know what country your passport that you travel on is from? |
| Person 2 | Haha |
| Person 2 | of course it is from here |
| Weeks | :) You know the IRS can yank it if you don't pay your taxes |
| Person 2 | I do know that |
| Person 2 | They haven't yet though |
| Weeks | So all you need is one person to send your video to and IRS agent to collect the reward. They get a reward for ratting you out. |
| Weeks | Then when he asks where your taxes are on all this bitcoin you're making, what will you tell them? |
| Weeks | Then they yank your passport |
| Weeks | Then they through you in jail |
| Weeks | Then if you resist, they shoot and kill you. |
| Person 2 | Yikes |
| Person 2 | I will delete these all |
| Weeks | they suck |
| Weeks | but thats what they do |
| Person 2 | I want to leave this country |
| Weeks | you can't without a passport |
| Person 2 | Yup |

For his conduct, Weeks faces exposure of up to 25 years' imprisonment and additional liability for willfully failing to pay taxes to the federal Government.  *See United States v. Abdullahu*, 488 F. Supp. 2d 433, 443 (D.N.J. 2007) ("The fact that defendant may possibly be indicted for other offenses creates another incentive to flee.").  A preliminary Guidelines estimate—which is predicated on a loss to investors

that tops the loss table at U.S.S.G. § 2B1.1—indicates that Weeks faces over 15 years' imprisonment. Even the prospect of a sentence considerably short of that projection is powerful incentive for Weeks to act on the plan he cultivated over the years to flee the United States and escape the consequences of his lucrative criminal conduct.

**B.   Weeks' Arguments About Loss Amount Are Premature Sentencing Arguments and Do Not Change That Weeks is a Flight Risk.**

Weeks argues that he is not a flight risk because he should be subject to a reduced loss amount and, consequently, a lower Guidelines range. He also argues that, generally, other defendants involved in wire fraud offenses have been allowed to self-surrender. These arguments are misplaced.

First, the type of statute charged is far less important than the underlying offense conduct. "By directing a Court to examine the 'nature and circumstances' of the charge rather than just the charge itself, Congress intended for courts to examine a defendant's actions in the context of all relevant background evidence." *Abdullahu*, 488 F. Supp. at 439. Weeks' years-long involvement to dupe unwitting investors into investing in a massive and lucrative international pyramid scheme—not the fact that he is accused of committing wire fraud—is what cuts strongly in favor of pretrial detention.

Second, Weeks' claim that he was not "in the top tier" of people who promoted the BitClub Network, and his articulated loss analysis that he contends limits his sentencing exposure, are essentially unsupported sentencing arguments. They do not account for Weeks' role as a key member of a multi-year fraud conspiracy and his responsibility for brokering high-dollar contracts with foreign companies to

12

advance the fraud.  In those capacities, Weeks knew that the BitClub Network was handling tens of millions of dollars, *see, e.g.*, Weeks Br. at 21 & Ex. P to Weeks Br. (describing Weeks' involvement in $53 million contract for the BitClub Network), and that the scheme attracted hundreds of thousands of victim-investors, *see, e.g.*, USA Ex. B (excerpt of 2017 Facebook message with Weeks acknowledging "there are 300,000 members in Bitclub now" and they made "$90,000,000 last month!").  Under hornbook conspiracy law, Weeks will be held responsible, "not only for the losses caused by his personal conduct, but also for the losses caused by 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'"  *United States v. Bent*, 445 F. App'x 487, 491 (3d Cir. 2011) (citing U.S.S.G. § 1B1.3(a)(B)); *see also* U.S.S.G. § 2B1.1 app. n.(3)(A)(iv).

After creating and deconstructing several loss amount arguments, Weeks concludes that calculating loss at this stage of the case is "the legal equivalent of throwing darts at a dartboard," but posits that his exposure should be around five years in prison.  Weeks Br. at 27, 31.  But a court in this District has held that a potential "sentence of only a few years in prison . . . does not dispel [a defendant's] substantial motive to flee."  *Abdullahu*, 488 F. Supp. 2d at 443.  Indeed, as Judge Hammer aptly noted, "even if the loss amount were one-tenth of 722 million, it would still result in a very substantial guidelines exposure on Count 1."  Hammer Feb. 14 Tr. at 167.  And, the projected Guidelines range should not be considered in isolation, but rather in view of Weeks' demonstrated resistance to U.S. regulation, efforts to establish residency in foreign countries, and wealth to fund flight.

**C.      Although Russ Medlin Is Now in Custody, Weeks Has Foreign Contacts and Access to Wealth Around the World.**

When Weeks filed his brief, codefendant Medlin remained an international fugitive. Weeks claimed that—notwithstanding evidence that he worked alongside Medlin for several years in furtherance of the BitClub Network fraud—Medlin's then-fugitive status was not probative of Weeks' likelihood of flight. Those arguments are now moot because Indonesian officials arrested and detained Medlin for engaging in, and documenting, sexual conduct with several children. *See, e.g.,* The Jakarta Post, *American fugitive arrested in Jakarta a known pedophile:  Jakarta police*, June 18, 2020, *attached hereto as* USA Ex. C.  Although the Government has limited information about the circumstances of Medlin's arrest and prosecution, its understanding at present is that Medlin will remain detained in Jakarta pending his prosecution for his sexual offenses against children in that country.

The Government previously cited Medlin's fugitive status as one aspect of the overall mix of information that justified Weeks' detention.  Medlin not only had the means and, possibly, incentive to facilitate and fund Weeks' flight, he was proof positive that the BitClub Network's operators planned to evade U.S. authorities by taking up residence abroad.  Although the former rationale is no longer a possibility, the latter remains very much worthy of consideration.

