# Exhibit A.

September 5, 2024, Records Request

# STONE ■ MAGNANINI

## COMPLEX LITIGATION

September 5, 2024

**VIA EMAIL**
AUSA Anthony Torntore
United States Attorney's Office
   for the District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

Re:    <u>United States v. Jobadiah Weeks</u> (19-cr-877-CCC)

Dear AUSA Torntore:

As you are aware, we are currently preparing to meet with you to discuss our position on Mr. Weeks' sentencing matters, including reaching an amicable resolution regarding restitution. To that end, we are investigating the underlying calculations referenced in Mr. Weeks' plea agreement pertaining to the relevant loss amounts as well as investigating the value of Mr. Weeks' assets that were seized by the government that remain in its possession.

On July 22, 2024, you emailed me an IRS memorandum, dated October 8, 2020, described as "[e]valuation of grand jury expansion request and special agent's report." Page 6 of the memorandum explains in a footnote that "[a] streamlined SAR was created and supplemented with documents which corroborate the allegations in the SAR…" which includes "copies of… interviews…." A footnote on page 8 references a "tax loss appendix." We respectfully request that you kindly produce to us a copy of the following items referenced in the October 8 memorandum:

1.    The "streamlined SAR."

2.    The tax loss appendix.

3.    "[C]opies of… interviews" in whatever form, including, but not limited to, transcripts, summaries or other reports.

To gain an understanding of the IRS's interpretation of the transfers and payments reflected in the cryptocurrency wallets owned by Mr. Weeks we respectfully further request the following information:

**STONE ■ MAGNANINI**

C O M P L E X   L I T I G A T I O N

1.  A detailed transaction history for the cryptocurrency wallets identified as belonging to Mr. Weeks, specifically "1Joby" and "19rFx." We believe that this should include all incoming and outgoing transactions, along with corresponding dates, transaction amounts and the parties involved.

2.  Among the items seized by the government is a computer containing a JAXX wallet. Please provide us with all records that set forth the current status of the cryptocurrency stored in the JAXX wallet and other wallets and hardware seized by the government (*e.g.*, Trezor and Ledger), including the wallet addresses associated with the seized hardware.

3.  All records documenting the results of "blockchain tracing analysis" conducted on the transactions involving Mr. Weeks' cryptocurrency wallets.

4.  On the day of Mr. Weeks' arrest two wallets on Mr. Weeks' computer were seized. The first, beginning "1Bzq5" had a balance of approximately 3.67 BTC. The second, beginning "1A9D3" had a balance of 5.00 BTC. It appears that on November 17, 2022, approximately 8.67 BTC was transferred from Mr. Weeks' wallets to a wallet beginning with "14YyA." Could you kindly indicate if this is a government controlled crypto-wallet and, if so, please provide any documents setting forth the procedures followed by the government to transfer these funds and, if the Bitcoin was liquidated, please provide us with the amounts recovered.

In order to determine the validity and the underlying basis for the analysis in the IRS memorandum, we request documents sufficient to show the following:

1.  BCN membership list.

2.  BCN membership agreements.

3.  Records indicating how the IRS viewed the relationship between BCN leadership and its members in terms of tax liability and responsibility.

4.  Records indicating how the IRS classified BCN and on what basis.

5.  Records that BCN applied for or organized under a specific tax classification, such as a for-profit or non-profit organization.

6.  Records that indicate how the IRS determined the tax obligations of BCN, particularly in relation to its business activities.

7.  Records indicating whether the IRS classified earnings from BCN as wages, commissions, or other forms of taxable income for its members.

**STONE ▪ MAGNANINI**

COMPLEX LITIGATION

8.      Records related to any audits or other reviews of BCN before Mr. Weeks was arrested.

9.      Records indicating whether the IRS considered Mr. Weeks an employee, independent contractor, or other classification, within BCN.

10.     Records that support the classification of Mr. Weeks' earnings from BCN as taxable income.

11.     Records indicating whether the IRS determined that BCN was responsible for withholding and payment of employment taxes for individuals such as Mr. Weeks.

12.     Records relating to BCN policies or practices for paying employment taxes or classifying its members and leadership correctly for tax purposes.

13.     Underlying records used to support the IRS assessment of Mr. Weeks' tax liability.

14.     Correspondence or other communications between the IRS and BCN, or its members, discussing their tax obligations or the IRS's expectations.

15.     Third party information or reports used to determine the tax obligations of BCN and its members.

We also request the following records:

1.      Any and all interview (*e.g.*, proffer sessions) transcripts and/or interview summaries or reports from any co-defendant in this matter.

Thank you for your attention to this matter and please do not hesitate to contact me if you require any additional information to assist us with this request.

Respectfully submitted,

*/s/ David Stone*
David S. Stone
Managing Partner

# Exhibit B.

February 13, 2025, Request for Clarification Letter

**February 13, 2025**

**VIA EMAIL**
AUSA Anthony Torntore
United States Attorney's Office
District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

## Subject: Request for Clarification for Relevant Outstanding Discovery – U.S. v. Jobadiah Weeks (19-cr-877-CCC)

Dear AUSA Torntore,

I am formally requesting full disclosure of records, internal communications, and decision-making documents related to my interactions, legal representation, and plea agreement. The requested information pertains to prosecutorial conduct and government actions that may have impacted my rights. Given the legal significance of these concerns, I respectfully request your prompt attention and full cooperation in providing the requested materials.

## 1. Interactions and Legal Representation

The Treasury memoranda dated August 17, 2020 ([2], p. 7) and August 25, 2020 ([1], p. 2-3) confirm that I was transported with Matthew Goettsche from an Oklahoma holding facility to New Jersey and was detained with Joseph Abel in a New Jersey holding cell. Furthermore, I was housed on the same tier as Mr. Abel in Essex County Jail for approximately one month.

Additionally, the August 17, 2020 Proffer Memo ([2], p. 7) notes that AUSA Hoxie instructed me not to solicit information from Goettsche and that I did not have a cooperation agreement with the government. This raises concerns regarding government knowledge and potential influence over witness interactions. Under **United States v. Henry, 447 U.S. 264 (1980)**, placing a defendant near a government witness without counsel's knowledge can violate the **Sixth Amendment**, and under **Weatherford v. Bursey, 429 U.S. 545 (1977)**, undisclosed coordination of such interactions may amount to a **due process violation**.

I request:

1. **Records confirming whether AUSA Hoxie or any government official issued instructions regarding my communication with Mr. Goettsche and Mr. Abel.**
2. **Documentation of any reports, email correspondence, or internal memoranda discussing these interactions.**
3. **Any record showing whether my legal counsel (Mr. Gaugush and Mr. Yaeger) were informed of these conditions before plea negotiations.**

1

4. **Any official government notes confirming that I was advised of my rights regarding these interactions, particularly regarding my legal standing in relation to other co-defendants.**

**Legal Basis:** I request the exculpatory evidence records pursuant to **Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and United States v. Henry, 447 U.S. 264 (1980),** which require the government to disclose exculpatory and impeachment evidence.

## 2. Prison Transfers and Detention Records

I request a full sequence of my prison transfers from my arrest on **December 10, 2019, through the signing of my plea agreement in October 2020.** Specifically, I seek:

- **U.S. Marshals Service prisoner transport logs** and any correspondence related to my transport between facilities.
- **Bureau of Prisons (BOP) records** detailing my cell assignments and tier placements during my detention.
- **Internal memoranda or communications justifying my transport and placement decisions.**
- **Any record confirming whether the government facilitated my proximity to key witnesses prior to plea negotiations.**

**Legal Basis:** This request is made under **Brady v. Maryland, 373 U.S. 83 (1963), Massiah v. United States, 377 U.S. 201 (1964), and Weatherford v. Bursey, 429 U.S. 545 (1977),** to determine whether these interactions and movements were used to obtain statements outside of legal counsel's presence.

## 3. The Plea Agreement, Cryptocurrency Seizure, and Prosecutorial Communications

I request:

1. **Records confirming when I was first presented with a plea agreement.**
2. **All records detailing when and how I was notified of the cryptocurrency seizures, as well as any documentation confirming that I was given the opportunity to verify the accuracy of the government's assessment of my holdings.**
3. **Records of all internal discussions related to which funds would be seized and why certain assets were left behind.**
4. **Any written communications between the prosecution and my legal representatives regarding plea discussions, including any warnings, offers, or counteroffers.**
5. **Records of meetings, interviews, or discussions where my plea agreement was negotiated or advised.**

2

6. **Any internal government documentation discussing the rationale for offering the plea agreement, including any strategic considerations related to ongoing investigations.**
7. **Any DOJ, FBI, or SEC memoranda discussing the justification for offering a plea agreement, including any internal assessments of my role in relation to co-defendants.**
8. Any government discussions on using tax charges as leverage for a plea agreement, particularly in light of the **July 2020 grand jury expansion to include tax charges ([3], p. 12-13).**

**Legal Basis:** Since these requests relate to my plea agreement and its formation, the government is obligated to ensure **full disclosure of all material facts under United States v. Ruiz, 536 U.S. 622 (2002), and Brady v. United States, 397 U.S. 742 (1970),** which recognize plea coercion as a violation if based on misleading or incomplete government disclosures.

# References

1. **Proffer Memo (Aug. 25, 2020)** – Treasury memorandum detailing interactions and transport conditions.
2. **Proffer Memo (Aug. 17, 2020)** – Records of government instructions and plea-related discussions.
3. **Pre-Sentencing Report (PSR)** – Government assessment regarding role and plea decisions.
4. **Crypto-Seizures Memo (Dec. 10, 2019)** – Internal government report detailing the seizure, access, and restoration of cryptocurrency wallets.
5. **Brady v. Maryland, 373 U.S. 83 (1963)** – Due process protections requiring disclosure of exculpatory evidence.
6. **Giglio v. United States, 405 U.S. 150 (1972)** – Obligation to disclose impeachment evidence of government witnesses.
7. **United States v. Henry, 447 U.S. 264 (1980)** – Sixth Amendment violation for deliberate government influence over defendant-witness interactions.
8. **Massiah v. United States, 377 U.S. 201 (1964)** – Prohibiting government from eliciting statements from a defendant outside the presence of legal counsel.
9. **Weatherford v. Bursey, 429 U.S. 545 (1977)** – Due process concerns for undisclosed government coordination in influencing defendants.
10. **United States v. Ruiz, 536 U.S. 622 (2002)** – Legal standard for plea negotiation disclosures.
11. **Brady v. United States, 397 U.S. 742 (1970)** – Ensuring plea agreements are voluntary and not based on misleading information.

## Conclusion & Request for Response

Given the legal significance of these concerns and their potential impact on my constitutional rights, I respectfully request a response by **February 21, 2025**. If any of the requested documentation is unavailable or withheld, please provide a **formal explanation stating the legal basis for doing so**. Additionally, if privilege is claimed, I request a **privilege log identifying the documents withheld, their date, authors, and the nature of the privilege asserted**. If any records do not exist, I request written certification of when and how they were removed from government records.

Should additional information or clarification be required, I remain available for further discussion.

**Respectfully submitted,**
**Jobadiah Weeks**

# Exhibit C.

Plea Agreement (Docket Entry 148, Nov. 5, 2020)



**OFFICE OF
CHIEF COUNSEL**

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
OFFICE OF DIVISION COUNSEL/ASSOCIATE CHIEF COUNSEL
CRIMINAL TAX
GREEN-BYRNE FEDERAL OFFICE BUILDING
600 ARCH STREET, SUITE 03-L14-01
PHILADELPHIA, PENNSYLVANIA 19106-1611
(267) 941-6200

## ATTORNEY WORK PRODUCT

CT-122627-20                                                October 8, 2020
CC:CT:PHI:JHHarris

To:      Ryan L. Korner                    <u>**GRAND JURY MATTER**</u>
            Special Agent in Charge       <u>**DOUBLE SEALED MAILING**</u>
            IRS, Criminal Investigation
            Los Angeles Field Office
            300 North Los Angeles Street
            Los Angeles, CA 90012

From:     James N. Beyer
            Area Counsel, Criminal Tax
            Area 1

Subject:   Evaluation of Grand Jury Expansion Request and Special Agent's Report in a Grand Jury Plea case

### CRIMINAL SUBJECT(S)

      Name:      Jobadiah Sinclair Weeks
      Address:   11627 West 74th Way
                   <u>Arvada, CO 80005</u>
      CIMIS#:   1000293264

### SPECIAL AGENT'S RECOMMENDATION

| <u>Charge</u> | <u>Year(s)</u> | <u>Count(s)</u> | <u>Tax Loss</u> |
|---|---|---|---|
| 26 U.S.C. § 7201 | 2015, 2016 | | |
| | 2017, 2018 | 1 | $7,128,987.00 |

We believe that the presently available evidence establishes a factual basis to support the plea of guilty to the count considered for referral and is sufficient to meet the requirements of Rule 11 of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim P. 11(b)(3). Further, we believe that the charge adequately addresses the crimes committed by the target. *See* CCDM §§ 38.2.1.7(2) and 38.2.2.6(1).

CT-122627-20                **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

**Venue:**        District of New Jersey[1]

**Statute of Limitations:**    April 15, 2022[2]

## EXECUTIVE SUMMARY

Jobadiah Sinclair Weeks (Weeks) was a <mark>promoter and broker</mark> for the Bitclub Network (BCN).  BCN was a cryptocurrency cloud mining pool which operated from 2014 through December 2019 when Weeks and others were arrested and charged with conspiring to offer and sell unregistered securities.  Weeks has remained in federal custody since he was arrested.  Weeks has signed a plea agreement wherein he admits to a conspiracy charge in violation of 18 U.S.C. § 371[3] for violating securities laws as well as evading the proper assessment of his personal income tax in violation of 26 U.S.C. § 7201 *Spies* for the taxable years 2015, 2016, 2017, and 2018.  Weeks failed to file a personal federal income tax return for the taxable years 2015 through 2018.  During these four years, Weeks failed to report more than $18 million of taxable income through his involvement with BCN.  The income was paid to Weeks partially in fiat currency, partially in bitcoin, and partially in stock.

## GRAND JURY EXPANSION

By letter dated July 23, 2020, the U.S. Attorney's Office (USAO) for the District of New Jersey (DNJ) requested to expand the existing grand jury investigation of Weeks to include potential Title 26 charges.  During the grand jury investigation, the USAO DNJ obtained an ex parte order for Weeks' personal income tax returns.  It was determined that Weeks has not filed a federal income tax return in over a decade.  This information coupled with the evidence of Weeks' BCN compensation made it clear that Weeks had not reported his BCN compensation on filed personal income tax returns for the taxable years 2015, 2016, 2017, and 2018.  Evidence obtained in the grand jury investigation revealed that Weeks failed to report $18.4 million of income between 2015 and 2019.

---

[1] Weeks waived venue in his plea agreement which was entered into with the U.S. Attorney's Office for the District of New Jersey.

[2] There is a six-year limitation period for the offense of willfully attempting to  evade or defeat any tax. I.R.C. § 6531(2).  The general rule is that the limitation period begins to run six years from the date of the  last affirmative act that took place or the statutory due date of the return, whichever is  later.  The statutory due date is used where no return is filed.   *United States v. Butler*, 297 F.3d 505, 511 (6th Cir. 2002), *cert. denied*, 123 S.Ct. 2074  (2003); *United States v. Myerson*, 368 F.2d 393, 395 (2d Cir. 1966), *cert. denied*,  386 U.S. 991 (1967).  Here, Weeks failed to file a return for the earliest year recommended for prosecution, 2015.  The taxable year 2015 return of Weeks would have been due on April 15, 2016.  Therefore, the statute of limitations will expire six years later on April 15, 2022.

[3] As the 18 U.S.C. § 371 charge is not tax-related, our office will not opine on the charge.

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

In evaluating this referral request, Counsel must determine: 1) whether there are articulable facts supporting a reasonable belief that a crime has been committed; 2) whether referral for grand jury investigation would be necessary and appropriate in the circumstances; and 3) whether there are legal impediments or other factors that substantially detract from or negate the prospect of ultimately developing admissible evidence necessary to establish guilt beyond a reasonable doubt and a reasonable probability of conviction.  IRM 38.2.2.2.2.

We believe there are articulable facts supporting a reasonable belief that Weeks committed criminal tax violations and that expanding the existing grand jury investigation to include Title 26 violations is an expeditious way to proceed.  There do not appear to be any legal impediments or other factors that would substantially detract from or negate the prospect of ultimately developing admissible evidence necessary to establish guilt beyond a reasonable doubt and a reasonable probability of conviction.  Based on our review of the evidence obtained in the grand jury investigation, we agree with IRS-CI's decision[4] to expand the grand jury investigation to include potential Title 26 charges for the taxable years 2015, 2016, 2017, 2018, and 2019.  We note that the signed plea does not address the taxable year 2019.

## FACTS

The USAO DNJ, with the assistance of the Internal Revenue Service-Criminal Investigation (IRS-CI) and the Federal Bureau of Investigation, conducted a grand jury investigation of BCN and its principals, including Weeks.

### Bitcoin

As per the Special Agent, a bitcoin is a form of digital currency, a convertible virtual currency that is created and held electronically.  It is the first relatively widely used example of a growing category of money known as cryptocurrency.  A single bitcoin is the basic unit of the currency although a single bitcoin may be electronically divided into smaller parts.  Launched in 2009, bitcoins only exist online and are not controlled by any kind of central authority, such as the U.S. Federal Reserve, and can be sent to anyone who has a web connection.  Bitcoin has been utilized by people suspicious of financial institutions and central banks; those who want to keep their financial transactions private; and speculators.  It has been used both in legitimate and illegal financial transactions.

Bitcoins are created or "mined" using high-powered computers all around the world, using software that solves mathematical problems.  The algorithm that generates bitcoins is set to stop producing bitcoins once 21 million are in circulation.  As of

---

[4] Our office was provided with a Form 9131, Request for Grand Jury Investigation, for Weeks dated September 22, 2020.

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

October 2020, over 18.5 million bitcoins exist.  Anyone with a powerful enough computer can create a bitcoin, but the computational power required is enormous and there are many individuals and groups that are competing to get the next bitcoin.  It is generally accepted that mining bitcoins is not cost effective.  Most bitcoin owners do not create them; they buy them.  In order to buy bitcoins, an individual can go to a bitcoin exchange, a place where funds from traditional currencies are exchanged for bitcoins. In addition to the bitcoin exchanges, bitcoins are traded in face-to-face transactions for cash.  Once an individual has purchased a bitcoin or bitcoins they can be held for investment or utilized to purchase goods and services from businesses which accept them or from private parties.[5]

### Multi-level Marketing

Multi-level Marketing (MLM) is a business model wherein a product is advertised and sold by the business founders to individuals who are then encouraged to pitch and sell the product to other individuals.  This cycle can continue indefinitely.  The business founders get a percentage of each sale made by individuals whom they have recruited. Further, they get a percentage of each sale made by those further removed from their initial recruits.  A series of "chains" are created wherein the business founder is at the top and those individuals whom the founder first recruited are the next link, and the individuals recruited by the first recruits are the next links.  Theoretically, the chain could go on indefinitely.  When viewed as a chart, these chains from the founders to the newest recruits form a pyramid with the founders at the top and the newest recruits at the base and give MLMs their more common name: "Pyramid Schemes."  This business model enriches those at the top and provides little to no benefit to those at the bottom. There are many laws which regulate MLMs, but such structures are not illegal per se.