Also, for several years, Weeks traveled around the globe to promote the BitClub Network and the array of international projects he describes in his brief.  He forged relationships with individuals overseas, some with access to significant wealth and influence.  *See* Hammer Feb. 14 Tr. at 168 (noting that Weeks' "work with the BitClub Network allowed him to form relationships with people around the

world"). When Weeks initially spoke with law enforcement in 2019, he claimed that he was well-situated to provide information on international money laundering through his contacts and association with others involved in the flow of large sums of funds through overseas cryptocurrency exchanges. Weeks' acknowledged relationships with those involved in significant, international criminal conduct and other Bitclub Network actors favor pretrial detention. As recognized by another federal court, "a defendant's 'alleged ties to a large [ ] syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction' favors denying bail." *United States v. Boustani*, 356 F. Supp. 3d 246, 252 (E.D.N.Y. 2019) (denying bail for defendant charged with fraud and money laundering offenses).

## II.   The Weight of the Evidence Against Weeks Highlights that He is a Flight Risk.

While an exhaustive explanation of the evidence against Weeks is beyond the scope of this brief or a detention hearing, the key evidence against Weeks—much of it in his own words—supports pretrial detention. *See* Hammer Feb. 14 Tr. at 168 (noting in his decision that Weeks is a flight risk that the evidence against him consists of "documentary evidence such as emails and Facebook messages that include a number of statements directly by Mr. Weeks that could be interpreted as inculpatory").

With respect to the Fraud Charge, the evidence against Weeks shows that during the course of the BitClub Network's existence, several online websites warned that the BitClub Network appeared to be a Ponzi scheme. Weeks was aware of these articles. In August 2015, for example, Weeks acknowledged during a conversation

15

with another person on Facebook that:  "Right now, when bitclub is googled all that come up are scam/ponzi pages."

As reflected in a Facebook message exchange with Weeks and Abel, in August 2015, Weeks sent Abel one of the articles that suggested the BitClub Network was a fraud, and observed that it was probably time for the Bitclub Network to stop using fake testimonials on their website:

| Weeks | https://www.zapchain.com/a/PqLKNM9THj BitClub Network claims 1% of the entire Bitcoin mining capacity. BitClub Network are promising 1000% increase in value of their 'memberships' within six months. BitClub Network are promising Bitcoin networked ATM's and Bitcoin debit cards. Wow Great, you say, a real professional cloud mining operation at last! Then you read about the $99 'membership' fee. Then you see the 1000 day roi. Then you read about their "cutting edge referral based pay plan". Then you read about Clubcoin, their PoS marvellous innovation, coming soon. It's all here, have a read https://bitclubnetwork.com/compensation.html http://behindmlm.com/companies/bitclub-network-review-zeek- ponzi-veterans-at-it-again/ http://behindmlm.com/companies/bitclub-network-out-of-funds- clubcoin-announced/ Wow, lots of reading, you say.. OK, let's start at the beginning, their website. Take any one of the many many addresses they use, they all lead to this http://bitclub.io/mining/mining OOXzacs.png That's what we like to see, full of information and testimonials from real life customers! Well, not much information, but look, real life customers! There's Amy from Romania . . . Who could be Monica from Rome . . . or just be a very pretty, Romanian bitcoin enthusiast who's looking for a boyfriend http://dating-en-relatie.com/Romanian-women.html Then there's Mike Jones from California . . . Who looks a bit like Mike Jones from Cape Town https://plus.google.com/107168767283731452906/about And the chap in the screenshot above, Victor Diaz from Chaco, Brazil according to BitClub. They even quote him in Spanish (I thought Brazilians spoke Portuguese, but no matter) "Thank you thank you thank you! BitClub has been very good for me. I really need passive income and gave himself for me BitClub" The only problem is that Victor from |
|---|---|

| | |
|---|---|
| | Brazil, the Bitclub investor, is in fact, Ali Ansari a rapist from India. . . . I can recently remember at least three "cloudmining investments" companies who used fake pictures of clients or management in their publicity. They all protested that it was an innocent error by a third party. They all turned out to be liars and scammers. This just the tip of the iceberg, much more to follow... |
| Abel | Who the hell is this idiot |
| Weeks | Someone vetting bitclub. Wants to put $20 million in |
| Weeks | ***We should put up real people for the testimonials now that we have some.*** |
| Abel | Doesn't sound like it. OK I will help you gather your ducks |
| Weeks | If we use a guy from Brazil as a testimonial, it should be in Portuguese instead of Spanish. I get it though |
| Abel | That's why Russ has been asking for testimonials lately |
| Weeks | ***I told the dude that when these systems are put up, most people just grab picks and make up the testimonials. But this guy is checking on everything ya know?*** |
| Abel | A lot of Brazilians speak Spanish and people from Portugal speak Spanish. Been there done that. What ever needs to be changed I will push hard to make it happen |
| Abel | Tell him to fly out to Iceland |
| Weeks | Cool. ***The more legit this looks the Better***. That's all. He is going to fly with me to Iceland. |

Further, in a Facebook message exchange in January 2016, codefendant Medlin told Weeks that the mining earnings figures that BitClub Network displayed to investors did not reflect 100% of what BitClub Network had mined—a fact BitClub Network tried to hide from investors:

| | |
|---|---|
| Weeks | So, (am I explaining this correctly) as an example, we have been paid per share: 0.0065 01-04-2016 0.0066 01-07-2016 0.0065 01-11-2016 0.0062 01-15-2016 A total pay out from Jan 4-15th .0256. We found 18 blocks (450 BTC) in that time frame. (according to bitclubpool.com) 450 btc /.0256= 17,578 shares outstanding that we are splitting what the mine finds with. Correct? |
| Medlin | Basicly yes |
| Medlin | And that will confuse people |
| Weeks | of course it will |
| Weeks | these fuckers are stuck on the paralysis of analysis |

| Medlin | Change their thinking. Don't let them change you |
|--------|---------------------------------------------------|
| Medlin | I have a hard line of I don't get in to that. It is just a waste of time |
| Weeks | Just as long as they know that 100% of the mining blocks found are paid out, it shouldn't be an issue. |
| Medlin | There is other power running to pay electric. It isn't 100% |
| Medlin | But basically 100% of what they see |
| Weeks | oh, I thought that came out of the rebuy. So its 100% of the mining earnings are paid out (after expenses) like the power bill. |
| Medlin | Yes |
| Medlin | But we try to keep that off of bitclubpool.com |
| Weeks | Is [Third Party] paying us for the hashing? I don't see it on the bitclubpool. I hope they are. |
| Medlin | I promise you that you will cost your self time and money to focus on this |

Indeed, Weeks was initially under the mistaken impression that mining expenses were paid out of the "rebuy" because that is what BitClub Network told investors— that the costs of mining would be paid out of a portion of the forced reinvestment (*i.e.*, the "rebuy"). The BitClub Network's website told investors that:

> Here's how it works…Whatever you earn from the pool will be credited to your account daily with a percentage automatically taken out and put toward re-purchasing additional shares. Each re-purchase goes toward more mining equipment and paying all fees associated with running the pool.