### Bitclub Network

BCN was founded in 2014 after discussions throughout 2013 among its founders led to its business model.  It was an MLM which marketed the ability to mine bitcoin at a profit for investors.  BCN sold investor packages to its customers which purportedly equated to their investment in server farms[6] dedicated to mining bitcoin.  The server farms, known as "mining pools", allegedly pooled the computing power of thousands of

---

[5] Bitcoins have fluctuated wildly in value since their inception in 2009 from relatively worthless to almost $20,000 per bitcoin.  The calendar year 2017 was particularly volatile.  As of January 2017, each bitcoin was valued at $1,000.  By May 2017, they were valued at $2,500 and by November 2017, they were valued at $7,000.  From November 2017 to December 2017, their value increased to over $19,000.  This peak was followed by a crash.  During most of 2018, bitcoin's value was between $6,000 and $7,000 until mid-November when it dropped below $6,000.  The price per bitcoin dropped below $4,000 by the end of 2018.  During 2020, bitcoin has traded for between $5,000 and $12,000 per bitcoin.

[6] A server farm is a collection of computer servers usually maintained by an organization to supply server functionality far beyond the capability of a single machine.  Server farms often consist of thousands of computers which require a large amount of power to run and to keep cool.

CT-122627-20                    [CAUTION: CONTAINS GRAND JURY INFORMATION]

computers to mine bitcoin.  BCN allegedly leased the servers it used for its mining pools from large overseas server farms on behalf of its investors.

The BCN investments of its members allegedly grew each time a BCN mining pool successfully solved an algorithm and was awarded a bitcoin or a share of a bitcoin. Initial BCN investment packages cost members between $600 and $3,600 based on the share of the mining pool that the member wanted to purchase.  BCN members were also encouraged to recruit new members.  It operated like a traditional MLM wherein a percentage of the buy-in cost and earnings of each new member recruited were passed up to the recruiter and to those BCN members above the recruiter.

**BCN Fraud**

As stated above, mining bitcoin is generally not considered cost effective.  The grand jury investigation into BCN determined that BCN was a fraudulent enterprise.  Beginning at its inception in 2014 through December 2019, BCN falsified its bitcoin mining results and manipulated the earnings of its members for the purpose of attracting additional investments.

In emails obtained via search warrants, BCN founders discussed fabricating mining results in order to attract more members.  Two of the founders exchanged emails wherein one directed another to make sure that the fabricated results created were inconsistent to make them look real stating: "inconsistent numbers daily so its not perfect."  The second agreed stating: "if we pay consistent numbers it will be fake."  This fabrication of data continued.  For example, on September 10, 2017, a BCN founder sent an email to another BCN founder stating that BCN should "[d]rop mining earnings significantly starting now."

BCN members noticed discrepancies in their earnings based on the date that they purchased their mining share.  Specifically, equal shares purchased on different dates should have earned the same amount each time a BCN mining pool earned a bitcoin or a portion of a bitcoin.  Multiple BCN members noted that older BCN mining shares produced lower earnings than more recent BCN mining shares.  Further, the members noted that every BCN mining share followed the same exact pattern.  On November 29, 2017, a BCN member posted the following to a Facebook chatroom: "…I have been carefully watching everything that happens in them, in each and every one of them there is a very strange pattern and it is that they all start earning a quantity of bitcoins around 0.00049 and as the days go by the number starts to go down.  In each and every one of these accounts, the pattern is the same…" and later states "I do not want to think badly but I can not think well about this that seems more like a mathematical exercise than an authentic mining."  The foregoing quote from the BCN member conveyed his concern that the pattern he noticed was unusual, because this pattern held no matter what bitcoin was trading for on the open market.  The BCN member believed that the pattern meant that BCN was fabricating its mining results.

5

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

The BCN founders knew that they could not make money by mining bitcoin.  On November 4, 2014, one founder told another: "just so you know, this model is not sustainable at all…this is a PONZI."  Financial records and electronic communications were used to determine that the BCN founders took the investments of its members and used them to enrich themselves personally.  BCN also made it very difficult for its members to cash out their memberships.  If a member was cashed out, that member was not paid with bitcoin mining earnings.  Instead, the member was paid via investment funds of new members.

As BCN conducted its fraud in many countries and through many different individuals, the exact number of BCN members defrauded has not been determined nor has the exact amount of financial harm been determined.  To date, investigators have determined that at least $722 million was stolen from BCN investors based on the fraudulent scheme.

### Weeks

Weeks was interviewed on multiple occasions.[7]  Each interview conducted after he was arrested in December 2019 was pursuant to a proffer agreement.  Weeks joined BCN in August 2015 after being introduced to BCN promoter Joseph Abel (Abel).[8]  Abel promoted BCN in the United States and was one of its first members. Abel explained the basics of BCN to Weeks and encouraged Weeks to join.  While Abel was Weeks' original contact at BCN, Weeks eventually began dealing with Matthew Goettsche (Goettsche) and Russ Medlin, the two principal founders of BCN.  Weeks determined that the mining portion of BCN was not actually profitable but that the MLM side still allowed him to make money by attracting new members to BCN.

Weeks had several different revenue streams through his involvement with BCN.  He not only earned MLM fees, he also earned broker commissions for negotiating deals to purchase bitcoin mining hardware.  Weeks' BCN income was received in U.S. Dollars (USD), bitcoin, and stock.  The bitcoin income was transferred into two bitcoin wallets owned by Weeks: 1JobyWkspb4BDdznWSmsrnE6cMzwV5qRRp (1Joby) and 19rFxgEXH8z6RfqT7hbR8XU4h9BTpeqh7a (19rFx).

---

[7] We note that a traditional Special Agent's Report (SAR) with exhibits attached was not created for this case.  A streamlined SAR was created and supplemented with documents which corroborate the allegations in the SAR.  Therefore, the Weeks interviews are not officially identified as evidentiary exhibits or attached to the report.  Our office requested copies of these interviews from the Special Agent and they were provided.  We would advise including these interviews with the plea recommendation when it is sent to the Tax Division.

[8] Our office reviewed and concurred with a plea recommendation for Abel by memorandum dated August 24, 2020 wherein Abel agreed to plead guilty to securities fraud and to filing a false federal tax return in violation 26 U.S.C. § 7206(1).

CT-122627-20                    [CAUTION: CONTAINS GRAND JURY INFORMATION]

### Recruiting and mining commissions in bitcoin

Weeks received compensation for recruiting new members of BCN by receiving a portion of member investments from those he recruited.  Weeks withdrew this compensation from BCN in several ways.  He withdrew funds directly from BCN in the form of bitcoin which was transferred to his personal bitcoin wallets.  These withdrawals represented both MLM commissions for recruiting members and earnings from BCN's mining of bitcoin.  The MLM commissions amounted to approximately $2.7 million between 2015 and 2018 while the mining earnings totaled approximately $1.1 million for the same period.  These earnings were deposited into the 1Joby and 19rFx bitcoin wallets.

### Investor funds in USD

In addition to the direct earnings from BCN, Weeks also had BCN investors pay him directly for their BCN memberships.  Weeks used an MLM structure known as "Pay it Forward" to convert his MLM earnings into fiat currency.  Pay it Forward allowed recruiters to take BCN MLM earnings out of BCN.  When Weeks recruited new members, he received a commission in bitcoin which was deposited in a BCN bitcoin wallet linked to Weeks.  BCN only accepted bitcoin from its investors to open their investor account.  Nevertheless, Weeks and other recruiters took fiat currency from new members whom they recruited and then transferred bitcoin, which they had earned previously for recruiting other members, to open the investor accounts for the new members.  This process allowed Weeks to convert his BCN bitcoin into fiat currency.

One of the methods employed by Weeks to receive fiat currency from his recruited investors involved the use of an MLM entity.  Weeks advised individuals to remit funds to a business bank account he maintained in the name of the MLM.  Weeks further advised the individuals to identify the checks and wires used to invest in BCN as "donations" to a "charity" operated by Weeks, because banks had closed several bank accounts held by Weeks due to their involvement in the purchase of bitcoin.  The "charity" is called Mannatech and is an MLM in which he and his mother have been involved.  Mannatech markets a nutrient powder.  Once the "donations" were deposited into the bank account under Weeks' control, Weeks transferred bitcoin from his BCN MLM earnings account to open investor accounts in the name of the newly recruited investors.

The second method employed by Weeks to receive fiat currency from his recruited investors had BCN investors transfer funds directly to an individual named Steve Snyder (Snyder).  Snyder and Weeks were involved in a cannabidiol or CBD start-up.  The funds Weeks had BCN investors transfer to Snyder represented Weeks' investment in the CBD business.  Like the BCN investments deposited directly into a bank account under his control, Weeks transferred bitcoin from his previously earned BCN MLM commissions to open investment accounts in the names of these investors.

CT-122627-20                      [CAUTION: CONTAINS GRAND JURY INFORMATION]

Using these two methods, Weeks was able to withdraw over $200,000 from BCN between 2015 and 2019.

### Broker income

The most lucrative method Weeks had for extracting money from BCN was by acting as a broker for BCN's mining equipment purchases.  BCN purchased a significant amount of computer hardware to mine cryptocurrency.  Much of the mining equipment was purchased through Bitfury, a company which sells cryptocurrency mining hardware and invests in blockchain technology.  The Bitfury process described below also applied to other BCN transactions brokered by Weeks.

Goettsche directed Weeks to negotiate deals with Bitfury on behalf of BCN.  Goettsche did not want his name associated with purchases of mining equipment.  As a result, Weeks functioned as a middleman between BCN and Bitfury for hardware purchases. Weeks received commissions on these hardware purchases in two ways.  First, BCN intentionally transferred more bitcoin than was required for Weeks to purchase BCN hardware from Bitfury.  The additional bitcoin transferred from BCN were Weeks' commission.  Second, Weeks received shares of stock in Bitfury in addition to the hardware from Bitfury as compensation from Bitfury for brokering the transaction. Weeks transferred the hardware to BCN and kept the shares of stock.  Bitfury provided records documenting the purchases pursuant to subpoena.  The bitcoin transfers involved in the transactions were also documented through blockchain tracing software.

> For example, BCN transfers 100 in bitcoin to Weeks for the purchase of hardware from Bitfury.  Weeks keeps 10 bitcoin and purchases the hardware from Bitfury for 90 bitcoin.  In addition to the hardware, Bitfury sends $5 of stock to Weeks.  Weeks sends the equipment to BCN and keeps the stock.  Thus, Weeks earns 10 bitcoin as a direct cut from the funds transferred from BCN and $5 of stock for brokering the transaction.

Between 2015 and 2018, Weeks earned the bitcoin equivalent of $11 million as commissions and received Bitfury stock with a fair market value (FMV) of $3.1 million at the time of receipt.

The chart below details the compensation which Weeks received directly from BCN and the stock which Weeks received from Bitfury.  The chart lists USD equivalents for the bitcoin and stock which are based on the FMV of bitcoin and stock which Weeks received as of the date and time he received each.[9]

---

[9] *See* Tax Loss Appendix.

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

| Income | Source | 2015 | 2016 | 2017 | 2018 | Totals |
|---|---|---|---|---|---|---|
| BCN commissions for Bitfury deals | 1Joby wallet | $0.00 | $0.00 | $8,324,970.83 | $455,945.46 | $8,780,916.29 |
| BCN commissions for Bitfury deals | 19rFx wallet | $0.00 | $606,850.34 | $0.00 | $0.00 | $606,850.34 |
| BCN commissions for other brokered deals | 1Joby wallet | $0.00 | $0.00 | $1,605,613.05 | $97,772.63 | $1,703,385.68 |
| BCN Withdrawals | 1Joby wallet | | | $1,383,335.34 | $1,064,415.54 | $2,447,750.88 |
| BCN Withdrawals | 19rFx wallet | $26,299.42 | $185,193.10 | $75,005.33 | $147,227.73 | $433,725.58 |
| Mining Earnings | 1Joby wallet | $0.00 | $0.00 | $788,153.88 | $288,209.25 | $1,076,363.13 |
| Mining Earnings | 19rFx wallet | $0.00 | $110.58 | $0.00 | $20,497.52 | $20,608.10 |
| Bitfury Stock | Bitfury Subpoena Return & Weeks' email | $0.00 | $0.00 | $3,102,364.00 | $0.00 | $3,102,364.00 |
| Pay It Forward | Chase 4847 | $0.00 | $25,265.00 | $43,350.00 | $0.00 | $68,615.00 |
| Steve Snyder CBD | Facebook | $0.00 | $0.00 | $154,565.00 | $0.00 | $154,565.00 |
| | | | | | | |
| **Total income** | | **$26,299.42** | **$817,419.02** | **$15,477,357.43** | **$2,074,068.13** | **$18,395,144.00** |

### Weeks' federal income taxes

Weeks has not filed a federal income tax return in almost two decades. He is currently 39 years old and stated that the last time he filed a federal income tax return was when he worked at a restaurant which withheld tax from his wages. Weeks stated that he had received some advice that he was not liable for personal income taxes, because he was not a federal employee. He also stated that he purchased an interest in a timeshare in Saint Kitts and Nevis so that he would no longer be liable for taxes in the U.S. Finally, Weeks stated that BCN provided its investors year-end statements which reported their earnings which he described as "like 1099s" for tax purposes. During an interview pursuant to a proffer agreement on August 17, 2020, Weeks acknowledges that he owes income taxes on the millions he made through BCN.

Despite his failure to file federal income tax returns, the IRS has been in contact with Weeks for over a decade concerning his income tax liabilities. Weeks has current liabilities with the IRS totaling $566,740.10 as of September 20, 2020 for the taxable years 2007 and 2009 through 2012. These liabilities are based on substitute returns prepared by the IRS. Further, Weeks filed a pro se petition with the U.S. Tax Court contesting his liability for income taxes related to his taxable year 2003.[10] The petition alleges that the IRS failed to take into account his deductions and expenses prior to

---

[10] Docket No. 29937-08

CT-122627-20                    [CAUTION: CONTAINS GRAND JURY INFORMATION]

computing his alleged tax liability.  The case was dismissed in 2010 based on Weeks' failure to prosecute the case.  Thus, Weeks has been in contact with the IRS concerning his personal income tax obligations for over a decade and his 2008 petition did not appear to challenge the taxability of his income.  Weeks knows of his obligation to file federal income tax returns and to pay federal income taxes.

## CRIMINAL VIOLATIONS AND DISCUSSIONS OF THE LAW

### Title 26 U.S.C. § 7201

The elements for the willful attempt to evade or defeat an assessment of tax, a violation of § 7201, are:

   1)    An attempt to evade or defeat a tax;
   2)    An additional tax due and owing; and
   3)    Willfulness.

*Sansone v. United States*, 380 U.S. 343, 351 (1965); *United States v. Farnsworth*, 456 F.3d. 394, 401-03 (3d Cir. 2006).  This section requires proof of the existence of a deficiency.

### Element 1

### The defendant attempted to evade or defeat the assessment of a tax.

Failure to file return coupled with an affirmative act of evasion is commonly referred to as a "*Spies* evasion."  Passive failure to file tax returns is not tax evasion. If the taxpayer failed to file a return, an evasion case can be maintained only if the taxpayer engaged in an affirmative act to conceal or mislead.  *Spies v. United States*, 317 U.S. 492,  498-99 (1943).  By way of illustration, and not by way of limitation, the Supreme Court in  *Spies*  set out examples of conduct which can constitute affirmative acts of evasion:

   (A) Keeping a double set of books.

   (B) Making false or altered entries.

   (C) Making false invoices.

   (D) Destruction of records.

   (E) Concealing sources of income.

   (F) Handling transactions to avoid usual records.

10

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

(G) Any other conduct likely to conceal or mislead.

*See also, United States v. Brooks*, 174 F.3d 950, 954-56 (8th Cir. 1999); *United States v. Meek*, 998 F.2d 776, 779 (10th Cir. 1993).

The taxpayer must undertake some action, that is, engage in an affirmative act for the purpose of attempting to evade or defeat the assessment of a tax. This element requires more than passive neglect of a statutory duty. A mere act of willful omission does not satisfy the affirmative act requirement of I.R.C. § 7201. *United States v. Masat*, 896 F.2d 88, 97-99 (5th Cir. 1990). Here, Weeks engaged in affirmative acts to evade his income tax liabilities by handing transactions to avoid the usual records and by concealing the source of his income.

Weeks had BCN investors make deposits into a bank under his control for the purpose of opening a BCN account, but told the investors to denote the deposits as donations to a charity. Weeks also had BCN investors pay his business partner directly. Weeks then used his BCN bitcoin holdings to open BCN investor accounts for these individuals. Both activities allowed Weeks to convert the bitcoin he earned for BCN MLM commissions to USD without leaving a paper trail. Further, Weeks received undocumented commissions from BCN and Bitfury for brokering deals for the purchase of cryptocurrency mining equipment. The commissions were in the form of bitcoin and stock, which were not reported on Forms 1099 by either BCN or Bitfury. Handling transactions to avoid the usual records in an affirmative act of evasion. *Spies* 317 U.S. at 498-99. Further, these activities were also an attempt to conceal BCN as a source of Weeks income. Concealing a source of income is an affirmative act of evasion. *Id.* We believe that this element has been met.

**Element 2**

**The defendant has an additional tax due and owing.**

Weeks did not file a federal income tax return for the taxable years 2015 through 2018. The threshold gross income required to file a return for the years in question was under $25,000 for each year. Weeks had $26,299.42 of income in 2015; $817,419.02 of income in 2016; $15,477,357.43 of income in 2017; and $2,074,068.13 of income in 2018. The total income tax due and owing on these amounts is $7,128,987.00.

**Element 3**

**The defendant willfully attempted to evade or defeat a tax.**

Section 7201 is a specific intent crime requiring a showing of willfulness. "Willfulness" is "a voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498

CT-122627-20                    [CAUTION: CONTAINS GRAND JURY INFORMATION]

U.S. 192, 200 (1991). The evidence establishes the willfulness of Weeks. Willfulness may be inferred from "any conduct, the likely effect of which would be to mislead or conceal." *Spies*, 317 U.S. at 499. The evidence leads to an inference that Weeks was willfully trying to evade his proper income tax liabilities.

Weeks failed to file returns and reported none of his $18.4 million of income from 2015 through 2018. A substantial understatement of income in successive years is a sign of willfulness. *United States v. Kim*, 884 F.2d 189, 192-93 (5th Cir. 1989). Weeks also failed to file returns in 2007, and 2009 through 2013. The IRS prepared substitute returns for these years and Weeks has income tax liabilities for these years which exceed $560,000. His prior failure to file and pay his federal income taxes due and owing is evidence of willfulness. *United States v. Johnson*, 386 F.2d 630, 631 (3d Cir. 1967). Finally, Weeks admitted his willfulness by signing the plea agreement.