But, as reflected above from Medlin, rather than using money from the "rebuy" to pay all expenses consistently with what the BitClub Network represented to its investors, Medlin told Weeks that the BitClub Network was instead deducting the expenses *before* it showed people the figures that were supposed to be the proverbial total pie. And, most importantly, Medlin also told Weeks that the BitClub Network wanted to keep that fact hidden from investors. But, even after Weeks learned from Medlin one of the secrets that the BitClub Network was kept from victims, Weeks remained very involved in promoting and helping the BitClub Network continue.

18

Further, in September 2017, Weeks was asked to admonish some BitClub Network investors in his downline who were using a recruiting video that promoted the BitClub Network and contained earnings projections. Weeks relayed: "Don't give them a reason to go after you. US Citizens are at higher risk right now with Bitclub." In his own words, Weeks was aware that the BitClub Network posed a significant legal "risk," but continued to solicit and profit from new investment.

Weeks also knew that promoting the scheme and securing referral bonuses was more lucrative than the promised "passive investment" of bitcoin mining—a hallmark of an illegal pyramid scheme. For example, in November 2017, Weeks received an email from an investor who, it appears was recruited to join the BitClub Network by Weeks. *See* USA Ex. D. After the investor did not realize the returns he had hoped for and received no response to several redemption requests, the investor reached out to Weeks to see if Weeks could help with securing a refund. *Id.* In response, Weeks shamed the investor into staying with the company as opposed to seeking a refund:

> Bro
> What are you retarded?
> Bitcoin is up 971% this year. You want a refund? Thats the stupidest thing Ive heard all year.
> Whats the matter with you [REDACTED] Why don't you start paying attention bro?
> You've had 70,000 hours to figure out bitcoin, since it was invented…Bro…you still don't get it?
> Bitcoin+golden egg. Bitclub=goose
> you had to have heard that story before right?
> Which is smarter?

When Weeks failed to convince the investor to remain in the BitClub Network, Weeks doubled down, touting "1000% a year returns," admonishing that the doubtful

investor would end up using bitcoin "when all the rest of the slow, feeble minded people finally figure it out," that he was choosing to "live in fear," and reiterated that he was "[a]bsolutely" "calling your decision retarded."  *See id.*

With respect to the Promotion Charge, evidence reflects that Weeks knew that the BitClub Network was illegally operating outside the scope of the SEC but chose to promote the sale of BitClub shares all the same.  For example, in 2015, Weeks had a conversation via Facebook with some of his coconspirators, during which he sent them an article about an SEC enforcement action against GAW Miners LLC, another digital currency mining scam.  *See SEC v. Homero Joshua Garza, et al.*, Civ. No. 15- 01760 (JAM) (D. Conn).  Weeks acknowledged that "we"—using the first person plural to refer to the BitClub Network—should be more transparent if they wanted to stay out of trouble with regulators:

> We really should have sep stats and oct stats and nov stats. The sophisticated investors with a lot of cash are hesitant with putting in big cash because they want to see the mining contract, the receipt or title to the mining equipments, proof that they own something in return, how much the mine made and what the mine paid out to each share holder so they can calculate what a share is worth etc. ***Bitclub pool doesn't tell us how many share holders we have etc. Its not transparent enough for the big big money guys.*** Thats why they are giving [Third-Party] $100M and not us right now...
>
> . . . .
>
> the biggest people in bitcoin are watching us right now
>
> and ***waiting for the SEC to step in... which I really want to avoid at all costs***.

If Weeks truly believed that he was engaged in a legitimate business—as opposed to a fraudulent pyramid scheme to sell unregistered securities—he would not have

been discussing his concerns with his coconspirators about the SEC's likely involvement and the BitClub Network's parallels to GAW Miners.

In 2016, Weeks was negotiating with a third-party vendor on behalf of the BitClub Network.  This vendor told Weeks that they were "not sure about a joint press release because we would need to get very comfortable from [the] legal side about your business" but were "not sure we can get there given the recent SEC guidance."  But again, these admonitions did not deter Weeks from continuing with the BitClub Network.  Even investors voiced frequent skepticism to Weeks.  For example, in August 2017, Weeks was warned by a potential BitClub Network investor:  "I don't know how to set up or use a VPN and more importantly I don't know if it's safe to assume that solves potential problems with the govt."

Finally, Weeks faces the prospect of additional tax charges because Weeks *confessed to the IRS* that he has never paid taxes on the wealth he has amassed from the BitClub Network.

In response to the evidence against him, Weeks contends that the Government's evidence is "not very strong" and, despite being a statutorily enumerated factor, is "the wrong focus."  Weeks Br. at 32.  Weeks does not argue that the Government's evidence—in many cases, emails and Facebook messenger records reflecting Weeks' own words—is unreliable.  Instead, Weeks attempts to provide an alternate theory of why the obvious is less so.  But Weeks' self-serving characterization of the evidence and charges against him is flawed in several respects.  For one, it ignores evidence—some of which is highlighted above—that reflects that Weeks knew that the BitClub Network was not providing its victims with

21

material information about the shares it was selling to unsuspecting investors and was intentionally trying to escape being caught by law enforcement and regulators. Weeks also recites the party line: if the BitClub Network was mining, then *ipso facto* it must not have been fraud. That is a drastic and incorrect oversimplification. The evidence shows that the BitClub Network was an illegal pyramid scheme that preyed on victims through fraudulent misrepresentations and omissions—and that Weeks knew it. Rather than refute the evidence, Weeks spins a one-liner: "access equals comfort, not culpability." Weeks Br. at 33.