The admissions in the plea are corroborated by documents seized through the execution of multiple search warrants. These documents corroborate the fraudulent nature of Weeks' actions and the amount of income he received from BCN. Further, the bitcoin transactions in which Weeks engaged were tracked via blockchain tracing software.

## TAX LOSS, COMPUTATIONS, METHOD OF PROOF AND TECHNICAL TAX ISSUES

The tax loss is based on the specific item method of proof. The income which Weeks received is detailed in the Tax Loss Appendix.

Gross income includes income from whatever source derived, including income received as compensation for services, income derived from business, and gains from dealings in property. 26 U.S.C. §§ 61(a)(1) – (3), 83. This basic premise incorporates and includes any type of payment, whether it is made in fiat currency or any other item of value, including stock or virtual currency. It is well-settled "that stock received as compensation for services rendered to the issuing corporation is taxable as ordinary income of an amount equal to the value of the stock at the date of issuance." *Champion v. Comm'r*, 303 F.2d 887, 891 (5th Cir. 1962). Although virtual currencies are relatively new, the IRS issued guidance in 2014 which stated that virtual currencies which are received as payment for services are gross income. The gross income is measured in USD as the FMV of the virtual currency as of the date that the virtual currency was received for federal income tax purposes.[11] Further, mining proceeds are also measured in USD as the FMV of the virtual currency as of the date that the virtual

---

[11] Q-3: Must a taxpayer who receives virtual currency as payment for goods or services include in computing gross income the fair market value of the virtual currency?

A-3: Yes. A taxpayer who receives virtual currency as payment for goods or services must, in computing gross income, include the fair market value of the virtual currency, measured in U.S. dollars, as of the date that the virtual currency was received. See Publication 525, Taxable and Nontaxable Income, for more information on miscellaneous income from exchanges involving property or services. *Notice 2014-21*, 2014-16 I.R.B. 938 (2014).

CT-122627-20                 [CAUTION: CONTAINS GRAND JURY INFORMATION]

currency was received.[12]  Although bitcoin is treated as property and, therefore, generally, a capital asset after its receipt,[13] there are no questions concerning basis or holding period implicated in the instant case.

From 2015 through 2018, Weeks received $15.1 million of income based on the FMV of bitcoin which he received as compensation from BCN, $3 million of income in the form of stock from Bitfury, and just over $200,000 of income in USD.  A Revenue Agent determined tax losses for 2015, 2016, 2017, and 2018 of $2,423.00, $294,947.00, $6,099,134.00, and $732,483.00, respectively.  The total tax loss is $7,128,987.00 for the four-year period from 2015 through 2018.

## CURRENT LIFESTYLE

Weeks is 39 years old and married.  He has daughter under the age of five.  We note that his wife has filed federal income tax returns during the past several years.  It is believed that Weeks still has interests in several MLM schemes.  Weeks is in good health.  He has been in federal custody since his arrest on December 10, 2019.  He is currently not eligible for bail.

## SENTENCING

Weeks is pleading to a single count of conspiracy in violation of 18 U.S.C. § 371 and a single count of tax evasion for the taxable years 2015, 2016, 2017, and 2018 in violation of 26 U.S.C. § 7201.  The plea proposes grouping the two criminal violations for sentencing purposes pursuant to U.S.S.G. § 3D1.2(d).  Although we believe that these two charges may not be closely related enough to group them for sentencing purposes, it was addressed by the parties and agreed to in the signed plea.  After analyzing all the remaining sentencing factors, the plea agreement recommends an adjusted offense level of 28 for Weeks.  The parties have agreed to a monetary loss in excess of $3,500,000 but less than $9,500,0000.  We agree with the adjusted offense level as

---

[12] Q-8:  Does a taxpayer who "mines" virtual currency (for example, uses computer resources to validate Bitcoin transactions and maintain the public Bitcoin transaction ledger) realize gross income upon receipt of the virtual currency resulting from those activities?
A-8:  Yes, when a taxpayer successfully "mines" virtual currency, the fair market value of the virtual currency as of the date of receipt is includible in gross income.  See Publication 525, Taxable and Nontaxable Income, for more information on taxable income.  *Id.*

[13] Q-7:  What type of gain or loss does a taxpayer realize on the sale or exchange of virtual currency?
A-7:  The character of the gain or loss generally depends on whether the virtual currency is a capital asset in the hands of the taxpayer.  A taxpayer generally realizes capital gain or loss on the sale or exchange of virtual currency that is a capital asset in the hands of the taxpayer.  For example, stocks, bonds, and other investment property are generally capital assets.   A taxpayer generally realizes ordinary gain or loss on the sale or exchange of virtual currency that is not a capital asset in the hands of the taxpayer.  Inventory and other property held mainly for sale to customers in a trade or business are examples of property that is not a capital asset.  See Publication 544 for more information about capital assets and the character of gain or loss.  *Id.*

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

computed in the plea.  The plea provides for Weeks to pay restitution to the IRS for the full amount of the tax loss in the amount of $7,128,987.

With a criminal history level of I, Weeks is facing a potential jail term of 78 to 97 months and a fine of between $12,500.00 and $125,000.00.[14]

## CONCLUSION

The evidence presented is sufficient to support the proposed plea of Weeks under the requirements of Rule 11 of the Federal Rules of Criminal Procedure.  Further, we believe that the charge adequately addresses the crimes committed by the target.

If for any reason, however, the guilty plea for a violation of 26 U.S.C. § 7201 is not accepted, further development will be necessary to establish sufficient evidence to support a prosecution recommendation before we can opine on whether there is proof beyond a reasonable doubt and that there is a reasonable probability of conviction.

We are closing our file in this case as of the date of this memorandum.  Please be advised that the "referral" of this matter will remain in effect until terminated within the meaning of 26 U.S.C. § 7602(d)(2)(B).

Access to and knowledge of grand jury material will be restricted solely to those Counsel personnel who provided assistance to the grand jury.  The following Counsel personnel in this office have had access to grand jury material in this case: James N. Beyer, Area Counsel; Patricia B. Krajewski, Deputy Area Counsel; Andrew J. Mandell, Senior Counsel; Mark M. Mulligan, Senior Counsel; Rosemarie D. Schellas, Senior Counsel; James H. Harris, Jr., Attorney (CT); and Sharon Young, Legal Assistant.  The following personnel may also have access to such grand jury material: Richard T. Lunger, Division Counsel/Associate Chief Counsel (CT); Elizabeth C. Hadden, Acting Deputy Division Counsel/ Deputy Associate Chief Counsel (CT); Martin Needle, Senior Level Counsel (CT); C. Teddy Li, Branch Chief (CT); Allison Menkes, Special Counsel (CT); Marta Yanes, Senior Counsel (CT); Katia Fano, Attorney (CT); Lauren R. Breaux, Attorney (CT); Linda K. Galanis, Executive Assistant (CT); Hartley M. Barnes, Program Analyst (CT); Dawn Caldwell, Executive Secretary (CT); and Diamond L. Ward, Management Assistant (CT).

---

[14] The fine is based on the version of the U.S.S.G. in effect during the years in which the crime was committed. U.S.S.G. § 5E1.2(h)(1).

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

Should you have any questions about this memorandum, please contact Jim Harris at (267) 941-6535.

Sincerely,


 /s/ James N. Beyer
JAMES N. Beyer
Area Counsel, Area 1
Criminal Tax


cc:    Darren Lian
       Assistant Special Agent in Charge

       Oleg Pobereyko
       Supervisory Special Agent

       Veniamin Karavchuk
       Special Agent

       Patricia Krajewski
       Deputy Area Counsel
       Criminal Tax



U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

Craig Carpenito
United States Attorney

970 Broad Street, Suite 700
Newark, New Jersey 07102

(973) 645-2700

September 21, 2020

**VIA EMAIL**
Simon A. Gaugush, Esq.
Michael L. Yaeger, Esq.
Corporate Center Three at International Plaza
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, Florida 33607-5780
SGaugush@carltonfields.com
MYaeger@carltonfields.com

Re: Plea Agreement with Jobadiah Sinclair Weeks

19-cr-877 (CCC)-03

Dear Counsel:

        This letter sets forth the plea agreement between your client, Jobadiah Sinclair Weeks ("Weeks"), and the United States Attorney for the District of New Jersey ("this Office"). This Office's offer to enter into this plea agreement will expire on September 25, 2020 if it is not accepted in writing by that date.

Charges

        Conditioned on the understandings specified below, this Office will accept a guilty plea from Weeks to: (a) Count Two of the Indictment, (Crim. No. 19-877), which charges Weeks with conspiring to offer and sell unregistered securities, contrary to Title 15, United States Code, Sections 77e and 77x, in violation of Title 18, United States Code, Section 371; and (b) an Information charging Weeks with one count of tax evasion, in violation of Title 26, United States Code, Section 7201. If Weeks enters a guilty plea to, and is sentenced on the above, charges, this Office will not initiate any further criminal charges against Weeks based upon (a) his involvement in the BitClub Network, as further detailed in the Indictment; or (b) his non-filing of taxes during the taxable periods 2015 through 2018. In addition, if Weeks fully complies with all of the terms of this agreement, at the time of sentencing in this matter, this Office will move to dismiss Count One of the Indictment against Weeks. Further, in the event that a guilty plea in this matter is not entered for any reason or the judgment of conviction entered as a result of this guilty plea does not remain in full force and effect, Weeks agrees that any dismissed charges and any other charges that are

not time-barred by the applicable statute of limitations on the date this agreement is signed by Weeks may be commenced against him, notwithstanding the expiration of the limitations period after Weeks signs the agreement.

## Sentencing

The violation of 18 U.S.C. § 371 alleged in Count Two to which Weeks agrees to plead guilty carries a statutory maximum prison sentence of five years and a statutory maximum fine equal to the greatest of: (1) $250,000; (2) twice the gross amount of any pecuniary gain that any persons derived from the offense; or (3) twice the gross amount of any pecuniary loss sustained by any victims of the offense.

The violation of 26 U.S.C. § 7201 charged in Count One of the Information to which Weeks agrees to plead guilty carries a statutory maximum prison sentence of 5 years imprisonment and a statutory maximum fine of not more than $100,000.

The sentence on each count may run consecutively. Fines imposed by the sentencing judge may be subject to the payment of interest.

The sentence to be imposed upon Weeks is within the sole discretion of the sentencing judge, subject to the provisions of the Sentencing Reform Act, 18 U.S.C. §§ 3551-3742, and the sentencing judge's consideration of the United States Sentencing Guidelines. The United States Sentencing Guidelines are advisory, not mandatory. The sentencing judge may impose any reasonable sentence up to and including the statutory maximum term of imprisonment and the maximum statutory fine. This Office cannot and does not make any representation or promise as to what guideline range may be found by the sentencing judge, or as to what sentence Weeks ultimately will receive.

Further, in addition to imposing any other penalty on Weeks, the sentencing judge: (1) pursuant to 18 U.S.C. § 3013, will order Weeks to pay an assessment of $100 per count ($200 total), which assessment must be paid by the date of sentencing; (2) with respect to both counts, must order Weeks to pay restitution pursuant to 18 U.S.C. § 3663 et seq.; (3) with respect to Count One of the Information, may order Weeks to pay the costs of prosecution and; (4) pursuant to 18 U.S.C. § 3583 may require Weeks to serve a term of supervised release for each count of conviction of not more than three years for Count Two of the Indictment and Count One of the Information, which terms will begin at the expiration of any term of imprisonment imposed. Should Weeks be placed on a term of supervised release and subsequently violate any of the conditions of supervised release before the expiration of its terms, Weeks may be sentenced to not more than two years' imprisonment on the supervised release for Count

- 2 -

Two of the Indictment and Count One of the Information, which term is in addition to any prison term previously imposed regardless of the statutory maximum term of imprisonment set forth above and without credit for time previously served on post-release supervision, and may be sentenced to an additional term of supervised release.

## Rights of This Office Regarding Sentencing

Except as otherwise provided in this agreement, this Office reserves its right to take any position with respect to the appropriate sentence to be imposed on Weeks by the sentencing judge, to correct any misstatements relating to the sentencing proceedings, and to provide the sentencing judge and the United States Probation Office all law and information relevant to sentencing, favorable or otherwise. In addition, this Office may inform the sentencing judge and the United States Probation Office of: (1) this agreement; and (2) the full nature and extent of Weeks' activities and relevant conduct with respect to this case.

## Stipulations

This Office and Weeks agree to stipulate at sentencing to the statements set forth in the attached Schedule A, which hereby is made a part of this plea agreement. This agreement to stipulate, however, cannot and does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties. To the extent that the parties do not stipulate to a particular fact or legal conclusion, each reserves the right to argue the existence of and the effect of any such fact or conclusion upon the sentence. Moreover, this agreement to stipulate on the part of this Office is based on the information and evidence that this Office possesses as of the date of this agreement. Thus, if this Office obtains or receives additional evidence or information prior to sentencing that it determines to be credible and to be materially in conflict with any stipulation in the attached Schedule A, this Office shall not be bound by any such stipulation. A determination that any stipulation is not binding shall not release either this Office or Weeks from any other portion of this agreement, including any other stipulation. If the sentencing court rejects a stipulation, both parties reserve the right to argue on appeal or at post-sentencing proceedings that the sentencing court was within its discretion and authority to do so. These stipulations do not restrict this Office's right to respond to questions from the Court and to correct misinformation that has been provided to the Court.

## Waiver of Appeal and Post-Sentencing Rights

As set forth in Schedule A, this Office and Weeks waive certain rights to file an appeal, collateral attack, writ, or motion after sentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255.

## Restitution

Pursuant to 18 U.S.C. §§ 3663(a)(3) and 3663A(b)(1)(B), this Office and Weeks agree that Weeks shall pay restitution to all victims of Count Two of the Indictment in such amounts as the parties will agree or, if no agreement can be reached, the Court shall determine following an evidentiary hearing. Weeks understands and agrees that the losses and restitution computed may exceed the loss amount agreed upon by the Government for purposes of the advisory Sentencing Guidelines computation, and the Government is permitted to provide the Court with information about the loss and restitution that will exceed the figures reflected in the negotiated, agreed-upon range reflected in Schedule A used to determine Weeks' advisory guidelines range of imprisonment.

Pursuant to 18 U.S.C. § 3663(a)(3), Weeks further agrees to pay restitution for losses beyond those directly caused by the offense of conviction charged in Count Two of the Indictment. This Office and Weeks agree, pursuant to 18 U.S.C. § 3663(a)(3), that Weeks shall pay restitution, in amounts to be agreed upon by the parties or, if no agreement can be reached, as determined by the Court following an evidentiary hearing, to all victims of Weeks' conduct involving the BitClub Network. This Office and Weeks agree to be bound by the Court's determinations regarding the victims of Weeks' conduct involving the BitClub Network and the restitution to be paid to each.

If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods available to the United States to enforce the judgment.

In addition to the foregoing, and pursuant to 18 U.S.C. § 3663(a)(3), Weeks agrees to pay restitution to the Internal Revenue Service ("IRS") based on the offense conduct charged in Count One of the Information in an amount to be determined prior to the date of sentencing. Weeks understands and agrees that this figure does not include interest under 26 U.S.C. § 6601, which will be assessed by the IRS pursuant to Title 26. Weeks agrees that the total amount of restitution reflected in this Agreement results from his criminal conduct. The restitution amount is based upon the total amount of loss for calendar years 2015 through 2018 and shall be paid according to a payment plan established

by the Court. If the Court orders Weeks to pay restitution to the IRS for the failure to pay tax, either directly as part of the sentence or as a condition of supervised release, the IRS will use the restitution order as the basis for a civil assessment. *See* 26 U.S.C. § 6201(a)(4)(a). Weeks does not have the right to challenge the amount of this assessment. *See* 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor Weeks's timely payment of restitution according to that schedule will preclude the IRS from administrative collection of the restitution-based assessment, including levy and distraint under 26 U.S.C. § 6331.

## Forms and Waivers

Prior to the date of sentencing, Weeks shall: (1) sign and file with the IRS a Form 870 Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment in lieu of filing returns or amended returns, for calendar years 2015 through 2018; (2) sign and file with the IRS a Form 2054 Agreement to Assessment and Collection of Additional Tax and Acceptance of Overassessment in lieu of filing returns or amended returns, for calendar years 2015 through 2018; (3) provide all appropriate documentation to the IRS in support of such Form 870 and 2504 waivers, upon request; (4) pay to the IRS all taxes and any penalties owed on those returns, or, if unable to do so, make satisfactory repayment arrangements with the IRS; and (5) fully cooperate with the IRS and comply with the tax laws of the United States. Further, Weeks agrees to allow the contents of his IRS criminal file to be given to civil attorneys and support staff of the IRS to enable them to investigate, if applicable, any and all civil penalties that may be due and owing by Weeks. With respect to disclosure of the criminal file to the IRS, Weeks waives any rights under Title 26, United States Code, Section 7213, Federal Rule of Criminal Procedure 6(e), and any other right of privacy with respect to Weeks's tax returns and return information. Further, Weeks agrees not to file any claims for refund of taxes, penalties, and interest for calendar years 2015 through 2018 or for any other amounts paid in accordance with this Agreement. Weeks agrees that the provisions set forth in this Agreement concerning his tax obligations, including those obligations set forth under the caption "Other Provisions" of this Agreement, are appropriate conditions of probation or supervised release.

Weeks further agrees that within ten (10) days of the execution of this plea agreement, he shall complete and submit the attached Financial Disclosure Statement provided by the United States (the "Financial Disclosure Statement"), along with all documents supporting his stated assets and liabilities. It is the intention of the parties that Weeks shall disclose all of his virtual currency holdings, including those held on exchanges and on cold storage wallets. Weeks agrees to cooperate fully with Financial Litigation

personnel of the Asset Recovery and Money Laundering Unit ("ARMLU") with respect to requests for additional information pertaining to the Weeks's assets and liabilities, and agrees, if necessary, to appear for a deposition concerning his assets and liabilities and his ability to pay restitution. Weeks understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding Weeks's acceptance of responsibility.

## Waiver of Appeal and Post-Sentencing Rights

As set forth in Schedule A, this Office and Weeks waive certain rights to file an appeal, collateral attack, writ, or motion after resentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255.

## Venue

Weeks agrees to waive and forego any and all challenges to venue in the District of New Jersey. Weeks understands and agrees that the charge in the Information will be filed and adjudicated in the District of New Jersey. Weeks further agrees not to assert in any appeal, motion or collateral attack, including a motion brought pursuant to 28 U.S.C. § 2255, any claim or argument challenging venue in the District of New Jersey to the charge in the Information, as set forth above.