As Judge Hammer correctly noted, Weeks, of course, can try to advance this interpretation to the jury; until then, the grand jury's determination that Weeks engaged in a fraud conspiracy must be acknowledged. *See* Hammer Feb. 14 Tr. at 165 ("The defense argues that because there was mining when Mr. Weeks joined BitClub Network, that I think the suggestion is he did not know that there was any fraudulent activity. And I understand that that will be something that will be heavily contested at trial. But I must give at least some reasonable deference to the fact that the grand jury has found probable cause enough to include Mr. Weeks in the fraud count.") And, significantly, as also previously highlighted by the Government and Judge Hammer, Weeks—by virtue of his high-level "access" and sheer common sense—knew the BitClub Network was defrauding its investors and flouting U.S. laws and regulation and nonetheless continued to promote and further the fraudulent scheme for his own benefit. *See* Hammer Feb. 14 Tr. at 164 ("even as Mr. Weeks had protested it's not right, he continued to work with the co-conspirators and persuade others to invest.").

22

**III.  Weeks Is an Unreasonable Flight Risk Given His History and Characteristics.**

**A.    Weeks' Substantial Travel and Foreign Contacts Render Him a Flight Risk.**

Weeks has extensive foreign contacts and global travel, including in nations where it would be difficult, and perhaps impossible, to locate and extradite him if he fled the United States.  His extensive history of foreign travel and substantial ties to individuals abroad counsel against releasing him pretrial.  *See, e.g., United States v. Kachkar*, 701 F. App'x 744, 747 (11th Cir. 2017) (*per curiam*) (affirming pre-trial detention order in fraud case, concluding that the district court "did not err in concluding that [the defendant's] significant ties and travel to foreign countries weighed in favor of a finding that he was a flight risk") (internal quotation marks omitted).

Weeks and his wife maintained a website—www.weeksabroad.com—that highlights their international travel.   A map posted to the site highlights the scope of their whereabouts:



The site claimed that Weeks has visited all seven continents and 141 countries.

In a 2017 email that Weeks sent to codefendant Goettsche, Weeks included his "pitch" for a television program that would follow Weeks and his wife around the world as they promoted what they called the "Bitcoin Revolution."  Below are several excerpts:

> "In the last two years my wife and I have visited 400+ cities and over 100+ countries. We basically fly around the world on private jets selling machines that print money. Who wouldn't like to have a machine that prints money?"

> Meet Joby and his wife Stephanie Weeks, entrepreneurs, investors, the front-line soldiers in a battle to change the way you spend and save your money. Except the money they want you to use is this NEW magical Internet money called Bitcoin!

>  . . .

> Joby and Stephanie never stop moving. They call themselves Perpetual Travelers! On a perpetual workcation, promoting and living off of Bitcoin wherever they go...

> Back on the Jet to Miami, St Kitts and then off Jeeping around Europe before swinging south for some dirt biking in the Sahara. Come crash at Richard Branson's pad in Marrakech, before skipping off to Necker Island for the Blockchain Summit Conference. Find out why all the Billionaires think Bitcoin and the Blockchain are the next big thing! See the underground mining pools of Iceland and learn everything you need to know about this evolving currency and others like it.

>  . . .

> Meet the Founders of the Global Network of Bitcoin enthusiasts and miners called "The BitClub" Get up to date on current technologies from some of the richest investors in the world, and get inside knowledge of the next big thing before it happens.

In this "pitch," Weeks cast himself as one of the BitClub Network's "founders," touted the highly misleading but enticing idea of selling machines that "print money," and described himself and his wife as "Perpetual Travelers."

24

There is plenty of evidence to support the last claim.  According to Government travel records, Weeks undertook the following travel between the U.S. and international locations since on or about November 15, 2016:

| Travel Date | Departure location | Arrival location |
|---|---|---|
| 11/22/2019 | Zurich | New York |
| 10/6/2019 | Key West | Nassau |
| 10/2/2019 | Rome | Chicago |
| 9/25/2019 | Chicago | Rome |
| 9/20/2019 | Bangor | Prince Edward Island |
| 8/26/2019 | St. Kitts/Nevis | Miami |
| 8/10/2019 | Atlanta | St. Kitts/Nevis |
| 7/14/2019 | Tokyo | Honolulu |
| 4/20/2019 | Washington Dulles | Munich |
| 4/16/2019 | St. Kitts/Nevis | San Juan |
| 4/10/2019 | Dominica | Denver-Aurora |
| 4/4/2019 | Cancun | Dallas/Fort Worth |
| 4/2/2019 | Houston | Cancun |
| 3/21/2019 | Cancun | Miami |
| 3/19/2019 | Houston | Cancun |
| 2/26/2019 | Mexico City | Salt Lake City |
| 2/14/2019 | Houston | Mexico City |
| 1/28/2019 | Panama | Denver |
| 12/30/2018 | Miami | Santiago |
| 12/14/2018 | Reykjavik | Denver |
| 12/8/2018 | Miami | Lisbon |
| 12/6/2018 | Belize City | Miami |
| 11/30/2018 | Dallas/Fort Worth | Belize City |
| 9/10/2018 | Greenland | Chicago |
| 9/8/2018 | Canada | Fairbanks |
| 7/23/2018 | St. Kitts/Nevis | Miami |
| 7/18/2018 | Belize City | Miami |
| 7/18/2018 | Miami | St. Kitts/Nevis |
| 7/13/2018 | Houston | Belize City |
| 7/6/2018 | Amsterdam | Atlanta |
| 4/12/2018 | New York | Istanbul |
| 3/23/2018 | BC, Canada | Gypsum, Colorado |
| 3/23/2018 | BC, Canada | Denver |
| 3/20/2018 | Gypsum, Colorado | BC, Canada |
| 3/2/2018 | Nassau Intl | Atlanta |