## Immigration Consequences

Weeks understands that, if he is not a citizen of the United States, his guilty plea to the charged offenses will likely result in him being subject to immigration proceedings and removed from the United States by making him deportable, excludable, or inadmissible, or ending his naturalization. Weeks understands that the immigration consequences of this plea will be imposed in a separate proceeding before the immigration authorities. Weeks wants and agrees to plead guilty to the charged offenses regardless of any immigration consequences of this plea, even if this plea will cause his removal from the United States. Weeks understands that he is bound by his guilty plea regardless of any immigration consequences of the plea. Accordingly, Weeks waives any and all challenges to his guilty plea and to his sentence based on any immigration consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction, or sentence, based on any immigration consequences of his guilty plea.

- 6 -

Other Provisions

This agreement is limited to the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities. However, this Office will bring this agreement to the attention of other prosecuting offices, if requested to do so.

This agreement was reached without regard to any civil or administrative matters that may be pending or commenced in the future against Weeks. This agreement does not prohibit the United States, any agency thereof (including the Internal Revenue Service, the U.S. Securities and Exchange Commission, and Immigration and Customs Enforcement) or any third party from initiating or prosecuting any civil or administrative proceeding against Weeks.

No provision of this agreement shall preclude Weeks from pursuing in an appropriate forum, when permitted by law, an appeal, collateral attack, writ, or motion claiming that Weeks received constitutionally ineffective assistance of counsel.

No Other Promises

This agreement constitutes the plea agreement between Weeks and this Office and supersedes any previous agreements between them. No additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties.

Very truly yours,

CRAIG CARPENITO
United States Attorney

By:   Anthony P. Torntore
      Jamie L. Hoxie
      Assistant U.S. Attorneys

APPROVED:

David W. Feder
Chief, Cybercrime Unit

- 7 -

I have received this letter from my attorneys, Simon A. Gaugush, Esq. and Michael L. Yaeger, Esq., and I have read it. My attorneys and I have discussed it and all of its provisions, including those addressing the charges, sentencing, stipulations, restitution, and waiver. I understand this letter fully. I hereby accept its terms and conditions and acknowledge that it constitutes the plea agreement between the parties. I understand that no additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties. I want to plead guilty pursuant to this plea agreement.

AGREED AND ACCEPTED:

_____          Date: 9/24/20

Jobadiah Sinclair Weeks


I have discussed with my client this plea agreement and all of its provisions, including those addressing the charges, sentencing, stipulations, and waiver. My client understands this plea agreement fully and wants to plead guilty pursuant to it.

_____          Date:

Simon A. Gaugush, Esq.
Michael L. Yaeger, Esq.

- 9 -

## Plea Agreement with Jobadiah Sinclair Weeks

### Schedule A

1. This Office and Weeks recognize that the United States Sentencing Guidelines are not binding upon the Court. This Office and Weeks nevertheless agree to the stipulations set forth herein, and agree that the Court should sentence Weeks within the Guidelines range that results from the total Guidelines offense level set forth below. This Office and Weeks further agree that neither party will argue for the imposition of a sentence outside the Guidelines range that results from the agreed total Guidelines offense level.

2. The version of the United States Sentencing Guidelines effective November 1, 2018 applies in this case.

### Count Two of the Indictment (the "Indictment Count")

3. The applicable guideline is U.S.S.G. § 2X1.1 because the Indictment Count is conspiracy in violation of Title 18, United States Code, Section 371. *See* Appendix A of U.S.S.G.

4. The applicable guideline for the base level offense is U.S.S.G. § 2B1.1 because the Indictment Count is offering and selling unregistered securities in violation of Title 15, United States Code, Sections 77e and 77x.

5. Under U.S.S.G. § 2B1.1(a)(1), the base offense level is 6 because conviction of the Indictment Count carries a statutory maximum term of imprisonment of less than 20 years.

6. Specific Offense Characteristic U.S.S.G. § 2B1.1(b)(1)(J) applies because the relevant loss amount that the parties have negotiated is more than $3,500,000 but not more than $9,500,000. This results in an increase of 18 levels.

7. Specific Offense Characteristic U.S.S.G. § 2B1.1(b)(2)(A) applies because the offense involved 10 or more victims. This results in an increase of 2 levels.

8. Specific Offense Characteristic U.S.S.G. § 2B1.1 (b)(10)(C) applies because the offense involved sophisticated means. This results in an increase of 2 levels.

9. The total adjusted level for Count Two of the Indictment is 28.

- 10 -

## Count One of the Information ("The Information Count")

10. The applicable guidelines for Count One of the Information, charging a violation of Title 26, United States Code, Section 7201, are U.S.S.G. §§ 2T1.1 and 2T4.1. Weeks agrees that he willfully evaded tax reporting requirements for the taxable periods 2015 through 2018. The parties agree that the combined tax loss for the calendar years 2015 through 2018 is greater than $3,500,000, but less than $9,500,000. This corresponds to an Offense Level of 24 pursuant to U.S.S.G. § 2T4.1(J).

11. Because Weeks failed to report and correctly identify the source of income exceeding $10,000 in any year from criminal activity, a two level upward adjustment is warranted pursuant to U.S.S.G. § 2T1.1(b)(1).

12. The total adjusted level for Count One of the Information is 26.

## Grouping Analysis

13. The parties agree that Count Two of the Indictment and Count One of the Information group pursuant U.S.S.G. § 3D1.2(d). Pursuant to U.S.S.G. § 3D1.3(b), when the counts involve offenses of the same general type to which different guidelines apply, the offense guideline that produces the highest offense level should be applied. Thus, the offense level is 28.

## Acceptance of Responsibility

14. As of the date of this letter, it is expected that Weeks will enter a plea of guilty prior to the commencement of trial, will truthfully admit his involvement in the offenses and related conduct, and will not engage in conduct that is inconsistent with such acceptance of responsibility. If all of these events occur, and Weeks' acceptance of responsibility continues through the date of sentencing, a downward adjustment of 2 levels for acceptance of responsibility will be appropriate. *See* U.S.S.G. § 3E1.1(a).

15. As of the date of this letter, it is expected that Weeks will assist authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting this Office to avoid preparing for trial and permitting this Office and the Court to allocate their resources efficiently. At sentencing, this Office will move for a further 1-point reduction in Weeks' offense level pursuant to U.S.S.G. § 3E1.1(b) if the following conditions are met: (a) Weeks enters a plea pursuant to this agreement, (b) this Office in its discretion determines that Weeks' acceptance of responsibility has continued through the date of sentencing and Weeks therefore qualifies for a 2-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and (c) Weeks' offense level under the Guidelines prior to the operation of § 3E1.1(a) is 16 or greater.

## Agreed Total Guidelines Offense Level

16. In accordance with the above, the parties agree that the total Guidelines offense level applicable to Weeks is 25 (the "agreed total Guidelines offense level").

17. The parties agree not to seek or argue for any upward or downward departure, adjustment or variance not set forth herein. The parties further agree that a sentence within the Guidelines range that results from the agreed total Guidelines offense level is reasonable.

## Appeal Waiver

18. Weeks knows that he has and, except as noted below in this paragraph, voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results from the agreed total Guidelines offense level. This Office will not file any appeal, motion, or writ which challenges the sentence imposed by the sentencing court if that sentence falls within or above the Guidelines range that results from the agreed total Guidelines offense level. The parties reserve any right they may have under 18 U.S.C. § 3742 to appeal the sentencing court's determination of the criminal history category. The provisions of this paragraph are binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, if the sentencing court accepts a stipulation, both parties waive the right to file an appeal, collateral attack, writ, or motion claiming that the sentencing court erred in doing so.

19. Both parties reserve the right to oppose or move to dismiss any appeal, collateral attack, writ, or motion barred by the preceding paragraph and to file or to oppose any appeal, collateral attack, writ or motion not barred by the preceding paragraph.

- 12 -

# Exhibit D.

Treasury August 17 & 25, 2020, Proffer Memos



**DEPARTMENT OF THE TREASURY**
**Internal Revenue Service**
**Criminal Investigation**

## Memorandum of Interview

---

| | | | |
|---|---|---|---|
| **Investigation #:** | ▮▮▮▮▮ | **Location:** | via Conference Call |
| **Investigation Name:** | JOBADIAH SINCLAIR WEEKS | | |
| **Date:** | August 17, 2020 | | |
| **Time:** | Approx. 9:00 - 10:58 a.m. | | |
| **Participant(s):** | JOBADIAH SINCLAIR WEEKS, Defendant | | |
| | Simon Gaugush, Attorney for Mr. WEEKS | | |
| | Michael Yeager, Attorney for Mr. WEEKS | | |
| | Jamie Hoxie, Assistant U.S. Attorney | | |
| | Anthony Torntore, Assistant U.S. Attorney | | |
| | Hanna Yang, Special Agent, FBI | | |
| | Leo Rovensky, Special Agent, IRS-CI | | |
| | Ven Karavchuk, Special Agent, IRS-CI | | |
| | Jonathan Helmstetter, Special Agent, IRS-CI | | |

On the above date and time, AUSAs and agents met via teleconference with JOBADIAH SINCLAIR WEEKS (hereinafter "WEEKS") and his attorneys. AUSA Hoxie explained the terms of the proffer agreement and WEEKS confirmed that he had reviewed it with his attorneys. The proffer letter dated August 6, 2020 referenced a proffer date of August 12, 2020. All parties acknowledged that the agreement would be valid for the conversation on August 17, 2020. Defense counsel agreed to change the August 12, 2020 date to August 17, 2020 and initial that change. WEEKS confirmed that he still wished to continue and voluntarily provided the following information:

1. WEEKS initially heard about BITCLUB NETWORK (hereinafter "BCN") from his friend John Hammock. John Hammock had been in network marketing for more than 20 years and had known WEEKS for about 10 years at that time. WEEKS gave John Hammock his first bitcoin. WEEKS also heard about BCN from his friend Hayden Stevens (WEEKS is not positive if the last name Stevens is correct) who is an internet marketer in Japan. WEEKS also heard about BCN from Ryan Conley, who lived in the U.S., and had previously joined BCN.

2. Ryan Conley introduced WEEKS to JOE ABEL around August of 2015 in Washington. Conley offered to share a position within BCN with WEEKS which ABEL supported. ABEL was friends with RUSS MEDLIN. ABEL was referred to as the "master distributor" within BCN. Whenever WEEKS joins any MLM, he likes to get to know the "inner-circle" of members so he will be able to

provide the best support to the new members that he brings to the MLM. BCN was no different as he felt comfortable having direct access to ABEL who had direct access to MEDLIN.

3. When ABEL explained BCN to WEEKS, ABEL told him that WEEKS would be buying computer equipment to mine BTC for a term of 1,000 days. Every 24 hours, WEEKS and other members would receive a portion of what was mined the previous day in the form of a credit to his back-office account. WEEKS used the analogy of purchasing the "goose who laid the golden egg," in this instance the "golden egg" being BTC and the "goose" being mining equipment. WEEKS was "excited to buy machines that print money." WEEKS formally joined BCN in August of 2015.

4. ABEL never claimed that WEEKS would make a set percentage or dollar amount per day from BCN because the price of BTC fluctuated drastically. WEEKS explained that you could earn your investment back faster if you referred friends to BCN.

5. WEEKS felt comfortable that BCN was purchasing equipment in bulk because they were able to get it at a cheaper price which left more profit for the compensation plan. WEEKS also liked that individual members did not need to host their own machines or pay for power. BCN handled those aspects of mining.

6. WEEKS was told that BCN needed access to mining equipment to grow. WEEKS had access to equipment through Bitfury. WEEKS felt that it would be best for BCN to have options, such as Bitfury, for purchasing equipment to keep prices competitive.

7. A few months after joining, WEEKS met MEDLIN via telephone to propose that BCN purchase Bitfury equipment. This call was arranged by ABEL. MEDLIN told WEEKS that he would need to speak with MATTHEW GOETTSCHE about this deal. The entire conversation happened over the phone.

8. WEEKS was aware of the MLM component of BCN. BCN was a way for anyone with any money to earn BTC through crowdfunding. The MLM portion allowed individuals who recruited new members to earn BTC by selling mining packages. Like other MLMs, BCN split investments as 40% for equipment, 40% for the MLM portion, and 20% for operating the business. According to WEEKS, most MLMs only put 40% of investments towards the product. WEEKS liked that BCN only took 20% of investments for operating the company. WEEKS further explained that his friends who own MLMs told him that most networks need to mark-up their products 7 times for retail to earn a 60% / 40% split.

9. WEEKS met a former IRS agent named Joe Bannister who "messed-up," WEEKS' thinking. Bannister told WEEKS that there was no requirement to pay taxes on earnings. WEEKS is comfortable pleading guilty to a tax charge.

WEEKS has not paid personal income tax because Bannister told him that he is not subject to or liable for personal income tax.  WEEKS has not paid federal income taxes since he was younger and filled-out W-4 forms.  He last filed when he was working at Macaroni Grill and Old Chicago Restaurant where taxes, including FICA and Social Security, were withheld from his paychecks. This was approximately 18-19 years ago.  WEEKS was enrolled in Social Security by his mother.  WEEKS has a Social Security number.  WEEKS has not filed a tax return for the past 10 years because his income was not connected to a trade or business per Bannister's recommendation.  In the past 10 years, WEEKS earned millions of dollars in the form of BTC.  WEEKS had millions of dollars stolen from him in BTC as well.  WEEKS lost BTC when Silk Road was taken down by the government and also lost BTC to hackers. WEEKS still earned millions in BTC.  WEEKS acknowledged that he did not file a return despite earning millions of dollars.  WEEKS did not file because Bannister told him that he did not have an obligation to file.

WEEKS spoke privately with his counsel from approximately 9:36 a.m. through 9:49 a.m.  All other parties disconnected from the call during this time and rejoined at approximately 9:49 a.m.

10. WEEKS earned millions of dollars over the years and was liable for the taxes on this income.  WEEKS did not file or pay any taxes on the income that he earned from BCN or elsewhere.

11. When WEEKS first became involved with BCN, he believed that he was purchasing physical machines.  He was told that 40% of what was invested would be used to purchase equipment.  GOETTSCHE told WEEKS that he could receive physical equipment as a "return."  ABEL told WEEKS about a system where serialized BTC miners would send mined BTC directly to member's personal wallets.  This was a system that was used by Dunamis.

12. Although BCN'S website showed that they had 3 separate pools operating, BCN only had 1 mining pool.  The 3 pools each had different mandatory reinvestment splits.  Pool 1 was a 50/50 split, pool 2 was a 60/40 split, and pool 3 was a 70/30 split.  If a member were to purchase a "founder's position" for $3,500, they were told that they would receive a share in each of the 3 pools but, in reality, they would receive 7 shares in BCN'S only pool.  BCN represented that there were three different pools on their website to give members incentive to invest more and purchase more shares.

13. The BCN website represented that BCN was operating 3 separate pools.  3 separate pools were also promoted by MEDLIN'S YouTube videos.  WEEKS learned that BCN only had 1 pool by looking at bitclubpool.com as the mining equipment in Canada, Iceland, and Georgia all mined into 1 pool.  WEEKS called ABEL to clarify that there was only 1 pool and a founder's position would actually result in 7 shares in BCN'S only pool.  WEEKS learned within weeks of joining BCN that there was only 1 pool operating.

14. While WEEKS was promoting BCN, he encouraged people to purchase founder's positions in BCN. When WEEKS promoted this, he did not tell them that there was only 1 pool. He encouraged people to watch the videos on the BCN site and told them that a founder's position would give them access to all 3 of BCN'S pools. This is consistent with what is represented on the BCN website. WEEKS did not tell people that there was only 1 pool.

15. WEEKS stated that the site bitclubpool.com would show members all of the mining earnings going into 1 pool. WEEKS continued to promote throughout his time with BCN that a founder's position would give the purchaser a share in all 3 pools despite knowing that this would really result in 7 $500 shares being purchased.

16. According to WEEKS, the BCN platform did not allow WEEKS to see who was in his downline. He was not able to see their names, usernames, contact information, or even how many members he had in his downline. This was very different from any other MLM that WEEKS has promoted as communication with members is key for MLMs to work.

17. At some point, WEEKS learned that BCN was not registered with the SEC. WEEKS recalled that BCN mined a large block, somewhere around 200 BTC, but it was not claimed. WEEKS encouraged GOETTSCHE to donate this BTC to the Bitcoin Foundation. Brock Pierce operated The Bitcoin Foundation.

18. WEEKS attended a dinner at the World BTC Conference in Las Vegas. There were about a dozen people at the dinner table with Pierce and WEEKS. At the dinner, WEEKS wanted to introduce GOETTSCHE and MEDLIN to Pierce and others in the BTC industry. Pierce had a conversation with GOETTSCHE at the table about BCN operating in the U.S. and the complications that could arise from it. WEEKS does not remember if he overheard their conversation or if GOETTSCHE told him later, but Pierce indicated that he believed that the SEC would see BCN as selling securities. Pierce said this was because of the Gaw Mining cases being litigated by the SEC and the SEC'S "crackdown" on BTC. This is around the time where WEEKS learned about the SEC rules governing securities, cryptocurrency, and the Howey test. WEEKS learned that the SEC could consider BCN a security despite BCN'S claim that it would ship members physical equipment if requested. WEEKS believes that BCN blocked U.S. IP addresses shortly after GOETTSCHE'S conversation with Pierce.

19. After the World BTC Conference, BCN banned U.S. citizens from participating in the network. At this time, WEEKS encouraged new members to use a VPN to access BCN because, "BCN did not want to deal with Americans." BCN banned U.S. IP addresses from accessing its site. WEEKS encouraged existing members who were U.S. citizens to use a VPN to avoid this restriction. WEEKS recalls telling more than 2 new members to use a VPN when joining BCN. He learned about the VPN loophole when trying to log in to his own account. WEEKS stated that this loophole was used by U.S. citizens to gamble online at offshore casinos. WEEKS stated that other BTC companies did not do

business in the U.S.

20. WEEKS does not recall direct conversations with GOETTSCHE or MEDLIN about the VPN loophole.  MEDLIN and GOETTSCHE threatened to suspend all U.S. accounts.

21. BCN did not collect any KYC information on its members until after the U.S. IP address block was implemented.  At that time, members were required to upload KYC documents.  BCN would block anyone who was identified as a U.S. citizen during the KYC process.

22. WEEKS promoted this on Facebook, at conventions, and in public.  Some of the people who WEEKS promoted BCN to were U.S. residents.  WEEKS was aware of this because some U.S. citizens told him that they lived in the U.S.  WEEKS continued to promote BCN in the U.S. and to U.S. citizens after he learned that BCN would be considered a security by the SEC.  WEEKS remembered sending MEDLIN an article about Gaw Mining.  MEDLIN responded that BCN was selling equipment and not securities.  WEEKS replied with, "okay."  None of the individuals promoting BCN were licensed broker/dealers.  MEDLIN continued to explain to WEEKS that they were selling equipment and not securities.

23. WEEKS recalls expressing concerns to MEDLIN that BCN was not transparent enough to attract large investors.  WEEKS explained that anyone wishing to invest a large sum of money would need to know how much they were going to make and, without knowing the number of outstanding shares, expenses, total mined coin, and other factors, that would not be possible.  Being able to calculate ROI would be important, especially for larger investors.