| Travel Date | Departure location | Arrival location |
|---|---|---|
| 2/27/2018 | Mexico City | Miami |
| 2/27/2018 | Miami | Nassau Intl |
| 2/15/2018 | Los Angeles | Mexico City |
| 2/5/2018 | Tokyo | Denver |
| 1/26/2018 | Washington Dulles | Tokyo |
| 1/24/2018 | Belize City | Miami |
| 1/21/2018 | Quito, Ecuador | Houston |
| 1/21/2018 | Houston | Belize City |
| 1/12/2018 | Las Vegas | Mexico City |
| 1/5/2018 | St. Kitts/Nevis | Miami |
| 12/23/2017 | Charlotte | St. Kitts/Nevis |
| 12/10/2017 | Tokyo | Los Angeles |
| 11/6/2017 | Honolulu | Sydney |
| 10/30/2017 | Panama | Los Angeles |
| 10/8/2017 | Miami | St. Kitts/Nevis |
| 10/2/2017 | Istanbul | New York |
| 9/20/2017 | Munich | Denver |
| 9/5/2017 | San Francisco | Manila |
| 8/31/2017 | Mexico City | Los Angeles |
| 8/13/2017 | Panama | San Francisco |
| 8/9/2017 | Houston | Panama |
| 7/29/2017 | British Virgin Islands | St. Thomas |
| 7/23/2017 | Charlotte | St. Maarten |
| 6/21/2017 | Reykjavík | Boston |
| 5/19/2017 | Westchester County, NY | London |
| 5/18/2017 | St. Kitts/Nevis | San Juan |
| 5/14/2017 | Miami | St. Kitts/Nevis |
| 5/7/2017 | Seattle Lake Union | Ontario |
| 5/4/2017 | Mexico | Los Angeles |
| 4/20/2017 | Miami | Columbia |
| 4/19/2017 | Zurich | Miami |
| 3/21/2017 | Miami | Lima |
| 3/19/2017 | Seoul | Los Angeles |
| 3/13/2017 | Denver | Tokyo |
| 3/7/2017 | Punta Cana | San Juan |
| 2/24/2017 | Chicago | Mexico City |
| 2/23/2017 | Hong Kong | Chicago |
| 2/24/2016 | Hong Kong | Newark |
| 12/23/2016 | Hong Kong | Newark |
| 11/15/2016 | Houston | London |

The chart does not account for travel entirely between international locations.

In addition to this significant foreign travel, Weeks has properties in St. Kitts and Mexico, and it appears from his brief that he has investments and projects scattered around the globe.  Obviously, "[t]he fact that [Weeks] can apparently sustain himself abroad weights in favor of detention." *Abdullahu*, 488 F. Supp. 2d at 442; *see also United States v. Goba*, 240 F. Supp. 2d 242, 251 (W.D.N.Y. 2003) (finding that the defendants presented a risk of flight because, *inter alia*, "each defendant has demonstrated the ability to sustain himself abroad for an extended period of time through his own or others' means").

Weeks also sought citizenship from St. Kitts & Nevis.  In connection with his attempt to gain this citizenship, Weeks explained that in the past year alone he had "run through" approximately $62 million and remarked:  "Now you know why I don't want my US Passport anymore.  Imagine the tax liability!"  *See* USA Ex. E.  In furtherance of his effort to gain citizenship, Weeks purchased a fractional interest in a condominium in St. Kitts.  This citizenship was important to Weeks for two reasons:  easier foreign travel and the ability to use his citizenship as a tax shelter.  As he explained to one of his friends on Facebook in May 2017:

| Weeks | In st kitts till the 18th |
|---|---|
| . . . . | |
| Weeks | Buying this to get a new passport. |
| Person 3 | that's an expensive passport! |
| Person 3 | you sure you don't want an island? |
| . . . . | |
| Person 3 | I will. Out of here on Wed with the data. This is necker level so a big one. |
| Weeks | Does it come with a passport? |
| Person 3 | Not sure. I'll ask. Why do you want a diff passport? Couldn't we just go buy a an acre in Costa Rica or Nicaragua for super cheap? |

| Weeks | St kitts is a Tax haven. |
| Weeks | Visa free travel in over 140 countries |

When St. Kitts did not send Weeks a passport, a friend of Weeks suggested other countries where Weeks could obtain foreign citizenship:

| Weeks | I'm heading to st kitts now to find out what's up with my passport.  They still haven't issued it |
| Person 4 | Are they going to let you have one? We can probably get you one from NZ |
| Person 4 | You can get one from Nicaragua if you get into a pinch. |

Later on, as noted by Judge Hammer in his opinion determining that Weeks is a flight risk, in 2019, Weeks engaged in the following chat with another person:

| Person 5 | IRS took my passport |
| Person 5 | I get it back in a few days |
| Person 5 | Fuckers |
| Weeks | no shit? |
| Weeks | Wow |
| Weeks | I can get you a mexican one for $20k |

*See* Hammer Feb. 14 Tr. at 173-74 (noting as relevant that Week "represented to someone in 2019 that [h]e could procure a Mexican passport").

Weeks, in response, essentially encourages this Court to ignore his extensive foreign travel, foreign properties, foreign contacts, and his conversations and attempts to obtain foreign travel documents.  He suggests that his broad access to foreign travel documents does not increase his risk of flight because he has not actually obtained them.  *See* Weeks Br. at 19.  But, until now, it does not appear that Weeks has had any need to use or obtain foreign travel documents.  He certainly has tried and discussed the possibility of doing so if need be.[1]  While Weeks claims

_____

[1] Weeks suggests that he voluntarily returned from Mexico to meet with IRS agents before his arrest.  To the extent meeting with the IRS agents was a factor, it was at best a secondary one:  Weeks told the IRS that he was coming to Florida so that he

28

that he is willing to sign extradition waivers, this promise is somewhat meaningless; each country has its own extradition process, and a signed waiver may well be worthless in many countries where Weeks could flee.

Judge Hammer correctly found that, while there is "nothing inherently wrong about travel," "it is a significant factor" that Weeks "has affiliations all over the world." Hammer Feb. 14 Tr. at 173. Judge Hammer also was not "satisfied that Mr. Weeks would be deterred from fleeing because of his wife and child given their own extensive travel." *Id.* Weeks mischaracterizes this acknowledgement that Weeks' foreign travel and contacts render him a flight risk, surmising that "[i]t seems the magistrate believed that if Mr. Weeks was released from detention he would feel comfortable leaving everything behind because of his experience with international travel," and suggests further that Judge Hammer "failed to recognize" that Weeks is not a flight risk because he already had his "big chance to flee" instead of meeting with IRS agents. Weeks Br. at 13. Weeks is incorrect, on several fronts.