24. GOETTSCHE told WEEKS that there would be a 10 day lag reporting mining earnings to members because BCN needed that time to determine the expenses associated with mining that coin.  WEEKS stated that people were trying to reverse engineer how many members there were in BCN based on their daily payout versus what BCN claimed as mined.  WEEKS was asked these questions frequently, specifically how many shares were outstanding.  WEEKS told MEDLIN to publish these statistics to be more transparent.

25. WEEKS wanted to know that the BCN pool was not becoming diluted.  WEEKS felt comfortable continuing to refer people to BCN because he kept seeing the hashing power grow on bitclubpool.com.  WEEKS could see BCN'S mining wallet being funded by mined coins. He also knew that BCN was buying equipment from Bitfury through WEEKS.  WEEKS also sold Bitfury equipment directly to others at this time.

26. BCN had a data center in Iceland where GOETTSCHE and MEDLIN invited WEEKS to go to physically see BCN'S equipment.

27. WEEKS asked GOETTSCHE for the ability to send messages to everyone in

his downline but WEEKS was unable to do that.  WEEKS would periodically ask GOETTSCHE for this ability.  WEEKS never got a direct answer as to how many members there were or how many shares were outstanding. GOETTSCHE told WEEKS at one point, BCN had over 300,000 members holding over 1,000,000 shares.  WEEKS felt comfortable continuing to promote BCN because he could see their hashing power and also because BCN was purchasing equipment.  Unless someone knew how many shares were outstanding, there would be no way to know if the pool was being diluted.  Only GOETTSCHE and MEDLIN would know that.  WEEKS continued to promote BCN because the price of BTC continued to rise.

28. WEEKS asked ABEL if anyone ever mined more BTC than they invested. ABEL showed WEEKS accounts where people earned more BTC than they invested.  WEEKS saw the daily payouts into his back-office wallet and BCN purchasing equipment.  WEEKS continued to refer new members to BCN.

29. WEEKS earned money from BCN'S compensation plan.  WEEKS was able to see a breakdown of this in his BCN back-office account which was broken into earnings from mining by each pool, binary cycle credits, and personal referral or direct bonus credits.  WEEKS earned BTC from the MLM side of BCN however he lost BTC on the mining side of BCN.  Over 1,000 days, WEEKS earned 8 BTC from mining despite investing 13 BTC, losing 5 BTC on mining endeavors. WEEKS explained that the fiat value increased however that had nothing to do with BCN'S activities but rather the fluctuation in the price of BTC over the 1,000 day timeframe.

30. WEEKS earned BTC through the MLM portion of BCN, at one point in excess of $2,000 per day.  There was a cycle bonus where you could earn up to 10 cycles per day which was credited in his back-office account as $200 in BTC. Regardless of whether or not an investor decided to participate in the MLM portion of BCN, only 40% of their investment would go towards mining.

31. When WEEKS was promoting BCN, he did not tell anyone that he lost BTC on the mining portion of the business because he knew that they would not sign-up.  WEEKS wanted everyone to earn money with BCN but continued to promote that he did not know what would happen to the market price of BTC during the course of their investment.  WEEKS never volunteered the fact that he lost BTC through the mining portion of BCN.

32. Mark Weiss, an attorney from Arizona, was frustrated with his return from BCN. WEEKS had a conversation with him about how many BTC he mined.  Weiss purchased a founder's position in BCN.  WEEKS believes that he may have told Weiss about the fiat valuation of his 13 BTC to 8 BTC mining ratio but he does not recall for sure.  Weiss wanted to sue MEDLIN but WEEKS told him that it would be difficult because MEDLIN was somewhere in Asia.

33. WEEKS believes that he had about 15 accounts with BCN.  Many people who joined BCN did not have BTC prior to joining.  WEEKS had approximately 15-20

accounts that were paid for by BCN'S "pay-it-forward," feature.  BCN only wanted members to have one account each but some people wanted to invest more.  BCN had a $10,000 cap on each account.

WEEKS has had conversations with GOETTSCHE since their arrests in December of 2019.  AUSA Hoxie explained that WEEKS should not solicit any information from GOETTSCHE and that WEEKS does not have a cooperation agreement with the government.  If GOETTSCHE initiates a conversation with WEEKS, he can listen but cannot solicit any information from GOETTSCHE.  WEEKS stated that he understood this distinction.  The interview was concluded at approximately 10:58 a.m.

I prepared this memorandum on August 17, 2020, after refreshing my memory from notes made during and immediately after the interview with JOBADIAH SINCLAIR WEEKS.

Jonathan Helmstetter
Special Agent



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

---

**Investigation #:** ███████                        **Location:**  via Conference Call
**Investigation Name:**  JOBADIAH SINCLAIR WEEKS
**Date:**  August 25, 2020
**Time:**  Approx. 9:00 - 10:59 a.m.
**Participant(s):**  JOBADIAH SINCLAIR WEEKS, Defendant
Simon Gaugush, Attorney for Mr. WEEKS
Michael Yeager, Attorney for Mr. WEEKS
Jamie Hoxie, Assistant U.S. Attorney
Anthony Torntore, Assistant U.S. Attorney
Stephanie Talamantez, Special Agent, FBI
Leo Rovensky, Special Agent, IRS-CI
Ven Karavchuk, Special Agent, IRS-CI
Jonathan Helmstetter, Special Agent, IRS-CI

On the above date and time, AUSAs and agents met via teleconference with Jobadiah (Joby) Sinclair Weeks (Weeks) and his attorneys. Weeks stated that he understands the proffer letter and has already signed and sent the letter to his attorney. Weeks confirmed that no one from the government has asked him to speak with Matt Goettsche (Goettsche) or to get information from Goettsche at the government's direction. Below is a summary of the proffer session and does not reflect the statements verbatim. Weeks provided the following information:

1. Weeks and Goettsche have not personally entered into a joint defense agreement with each other, however, their respective attorneys may have.

2. Weeks's attorney, Simon Gaugush (Gaugush), stated that there is no written joint defense agreement with Goettsche's attorneys. However, an oral joint defense agreement between the attorneys may have happened at Weeks' and Goettsche's initial appearance in Newark, New Jersey on January 15, 2020. Gaugush explained that it is potentially arguable that the oral agreement may have happened on that date.

3. Weeks stated that he understands that he should not discuss conversations he has had with Goettsche after his initial appearance in New Jersey because of the potential oral joint defense agreement. Weeks also stated that he understands not to talk about anything that Goettsche said his lawyers may have told him.

4. At the time of his arrest, Weeks was no longer promoting Bitclub Network (BCN). Weeks stopped signing up new members to BCN around the end of 2018, when his daughter was born.

5. Weeks also severed other business ties he had with Goettsche and Russ Medlin (Medlin) in late 2018. Weeks stopped talking with Goettsche and Medlin after they failed to honor the agreement for the Montana data center and refused to pay the power bill for the data center in the country of Georgia.

6. In late 2018 or early 2019, Joe Abel (Abel) reached out to Weeks and told him about the company Dunamis. Abel asked Weeks to join Dunamis. Weeks agreed to join Dunamis and stopped promoting BCN.

7. Weeks and Goettsche spoke to each other prior to and on January 15, 2020. The most time that Weeks spent together with Goettsche after their arrests was during their transport to New Jersey. First in an Oklahoma holding facility and then on the airplane while they were being flown to New Jersey. Weeks and Goettsche also spent one day together in a holding cell in New Jersey and in the back of a police car on the date of their initial appearance on January 15, 2020. Abel was also present in Oklahoma, on the flight to New Jersey, and during the initial appearance.

8. While they were in Oklahoma, Weeks, Goettsche and Abel were sitting in the same holding cell. Weeks asked Goettsche why he called members of BCN idiots and why he said the company was built on the backs of idiots. Goettsche told Weeks that the conversation where he said that was taken out of context. Goettsche told Weeks that BCN did a lot more than $700 million in revenue. Weeks asked if Goettsche can prove that they spent 40% on mining equipment and Goettsche said he can account for where all the money went. Goettsche said he can prove that he purchased a lot of equipment.

9. Abel was there during this conversation. He was upset that he was dragged into the BCN arrests because he had formally left BCN. Abel had publicly said that BCN wasn't buying enough mining equipment. Abel also did not think he would get bail because he already fled prosecution in Malaysia. Abel was angry and had nothing good to say about Medlin. Weeks thinks Medlin and Goettsche were lending Abel money to buy Lamborghinis and Rolls Royce's before he left BCN.

10. Goettsche said BCN brought in a lot more than $722 million and can account that 40% went to mining equipment. Goettsche also said that he and Medlin had shared the same email address and that some of the communications in the indictment were done by Medlin because they had different sleeping schedules. Goettsche did not get into the specifics of which emails were done by whom.

11. Weeks asked Goettsche if he was trying to make an exit when he tried to sell Weeks mining equipment at a big discount.  Goettsche said he was getting rid of old mining equipment to buy new equipment.  In around September 2019, Goettsche had asked Weeks if he had a buyer for mining equipment.  Goettsche had bought the miners for $100 million and was willing to sell them for $5 million because they were old and used.  Goettsche was working with Rick in Montana and they were going to use the $5 million to retrofit a data center in Montana with S17 miners.  Weeks assumed that the old equipment and the S17s were for the benefit of BCN.  Goettsche had asked Weeks to find buyers for mining equipment on other occasions as well.  On those other occasions, Weeks understood that the equipment was bought with BCN funds.  After the mining equipment would be sold, Weeks assumed that Goettsche would buy more mining equipment for BCN.  Goettsche said that he and Rick had another plot of land in Montana and were looking to add more mining power to that site.

12. Weeks could not recall Rick's last name.  Rick set up the data center in Butte, Montana with Dan Burrell (Burrell) and Kevin Washington (Washington).  Rick owns an operations/construction company.  Weeks previously told Rick there was an investigation on BCN.  Rick was mad at Goettsche because Goettsche was not honoring agreements.  Rick said to Weeks that Goettsche and Yoshi are cyber criminals because there were multiple mining wallets.

13. In Oklahoma, Weeks was asking Goettsche if what the indictment said is true and what the expansion plan was for BCN.  Goettsche said that there were other products such as debit cards, arbitrage trader platform, etc.  BCN was diversifying because mining earnings were poor.  A year earlier, Weeks tried to sell bitcoin ATM software to Goettsche to help BCN diversify.  Goettsche also said that he has not heard from Yoshi.  Goettsche thinks Yoshi disappeared in Russia and no one has heard from him since.  Goettsche did not tell Weeks whether something was wrong with the BCN pool because of Yoshi's disappearance.

14. Around September 2019, Goettsche told Weeks that the $100 million of old mining equipment that he was looking to sell for $5 million was located in a data center in China.  Yoshi had set up this equipment and now there was some sort of discrepancy.  There was a lawsuit that involved Genesis Mining.  BCN and Genesis Mining had mining equipment co-located in the same data center in China and the discrepancy was about the equipment.  Weeks thinks that the equipment was pointed to both the BCN and Genesis Mining respective pools, but he does not know that for certain.  Weeks added that on the www.bitclubpool.com website, it is possible to see which data center was hitting the blocks on the blockchain.

15. During the flight from Oklahoma to Essex County Jail, Weeks and Goettsche sat next to each other and Abel was one row in front of them. Weeks and Goettsche talked on the plane about more of the same topics. Weeks asked if Goettsche can prove that what BCN represented to its members is true. Goettsche said that he has records of where every dime went to for BCN. Goettsche said that he can prove that BCN was not a Ponzi scheme. Goettsche said his statements in the indictment were taken out of context and he will be able to prove that BCN was legitimate. Goettsche said that all the wallets that BCN had are on the blockchain and you can see all the wallets that BCN paid out from. Goettsche said he will be able to show all of that.

16. On the plane, Goettsche told Weeks that BCN did not initially have their own pool and were mining to Antpool. Goettsche said that was what the conversation from the indictment between him and Catalin Balaci (Balaci) was about. Goettsche said that BCN was mining to Antpool before the BCN pool was created.

17. Weeks asked Goettsche when he made the first purchase of equipment for BCN. Goettsche said he did that in December 2014 after Goettsche met Yoshi at a bitcoin conference in Las Vegas.

18. Goettsche told Weeks that before the December 2014 purchase from Yoshi, BCN was script mining. Goettsche acknowledged to Weeks that the script mining that BCN was doing at that time was not that profitable. Prior to Yoshi, Balaci was the mining expert that Goettsche was listening to.

19. Weeks did not and still does not know what script mining is.

20. After the purchases of mining equipment from Yoshi, Goettsche started going with him to Iceland to set up the data center at Verne Global.

21. Weeks did not talk to Goettsche about bumped up or manipulated mining earnings. Goettsche said that the fudging numbers comment in the indictment was taken out of context. Weeks does not understand how that can be taken out of context.

22. Weeks and Goettsche did not discuss the 3 different mining pools that were represented to BCN members.

23. Weeks understands now that if BCN was transparent about how many shares members purchased in the BCN pool, people would know exactly what their mining earnings should be.

24. Weeks did not get the impression at any point that Goettsche was no longer a part of BCN or had stepped away from BCN.

25. Weeks talked to Goettsche on the plane about the Montana and Georgia data centers. Goettsche said that some of the mining equipment from Bitfury that was shipped to Montana had still not been plugged in.

26. On the plane, Goettsche asked Weeks to gather the Bitfury mining contracts for Goettsche. Goettsche wanted to make the Bitfury contracts clear in his mind and asked Weeks to refresh his memory regarding BCN's dealings with Bitfury. Weeks told him about the Bitfury mining equipment in Georgia and Canada.

27. Goettsche told Weeks on the flight from Oklahoma that he had taken over Cryptowatt and the Montana data centers as the majority owner. Burrell was originally the CEO of Cryptowatt but Goettsche forced Burrell to step down.

28. Weeks recalls that there was a guy that was going to take BCN public, but he died tragically. There was another discussion about eventually taking BCN public with Goettsche, Burrell, and Washington. On the plane, Goettsche said that Cryptowatt was eventually going to go public before the arrests happened.

29. More than half of Cryptowatt was filled with BCN equipment. Weeks helped supply some of that power from Bitfury. Goettsche sent the bitcoin to pay for Bitfury equipment to Weeks from Bitclub wallets. Therefore, the money that purchased equipment for Cryptowatt from Bitfury, that went through Weeks, came from BCN members.

30. Abel was one row ahead of Goettsche and Weeks on the airplane from Oklahoma and would be able to overhear what Weeks and Goettsche were discussing. Abel did not, however, really interject into the conversation.

31. Goettsche mentioned to Weeks that $10 out of the $99 membership fee to join BCN went to Catalin Balaci (Balaci). Medlin did not want to pay Balaci any part of the $99 fee. Goettsche paid Balaci out of his half of the membership fee. Goettsche said Medlin is somewhere in Asia, probably Cambodia, and is never coming to the U.S. They all knew that Medlin was the redacted defendant in the indictment. Goettsche told Weeks this in either the airplane or the holding cell in New Jersey.

32. Abel was closer friends with Medlin than Goettsche. Abel and Medlin were always together and that can be seen on Facebook. Abel probably had a better idea of where Medlin was than anybody.

33. Prior to the initial appearance in New Jersey on January 15, 2020, Weeks, Goettsche, and Abel were in the same holding cell. The conversations then were about family. Goettsche told Weeks that his dad died in an airplane crash and Goettsche raised his family from a young age. Goettsche told Weeks that he met Elon Musk and was doing some charity projects with Richard Branson. Weeks said he had projects with Richard Branson as well. Weeks told Goettsche about trips with his daughter and family.

34. Weeks and Abel were on the same tier in Essex County Jail for approximately one month and played chess together every day.

35. Weeks asked Abel if BCN was a scam.  Abel responded to Weeks that it seems like it was.  Abel had called BCN a scam on YouTube before the arrests and was mad at Medlin and Goettsche.

36. Weeks saw the video on YouTube of Abel saying that BCN was a Ponzi scheme around the time that it was posted online.  Weeks knew that BCN was buying equipment and that some of the equipment that was purchased was not showing up as power directed to the BCN pool.  Weeks knows that getting the equipment plugged in is not always easy.  Weeks understood that if the money that was coming in from members was not being used for equipment, then that would be make BCN a Ponzi scheme.  Weeks thinks Abel was mad at Medlin for terminating his position in BCN and keeping Abel's money.  Goettsche had told Weeks that Abel was borrowing money to buy fancy cars.  Abel was asking for money up front so that he can flash his riches to entice more people to invest in BCN.

37. Abel told Weeks that he paid an attorney in Malaysia to get him smuggled out of Malaysia to the Philippines on a private jet.  Abel was able to make it back to the U.S. from the Philippines.  Abel blames the Malaysia arrest on Medlin and thinks Medlin is the one that had him arrested.

38. Weeks saw the article online about BCN having fake testimonials on its website on the first day he joined BCN.   By the time Weeks joined, however, those testimonials were no longer on the BCN website.  Weeks forwarded that internet article to Abel to ask him about it.  At some point later, Goettsche told Weeks that the fake testimonials were made by a BCN recruiter and not by the company.  Weeks remembers that Medlin laughed about the fake testimonials on a group Facebook chat.

39. Weeks recalls that the Facebook conversation about BCN not being transparent enough for the big money guys happened around same time as the SEC enforcement action against Gaw Miners.  Medlin blew off Weeks's concerns and said that the big money guys and bitcoin nerds are not the market that BCN is looking for.  Medlin wanted MLM marketing sales guys to recruit members and would rather have 10,000 people put in $1,000 rather than one rich person put in $1 million at once.  Medlin preferred this because more investors meant that there were more people talking about BCN, which would in turn bring more people into the fold.  At the time of this conversation with Medlin, Weeks did not know Goettsche very well.  For the first couple of months of his membership in BCN, Weeks did not even know Goettsche existed.

40. Weeks talked to Goettsche about refunds in the form of mining equipment. Goettsche said that some people would submit a request for a refund in equipment, get to the stage of entering their mailing address, and would change their mind. Some members would say that they were just making sure that BCN would actually send equipment to members. Goettsche said that if a member had been invested for 400 days or so and wanted a refund, Goettsche would usually buy them out of the contract for a fairly small dollar amount, such as $200. Weeks talked to Goettsche about this at the Iceland data center trip.

41. In Iceland, BCN was giving away old mining units. These units were used and worth about $80 at the time. Since it would cost about $75 to ship them, it was better to give them away in person to members as a promotion. BCN was giving out this equipment to the BCN members that came to see the data center. The machines were sitting on the table and the members were able to bring them home as souvenirs.

42. Weeks recalled asking Goettsche about mining equipment purchased by BCN that was more expensive than the mining pool packages that were sold to members. Some of the miners cost as much as $5,000 per unit. Goettsche explained that if someone wanted their equipment back, Goettsche would send them an old cheap machine rather than the new expensive equipment that was bought with part of that investor's membership package. Goettsche explained that BCN would refund the member an older machine that was already used and not worth a lot of money anymore. Most people that wanted out, however, would just get buyouts of their contracts. This conversation was around the time that BCN was buying B8 units from Bitfury and probably happened over the phone. A lot of the communications with Goettsche and Medlin would happen over the phone. Sometimes they used Skype. With Goettsche, Weeks would typically talk on a regular cell phone line or through Telegram.