First, the evidence reflects that if Weeks fled, he would not need to leave everything behind because he likely has access to bitcoin and other wealth accessible from anywhere in the world, has demonstrated an aptitude for financing his lifestyle by ingratiating himself with fraudsters and victims, including in many

---

and his family could attend a Tony Robbins seminar.  In any case, Weeks thought he was meeting with the IRS to explore becoming a law enforcement source, not because he thought he was in imminent legal jeopardy, and certainly not because he thought he was about to be arrested.

foreign countries, and has a wife and child who are acutely comfortable with a life of travel.[2]  In other words, Weeks would be leaving little behind if he fled.

Second, Judge Hammer correctly understood the significance of Weeks' decision to meet with IRS agents.  This decision was made *prior* to Weeks knowing that he was under indictment, *prior* to Weeks knowing that he was going to be arrested, and *prior* to Weeks' realizing that he would be incarcerated.  Weeks—in his words—thought that he would be the "Jason Bourne" of cryptocurrency if he could convince the IRS that he was valuable to them.  Weeks' decision to interact with the IRS plainly reflects his own awareness that he had criminal exposure and his hope that if he spoke to IRS he could avoid having to take responsibility for it.  Now that his "plan A" did not work, Weeks would see flight as his best, and perhaps only, option.

For all of these reasons, both federal judges who have reviewed Weeks' travel and foreign contacts correctly concluded that this factor makes Weeks a flight risk.  *See* Hammer Feb. 14 Tr.; Matthewman Order.  This Court should reach the same conclusion.

## B.  Weeks' Lack of Ties to a Permanent Residence Renders Him a Flight Risk.

Unsurprisingly, given his near-constant foreign travel, it appears that Weeks has no real home of his own.  When law enforcement officers went to Weeks' purported "home" in Aurora, Colorado on December 10, 2019, they were met not by

---

[2] Indeed, it appears from Weeks' brief that his wife's jobs rely on, if not benefit from, foreign travel.  *See* Weeks Br. at 15.

members of the Weeks family, but instead by several individuals who said that they rarely see Weeks at that residence, that he certainly did not live at that residence, and that he visited the residence only a few times a year. When asked where Weeks lived, the people living in this house stated that Weeks lived all over the world, that he did not have a primary residence, and that he had lived this way for at least the last ten years.

Weeks responds that the people who were in that house that day were family friends who had moved in shortly beforehand. But even by Weeks' own account, this house—notwithstanding Weeks' accumulation of millions of dollars—belongs to Weeks' parents and it appears that Weeks visits Colorado only a handful of times throughout the year. *See* Weeks Br. at 10, 12.

Under these circumstances, Weeks' alleged ties to Colorado do not mitigate his risk of flight. *See* Matthewman Order at 4 (noting that Weeks "does not maintain a permanent residence anywhere in the United States" as a factor in supporting pretrial detention). This is especially true where, as here, Weeks' immediate family is used to spending significant time traveling alongside Weeks. It also has been reported that Weeks's daughter was the youngest person to visit all 50 states, completing the trip in just 42 days. *See* https://www.thegazette.com/50-states-in-42-days-baby-liberty-becomes-the-youngest-to-travel-the-us-20181207. Although the COVID-19 pandemic has made foreign travel more challenging, it has not made it impossible, particularly for those with unaccounted-for assets. Even if Weeks

were to flee this Court's jurisdiction but remain in the United States, the current conditions would make it *more* difficult to locate Weeks, not less.

As for Weeks' references to his ties to prominent members of the community, as noted by a Judge in this District, "Congress has cautioned against relying too heavily on family and community ties." *Abdullahu*, 488 F. Supp. 2d at 443. Indeed, the Judicial Committee recognized that there was "growing evidence that the presence of [community ties] does not necessarily reflect a likelihood of appearance. . . . [T]he Committee wishes to make clear that it does not intend that a court conclude there is no risk of flight on the basis of community ties alone; instead a court is expected to weigh all the factors in the case before making its decision as to risk of flights[.]" *Id.* (quoting *United States v. Caniglia*, 2002 WL 32351181, at *4 (E.D. Pa. 2002)). As for Weeks' cited involvement with the Republican Party, his great-grandfather's title, his being a "devoted libertarian," and his work for Ron Paul, *see* Weeks Br. at 3, 22, all of that is irrelevant to whether he presents an unreasonable risk of flight.

### C. Weeks' Self-Proclaimed Anarchist Beliefs and Demonstrated Self-Serving Behavior Make Him a Flight Risk.

Weeks has a demonstrated history of refusing to follow rules that do not suit his needs and has a demonstrated streak of anti-government rhetoric. In a March 2017 email to two coconspirators, Weeks urged the BitClub Network to post the following on its website regarding the BitClub Network's decision to block U.S. investors:

Bitclub pays all of our members around the world daily, tax free.

32

> Despite what you may have been told, America is, unfortunately, no longer a free country.
>
> If you are a U.S. CITIZENS with a SS# (Slave Surveillance Number) Then you may get in trouble with your masters at the IRS for making a bunch of Bitcoin tax free.
>
> As a precaution, we have decided to block people using ip addresses based in the USA from joining Bitclub.
>
> We understand U.S. CITIZENS are property and we don't want any trouble with your owners.