43. Weeks was assured by Medlin that BCN was not cloud mining because BCN was selling a physical product. Weeks sent the Kevin Thompson article on cloud mining to Medlin and others. Medlin told Weeks that BCN is not cloud mining. Weeks understands cloud mining to mean that you are not purchasing physical equipment and you are instead leasing equipment. For the contracts that Weeks negotiated with Bitfury, BCN was buying equipment.

44. Weeks does not know if BCN leased mining equipment from Genesis Mining. At one point, Weeks bought a share from Genesis Mining's pool just to see how it compared with BCN's mining earnings.

45. When Weeks asked Medlin about BCN not being transparent, Medlin said that BCN would eventually get to doing that, however, it would take more programming resources. Ultimately, BCN never programmed in the transparency that Weeks was referring to.

46. The same thing happened with the Coinpay product that Weeks told BCN investors about.  Coinpay was promised but it never came to be.  Weeks was told by Goettsche and Medlin that Coinpay had a CEO in Hong Kong and the rollout was delayed because there were a lot of legal hoops to jump through.

47. Weeks asked Medlin on Facebook about how BCN mining earnings were split up. Medlin told Weeks that expenses such as electricity are deducted before the mining earnings go up on the BCN website.  Medlin added that BCN tries to keep that fact off of the updates to members on the BCN website.  Weeks said that in retrospect, he is concerned that this was concealed from members.  Medlin was saying that the electric bill would be paid first and that what was left over was paid out to the investors.  At the time, Weeks was OK with this explanation because profits were still split in his mind.  Weeks should have pushed back on this because it was not what was being told to investors on the website.  Weeks understands that when it comes to what investors received in mining earnings, there is quite a difference between paying the power bill up front versus distributing all the mining earnings.  Weeks understands that this was concealing information from investors.  Weeks explained this to investors as a one-third versus two-thirds split and one-third of the earnings would go to the power bill.  Weeks did not tell investors about BCN paying the power bill first as Medlin explained it to Weeks in that Facebook conversation.

48. Weeks is not sure why BCN was changing the length of mining pool contracts from 1,000 days to 600 days and then back to 1,000 days.

49. Weeks knows that BCN investors did not have access to the details of the mining contracts that BCN entered into with providers of the mining equipment such as Bitfury and Bitmain.  BCN made an announcement about paying $0.06 cents per kilowatt hours in the Iceland data center.  However, BCN investors never knew the specifics of the mining contracts that BCN entered into with providers and Weeks did not discuss providing the information to investors with Goettsche or Medlin.  Weeks knew the amounts BCN was paying to Weeks for the equipment that Bitfury was hosting.  Bitfury was charging less than Bitmain based on what Weeks knows.  Weeks did not know the terms of the BCN agreements with Bitmain Warranty.

50. Weeks oversaw the data center in Georgia that was filled with BCN mining equipment under a company called GeoServers.  Weeks also knows that the Montana facility had power pointed to the BCN pool.  Weeks does not know any details about BCN's activities with Genesis Mining.  One of the Markos from Genesis Mining was at a BCN event in Kuala Lumpur.  Weeks is not sure about all the details regarding the agreement between BCN, Yoshi, and Bitmain.  Weeks knows that Yoshi knew the manufacturer at Bitmain, Jihan.  Yoshi told Weeks that every time Weeks saw him.  Weeks saw Yoshi at a BCN event in Korea.  Weeks knows Yoshi did a lot of business with Bitmain.

51. Weeks was involved in the ownership structure of Cryptowatt Mining when it was first being formed.  At that time, Burrell was in charge and was changing everything around all the time.  Burrell told a lot of lies.  Weeks was involved with Cryptowatt in the beginning but does not know how it ultimately ended up.

52. Weeks attended multiple BCN events with Medlin and Goettsche.  He was at the events in Korea, Malaysia, Japan, and Iceland.  Goettsche was present at these events.  Goettsche was in Korea twice and in Iceland.  Medlin was the front man for BCN.  Medlin would do the presentations on stage and had a banner displayed that named him the CEO of BCN.  Goettsche was completely unknown at the BCN events.  No one knew who Goettsche was and he would sit there and chuckle at that notion.  Goettsche wanted to be behind the scenes and not take any glory.  Goettsche did not tell people his role in BCN.  Weeks, Abel, and Medlin were probably the only ones at the events that knew Goettsche was the owner of BCN.  At the events, Goettsche would just sit at a table, and appear to simply be an attendee.  Goettsche never got up on stage.  Weeks remembers at the BCN event in Iceland at the Blue Lagoon, Goettsche swam up to Weeks's team and asked if they could explain bitcoin to him.  Weeks's whole team did not know Goettsche was the owner of BCN.  Goettsche got a kick out of pretending to not be the owner of BCN and joke with people.  Goettsche did not tell Weeks's team the truth about who he was.  Weeks may have mentioned that to his team afterward.

53. BCN was a billion dollar bitcoin company and Weeks is not sure why Goettsche would not be proud to be the founder of BCN.

54. Goettsche tried to keep his name off of BCN.  Medlin signed everything.  Goettsche was the same with his real estate investments.  Goettsche did not put real estate in his own name and would have Matt Morrow or some sort of trusts buy the real estate.

55. Medlin, on the other hand, loved the glory.

56. Weeks met Travis Bott (Bott) in Salt Lake City.  Weeks was the one that told Bott about BCN and introduced him to Goettsche.  Goettsche and Bott hit it off and soon after bought a Forever Green MLM position from each other.  Weeks thinks Goettsche sold his position in Forever Green to Bott, but he is not positive of that.  After Goettsche and Bott became friends,  Bott started running customer service for BCN.  Matt Grimmer, their attorney, was creating companies and paperwork for BCN.  Weeks thinks Bott had an arbitrage trading software that he tried to sell to Goettsche.

The proffer concluded at approximately 10:59 a.m. ET.

Leo Rovensky
Special Agent

# Exhibit E.

Certificate of Service (Filed February 26, 2025)

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

**United States of America,**
**v.**
**Jobadiah Weeks,**
Defendant.

**Case No. 19-cr-877-CCC**
**Hon. Claire C. Cecchi**

# CERTIFICATE OF SERVICE

I, **Jobadiah Weeks**, certify the following:

## 1. Service of September 5, 2024, Records Request

- On **September 5, 2024**, my legal counsel served a **formal records request** (Exhibit A) via **email** to:
  **AUSA Anthony Torntore**
  United States Attorney's Office, District of New Jersey
  970 Broad Street, 7th Floor, Newark, NJ 07102
  **Email:** Anthony.Torntore@usdoj.gov
- The request **explicitly sought the Special Agent's Report (SAR) from April 19, 2019**, along with **additional grand jury materials** related to my case.
- **As of February 24, 2025, the government has failed to provide these materials since the initial request on September 5, 2024.**

## 2. Service of February 13, 2025, Request for Clarification Letter

- This filing also references my **February 13, 2025**, **Request for Clarification Letter**, (Exhibit B) which was previously served via email and remains unanswered. I served the **Request for Clarification Letter** via **email** to:
  **AUSA Anthony Torntore**
  United States Attorney's Office, District of New Jersey
  970 Broad Street, 7th Floor, Newark, NJ 07102
  **Email:** Anthony.Torntore@usdoj.gov
- **As of February 24, 2025, the government has failed to respond** to this request.

Initial
JW

## 3. Service of Motion to Compel Discovery

- This filing references my **February 13, 2025, Request for Clarification Letter**, which was previously served via email and remains unanswered.

- On **February 26, 2025**, I filed the Motion to Compel Discovery, along with **all attached exhibits (A-L)**, via the Court's CM/ECF system and served a complete copy upon:

  **AUSA Anthony Torntore**
  United States Attorney's Office, District of New Jersey
  970 Broad Street, 7th Floor, Newark, NJ 07102
  **Email: Anthony.Torntore@usdoj.gov**

- Additionally, a courtesy copy of the motion and exhibits was sent via email to AUSA Torntore on the same date.

I declare under **penalty of perjury** under the laws of the United States that the foregoing is **true and correct**.

**Dated:** February 26, 2025

**Respectfully submitted,**

Jobadiah Weeks, Pro Se
Electronically Signed via DocuSign

Signed by:

*Joby Weeks*

87866A420DB4490...

**Address**:
11627 West 74th Way
Arcada, Colorado 80005

**E-mail:** silenceweeks1@gmail.com

# Exhibit F.

Meeting Notes April 19, 2019

, Joby, Leo, Amjad                    Restaurant, Ritz Hotel Washington DC
                                                        4/19/2019  7:35 PM

 made introduction and left

Father Christian school teacher in CO

Mom Amway then Brad MD in Seattle – Vitamins sales all over the world – first in CO and MA and made $1M.  Took company public

"Mannatec Tech" – Powder in drinks, bars, etc…  Hope bar

"Manna Relief Ministries" distributed it worldwide

60 minutes does story on them.  TX AG sued tem for claims – 2004

Stock plummeted, made deal & stock recuperated.

Many friends had tax trouble in those days and got into anti-tax groups

USA Corporate is a Corporation – Republic & State.  US is only 10 miles around Washington DC.

14th Amendment created US Citizen.

Money used to be backed by Gold & silver, now bonds backed by birth certificates.  We are all held as collateral for all the dept.

He fell down rabbit hole with Joe Banister (former IRS-CI) protester.

Went to IMF Decoders to decode his tax files

Tried to help people quit smoking & bought electronic cigarettes from China then took back seat on it.

Writes a paragraph for each month of his life and keeps them.

Partnered with guy on energy drink "Neon" & partner ripped him off for $1M.

Read Ron Paul books and started supporting him

Went to Island and claimed it.  Libertyland  libertyland.org

Income tax is not a just tax because it implies you do not won yourself, the government owns you.

Wanted to support Ron Paul.  Registered as Republican and became a registrar and got elected to national convention from CO & met Ron Paul.

Created silver coins and released them.  Then put Ron Paul's face on coin.

Rented Limo & promoted Ron Paul in 2008 and paid $50k X 2 to rent it.  Charged on his Visa and AE cards.  Should have been on $50k.

Became friends with Ron Paul who told him to do things at local level.  Collected signatures in CO to legalize weed.

Put together $5M in silver & gold.  FBI seized it all in 2010-12

Made a time backed currency & got 100 businesses to use it and paid them 100 of this currency to use it.

Someone told him about TOR and BTC.  He gave $200 to buy BTC @ $0.85.  He was told to go to Silk Roads to purchase BTC with Green Dot Cards.  250 BTC in his account on Silk Roads around 2010.  Silk Roads account went to $50K for 250 BTC.  Silk Roads got raided & lost BTC.  Tried to get it back from FBI but did not get it back.

Friends with Roget Ver.  Free State Project for NH and meet people.

Friends with Patric Byrne from Overstock.com

Worked with IEA sub of NRG power company.  Independent Energy Alliance.

USA_19877_04006418

Signed up customers to buy solar energy.  IEA contract was stopped & NRG took customers.

Elevate Solar started solar panels on houses to generate energy.  Then wanted to mine BTC & use solar power for power.

Meet Susie Mai & Bill Tai (lives in SF) with Mai-Tai Company at a party and talked about BTC.  They ran Bitfury to mine BTC.  Kept asking to purchase a box to mine BTC and after 6 months purchased one box.  They for $1M for one box.

In 2014, a friend, John, told him about Bitclub in Vegas to mine BTC.

Met Russ who said Bitmain sold them equipment.

Joby brought Russ to Bitfury t buy data center portions.  They purchased a portion of the data center & Bitfury hosted for them (Bitclub).

Bitfury then told them they have to take position of equipment because they did not want to run the data center for them.

Bitclub had not incorporated or articles or anything, just a club to mine BTC.

Bitclub was shares in mining pool.  Joby got no answers when he asked about procedures.

You could not join because from USA, Regulators would say it was a security.  Set data centers in Georgia and other countries.

In 2018, BTC crashed and no longer worth mining.

Bitclub doesn't want to deal with Bitfury anymore because they keep coming up with new chips and they have to keep upgrading.

Russ Medlin runs MLM for Bitclub, lives in Asia

Joe Abel MLM for Bitclub, best friends with Russ.

Joby worked MLM side of Bitclub.

Bitclub ordered equipment from Bitfury but Bitfury did not want to host anymore, so Joby tried to find a new location.

Kevin Washington, son of Dennis Washington (copper mine) & Dan Burrel started company called "crypto watt."  75 megawatt plant.   Crypto watt holds title bot land & equipment.  Joby was supposed to get 3% but got ripped off.  In Butte Montana.  They, Kevin & Dan, violated contract & Bitclub got mad @ Joby for it.

Price of equipment went down because BTC dropped.  Russ & Matt Getche from CO were signers for Crypto Watt.

Matt & Russ said to shut down Georgia plant & fire the 50 employees because BTC dropped.  June 2018 power bill not paid.  Tried to get VAT refunded to pay Georgia Power Bill.

Joby got hacked by transvestite in Philippines & went to SF FBI to get help to get it back but they didn't do anything.  They did notify him they are still working on it.

Joby's name is on power bill in Georgia for Bitclub.

$285,000 power bill for June.  Average bill was $1M per month for power.  Paid 18% VAT.

Bitclub does not want the Bitfury boxes & told Joby to just sell it back to Bitfury but they don't want it back.

Joby signed up as distributor for Bitclub.

Joby bought equipment from Bitfury & sold it to Bitclub.

Bitclub would send money in BTC to Joby and he paid BTC to Bitfury.  Bitfury said they would not sell to anyone but Joby.

USA_19877_04006419

Joby got 3% commission on purchases from Bitfury.

Joby told Bitclub to put serial #s on each piece of machine & have them mine to owner's wallet directly.  They said no.

Boxes generate BTC & it goes to Bitclub wallet & expenses would be paid then rest to clients.

Only purchased 2 to 3 times new equipment from Bitfury.  Bitfury sent equipment in waves.  Mining earnings settled 30 days after purchase since it took time to ship and get up & running.

1 M people - $500 minimum to get in each.  Does not know about internal controls of Bitclub.  They would not answer him when he asked.

Bitclub has 1 M members but only 4 nodes.

"phasecore" box generates heat/electricity to power battery pack.  50 TB boxes.  Wants to sell to everyone.

Russ won't talk to Joby for over 1 year now.

Matt talks to Joby occasionally.

Cost 2.7 cents for electricity in MT and that service center is up and running.

No one owns Bitclub & it has 10,000 founders.

Russ (American lives in Philippines) and Matt (lives in CO) are partners.

To become a founder, you send BTC to Bitclub.  40% goes to buy equipment, 40% compensates MLM and 20% to Matt  Russ to run company and overhead.  20% pays staff and overhead.

Mined coins are used to pay electricity & rent then paid out.

For 1 day BTC from new buyers went to hacker's wallet about 1 ½ years ago this happened.

Stopped allowing Americans in 2015.  Bitclub started in 2014.

Smart contracts every 24 hours pays out of Bitclub wallets to investors.

Joby made powerful connections.  Met Prime Minister of St. Kitts & Dominica.  People come to him that have billions of $ in BTC.

Wants to get hackers & child porn people.  Can get into upper echelon of all these groups.  Give him persons of interest & he can find out stuff about them.  Gets calls of people with cash that want BTC without KYC.

Joined jetsmarter for $1,000 per month, but attracted too much attention.  Wants to be like Jason Bourne.

Cannabis people call him to process people's payments from cc to LTC to bank deposits.

Gets commissions from bringing people into Bitclub.  2 to 3 orders by Bitclub from Bitfury but took up to 15 months to fill in full, piecemeal.

Bitclub: you can see what is mined & paid out and what your team is doing.  $99 to join goes to 50 to Matt and 50 to Russ.  Can buy in at $500; $1,000; $2,000 or $3,500 to be a founder.  No limit on purchases.  10 days lag from when it is mined to paid out.  Matt did back office for Bitclub.  Formal orders between Bitclub and Joby and between Joby and Bitfury.  Joby has orders.

T mobile # was being hacked.  Joby made millions from Bitclub, but keeps getting hacked.  Primary source of income is Bitclub.

619-519-2208   jobyweeks@gmail.com

Has not referred anyone to Bitclub in 8 months.  You used to get commissions when they sign-up and when they got paid from mining.  Now only when they sign up.  If you get 4 per day for 1,000 purchase; you can take out 2 and 2 went to reinvest.  You get 10% of rebuys as commission.

Joby only had Georgia Company "Geo Servers" LLC which was a Georgia Company.  Joby is 100% shareholder.  Bitclub sends BTC to Joby and Joby would cash out at OSL Octagon to pay bills.  Joby was getting a fee for doing this.  Bitclub was primary source of income for Joby.

Roger Ver – straight good guy.

Give list of persons of interest to Joby & he will get info on them.

Joby bought house in St. Kitts next to Roger Ver & Patric Burns.

He is only a US Citizen.

There is no fiat at Bitclub.

Can get a meeting with Matt but not with Russ.

They, Bitclub, were looking at ATMs to exchange.

Joby has AE card & has a guy he pays in BTC who pays the AE for him.  Guy just keeps the points.

When he purchased the house in St. Kitts, banks stopped doing business with him (Chase Bank).  St. Kitts rejected his passport request.  Joby figured something was up.

Imported equipment for Bitclub and thinks it was an issue.

$400k to buy house can get passport in St. Kitts but they rejected him.

Joby will be in HK and Singapore and can do things if we want.  Can follow-up with guys that wanted to exchange cash to BTC.  $1M cash = 22 lbs.  can smuggle on private planes.

Free OS – new Silk Roads, pitching and requesting investors.  Using DASH Wants to go to conferences & get info on people in exchange for no fear of blowback.  Wants to run for office.  Wants no paperwork to worry about.

Now living off of savings only now.  Has some investments in companies, but not paying out yet.

I told Joby "you are not working for us and we are not instructing you to do anything."  You can pass into to us if you come across it.

Will be more formal with attorney if going forward.

40% really went to buy equipment by Bitclub.

Joe Abel left Bitclub.  Joe got into Dunmis which is the new better Bitclub & can raise money in USA.

Joby – "I have not filed for 20 years."  Started with Joe Banister.  Paid Joe monthly fee for representing him if audited.  Never needed and stopped paying him.

Wants to help and wants immunity going forward.

Froze Joby's / Company's bank account in Georgia because of bank account liens.

Talks via text on Facebook and regular texts.

Has contacts with OneCoin, Nick & his twin brother.  They are in Dubai.  German guys.