In a 2019 post on the website of Wired Magazine called "Anarchy, Bitcoin, and Murder in Acapulco," Weeks was described as one of thousands of "crypto-anarchists" that periodically gather in Mexico:

> Perpetual traveler and bitcoin evangelist Joby Weeks was so taken with Acapulco during his annual talks at the conference that he bought a 13-bedroom mansion overlooking the water three years ago, paying the equivalent of $4 million in bitcoin. Soon after, bitcoin went through the roof, making the amount of cryptocurrency he paid worth $40 million and then $80 million. Then his bitcoin stash got hacked. He smacks his head recalling how he felt: "Oh! I should have saved my bitcoin!"
>
> He plans to turn the house into a time-share of sorts, giving members access for one week a month. Anarchists will be anarchists whether they are in Acapulco or anywhere else, he figures, while crediting Anarchapulco for drawing him to the city in the first place. Anarchy is "a state of mind, it's a state of living," **Weeks says. "The whole asking for forgiveness instead of permission mindset."**

*Available at:* https://www.wired.com/story/anarchy-bitcoin-and-murder-in-mexico/ (emphasis added).  This "state of mind" and "state of living" suggests that, consistent with both federal judge's orders, Weeks is unlikely to follow pretrial release conditions of this Court.  As put by the judge in the Southern District of Florida:  "Simply stated, the Court does not believe that [Weeks] would comply with any conditions of release set by the Court."  Matthewman Order at 7.

Weeks evidently has close contacts with individuals overseas who are interested in forming sovereign states, usually involving some aspect of cryptocurrency as a focal point. For example, in October 2017, Weeks emailed several coconspirators regarding his "buddy Vit, The President of Liberland." According to a 2015 article posted on the website of the Independent:

> Vit Jedlicka, a member of the Conservative Party of Free Citizens, is the self-appointed president of "Liberland," a 7sq km "country" (only the Vatican and Monaco are smaller) where taxes are optional and there is no military.
>
> It is situated on the banks of the Danube between Serbia and Croatia in an unclaimed no-man's land, or terra nullius territory, meaning that neither country has ever held full sovereignty over the area.

*Available at:* https://www.independent.co.uk/news/world/europe/welcome-to-liberland-europes-tiny-new-country-where-taxes-are-optional-and-youre-allowed-to-move-in-10185477.html. In the email, Weeks pitched an idea by which each of Liberland's 500,000 "citizens" would pay $5,000 each to become "founding father[]" investors in the BitClub Network and all existing BitClub Network members would be granted Liberland citizenship. Weeks envisioned a $140 million commission for the BitClub Network for onboarding Liberland citizens. He said, "Starting a country is a mission a ton of people are on board with," and that Liberland, with BitClub Network's help, "would be the first country that runs on bitcoin mining instead of taxing its citizens."

In 2015, Weeks participated in a Facebook chat with other users in which he discussed establishing a sovereign territory proximate to Madeira, an autonomous region of Portugal, that he referred to as "Atlantis." On August 10, 2015, Weeks wrote:

> Here is how I see the evolution of Atlantis. Step 1 buy island (check) step 2 declare sovereignty and set up principality (check) step 3 refuse to pay tribute to Portugal/Madeira. (Check) step 4 defend sovereignty in court (happening hopefully soon) that would be preferable instead of dealing with an invasion. step 5 get recognition/treaty with Madeira. (Hoping to find out on this trip what that would entail) step 6 go to the rest of the world.

As evidenced by Weeks' behavior and involvement in the course of his criminal conduct at issue in this case, Weeks has shown a willingness to disregard laws that he believes should not apply to him and has also taken steps to encourage others to do the same.  Indeed, even when IRS agents relayed to Weeks that his continued failure to pay his taxes was serious, Weeks cited to a possible defense to his criminal tax liability based on a baseless interpretation of the Fourteenth Amendment.[3]

 In response, Weeks suggests that considering evidence that he does not believe in "asking for permission" and views anarchy as a state of mind in considering whether he will follow the rules of this Court if released somehow violates the First Amendment.  It does not, and this Court should not ignore Weeks' words that he spoke before he was under indictment.

Weeks also argues that, notwithstanding the aforementioned statements, he is not a flight risk because he believes that "it is illegitimate to use force, fraud, or coercion to get your way."  Weeks Br. at 22.  The belief that Weeks espouses in his brief does not appear to have any actual relevance to whether he is a flight risk, but also is markedly inconsistent with statements he made during his involvement with

---

[3] One can only assume Weeks' rationale was akin to his explanation to the BitClub Network victim who asked him how she should answer the question of whether she was a United States' resident.  *See supra*, page 10.

35

the BitClub Network, including dismissing perceptive skeptics as "retarded," "stupid," and "feeble-minded," because their behavior was not profitable for Weeks. *See* USA Ex. D.

### D. Weeks' Financial Resources and Access to Wealth Renders Him a Flight Risk.

Weeks' access to wealth is significant and warrants pretrial detention. Throughout the course of the BitClub Network scheme, Weeks made millions of dollars.  By way of example, in an email to the "second citizenship" concierge Weeks enlisted in an effort to obtain St. Kitts citizenship, Weeks wrote:

> The funds that I used to buy the property and pay you came from me selling some bitcoins.
>
> I try to keep my money out of the banks and in Bitcoin instead.
>
> Thats why that bank account has such a low balance all the time.
>
> What should we do? I don't like or trust banks and I am not a fan of fiat money.
>
>  . . .
>
> I think Ive run through around $62,000,000 in the last year selling computer equipment that mines bitcoin.

*See* USA Ex. E; *see also* Hammer Feb. 14 Tr. at 168 (noting the above email in flight risk analysis).

If Weeks were to be released and were to flee from law enforcement, he would be able to access his bitcoin holdings from any location around the world. Additionally, Weeks has used several different bitcoin exchanges located in different countries.  As a result, not only are Weeks' financial holdings scattered around the world, U.S. law enforcement lacks visibility into these accounts or the ability to seize money from them.

36

And Weeks knows this. For example, in 2017, Weeks sent the following meme to a Facebook user:



Weeks' decision to send a meme to someone referencing the seizure of money shows that Weeks understands that cryptocurrency is harder to freeze than funds stored in a traditional bank account and suggests further that law enforcement has reason to seize funds from him.

Weeks also made high-dollar value international wire transfers from his account at Octagon, a foreign cryptocurrency exchange.  On or about April 30, 2018, Weeks caused Octagon to transfer approximately $1.2 million from its account at California-based Silvergate Bank to the Bank of Georgia on behalf of "Geo Servers LLC."  On or about May 1, 2018, Weeks received a confirmation of the transaction from an individual using a third-party business's email account.  Weeks negotiated on behalf of the BitClub Network with this third-party business at various times during the conspiracy.