USA_19877_04006421

Wants encrypted way to communicate with us.  Will be on cruise with family from HK.                                                    10:54 PM end

**USA_19877_04006422**

# Exhibit G.

Special Agent's Report (SAR)

JOBADIAH SINCLAIR WEEKS
Arvada, CO 80005
SSN: 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
1000293264

Years: 2015, 2016, 2017, 2018

Violation(s):Title 26, United States Code, Section 7201

Special Agent:     Veniamin Karavchuk
Revenue Agent:   James P. Pack

# Table of Contents

Introduction .............................................................................................................. 1

    Recommended Charges And Prosecution Years ...................................................... 1

    Returns Filed And Statute Of Limitations ............................................................. 2

    Venue .................................................................................................................. 2

    Investigative Contact(S) With Subject(S) And/Or Representative(S) ......................... 2

    Other Pertinent Data ........................................................................................... 2

Theory Of The Investigation ....................................................................................... 3

Books And Records And Preparation Of Tax Return(S) ................................................. 5

Elements Of The Offense(S) ........................................................................................ 5

    Elements Of 26 U.S.C. § 7201 ............................................................................ 5

List Of Appendices .................................................................................................... 6

Disposition Of Proceeds ............................................................................................. 6

Relevant Conduct ...................................................................................................... 7

Current Lifestyle ........................................................................................................ 7

Explanation And Defense Of Subject ........................................................................... 7

Conclusions And Recommendations ............................................................................ 7

List Of Witnesses And Exhibits

**Internal Revenue Service**

Department of the Treasury
Criminal Investigation
300 N. Los Angeles St
Los Angeles, CA  90012

Ryan L. Korner
Special Agent in Charge
300 N. Los Angeles St.
Los Angeles, CA  90012

Person to Contact:
Veniamin Karavchuk
Telephone Number:
(702) 467-5787
Agent Cell Phone
(702) 467-5787
Refer Reply to:
SE:CI:WA:LA:09
Date:

IN RE:  JOBADIAH SINCLAIR WEEKS
11627 W 74th Way
Arvada, CO 80005
SSN:  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
DOB:  08/25/1981
1000293264

REPRESENTATIVE:  Adam P. Schwartz
4221 W. Boy Scout Rd.
Tampa, F 33607
Ph. (813) 229-4336

FINAL:  Prosecution

# INTRODUCTION

**Recommended Charges and Prosecution Years**

JOBADIAH SINCLAIR WEEKS - 26 U.S.C. § 7201 - 1 Count - 2015-2018

**Returns Filed and Statute of Limitations**

WEEKS did not file returns during the period under investigation. In such a case, the the statute of limitations is based on when the return should have been filed. The tax return for the earliest period under investigation, the 2015 tax year, would have been due on April 18, 2016. Therefore, the statue of limitations on the earliest tax year charged expires on April 18, 2022.


**Venue**

Although the defendant was a permanent resident in the District of Colorado during the charged tax period, he agrees in his signed guilty plea to waive and forego any and all challenges to venue in the District of New Jersey. Furthermore, the defendant understands and agrees that the charge in the Information will be filed and adjudicated in the District of New Jersey. He further agrees not to assert in any appeal, motion or collateral attack, including a motion brought pursuant to 28 U.S.C. Section 2255, any claim or argument challenging venue in the District of New Jersey to the charge in the Information, as set forth above.


**Investigative Contact(s) with Subject(s) and/or Representative(s)**

Defendant was indicted and arrested in December 2019 on charges of 18 USC 371, defrauding the government with respect to selling unregistered securities. Defendant was advised of his rights on December 10, 2019 and made custodial statements to agents on the day of his arrest.   Defendant has since proffered with agents on multiple occasions.


**Other Pertinent Data**

Plea Agreement Information – The defendant has signed a guilty plea to charges of Title 26 USC §7201. The signed plea is attached with this report.

Search Warrants – Agents conducted electronic search warrants of WEEKS' stored communications during the course of the investigation as well as a physical search warrant of his residence on December 10, 2019.

Citizenship – WEEKS is a United States citizen.

Criminal History
      1999 – Westminster, CO – Obstructing police, assault and battery.
      2004 – Boulder, CO – DUI.
      2014 – Las Vegas, NV – DUI.
      2015 – Las Vegas, NV - Reckless driving.

## THEORY OF THE INVESTIGATION

From in around 2014 until December 2019, The Bitclub Network (BCN) was a cryptocurrency cloud mining pool that used a multi-level marketing (MLM) referral structure to recruit investors worldwide. In an indictment dated December 5, 2019, out of the District of New Jersey, BCN and the indicted defendants are alleged to have been operating BCN as an illegal pyramid Ponzi scheme that generated over $722 million from investors. In addition, the indictment alleges that the defendants conspired to sell unregistered securities.

During tax years 2015 through 2018, JOBADIAH SINCLAIR WEEKS (WEEKS) was a recruiter and promoter for BCN. He sold or caused to be sold by those he recruited, BCN mining pool packages to investors all over the world. WEEKS joined as a recruiter for BCN approximately a year after it was formed, but when the scheme was still small and growing. He interacted directly with the two owners of BCN, RUSS MEDLIN (MEDLIN) and MATTHEW GOETTSCHE (GOETTSCHE). As a result, WEEKS had a rank inside BCN as a Mega-Monster, the highest rank that a BCN recruiter can have, and earned millions of dollars in MLM commissions.

WEEKS is one of the indicted principal operators of BCN. On December 10, 2019, WEEKS was arrested on charges of 18 USC 371, Conspiracy to Defraud the U.S. in violation of 15 USC 77e and 77x, selling unregistered securities. WEEKS was detained and remains incarcerated. In the course of his incarceration, WEEKS has proffered with agents on multiple occasions and has shown the ability and willingness to cooperate with the government against his co-defendants, as well as other yet to be charged co-conspirators.

The government, WEEKS and his attorneys engaged in plea negotiations and all parties have agreed that WEEKS will plead guilty to the initial charge of 18 USC 371 and to 26 USC 7201, Tax Evasion for tax years 2015-2018.

The Specific Item Method of Proof was used to compute WEEKS; unreported and corrected taxable income. The cash basis method of accounting was used for all computations.

## SOURCES OF INCOME

WEEKS received his MLM commissions in two primary methods. One way was to request for BCN to send him bitcoin to his personal bitcoin wallets by generating a withdrawal from his member back office account on the BCN website. Notably, the BCN website did not actually hold bitcoin for its members. The back-office account balances were simply internal ledger entries made by a computer programming script that did not

correspond with the actual bitcoin blockchain unless a BCN member actually generated a withdrawal request.

Another way for WEEKS to receive his commissions was to accept fiat currency directly from investors and then to credit those investors with mining pool packages by using his existing balance of earnings inside his member back office account on the BCN website. This practice is commonly referred to as "Pay-It-Forward" in the MLM industry; it is a way to withdraw earnings without having to pay transaction fees.

Agents have analyzed a copy of the BCN web server database that was obtained in the course of the investigation. The web server data with respect to WEEKS' BCN accounts was compared to the bitcoin public blockchain transactions that occurred on known WEEKS bitcoin wallets. The result of this analysis showed that WEEKS received commissions from BCN to his personal bitcoin wallets in the equivalent USD amounts of $26,299 in 2015; $185,193 in 2016; $1,458,341 in 2017; and $1,211,643 for the 2018 tax year.

Agents have analyzed bank accounts owned and operated by WEEKS from 2015 through 2018. Using a conservative approach of only confirmed investor deposits, this analysis showed that WEEKS accepted fiat currency from investors for BCN mining pool packages, in the form of Pay-It-Forward withdrawals, in the amounts of at least $25,265 for 2016 and $43,350 for 2017. In addition, WEEKS started a side business with an individual named Steven Snyder to create CBD soft gel pills for sale. WEEKS invested directly into the business, and he also redirected some "Pay-It-Forward" payments directly to Snyder. WEEKS caused $154,565 in payments to be sent directly to Snyder in 2017. As with the other "Pay-It-Forward" payments, agents are only including amounts confirmed with investor deposits.

WEEKS also earned income through other means. The main operator of BCN, GOETTSCHE, did not want his name associated purchases and contracts for equipment or mining. This afforded WEEKS the opportunity to act as a middleman, as well take a finder's fee for putting together parties interested in making deals with BCN. WEEKS primarily took his "commissions" by up charging BCN and keeping the difference between the payment received from BCN and the amounts he paid for the equipment or services. In this manner, WEEKS earned $606,850 in 2016; $9,930,584 in 2017; and $553,718 in 2018. Furthermore, WEEKS at times included stock purchases in the contracts to purchase equipment from Bitfury. These purchases were lumped together with the purchase of equipment, so it would look like the entire payment was for equipment. However, WEEKS received Bitfury stock that he did not send or disclose to GOETTSCHE or MEDLIN. In this way, WEEKS increased the "commission" he received through the equipment purchases. WEEKS received $3,102,364 worth of stock from Bitfury in 2017.

Finally, WEEKS received mining earnings from mining pools other than BCN. The main pool operators that paid WEEKS were Bitfury, Genesis Mining, and SlushPool. Agents attributed these earnings through blockchain analysis of wallets belonging to WEEKS

and sourcing deposits to mining pools. WEEKS received at least $111 in 2016; $788,154 in 2017; and $308,707 in 2018 from mining earnings.

WEEKS also had some minor amounts reported to the IRS from 3rd party institutions, including earnings from previous MLMs in which he participated as well as capital gains and losses from financial institutions. WEEKS was reported to have received $3,231 in 2015; $2,300 in 2016; and a net loss of $465 in 2018.

In total, agents can conservatively summarize that WEEKS received a value of at least $29,530; $819,719; $15,477,357; and $2,073,603 for tax years 2015, 2016, 2017, and 2018, respectively, in income in the form of bitcoin, US currency, and Bitfury stock.

WEEKS did not file tax returns for any of the years under investigation. WEEKS committed affirmative acts of evasion to facilitate hiding his earnings from the IRS.

WEEKS signed a plea deal pleading guilty to one count of Title 26 USC §7201 for the tax years 2015-2018, and one count of Title 18 USC §371. WEEKS has agreed in his guilty plea to sign a Form 870, Waiver and Acceptance of Tax Assessment, accepting responsibility for his tax liability for all four years prior to sentencing.

### BOOKS AND RECORDS AND PREPARATION OF TAX RETURN(S)

Agents have analyzed WEEKS' BCN accounts on the BCN web server and compared this data with the transactions that occurred on the bitcoin public blockchain on known WEEKS bitcoin wallets. Agents have also analyzed bank accounts owned and operated by WEEKS from 2015 through 2018, as well as communications and contracts with other individuals involved with BCN and bitcoin mining. Please see the attached tax loss schedule.

### ELEMENTS OF THE OFFENSE(S)

### ELEMENTS OF 26 U.S.C. § 7201

1. An attempt to evade or defeat a tax or the payment thereof:

- WEEKS told individuals who invested with his business to deposit their funds in accounts in other people's names, or in the name of WEEKS' charity account. WEEKS did so in order to avoid having deposits into his personal bank account.

- WEEKS purchased a property in St. Kitts in order to obtain a St. Kitts citizenship. He told agents he did so to stop from having to pay US taxes.

- WEEKS used bitcoin to receive payments and pay for expenses in order to avoid using financial institutions and having his earnings reported to the IRS.

2. An additional tax due and owing:

- WEEKS has a tax due and owing, as established by the Specific Item Method of Proof and corroborated by witness statements, of $7,128,987 for the 2015 to 2018 tax years. Please see the Form 4549, Revenue Agent Report, and Tax Loss Schedule for the full calculations.

3. Willfulness:

- At all times relevant to the investigation, WEEKS had access and control over the bank accounts, his bitcoin wallets, and his BCN account used when calculating the tax loss.

- WEEKS has not filed returns for the 2015-2018 tax years. When questioned about it, WEEKS admitted to agents that he knew he owed taxes on his earnings and did not file or pay income tax.

- WEEKS bought a St. Kitts property in order to get a St. Kitts citizenship. WEEKS told agents that he wanted to avoid issues with his US taxes.

- BCN created year-end statements for investor activity for BCN accounts. WEEKS told agents he knew these statements were like 1099s, and they were created in order for account holders to pay taxes.

- On September 24, 2020 WEEKS signed a plea agreement accepting responsibility for his role in evading his taxes for the 2015 to 2018 tax years.

Additionally, for all elements referenced above, please see the attached Tax Loss Schedule, Form 4549 (Revenue Agent Report), signed Guilty Plea, and Draft Information.

## LIST OF APPENDICES

Please see attached master file transcript for WEEKS, Form 4549 (Revenue Agent Report), Tax Loss Schedule, Signed Guilty Plea, and Draft Information.

## DISPOSITION OF PROCEEDS

During the investigative period and including tax year 2015-2018, WEEKS lived a lavish lifestyle as a result of his earnings from BCN. WEEKS travelled all over the world and purchased property in the U.S. and internationally.

## RELEVANT CONDUCT

There is relevant conduct from the 2019 tax year in the amount of $445,395.96 in unreported income and a tax due of $130,296.00 Please see the attached Tax Loss Appendix and Revenue Agent Report for more information.

## CURRENT LIFESTYLE

WEEKS has been detained in Essex County jail without bail since his arrest on December 10, 2019. As part of his guilty plea, WEEKS will seek a bail package that will include close monitoring from pretrial services.

## EXPLANATION AND DEFENSE OF SUBJECT

None.

## CONCLUSIONS AND RECOMMENDATIONS

Veniamin Karavchuk
Special Agent
Cellular (702) 467-5787

**Approved:**

Oleg Pobereyko
Supervisory Special Agent, Criminal Investigation
300 N. Los Angeles St
Los Angeles, CA  90012
Cellular (213) 256-3307

# Exhibit H.

Docket Entry 15: Attorney Notice of Appearance (January 7, 2020)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

                    v.                            Hon. Claire C. Cecchi

MATTHEW BRENT GOETTSCHE,        CRIMINAL NO.:  19-877-CCC
[DEFENDANT TWO],
JOBADIAH SINCLAIR WEEKS,
JOSEPH FRANK ABEL, and
SILVIU CATALIN BALACI

To the Clerk of this Court and all parties of record:

     Enter my appearance as counsel in the case for Jobadiah Sinclair Weeks.

     I hereby certify under penalty of perjury that I am a member in good standing of the bar of the following Courts since the indicated year of admission and that I am not the subject of suspension or disbarment from any Court.

See attached _____    See attached _____
Court(s)                                 Year(s) of Admission

Date:  January 7, 2020

                                 Michael L. Yaeger
                                 CARLTON FIELDS
                                 405 Lexington Avenue, 36th Floor
                                 New York, NY 10174
                                 Telephone:  212.785.2577
                                 Facsimile:  212.785.5203

## COURT MEMBERSHIPS
## MICHAEL L. YAEGER

| Court | Date Admitted |
|---|---|
| New York State Bar (ID No. 4250304) | July 26, 2004 |
| U.S. Court of Appeals for the Third Circuit | July 17, 2005 |
| U.S. Court of Appeals for the Second Circuit | February 2, 2009 |
| U.S. District Court for the Southern District of New York | December 8, 2005 |
| U.S. District Court for the Eastern District of New York | February 25, 2016 |

# Exhibit K.

February 26, 2025, Letter to AUSA Regarding Seized Assets

**February 26, 2025**

**VIA EMAIL**

AUSA **Anthony Torntore**
United States Attorney's Office
District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

**Subject: Request for Immediate Return of Seized Assets – U.S. v. Jobadiah Sinclair Weeks (19-cr-877-CCC)**

**Dear AUSA Torntore,**

I am formally demanding the **immediate return** of my **seized assets**, which were confiscated by federal agents during the execution of a **search and seizure warrant on December 10, 2019**, at **11627 West 74th Way, Arvada, Colorado**. This request follows **over two years** of communications with **David Stone of Stone Magnanini**.

On **January 14, 2025**, my legal representative **David Stone** was informed that **details on the seized assets' status and disposition would be provided shortly**. However, **no such details or assets have been returned**, necessitating this **formal demand for immediate action**.

Additionally, I refer to **Exhibit C**, the letter dated **September 5, 2024**, from **David Stone to your office**, requesting **records related to my cryptocurrency**. This letter **reinforces the need for transparency** regarding the handling of my seized assets.

# 1. Seized Property and Its Status

The government executed the **search warrant under Judge Scott T. Varholak's authorization** and seized, among other items:

- **Precious Metals:** Gold and silver coins, bullion, and bars.
- **Cryptocurrency:** Various digital assets stored in hardware wallets, computers, and online accounts.
- **United States Currency and Other Valuables:** Stock certificates, cash, and other property.

These assets **remain in government custody**, despite the fact that:

- **They are not subject to forfeiture** under my **plea agreement**.
- **There has been no forfeiture action initiated** against them.

1

- **The government has acknowledged intent** to return the property **but has not followed through**.

Additionally, I refer to **Exhibit A** (dated **December 10, 2019**), containing a **detailed inventory of items removed by the IRS** from **11627 West 74th Way, Arvada, Colorado**, and **apparently stored in the Denver Holding Office**.

# 2. Demand for Immediate Return of Physical Assets

I formally request the **immediate return** of my **physical assets**, including:

- **Gold and silver bars and coins.**
- **Stock certificates.**
- **Cash and other monetary instruments.**

These assets are **not contraband, have no evidentiary value, and should be promptly returned**.

## Response Deadlines:

I expect:

1. **Written confirmation within three (3) business days** regarding the **status and location** of the physical assets.
2. **A plan for the return of the physical assets within ten (10) business days** from the date of this letter.
3. **The actual return and delivery of all non-forfeitable physical assets within fifteen (15) business days**, accompanied by a **complete inventory list** signed by a **responsible government official** verifying that **all items are intact and accounted for**.

Failure to comply will result in **legal action without further notice**.

# 3. Demand for Cryptocurrency Accounting and Transfer

The government also seized multiple cryptocurrency assets, which were stored in **cold storage wallets and hardware wallets**. The **Crypto-Seizures Memo (Exhibit B)** details the government's attempts to **access and transfer these assets**, which require **further clarification and documentation**.

## Transferred Cryptocurrencies

According to **Exhibit B (Crypto-Seizures Memo)**, the following amounts were **successfully transferred** and **must now be returned to my designated wallets** within **ten (10) business days**:

- **2.9765462 Bitcoin Cash (BCH)**
- **3.6704622 Bitcoin (BTC)**
- **48.916537 Ethereum (ETH)**
- **91.851854 Litecoin (LTC)**

The **seized cryptocurrencies** must be **returned to the following designated wallet addresses**:

- **Bitcoin (BTC) Wallet:** bc1qma0h6ny57l5xyvggzy2lpdf9tmnu3hk2v3939t
- **Ethereum (ETH) Wallet:** 0x9b56Fd9857851FDe90F4ab5606F394884BAA8526
- **Litecoin (LTC) Wallet:** LerGugfaoqiiPuedSVZpFZRcuiCPJuydcf
- **Bitcoin Cash (BCH) Wallet:** qzdtpsmvr39sdg4cz6kz0qnjrk2hjshyrsv5xd0262

All cryptocurrency transactions must be **conducted via verifiable on-chain blockchain transfers**. The government must provide:

- **A signed declaration identifying the responsible official executing the transfers.**
- **A forensic audit verifying that no unauthorized withdrawals or modifications were made.**
- **Complete transaction logs documenting all movements of my seized cryptocurrency holdings.**

## Clarification on the Seized Jaxx Wallet and Bitcoin Holdings

Additionally, I request **immediate clarification** regarding the **Jaxx wallet that was seized by the government**.