Weeks also had multiple conversations in which he offered to broker conversions of fiat currency to cryptocurrency.  In one exchange, Weeks introduced

one of his coconspirators to an exchanger who could convert $1m into bitcoin. Weeks described his associate as the "biggest bitcoin trader in the world." For one such transaction, Weeks was asked, "Do we have to bring the cash from Jakarta to Singapore or is it already in Singapore?" In another exchange, Weeks told someone on Facebook that he could "turn $1m into bitcoin in about a day."

Weeks is also known to maintain cryptocurrency in easy-to-transport hardware wallets. Hardware wallets are located on an external or removable media device, such as a USB thumb drive or other commercially available device, and designed to store cryptocurrency. Some of these devices are quite small—some can be as small as a postage stamp—and highly portable. Weeks also received periodic emails from "no-reply@trezor.com," an apparent promotional account for the Trezor brand of cryptocurrency hardware wallets. Trezor and Ledger are companies that manufacture and sell hardware wallets used to store cryptocurrency. Maintaining cryptocurrency on a hardware (or cold storage) wallet would give Weeks access to the funds stored therein from anywhere in the world. At present, it is unclear how much cryptocurrency Weeks maintains. During his custodial interview on December 10, 2019, Weeks declined to give consent to law enforcement to access his holdings.[4]

Finally, Weeks had what appeared to be multiple thousands of dollars in cash concealed in the belt he was wearing when he was arrested. He did not tell

---

[4] Weeks told law enforcement that he had a cold storage bitcoin wallet buried in a tube somewhere in Colorado, a cryptocurrency go-bag for emergency purposes. He refused to provide its exact location. Agents searching the house that Weeks claims is his residence for 2-3 months out of the year in Colorado found an empty tube that matched what Weeks described.

the interviewing agents about it.  The concealed cash was discovered only when the belt was removed when Weeks was processed for detention.

In response, Weeks attempts—as he did with Judge Hammer—to create confusion with a document that Weeks provided in his efforts in St. Kitts to boast of his extraordinary wealth.  The document on its face reflects that one of his wallets received more than $560 Million over the course of its existence.  Weeks contends that this figure overrepresents his wealth, evidently disregarding that it was Weeks used this document and that dollar amount to attest to his personal fortune.  But what the Government told Judge Hammer is that, while the document that Weeks used was misleading, this wallet *did in fact* receive significant holdings during the course of its existence—approximately $124 million.  There was no confusion, as Weeks suggests, about the significance of this document, which is something *Weeks himself* used because he thought it would help him get what he wanted.  If anything, the misleading nature of this document and the reality that Weeks submitted this document that he now claims is misleading cuts in favor of pretrial detention.

And, while Weeks claims that he used his bitcoin wallet to transfer large sums of money to third-party companies, he admits that he would keep millions of dollars as a fee for these transactions and does not attempt to parse out what amount of money in that wallet went to him as opposed to what was only temporarily in his accounts to facilitate transactions.  *See* Weeks Br. at 21.  Weeks' access to wealth, much of which is in cryptocurrency, militates in favor of detention.

IV.     **The Size and Complexity of the Case and COVID-19 Does Not Require Weeks' Pretrial Release.**

Weeks argues that the size and complexity of this case, coupled with the challenges of the Essex County Correctional Facility ("ECCF"), requires his pretrial release.  But Weeks' complaints are no different from those of any defendant whose case involves multiple defendants, a large volume of discovery, and intricate facts.

The COVID-19 pandemic and the measures instituted in ECCF and other facilities to mitigate its spread undoubtedly will impede the ability of pretrial detainees like Weeks to meet with counsel and participate in their defense.  But, under the circumstances, the courts must consider how those unfortunate burdens will affect individual detainees.  Here, as Judge Hammer noted in denying Weeks' COVID-related motion for pretrial release, Weeks is comparatively well-situated as he is represented by "extremely sophisticated, capable criminal counsel," *see* Hammer Feb. 14 Tr. at 162, 174, from a major law firm who are well-situated to process and review discovery, prepare motions (including the motion addressed by this brief), and construct a defense.  Moreover, the Government has worked with the U.S. Marshals Service to help alleviate some of the concerns espoused in Weeks' brief.  And while Weeks states that "[d]efense counsel needs to be side-by-side with Mr. Weeks in a room to review documents without the fear of getting sick from COVID-19," *see* Weeks Br. at 39, that is a concern and barrier that will exist under the present circumstances whether Weeks is incarcerated or freed on bail.

There also is less of an immediate need for extensive consultation, at least compared to other cases with more urgent deadlines.  As a district court judge in the Central District of California ruled in denying release on COVID-19 grounds,

40

"the fact of the matter is that no jury trial will be conducted until conditions in the Central District normalize. Notwithstanding any current limitations on attorney visits, there will be an adequate opportunity to prepare once conditions normalize." *United States v. Avenatti*, Crim. No. 19-61 (JVS), at 2-3 (C.D. Cal. Mar. 21, 2020). Here, there is no scheduled trial date, and there are no pretrial evidentiary hearings scheduled at this time. There is a considerable amount of discovery in this matter, and Weeks doubtless would prefer to review that discovery as soon and as seamlessly as possible. But he is not alone in dealing with this level of disruption.

## CONCLUSION

This Court should, consistent with the two other federal judges who have addressed this question, find that Weeks represents an unreasonable risk of flight and should order Weeks detained pending his trial.

Respectfully submitted,

CRAIG CARPENITO
UNITED STATES ATTORNEY


*s/ Jamie L. Hoxie*
By:    Jamie L. Hoxie
       Anthony P. Torntore
       David W. Feder
       Assistant U.S. Attorneys

Dated:  June 28, 2020

**CERTIFICATE OF SERVICE**

I, Jamie L. Hoxie, certify that I served the above brief on counsel of record for defendant Jobadiah Sinclair Weeks by emailing a copy of this brief to counsel of record on June 28, 2020.

*s/ Jamie L. Hoxie*
Jamie L. Hoxie
Assistant U.S. Attorney