The **September 3, 2021 email** between **David Stone and AUSA Torntore** confirms that **this wallet contained approximately $1 million worth of Bitcoin (BTC) at the time of seizure**.

Accordingly, I demand the **official seizure logs and transaction records from government-controlled storage accounts**.

According to records, including **correspondence between David Stone and AUSA Anthony Torntore on September 3, 2021**, this wallet contained **approximately $1 million worth of Bitcoin (BTC) at the time of seizure**.

- Given the **average Bitcoin price in December 2019** was **approximately $7,571.62**, this amount would have been valued at **approximately 132.06 BTC**.

3

- The **email correspondence confirms that I no longer had access to the Jaxx wallet** due to **lost login information** at the time of my **financial disclosure**.

However, the **government's seizure of this wallet**, along with **other cryptocurrency-related storage devices**, places a **direct obligation on the government to account for these assets in full**.

**Accordingly, I demand:**

- A **detailed report on the current status** of the Bitcoin and any other digital assets stored in the **seized Jaxx wallet**.
- A **full transaction history** showing whether the **government accessed, transferred, or otherwise modified** the holdings in the **Jaxx wallet**.
- A **signed declaration under penalty of perjury** from **responsible government agents**, confirming whether the **Bitcoin in the Jaxx wallet was moved, liquidated, or remains in custody**.
- A **forensic audit** of all seized cryptocurrency wallets and storage devices, including:
  - **Ledger HW.1**
  - **Trezor Wallet**
  - **USB Bitcoin Storage Drive**
  - **BTC Cold Storage Coin**
  - **Verifying that no unauthorized transactions were conducted while in government custody**.

The **government's failure to provide a full accounting** of these assets constitutes **deprivation of property without due process**, as well as a **violation of**:

- **18 U.S.C. § 1519 – Obstruction of Justice**
- **18 U.S.C. § 1001 – False Statements** (if any misrepresentations regarding the status of these assets have been made).

Given the **significant monetary value involved** and the potential **unauthorized handling of these assets**, I demand an **immediate response detailing the exact status of the seized Jaxx wallet and its Bitcoin holdings**.

# 4. Discrepancy in Bitcoin Transfers – Fraud & Theft Notification

According to the **Crypto-Seizures Memo (Exhibit B)**, the government reported transferring **3.6704622 BTC** from the seized wallets. However, an independent review of **Blockchain.com transaction history** from **wallet address 14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi** reveals that **an additional 4.99995661 BTC was transferred**, which is **not reflected** in the official Government report.

The **government must immediately return the missing 4.99995661 BTC** to my designated **Bitcoin wallet** and provide:

- **A full forensic audit of all Bitcoin transactions** from the seized wallet **since December 10, 2019**.
- **A notarized declaration under penalty of perjury** explaining whether the missing BTC was **moved, liquidated, or remains in custody**.

Failure to return this **missing BTC** within **ten (10) business days** will be treated as:

- **18 U.S.C. § 1519 – Obstruction of Justice** (for falsifying seizure records).
- **18 U.S.C. § 1001 – False Statements** (for knowingly misrepresenting Bitcoin transactions).
- **18 U.S.C. § 641 – Theft of Government Property** (for unlawfully converting seized assets).

If a full and **satisfactory response is not provided**, I will initiate **immediate legal action, including criminal and civil complaints** against all responsible government personnel.

# 5. Demand for Computers & Hardware

In addition to the seized physical assets and cryptocurrency storage devices, the Government confiscated multiple **computers, external storage devices, and cryptocurrency-related hardware**. Based on **Schedule A and Attachment B**, the following items were taken from my residence at **11627 West 74th Way, Arvada, Colorado:**

**Computers:**

- **Apple MacBook Pro (Serial Number: W8944JH766E)**

**External Hard Drives and USB Storage:**

- **Western Digital MyBook USB Hard Drive (Serial Number: WCC7K1LSFTTP)**
- **Generic USB Thumb Drive (Serial Number: Y1178-T48L-B52L-V3)**
- **Sandisk Extreme SD Card (Serial Number: BM1235222025G)**

**Cryptocurrency-Related Storage Devices:**

- **Trezor Bitcoin Wallet Hardware**
- **Ledger HW.1 Wallet Hardware (Cryptocurrency Storage)**
- **Ethereum Cold Storage Coin**
- **BTC Cold Storage Coin**
- **USB "Bitcoin" Storage Drive**
- **BTC Cryptocurrency Indicia Storage Cards**
- **Password Recovery Cards for Bitcoin**

**Mobile Devices:**

- **Huawei Cell Phone (Serial Number Unknown)**

These devices contain **critical financial data, legal documents, and access credentials necessary for my financial and legal affairs.** Their continued unjustified retention violates **due process rights and constitutes unlawful deprivation of property.**

I formally demand the **immediate return of all computers, storage devices, and mobile phones**, as there is **no legal basis for their continued seizure.**


# 6. Legal Basis and Consequences of Non-Compliance

Under **Federal Rule of Criminal Procedure 41(g)** and **Fifth Amendment Due Process protections**, the government **cannot indefinitely withhold property** without a **valid legal basis**.

**Legal Precedents Supporting the Return of Seized Assets:**

- **Luis v. United States, 578 U.S. 5 (2016)** – The **government cannot deprive** a defendant of property **absent a lawful basis**.
- **United States v. Chambers, 192 F.3d 374 (3d Cir. 1999)** – **Unjustified government retention** of property **mandates return**.
- **United States v. Rodriguez-Aguirre, 264 F.3d 1195 (10th Cir. 2001)** – The government **must justify delays** in returning property.
- **United States v. $8,850, 461 U.S. 555 (1983)** – The **unjustified retention of property without forfeiture proceedings violates due process**.
- **United States v. 50.44 Bitcoins, No. 16-265, 2017 WL 8792550 (D.D.C. May 22, 2017)** – Cryptocurrency **is subject to the same constitutional protections** as traditional financial assets and **cannot be indefinitely seized** without due process.
- **United States v. Approximately 64,695 Bitcoin, No. 21-CR-321 (S.D.N.Y. 2021)** – **Reaffirming due process protections** for cryptocurrency asset seizures and **mandating government compliance** in asset returns.

**Procedural and Substantive Default by the Government**

As the **Government is now in procedural and substantive default**, this demand **requires immediate compliance**. The continued **unlawful retention** of my property, despite the **absence of any valid forfeiture order** or **legal justification**, constitutes a **direct violation of**:

- **Federal Rule of Criminal Procedure 41(g)** (requiring return of unlawfully seized property).
- **Fifth Amendment Due Process protections** (prohibiting unlawful deprivation of property).

I hereby set a **strict deadline of ten (10) business days** for the **full return of all assets listed in this letter**.

**Legal Actions to Follow Non-Compliance**

If the Government **fails to provide full compliance within 10 business days**, I will **immediately** proceed with formal legal action, including:

1. **Filing a motion under Rule 41(g)** for **return of property**.
2. **Pursuing criminal complaints** for **theft, obstruction of justice, and fraud**.
3. **Submitting a formal complaint** to the **DOJ Inspector General** regarding this **misconduct**.
4. **Seeking compensatory and punitive damages** for the **wrongful deprivation** of my assets.

The **Government's failure to comply** will be treated as **willful misconduct**, and **those responsible** will be held **personally liable** under:

- **Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971)** (establishing liability for federal officials engaging in unlawful conduct).

**No further extensions or excuses will be accepted. Compliance is mandatory.**

**Respectfully submitted,**
**Jobadiah Weeks**

**Exhibits:**

- **Exhibit A (December 10, 2019)**: Items Removed by the IRS
- **Exhibit B (December 10, 2019)**: Crypto-Seizures Memo
- **Exhibit C (September 5, 2024)**: Letter from David Stone

7

# Exhibit L.

December 10, 2019: Crypto-Seizures Memo.



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

# Memorandum of Activity

---

**Investigation #:** 1000293264  
**Investigation Name:** Jobadiah Weeks

**Location:** Residence of Jobadiah Weeks  
11627 W. 74th Way  
Arvada, CO

**Date:** December 10, 2019  
**Time:** Various  
**Participant(s):** Adam Rutkowski, Special Agent  
Victor Vanacore, Special Agent

Attached are documents containing screenshots representative of the cryptocurrency seizures Special Agent Vanacore (witnessed by SA Rutkowski) were able to affect at the Weeks' Residence during the Search Warrant on December 10, 2019. This document and its related attachments should be preserved as an official account of the activities associated with these seizures:

1. There were multiple assets left in the Exodus Wallet, which were not seized, as there were no seizure wallet addresses which had been provided to send the funds to. Additionally, the dollar amounts were deemed to be below the threshold after speaking with the Command Post.
    a. A Final Screenshot showing the balances in these accounts is included in the .pdf file.
    b. The Exodus wallet was restored based upon a .png picture file located on an SD card which was found during the Search Warrant on the room which had been identified as belonging to Joby Weeks. The .png file was a picture of the backup seed phrase.
    c. The seed phrase was used to restore the Exodus Wallet onto a cold computer.
    d. After the transfers were affected by SA Vanacore, the Exodus Wallet was deleted from the Cold Computer.
    e. Any further access to the remaining funds on the Exodus Wallet can only be gained by using the .png seed phrase picture.
2. One Bitclub Club Coin Ledger Nano S was located. Two hand-written seed phrase cards, manufactured by Ledger, were located.
    a. Attempts were made to restore the Ledger Nano S using the seed phrase. Agents were successful in that they could see the device potentially contained Bitcoin, Ethereum, Club Coin, and possibly two other assets. However, the agents were unable to determine the quantity of these assets using the device without plugging the device into the cold computer.
    b. Agents attempted to plug the device into a cold computer using the required software, Ledger Live.
    c. It was determined that the firmware on the device needed to be updated. Agents were unsuccessful in upgrading the firmware.

    d.   Therefore, agents used the wallet software, Electrum, to attempt recovery of the Bitcoin assets associated with each of the two seed phrases. This attempt only provides potential access to the Bitcoin. Access to the other potential cryptocurrencies associated with these wallets was not attempted.

    e.   For one of the two seed phrases, agents were successful in finding bitcoin. Agents transferred this bitcoin to the seizure addresses provided in advance of the enforcement action.

3.   Access to the Bitcoin using Electrum has to be conducted by creating three separate wallets – One Legacy Wallet, a P2SH SegWit Wallet (containing bitcoin addresses starting with the number 3), and a bech32 SegWit Wallet (containing bitcoin addresses starting with "bc1".

    a.   Given time constraints while on site, agents are unsure if they tried all three methods using each seed phrase. Also, there are additional configuration settings which must be used in order to properly gain access to any of these assets. If the configuration settings are not put in place correctly, the assets would not appear, even if they are actually present.

    b.   Therefore, it is recommended that at a later date in time, the government use another Ledger Device to restore each of the seed phrase cards to. Once the restore has occurred successfully, all assets available that are connected with that seed phrase (which represents a private key) should become viewable and accessible.

4.   Other potential physical cryptocurrency assets were seized. Most of these were things like actual physical coins which contained either public or private Bitcoin keys, or both. Because of time constraints involved with the search, these items were physically seized, and no attempt was made to quantify their value, or to seize any potential funds which may be present. As such, a separate attempt should be made at a later date to determine whether there are any funds associated with these physically seized items.

5.   Each of the aforementioned seizures was conducted by the Seizing Agent at our Site – SA Vanacore. SA Rutkowski and SA Vanacore were each present and watching during the entire analysis and seizure process.

6.   The attached screenshots are considered to be the evidence of the activities conducted related to the items discussed in this memorandum.


Adam Rutkowski
Special Agent


Victor Vanacore
Special Agent











$17,410.88

Home

Wallet

Exchange

Backup

Aragon
492.694 ANT

Augur
103.89077 REP

Basic Attention Token
4,922 BAT

Bitcoin Cash
2.9765462 BCH

Dash
18.643134 DASH

Decred
17.590321 DCR

Dogecoin
899,543.45 DOGE

Ethereum
48.916573 ETH

Ethereum Classic
26.5 ETC

Golem
5,087.4386 GNT

Litecoin
91.851854 LTC

OmiseGo
0.7446005 OMG

SALT
229.94833 SALT

Settings

Help

2.9765462 BCH
$618.24 USD

Send        Receive

PRICE (30D)

DESCRIPTION

+ 2.97654615

PRIVATE KEYS                                            ×

## Exodus Bitcoin Cash Private Keys

Close

| Address | Path | Balance | Private Key |
|---|---|---|---|
| qzcszz6ysdu7d5p2tu5xlh4njlavnx8yku0zf7pzz7 | m/0/0 | 2.97654615 | L3fR9shvfp3ns5AQ35MUFxP2mkLhCt3XYrqUwgH9zcTgF4xoV8tf |

Close





Are you sure you want to

# Send 618.58 USD?

| | |
|---|---|
| Sending: | 2.97653485 BCH |
| Value: | 618.58 USD |
| Address: | 12tsacDyVoiDAva1dUFYTkUGhtTZPYRniN |

Back    Send



EXODUS 19.12.5
Success!
Your Bitcoin Cash has been sent
OK




# Exodus Bitcoin Private Keys

Close

| Address | Path | Balance | Private Key |
|---|---|---|---|
| 14uKvjJAYPWHXCn8SyR7k8Px7dWXTTjGaB | m/0/0 | 0 | Ky797MHpvu7Ar1eN7LhuVsEBSwFFqomip8zgJzaka1hp5gSHgPoc |
| bc1qqad2mvfn2wewd8cavn7602h9g06r6hfk0g5n6c | m/0/0 | 0 | KwVs4krgY78p81rfzn3b4ssK3kQf23ZjzCcpUhaDTVnDxpFYcvuw |
| 12UhenKVdMzkAHewusS3rBHENJjZEK8ook | m/1/0 | 0 | L2rSz6Yu7PRa3JCLmxSqMvq87Aq5ihsKmwBzNKmQfDcLUdEGEc8s |
| 13g5vsZd42uwTwsQc18dCzJ9cgxXmBCsXg | m/1/1 | 0 | L5aTKjk8FUba9VDP9bWfA9DTVEtK4imBLzYe8zghSkQtPf7KGtXS |
| 1AFZqnSRdsWmn95NHGja8kJteihmCnwJdb | m/1/2 | 0 | KwDos6dx5Vh33MVVoB6AxitkEBwMwr6ackSCcynagePaZa8ACmvM |
| 1tsjQDq1QgGjt1DVe5y9QFLJBv1RsLHg6 | m/1/3 | 0 | L2cpAXQkZmb7dU7KuaCVDCi3WMGWZmjVoYKWJppc7N8SBtafUtBq |
| 14jzSRGaXDkoUWkA99gPDJ4vSmCVD1TBTB | m/1/4 | 0 | Kyt21dydc68zg3qUrZL5W2kEUwdw6bxxck3kU1LHPNqkZMJMpur7 |
| 1F8MiVcaPM74MBaCVJAbWBTgHfYoEGYf6o | m/1/5 | 0 | L1WEQECwg5wYDZyE1WXpsxHhjQLP5bucEwufUW7MCusZtCzxj8TZ |
| 1JVTnkccSo9F1ho3qcm589nPsmx7S8gwZe | m/1/6 | 0 | KxcNNbMvNszcjmPbPGWGL2oKYrWswKcS7JRFv9nSwxrMZN5RP4gg |
| 1PcG5ndUUCpu7977PRHM8AJPv1D3BsocAG | m/1/7 | 0 | L4QWNEj8HcrBSViMmfN8TjFDoRDZE41gxKhECSFBNRDoSPrT8Hxe |
| 1NDq3gnpx71igXhhiFKCR7x3eWKbfhcc1t | m/1/8 | 0 | L4eTYbQES3KPZHzUDJMGzmEyVxEvZK8otxXqsrw1KUvxc5FyvpD4 |
| 17rwZ7mZHT1zhnnppDqTgMvSRnMRFVtuEF | m/1/9 | 0 | KxKKXmQriqNUsS3MHTBmxakGLkmDVFZVMShWPGozfzxKqrRCToRh |
| 1Bzq5h94BHK32awJchuAjWP3EtGKyEhCqf | m/1/10 | 3.67046219 | L4AcAu2Bpot5dgCmwg8PwzPm5uUAnxhvFEhGCEbc6NrDvVz2GANa |

Close





EXODUS 19.12.5

14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi

3.67041619    HALF  ALL    BTC

26,544.74                   USD

**Send**

You are sending 3.67041619 BTC ($26,544.74)

Bitcoin Network Fee ( 0.230 KB )        0.000046 BTC    $0.33
Remaining Balance                        0 BTC    $0.00





EXODUS 19.12.5
Success!
Your Bitcoin has been sent
OK



# 0 BTC

$0.00 USD

**Send**    **Receive**

PRICE (30D)

DESCRIPTION

Dec 10, 2019

↗ **Sent** a minute ago                                                    3.67041619

| Date | Transaction ID | Fee |
|------|----------------|-----|
| 12/10/2019 7:14 PM | 47b721857e826dadaa2261d0c61ad40ef1ca1... | 0.0000444 BTC |

| To | Now | |
|----|-----|--|
| 14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi | $26,565.26 USD | |

Personal note                                        ?



EXODUS 19.12.5



0x09d0FDb66e815F33A2133315dDeC9F0C2922e250

48.916404894984693906    HALF  ALL  ETH

7,115.68    USD

Send

You are sending 48.916404894984694 ETH ($7,115.68)

| Ethereum Network Fee | 0.000168 ETH | $0.02 |
| Remaining Balance | 0 ETH | $0.00 |



Are you sure you want to

# Send 7,115.68 USD?

| | |
|---|---|
| Sending: | 48.916404894984694 ETH |
| Value: | 7,115.68 USD |
| Address: | 0x09d0FDb66e815F33A2133315dDeC9F0C2922e250 |

Back          Send



## Ethereum Token Warning

You have tokens that require Ethereum. Sending this will not leave enough Ethereum to send or exchange your tokens. Are you sure you want to proceed?

LEARN MORE          CONTINUE



EXODUS 19.12.5
Success!
Your Ethereum has been sent
OK









Are you sure you want to

# Send 4,037.67 USD?

| | |
|---|---|
| Sending: | 91.85073198 LTC |
| Value: | **4,037.67 USD** |
| Address: | LeNUmQpSPfMkbZffVRizeaZULHs45rmGsk |

Back    Send



EXODUS
Success!
Your Litecoin has been sent
OK







Help

Tron (old)
79 TRX

_____

Binance Coin



| | Date | Description | Amount | Balance | USD Value | USD Acquisition price | USD Capital Gains |
|---|---|---|---|---|---|---|---|
| ✔ | 2017-05-21 22:29 | | +5. | 5. | No data | | |











