# Exhibit A

Letter to AUSA Anthony Torntore, dated February 21, 2025 (Selective Prosecution & Fraudulent Misconduct Request)

**February 21, 2025**

VIA EMAIL

AUSA Anthony Torntore
United States Attorney's Office
District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

**Subject: Request for Disclosure on Selective Prosecution for Relevant Outstanding Discovery – U.S. v. Jobadiah Weeks (19-cr-877-CCC)**

Dear AUSA Torntore,

I am formally requesting full disclosure of records, internal communications, and decision-making documents related to the government's charging decisions in the BitClub Network (BCN) case. Additionally, there are **serious concerns that the prosecution engaged in fraud and perjury** by misrepresenting evidence, selectively withholding exculpatory material, and making false statements regarding the timeline and scope of my involvement. The requested information pertains to disparities in prosecution among similarly situated individuals, raising concerns that I was selectively prosecuted while others involved in similar or greater conduct were not charged or faced lesser legal consequences. Given the legal significance of these issues, I respectfully request your prompt attention and full cooperation in providing the requested materials.

## 1. Disparity in Charging Decisions Among Key BCN Figures

The **Pre-Sentencing Report (PSR) (Docket Entry 384, Jan. 7, 2025)** and **proffer memoranda (Aug. 17 & 25, 2020)** confirm that my role in BCN was significantly reduced after 2018, with Goettsche and Medlin retaining primary control. Despite this, I was prosecuted before others who had greater managerial control over BCN, raising serious concerns of selective prosecution. Moreover, the **government's failure to disclose exculpatory evidence and its potential fabrication or alteration of investigative reports** suggest elements of **fraud and perjury** in the charging decisions.

The **Indictment (Docket Entry 9, Dec. 20, 2019)** states:

> "Russ Medlin played a key role in BitClub Network's operations and finances. Despite this, Medlin does not appear to have been criminally prosecuted or reached a plea agreement, while I was aggressively pursued and charged prior to him."

Given his significant involvement, the disparity in prosecutorial treatment raises further concerns about selective enforcement.


Initial

1

I request:

1. Any internal DOJ memoranda, charging criteria, or case evaluation reports related to charging decisions in the BCN case, including discussions on DOJ's own evidentiary concerns and credibility issues related to my prosecution (**Docket Entry 396, Feb. 11, 2025**).
2. Any records or correspondence discussing my charging decision in contrast to similarly situated individuals (e.g., Medlin, Goettsche, Abel).
3. All DOJ, SEC, or IRS discussions on why certain individuals were not charged at the same time as I was.
4. Any internal communications regarding the government's decision to prosecute me while delaying or dismissing charges for others.
5. All IRS, DOJ, and SEC internal discussions regarding tax-related enforcement decisions in the BCN case, including why certain individuals were not prosecuted for tax violations while I was. This includes any records discussing civil vs. criminal enforcement strategies applied to BCN members.
6. All DOJ, SEC, and FBI internal communications discussing my **level of involvement compared to Medlin, Abel, Vausē, and Hidalgo**.

I specifically request the disclosure of:

7. All DOJ, SEC, IRS, and FBI records discussing charging decisions related to Russ Medlin, including internal deliberations on whether he should face prosecution, receive a plea agreement, or be excluded from indictment.
8. Any records confirming whether Medlin was offered a plea deal, a non-prosecution agreement, or was otherwise treated differently from other BCN members.
9. Government correspondence or memoranda evaluating Medlin's role in BCN in comparison to mine and other co-defendants.
10. Any internal justification provided for the timing and nature of the government's prosecution strategy regarding Medlin, including whether potential cooperation agreements were discussed or considered.

Additionally, in **Oyler v. Boles, 368 U.S. 448 (1962)**, the Supreme Court held that selective prosecution violates equal protection if the government enforces laws against some individuals while ignoring others engaged in similar conduct. The fact that Russ Medlin, despite his significant managerial role in BCN, has no documented plea agreement while I was aggressively prosecuted strengthens the claim of selective enforcement.

The DOJ's internal guidelines, specifically the **Justice Manual Section 9-27.000 - Principles of Federal Prosecution**, emphasize the necessity of transparency and fairness in prosecutorial decision-making. These guidelines highlight that prosecutorial decisions must be based on an individualized assessment of the facts and circumstances of each case, ensuring that actions are free from improper considerations. Similarly, **Section 9-28.000 - Principles of Federal Prosecution of Business Organizations**, underscores the DOJ's commitment to consistent and transparent charging decisions to maintain public confidence in its prosecutorial practices. While these guidelines do not explicitly reference

"selective prosecution," they reinforce the need for reasoned and justifiable decision-making,
which is relevant to Defendant's claim of disparate treatment.

Pretrial Detention Disparities:

In addition to selective charging concerns, my pretrial detention and bail conditions were
notably harsher than those of similarly situated BCN defendants. Russ Medlin remained
unsealed until June 2020, and Silviu Catalin Balaci was granted international travel while I
remained in custody. These discrepancies reinforce the broader selective enforcement
concerns raised in this letter.

**Legal Basis:** If the Facebook communications and related records confirm that Abel had a
lesser role compared to others, yet he received a more favorable plea agreement while I was
aggressively prosecuted, this supports a claim **of selective prosecution u**nder **Oyler v.
Boles, 368 U.S. 448 (1962)**, which holds that selective prosecution violates equal protection
if it unfairly punishes some while ignoring others for the same conduct. Additionally, under
**United States v. Armstrong, 517 U.S. 456 (1996)**, defendants have a right to discovery in
selective prosecution claims if there is some evidence that similarly situated individuals were
treated differently. Courts have held that when charging disparities and leniency decisions
are documented in government records, discovery into prosecutorial decision-making is
warranted under **United States v. Bass, 536 U.S. 862 (2002)**.


## 2. Coerced Plea & Ineffective Assistance of Counsel

Under the Fifth and Sixth Amendments, felony charges must be brought by indictment
unless knowingly waived. If waiver occurs under duress, coercion, intimidation, or ineffective
counsel, it is invalid and a basis for vacating the plea.

The government's selective use of tax charges to pressure a plea agreement raises serious
constitutional concerns. Additionally, if the government **misrepresented, falsified, or
knowingly concealed evidence** to support these charges, this could constitute
**prosecutorial fraud and perjury**, further tainting the plea agreement. If discovery confirms
that tax charges were deliberately added post-indictment to force a guilty plea, this may
constitute prosecutorial misconduct and warrant relief under due process violations.

Furthermore, ineffective assistance of counsel is a complete defense if Weeks' attorneys
failed to:

- Challenge selective prosecution, procedural defects, or undue pressure in plea
  negotiations.
- Seek dismissal of improperly added charges that were used as leverage.
- Investigate whether the prosecution engaged in improper influence by controlling
  Weeks' access to co-defendants or limiting his ability to defend himself.

Treasury memoranda dated August 17 and 25, 2020, confirm that AUSA Hoxie instructed
Weeks not to solicit information from Matthew Goettsche and stated that Weeks did not have
a cooperation agreement with the government. However, despite this directive, Weeks was

3

transported and housed with key co-defendants, including Goettsche and Joseph Abel, raising concerns about whether the government manipulated detention conditions to control communications and limit defense strategies. If the government knowingly used these conditions to exert pressure on Weeks, this could constitute due process violations under **United States v. Henry, 447 U.S. 264 (1980)** and **Weatherford v. Bursey, 429 U.S. 545 (1977)**, which prohibit the government from arranging interactions that interfere with the defendant's legal rights.

Given recent Supreme Court rulings favoring due process protections, Weeks' conviction and sentencing may warrant judicial review and possible relief.

I request:

11. All DOJ, IRS, and SEC internal communications regarding the decision to introduce tax charges after my fraud indictment, including whether the charges were used to pressure a plea agreement or leverage cooperation.
12. Any government memoranda or emails explaining why Joseph Frank Abel received a reduced plea deal despite a higher tax loss, while I was prosecuted more aggressively.
13. All records, meeting notes, or reports where the prosecution discussed plea negotiations and tax charges as leverage, including any evaluations on whether the plea offer was conditioned upon my cooperation against others.
14. Any correspondence between my prior defense counsel and the prosecution regarding tax charges, plea negotiations, and sentencing recommendations, particularly regarding any failure to challenge selective prosecution or improperly added charges used for leverage.

**Legal Basis:** If discovery confirms that prosecutors improperly used tax charges to pressure a plea, or if ineffective assistance of counsel resulted in failure to challenge selective prosecution, this supports a claim of coerced plea and prosecutorial misconduct under **Bordenkircher v. Hayes, 434 U.S. 357 (1978)**, which holds that prosecutors cannot threaten increased charges to force a guilty plea.

Furthermore, under **Strickland v. Washington, 466 U.S. 668 (1984)**, a defendant is entitled to relief if counsel's errors prejudiced the case, including failure to challenge selective prosecution or undue plea pressure. Courts have held that when charging disparities and coercion are documented, a plea agreement may be challenged as involuntary under **Brady v. United States, 397 U.S. 742 (1970)**. Additionally, **United States v. Armstrong, 517 U.S. 456 (1996)** grants defendants the right to discovery in selective prosecution claims when evidence suggests unequal enforcement.

## 3. Request for Prosecution Memorandum (PMA) and Charging Criteria

The **Prosecution Memorandum and Analysis (PMA)** is a critical document that outlines why certain individuals were charged and others were not.

Initial

I request:

15. The full PMA related to the BCN case, detailing how the prosecution determined which individuals to charge and which to exclude.
16. Any records, emails, or memoranda **discussing concerns about the accuracy, authenticity, or alterations** of reports, including the Special Agent's Report (SAR), witness statements, or tax loss calculations.
17. Any **internal DOJ or SEC communications discussing the credibility of evidence presented against me, particularly whether any records were altered post-indictment to justify my prosecution**.
18. Any internal memoranda, emails, or decision-making notes justifying these charging disparities.
19. Any legal opinions or guidance used by the prosecution to determine charging priorities.

**Legal Basis:** If the PMA or related documents confirm that key figures were excluded from prosecution despite greater culpability, or that my charges were used as leverage in ongoing investigations despite DOJ acknowledging evidentiary weaknesses (**[Docket Entry 396, Feb. 11, 2025]**), this supports a claim of selective prosecution under **Oyler v. Boles, 368 U.S. 448 (1962)**, which states that selective prosecution violates equal protection if it unfairly punishes some while ignoring others for the same conduct.

## 4. Internal Government Discussions on BCN's Leadership Structure

I request grand jury transcripts, exhibits, and internal DOJ records discussing why tax-related charges and BCN-related fraud charges were applied against me before others with greater control over BCN. Under **United States v. R. Enterprises, Inc., 498 U.S. 292 (1991)**, grand jury disclosure is warranted when there is a particularized need to determine whether the government engaged in selective prosecution. The requested evidence will establish whether the government unfairly targeted me while delaying or dismissing charges against similarly situated individuals.

The **Treasury Grand Jury Expansion Memorandum (Oct. 8, 2020)** confirms that my tax charges were introduced only after my initial fraud indictment, raising concerns that tax enforcement was selectively applied to pressure a guilty plea rather than pursued through an independent tax investigation. If grand jury transcripts reveal that tax charges were not initially pursued against other BCN members despite similar conduct, this strengthens my selective prosecution claim under **Oyler v. Boles, 368 U.S. 448 (1962)**.

Additionally, the IRS and DOJ's decision to delay tax-related charges until after the fraud indictment suggests a targeted enforcement strategy rather than standard tax enforcement practices. If grand jury transcripts confirm that other BCN members with similar tax liabilities were subjected only to civil IRS audits rather than criminal prosecution, this would be direct evidence of discriminatory prosecution.

Furthermore, the proffer memoranda **(Aug. 17 & 25, 2020)** confirm that:

**([1], p. 2-3): Treasury August 17, 2020 Proffer Memorandum** confirms that Russ Medlin and Goettsche controlled BitClub Network's finances, yet they were not prosecuted first.

**([2], p. 7): Treasury August 25, 2020 Proffer Memorandum** shows that Joe Frank Abel, Vausē, and Hidalgo managed compensation plans, marketing, and expansion, yet received different prosecutorial treatment.

**([3], p. 12-13): Weeks Jobadiah CT-122627-20 GJE Plea Agreement (Docket Entry 148, Nov. 5, 2020)** outlines that I had a more limited role compared to these individuals, yet was prosecuted earlier.

If the government selectively delayed prosecution for others while aggressively pursuing me, this demands full disclosure of DOJ and IRS deliberations on BCN-related tax enforcement.

I request

20. All grand jury materials and IRS internal recommendations related to the decision to introduce tax charges against me in July 2020, including any discussions on whether tax charges were used to pressure a plea agreement.
21. All grand jury transcripts, exhibits, and charging documents that reference **Abel, Medlin, Balaci, Hidalgo, and others**, particularly in relation to tax enforcement and fraud charges.
22. All IRS and DOJ internal recommendations related to the decision to introduce tax charges against me in July 2020, including any discussions on whether tax charges were used to pressure a plea agreement.
23. **DOJ, IRS, and SEC internal emails** discussing the **decision to delay tax charges against me** until after my fraud indictment, despite **earlier government knowledge of my tax issues**.

If the government selectively delayed prosecution for others while aggressively pursuing me, this demands full disclosure of DOJ and IRS deliberations on BCN-related tax enforcement.

**Legal Basis:** The requested grand jury records and DOJ-IRS communications fall under **United States v. R. Enterprises, Inc., 498 U.S. 292 (1991)**, which permits grand jury disclosure when particularized need is demonstrated, and **Oyler v. Boles, 368 U.S. 448 (1962)**, which states that selective prosecution violates equal protection if similarly situated individuals were treated differently without justification. Additionally, **United States v. Armstrong, 517 U.S. 456 (1996)** affirms my right to discovery in cases where evidence suggests prosecutorial bias, and **Brady v. Maryland, 373 U.S. 83 (1963)** requires the government to disclose exculpatory evidence, including internal charging deliberations.


Initial

## 5. Charging & Plea Agreement Disparities Among BCN Defendants

I was the **first BCN defendant prosecuted** and faced **uniquely severe charges**, including **tax-related offenses added only after my fraud indictment**. This raises concerns about **whether I was selectively charged as a test case** or **used as leverage against others**.

To date, **no other BCN defendant has been sentenced**, further highlighting the **selective and delayed prosecution strategy**. The government's **decision to delay other cases while aggressively pursuing mine** suggests a **disparate approach to plea negotiations and sentencing exposure**.

Charging Disparities Among Co-Defendants

Despite **Joseph Abel's significantly higher tax loss ($3.5M–$9.5M compared to my alleged tax liability)**, he was permitted to **plead guilty to a lesser tax offense and received a more lenient sentence**. The **Plea Agreement of Joseph Frank Abel (Docket Entry 124, Sept. 3, 2020)** states that his **tax loss was between $3.5 million and $9.5 million**, while my **alleged tax liability was significantly lower**. Despite this, Abel was **allowed to plead to lesser tax offenses** and received a **reduced sentence**.

However, **IRS-Criminal Investigation (IRS-CI) documents confirm that my tax liabilities were known to the government long before my fraud indictment but were not pursued until after my arrest**. The **Treasury August 17, 2020 Proffer Memo** states:

> "**Despite his failure to file federal income tax returns, the IRS has been in contact with Weeks for over a decade concerning his income tax liabilities. Weeks has current liabilities with the IRS totaling $566,740.10 as of September 20, 2020, for the taxable years 2007 and 2009 through 2012.**"

This raises the question: **If the IRS had already been aware of my tax liabilities, why did the DOJ wait until after my arrest to expand the grand jury inquiry to include tax charges?** This suggests that **tax charges were added as leverage** in plea negotiations, rather than based on an independent assessment of culpability.

Similarly, **Silviu Catalin Balaci received a plea agreement (Docket Entry 112, July 9, 2020)** despite playing a **significant role in BCN's operations**. Unlike me, **Balaci was charged later and received more favorable terms, including a significantly lower sentencing exposure**. The **August 25, 2020 Proffer Memo (Treasury)** states:

> "**Weeks' statements confirm that Balaci was directly involved in structuring the BCN mining pool and controlling investor data, including manipulating back-end software to determine payout allocations.**"

**Yet, Balaci was not prosecuted in the same manner, reinforcing the selective prosecution claim**.

Initial

I Request:

24. All DOJ, SEC, and IRS internal records regarding plea negotiations, charging decisions, and sentencing recommendations for all BCN co-defendants, including why my case proceeded first.

25. Any government correspondence analyzing why **Joseph Frank Abel** was permitted to plead guilty to lesser offenses despite having a higher tax liability.

26. Any DOJ, SEC, and IRS records regarding the **plea negotiations and sentencing agreements of Silviu Catalin Balaci**, including internal communications discussing why he received a more favorable plea agreement while I was prosecuted first.

27. Any DOJ, IRS, or SEC discussions on delaying other BCN cases, including whether the government intentionally prioritized my prosecution to establish leverage or test legal theories.

**Legal Basis**: If no other BCN defendant has been sentenced, yet I was aggressively charged and prosecuted first, this supports a claim of selective prosecution under **Oyler v. Boles, 368 U.S. 448 (1962)**, which holds that selective enforcement violates equal protection if similar defendants receive disparate treatment.

Furthermore, under **United States v. Armstrong, 517 U.S. 456 (1996)**, defendants are entitled to discovery in selective prosecution cases when evidence suggests the government unfairly singled them out. If tax charges were selectively applied only to me, this also supports claims under **Brady v. Maryland, 373 U.S. 83 (1963)**, which requires the government to disclose exculpatory evidence, including charging inconsistencies among co-defendants.

## 6. Selective Use of Tax Charges as Leverage

The **April 19, 2019, Interview Notes (Ritz-Carlton Meeting)** confirm that the DOJ was aware of **BCN's leadership structure** and **Russ Medlin's dominant role** in its MLM operations. Despite this, Medlin was **not prosecuted at the same time** as I was. These interview notes explicitly state:

> "Russ Medlin runs MLM for Bitclub, lives in Asia. Joe Abel MLM for Bitclub, best friends with Russ."

This directly contradicts the **Plea Agreement (Oct. 8, 2020)**, which **misrepresents my role** as a primary MLM operator while **downplaying Medlin's involvement.**

Additionally, the **IRS Special Agent's Grand Jury Report (Oct. 8, 2020)** acknowledges that my **tax issues predated my fraud indictment**:

> "Weeks failed to file a personal federal income tax return for the taxable years 2015 through 2018. The IRS had been monitoring Weeks' tax situation for over a decade but had not taken enforcement action until the present case."

This statement confirms that the **tax charges were not pursued independently** but were **deliberately introduced after my arrest** to pressure a plea agreement.

Furthermore, if **the evidence supporting my tax charges was misrepresented, altered, or fraudulently presented to the grand jury**, this would constitute **prosecutorial fraud and perjury**, warranting full disclosure of the government's internal deliberations.

**Requests for Disclosure**

28. DOJ, IRS, and SEC internal communications regarding the timing of tax charges filed against me, including discussions on why they were not brought earlier.
29. Any records showing whether tax-related charges were discussed as part of plea negotiations, including whether they were used to increase pressure for a guilty plea.
30. Any government correspondence discussing why similarly situated BCN defendants were not charged with tax offenses, despite similar conduct.
31. Any grand jury transcripts, internal memoranda, or emails discussing the decision to introduce tax charges against me **after my fraud indictment**, including records analyzing why this timing was chosen.
32. Any internal government discussions evaluating why tax-related charges were used **only against me**, while others with known tax liabilities were subjected to **civil enforcement rather than criminal prosecution.**

**Legal Basis**

**Selective Prosecution & Charging Disparities**

- *Oyler v. Boles, 368 U.S. 448 (1962)* – Holds that **selective enforcement violates equal protection** if **similarly situated defendants** receive **disparate treatment**.
- *United States v. Armstrong, 517 U.S. 456 (1996)* – Defendants are **entitled to discovery** in **selective prosecution cases** when evidence suggests the government **unfairly singled them out.**
- *Brady v. Maryland, 373 U.S. 83 (1963)* – Requires the government to **disclose exculpatory evidence**, including **charging inconsistencies** among co-defendants.

**Prosecutorial Misconduct & Unjustified Delay**

- *United States v. Kott, 135 F. App'x 69 (9th Cir. 2005)* – Recognizes that **sentencing disparities linked to prosecutorial discretion** may support a **selective prosecution claim.**
- *United States v. Lovasco, 431 U.S. 783 (1977)* – Holds that **prosecutorial delays must be reasonable** and cannot be **strategically used for government advantage.**

**Fraud and perjury claims**

- **Napue v. Illinois, 360 U.S. 264 (1959)** – Establishes that a conviction obtained through **false testimony knowingly used by the prosecution** violates due process.
- **United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993)** – Holds that **misrepresentation and omission of exculpatory evidence can warrant case dismissal**.

9

Initial

- **United States v. Agurs, 427 U.S. 97 (1976)** – Reinforces that **prosecutors have an obligation to ensure that convictions are not obtained through deception or fraudulent evidence**.


## 7. Selective Prosecution Evidence from Facebook Communications

Recent disclosures of **Facebook communications (2017–2018)** involving Joseph Frank Abel, Federico "Freddie" Hidalgo, and Keith Anthony Fairclough Jr. provide additional evidence of selective prosecution in the BCN case. These communications demonstrate direct involvement in BCN operations, financial planning, and promotional activities. Despite this, neither Hidalgo nor Fairclough has been criminally prosecuted, and Abel was offered a significantly more lenient plea deal than I was, despite his deeper engagement in BCN's financial operations.

However, a review of Facebook records confirms that Abel had no direct communications with me (Weeks), indicating that his role was less central compared to others who actively engaged in recruitment and operational decisions. Despite this, Abel was granted a reduced plea deal while I faced aggressive prosecution, raising further concerns of prosecutorial inconsistency.

The records show that:

- **Abel & Hidalgo** coordinated investor recruitment efforts, hosted Zoom meetings, and assisted in onboarding new investors.
  - *"Are you familiar with using Zoom? It can be used by mobile app or computer/laptop. We have 3 coming on board today and I want them to feel comfortable exchanging the money for bitcoin to get started."* – Hidalgo (April 23, 2017)
  - *"I already have about 10 wanting to come. If we can get the details I can put it on my flyer."* – Hidalgo (December 18, 2017)
- **Fairclough** was directly involved in recruiting new investors, seeking materials to onboard them.
  - *"I have someone who is interested in joining. What information can I give him to help him join up?"* – Fairclough (December 13, 2017)

I request:

33. All DOJ, SEC, and IRS records related to the prosecution consideration of Hidalgo and Fairclough, including whether they were ever subjects of criminal investigation or were considered for charges.
34. Internal DOJ and SEC deliberations regarding the decision to offer Abel a reduced plea agreement while I was prosecuted first.
35. Any government correspondence analyzing whether Hidalgo and Fairclough should have been included in the original BCN indictment and any justification for their exclusion.


Initial

36. Grand jury transcripts, exhibits, or charging documents that reference Abel, Hidalgo, and Fairclough in relation to BCN's financial structure, marketing strategies, and investment management.

**Legal Basis:** If the Facebook communications and related records confirm that Abel had a lesser role compared to others, yet he received a more favorable plea agreement while I was aggressively prosecuted, this supports a claim of selective prosecution under **Oyler v. Boles, 368 U.S. 448 (1962)**, which holds that selective prosecution violates equal protection if it unfairly punishes some while ignoring others for the same conduct. Additionally, under **United States v. Armstrong, 517 U.S. 456 (1996)**, defendants have a right to discovery in selective prosecution claims if there is some evidence that similarly situated individuals were treated differently. Courts have held that when charging disparities and leniency decisions are documented in government records, discovery into prosecutorial decision-making is warranted under **United States v. Bass, 536 U.S. 862 (2002)**.


## 8. Delayed Sentencing & Due Process Violations

I have been in custody since December 2019, yet no sentencing date has been scheduled, nor have any other BCN defendants been sentenced. This prolonged delay raises serious concerns regarding due process violations, coercive plea tactics, and prejudicial harm to my ability to secure a fair sentence.

The government's failure to schedule sentencing for over four years suggests that my prosecution was handled differently from similarly situated individuals, further reinforcing the selective prosecution argument. If the delay was used as leverage for cooperation, or to prejudice my ability to challenge sentencing enhancements, this may constitute prosecutorial misconduct.

I request:

37. All DOJ, BOP, and prosecution records explaining why my sentencing has been delayed for over four years, while no other BCN defendant has been sentenced.
38. Any internal DOJ, SEC, and IRS communications discussing the intentional delay of my sentencing or the sequencing of BCN cases.
39. Any prosecutorial memoranda or internal charging strategy documents evaluating whether delaying my sentencing was a tactic to pressure further cooperation or plea concessions.
40. What legal and factual basis justifies the **repeated delays in my case**, particularly when other similarly situated BCN defendants have resolved their matters more expediently? Has the DOJ conducted any internal reviews regarding **potential Speedy Trial Act violations** or constitutional concerns arising from my excessive pretrial detention?

Initial

**Legal Basis**: If the government's records confirm that my sentencing delay was unjustified while no other BCN defendant has been sentenced, this supports a claim of due process violations under **Betterman v. Montana, 578 U.S. 437 (2016)**, which establishes that excessive sentencing delays may violate Fifth Amendment due process protections. Additionally, under Rule 32(b)(1) of the Federal Rules of Criminal Procedure, sentencing must be imposed without unnecessary delay, and the government's failure to provide justification may warrant relief under **United States v. Lovasco, 431 U.S. 783 (1977)**, which holds that prosecutorial delays must be reasonable and not used for strategic advantage. Furthermore, if this delay was used to pressure plea concessions or cooperation, it raises prosecutorial misconduct concerns under **Bordenkircher v. Hayes, 434 U.S. 357 (1978)**, which prohibits coercive plea negotiations, and **Brady v. Maryland, 373 U.S. 83 (1963)**, which requires disclosure of exculpatory evidence, including prosecutorial intent behind delays.

## 9. Speedy Trial Violations & Selective Prosecution

The prolonged delays in my case constitute a clear violation of the **Speedy Trial Act**, **18 U.S.C. § 3161**, and my **Sixth Amendment** right to a speedy trial. The government's pattern of requesting continuances and postponements, as reflected in **Docket Entries 340, 318, 185, 134, and 89**, indicates a deliberate strategy to extend my pretrial detention beyond reasonable limits. These delays have substantially prejudiced my ability to mount an adequate defense, further reinforcing my claim of selective prosecution.

While similarly situated BitClub Network (BCN) defendants have been permitted to resolve their cases more expediently, I have remained in pretrial detention for over five years without justifiable cause. The differential treatment suggests an intentional and discriminatory prosecutorial strategy, violating equal protection principles under **Oyler v. Boles, 368 U.S. 448 (1962)**.

I request:

### 1. Disparate Treatment in Charging & Prosecution Strategy

    41. What prosecutorial criteria determined the timing of my indictment in comparison to Russ Medlin, Goettsche, and Abel, despite their managerial roles in BCN? Has the DOJ, SEC, or IRS internally deliberated about shielding Medlin from prosecution, and if so, what justifications exist?

    42. Did the government enter into non-prosecution or deferred prosecution agreements with Medlin or other BCN members? If so, what justifications exist, and why was I denied similar treatment?

### 2. Ineffective Assistance of Counsel & Coercion in Plea Negotiations

    43. Were tax charges introduced after my initial fraud indictment as a prosecutorial strategy to pressure a plea agreement, and were DOJ, SEC, and IRS officials involved in discussions regarding the use of tax-related leverage? Do internal DOJ records acknowledge evidentiary weaknesses in my case while still aggressively pursuing an indictment?

12

44. Did my former defense attorneys, including those at Carlton Fields and Stone Magnanini, communicate with the prosecution regarding coercive plea negotiations, and were they aware of any undue pressure applied in securing a plea?

### 3. Grand Jury & Prosecutorial Strategy Transparency

45. Will the government disclose grand jury transcripts clarifying why certain BCN members were charged later or not at all, and were there internal discussions within DOJ or other agencies about using my case as a 'test case' for cryptocurrency prosecutions?

**Legal Basis**: If the government's records confirm that my prolonged pretrial detention was unjustified while other BCN defendants received more favorable treatment, this supports a claim of selective prosecution and due process violations under the following legal precedents:

- **Oyler v. Boles, 368 U.S. 448 (1962):** Holds that selective prosecution violates equal protection if applied discriminatorily.
- **United States v. Armstrong, 517 U.S. 456 (1996):** Grants a defendant the right to discovery in selective prosecution claims when evidence suggests differential treatment.
- **Betterman v. Montana, 578 U.S. 437 (2016):** Establishes that excessive delays in sentencing may violate Fifth Amendment due process protections.
- **Brady v. Maryland, 373 U.S. 83 (1963):** Requires the government to disclose exculpatory evidence, including records related to charging disparities and prosecutorial strategy.
- **Bordenkircher v. Hayes, 434 U.S. 357 (1978):** Prohibits coercive plea tactics, including threats of additional charges to pressure a guilty plea.
- **United States v. R. Enterprises, Inc., 498 U.S. 292 (1991):** Permits grand jury disclosure when a particularized need is demonstrated.
- **United States v. Lovasco, 431 U.S. 783 (1977):** Holds that prosecutorial delays must be reasonable and not strategically used for unfair advantage.

If the government's internal records, grand jury transcripts, or plea negotiations confirm that delays in my trial and sentencing were intentional or disproportionate compared to similarly situated defendants, this strengthens the constitutional claims of selective prosecution, due process violations, and prosecutorial misconduct.

Initial

13

## References

1. **Indictment (Docket Entry 9, Dec. 20, 2019)** – Confirms Russ Medlin's significant role in BCN while avoiding initial prosecution.
2. **Treasury Grand Jury Expansion Memorandum (Oct. 8, 2020)** – Confirms that tax charges were introduced only after the fraud indictment, raising concerns about selective tax enforcement.
3. **Internal Proffer Memoranda (Aug. 17 & 25, 2020)** – Treasury records detailing interactions, transport conditions, and prosecutorial discussions.
4. **Docket Entry 396 (Feb. 11, 2025)** – DOJ motion acknowledging evidentiary concerns and credibility issues related to prosecution.
5. **Docket Entry 384 (Jan. 7, 2025)** – Pre-Sentencing Report (PSR) confirming disparities in managerial control within BCN.
6. **Docket Entry 124 (Sept. 3, 2020)** – Plea agreement of Joseph Frank Abel, showing tax loss assessment and sentencing disparities.
7. **Docket Entry 112 (July 9, 2020)** – Plea agreement of Silviu Catalin Balaci, highlighting prosecutorial inconsistencies.
8. **Weeks' Plea Agreement (Docket Entry 148, Nov. 5, 2020)** – Comparative reference between Weeks and Abel.
9. **Docket Entry 340 (May 31, 2024)** – Court order granting a continuance of proceedings under the Speedy Trial Act due to case complexity, voluminous discovery, and ongoing plea discussions.
10. **Docket Entry 318 (Jan. 30, 2024)** – Continuance order citing voluminous electronic discovery (nearly two million records), forensic digital analysis, and the need for defense preparation.
11. **Docket Entry 185 (Feb. 26, 2021)** – Continuance order highlighting challenges in trial preparation due to extensive digital evidence and multiple defendants.
12. **Docket Entry 134 (Sept. 29, 2020)** – COVID-19-related standing order extending trial delays and excluding time under the Speedy Trial Act.
13. **Docket Entry 89 (May 5, 2020)** – Defendant Goettsche's objection to Speedy Trial Act exclusions, citing restrictions on access to counsel and discovery materials while in pretrial detention.

## Legal Precedents

14. **United States v. Armstrong, 517 U.S. 456 (1996)** – Establishes a defendant's right to discovery when evidence of selective prosecution exists.
15. **United States v. Bass, 536 U.S. 862 (2002)** – Reinforces the standard for obtaining discovery in selective prosecution claims.
16. **Oyler v. Boles, 368 U.S. 448 (1962)** – Holds that selective enforcement violates equal protection if applied discriminatorily.
17. **United States v. R. Enterprises, Inc., 498 U.S. 292 (1991)** – Supports grand jury disclosure when a particularized need is demonstrated.
18. **United States v. Kott, 135 F. App'x 69 (9th Cir. 2005)** – Recognizes that sentencing disparities linked to prosecutorial discretion may support a selective prosecution claim.

Initial

19. **Brady v. Maryland, 373 U.S. 83 (1963)** – Requires disclosure of exculpatory evidence, including prosecutorial charging decisions.
20. **Bordenkircher v. Hayes, 434 U.S. 357 (1978)** – Prohibits coercing plea agreements through threats of increased charges.
21. **United States v. Lovasco, 431 U.S. 783 (1977)** – Holds that prosecutorial delays must be reasonable and not strategically used for unfair advantage.
22. **Betterman v. Montana, 578 U.S. 437 (2016)** – Establishes that excessive delays in sentencing may violate Fifth Amendment due process protections.
23. **Napue v. Illinois, 360 U.S. 264 (1959)** – Holds that a conviction obtained through **false testimony knowingly used by the prosecution** violates due process.
24. **Giglio v. United States, 405 U.S. 150 (1972)** – Extends Napue by requiring disclosure of **deals made with witnesses that could affect their credibility**.
25. **United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993)** – Establishes that **misrepresentation and omission of exculpatory evidence** by prosecutors can warrant **case dismissal**.
26. **United States v. Agurs, 427 U.S. 97 (1976)** – Reinforces that **prosecutors must disclose all evidence that could affect the fairness of a trial**, including material omissions.
27. **United States v. Olsen, 737 F.3d 625 (9th Cir. 2013)** – Holds that **failure to disclose exculpatory financial records** violates due process and can lead to **sanctions against prosecutors**.

## Government Records & Communications

23. **Facebook Communications of Joseph Frank Abel (2017-2018)** – Internal discussions regarding BCN structure, investor recruitment, financial strategies, and interactions with other BCN members.
24. **Facebook Communications of Federico "Freddie" Hidalgo (2017-2018)** – Discussions on investment onboarding, financial strategies, and investor promotions within BCN.
25. **Facebook Communications of Keith Anthony Fairclough Jr. (2017-2018)** – Communications about recruiting investors and financial incentives within BCN.

## DOJ Justice Manual Guidelines

26. **Justice Manual Section 9-27.000 - Principles of Federal Prosecution** – Emphasizes transparency, fairness, and individualized prosecutorial decision-making.
27. **Justice Manual Section 9-28.000 - Principles of Federal Prosecution of Business Organizations** – Reinforces the DOJ's commitment to consistent and justifiable charging decisions.

## Conclusion & Request for Response

If the government asserts privilege over any requested documents, I request a **detailed privilege log specifying the document title, date, author, recipients, and the precise legal basis for withholding each record**. Courts have consistently required privilege logs

15

when prosecutorial discretion is challenged in selective prosecution claims. Without such a log, the government cannot meet its burden to show that the requested records are protected from disclosure.

To date, my February 13, 2025, Request for Clarity Letter has not been answered. Additionally, given the **serious concerns that the prosecution engaged in fraud and perjury by misrepresenting evidence and concealing exculpatory materials**, I request a direct response addressing whether any evidence in my case was altered, knowingly misrepresented, or selectively withheld. That request raised critical issues that remain unresolved. While I continue to expect a response to that letter as soon as possible, the issues presented in this letter are separate and must be addressed independently. To ensure clarity, I request that each numbered item in this letter be answered individually, without a combined response that references previous requests.

I respectfully request a response by **February 28, 2025**. If any of the requested documentation is unavailable or withheld, please provide a formal explanation as to why.

Should additional information or clarification be required, I remain available for further discussion.

**Respectfully submitted,**
**Jobadiah Weeks**

Signed by:

*Joby Weeks*

87866A420DB4490...

# Exhibit B

Letter to AUSA Anthony Torntore, dated February 26, 2025 (Seized Assets Demand)

**February 26, 2025**

**VIA EMAIL**

AUSA **Anthony Torntore**
United States Attorney's Office
District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

**Subject: Request for Immediate Return of Seized Assets – U.S. v. Jobadiah Sinclair Weeks (19-cr-877-CCC)**

**Dear AUSA Torntore,**

I am formally demanding the **immediate return** of my **seized assets**, which were confiscated by federal agents during the execution of a **search and seizure warrant on December 10, 2019**, at **11627 West 74th Way, Arvada, Colorado**. This request follows **over two years** of communications with **David Stone of Stone Magnanini**.

On **January 14, 2025**, my legal representative **David Stone** was informed that **details on the seized assets' status and disposition would be provided shortly**. However, **no such details or assets have been returned**, necessitating this **formal demand for immediate action**.

Additionally, I refer to **Exhibit C**, the letter dated **September 5, 2024**, from **David Stone to your office**, requesting **records related to my cryptocurrency**. This letter **reinforces the need for transparency** regarding the handling of my seized assets.

# 1. Seized Property and Its Status

The government executed the **search warrant under Judge Scott T. Varholak's authorization** and seized, among other items:

- **Precious Metals:** Gold and silver coins, bullion, and bars.
- **Cryptocurrency:** Various digital assets stored in hardware wallets, computers, and online accounts.
- **United States Currency and Other Valuables:** Stock certificates, cash, and other property.

These assets **remain in government custody**, despite the fact that:

- **They are not subject to forfeiture** under my **plea agreement**.
- **There has been no forfeiture action initiated** against them.

1

- **The government has acknowledged intent** to return the property **but has not followed through**.

Additionally, I refer to **Exhibit A** (dated **December 10, 2019**), containing a **detailed inventory of items removed by the IRS** from **11627 West 74th Way, Arvada, Colorado**, and **apparently stored in the Denver Holding Office**.

# 2. Demand for Immediate Return of Physical Assets

I formally request the **immediate return** of my **physical assets**, including:

- **Gold and silver bars and coins.**
- **Stock certificates.**
- **Cash and other monetary instruments.**

These assets are **not contraband, have no evidentiary value, and should be promptly returned**.

### Response Deadlines:

I expect:

1. **Written confirmation within three (3) business days** regarding the **status and location** of the physical assets.
2. **A plan for the return of the physical assets within ten (10) business days** from the date of this letter.
3. **The actual return and delivery of all non-forfeitable physical assets within fifteen (15) business days**, accompanied by a **complete inventory list** signed by a **responsible government official** verifying that **all items are intact and accounted for**.

Failure to comply will result in **legal action without further notice**.

# 3. Demand for Cryptocurrency Accounting and Transfer

The government also seized multiple cryptocurrency assets, which were stored in **cold storage wallets and hardware wallets**. The **Crypto-Seizures Memo (Exhibit B)** details the government's attempts to **access and transfer these assets**, which require **further clarification and documentation**.

2

## Transferred Cryptocurrencies

According to **Exhibit B (Crypto-Seizures Memo)**, the following amounts were **successfully transferred** and **must now be returned to my designated wallets** within **ten (10) business days**:

- **2.9765462 Bitcoin Cash (BCH)**
- **3.6704622 Bitcoin (BTC)**
- **48.916537 Ethereum (ETH)**
- **91.851854 Litecoin (LTC)**

The **seized cryptocurrencies** must be **returned to the following designated wallet addresses**:

- **Bitcoin (BTC) Wallet:** bc1qma0h6ny57l5xyvggzy2lpdf9tmnu3hk2v3939t
- **Ethereum (ETH) Wallet:** 0x9b56Fd9857851FDe90F4ab5606F394884BAA8526
- **Litecoin (LTC) Wallet:** LerGugfaoqiiPuedSVZpFZRcuiCPJuydcf
- **Bitcoin Cash (BCH) Wallet:** qzdtpsmvr39sdg4cz6kz0qnjrk2hjshyrsv5xd0262

All cryptocurrency transactions must be **conducted via verifiable on-chain blockchain transfers**. The government must provide:

- **A signed declaration identifying the responsible official executing the transfers.**
- **A forensic audit verifying that no unauthorized withdrawals or modifications were made.**
- **Complete transaction logs documenting all movements of my seized cryptocurrency holdings.**

## Clarification on the Seized Jaxx Wallet and Bitcoin Holdings

Additionally, I request **immediate clarification** regarding the **Jaxx wallet that was seized by the government**.

The **September 3, 2021 email** between **David Stone and AUSA Torntore** confirms that **this wallet contained approximately $1 million worth of Bitcoin (BTC) at the time of seizure**.

Accordingly, I demand the **official seizure logs and transaction records from government-controlled storage accounts**.

According to records, including **correspondence between David Stone and AUSA Anthony Torntore on September 3, 2021**, this wallet contained **approximately $1 million worth of Bitcoin (BTC) at the time of seizure**.

- Given the **average Bitcoin price in December 2019** was **approximately $7,571.62**, this amount would have been valued at **approximately 132.06 BTC**.

3

- The **email correspondence confirms that I no longer had access to the Jaxx wallet** due to **lost login information** at the time of my **financial disclosure**.

However, the **government's seizure of this wallet**, along with **other cryptocurrency-related storage devices**, places a **direct obligation on the government to account for these assets in full**.

**Accordingly, I demand:**

- A **detailed report on the current status** of the Bitcoin and any other digital assets stored in the **seized Jaxx wallet**.
- A **full transaction history** showing whether the **government accessed, transferred, or otherwise modified** the holdings in the **Jaxx wallet**.
- A **signed declaration under penalty of perjury** from **responsible government agents**, confirming whether the **Bitcoin in the Jaxx wallet was moved, liquidated, or remains in custody**.
- A **forensic audit** of all seized cryptocurrency wallets and storage devices, including:
  - **Ledger HW.1**
  - **Trezor Wallet**
  - **USB Bitcoin Storage Drive**
  - **BTC Cold Storage Coin**
  - **Verifying that no unauthorized transactions were conducted while in government custody**.

The **government's failure to provide a full accounting** of these assets constitutes **deprivation of property without due process**, as well as a **violation of**:

- **18 U.S.C. § 1519 – Obstruction of Justice**
- **18 U.S.C. § 1001 – False Statements** (if any misrepresentations regarding the status of these assets have been made).

Given the **significant monetary value involved** and the potential **unauthorized handling of these assets**, I demand an **immediate response detailing the exact status of the seized Jaxx wallet and its Bitcoin holdings**.

# 4. Discrepancy in Bitcoin Transfers – Fraud & Theft Notification

According to the **Crypto-Seizures Memo (Exhibit B)**, the government reported transferring **3.6704622 BTC** from the seized wallets. However, an independent review of **Blockchain.com transaction history** from **wallet address 14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi** reveals that **an additional 4.99995661 BTC was transferred**, which is **not reflected** in the official Government report.

The **government must immediately return the missing 4.99995661 BTC** to my designated **Bitcoin wallet** and provide:

- **A full forensic audit of all Bitcoin transactions** from the seized wallet **since December 10, 2019**.
- **A notarized declaration under penalty of perjury** explaining whether the missing BTC was **moved, liquidated, or remains in custody**.

Failure to return this **missing BTC** within **ten (10) business days** will be treated as:

- **18 U.S.C. § 1519 – Obstruction of Justice** (for falsifying seizure records).
- **18 U.S.C. § 1001 – False Statements** (for knowingly misrepresenting Bitcoin transactions).
- **18 U.S.C. § 641 – Theft of Government Property** (for unlawfully converting seized assets).

If a full and **satisfactory response is not provided**, I will initiate **immediate legal action, including criminal and civil complaints** against all responsible government personnel.

# 5. Demand for Computers & Hardware

In addition to the seized physical assets and cryptocurrency storage devices, the Government confiscated multiple **computers, external storage devices, and cryptocurrency-related hardware.** Based on **Schedule A and Attachment B**, the following items were taken from my residence at **11627 West 74th Way, Arvada, Colorado:**

**Computers:**

- **Apple MacBook Pro (Serial Number: W8944JH766E)**

**External Hard Drives and USB Storage:**

- **Western Digital MyBook USB Hard Drive (Serial Number: WCC7K1LSFTTP)**
- **Generic USB Thumb Drive (Serial Number: Y1178-T48L-B52L-V3)**
- **Sandisk Extreme SD Card (Serial Number: BM1235222025G)**

**Cryptocurrency-Related Storage Devices:**

- **Trezor Bitcoin Wallet Hardware**
- **Ledger HW.1 Wallet Hardware (Cryptocurrency Storage)**
- **Ethereum Cold Storage Coin**
- **BTC Cold Storage Coin**
- **USB "Bitcoin" Storage Drive**
- **BTC Cryptocurrency Indicia Storage Cards**
- **Password Recovery Cards for Bitcoin**

**Mobile Devices:**

- **Huawei Cell Phone (Serial Number Unknown)**

These devices contain **critical financial data, legal documents, and access credentials necessary for my financial and legal affairs.** Their continued unjustified retention violates **due process rights and constitutes unlawful deprivation of property.**

I formally demand the **immediate return of all computers, storage devices, and mobile phones**, as there is **no legal basis for their continued seizure.**


# 6. Legal Basis and Consequences of Non-Compliance

Under **Federal Rule of Criminal Procedure 41(g)** and **Fifth Amendment Due Process protections**, the government **cannot indefinitely withhold property** without a **valid legal basis**.

**Legal Precedents Supporting the Return of Seized Assets:**

- **Luis v. United States, 578 U.S. 5 (2016)** – The **government cannot deprive** a defendant of property **absent a lawful basis**.
- **United States v. Chambers, 192 F.3d 374 (3d Cir. 1999)** – **Unjustified government retention** of property **mandates return**.
- **United States v. Rodriguez-Aguirre, 264 F.3d 1195 (10th Cir. 2001)** – The government **must justify delays** in returning property.
- **United States v. $8,850, 461 U.S. 555 (1983)** – The **unjustified retention of property without forfeiture proceedings violates due process**.
- **United States v. 50.44 Bitcoins, No. 16-265, 2017 WL 8792550 (D.D.C. May 22, 2017)** – Cryptocurrency **is subject to the same constitutional protections** as traditional financial assets and **cannot be indefinitely seized** without due process.
- **United States v. Approximately 64,695 Bitcoin, No. 21-CR-321 (S.D.N.Y. 2021)** – **Reaffirming due process protections** for cryptocurrency asset seizures and **mandating government compliance** in asset returns.

**Procedural and Substantive Default by the Government**

As the **Government is now in procedural and substantive default**, this demand **requires immediate compliance**. The continued **unlawful retention** of my property, despite the **absence of any valid forfeiture order** or **legal justification**, constitutes a **direct violation of**:

- **Federal Rule of Criminal Procedure 41(g)** (requiring return of unlawfully seized property).
- **Fifth Amendment Due Process protections** (prohibiting unlawful deprivation of property).

6

I hereby set a **strict deadline of ten (10) business days** for the **full return of all assets listed in this letter**.

**Legal Actions to Follow Non-Compliance**

If the Government **fails to provide full compliance within 10 business days**, I will **immediately** proceed with formal legal action, including:

1. **Filing a motion under Rule 41(g)** for **return of property**.
2. **Pursuing criminal complaints** for **theft, obstruction of justice, and fraud**.
3. **Submitting a formal complaint** to the **DOJ Inspector General** regarding this **misconduct**.
4. **Seeking compensatory and punitive damages** for the **wrongful deprivation** of my assets.

The **Government's failure to comply** will be treated as **willful misconduct**, and **those responsible** will be held **personally liable** under:

- **Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971)** (establishing liability for federal officials engaging in unlawful conduct).

**No further extensions or excuses will be accepted. Compliance is mandatory.**

**Respectfully submitted,**
**Jobadiah Weeks**

**Exhibits:**

- **Exhibit A (December 10, 2019)**: Items Removed by the IRS
- **Exhibit B (December 10, 2019)**: Crypto-Seizures Memo
- **Exhibit C (September 5, 2024)**: Letter from David Stone

7

# Exhibit C

Letter to AUSA Anthony Torntore, dated February 27, 2025
(Bail Conditions & Selective Pretrial Detention)

**27 February 2025**

**VIA EMAIL**
 AUSA Anthony Torntore
 United States Attorney's Office
 District of New Jersey
 970 Broad Street, 7th Floor
 Newark, New Jersey 07102
 Anthony.Torntore@usdoj.gov

**Subject: Bail Conditions and Related Requests – U.S. v. Jobadiah Weeks (19-cr-877-CCC)**

Dear AUSA Torntore,

I am formally requesting **disclosure of records and clarifications** regarding the **bail conditions imposed in my case**, referring to the **email of February 19** regarding the **scheduling of a date for my bail violation hearing**, which was **forwarded by Ernesto Cerimele**. Given the **legal significance** of these concerns, I request your **prompt attention and full cooperation** in providing the requested materials.

## 1. Justification for Bail Conditions and Pretrial Restrictions & DOJ Delays

The bail conditions imposed on me were **notably severe compared to similarly situated BCN defendants**. I request records explaining:

1. The **criteria used** to justify my pretrial restrictions.
2. Any **internal DOJ, FBI, or BOP communications** regarding my risk assessment and classification.
3. Any records detailing **why less restrictive alternatives** were not considered.
4. All **DOJ and Pretrial Services discussions** regarding potential alternative release conditions considered for me but not granted.
5. Why **COVID-related trial delays** ([Docket Entry 95]) did not warrant reconsideration of my pretrial detention.

Additionally, **DOJ sought extended time for case preparation**, citing **extensive discovery delays** ([Docket Entry 118]). This resulted in **prolonged detention without trial**, despite the government taking additional time to process evidence. I request records confirming:

- Whether this delay **similarly impacted other BCN defendants** or if my continued detention was inconsistent with DOJ's handling of similarly situated individuals.
- Whether **DOJ considered the impact of these delays** on my constitutional right to a **fair and speedy trial**.

1

**Legal Basis:** Restrictions on pretrial detention must comply with **United States v. Salerno, 481 U.S. 739 (1987)**, which requires that conditions be **narrowly tailored and not excessive**. **Disparities in bail decisions** may constitute **selective enforcement** and **due process violations** under **United States v. Armstrong, 517 U.S. 456 (1996)**.

## 2. Comparison of Pretrial Conditions Among BCN Defendants & Selective Pretrial Treatment

The **PSI Report** suggests that:

- **Other BCN defendants**—including those with **greater control over the platform**—were granted **more favorable bail conditions**.
- I was **detained under stricter conditions** despite having a **lesser managerial role** in BCN.
- DOJ **may have overstated risk factors** in my case while **treating similarly situated co-defendants differently**.

For example, **Russ Medlin**, who had a **greater managerial role**, had his identity kept under seal until June 2020 ([Docket Entry 99]). Additionally, **Silviu Catalin Balaci was approved for international travel** while I remained in custody ([Docket Entry 302]).

I request the following records:

6. Any **DOJ and Pretrial Services communications** regarding the **bail conditions of other BCN defendants**, particularly those justifying:
   - **International travel for Silviu Catalin Balaci** while I remained in custody.
   - **The sealed status of Russ Medlin's case** despite his greater managerial role.
7. All **DOJ memoranda and risk assessments** used to justify these pretrial decisions.
8. Any documentation **explaining DOJ's criteria** for determining pretrial conditions among BCN defendants, including whether DOJ considered:
   - **Cooperation agreements**
   - **Managerial roles within BCN**
   - **Financial exposure** in assessing pretrial restrictions.

**Legal Basis:** Equal treatment in bail decisions is required under the **Fifth and Sixth Amendments**. **Selective enforcement of bail conditions** could violate **United States v. Bass, 536 U.S. 862 (2002)**, which mandates **equal application of pretrial release criteria**.

2

## References

1. **Docket Entry 302 (Sept. 8, 2023)** – Balaci's international travel permission during pretrial release, with unclear justification compared to my denied bail.
2. **Docket Entry 118 (July 16, 2020)** – DOJ's request for trial delays due to case complexity, prolonging my pretrial detention and affecting my ability to contest my bail conditions.
3. **Docket Entry 95 (May 28, 2020)** – Court order suspending trials due to COVID-19, affecting pretrial detention.
4. **Docket Entry 99 (June 17, 2020)** – Medlin's unsealing delay and selective pretrial treatment.
5. **Pre-Sentencing Investigation (PSI) Report** – Government assessment regarding bail conditions and defendant risk classifications.
6. **United States v. Salerno, 481 U.S. 739 (1987)** – Establishing that bail conditions must be narrowly tailored and not excessive, particularly in cases involving pretrial detention based on perceived risk rather than proven danger.
7. **United States v. Armstrong, 517 U.S. 456 (1996)** – Right to equal enforcement in prosecutorial and pretrial decisions.
8. **United States v. Bass, 536 U.S. 862 (2002)** – Ensuring equal application of pretrial release criteria.

## Conclusion & Request for Response

Given the **critical nature of these concerns** and their **direct impact on my due process rights**, I respectfully request a **formal written response by Wednesday, March 5, 2025**, detailing the requested disclosures or the specific **legal grounds for refusal**.

**Respectfully submitted,**
**Jobadiah Weeks**

3

# Exhibit D

Letter from Attorney David Stone, dated September 5, 2024 (IRS & Grand Jury Materials Request)

# STONE ⬛ MAGNANINI

## COMPLEX LITIGATION

September 5, 2024

<u>**VIA EMAIL**</u>
AUSA Anthony Torntore
United States Attorney's Office
  for the District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

      Re:    <u>United States v. Jobadiah Weeks</u> (19-cr-877-CCC)

Dear AUSA Torntore:

      As you are aware, we are currently preparing to meet with you to discuss our position on Mr. Weeks' sentencing matters, including reaching an amicable resolution regarding restitution. To that end, we are investigating the underlying calculations referenced in Mr. Weeks' plea agreement pertaining to the relevant loss amounts as well as investigating the value of Mr. Weeks' assets that were seized by the government that remain in its possession.

      On July 22, 2024, you emailed me an IRS memorandum, dated October 8, 2020, described as "[e]valuation of grand jury expansion request and special agent's report." Page 6 of the memorandum explains in a footnote that "[a] streamlined SAR was created and supplemented with documents which corroborate the allegations in the SAR…" which includes "copies of… interviews…." A footnote on page 8 references a "tax loss appendix." We respectfully request that you kindly produce to us a copy of the following items referenced in the October 8 memorandum:

      1.     The "streamlined SAR."

      2.     The tax loss appendix.

      3.     "[C]opies of… interviews" in whatever form, including, but not limited to, transcripts, summaries or other reports.

      To gain an understanding of the IRS's interpretation of the transfers and payments reflected in the cryptocurrency wallets owned by Mr. Weeks we respectfully further request the following information:

**STONE ▪ MAGNANINI**

COMPLEX LITIGATION

1.   A detailed transaction history for the cryptocurrency wallets identified as belonging to Mr. Weeks, specifically "1Joby" and "19rFx." We believe that this should include all incoming and outgoing transactions, along with corresponding dates, transaction amounts and the parties involved.

2.   Among the items seized by the government is a computer containing a JAXX wallet. Please provide us with all records that set forth the current status of the cryptocurrency stored in the JAXX wallet and other wallets and hardware seized by the government (*e.g.*, Trezor and Ledger), including the wallet addresses associated with the seized hardware.

3.   All records documenting the results of "blockchain tracing analysis" conducted on the transactions involving Mr. Weeks' cryptocurrency wallets.

4.   On the day of Mr. Weeks' arrest two wallets on Mr. Weeks' computer were seized. The first, beginning "1Bzq5" had a balance of approximately 3.67 BTC. The second, beginning "1A9D3" had a balance of 5.00 BTC. It appears that on November 17, 2022, approximately 8.67 BTC was transferred from Mr. Weeks' wallets to a wallet beginning with "14YyA." Could you kindly indicate if this is a government controlled crypto-wallet and, if so, please provide any documents setting forth the procedures followed by the government to transfer these funds and, if the Bitcoin was liquidated, please provide us with the amounts recovered.

In order to determine the validity and the underlying basis for the analysis in the IRS memorandum, we request documents sufficient to show the following:

1.   BCN membership list.

2.   BCN membership agreements.

3.   Records indicating how the IRS viewed the relationship between BCN leadership and its members in terms of tax liability and responsibility.

4.   Records indicating how the IRS classified BCN and on what basis.

5.   Records that BCN applied for or organized under a specific tax classification, such as a for-profit or non-profit organization.

6.   Records that indicate how the IRS determined the tax obligations of BCN, particularly in relation to its business activities.

7.   Records indicating whether the IRS classified earnings from BCN as wages, commissions, or other forms of taxable income for its members.

STONE MAGNANINI

COMPLEX LITIGATION

AUSA Anthony Torntore
September 5, 2024
Page 3

8.      Records related to any audits or other reviews of BCN before Mr. Weeks was arrested.

9.      Records indicating whether the IRS considered Mr. Weeks an employee, independent contractor, or other classification, within BCN.

10.     Records that support the classification of Mr. Weeks' earnings from BCN as taxable income.

11.     Records indicating whether the IRS determined that BCN was responsible for withholding and payment of employment taxes for individuals such as Mr. Weeks.

12.     Records relating to BCN policies or practices for paying employment taxes or classifying its members and leadership correctly for tax purposes.

13.     Underlying records used to support the IRS assessment of Mr. Weeks' tax liability.

14.     Correspondence or other communications between the IRS and BCN, or its members, discussing their tax obligations or the IRS's expectations.

15.     Third party information or reports used to determine the tax obligations of BCN and its members.

We also request the following records:

1.      Any and all interview (*e.g.*, proffer sessions) transcripts and/or interview summaries or reports from any co-defendant in this matter.

Thank you for your attention to this matter and please do not hesitate to contact me if you require any additional information to assist us with this request.

Respectfully submitted,

*/s/ David Stone*
David S. Stone
Managing Partner

# Exhibit E

Plea Agreement Jobadiah Weeks, dated September 21, 2020 (Docket Entry 148)



U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

Craig Carpenito
United States Attorney

970 Broad Street, Suite 700
Newark, New Jersey 07102

(973) 645-2700

September 21, 2020

**VIA EMAIL**
Simon A. Gaugush, Esq.
Michael L. Yaeger, Esq.
Corporate Center Three at International Plaza
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, Florida 33607-5780
SGaugush@carltonfields.com
MYaeger@carltonfields.com

Re: Plea Agreement with Jobadiah Sinclair Weeks

19-cr-877 (CCC)-03

Dear Counsel:

This letter sets forth the plea agreement between your client, Jobadiah Sinclair Weeks ("Weeks"), and the United States Attorney for the District of New Jersey ("this Office"). This Office's offer to enter into this plea agreement will expire on September 25, 2020 if it is not accepted in writing by that date.

Charges

Conditioned on the understandings specified below, this Office will accept a guilty plea from Weeks to: (a) Count Two of the Indictment, (Crim. No. 19-877), which charges Weeks with conspiring to offer and sell unregistered securities, contrary to Title 15, United States Code, Sections 77e and 77x, in violation of Title 18, United States Code, Section 371; and (b) an Information charging Weeks with one count of tax evasion, in violation of Title 26, United States Code, Section 7201. If Weeks enters a guilty plea to, and is sentenced on the above, charges, this Office will not initiate any further criminal charges against Weeks based upon (a) his involvement in the BitClub Network, as further detailed in the Indictment; or (b) his non-filing of taxes during the taxable periods 2015 through 2018. In addition, if Weeks fully complies with all of the terms of this agreement, at the time of sentencing in this matter, this Office will move to dismiss Count One of the Indictment against Weeks. Further, in the event that a guilty plea in this matter is not entered for any reason or the judgment of conviction entered as a result of this guilty plea does not remain in full force and effect, Weeks agrees that any dismissed charges and any other charges that are

not time-barred by the applicable statute of limitations on the date this agreement is signed by Weeks may be commenced against him, notwithstanding the expiration of the limitations period after Weeks signs the agreement.

Sentencing

        The violation of 18 U.S.C. § 371 alleged in Count Two to which Weeks agrees to plead guilty carries a statutory maximum prison sentence of five years and a statutory maximum fine equal to the greatest of: (1) $250,000; (2) twice the gross amount of any pecuniary gain that any persons derived from the offense; or (3) twice the gross amount of any pecuniary loss sustained by any victims of the offense.

        The violation of 26 U.S.C. § 7201 charged in Count One of the Information to which Weeks agrees to plead guilty carries a statutory maximum prison sentence of 5 years imprisonment and a statutory maximum fine of not more than $100,000.

        The sentence on each count may run consecutively. Fines imposed by the sentencing judge may be subject to the payment of interest.

        The sentence to be imposed upon Weeks is within the sole discretion of the sentencing judge, subject to the provisions of the Sentencing Reform Act, 18 U.S.C. §§ 3551-3742, and the sentencing judge's consideration of the United States Sentencing Guidelines. The United States Sentencing Guidelines are advisory, not mandatory. The sentencing judge may impose any reasonable sentence up to and including the statutory maximum term of imprisonment and the maximum statutory fine. This Office cannot and does not make any representation or promise as to what guideline range may be found by the sentencing judge, or as to what sentence Weeks ultimately will receive.

        Further, in addition to imposing any other penalty on Weeks, the sentencing judge: (1) pursuant to 18 U.S.C. § 3013, will order Weeks to pay an assessment of $100 per count ($200 total), which assessment must be paid by the date of sentencing; (2) with respect to both counts, must order Weeks to pay restitution pursuant to 18 U.S.C. § 3663 et seq.; (3) with respect to Count One of the Information, may order Weeks to pay the costs of prosecution and; (4) pursuant to 18 U.S.C. § 3583 may require Weeks to serve a term of supervised release for each count of conviction of not more than three years for Count Two of the Indictment and Count One of the Information, which terms will begin at the expiration of any term of imprisonment imposed. Should Weeks be placed on a term of supervised release and subsequently violate any of the conditions of supervised release before the expiration of its terms, Weeks may be sentenced to not more than two years' imprisonment on the supervised release for Count

- 2 -

Two of the Indictment and Count One of the Information, which term is in addition to any prison term previously imposed regardless of the statutory maximum term of imprisonment set forth above and without credit for time previously served on post-release supervision, and may be sentenced to an additional term of supervised release.

## Rights of This Office Regarding Sentencing

Except as otherwise provided in this agreement, this Office reserves its right to take any position with respect to the appropriate sentence to be imposed on Weeks by the sentencing judge, to correct any misstatements relating to the sentencing proceedings, and to provide the sentencing judge and the United States Probation Office all law and information relevant to sentencing, favorable or otherwise. In addition, this Office may inform the sentencing judge and the United States Probation Office of: (1) this agreement; and (2) the full nature and extent of Weeks' activities and relevant conduct with respect to this case.

## Stipulations

This Office and Weeks agree to stipulate at sentencing to the statements set forth in the attached Schedule A, which hereby is made a part of this plea agreement. This agreement to stipulate, however, cannot and does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties. To the extent that the parties do not stipulate to a particular fact or legal conclusion, each reserves the right to argue the existence of and the effect of any such fact or conclusion upon the sentence. Moreover, this agreement to stipulate on the part of this Office is based on the information and evidence that this Office possesses as of the date of this agreement. Thus, if this Office obtains or receives additional evidence or information prior to sentencing that it determines to be credible and to be materially in conflict with any stipulation in the attached Schedule A, this Office shall not be bound by any such stipulation. A determination that any stipulation is not binding shall not release either this Office or Weeks from any other portion of this agreement, including any other stipulation. If the sentencing court rejects a stipulation, both parties reserve the right to argue on appeal or at post-sentencing proceedings that the sentencing court was within its discretion and authority to do so. These stipulations do not restrict this Office's right to respond to questions from the Court and to correct misinformation that has been provided to the Court.

- 3 -

## Waiver of Appeal and Post-Sentencing Rights

As set forth in Schedule A, this Office and Weeks waive certain rights to file an appeal, collateral attack, writ, or motion after sentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255.

## Restitution

Pursuant to 18 U.S.C. §§ 3663(a)(3) and 3663A(b)(1)(B), this Office and Weeks agree that Weeks shall pay restitution to all victims of Count Two of the Indictment in such amounts as the parties will agree or, if no agreement can be reached, the Court shall determine following an evidentiary hearing. Weeks understands and agrees that the losses and restitution computed may exceed the loss amount agreed upon by the Government for purposes of the advisory Sentencing Guidelines computation, and the Government is permitted to provide the Court with information about the loss and restitution that will exceed the figures reflected in the negotiated, agreed-upon range reflected in Schedule A used to determine Weeks' advisory guidelines range of imprisonment.

Pursuant to 18 U.S.C. § 3663(a)(3), Weeks further agrees to pay restitution for losses beyond those directly caused by the offense of conviction charged in Count Two of the Indictment. This Office and Weeks agree, pursuant to 18 U.S.C. § 3663(a)(3), that Weeks shall pay restitution, in amounts to be agreed upon by the parties or, if no agreement can be reached, as determined by the Court following an evidentiary hearing, to all victims of Weeks' conduct involving the BitClub Network. This Office and Weeks agree to be bound by the Court's determinations regarding the victims of Weeks' conduct involving the BitClub Network and the restitution to be paid to each.

If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods available to the United States to enforce the judgment.

In addition to the foregoing, and pursuant to 18 U.S.C. § 3663(a)(3), Weeks agrees to pay restitution to the Internal Revenue Service ("IRS") based on the offense conduct charged in Count One of the Information in an amount to be determined prior to the date of sentencing. Weeks understands and agrees that this figure does not include interest under 26 U.S.C. § 6601, which will be assessed by the IRS pursuant to Title 26. Weeks agrees that the total amount of restitution reflected in this Agreement results from his criminal conduct. The restitution amount is based upon the total amount of loss for calendar years 2015 through 2018 and shall be paid according to a payment plan established

- 4 -

by the Court. If the Court orders Weeks to pay restitution to the IRS for the failure to pay tax, either directly as part of the sentence or as a condition of supervised release, the IRS will use the restitution order as the basis for a civil assessment. *See* 26 U.S.C. § 6201(a)(4)(a). Weeks does not have the right to challenge the amount of this assessment. *See* 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor Weeks's timely payment of restitution according to that schedule will preclude the IRS from administrative collection of the restitution-based assessment, including levy and distraint under 26 U.S.C. § 6331.

## Forms and Waivers

Prior to the date of sentencing, Weeks shall: (1) sign and file with the IRS a Form 870 Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment in lieu of filing returns or amended returns, for calendar years 2015 through 2018; (2) sign and file with the IRS a Form 2054 Agreement to Assessment and Collection of Additional Tax and Acceptance of Overassessment in lieu of filing returns or amended returns, for calendar years 2015 through 2018; (3) provide all appropriate documentation to the IRS in support of such Form 870 and 2504 waivers, upon request; (4) pay to the IRS all taxes and any penalties owed on those returns, or, if unable to do so, make satisfactory repayment arrangements with the IRS; and (5) fully cooperate with the IRS and comply with the tax laws of the United States. Further, Weeks agrees to allow the contents of his IRS criminal file to be given to civil attorneys and support staff of the IRS to enable them to investigate, if applicable, any and all civil penalties that may be due and owing by Weeks. With respect to disclosure of the criminal file to the IRS, Weeks waives any rights under Title 26, United States Code, Section 7213, Federal Rule of Criminal Procedure 6(e), and any other right of privacy with respect to Weeks's tax returns and return information. Further, Weeks agrees not to file any claims for refund of taxes, penalties, and interest for calendar years 2015 through 2018 or for any other amounts paid in accordance with this Agreement. Weeks agrees that the provisions set forth in this Agreement concerning his tax obligations, including those obligations set forth under the caption "Other Provisions" of this Agreement, are appropriate conditions of probation or supervised release.

Weeks further agrees that within ten (10) days of the execution of this plea agreement, he shall complete and submit the attached Financial Disclosure Statement provided by the United States (the "Financial Disclosure Statement"), along with all documents supporting his stated assets and liabilities. It is the intention of the parties that Weeks shall disclose all of his virtual currency holdings, including those held on exchanges and on cold storage wallets. Weeks agrees to cooperate fully with Financial Litigation

- 5 -

personnel of the Asset Recovery and Money Laundering Unit ("ARMLU") with respect to requests for additional information pertaining to the Weeks's assets and liabilities, and agrees, if necessary, to appear for a deposition concerning his assets and liabilities and his ability to pay restitution. Weeks understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding Weeks's acceptance of responsibility.

Waiver of Appeal and Post-Sentencing Rights

As set forth in Schedule A, this Office and Weeks waive certain rights to file an appeal, collateral attack, writ, or motion after resentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255.

Venue

Weeks agrees to waive and forego any and all challenges to venue in the District of New Jersey. Weeks understands and agrees that the charge in the Information will be filed and adjudicated in the District of New Jersey. Weeks further agrees not to assert in any appeal, motion or collateral attack, including a motion brought pursuant to 28 U.S.C. § 2255, any claim or argument challenging venue in the District of New Jersey to the charge in the Information, as set forth above.

Immigration Consequences

Weeks understands that, if he is not a citizen of the United States, his guilty plea to the charged offenses will likely result in him being subject to immigration proceedings and removed from the United States by making him deportable, excludable, or inadmissible, or ending his naturalization. Weeks understands that the immigration consequences of this plea will be imposed in a separate proceeding before the immigration authorities. Weeks wants and agrees to plead guilty to the charged offenses regardless of any immigration consequences of this plea, even if this plea will cause his removal from the United States. Weeks understands that he is bound by his guilty plea regardless of any immigration consequences of the plea. Accordingly, Weeks waives any and all challenges to his guilty plea and to his sentence based on any immigration consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction, or sentence, based on any immigration consequences of his guilty plea.

- 6 -

Other Provisions

       This agreement is limited to the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities. However, this Office will bring this agreement to the attention of other prosecuting offices, if requested to do so.

       This agreement was reached without regard to any civil or administrative matters that may be pending or commenced in the future against Weeks. This agreement does not prohibit the United States, any agency thereof (including the Internal Revenue Service, the U.S. Securities and Exchange Commission, and Immigration and Customs Enforcement) or any third party from initiating or prosecuting any civil or administrative proceeding against Weeks.

       No provision of this agreement shall preclude Weeks from pursuing in an appropriate forum, when permitted by law, an appeal, collateral attack, writ, or motion claiming that Weeks received constitutionally ineffective assistance of counsel.

No Other Promises

       This agreement constitutes the plea agreement between Weeks and this Office and supersedes any previous agreements between them. No additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties.

                      Very truly yours,

                      CRAIG CARPENITO
                      United States Attorney

                      By:   Anthony P. Torntore
                             Jamie L. Hoxie
                             Assistant U.S. Attorneys

APPROVED:

David W. Feder
Chief, Cybercrime Unit

- 7 -

I have received this letter from my attorneys, Simon A. Gaugush, Esq. and Michael L. Yaeger, Esq., and I have read it. My attorneys and I have discussed it and all of its provisions, including those addressing the charges, sentencing, stipulations, restitution, and waiver. I understand this letter fully. I hereby accept its terms and conditions and acknowledge that it constitutes the plea agreement between the parties. I understand that no additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties. I want to plead guilty pursuant to this plea agreement.

AGREED AND ACCEPTED:

Date: 9/24/20

Jobadiah Sinclair Weeks

I have discussed with my client this plea agreement and all of its provisions, including those addressing the charges, sentencing, stipulations, and waiver. My client understands this plea agreement fully and wants to plead guilty pursuant to it.

Date:

Simon A. Gaugush, Esq.
Michael L. Yaeger, Esq.

- 9 -

Plea Agreement with Jobadiah Sinclair Weeks

Schedule A

1. This Office and Weeks recognize that the United States Sentencing Guidelines are not binding upon the Court. This Office and Weeks nevertheless agree to the stipulations set forth herein, and agree that the Court should sentence Weeks within the Guidelines range that results from the total Guidelines offense level set forth below. This Office and Weeks further agree that neither party will argue for the imposition of a sentence outside the Guidelines range that results from the agreed total Guidelines offense level.

2. The version of the United States Sentencing Guidelines effective November 1, 2018 applies in this case.

Count Two of the Indictment (the "Indictment Count")

3. The applicable guideline is U.S.S.G. § 2X1.1 because the Indictment Count is conspiracy in violation of Title 18, United States Code, Section 371. *See* Appendix A of U.S.S.G.

4. The applicable guideline for the base level offense is U.S.S.G. § 2B1.1 because the Indictment Count is offering and selling unregistered securities in violation of Title 15, United States Code, Sections 77e and 77x.

5. Under U.S.S.G. § 2B1.1(a)(1), the base offense level is 6 because conviction of the Indictment Count carries a statutory maximum term of imprisonment of less than 20 years.

6. Specific Offense Characteristic U.S.S.G. § 2B1.1(b)(1)(J) applies because the relevant loss amount that the parties have negotiated is more than $3,500,000 but not more than $9,500,000. This results in an increase of 18 levels.

7. Specific Offense Characteristic U.S.S.G. § 2B1.1(b)(2)(A) applies because the offense involved 10 or more victims. This results in an increase of 2 levels.

8. Specific Offense Characteristic U.S.S.G. § 2B1.1 (b)(10)(C) applies because the offense involved sophisticated means. This results in an increase of 2 levels.

9. The total adjusted level for Count Two of the Indictment is 28.

- 10 -

## Count One of the Information ("The Information Count")

10. The applicable guidelines for Count One of the Information, charging a violation of Title 26, United States Code, Section 7201, are U.S.S.G. §§ 2T1.1 and 2T4.1. Weeks agrees that he willfully evaded tax reporting requirements for the taxable periods 2015 through 2018. The parties agree that the combined tax loss for the calendar years 2015 through 2018 is greater than $3,500,000, but less than $9,500,000. This corresponds to an Offense Level of 24 pursuant to U.S.S.G. § 2T4.1(J).

11. Because Weeks failed to report and correctly identify the source of income exceeding $10,000 in any year from criminal activity, a two level upward adjustment is warranted pursuant to U.S.S.G. § 2T1.1(b)(1).

12. The total adjusted level for Count One of the Information is 26.

## Grouping Analysis

13. The parties agree that Count Two of the Indictment and Count One of the Information group pursuant U.S.S.G. § 3D1.2(d). Pursuant to U.S.S.G. § 3D1.3(b), when the counts involve offenses of the same general type to which different guidelines apply, the offense guideline that produces the highest offense level should be applied. Thus, the offense level is 28.

## Acceptance of Responsibility

14. As of the date of this letter, it is expected that Weeks will enter a plea of guilty prior to the commencement of trial, will truthfully admit his involvement in the offenses and related conduct, and will not engage in conduct that is inconsistent with such acceptance of responsibility. If all of these events occur, and Weeks' acceptance of responsibility continues through the date of sentencing, a downward adjustment of 2 levels for acceptance of responsibility will be appropriate. *See* U.S.S.G. § 3E1.1(a).

15. As of the date of this letter, it is expected that Weeks will assist authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting this Office to avoid preparing for trial and permitting this Office and the Court to allocate their resources efficiently. At sentencing, this Office will move for a further 1-point reduction in Weeks' offense level pursuant to U.S.S.G. § 3E1.1(b) if the following conditions are met: (a) Weeks enters a plea pursuant to this agreement, (b) this Office in its discretion determines that Weeks' acceptance of responsibility has continued through the date of sentencing and Weeks therefore qualifies for a 2-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and (c) Weeks' offense level under the Guidelines prior to the operation of § 3E1.1(a) is 16 or greater.

- 11 -

## Agreed Total Guidelines Offense Level

16. In accordance with the above, the parties agree that the total Guidelines offense level applicable to Weeks is 25 (the "agreed total Guidelines offense level").

17. The parties agree not to seek or argue for any upward or downward departure, adjustment or variance not set forth herein. The parties further agree that a sentence within the Guidelines range that results from the agreed total Guidelines offense level is reasonable.

## Appeal Waiver

18. Weeks knows that he has and, except as noted below in this paragraph, voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results from the agreed total Guidelines offense level. This Office will not file any appeal, motion, or writ which challenges the sentence imposed by the sentencing court if that sentence falls within or above the Guidelines range that results from the agreed total Guidelines offense level. The parties reserve any right they may have under 18 U.S.C. § 3742 to appeal the sentencing court's determination of the criminal history category. The provisions of this paragraph are binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, if the sentencing court accepts a stipulation, both parties waive the right to file an appeal, collateral attack, writ, or motion claiming that the sentencing court erred in doing so.

19. Both parties reserve the right to oppose or move to dismiss any appeal, collateral attack, writ, or motion barred by the preceding paragraph and to file or to oppose any appeal, collateral attack, writ or motion not barred by the preceding paragraph.

# Exhibit F

Plea Agreement Joseph Frank Abel, dated August 5, 2020



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

_____

*Anthony Torntore*                          *970 Broad Street, Suite 700*
*Assistant United States Attorney*          *Newark, New Jersey 07102*

                                            *Direct Dial: (973) 645-2726*
                                            *Facsimile: (973) 297-2045*

                                            August 5, 2020

Jason J. LeBoeuf, Esq.
Ziegler, Zemsky & Resnick
651 Old Mount Pleasant Avenue, Suite 150
Livingston, NJ 07039

            Re:   Plea Agreement with Joseph Frank Abel
                        19-CR-877 (CCC)-04

Dear Mr. LeBoeuf:

        This letter sets forth the plea agreement between your client, Joseph
Frank Abel, and the United States Attorney for the District of New Jersey ("this
Office"). This plea offer will expire if an executed copy is not received by this
Office by 5 p.m. on August 14, 2020.

Charge

        Conditioned on the understandings specified below, this Office will
accept a guilty plea from Joseph Frank Abel ("Abel") to (a) Count Two of the
Indictment, Crim. No. 19-877 (CCC), which charges Abel with conspiring to
offer and sell unregistered securities, contrary to Title 15, United States Code,
Sections 77e and 77x, in violation of Title 18, United States Code, Section 371;
and (b) an Information charging Abel with one count of subscribing to a false
tax return, in violation of Title 26, United States Code, Section 7206(1). If Abel
enters a guilty plea and is sentenced on the above charges, this Office will not
initiate any further criminal charges against Abel based upon (a) his
involvement, from in or around 2013 through in or around December 2019, in
the BitClub Network, as further detailed in the Indictment; or (b) his filing or
non-filing of taxes during the taxable periods 2015 through 2018. Further, in
the event that a guilty plea in this matter is not entered for any reason or the
judgment of conviction entered as a result of this guilty plea does not remain in
full force and effect, Abel agrees that any dismissed charges and any other
charges that are not time-barred by the applicable statute of limitations on the
date this agreement is signed by Abel may be commenced against him,

notwithstanding the expiration of the limitations period after Abel signs the agreement.

<u>Sentencing</u>

The violation of 18 U.S.C. § 371 charged in Count Two of the Indictment to which Abel agrees to plead guilty carries a statutory maximum term of five years' imprisonment and a statutory maximum fine equal to the greatest of:  (1) $250,000; (2) twice the gross amount of any pecuniary gain that any person derived from the offense; or (3) twice the gross amount of any pecuniary loss sustained by any victims of the offense.  Fines imposed by the sentencing judge may be subject to the payment of interest.

The violation of 26 U.S.C. § 7206 charged in Count One of the Information to which Abel agrees to plead guilty carries a statutory maximum prison sentence of 3 years imprisonment and a statutory maximum fine of not more than $100,000.

The sentence on each count may run consecutively.  Fines imposed by the sentencing judge may be subject to the payment of interest.

The sentence to be imposed upon Abel is within the sole discretion of the sentencing judge, subject to the provisions of the Sentencing Reform Act, 18 U.S.C. §§ 3551-3742, and the sentencing judge's consideration of the United States Sentencing Guidelines.  The United States Sentencing Guidelines are advisory, not mandatory.  The sentencing judge may impose any reasonable sentence up to and including the statutory maximum term of imprisonment and the maximum statutory fine.  This Office cannot and does not make any representation or promise as to what guideline range may be found by the sentencing judge, or as to what sentence Abel ultimately will receive.

Further, in addition to imposing any other penalty on Abel, the sentencing judge: (1) pursuant to 18 U.S.C. § 3013, will order Abel to pay an assessment of $100 per count ($200 total), which assessment must be paid by the date of sentencing; (2) with respect to both counts, must order Abel to pay restitution pursuant to 18 U.S.C. § 3663 <u>et seq.</u>; (3) with respect to Count One of the Information, may order Abel to pay the costs of prosecution; and (4) with respect to both counts, pursuant to 18 U.S.C. § 3583, may require Abel to serve a term of supervised release of not more than three years, which will begin at the expiration of any term of imprisonment imposed.  Should Abel be placed on a term of supervised release for either count and subsequently violate any of the conditions of supervised release before the expiration of its term, Abel may be sentenced to not more than two years' imprisonment for each count, which may be concurrent or consecutive,  regardless of the statutory maximum term of imprisonment set forth above and without credit

2

for time previously served on post-release supervision, and may be sentenced to an additional term of supervised release.

Rights of This Office Regarding Sentencing

      Except as otherwise provided in this agreement, this Office reserves its right to take any position with respect to the appropriate sentence to be imposed on Abel by the sentencing judge, to correct any misstatements relating to the sentencing proceedings, and to provide the sentencing judge and the United States Probation Office all law and information relevant to sentencing, favorable or otherwise.  In addition, this Office may inform the sentencing judge and the United States Probation Office of: (1) this agreement; and (2) the full nature and extent of Abel's activities and relevant conduct with respect to this case.

Stipulations

      This Office and Abel agree to stipulate at sentencing to the statements set forth in the attached Schedule A, which hereby is made a part of this plea agreement.  This agreement to stipulate, however, cannot and does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties.  To the extent that the parties do not stipulate to a particular fact or legal conclusion, each reserves the right to argue the existence of and the effect of any such fact or conclusion upon the sentence.  Moreover, this agreement to stipulate on the part of this Office is based on the information and evidence that this Office possesses as of the date of this agreement.  Thus, if this Office obtains or receives additional evidence or information prior to sentencing that it determines to be credible and to be materially in conflict with any stipulation in the attached Schedule A, this Office shall not be bound by any such stipulation.  A determination that any stipulation is not binding shall not release either this Office or Abel from any other portion of this agreement, including any other stipulation.  If the sentencing court rejects a stipulation, both parties reserve the right to argue on appeal or at post-sentencing proceedings that the sentencing court was within its discretion and authority to do so.  These stipulations do not restrict the Government's right to respond to questions from the Court and to correct misinformation that has been provided to the Court.

Restitution

      Pursuant to 18 U.S.C. §§ 3663(a)(3) and 3663A(b)(1)(B), this Office and Abel agree that Abel shall pay restitution to all victims of Count Two of the Indictment in such an amount as the parties will agree or, if no agreement can be reached, the Court shall determine following an evidentiary hearing.  Abel

understands and agrees that the losses and restitution computed may exceed the loss amount agreed upon by the Government for purposes of the advisory Sentencing Guidelines computation, and the Government is permitted to provide the Court with information about the loss and restitution that will exceed the figures reflected in the negotiated, agreed-upon range reflected in Schedule A used to determine Abel's advisory guidelines range of imprisonment.

Pursuant to 18 U.S.C. § 3663(a)(3), Abel further agrees to pay restitution for losses beyond those directly caused by the offense of conviction charged in Count Two of the Indictment. This Office and Abel agree, pursuant to 18 U.S.C. § 3663(a)(3), that Abel shall pay restitution, in amounts to be agreed upon by the parties or, if no agreement can be reached, as determined by the Court following an evidentiary hearing, to all victims of Abel's conduct charged in Count Two of the Indictment. This Office and Abel agree to be bound by the Court's determinations regarding the victims of Abel's conduct charged in Count Two of the Indictment and the restitution to be paid to each.

If the Court imposes a schedule of payments, Abel understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods available to the United States to enforce the judgment.

In addition to the foregoing, and pursuant to 18 U.S.C. § 3663(a)(3), Abel agrees to pay restitution in the amount of $4,306,873.00 to the Internal Revenue Service ("IRS") based on the offense conduct charged in Count One of the Information. Abel understands and agrees that this figure does not include interest under 26 U.S.C. § 6601, which will be assessed by the IRS pursuant to Title 26. Abel agrees that the total amount of restitution reflected in this Agreement results from his criminal conduct. The restitution amount is based upon the total amount of loss for calendar years 2015 through 2018 and shall be paid according to a payment plan established by the Court. If the Court orders Abel to pay restitution to the IRS for the failure to pay tax, either directly as part of the sentence or as a condition of supervised release, the IRS will use the restitution order as the basis for a civil assessment. *See* 26 U.S.C. § 6201(a)(4)(a). Abel does not have the right to challenge the amount of this assessment. *See* 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor Abel's timely payment of restitution according to that schedule will preclude the IRS from administrative collection of the restitution-based assessment, including levy and distraint under 26 U.S.C. § 6331.

Abel further agrees that $44,300.00 in United States currency located in Abel's residence on December 10, 2019 shall be applied to the tax loss attributed to Abel as a result of his guilty plea to Count One of the Information.

<u>Forms and Waivers</u>

Prior to the date of sentencing, Abel shall: (1) sign and file with the IRS a Form 870 Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment in lieu of filing returns or amended returns, for calendar years 2015 through 2018; (2) sign and file with the IRS a Form 2054 Agreement to Assessment and Collection of Additional Tax and Acceptance of Overassessment in lieu of filing returns or amended returns, for calendar years 2015 through 2018; (3) provide all appropriate documentation to the IRS in support of such Form 870 and 2504 waivers, upon request; (4) pay to the IRS all taxes and any penalties owed on those returns, or, if unable to do so, make satisfactory repayment arrangements with the IRS; and (5) fully cooperate with the IRS and comply with the tax laws of the United States. Further, Abel agrees to allow the contents of his IRS criminal file to be given to civil attorneys and support staff of the IRS to enable them to investigate, if applicable, any and all civil penalties that may be due and owing by Abel. With respect to disclosure of the criminal file to the IRS, Abel waives any rights under Title 26, United States Code, Section 7213, Federal Rule of Criminal Procedure 6(e), and any other right of privacy with respect to Abel's tax returns and return information. Further, Abel agrees not to file any claims for refund of taxes, penalties, and interest for calendar years 2015 through 2018 or for any other amounts paid in accordance with this Agreement. Abel agrees that the provisions set forth in this Agreement concerning his tax obligations, including those obligations set forth under the caption "Other Provisions" of this Agreement, are appropriate conditions of probation or supervised release.

Abel further agrees that within ten (10) days of the execution of this plea agreement, he shall complete and submit the attached Financial Disclosure Statement provided by the United States (the "Financial Disclosure Statement"), along with all documents supporting his stated assets and liabilities. It is the intention of the parties that Abel shall disclose all of his virtual currency holdings, including those held on exchanges and on cold storage wallets. Abel agrees to cooperate fully with Financial Litigation personnel of the Asset Recovery and Money Laundering Unit ("ARMLU") with respect to requests for additional information pertaining to the Abel's assets and liabilities, and agrees, if necessary, to appear for a deposition concerning his assets and liabilities and his ability to pay restitution. Abel understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding Abel's acceptance of responsibility.

<u>Waiver of Appeal and Post-Sentencing Rights</u>

As set forth in Schedule A, this Office and Abel waive certain rights to file an appeal, collateral attack, writ, or motion after resentencing, including but

not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255.

Venue

Abel agrees to waive and forego any and all challenges to venue in the District of New Jersey. Abel understands and agrees that the charge in the Information will be filed and adjudicated in the District of New Jersey. Abel further agrees not to assert in any appeal, motion or collateral attack, including a motion brought pursuant to 28 U.S.C. § 2255, any claim or argument challenging venue in the District of New Jersey to the charge in the Information, as set forth above.

Immigration Consequences

Abel understands that, if he is not a citizen of the United States, his guilty plea to the charged offenses will likely result in him being subject to immigration proceedings and removed from the United States by making him deportable, excludable, or inadmissible, or ending his naturalization. Abel understands that the immigration consequences of this plea will be imposed in a separate proceeding before the immigration authorities. Abel wants and agrees to plead guilty to the charged offenses regardless of any immigration consequences of this plea, even if this plea will cause his removal from the United States. Abel understands that he is bound by his guilty plea regardless of any immigration consequences of the plea. Accordingly, Abel waives any and all challenges to his guilty plea and to his sentence based on any immigration consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction, or sentence, based on any immigration consequences of his guilty plea.

Other Provisions

This agreement is limited to the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities. However, this Office will bring this agreement to the attention of other prosecuting offices, if requested to do so.

This agreement was reached without regard to any civil or administrative matters that may be pending or commenced in the future against Abel. This agreement does not prohibit the United States, any agency thereof (including the IRS and Immigration and Customs Enforcement), or any third party from initiating or prosecuting any civil or administrative proceeding against Abel.

No provision of this agreement shall preclude Abel from pursuing in an appropriate forum, when permitted by law, an appeal, collateral attack, writ, or

motion claiming that Abel's guilty plea or sentence resulted from constitutionally ineffective assistance of counsel.

<u>No Other Promises</u>

This agreement constitutes the plea agreement between Abel and this Office and supersedes any previous agreements between them. No additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties.

Very truly yours,

CRAIG CARPENITO
United States Attorney

By: _____

ANTHONY P. TORNTORE
JAMIE L. HOXIE
Assistant U.S. Attorneys

Approved:

_____

DAVID W. FEDER
Chief, Cybercrime Unit

7

I have received this letter from my attorney, Jason J. LeBoeuf, Esq.  I have read it.  My attorney and I have discussed it and all of its provisions, including those addressing the charges, sentencing, forfeiture, stipulations, waiver, and immigration consequences.  I understand this letter fully.  I hereby accept its terms and conditions and acknowledge that it constitutes the plea agreement between the parties.  I understand that no additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties.  I want to plead guilty pursuant to this plea agreement.

AGREED AND ACCEPTED:

_____                    Date: 8/14/20
Joseph Frank Abel


I have discussed with my client this plea agreement and all of its provisions, including those addressing the charges, sentencing, forfeiture, stipulations, waiver, and immigration consequences.  My client understands this plea agreement fully and wants to plead guilty pursuant to it.

_____                    Date: 8/14/20
Jason J. LeBoeuf, Esq.

8

Plea Agreement with Joseph Frank Abel

SCHEDULE A

1.    This Office and Abel recognize that the United States Sentencing Guidelines are not binding upon the Court.  This Office and Abel nevertheless agree to the stipulations set forth herein, and agree that the Court should sentence Abel within the Guidelines range that results from the total Guidelines offense level set forth below. This Office and Abel further agree that neither party will argue for the imposition of a sentence outside the Guidelines range that results from the agreed total Guidelines offense level.

2.    The version of the United States Sentencing Guidelines effective November 1, 2018 applies in this case.

Count Two of the Indictment ("The Indictment Count")

3.    The applicable guideline for the Indictment Count is U.S.S.G. § 2X1.1 because the offense is conspiracy in violation of Title 18, United States Code, Section 371.  *See* U.S.S.G. Appendix A.

4.    The applicable guideline for the base offense level for the Indictment Count is U.S.S.G. § 2B1.1, because the substantive offense is offering and selling unregistered securities.

5.    Under U.S.S.G. § 2B1.1(a)(1), the base offense level is 6 because conviction of the Indictment Count carries a statutory maximum term of imprisonment of less than twenty years.

6.    Specific Offense Characteristic U.S.S.G. § 2B1.1(b)(1)(J) applies because the relevant loss amount that the parties have negotiated is more than $3,500,000 but not more than $9,500,000.  This results in an increase of 13 levels.

7.    Specific Offense Characteristic U.S.S.G. § 2B1.1(b)(2)(A) applies because the offense involved 10 or more victims.  This results in an increase of 2 levels.

8.    Specific Offense Characteristic U.S.S.G. § 2B1.1 (b)(10)(C) applies because the offense involved sophisticated means.  This results in an increase of 2 levels.

9.     The total adjusted level for Count Two of the Indictment is 28.

Count One of the Information ("The Information Count")

10.     The applicable guidelines for Count One of the Information, charging a violation of Title 26, United States Code, Section 7206(1), are U.S.S.G. §§ 2T1.1 and 2T4.1.  Abel agrees that he filed a false tax return for the calendar year 2017.  Abel further agrees that he is also responsible pursuant to the relevant conduct provision, U.S.S.G. § 1B1.3, for the loss created by his non-filing of tax returns for calendar years 2015, 2016, and 2018.  The parties agree that combined the tax loss for the calendar years 2015 through 2018 is greater than $3,500,000, but less than $9,500,000.  This corresponds to an Offense Level of 24 pursuant to U.S.S.G. § 2T4. 1(J).

11.     Because Abel failed to report and correctly identify the source of income exceeding $10,000 in any year from criminal activity, a two level upward adjustment is warranted pursuant to U.S.S.G. § 2T1. 1(b)(1).

12.     The total adjusted level for Count One of the Information is 26.

Grouping Analysis

13.     Count Two of the Indictment and Count One of the Information group pursuant U.S.S.G. § 3D1.2(d) as both offense levels are determined largely on the basis of the total amount of loss.  Pursuant to U.S.S.G. § 3D1.3(b), the offense level corresponds to the aggregate quantity and the offense guideline that produces the highest offense level applies.  The parties agree that combining the loss amounts for the two groups results in a loss amount of more than $3,500,000 but not more than $9,500,000.  Thus, the offense level will be 28.

Acceptance of Responsibility

14.     As of the date of this letter, it is expected that Abel will enter a plea of guilty prior to the commencement of trial, will truthfully admit his involvement in the offense and related conduct, and will not engage in conduct that is inconsistent with such acceptance of responsibility.  If all of these events occur, and Abel's acceptance of responsibility continues through the

date of sentencing, a downward adjustment of 2 levels for acceptance of responsibility will be appropriate.  *See* U.S.S.G. § 3E1.1(a).

15.     As of the date of this letter, it is expected that Abel will assist authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting this Office to avoid preparing for trial and permitting this Office and the court to allocate their resources efficiently.  At sentencing, this Office will move for a further 1-point reduction in Abel's offense level pursuant to U.S.S.G. § 3E1.1(b) if the following conditions are met: (a) Abel enters a plea pursuant to this agreement, (b) this Office in its discretion determines that Abel's acceptance of responsibility has continued through the date of sentencing and Abel therefore qualifies for a 2-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and (c) Abel's offense level under the Guidelines prior to the operation of § 3E1.1(a) is 16 or greater.

Agreed Total Guidelines Offense Level

16. In accordance with the above, the parties agree that the total Guidelines offense level applicable to Abel is 25 (the "agreed total Guidelines offense level").

17.     The parties agree not to seek or argue for any upward or downward departure, adjustment or variance not set forth herein.  The parties further agree that a sentence within the Guidelines range that results from the agreed total Guidelines offense level is reasonable.

Appeal Waiver

18.     Abel knows that he has and, except as noted below in this paragraph, voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results from the agreed total Guidelines offense level. This Office will not file any appeal, motion, or writ which challenges the sentence imposed by the sentencing court if that sentence falls within or above the Guidelines range that results from the agreed total Guidelines offense level. The parties reserve any right they may have under 18 U.S.C. § 3742 to appeal the sentencing court's determination of the criminal history category.  The

11

provisions of this paragraph are binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, if the sentencing court accepts a stipulation, both parties waive the right to file an appeal, collateral attack, writ, or motion claiming that the sentencing court erred in doing so.

19.    Both parties reserve the right to oppose or move to dismiss any appeal, collateral attack, writ, or motion barred by the preceding paragraph and to file or to oppose any appeal, collateral attack, writ or motion not barred by the preceding paragraph.

# Exhibit G

Pre-Sentencing Report (PSR) (Docket Entry 384, Jan. 7, 2025)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | PRESENTENCE INVESTIGATION REPORT |
| | ) | |
| JOBADIAH SINCLAIR WEEKS | ) | Docket No.   0312 2:19CR00877-3 |
| | ) | |

**Prepared For:**    **THE HONORABLE CLAIRE C. CECCHI**
United States District Judge

**Prepared By:**    **KELLY A. MACIEL**
U.S. Probation Officer
Newark, New Jersey
973-943-0378
kelly_maciel@njp.uscourts.gov

**Assistant U.S. Attorneys**
Anthony P. Torntore and Joseph N. Minish,
970 Broad Street
Newark, New Jersey 07102
973-645-2726
anthony.torntore@usdoj.gov
joseph.minish@usdoj.gov

**Defense Counsel**
David Boies, Matthew L. Schwartz, and John
Zack (Retained)
333 Main Street, Suite 3001
Armonk, New York 10504
914-749-8201
212-446-2300
dboies@bsfllp.com
mlschwartz@bsfllp.com
jzach@bsfllp.com

David S. Stone (Retained)
400 Connell Drive, Suite 6200
Berkeley Heights, New Jersey 07922
973-218-1111
dstone@smcomplex.com

**Sentence Date:**    02/06/2025

**Offense:**    <u>Count One</u>: Tax Evasion – 26 U.S.C. § 7201 - Not more than 5 years
imprisonment/$250,000 fine, a Class D Felony
<u>Count Two</u>: Conspiracy to Offer and Sell Unregistered Securities –
18 U.S.C. § 371 [15 U.S.C. §§ 77x and 77e] - Not more than 5 years
imprisonment/$250,000 fine, a Class D Felony

**Arrest Date:**    12/10/2019
**Release Status:**    11/06/2020: Released on $2,000,000 Secured Appearance Bond
**Detainers:**    None
**Codefendants:**    *See* Part A
**Related Cases:**    *See* Part A

**Date Report Prepared:** 10/24/2024                **Final Report Prepared:** 01/07/2025

U.S. DISTRICT COURT                                    JOBADIAH SINCLAIR WEEKS

**Identifying Data:**

| | |
|---|---|
| **Date of Birth:** | August 25, 1981 |
| **Age:** | 43 |
| **Race:** | White, Non-Hispanic origin |
| **Sex:** | Male |
| **SSN:** | 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 |
| **FBI #:** | 339747LB6 |
| **USM #:** | 25950-104 |
| **Other ID #:** | CO SID No. 1057506 |
| | NV SID No. 04487983 |
| | CO DL No. 971210322 |
| **PACTS #:** | 6764673 |
| **Education:** | High School Diploma |
| **Dependents:** | 2 (wife and minor child) |
| **Citizenship:** | U.S. Citizen |
| **Legal Address:** | 11627 West 74th Way |
| | Arvada, Colorado 80005 |
| **Alias(es):** | Joby Weeks |



***Restrictions on Use and Redisclosure of Presentence Investigation Report.*** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

U.S. DISTRICT COURT                                    JOBADIAH SINCLAIR WEEKS

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.  On November 5, 2020, **Jobadiah Sinclair Weeks** appeared before the Honorable Claire
    C. Cecchi, United States District Judge, and pled guilty to Count One of the Information
    and Count Two of the Indictment, both under the same docket.

Information

2.  Count One charged that from January 2015 through April 2019, in the District of
    Colorado and elsewhere, **Jobadiah Sinclair Weeks** willfully attempted to evade and
    defeat the income taxes due and owing by him to the United States of America, for
    calendar years 2015, 2016, 2017, and 2018, totaling at least approximately $7 million, by
    committing the following affirmative acts, among others: (a) using a virtual private
    network, or VPN, to obscure his true, U.S.-based IP addresses, so that he could avoid
    detection and regulation by U.S. law enforcement, including the IRS; (b) applying for
    citizenship in the Federation of Saint Christopher and Nevis; and (c) concealing income
    and other assets through the use of private cryptocurrency wallets, in violation of Title
    26, United States Code, Section 7201.

Indictment

3.  Count one charged that from at least in or around April 2014 through in or about
    December 2019, in Passaic County, in the District of New Jersey, and elsewhere,
    defendants, Matthew Brent Goettsche, Russ Albert Medlin; **Jobadiah Sinclair Weeks**,
    and Silviu Catalin Balaci, knowingly and intentionally conspired and agreed with each
    other and others to devise a scheme and artifice to defraud, and to obtain money and
    property from victims by means of false and fraudulent pretenses, representations, and
    promises, and, for the purpose of executing such scheme and artifice to defraud, to
    transmit and cause to be transmitted by means of wire communications in interstate and
    foreign commerce certain writings, signs, signals, pictures, and sounds, contrary to Title
    18, United States Code, Section 1343, all in violation of Title 18, United States Code,
    Section 1349.

4.  Count Two charged that from in or about 2014 through in or about December 2019, in
    Passaic County, in the District of New Jersey, and elsewhere, defendants, Matthew Brent
    Goettsche; Russ Albert Medlin; Joseph Frank Abel; **Jobadiah Sinclair Weeks**; and
    Silviu Catalin Balaci, knowingly and intentionally conspired and agreed with each other
    and others to directly and indirectly willfully offer and sell unregistered securities,
    contrary to Title 15, United States Code, Sections 77e and 77x, and in violation of Title
    18, United States Code, Section 371.

U.S. DISTRICT COURT                                    JOBADIAH SINCLAIR WEEKS

**Status of Defendants**

5.    The following chart summarizes the charges and convictions for identified co-defendants and related cases:

| Defendant/ Docket No. | Charges and Conviction(s) | Status |
|---|---|---|
| Matthew Brent Goettsche 19-CR-00877-1 | 12/05/2019: Indictment filed Ct. 1: 18 U.S.C. § 1349 [18 U.S.C. § 1343] Ct. 2:18 U.S.C. § 371 [15 U.S.C. §§ 77e and 77x] | Pending Prosecution |
| Russ Albert Medlin 19-CR-00877-2 | 12/05/2019: Indictment filed Ct. 1: 18 U.S.C. § 1349 [18 U.S.C. § 1343] Ct. 2: 18 U.S.C. § 371 [15 U.S.C. §§ 77e and 77x] | Pending Prosecution |
| Silviu Catalin Balaci 19-CR-00877-5 | 07/09/2020: Pled Guilty to Cts. 1 and 2 of an Indictment Ct. 1: 18 U.S.C. § 1349 [18 U.S.C. § 1343] Ct. 2: 18 U.S.C. § 371 [15 U.S.C. §§§ 77b(a)(1), 77e, and 77x] | Pending Sentencing |
| Joseph Frank Abel 19-CR-00877-4 | 09/03/2020: Pled guilty to Ct. 1 of an Information and Ct. 2: of an Indictment Ct. 1: 26 U.S.C. § 7206(1) Ct. 2: 18 U.S.C. § 1349 [18 U.S.C. § 1343] | Pending Sentencing |
| Gordon Brad Beckstead 22-CR-00204-1 | 03/24/2022: Pled Guilty to Cts. 1 and 3 of an Information Ct. 1: 18 U.S.C. § 1956(h) and 2 [18 U.S.C. § 1956(a)(1)(B)(i)] Ct. 2: 26 U.S.C. § 7206(2) Ct. 3: 26 U.S.C. § 7206(2) | Pending Sentencing |

**The Offense Conduct**

6.    This version of the Offense Conduct was prepared by Sr. USPO Shannan DaSilva and approved by Supervising USPO Natalie Shreve.

7.    The following information was prepared after a review of the charging document and investigation information provided by the government and prepared by law enforcement officers of the Federal Bureau of Investigation (FBI) and Internal Revenue Service (IRS).

Individuals and Entities

8.    BitClub Network ("BCN") was a worldwide fraudulent scheme that solicited money from investors in exchange for shares of pooled investments in cryptocurrency mining and that rewarded existing investors for recruiting new investors. BCN was created in 2014.

U.S. DISTRICT COURT                                JOBADIAH SINCLAIR WEEKS

9.    Matthew Brent Goettsche created and operated BCN. Goettsche held the lead role in BCN and controlled most of the assets. Goettsche was not publicly known as the owner of BCN, and the company website reflected that that it was owned by its members and operated by an unnamed team of experts, entrepreneurs, professionals, network marketers, and programming geeks.

10.   Russ Albert Medlin created, operated, and promoted BCN.

11.   Silviu Catalin Balaci created BCN; however, he did not co-own company with Goettsche and Medlin. Balaci was also a computer programmer for BCN.

12.   **Jobadiah Sinclair Weeks** was a resident of Colorado and was a promoter of BCN. **Weeks** sold or caused to be sold by those he recruited BCN mining pool packages to investors all over the world. **Weeks** joined BCN approximately one year after it was formed.

13.   Joseph Frank Abel was a resident of Ventura County, California, and was a promoter of BCN. Abel was a recruiter for BCN from its first day of operation.

14.   **Weeks** and Abel worked directly under the two owners of BCN, Russ Medlin and Matt Goettsche. **Weeks** and Abel held a rank inside BCN as "Mega-Monsters", the highest rank that a BCN recruiter can have, and they both earned millions of dollars in MLM commissions.

15.   Gordon Brad Beckstead was a resident of Nevada and was Goettsche's tax preparer since 2004. Beckstead was a CPA until 2016, when his license was suspended by the State of Nevada for violations which were unrelated to the instant offense.

16.   Beckstead managed Goettsche's financial records and prepared his personal and business tax returns. On behalf of Goettsche, Beckstead also opened bank accounts, had signatory authority, and was the chief financial officer for many of the business entities Goettsche directed him to create.

Relevant Terminology

17.   Cryptocurrency was a digital representation of value that could be traded and functioned as a medium of exchange; a unit of account; and a store of value. Its value was decided by consensus within the community of users of the cryptocurrency.

18.   Bitcoin was a type of cryptocurrency. Bitcoin were generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin could be used for purchases or exchanged for other currency on currency exchanges.

19.   Mining was the way new bitcoin were produced and the way bitcoin transactions were verified. Individuals or entities ran special computer software to solve complex algorithms that validated groups of transactions in a particular crypto currency. Under the bitcoin protocol, which fostered a competition to verify transactions for inclusion on the

- 5 -

public bitcoin ledger, known as the "blockchain," the first miner to solve the algorithm was rewarded with a preset amount of newly issued bitcoin.

20.     Hash rate was the measure of the speed at which a mining machine operated by way of computer processing power that was applied by miners to solve the algorithms and harvest new currency. Hash rate was expressed generally as the number of calculations mining computers could perform per second. In general, the greater the hash rate, the greater the miner's chance to solve the algorithm and be rewarded the newly issued bitcoin.

21.     Mining pools were combinations of cryptocurrency miners who consolidated their computing power to achieve greater hash rate.

22.     A virtual private network (VPN) allowed an internet user to secure his or her internet connection and anonymize internet use by obscuring and concealing the user's true personal identity and location information.

The Conspiracy

23.     The goal of the conspiracy for Goettsche, Medlin, **Weeks**, Abel, and Balaci, to enrich themselves by soliciting and causing others to solicit investments in BCN through materially false and fraudulent pretenses, representations, promises, and omissions.

24.     Goettsche, Medlin, **Weeks**, Abel, and Balaci, directly and indirectly, offered and sold securities in BCN without filing a registration statement with the U.S. Securities and Exchange Commission, and used the means and instruments of transportation and communication in interstate commerce and the mail in connection with the offer and sale, for the purpose of enriching themselves and others.

25.     BCN marketed itself as a profit-seeking business venture where investors paid a $99 membership fee to be a part of BCN arid then were provided the option to pay additional money for shares in what BCN purported were three mining pools. According to BCN's website, investors could earn passive income through investment in the pools.

26.     Goettsche, Medlin, **Weeks**, and Abel promoted and caused to be promoted investments in BCN shares as a pooled investment of bitcoin mining proceeds. Medlin, **Weeks**, and Abel promoted the sale of shares in BCN through discussions with potential investors via the Internet and by creating and posting videos, and webinars, on the Internet. They also made presentations in the United States, including New Jersey and California, and around the world.

27.     Goettche, Medlin, **Weeks**, and Abel, directly and indirectly took money from investors in exchange for membership in BCN and as investment for shares of mining pools that BCN purported to own and operate. **Weeks** and Abel encouraged U.S. investors to utilize a VPN to obscure their true, U.S.-based IP addresses so that BCN and the defendants could avoid detection and regulation by law enforcement.

28.    BCN represented to investors that BCN would pool investor money together to sustain, among other things, bitcoin mining pools, which included purchasing mining equipment and computer power and by engaging in cryptocurrency mining. On its website, BCN further stated that BCN "use[s] our leverage and massive purchasing power to strategically buy mining hardware at the lowest prices and share in all the profits produced."

29.    BCN represented to investors that investors' mining returns would be calculated based on the mining success of the collective operations for each of the pools. BCN represented that purchases of shares in the mining pools would determine a BCN member's allocation of mining pool profits, with more shares leading to a greater allocation of the mining pool profits. BCN's website displayed the following illustration of how BCN investors would earn profit from their investments in shares of the purported bitcoin mining pools.

30.    Despite the claims made to investors, Goettsche and Balaci discussed and understood that BCN's purported cryptocurrency mining would not be profitable but would serve to induce investors to purchase BCN memberships and shares in BCN's purported mining pools.

31.    The defendants made, and caused others to make, materially false and fraudulent representations and concealed material facts from investors regarding aspects of BCN's investment products, including the information that was displayed to BCN's investors as proof of bitcoin mining earnings that purportedly were generated through BCN's bitcoin mining pool.

32.    BCN promoted and sold shares of its mining pools both in the United States, including in New Jersey, and abroad.

33.    Goettsche, Balaci, and Medlin manipulated the numbers that were displayed to BCN investors as mining earnings to promote the sale of bitcoin mining shares in BCN and to convince BCN members to invest additional funds in other BCN cryptocurrency-related products.

34.    Based on the materially false and fraudulent representations that the defendants made, and caused to be made, to investors, the defendants both individually and through BCN, received funds from investors, including through cash, check, wire transmissions, and cryptocurrency transfers.

35.    The defendants, through BCN, obtained at least $722 million from investors.

36.    The defendants and others discussed the fraudulent scheme over email and Internet, posted videos encouraging investment in BCN, and used the BCN website to promote the fraudulent scheme. An example of an email exchanged, was in January 2015, when Goettsche emailed Balaci, "we are building this whole model on the backs of idiots" and to "prove the mining… just means convincing the morons."

37.     In February 2015, Goettsche directed Balaci to manipulate and falsely increase the "mining earnings" figures displayed to investors on theft BCN online accounts.

38.     In August 2015 through November 2019, BCN falsely claimed on its website that "Our pool was established in October 2014 as a solo mining pool that was exclusive to BitClub Network members," when, in fact, BCN lacked a mining pool exclusive to its members in October 2014.

39.     In September 2017, Goettsche and Medlin exchanged emails regarding a new scheme to encourage current BCN investors to reinvest their shares into another BCN investment product. Goettsche suggested that BCN manipulate mining earnings by closing the current pool to new shares and calling it the Early Adopters or Legacy Pool. The scheme involved continuing to pay out for the total of the life of the pool, but no more partial or new shares would be allowed in.

40.     Throughout the scheme, Goettsche misused BCN investor funds for purposes other than those represented to its members. Goettsche purchased personal and business real estate, private islands, private jets, ownership stakes in various businesses, and countless personal expenditures. In addition, he set up a venture capital family office to provide seed funding to a multitude of start-up companies.

Loss

41.     The indictment alleged that the defendants, through BCN, obtained at least $722 million from investors. The Government provided additional information regarding loss and/or credits to the investors showing that this figure likely exceeded $1 billion. Based on the complexity of the case, the loss amounts attributed to each defendant will be calculated based on the agreed amounts outlined in their respective plea agreements.

The Internal Revenue Service (IRS)

42.     The IRS was an agency of the United States Department of the Treasury, responsible for administering and enforcing the tax laws of the United States and collecting the taxes that were due and owing to the Treasury of the United States by its citizens and businesses.

*Conduct Related to Goettsche and Beckstead*

43.     Goettsche liquidated BCN funds from crypto to Fiat[1] currency. He then funneled the liquidations of crypto using numerous third parties including attorneys, exchanges, Over-The-Counter desks at exchanges, nominee bank accounts, shell companies, and lifestyle concierge services. For many of these expenditures, especially the largest ones, Goettsche directed the money to flow through multiple layers, to the ultimate destination, without ever being deposited into an account in his name.

---

[1] A cursory internet search found that Fiat currency is a government-issued currency that is not backed by a physical commodity, such as gold or silver. Instead, its value comes from the public's trust in the government that issued it.

44.     Goettsche did not have a formal compensation structure for being the principal owner of BCN nor was BCN registered as a corporation or a partnership.

45.     Beckstead was responsible for keeping track of Goettsche's income, and he willfully and knowingly prepared or helped prepare false tax returns for Goettsche. Beckstead helped Goettsche evade federal income taxes and launder BCN proceeds by directing and authorizing the transfers exceeding $50 million to and from Entity Accounts, which were designed to conceal the source of Goettsche's income generated from BCN and to disguise Goettsche's ownership of properties and assets paid for with BCN proceeds. This was also done to evade tax reporting requirements.

46.     Goettsche reported total taxable income of $10,690,383 and $3,049,437, for tax years 2017 and 2018 on his personal income tax returns. On October 2, 2019, Goettsche submitted an amended personal income tax return that included tax year 2017 on which he reported a reduced taxable income figure of $9,692,506.

47.     The 2017 Tax Return was prepared with the assistance of Beckstead. In the return, Goettsche omitted $16,380,062 of income earned through his operation of BCN on his personal income tax returns which resulted in an additional tax loss of $5,460,696.

48.     The 2018 Tax Return was prepared with the assistance of Beckstead. In the return, Goettsche omitted $49,575,060 of income earned through his operation of BCN on his personal income tax returns which resulted in an additional tax loss of $18,364,153. This caused a total tax loss of $23,824,849.

*Conduct Related to **Weeks***

49.     **Weeks** received commission in two methods. The first method was to request for BCN to send him bitcoin to his personal bitcoin wallets by generating a withdrawal from his member back-office account on the BCN website. The second method was for **Weeks** to accept Fiat currency directly from investors and then to credit those investors with mining pool packages by using his existing balance of earnings inside his member back-office account on the BCN website.

50.     **Weeks** received commissions from BCN to his personal bitcoin wallets in the equivalent U.S. dollar amounts of $26,299 in 2015; $185,193 in 2016; $1,458,341 in 2017; and $1,211,643 for the 2018 tax year.

51.     **Weeks** accepted currency from investors for BCN mining pool packages, in the amounts of at least $25,265 for 2016 and $43,350 for 2017. In addition, **Weeks** started a business with an individual named Steven Snyder to create and sell CBD soft gel pills. **Weeks** invested directly into the business, and he also redirected some investor payments directly to Snyder. **Weeks** caused $154,565 in payments to be sent directly to Snyder in 2017.

52.     **Weeks** also earned income through other means. Goettsche did not want his name associated purchases and contracts for equipment or mining; therefore, **Weeks** acted as a

middleman. He was compensated with a finder's fee for putting together parties interested in making deals with BCN. **Weeks** primarily took his "commissions" by up charging BCN and keeping the difference between the payment received from BCN and the amounts he paid for the equipment or services. In this manner, **Weeks** earned $606,850 in 2016; $9,930,584 in 2017; and $553,718 in 2018.

53.   Furthermore, **Weeks**, at times, included stock purchases in the contracts to purchase equipment from Bitfury. These purchases were lumped together with the purchase of equipment, so it would look like the entire payment was for equipment. However, **Weeks** received Bitfury stock that he did not send or disclose to Goettsche or Medlin. In this way, **Weeks** increased the "commission" he received through the equipment purchases. **Weeks** received $3,102,364 worth of stock from Bitfury in 2017.

54.   **Weeks** also received mining earnings from mining pools other than BCN, such as, Bitfury, Genesis Mining, and SlushPool. **Weeks** received at least $111 in 2016; $788,154 in 2017; and $308,707 in 2018 from mining earnings.

55.   In total, **Weeks** received at least $26,299.42 in 2015; $817,419.02 in 2016; $15,477,357.43 in 2017; and $2,074,608.13 in 2018; from income stemming from bitcoin, U.S. currency, and Bitfury stock.

56.   From 2015 through 2018, **Weeks** failed to file a Form 1040, thus failing to report at least $18 million of taxable income to the IRS, including income earned by **Weeks** through his affiliation with the BitClub Network. By failing to report this income, **Weeks** failed to pay $7 million in federal income taxes to the United States.

57.   **Weeks** told individuals who invested with his business to deposit their funds in accounts in other individual's names, or in the name of **Weeks'** charity account, to avoid having deposits made into his personal bank account. **Weeks** also purchased property in St. Kitts to obtain a St. Kitts citizenship and to avoid paying U.S. taxes.

58.   In total, **Weeks** caused a tax loss of $3,480 in 2015; $296,531.08 in 2016; $6,101,648.94 in 2017; and $737,094.74 in 2018, which resulted in a total tax loss of $7,138,754.76.

*Conduct Related to Abel*

59.   Abel received commissions in two methods. The first method was to request for BCN to send him bitcoin to his personal bitcoin wallets by generating a withdrawal from his member back-office account on the BCN website. The second method was for Abel to accept fiat currency directly from investors and then to credit those investors with mining pool packages by using his existing balance of earnings inside his member back-office account on the BCN website.

60.   In total, Abel received a value of at least $65,388, $253,405, $1,650,598, and $10,281,269 for tax years 2015, 2016, 2017, and 2018, respectively, in BCN commissions in the form of bitcoin and U.S. dollars.

U.S. DISTRICT COURT                                        JOBADIAH SINCLAIR WEEKS

61.    For tax year 2017, Abel filed a Form 1040 income tax return with the IRS on October 15, 2018. The return included capital gains listing proceeds from Bitcoin sales of $280,923 which were sold at a profit of $272,496. This return did not include the additional earnings from commissions earned as part of his role as a recruiter for BCN. Records found that Abel earned $1,650,598 from BCN during the 2017 tax year.

62.    The 2017 tax return excluded income totaling $1,369,675 and miscategorized income of $280,923 as a capital gain, all of which was attributable to his role as a promoter for BCN. Commission would not be considered a capital transaction. Therefore, by filing the false return, Abel evaded additional assessed taxes of $476,213 for the 2017 tax year.

63.    In total, Abel caused a tax loss of $11,338 in 2015; $46,573 in 2016; $476,213 in 2017; and $3,772,749 in 2018, which resulted in a total tax loss of $4,306,873.

64.    The investigative report documented that Abel travelled internationally, purchased property in the U.S. and internationally in the Philippines, purchased and leased high priced vehicles, and spent money at casinos and luxury retail stores.

Arrests

65.    Goettsche was arrested without incident at his residence in Colorado on December 10, 2019.

66.    Medlin is currently detained in Indonesia on unrelated charges. The Government advised that Medlin is unable to be extradited and has not been arrested for the instant offense.

67.    **Weeks** was arrested on December 10, 2019, in West Palm Beach, Florida.

68.    Abel was arrested on December 10, 2019, in California.

69.    Balaci was residing in Germany and waived extradition. He self-surrendered and had an initial appearance in the District of New Jersey on July 7, 2020.

70.    Beckstead self-surrendered on March 24, 2022, in the District of New Jersey.

Guideline Analysis

71.    Since use of the manual in effect at the time of sentencing would violate the ex post facto clause of the Constitution, the 2018 Guidelines Manual was used. USSG §1B1.11(a).

**Weeks**

72.    Pursuant to USSG §3D1.2, the offenses set forth in Counts One and Two do not involve the same victim and are not closely related; therefore, they would not normally group; however, it appears that **Weeks** is only being held accountable for the loss amounts attributed to his tax offense. Therefore, the pursuant to USSG §3D1.2(d), the counts will be grouped on the basis of the total amount of loss which was only attributed to the IRS.

- 11 -

It is noted that the parties stipulated that Counts 1 and 2 are grouped under USSG §3D1.2(d).

### *Count One: Tax Evasion*

73. The guideline for a violation of 26 U.S.C. § 7201 is USSG §2T1.1. Pursuant to USSG §2T1.1, the base offense level is determined by the amount of tax loss determined in the tax table at USSG §2T4.1. The tax loss was $7,138,754.76, which is more than $3,500,000 but not more than $9,500,000. Therefore, the base offense level is increased by 24 levels. USSG §§2T1.1(a)(1) and 2T4.1(J).

*Specific Offense Characteristics*

74. **Weeks** failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity. Specifically, from 2015 through 2018, **Weeks** failed to file a Form 1040, thus failing to report the income earned through his affiliation with the BitClub Network. Therefore, the offense level is increased by 2 levels. USSG §2T1.1(b)(1).

75. The adjusted level for Count One of the Information is 26.

### *Count Two: Conspiracy to Offer and Sell Unregistered Securities*

76. The guideline for a violation of 18 U.S.C. § 371 is USSG §2X1.1. Pursuant to §2X1.1(a), §2B1.1 is referenced when determining the offense level. The base offense level is 6, because the offense of conviction does not have a statutory maximum term of imprisonment of 20 years or more. USSG §§2X1.1(a) and 2B1.1(a)(2).

*Specific Offense Characteristics*

77. **Weeks** is accountable for a loss that is more than $3,500,000 but not more than $9,500,000; therefore, the offense level is increased by 18 levels. USSG §2B1.1(b)(1)(J).

78. The offense involved 10 or more victims; therefore, the offense level is increased by 2 levels. USSG §2B1.1(b)(2)(A).

79. The offense involved sophisticated means. Specifically, **Weeks** directed individuals to deposit funds in accounts in other individual's names, or in the name of **Weeks'** charity account, to avoid having deposits made into his personal bank account; therefore, the offense level is increased by two levels. USSG §2B1.1(b)(10)(C).

80. The adjusted level for Count Two of the Indictment is 28.

*Role*

81. There is no evidence or information to suggest that **Weeks** warrants any mitigating or aggravating role adjustments.

U.S. DISTRICT COURT                                        JOBADIAH SINCLAIR WEEKS

Abel

82.     Pursuant to USSG §3D1.2, the offenses set forth in Counts One and Two do not involve the same victim and are not closely related; therefore, they would not normally group; however, it appears that Abel is only being held accountable for the loss amounts attributed to his tax offense. Therefore, the pursuant to USSG § 3D1.2(d), the counts will be grouped on the basis of the total amount of loss which was only attributed to the IRS. It is noted that the parties stipulated that Counts 1 and 2 are grouped under USSG §3D1.2(d).

*Count One: Subscribing to a False Tax Return*

83.     The guideline for a violation of 26 U.S.C. § 7206(1) is USSG §2T1.1. Pursuant to USSG §2T1.1, the base offense level is determined by the amount of tax loss determined in the tax table at USSG §2T4.1. The tax loss was $4,306,873, which is more than $3,500,000 but not more than $9,500,000. Therefore, the base offense level is increased by 24 levels. USSG §§2T1.1(a)(1) and 2T4.1(J).

*Specific Offense Characteristics*

84.     Abel failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity. Specifically, the 2017 tax return excluded income totaling $1,369,675 and miscategorized income of $280,923 as a capital gain, all of which was attributable to his role as a promoter for BCN. Therefore, the offense level is increased by 2 levels. USSG §2T1.1(b)(1).

85.     The adjusted level for Count One of the Information is 26.

*Count Two: Conspiracy to Offer and Sell Unregistered Securities*

86.     The guideline for a violation of 18 U.S.C. § 371 is USSG §2X1.1. Pursuant to §2X1.1(a), §2B1.1 is referenced when determining the offense level. The base offense level is 6, because the offense of conviction does not have a statutory maximum term of imprisonment of 20 years or more. USSG §§2X1.1(a) and 2B1.1(a)(2).

*Specific Offense Characteristics*

87.     Abel is accountable for a loss that is more than $3,500,000 but not more than $9,500,000; therefore, the offense level is increased by 18 levels. USSG §2B1.1(b)(1)(J).

88.     The offense involved 10 or more victims; therefore, the offense level is increased by 2 levels. USSG §2B1.1(b)(2)(A).

89.     The offense involved sophisticated means as Abel encouraged U.S. investors in the United States, Europe, Asia, and Africa, to utilize a virtual private network, or "VPN," to obscure their true, U.S.-based IP addresses, which was done to avoid detection and

U.S. DISTRICT COURT                                    JOBADIAH SINCLAIR WEEKS

regulation by U.S. law enforcement. Therefore, the offense level is increased by 2 levels. USSG §2B1.1(b)(10)(C).

90.     The adjusted level for Count Two of the Indictment is 28.

*Role*

91.     There is no evidence or information to suggest that Abel warrants any mitigating or aggravating role adjustments.

Balaci

92.     Pursuant to USSG §3D1.2, the offenses set forth in Counts One and Two involve the same victim and are closely related; therefore, they group pursuant to USSG §3D1.2(d), on the basis of the total amount of loss.

*Count One: Conspiracy to Commit Wire Fraud*

93.     The guideline for a violation of 18 U.S.C. § 1343 is USSG §2B1.1 The base offense level is 7, because the offense of conviction carries a statutory maximum term of imprisonment of 20 years or more. USSG §2B1.1(a)(1).

*Specific Offense Characteristics*

94.     The offense involved 10 or more victims; therefore, the offense level is increased by two levels. USSG §2B1.1(b)(2)(A).

95.     The offense involved sophisticated means as Balaci, under fraudulent representations, caused investors to send funds to BCN through cash, check, wire transmissions, and cryptocurrency transfers. Therefore, the offense level is increased by 2 levels. USSG §2B1.1(b)(10)(C).

96.     The adjusted level for Count One of the Indictment is 11.

*Count Two: Conspiracy to Offer and Sell Unregistered Securities*

97.     The guideline for a violation of 18 U.S.C. § 371 is USSG §2X1.1. Pursuant to §2X1.1(a), §2B1.1 is referenced when determining the offense level. The base offense level is 7, because the offense of conviction carries a statutory maximum term of imprisonment of 20 years or more. USSG §§2X1.1(a) and 2B1.1(a)(1).

*Specific Offense Characteristics*

98.     The offense involved 10 or more victims; therefore, the offense level is increased by two levels. USSG §2B1.1(b)(2)(A).

99.     The offense involved sophisticated means as Balaci assisted Goettsche and Medlin in using a BCN website to show BCN investors false figures that BCN represented were

U.S. DISTRICT COURT                                    JOBADIAH SINCLAIR WEEKS

actual bitcoin mining earnings from the pool. Therefore, the offense level is increased by 2 levels. USSG §2B1.1(b)(10)(C).

100.   The adjusted level for Count Two of the Indictment is 11.

   *Role*

101.   There is no evidence or information to suggest that Balaci warrants any mitigating or aggravating role adjustments.

   <u>Beckstead</u>

102.   Pursuant to USSG §3D1.2, the offenses set forth in Counts One and Two do not involve the same victim and are not closely related; therefore, they would not normally group; however, it appears that Beckstead is only being held accountable for the loss amounts attributed to his tax offense. Therefore, the pursuant to USSG §3D1.2(d), the counts will be grouped on the basis of the total amount of loss which was only attributed to the IRS. It is noted that the parties stipulated that Counts 1 and 2 are grouped under USSG §3D1.2(d).

   <u>*Count One: Conspiracy to Commit Money Laundering*</u>

103.   The guideline for a violation of 18 U.S.C. § 1956(h) is USSG §2S1.1. Pursuant to USSG §2S1.1(a)(2), the base offense level is 8, plus the number of offense levels from the table in §2B1.1 which corresponds to the value of the laundered funds, because Beckstead did not commit the underlying offense from which the laundered funds were derived.

104.   The value of the laundered funds was more than $9,500,000 but not more than $25,000,000; therefore, the offense level is increased by 20 levels. USSG §2B1.1(b)(1)(K).

   *Specific Offense Characteristics*

105.   Beckstead was convicted under 18 U.S.C. § 1956; therefore, the level is increased by 2 levels. §2S1.1(b)(2)(B).

106.   Beckstead helped Goettsche evade federal income taxes and launder BCN proceeds by directing and authorizing the transfers exceeding $50 million to and from Entity Accounts, which were designed to conceal the source of Goettsche's income generated from BCN and to disguise Goettsche's ownership of properties and assets paid for with BCN proceeds. If subsection (b)(2)(B) applied, and the offense involved sophisticated laundering, the level is increased by 2 levels. §2S1.1(b)(3).

   <u>*Count Three: Aiding in the Preparation of a False Tax Return*</u>

107.   The guideline for a violation of 26 U.S.C. § 7206(2) is USSG §2T1.1. Pursuant to USSG §2T1.1, the base offense level is determined by the amount of tax loss determined in the

tax table at USSG §2T4.1. The tax loss was $23,824,849, which was more than $9,500,000 but not more than $25,000,000. Therefore, the base offense level is increased by 26 levels. USSG §§2T1.1(a)(1) and 2T4.1(K).

*Specific Offense Characteristics*

108. The offense involved sophisticated means. Specifically, Beckstead knowingly prepared or helped prepare false tax returns for Goettsche. Beckstead helped Goettsche evade federal income taxes and launder BCN proceeds by directing and authorizing the transfers exceeding $50 million to and from Entity Accounts, which were designed to conceal the source of Goettsche's income generated from BCN and to disguise Goettsche's ownership of properties and assets paid for with BCN proceeds. This was also done to evade tax reporting requirements; therefore, the offense level is increased by two levels. USSG §2T1.1(b)(2).

*Role*

109. Beckstead was a minor participant in the underlying criminal activity. Specifically, he did not help to create or promote the BCN network and was only the accountant for Beckstead. Therefore, his level is decreased by 2 levels. USSG §3B1.2(b).

**Victim Impact**

110. The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense. The Government advised that there was a voluminous number of victims associated with this conspiracy and victim information was not provided. The case agent provided contact information for nine of the victims who were interviewed. The Probation Office notified those victims of their rights under the Mandatory Victims Restitution Act of 1966 and provided the form to declare any losses that are compensable. Subsequently, those victims forwarded the forms to victims with whom they were associated with and additional declaration of loses were received. To date, the responses received are as follows:

| Victim | Restitution Requested[2] |
|---|---|
| Victim-1-A.R. | 0 |
| Victim-2-E.R.R. | $3,600.00 |
| Victim-3-E.M. | $3,000.00 |
| Victim-4-E.L. | $28,800.00 |
| Victim-5-E.M.R. | $20,000.00 |
| Victim-6-F.A. | $8,200.00 |
| Victim-7-G.R. | $14,000.00 |
| Victim-8-J.T.B. | $60,000.00 |
| Victim-9-L.M. | $10,000.00 |

---

[2] Verification from the Government was not received to validate the figures received by the victims are compensable.

U.S. DISTRICT COURT                                    JOBADIAH SINCLAIR WEEKS

| | |
|---|---|
| Victim-10-M.P. | $3,600.00 |
| Victim-11-M.P.P. | $12,000.00 |
| Victim-12-M.L. | 0 |
| Victim-13-M.S. | $3,600.00 |
| Victim-14-O.P.A. | $18,000.00 |
| Victim-15-P.P. | 0 |
| Victim-16-R.D. | $10,800.00 |
| Victim-17-R.S. | $232,894.40 |
| Victim-18-T.S. | $40,208.00 |
| **Total** | **$468,702.40** |

111.  A declaration of losses was received from Victim-2-E.R.R. wherein she requested $3,600 in restitution. The victim noted as a result of the offense she suffered substantial loss of a retirement, education, or other savings or investment fund. The following statement was provided for the Court's consideration:

> Joseph frank Abel and Janet Abel, we been deceived, play with our emotions and take advantage of our kindness, take our money. Our hard earned money. Thank you for helping us.

112.  A declaration of losses was received from Victim-3-E.M. wherein he requested $3,000 in restitution. The victim noted as a result of the offense he became insolvent, and he suffered substantial loss of a retirement, education, or other savings or investment fund.

113.  A declaration of losses was received from Victim-4-E.L. wherein she requested $28,800 in restitution. The victim noted as a result of the offense she suffered substantial loss of a retirement, education, or other savings or investment fund. The following statement was provided for the Court's consideration:

> Joseph Frank Abel conducted a seminar of bit club network in Ramada Inn Vallejo, California on November 25, 2017. He was accompanied by his wife Jaynet Basilan Abel. I knew her since we grew up in the same community in San Luis, Sto. Tomas Batangas Phillippines.

> Joe and Jaynet Abel encouraged us to join and invest to Bitclub Network. On the seminar, they promoted to invest $428,800 for more big money returns of my investment. Joe Abel received the amount of $10,800 in cash on November 25, 2017 in my home. I also sent a cashier check to Jaynet Abel for $18,000 on December 2, 2017 (receipt attached) to complete the $28,800 investment they were promoting.

> After several months, I never heard from them anymore. I made several calls to Jaynet but no answer. Joe answered my call once but couldn't discuss my investment since he was in Malaysia at that time. I made many attempts to recover my money but there was no response from them.

- 17 -

I borrowed that money from my retirement savings account and lost earnings. I was not able to pay my student loan on time and went into default. My student loan is still not paid; it is now higher amount due because of the interest added to it. It also affected my credit for not paying my bills on time. Above all, it took a toll on my health resulting in high blood pressure, diabetes and anxiety of losing the money I worked so hard for. I plea to the court to grant me restitution in accordance to the losses I suffered in investing to the Bitclub Network.

114.    A declaration of losses was received from Victim-5-E.M.R. wherein she requested $20,000 in restitution. The victim noted as a result of the offense she became insolvent and suffered substantial loss of a retirement, education, or other savings or investment fund. The following statement was provided for the Court's consideration:

After falling victim to Jospeh Frank Abel's pyramid scheme, I experienced: financial hardship, emotional distress, anxiety, anger, sleepless nights, fear, guilt, shame and loss of trust in others.

115.    A declaration of losses was received from Victim-6-F.A. wherein she requested $8,200 in restitution. The victim noted as a result of the offense she suffered substantial loss of a retirement, education, or other savings or investment fund. The following statement was provided for the Court's consideration:

I am also one of the victims of Joseph Frank Abel. We thought He was real, especially when Joseph Frank Abel and his Filipino wife Janette Basilan conducted an event seminar in Vallejo, California November 27, 2017. My sister [R.D.] called me and joined them through video cam. It was very convincing because they flaunted their millions, mansion, luxurious car, jewelry and many more that they said all came from Investment of joining Bitclub Network. I invested $8,000.00 cash for Bitcoin after the conference and joined other of my sisters in the year 2017. We also pay a $210 membership fee for each account. He promised that it would be gained not as double but triple if we joined. I have a very low income job but try to save money for emergencies.  I used up all my savings $2,500. borrowed $1,000.00 from my sister R.D. and $5,000.00 from my husband. I invested these monies thinking it was legit, and I would like to prepare for my daughter's education in the future.

I remember enrolling for two accounts: Two for me and one to the name of my daughter. First enrollment was $3,500 plus $99.00 for membership fee. My sister [R.D.] want me to be on her line/Level 1, so she lend me $1,000 to put my spot so I won't lose my line to level one. I have not been able to repay her yet.

During that time that we enrolled, we can see our name on the Bitclub Network System but we can only see the money we put in but no gain of

- 18 -

U.S. DISTRICT COURT                                    JOBADIAH SINCLAIR WEEKS

the money. After 3 months, I cannot login anymore, and I asked my sisters
in California and they experienced the same thing. We got suspicious and
started calling Janette and people who worked with her. Their response is
because the Bitcoin is down and it will take time to gain income. I waited
!! I tried to login and I cannot login into my accounts anymore and we
found out that they SCAM us. I was infuriated! I cannot believe it because
I lost a lot of money. Thinking about what Mr. Abel did to me and to the
rest of my family and their losses.

Who would have thought about it? Janette Basilan Abel (wife of Joseph
Frank Abel) was born and raised in Barrio San Luis, Sto Tomas, Batangas,
Philippines to the place where I was born and 6 of my siblings. Our
friends and other relatives know each other, and they are close to us. Then,
this happened!! I suffered anxiety, anger and disagreement with my
husband (after he lost $5,000 that he lent to me). My husband trusted me. I
disappointed my husband. I thought it would help us financially but
instead we lost the money. I harbor anger, mistrust, angriness and
disagreement from my husband and financial difficulties after the losses.

I wish and pray. Mr. Abel got the sentence he deserved and I want my
money back. Thank you for all you do for us! May the Lord keep you
blessed and healthy! keep me informed all the way up to his sentencing.
Good luck!

116.    A declaration of losses was received from Victim-7-G.R. wherein she requested $14,000
in restitution. The victim noted as a result of the offense she suffered substantial loss of a
retirement, education, or other savings or investment fund and made substantial changes
to her employment. The following statement was provided for the Court's consideration:

I work in the healthcare sector. I am writing to formally address the matter
in which I have fallen victim to a financial scam that has deeply affected
both my finances and my professional life. I respectfully submit this letter
seeking restitution for the losses I have incurred.

I was approached by an individual named Joseph Frank Abel, who
convinced me to attend a seminar that promoted investment opportunities
for Bitcoin. Trusting the information presented and believing in the
potential of earning returns, I invested $3,600. Unfortunately, I later
discovered that this investment opportunity was not legitimate and closely
resembles a pyramid scheme.

In my genuine, albeit misguided, desire to help others succeed, I
unknowingly encouraged three of my coworkers to invest under my
referral. Each of them also contributed $3,600, believing they would
benefit from the opportunity. When it became clear that this was a
fraudulent scheme, I felt morally obligated to reimburse my coworkers the

full amounts they had invested, totaling $10,800 ($3,600 for each coworker). I made these payments from my own personal funds as I did not want them to suffer the consequences of this scam that I, too, fell victim to.

The situation has caused me significant financial hardship, and I am now facing the prospect of legal and professional consequences, as my coworkers initially considered reporting the incident to human resources. It has been an extremely stressful and distressing experience, as my sole intention was to improve my financial standing and assist my coworkers in doing the same, all without any awareness that I was involved in a scam.

I am humbly requesting assistance in recovering the money I invested, as well as the $10,800 I paid to my coworkers. This ordeal has left me in a difficult financial situation, and I sincerely hope this can consider my plea for relief.

117.   A declaration of losses was received from Victim-8-J.T.B. wherein he requested $60,000 in restitution. The victim noted as a result of the offense he became insolvent; he suffered substantial loss of a retirement, education, or other savings or investment fund; he made substantial changes to his living arrangements; and suffered substantial harm to his ability to obtain credit.

118.   A declaration of losses was received from Victim-9-L.M. wherein she requested $10,000 in restitution. The victim noted as a result of the offense she became insolvent; suffered substantial loss of a retirement, education, or other savings or investment fund; and suffered substantial harm to her ability to obtain credit. The following statement was provided for the Court's consideration:

The impact of this crime changed my life. Especially my mental health. I developed anxiety and sleepless nights before dye to the loose of my savings. I'm living pay check to paycheck and that amount of money cost me a lot. Anxiety and depression is something else and mood swings were unbelievable.

119.   A declaration of losses was received from Victim-10-M.P. wherein she requested $3,600 in restitution. The victim noted as a result of the offense she suffered substantial loss of a retirement, education, or other savings or investment fund. The following statement was provided for the Court's consideration:

I gave $3,600 cash to Joseph Abel when he had seminar here last November 25, 2017. We trusted Abel since he's with Janet Basilan who he's business partner and fiancée on that time. We know Janet for a long time since we live in a small community when we used to live in the Philippines.

120.   A declaration of losses was received from Victim-11- M.P.P wherein she requested $12,000 in restitution. The victim noted as a result of the offense she suffered substantial loss of a retirement, education, or other savings or investment fund and made substantial changes to her employment.

121.   A declaration of losses was received from Victim-13-M.S. wherein she requested $3,600 in restitution. The victim noted as a result of the offense she suffered substantial loss of a retirement, education, or other savings or investment fund. The following statement was provided for the Court's consideration:

> I gave my cash money to Joseph Frank Abel. I trusted him because he is with my cousin Jaynet Basilan. I took the money on my retirement account knowing it will earn more but was disappointed I didn't get anything.

122.   A declaration of losses was received from Victim-14-O.P.A. wherein she requested $18,000 in restitution. The victim noted as a result of the offense she suffered substantial loss of a retirement, education, or other savings or investment fund and she made substantial changes to her employment.

123.   A declaration of losses was received from Victim-16-R.D. wherein she requested $10,800 in restitution. The victim noted as a result of the offense he suffered substantial loss of a retirement, education, or other savings or investment fund. The following statement was provided for the Court's consideration:

> My money was stolen. I had saved to pay my bills by joining Jospeh Frank Abel Bitclub Network, thinking my investment would grow. He solicited money from me, my family friends promising shares in pooled investments and rewards for recruiting new investors. I suffered tremendously, got sick, anxiety, peace of mind, very upset not good for my health. Including my family by trusting Joseph Frank Abel.

124.   A declaration of losses was received from Victim-17-R.S. wherein he requested $232,894.40 in restitution. The victim noted as a result of the offense he suffered substantial loss of a retirement, education, or other savings or investment fund and he made substantial changes to his employment. The following statement was provided for the Court's consideration:

> 3.722 Bitcoin was stolen from me as a result of this fraud case. Currently valued at time of writing is $323,894.40.

125.   A declaration of losses was received from Victim-18-T.S. wherein he requested $40,208 in restitution. The victim noted as a result of the offense he suffered substantial loss of a retirement, education, or other savings or investment fund.

126.   Regarding the additional tax offenses for **Weeks**, Abel, and Beckstead, these are Title 26 offenses. In cases where the IRS is the victim, the defendant can directly satisfy the

U.S. DISTRICT COURT                                    JOBADIAH SINCLAIR WEEKS

restitution obligation with the IRS through compliance with a special condition requiring cooperation with the IRS and the filing of any amended or overdue income tax returns and payment of all taxes, interest, and penalties due.

**Plea Agreement Information**

127.   Pursuant to the written plea agreement dated September 21, 2020, the U.S. Attorney's Office and the defendant have agreed to guideline stipulations, which are non-binding upon this Court. Specifically, regarding Count One, the parties agreed to an offense level of 24, as the tax loss for the calendar years 2015 through 2018 is greater than $3,500,000, but less than $9,500,000. The parties also agree that the defendant shall receive a two-level enhancement as the defendant failed to report and correctly identify the source of income exceeding $10,000 in any year of the criminal activity, resulting in an adjusted offense level of 26.

128.   Regarding Count Two, the parties agreed to a base offense level is 6, and that the defendant shall receive an 18-level enhancement as the loss amount is more than $3,500,000, but not more than $9,500,000. The parties further agree that the defendant shall receive a two-level enhancement for the offense involving 10 or more victims, and an additional two-level enhancement for the offense involving sophisticated means. Therefore, the adjusted offense level is 28.

129.   The parties agree that Count One and Two are to be grouped together under USSG §3D1.2(d), and that the highest offense level should be applied. Therefore, the offense level is 28. With a three-level reduction for acceptance of responsibility, the total offense level is 25.

Restitution

130.   Additionally, pursuant to the terms of the plea agreement, the defendant has agreed to pay restitution to all victims in Count Two; however, no restitution amount has been agreed upon.

**Pretrial Adjustment**

131.   On December 10, 2019, the defendant was arrested in the Southern District of Florida. He had an initial appearance that same day before the Honorable William Matthewman, United States Magistrate Judge, and was detained. The defendant was transported to the District of New Jersey and had an initial appearance before the Honorable Claire C. Cecchi, United States District Judge, on January 15, 2020, and was detained.

132.   At a subsequent bail review hearing held on November 6, 2020, before the Honorable Michael A. Hammer, United States Magistrate Judge, he was released on a $2,000,000 bond, secured by property located at 11627 West 74th Way, Arvada, Colorado; 15200 County Road 353C, Buena Vista, Colorado; Sangre De Cristo Rach, 86 Hamilton Creek Road, Coaldale, Colorado; and Tract of land in County of Island, State of Washington,

U.S. DISTRICT COURT                                    JOBADIAH SINCLAIR WEEKS

with the imposition of special bail conditions. The defendant was placed on home incarceration (GPS) with location monitoring. Based on the defendant's residence in Arvada, Colorado, the defendant is supervised by Pretrial Services in the District of Colorado.

133.    On November 20, 2020, Pretrial Services in the District of New Jersey submitted an Informational Memorandum to the Honorable Claire C. Cecchi, United States District Judge, advising that upon the review of GPS mapping, it was revealed the defendant landed in the District of Colorado and proceeded to Texas Roadhouse Steakhouse in Arvada, Colorado. After Pretrial Services' several attempts to contact the defendant's parents, the defendant's father, Nathaniel Weeks, answered and was questioned about his location as well as that of the defendant's. Mr. Weeks failed to answer the Pretrial Services officer with an honest explanation of his whereabouts stating he was enroute from the airport to the defendant's residence. Pretrial Services reminded Mr. Weeks that the defendant was on GPS, which elicited an honest response from Mr. Weeks that he treated his son to a steak dinner at Texas Roadhouse.

134.    On March 19, 2021, Judge Hammer signed an order modifying the location monitoring component of the defendant's bail conditions from home incarceration to home detention.

135.    On August 23, 2021, an order modifying the conditions of release was signed by Judge Hammer to include the following conditions: (1) Defendant is subject to the following computer/internet and network restrictions which may include manual inspection, and/or the installation of computer monitoring software, as deemed appropriate by Pretrial Services. The defendant consents to Pretrial Services' use of electronic detection devices to evaluate the defendant's access to wi-fi connections; (2) The defendant is permitted use of a computer or connected devices, and is permitted access to the Internet (World Wide Web), FTP Sites, IRC Servers, Instant Messaging, etc); (3) By consent of other residents in the home, any computers in the home utilized by other residents shall be approved by Pretrial Services, password protected by a third party custodian approved by Pretrial Services, and subject to inspection for compliance by Pretrial Services. Home computer networks are subject to inspection for compliance by Pretrial Services; and (4) Defendant must disclose any and all cryptocurrency holdings acquired or held.

136.    On September 22, 2021, and in lieu of revocation proceedings initiated by the U.S. Attorney's Office, an order modifying the conditions of release was signed by Judge Hammer to modify the computer monitoring conditions as follows:

(1) Weeks may possess a phone that has call and text capabilities, but no access to or capability to access the internet (*i.e.*, Weeks shall not possess a "smart" phone);

(2) Weeks shall not use the internet to communicate with others except (a) through one or more e-mail addresses specifically disclosed to Pretrial Services and the government; (b) through the Airbnb app; or (c) as otherwise approved by Pretrial Services;

- 23 -

(3) Weeks shall provide 72 hours' advance notice to the government of any visitors to his house, other than family, counsel, and guests who will be staying on other parts of Weeks' property who have booked through Airbnb;

(4) Weeks shall provide updated financial statements to the government on a quarterly basis;

(5) In addition, Weeks shall provide notice to Pretrial Services and the government of any transaction he makes, directly or indirectly, in any cryptocurrency or similar vehicle, within 72 hours or making such a transaction. Where practicable, Weeks shall provide advance notice to Pretrial Services of any such transaction;

(6) Weeks shall not directly or indirectly promote or otherwise encourage others to invest in any cryptocurrency or other investment vehicle, including those that employ a multi-level marketing strategy. For purposes of this condition, Weeks shall be deemed to be promoting or otherwise encouraging investment if, among other things, he stands to benefit financially from the investment of a third party, such as through a referral fee. Nothing in this condition is intended to restrict Weeks from transacting in his own assets; and

(7) Weeks shall not direct any other person to engage in any restricted activity on his behalf.

137.    On August 15, 2022, Judge Hammer signed an order modifying the location monitoring component of the defendant's bail conditions from home detention to curfew.

138.    On June 21, 2023, the defendant's location monitoring condition was modified by Judge Hammer to stand alone monitoring and allowed for travel outside Colorado for business and personal reasons, with 72-hour notice to Pretrial Services and a detailed itinerary furnished to Pretrial Services and the government at least 72 hours in advance of any travel.

139.    On February 22, 2024, Pretrial Services submitted a Petition for Action on Conditions of Pretrial Release and requested that the condition of location monitoring be amended to home incarceration and travel restricted to the District of Colorado, until which time, a Bail Review Hearing to address the violations set forth has been heard by the Court. The petition outlined the following violations:

(1) On January 30, 2024, Pretrial Services in the District of New Jersey was informed by the defendant' s supervising officer in Colorado as to a possible violation of the defendant's pretrial release conditions, which includes refraining from promoting cryptocurrency, among other things. The defendant had requested to travel to Florida; however, failed to advise that he was scheduled to attend and participate in an event titled, *'The Past, Present, and Future of Cryptocurrency.'* The event was hosted by an organization known as the Restore Freedom Rally. As a result of this information, the

supervising officer contacted the defendant and reviewed his restriction on promoting cryptocurrency. The defendant agreed to forgo participating in the event.

(2) On February 9, 2024, Pretrial Services in the District of New Jersey received notification from his supervising officer in Colorado as to the defendant's alleged use of a MacBook computer and two different smartphones. In the information received by Pretrial Services, the defendant made statements such as "using 'one of my other cell phones'; sending a text message via the application, Signal (internet-based messaging service); attempted to sell stocks to liquify his assets with a brokerage; 'sending of a link on a text thread in order for the conversation to be 'secure, much like Zoom, but better'.

(3) On February 21, 2024, Pretrial Services in the District of New Jersey was provided information regarding the defendant's own admission of using bitcoin to make a purchase. On the same date, Pretrial Services contacted the defendant to address his noncompliance with failing to notify Pretrial Services timely and accurately as to changes in his travel itinerary. During this conversation, Pretrial Services questioned the defendant as to any computer use, use of smartphones, or the internet, to which he denied using.

140.     On March 21, 2024, a bail revocation hearing was held before Judge Hammer, and it was ordered that counsel will submit a proposed order that includes the Court's modified conditions. On March 26, 2024, Judge Hammer signed an order modifying the conditions of supervision to impose all previously imposed conditions with the inclusion of the following bail conditions:

(1) The defendant shall provide notice to Pretrial Services and the government, through counsel, of any transaction he makes, in any cryptocurrency or similar vehicle within 72 hours of making such a transaction. Where practicable, the defendant shall provide advance notice to Pretrial Services of any such transaction. This shall specifically include any indirect transaction;

(2) The defendant shall continue to not directly or indirectly promote or otherwise encourage others to invest in any cryptocurrency or other investment vehicle, including those that employ a multi-level marketing strategy. For purposes of this condition, the defendant shall be deemed to be promoting or otherwise encouraging investment if, among other things, he stands to benefit financially from the investment of a third party, such as through a referral fee. Nothing in this condition is intended to restrict the defendant from transacting in his own assets; and

(3) Defendant's third-party custodians, Silence Weeks and Nathanial Weeks, are directed to attempt to locate and take possession of the smart phones' the defendant is shown to be using and the laptop the defendant is shown to be using in the materials provided by Pretrial Services to the Court. They are also directed to search their Arvada residence and take possession of any smart phones or computers other than their personal computers and phones. Defendants are to report to counsel no later than 5 p.m. today that they have done as directed and counsel is to email the government and Pretrial Services to confirm

this. The defendant shall take any such devices they have taken possession of to Pretrial Services upon request. To remove any doubt as to the intention of this provision, the defendant will have no access to any smartphone or computer in the Arvada residence and as of 5 p.m. today, any such devices shall be in the possession of the third-party custodians. Upon request of Pretrial Services, the third-party custodians shall allow their personal devices to be password protected as provided Section 9(ii) herein.

141.    On November 14, 2024, the Government filed a motion to revoke Weeks' bail and order him detained pending sentencing, as the defendant continued to engage in noncompliant behavior following the March 21, 2024, bail revocation hearing. Specifically, the noncompliant conduct includes to (a) promote investments; and (b) surreptitiously use unauthorized electronic devices, including encrypted chat applications, contrary to the conditions of his pre-trial release. A bail revocation hearing is scheduled for January 22, 2025.

142.    As confirmed with Pretrial Services, as of January 3, 2025, the defendant is not compliant with the conditions of release based off the conduct in the motion filed by the Government. All urinalysis tests submitted by the defendant have been negative.

### Adjustment for Obstruction of Justice

143.    The probation officer has no information indicating the defendant impeded or obstructed justice.

### Adjustment for Acceptance of Responsibility

144.    The defendant was interviewed by the probation officer on November 12, 2024 in the presence of defense counsel. In lieu of discussing the conduct comprising the offense of conviction, defense counsel submitted the following written statement on the defendant's behalf:

> ***Why did you become involved? What influenced your involvement in this offense? (i.e.,peers, personal circumstances…)***
>
> Conspiracy to Offer and Sell Unregistered Securities (18 U.S.C. § 371)
>
> My involvement in BCN which left me in the circumstances I am today began when I met my codefendant Joe Abel. At the time we met, I was very familiar with Bitcoin, having been an early adopter of Bitcoin when it was trading for less than a dollar and having come to meet and befriend many others in the Bitcoin community. BCN had been founded by Matt and Russ 16 months earlier and it was already operational with many members from around the world. I joined as a member like everyone else. Because of my contacts, Goetsche asked me if I could obtain Bitcoin mining equipment for them. I told them I did have relationships to source equipment and that I could obtain it for them at a discounted price. They

agreed that BCN would purchase the equipment from me. I made good on my promise and sourced and caused to be delivered several million dollars of computer equipment. In addition, because I believed that the Club had an exciting business plan I joined as a member and encouraged other people I knew in the bitcoin community to join as well. At the time that I became involved with BCN, I was comfortable with its business plan and I believed it to be a good prospect for others who were looking to mine Bitcoin. At some point in time I learned that certain U.S. government officials considered that Bitclub's business model could constitute offering "securities". I read the Securities Act of 1933 and Title 15 and I didn't see computer equipment mentioned anywhere as being a "security". However, after that I was arrested. I had the opportunity to consult legal counsel with expertise in criminal law, after doing so I pled guilty to that offense to spare the government the need to prosecute and try it.

Tax Count (26 U.S.C. § 7201)

In my guilty plea, I admitted that I did not file personal income tax forms for the tax years 2015 through 2018. As I told the prosecutors and the FBI, I had not filed taxes because I was told by a former IRS agent named Joseph Bannister who shared with me that there was no law that required the average American worker in the private sector to pay a direct unapportioned tax on their labor and compensation. Mr. Bannister told me that I was not subject to, or liable for, personal income taxes in the United States because Bitcoin mining was not money, it didn't touch the US Financial system, it wasn't connected to a "trade or business", I wasn't a public officer and I was domiciled in Mexico. At that time, I did not consult any other tax professional or attorney regarding Mr. Bannister's advice to me because I figured, he was an IRS agent who probably knew the law better than anyone. After consulting with my attorneys, I pled guilty to this offense. Under my plea, I agreed to pay any amounts I owe which amount is currently being determined by my attorneys through their discussions with the government and the IRS. My plea provides that those payments will be the subject of a restitution agreement for not filing the tax returns.

***What impact has your behavior had on others?***

My involvement in this case and the resulting circumstance have severely impacted my family and loved ones. First, I was denied bail and a trial and served 11 difficult months in jail after I was arrested, during the frightening height of the Covid pandemic. At the time of my arrest my daughter – Liberty – was a baby and I was unable to be with her and act as a father and help my wife during the time I was away.

After I plead guilty to a count of the Indictment (and, although I was not indicted for violating any tax statute, I also agreed to plead guilty to an information charging me with a tax crime), I was finally released on bail, I was (and I still am) subject to various onerous conditions of release. These release conditions – which I have been subject to for over four years and for which I am wholly responsible for –placed a significant emotional and financial burden on my family, who I care for very much. During these few years, my wife (and, likely, soon to be ex-wife) received a devastating cancer diagnosis. This required her to relocate (with Liberty) to Nevada so that she could receive treatment and have family care for her while she was recuperating. This was, in part, because I was not able to provide her with the home care that she required due to my legal circumstances.

Ultimately, as a result of the circumstances brought about by my plea, my wife and I are separated and she has told me she intends to initiate a divorce. Because of my behavior I am now separated from Stephanie and I have only limited opportunities to spend time with Liberty, which causes me great pain. As I explained to you on the telephone, Liberty is aware that I am in some sort of trouble, she knows that I am no longer living with "Mommy," and she wants us to all be a family together again. As I hope you gathered from our conversation, I fully appreciate that the situation that I am in, which has had a very negative impact on my family. Although we did not discuss the specific arrangement that Stephanie and I have discussed, you should know that I agreed to arrange for our family home, which is paid off and given to Stephanie so that Stephanie and Liberty could remain in it so that they could not end up homeless and a burden to the system. As a result of that decision, I moved into my parents' home where I remain on home incarceration as a condition of my bail conditions.

My behavior has also impacted my relationship with my parents. When I was released from jail, my parents graciously agreed to serve as my third party custodians, agreeing to be responsible for me while I was released on bail. My parents have dutifully served as my custodians for many years. This has required them to expend significant financial resources, as well as their own personal time, to comply with the Court-ordered obligations. My parents' house me in their own home, feed me with food that they purchase for me, and, from time to time, pay some of my personal expenses. My release conditions also restricted my parents from visiting out-of-state family members and friends, attending funerals and family functions and visiting their summer home, and even restricted them from both leaving the home at the same time to, for example, go out to dinner or go to medical appointments together. I am very remorseful for the negative impact my behavior has caused to my parents. However, despite this, my parents have been my biggest supporters and I remain extremely close to them.

My behavior has also negatively impacted other people that are close to me and impacted my friendships and romantic relationships. At the end of the day, I realize that my involvement in this criminal proceeding has negatively impacted many people close to me which I deeply regret.

### *What was your relationship with your co-conspirators/co-defendants?*

Prior to my involvement in BCN, I had no relationship with my co-conspirators/codefendants. I was involved with these people only during the time that I was associated with BCN. My involvement consisted of acting as a vendor to supply them with bitcoin mining equipment and as Member of BCN. After my arrest, I no longer have any relationship with any of the individuals who were involved in BCN.

### *What could you have done differently to avoid finding yourself in this situation? What can you do differently in the future to avoid finding yourself in a similar situation?*

In retrospect, I realize that there were several key actions that I could have taken differently to avoid this situation. I should have paid more attention to what I now know were warning signs and I should not have relied on information provided to me by others. I also could have sought independent legal advice about BCN. Through this ordeal, I have learned the importance of seeking independent and trustworthy legal and tax advice when dealing with issues of this complexity, which I overlooked in this instance. This experience has taught me a great deal about the importance of accountability. I am now committed to being more vigilant and seeking guidance when needed to ensure that I do not find myself in a similar situation again.

In closing, I would like you to know that I am a both a Christian who strives in my daily life to conduct myself ethically, professionally, and in the spirit of the Lord. I have been on dozens of mission trips, as I explained to you, distributing nutritional supplements to starving children around the world as a part of the charity associated with Mannatech and I have made financial contributions to a number of charitable organizations that I support. I am hopeful that after our conversation you were able to see that I acknowledge and take responsibility for my actions and the consequences that result from them. I urge you to consider that I timely pleaded guilty to these crimes and, in doing so, that I admitted to the charges against me and that I accept the consequences that come with those charges. I am so glad that there is no claim by the Government in the draft presentence report that any individual was harmed by my actions. I certainly did not intend to harm anyone. I also ask that you consider the fact that I have agreed to cooperate with the Government, and that I provided them with everything I know about BCN, and that I have always

- 29 -

U.S. DISTRICT COURT                                      JOBADIAH SINCLAIR WEEKS

> been willing, and remain willing, to testify if called to do so by the
> Government. I also ask that you consider the fact that I have agreed to, and
> am willing to, make restitution of whatever amounts are deemed
> appropriate after my attorneys confer with the Government about those
> amounts, which also demonstrates that I accept responsibility for my
> actions and that I am taking steps to make amends.

145.  Pursuant to USSG §3E1.1, a reduction for acceptance of responsibility is warranted.

### Offense Level Computation

146.  Since use of the manual in effect at the time of sentencing would violate the ex post facto clause of the Constitution, the 2018 Guidelines Manual was used. USSG §1B1.11(a).

147.  Counts 1 and 2 are grouped for guideline calculation purposes because the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior. USSG §3D1.2(d) and §1B1.2.

### Count Group 1: Tax Evasion and Conspiracy to Offer and Sell Unregistered Securities

148.  **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 371 is USSG §2X1.1. Pursuant to §2X1.1(a), 2B1.1 is referenced when determining the offense level. The base offense level is 6. USSG §§2X1.1(a) and 2B1.1(a)(2).   **6**

149.  **Specific Offense Characteristics:** Weeks is accountable for a loss that is more than $3,500,000 but not more than $9,500,000; therefore, the offense level is increased by 18 levels. USSG §2B1.1(b)(1)(J).   **+18**

150.  **Specific Offense Characteristics:** The offense involved 10 or more victims; therefore, the offense level is increased by 2 levels. USSG §2B1.1(b)(2)(A).   **+2**

151.  **Specific Offense Characteristics:** The offense involved sophisticated means. Specifically, Weeks directed individuals to deposit funds in accounts in other individual's names, or in the name of Weeks' charity account, to avoid having deposits made into his personal bank account; therefore, the offense level is increased by two levels. USSG §2B1.1(b)(10)(C).   **+2**

152.  **Victim Related Adjustment:** None.   **0**

153.  **Adjustment for Role in the Offense:** None.   **0**

154.  **Adjustment for Obstruction of Justice:** None.   **0**

155.  **Adjusted Offense Level (Subtotal):**   **28**

U.S. DISTRICT COURT                                JOBADIAH SINCLAIR WEEKS

156.   **Chapter Four Enhancement:** None.                                            **0**

157.   **Adjustment for Acceptance of Responsibility:** The defendant has clearly
       demonstrated acceptance of responsibility for the offense. Accordingly, the
       offense level is decreased by two levels. USSG §3E1.1(a).                      **-2**

158.   **Additional Adjustment for Acceptance of Responsibility:** The defendant has
       assisted authorities in the investigation or prosecution of the defendant's own
       misconduct by timely notifying authorities of the intention to enter a plea of
       guilty. Accordingly, the offense level is decreased by one additional level. USSG
       §3E1.1(b).                                                                     **-1**

159.   **Total Offense Level:**                                                       **25**

**PART B. DEFENDANT'S CRIMINAL HISTORY**

160.   Unless otherwise noted, details for the following arrests were requested but have not been
       received.

       **Juvenile Adjudication(s)**

| Date of Referral | Charge/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|
| 161. 08/06/1999 (Age 17) | Ct. 1: Obstruct the Administration of Law Ct. 2: Assault/ County Court, Denver, CO; Docket No.: Unknown | 10/04/1999: 6 months of probation | 4A1.2(e)(4) | 0 |

       **Adult Criminal Conviction(s)**

| Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|
| 162. 05/15/2004 (Age 22) | Driving Under the Influence/ Municipal Court, Boulder, CO; Docket No.: 2004T2839 | 03/09/2005: $837 fees/cost | 4A1.1(c) | 1 |

       According to records received from the U.S. Probation Office in the District of Colorado,
       on May 15, 2004, Weeks was arrested by Boulder Police Department.

U.S. DISTRICT COURT                                     JOBADIAH SINCLAIR WEEKS

| 163. | 03/25/2014 (Age 32) | Reckless Driving/ Justice Court, Las Vegas, NV; Docket No.: 14M08998X | 10/20/2014: 30 days of imprisonment (suspended), 50 hours of community service, $685 fees/cost | 4A1.2(c)(1) | 0 |

The defendant was originally charged with driving under the influence. On March 25, 2013, the defendant was arrested by law enforcement for operating a motor vehicle while having a blood-alcohol content of more than .08 grams-percent.

### Criminal History Computation

164.    The total criminal history score is one. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of one establishes a criminal history category of I.

### Other Arrests

165.    None.

### Motor Vehicle History

166.    According to records received from the U.S. Probation Office, District of Colorado, the defendant has a Colorado driver's license, number 971210322, which was issued on October 8, 2021, and expired on October 8, 2024. The defendant's license lists an address of 44301 E. Iliff Trail, Bennett, Colorado. Weeks has received citations for speeding and driving under the influence (noted above).

### New Jersey Firearms Registry

167.    A check of the New Jersey Firearms Registry found no results.

### Domestic Violence History

168.    A review of the New Jersey Domestic Violence Central Registry reflected no history.

## PART C. OFFENDER CHARACTERISTICS

*After numerous attempts to schedule the Presentence Interview since July 17, 2024, the Defendant and defense counsel have failed to make themselves available for a presentence interview. In August 2024, defense counsel advised the Probation Office that due to a motion before the Court regarding a possible employment opportunity, the defendant "has been districted by this and is uncomfortable proceeding with the interview until he has resolved these other issues that [defense counsel] have been handling for him." Following the disclosure of the draft presentence report, the Probation Office was able to interview the defendant, in the presence of defense counsel,*

*via telephone, on November 12, 2024. The defendant was at his residence in Arvada, Colorado, at the time of the presentence interview.*

*Unless otherwise noted, the following information could not be verified since executed release forms have not been received from the defendant.*

**<u>Personal and Family Data</u>**

169. Jobadiah Sinclair Weeks was born on August 25, 1981, in Denver, Colorado, to the union of Nathanial and Silence Weeks (ages 72). The defendant's parents reside in Arvada, Colorado; however, the defendant's father's driver's license lists an address in Buena Vista, Colorado. The defendant's parents are both retired. Weeks has one brother, Caleb Weeks (age 42), who resides in Nashville, Tennessee. The defendant married Stephanie (nee Stolba) Weeks (age 43) in the Bahamas on October 28, 2009; however, the couple later separated in October 2023 and are in the process of getting divorced. This union resulted in one child, Liberty Weeks (age 6), who was born on October 18, 2022. Stephanie and Liberty reside in Bennett, Colorado. The defendant indicated there is no current child support order, nor is there any verbal child support agreement. The defendant believes a child support order will be implemented once the divorce is finalized. Weeks is currently engaged to Dasha Gordon (age 43), who resides with the defendant in Arvada and is employed as an online content influencer.

170. The defendant reportedly lived in Denver until he was five years old, and his family then relocated to Massachusetts to be closer to family until he was about 12 years old. At the age of 12, his family relocated back to Denver for a better employment opportunity for his father. Based off the evaluation completed by Independence House in Denver, Weeks reported close, long-lasting relationships with family and friends. The defendant reported no history of emotional, physical, or sexual abuse. At the time of the presentence interview, Weeks reported having a "great" childhood and indicated he never saw his family fight.

171. Weeks previously possessed a Mexican Passport and Voter Card. Weeks purchased a 13-bedroom residence in Acapulco, Guerrero, Mexico. The defendant reported this was his primary residence for 20 years, and that he would like to return to this address in the future. Weeks indicated that a partner of his is maintaining the residence on his behalf. No evidence has been provided whether the defendant had acquired citizenship in St. Kitts. Weeks has owned property in St. Kitts; specifically, at the Windswept Residence Club in Christophe Harbour, St. Kitts. Records held by Pretrial Services show the defendant had a diplomatic laissez-passport which was issued by the World Sports Alliance Intergovernmental Organization for the defendant's position as a Sustainable Development Goal (SDG) ambassador which is set to expire on May 28, 2029. Additionally, Weeks had a United States passport issued on June 30, 2017, which is set to expire on June 29, 2027. Weeks reported being an avid traveler and has visited over 175 countries.

U.S. DISTRICT COURT                                    JOBADIAH SINCLAIR WEEKS

172.  Correspondence received from the Probation Office in the District of Colorado indicates the defendant resides at 11627 West 74th Way, Arvada, Colorado, which is owned by his parents. The last home visit occurred on October 11, 2024. The residence is a three-story, single-family home with four bedrooms and four bathrooms. Weeks' fiancée also lives at the home.

173.  On January 3, and January 7, 2025, the Probation Office was unsuccessful in contacting the defendant's father, Nathaniel Weeks, for a collateral interview.

**Physical Condition**

174.  Weeks stands at six feet, three inches tall, weighs 200 pounds, and has green eyes and brown hair. The defendant reported being in excellent physical health and denied having any scars or tattoos. Weeks has never been hospitalized and does not have any chronic medical issues that require monitoring. The defendant is currently not prescribed any medication, and he denied any allergies to any food or medication.

**Mental and Emotional Health**

175.  Weeks reported his overall mental health as excellent and denied exhibiting any stress or anxiety. At the time of the presentence interview, the defendant indicated that he believes "the truth will set you free," and has turned to spirituality and religion to help him cope with stress. However, during an evaluation conducted by Independence House, Weeks reported a significant history of anxiety. He said he had never been prescribed psychotropic medications and never participated in treatment for psychological or emotional problems.

**Gambling History**

176.  Weeks denied any issues with gambling.

**Substance Abuse**

177.  Weeks indicated that he first drank alcohol at 21 years old and denied having any issues with alcohol. The defendant reported the last time he drank alcohol was on March 24, 2024, and that he drank champagne. The defendant denied having any issues with alcohol and reported that alcohol did not negatively impact his relationships with family or friends. Despite noting no issues with alcohol, Weeks was referred to substance abuse evaluation at Independence House in Denver, in April 2024, and it was recommended that the defendant engage in bi-weekly individual counseling sessions for six months. The evaluation indicated that Weeks drank regularly but not necessarily heavily for a period of 20 years. He has never experienced alcohol withdrawal and indicated he drank occasionally and in moderation.

178.  The evaluation continued by stating that the defendant has a 29-year history of regular cannabis use. The defendant admitted to using CBD oil to assist him in sleeping. Weeks had no apparent history of regular (typically defined as weekly, ongoing, or problematic

binge use) poly-drug use (including alcohol), for any time period of six months or more. He has never overdosed, either intentionally or unintentionally, on drugs.

### Educational, Vocational and Special Skills

179.   Weeks graduated high school at Pomona High School in Arvada, Colorado, in 2000. The defendant was accepted to the University of Colorado in Boulder, Colorado; however, he never formally enrolled at the University. Weeks reported that he continued to defer his acceptance at the University to continue to pursue an entrepreneurship with his family's wellness company. After many years of deferring, the defendant decided not to further any higher education.

### Military Experience

180.   The defendant denied serving in the armed forces.

### Employment Record

181.   The defendant reported that he invested money into Bitcoin several years ago, and he used the profits he gained to purchase a hemp farm. The defendant also indicated that he traveled frequently to lecture and speak at various ventures. The defendant previously earned an average of $10,000 in gross monthly proceeds. The Probation Office has been unable to locate the defendant's ranch. According to LexisNexis, the defendant is an owner of Sacred CBD, and cofounder of Altairia International. According to Colorado records, Sacred CBD is registered to the defendant, Joby Weeks, beginning on May 9, 2015.

182.   The evaluation from Independence House indicated that Weeks has worked full-time for most of the past three years. He has been an entrepreneur since age 19 through the present and reportedly made his first million dollars when he was 19 years old selling nutraceuticals. Most of his employment in the past few years has been in the Wellness and Finance fields.

183.   At the time of the presentence interview, the defendant admitted to being an entrepreneur; however, he denied working for any sole business and was not making any legitimate income. Weeks indicated that his income came from his buying of bitcoin. A supplemental submission received by Defense Counsel pertaining to the defendant's prior employment states the following:

> As you learned, Weeks has made his career in sales and promotions and Mr. Weeks has a strong entrepreneurial spirit. Weeks explained to you that, over the years, he had been involved in a number of business opportunities, some more successful and some less so. Weeks told you that he got his first big break in working with Mannatech, a publicly traded multi-national multi-level marketing firm that sells dietary supplements and other items. You may have noticed that, as Weeks explained to you his association with Mannatech, he frequently used the

first person plural as he discussed the company (*e.g.*, "we," "us" and "our"). However, as you probably realized, Weeks had and has no formal role in Mannatech other than as a person who sells their products and who recruits others to sell Mannatech products, like tens of thousands of other people (if not many more).

184. An online search found that Mannatech is a family business and is a publicly traded, multinational multi-level marketing firm that sells dietary supplements and personal care products. Mannatech has officers in over 26 countries, and the defendant indicate he became a sales associate for the business when he was 14 years old. At the time of the presentence interview, the defendant indicated he would bring in $10,000 monthly in sales.

185. Weeks indicated that during periods of unemployment, he financially supported himself by selling bitcoin. The defendant is interested in starting a new business by converting his hemp farm into a moringa tree farm, also known as the "miracle tree."

**Financial Condition: Ability to Pay**

186. The defendant has not submitted a Net Worth and Monthly Cash Flow statement. In lieu of submitting the Net Worth and Monthly Cash Flow Statement, defense counsel provided a financial affidavit completed in October 2020 and August 2021. No documentation has been provided by the defendant or defense counsel. A financial affidavit completed by the defendant in October 2020 advised that the defendant was last employed in 2019 and earned the following per month: (1) $200 to $500 a month from Mannatech; (2) $1,000 from BitClub; and (3) $10,000 from Kanergrow. The second financial affidavit submitted by the defendant in August 2021 indicated that he earned the following per month: (1) $200 to $500 a month from Mannatech; (2) $3,000 monthly selling scrap metal; (3) $500 monthly from ClearPhone; and (4) $1,000 from Coin Empire License.

187. At the time of the presentence interview, the defendant indicated that he has been financially supported by his parents. The defendant's primary source of income was cryptocurrency, which he can no longer access at this time due to the instant offense.

**Analysis:**

188. At the time of the defendant's bail interview, he reported owning a 2014 Toyota Tundra dirt bike, a 2016 Cadillac Escalade, and a snowmobile. He also stated that he owned a ranch, which he used to farm hemp. The defendant reported the ranch is unencumbered and has a fair market value of two million dollars. The defendant stated that he has 25 Bitcoin, which he estimated to be worth $250,000.

189. At the time of the defendant's initial arrest in December 2019, the Probation Office in the Southern District of Florida was unable to locate any property currently owned by the defendant. According to LexisNexis, the defendant previously owned 3090 West 63rd Avenue, Denver, Colorado. Records indicated the defendant purchased the property in

U.S. DISTRICT COURT                                        JOBADIAH SINCLAIR WEEKS

October 2009 for $433,000 and sold the property in August 2013 for $499,00. That residence is a one-story, ranch-style residence with a basement and an attached garage.

190. The defendant co-owned 3635 Longwood Avenue, Boulder, Colorado. Records indicate the property was purchased for $879,000 in April 2006 by the defendant and John C. Ball. In March 2011, the property was quit claimed to Peter M. Spraitz for $0. The residence consists of 10,053 square feet on a 0.23-acre lot. Spraitz's relation to the defendant is unknown.

191. An Accurint public records search found two active addresses: 4629 Desmond Beach, Fort Gratiot, Michigan, and 11627 W. 74th Way, Arvada, Colorado. The owner of the Fort Gratiot resides is Darlene and Michael Depree; however, the defendant's name is associated with the residence. There is one federal tax lien filed against the defendant on March 18, 2013, for $20,223. No additional liens or judgments were listed.

192. Defense counsel is retained in this matter. The defendant's parents are paying for his legal expenses. The probation office has not been advised on any outstanding balance.

193. Based upon the available financial information, the defendant appears able to pay a fine. If the defendant is incarcerated, payment on a fine or restitution can commence through the Bureau of Prisons Inmate Financial Responsibility Program. An inmate participating in this program will be able to contribute half of monthly prison work earnings, for every month of imprisonment served, toward any immediately due fine or restitution.

**PART D. SENTENCING OPTIONS**

**Custody**

194. **Statutory Provisions:** Count 1: The maximum term of imprisonment is five years. 26 U.S.C. § 7201. Count 2: The maximum term of imprisonment is five years. 18 U.S.C. § 371 and 15 U.S.C. § 77x.

195. **Guideline Provisions:** Based upon a total offense level of 25 and a criminal history category of I, the guideline imprisonment range is 57 to 71 months.

**Impact of Plea Agreement**

196. The U.S. Probation Office agrees with the guideline stipulations outlined in the plea agreement.

**Supervised Release**

197. **Statutory Provisions:** Count 1: The Court may impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2). Count 2: The Court may impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2).

198. Multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

U.S. DISTRICT COURT                                        JOBADIAH SINCLAIR WEEKS

199. **Guideline Provisions:** Count 1: Since the offense is a Class D Felony, the guideline range for a term of supervised release is 1 to 3 years. USSG §5D1.2(a)(2). Count 2: Since the offense is a Class D Felony, the guideline range for a term of supervised release is 1 to 3 years. USSG §5D1.2(a)(2).

## Probation

200. **Statutory Provisions:** Count 1: The defendant is eligible for not less than one nor more than five years probation because the offense is a Class D Felony. 18 U.S.C. § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service. Count 2: The defendant is eligible for not less than one nor more than five years probation because the offense is a Class D Felony. 18 U.S.C. § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service.

201. Multiple terms of probation shall run concurrently. 18 U.S.C. § 3564(b).

202. **Guideline Provisions:** Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. USSG §5B1.1, comment.(n.2).

### Possible Special Conditions

203. Pursuant to the provisions of 18 U.S.C. §§ 3563 and 3583, and USSG §§ 5B1.3 and 5D1.3, with regard to the special conditions of probation and supervised release, respectively, the Court has the discretion to impose special conditions of supervision to the extent that such conditions are reasonably related to the factors set forth in 18 U.S.C. §§ 3553(a)(1) and (a)(2) and to the extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in 18 U.S.C. § 3553(a)(2). The special conditions that may be imposed at sentencing are listed in Appendix A of this report.

### DNA Collection

204. Prior legislation in 2000 and 2001 (Public Law Nos. 106-546 and 107-56) amended 18 U.S.C. §§ 3563(a), 3583(d), and 4209 to require persons convicted of certain current or prior federal offenses to cooperate in the collection of a DNA sample. Public Law No. 108-405 (October 30, 2004) amended 42 U.S.C. § 14135a(d)(1) to expand the list of qualifying federal offenses to include any felony, any offense under Chapter 109A of Title 18, any crime of violence (as defined in 18 U.S.C. § 16), and any attempt or conspiracy to commit any of the above offenses. The law amended 10 U.S.C. § 1565(d) to expand the list of qualifying military offenses to include any offense under the Uniform Code of Military Justice for which a sentence of confinement of more than one year can be imposed, and any other offense under the Uniform Code of Military Justice that is comparable to a qualifying federal offense. Cooperation in the collection of a DNA sample is a mandatory condition of community supervision unless a sample has been

U.S. DISTRICT COURT                                      JOBADIAH SINCLAIR WEEKS

secured by the U.S. Bureau of Prisons during a term of imprisonment. Failure to cooperate in the collection of a DNA sample is a Class A misdemeanor, pursuant to 42 U.S.C. § 14135(a)(5).

**Fines**

205.   **Statutory Provisions:** Count 1: The maximum fine is $250,000. 18 U.S.C. § 3571(b). Count 2: The maximum fine is $250,000. 18 U.S.C. § 3571(b).

206.   Count 1: A special assessment of $100 is mandatory. 18 U.S.C. § 3013. Count 2: A special assessment of $100 is mandatory. 18 U.S.C. § 3013.

207.   **Guideline Provisions:** The fine range for this offense is from $20,000 to $200,000. USSG §5E1.2(c)(3).

208.   Costs of prosecution shall be imposed on the defendant as required by statute. USSG §5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. USSG §5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated October 25, 2023, provides the following monthly cost data:

|  | **Bureau of Prisons Facilities** | **Community Correction Centers** | **Supervision by Probation Officer** |
|---|---|---|---|
| Daily | $136.00 | $107.00 | $12.00 |
| Monthly | $4,147.00 | $3,266.00 | $366.00 |
| Annually | $49,770.00 | $39,197.00 | $4,387.00 |

209.   The Criminal Fine Improvement Act of 1987 is applicable. Any fine exceeding $2,500, not satisfied within 15 days, will be charged interest at a rate determined by the U.S. Treasury auctions. If a defendant is unable to pay interest, the Court may waive the interest, limit the total interest to a specific dollar amount, or limit the time of interest accrual. See 18 U.S.C. § 3612(f). The liability to pay a fine terminates the later of 20 years from the entry of judgment or 20 years after release from imprisonment. See 18 U.S.C. § 3613(b). Fine payments, as well as the special assessment, should be made payable to the U.S. Treasury and forwarded to the Clerk of the Court.

**Restitution**

Count Two of the Information

210.   **Statutory Provisions:** The Antiterrorism and Effective Death Penalty Act of 1996 requires the Court to enter a restitution order if the instant offense is a crime of violence (see 18 U.S.C. § 16), an offense against property, or a crime related to product tampering (see 18 U.S.C. § 1365) and when an identified victim suffers a physical injury or

pecuniary loss, regardless of the defendant's ability to pay. This mandatory restitution provision (18 U.S.C. § 3663A) pertains to offenses committed after April 24, 1996, and can only be waived if the Court finds that the sheer number of identifiable victims makes a restitution order impracticable or the complexity of fashioning an order outweighs the need to provide restitution. See 18 U.S.C. § 3663A(c)(3). If the Court does not order restitution or only partial restitution, it must state its reasons for doing so, pursuant to 18 U.S.C. § 3553. The liability to pay restitution terminates the later of 20 years from the entry of judgment or 20 years after release from imprisonment. See 18 U.S.C. §§ 3613(b) and (f); 3664(m). Any restitution exceeding $2,500, not satisfied within 15 days, will be charged interest at a rate determined by the U.S. Treasury auctions. If a defendant is unable to pay interest, the Court may waive the interest, limit the total interest to a specific dollar amount, or limit the time of interest accrual. See 18 U.S.C. §§ 3612(f); 3664(m). **The restitution recommended thus far is $468,702.40.** Payments should be made payable to the U.S. Treasury and forwarded to the Clerk of the Court for distribution to the victim(s).

211.    **Guideline Provisions:** In accordance with the provisions of USSG § 5E1.1, restitution shall be ordered, unless the Court determines that the complication and prolongation of the sentencing process resulting from fashioning such an order outweighs the need to provide restitution to any victim through the criminal process.

        Count One of the Indictment

212.    **Statutory Provisions:** Pursuant to 18 U.S.C. §§ 3563 and 3583, restitution may be ordered in this case as a condition of probation or supervised release. If the Court does not order restitution or only partial restitution, it must state its reasons for doing so, pursuant to 18 U.S.C. § 3553. Any restitution exceeding $2,500, not satisfied within 15 days, will be charged interest at a rate determined by the U.S. Treasury auctions. If a defendant is unable to pay interest, the Court may waive the interest, limit the total interest to a specific dollar amount, or limit the time of interest accrual. See 18 U.S.C. §§ 3612(f); 3664(m). In cases where the IRS is the victim, the defendant can directly satisfy the restitution obligation with the IRS through compliance with a special condition requiring cooperation with the IRS and the filing of any amended or overdue income tax returns and payment of all taxes, interest, and penalties due.

213.    **Guideline Provisions:** In accordance with the provisions of USSG § 5E1.1, restitution shall be ordered, unless the Court determines that the complication and prolongation of the sentencing process resulting from fashioning such an order outweighs the need to provide restitution to any victim through the criminal process.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

214.    The probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.

U.S. DISTRICT COURT                                JOBADIAH SINCLAIR WEEKS

**PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM**

215.   Pursuant to 18 U.S.C. § 3553(a)(1) through (7), the following factors are to be considered in imposing a sentence: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to satisfy the statutory purposes of sentencing; the kinds of sentences available; the applicable guidelines; pertinent Sentencing Commission policy statements; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution. Available information concerning these factors is contained throughout the presentence report.

Respectfully submitted,

JOSEPH A. DAGROSSA
Acting Chief U.S. Probation Officer


By: _____
         KELLY A. MACIEL
         U.S. Probation Officer


Approved:

_____        _____
NATALIE SHREVE                                              01/07/2025
Supervising U.S. Probation Officer                        Date

- 41 -

## APPENDIX A

### U.S. Probation Office - District of New Jersey
### Special Conditions of Supervision That May Be Imposed at Sentencing

#### ALCOHOL AND/OR DRUG TESTING AND TREATMENT

You must refrain from the illegal possession and use of drugs, including prescription medication not prescribed in your name, and the use of alcohol, and must submit to urinalysis or other forms of testing to ensure compliance. It is further ordered that you must submit to evaluation and treatment, on an outpatient or inpatient basis, as approved by the U.S. Probation Office. You must abide by the rules of any program and must remain in treatment until satisfactorily discharged by the Court. You must alert all medical professionals of any prior substance abuse history, including any prior history of prescription drug abuse. The U.S. Probation Office will supervise your compliance with this condition.

#### COMMUNITY SERVICE

You must contribute ___ hours of community service work over a period of ___ or less, from the date supervision commences. Such service will be without compensation, with the specific work placement to be approved by the U.S. Probation Office.

#### COMPUTER MONITORING

You must submit to an initial inspection by the U.S. Probation Office, and to any unannounced examinations during supervision, of your computer equipment. This includes, but is not limited to, personal computers, personal digital assistants, entertainment consoles, cellular telephones, and/or any electronic media device which is owned or accessed by you. You must allow manual searches of these devices and the installation on your computer of any hardware or software systems which monitor computer use. You must pay the cost of the computer monitoring program. You may use a computer in connection with employment if approved by the U.S. Probation Office, provided you notify your employer of the nature of your conviction and any computer related restrictions that are imposed on you. The U.S. Probation Office will confirm your compliance with this notification requirement.

#### CONSENT TO SEARCH

You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

## DENIAL OF COMPUTER

You must not possess, procure, purchase or otherwise obtain access to any form of computer network, bulletin board, internet, or exchange format involving computers unless specifically approved by the U.S. Probation Office. Any dispute as to the applicability of this condition will be decided by the Court.

(*In accordance with Third Circuit case law, this condition shall only be recommended for offenses that involve the following statutes: 18 U.S.C. §§ 2241, 2242, 2243(a) & (b), 2244, 2421, 2422, 2423, 2325, 2251, 2260(b), 2251(a), 2252A(g), 2252B, 2252C, 1591, 1460, 1462, 1463, 1465, 1470, and 8 U.S.C. § 1328*).

## FINANCIAL DISCLOSURE

Upon request, you must provide the U.S. Probation Office with full disclosure of your financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, you are prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Office. You must cooperate with the U.S. Probation Office in the investigation of your financial dealings and must provide truthful monthly statements of your income. You must cooperate in the signing of any authorization to release information forms permitting the U.S. Probation Office access to your financial records.

## FINANCIAL - NEW DEBT RESTRICTIONS

You are prohibited from incurring any new credit charges, opening additional lines of credit, or incurring any new monetary loan, obligation, or debt, by whatever name known, without the approval of the U.S. Probation Office. You must not encumber or liquidate interest in any assets unless it is in direct service of the fine and/or restitution obligation or otherwise has the expressed approval of the Court.

## GAMBLING ESTABLISHMENTS RESTRICTION

You must not enter any gambling establishment without the permission of the U.S. Probation Office and/or the Court.

## GAMBLING RESTRICTIONS AND REGISTRATION ON EXCLUSION LISTS

You must refrain from all gambling activities, legal or otherwise, to include the purchase or receipt of lottery tickets and internet gambling. You must register on the self-exclusion lists maintained by the New Jersey Casino Control Commission and Racetrack Commission within 60 days of the commencement of supervision and remain on these lists for the duration of supervision. The U.S. Probation Office will supervise your compliance with this condition.

## GANG/CRIMINAL ASSOCIATIONS PROHIBITION

You must refrain from associating with, or being in the company of, any members of any street gang, outlaw motorcycle gang, traditional or non-traditional organized crime group, or any other identified threat group. You are restricted from frequenting any location where members of said organizations are known to congregate or meet. You must not have in your possession any item or paraphernalia which has any significance or is evidence of affiliation with said organizations.

## GATEWAY NATIONAL PARK RESTRICTION

You must refrain from entering Gateway National Park while on supervision.

## IMMIGRATION AND CUSTOMS ENFORCEMENT - COMPLIANCE

You must comply with instructions from Immigration and Customs Enforcement to resolve any problems with your status in the United States. You must provide truthful information and abide by the rules and regulations of Immigration and Customs Enforcement. You must seek proper documentation from U.S. Immigration and Customs Enforcement authorizing you to work in the United States. If deported, you must not re-enter the United States without the written permission of the Secretary of United States Department of Homeland Security. If you re-enter the United States, you must report in person to the nearest U.S. Probation Office within 48 hours.

## INTERNAL REVENUE SERVICE - COOPERATION

You must fully cooperate with the Internal Revenue Service by filing all delinquent or amended returns within six months of the sentence date and timely file all future returns that come due during the period of supervision. You must properly report all corrected taxable income and claim only allowable expenses on those returns. You must provide all appropriate documentation in support of said returns. Upon request, you must furnish the Internal Revenue Service with information pertaining to all assets and liabilities, and you must fully cooperate by paying all taxes, interest and penalties due and otherwise comply with the tax laws of the United States.

## LIFE SKILLS/EDUCATION

As directed by the U.S. Probation Office, you must participate in and complete any educational, vocational, cognitive or any other enrichment programs offered by the U.S. Probation Office or any outside agency or establishment while under supervision.

## LOCATION MONITORING PROGRAM

You must submit to home detention for a period of _____ months and comply with the Location Monitoring Program requirements as directed by the U.S. Probation Office. You will be restricted to your residence at all times except for employment, education, religious services, medical, substance abuse and mental health treatment, court-ordered obligations, and any other such times specifically authorized by the U.S. Probation Office. The location monitoring technology is at the discretion of the U.S. Probation Office. You must pay the cost of the monitoring. (Or waive).

## MENTAL HEALTH TREATMENT

You must undergo treatment in a mental health program approved by the U.S. Probation Office until discharged by the Court. As necessary, said treatment may also encompass treatment for gambling, domestic violence and/or anger management, or sex offense-specific treatment, as approved by the U.S. Probation Office, until discharged by the Court. The U.S. Probation Office will supervise your compliance with this condition.

## MINORS - RESTRICTED CONTACT/MATERIALS AND REASONABLE SEARCH

With the exception of brief, unanticipated and incidental contacts, you must not associate with children under the age of 18, except for family members or children in the presence of an adult who has been approved by the U.S. Probation Office. You must not obtain employment or perform volunteer work which includes, as part of its job/work description, contact with minor children, without the expressed approval of the U.S. Probation Office. You must not maintain, within your residence or within any outside establishment within your control or custody, a collection of digital images or videos, films, slides, pictures, tapes, videotapes or other form of pictorial representation whose subject matter involves minor children of either sex and can be deemed to be pornographic. The U.S. Probation Office will have the right of reasonable search of your person and residence, or any other establishment within your custody or control, and will, if necessary, request the assistance of other law enforcement personnel to enforce the provisions of this special condition.

## MOTOR VEHICLE COMPLIANCE

You must not operate any motor vehicle without a valid driver's license issued by the State of New Jersey, or in the state in which you are supervised. You must comply with all motor vehicle laws and ordinances and must report all motor vehicle infractions (including any court appearances) within 72 hours to the U.S. Probation Office.

## OCCUPATIONAL RESTRICTIONS

As a further special condition of supervision, you must refrain from _____.

*{As an underlying foundation for this special condition, the Court must find that: (1) a reasonably direct relationship existed between the defendant's occupation, business or profession and the conduct relevant to the offense of conviction; (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted; and (3) that the time frame and structure of the special condition is for the minimum time frame and to the minimum extent necessary to protect the public.}*

## POLYGRAPH EXAMINATION

You must submit to an initial polygraph examination and subsequent maintenance testing, at intervals to be determined by the U.S. Probation Office, to assist in treatment, planning, and case monitoring. You will be required to contribute to the costs of services rendered in an amount to be determined by the U.S. Probation Office, based on ability to pay or availability of third-party payment.

## PRETRIAL OPPORTUNITY PROGRAM (POP)

You must continue to participate in the Pretrial Opportunity Program during the full term of supervision as directed.

## RESIDENTIAL REENTRY CENTER PLACEMENT

You must reside for a period of ___ months in a community corrections center, halfway house or similar residential facility and must observe all the rules of that facility. You will be eligible for weekend privileges. (Or deny). You must pay subsistence as required by the program.

## SELF-EMPLOYMENT/BUSINESS DISCLOSURE

You must cooperate with the U.S. Probation Office in the investigation and approval of any position of self-employment, including any independent, entrepreneurial, or freelance employment or business activity. If approved for self-employment, you must provide the U.S. Probation Office with full disclosure of your self-employment and other business records, including, but not limited to, all of the records identified in the Probation Form 48F (Request for Self-Employment Records), or as otherwise requested by the U.S. Probation Office.

## SEX OFFENSE-SPECIFIC ASSESSMENT AND TREATMENT

You must participate in a sex offense-specific assessment and treatment program and follow the rules and regulations of that program. You must remain in that program until satisfactorily discharged with the approval of the Court or the U.S. Probation Office. You shall pay the cost of assessment and/or treatment as directed by the Probation Office.

- 46 -

## STATUS CONFERENCE

You must appear before this Court after commencement of supervision for a conference to assess your progress and compliance with the conditions of supervision. [The Court will establish the time frame.]

## SUPPORTING DEPENDENTS

If you are court-ordered to make child support payments or to make payments to support a person caring for a child, you must make the payments and comply with the other terms of the order.

## VICTIM (NO CONTACT)

You must not communicate, or otherwise interact with [initials of victim], either directly or indirectly, without first obtaining the permission of the U.S. Probation Office. This includes, but is not limited to, contact through a third person, personal visits, letters, communication devices, audio or visual devices, or social networking sites.

**(Revised October 5, 2020)**

## ADDENDUM TO THE PRESENCE REPORT

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
### UNITED STATES V. JOBADIAH WEEKS, DOCKET NO. 0312 2:19CR00877-3

### REVISIONS

Previous paragraphs 75 and 86 were deleted. Paragraphs 141, 158, 173, and 183 through 185 were added, which changed the numbering of all subsequent paragraphs. Revisions were made to paragraphs 41, 71, 110 through 125, 142, 144, 145, 150, 151, 157, 159, 169 through 171, 174 through 181, 186, 187, 192, 195, 196, 205, and 210.

### GUIDELINE OBJECTIONS

#### By the Government

In a letter dated December 12, 2024, the Government submitted no guideline objections. Any other recommended corrections were made as noted above.

#### By the Defendant

In a letter dated November 18, 2024, the Defendant submitted no guideline objections.

### NON-GUIDELINE OBJECTIONS

#### By the Government

None.

#### By the Defendant

The Defendant submitted the following comments for the Court's consideration at sentencing:

**Comment #1**: Defense Counsel notes that the defendant did not have any formal role within Bit Club Network ("BCN"), and that he was simply a promoter or salesperson of the BCN membership program. Additionally, Weeks had no knowledge of ever being called a "Mega-Monster."

**Comment #2:** Defense Counsel made numerous references to the offense conduct, noting that many of the paragraphs do not pertain to Weeks. Defense Counsel further notes that the defendant was charged under his plea agreement with one count of failing to file tax returns and one count of promoting unregistered securities, which he acknowledged responsibility for those counts. They indicated that neither of these counts involved a fraud on investors and/or alleged that Mr. Weeks caused any harm or damage to the public.

**Comment #3**: Defense Counsel indicates that they are working alongside the Government to determine the appropriate amount of tax owed by Weeks for the years of 2015 through 2018.

U.S. DISTRICT COURT                                              JOBADIAH WEEKS

Defense Counsel notes that "Weeks has now retained appropriate tax counsel to advise him on these matters and to assist the United States Attorney's Office and revenue agents at arriving at the appropriate amounts to be paid in restitution and to be applied with respect to the sentencing guidelines. We would respectfully request that these facts be reflected in the PSR and we will, of course, update Probation and the Court on the results of those discussions, which are ongoing."

### Response by U.S. Probation Office

The information contained in the Offense Conduct of the presentence report is based on court-filed documents and information corroborated by the Government through its work and conversation with the investigating agency, the Federal Bureau of Investigation (FBI) and Internal Revenue Service (IRS), which are believed to be accurate and provable by a preponderance of the evidence. Therefore, the report remains unchanged, and the defendant's comments are noted for the Court's review.

Respectfully submitted,

JOSEPH A. DAGROSSA
Acting Chief U.S. Probation Officer

By: _____
KELLY A. MACIEL
U.S. Probation Officer

Approved:

_____        _____
NATALIE SHREVE                                        01/07/2025
Supervising U.S. Probation Officer                   Date

- 49 -

# Exhibit H

Treasury Proffer Memoranda (Aug. 17 & 25, 2020)



**DEPARTMENT OF THE TREASURY**
**Internal Revenue Service**
**Criminal Investigation**

## Memorandum of Interview

---

| | |
|---|---|
| **Investigation #:** | ██████████ | **Location:** via Conference Call |
| **Investigation Name:** | JOBADIAH SINCLAIR WEEKS |
| **Date:** | August 25, 2020 |
| **Time:** | Approx. 9:00 - 10:59 a.m. |
| **Participant(s):** | JOBADIAH SINCLAIR WEEKS, Defendant |
| | Simon Gaugush, Attorney for Mr. WEEKS |
| | Michael Yeager, Attorney for Mr. WEEKS |
| | Jamie Hoxie, Assistant U.S. Attorney |
| | Anthony Torntore, Assistant U.S. Attorney |
| | Stephanie Talamantez, Special Agent, FBI |
| | Leo Rovensky, Special Agent, IRS-CI |
| | Ven Karavchuk, Special Agent, IRS-CI |
| | Jonathan Helmstetter, Special Agent, IRS-CI |

On the above date and time, AUSAs and agents met via teleconference with Jobadiah (Joby) Sinclair Weeks (Weeks) and his attorneys. Weeks stated that he understands the proffer letter and has already signed and sent the letter to his attorney. Weeks confirmed that no one from the government has asked him to speak with Matt Goettsche (Goettsche) or to get information from Goettsche at the government's direction. Below is a summary of the proffer session and does not reflect the statements verbatim. Weeks provided the following information:

1. Weeks and Goettsche have not personally entered into a joint defense agreement with each other, however, their respective attorneys may have.

2. Weeks's attorney, Simon Gaugush (Gaugush), stated that there is no written joint defense agreement with Goettsche's attorneys. However, an oral joint defense agreement between the attorneys may have happened at Weeks' and Goettsche's initial appearance in Newark, New Jersey on January 15, 2020. Gaugush explained that it is potentially arguable that the oral agreement may have happened on that date.

3. Weeks stated that he understands that he should not discuss conversations he has had with Goettsche after his initial appearance in New Jersey because of the potential oral joint defense agreement. Weeks also stated that he understands not to talk about anything that Goettsche said his lawyers may have told him.

4.  At the time of his arrest, Weeks was no longer promoting Bitclub Network (BCN).  Weeks stopped signing up new members to BCN around the end of 2018, when his daughter was born.

5.  Weeks also severed other business ties he had with Goettsche and Russ Medlin (Medlin) in late 2018.  Weeks stopped talking with Goettsche and Medlin after they failed to honor the agreement for the Montana data center and refused to pay the power bill for the data center in the country of Georgia.

6.  In late 2018 or early 2019, Joe Abel (Abel) reached out to Weeks and told him about the company Dunamis.  Abel asked Weeks to join Dunamis.  Weeks agreed to join Dunamis and stopped promoting BCN.

7.  Weeks and Goettsche spoke to each other prior to and on January 15, 2020. The most time that Weeks spent together with Goettsche after their arrests was during their transport to New Jersey.  First in an Oklahoma holding facility and then on the airplane while they were being flown to New Jersey.  Weeks and Goettsche also spent one day together in a holding cell in New Jersey and in the back of a police car on the date of their initial appearance on January 15, 2020.  Abel was also present in Oklahoma, on the flight to New Jersey, and during the initial appearance.

8.  While they were in Oklahoma, Weeks, Goettsche and Abel were sitting in the same holding cell.  Weeks asked Goettsche why he called members of BCN idiots and why he said the company was built on the backs of idiots.  Goettsche told Weeks that the conversation where he said that was taken out of context. Goettsche told Weeks that BCN did a lot more than $700 million in revenue. Weeks asked if Goettsche can prove that they spent 40% on mining equipment and Goettsche said he can account for where all the money went.  Goettsche said he can prove that he purchased a lot of equipment.

9.  Abel was there during this conversation.  He was upset that he was dragged into the BCN arrests because he had formally left BCN.  Abel had publicly said that BCN wasn't buying enough mining equipment.  Abel also did not think he would get bail because he already fled prosecution in Malaysia.  Abel was angry and had nothing good to say about Medlin.  Weeks thinks Medlin and Goettsche were lending Abel money to buy Lamborghinis  and Rolls Royce's before he left BCN.

10. Goettsche said BCN brought in a lot more than $722 million and can account that 40% went to mining equipment.  Goettsche also said that he and Medlin had shared the same email address and that some of the communications in the indictment were done by Medlin because they had different sleeping schedules.  Goettsche did not get into the specifics of which emails were done by whom.

11. Weeks asked Goettsche if he was trying to make an exit when he tried to sell Weeks mining equipment at a big discount. Goettsche said he was getting rid of old mining equipment to buy new equipment. In around September 2019, Goettsche had asked Weeks if he had a buyer for mining equipment. Goettsche had bought the miners for $100 million and was willing to sell them for $5 million because they were old and used. Goettsche was working with Rick in Montana and they were going to use the $5 million to retrofit a data center in Montana with S17 miners. Weeks assumed that the old equipment and the S17s were for the benefit of BCN. Goettsche had asked Weeks to find buyers for mining equipment on other occasions as well. On those other occasions, Weeks understood that the equipment was bought with BCN funds. After the mining equipment would be sold, Weeks assumed that Goettsche would buy more mining equipment for BCN. Goettsche said that he and Rick had another plot of land in Montana and were looking to add more mining power to that site.

12. Weeks could not recall Rick's last name. Rick set up the data center in Butte, Montana with Dan Burrell (Burrell) and Kevin Washington (Washington). Rick owns an operations/construction company. Weeks previously told Rick there was an investigation on BCN. Rick was mad at Goettsche because Goettsche was not honoring agreements. Rick said to Weeks that Goettsche and Yoshi are cyber criminals because there were multiple mining wallets.

13. In Oklahoma, Weeks was asking Goettsche if what the indictment said is true and what the expansion plan was for BCN. Goettsche said that there were other products such as debit cards, arbitrage trader platform, etc. BCN was diversifying because mining earnings were poor. A year earlier, Weeks tried to sell bitcoin ATM software to Goettsche to help BCN diversify. Goettsche also said that he has not heard from Yoshi. Goettsche thinks Yoshi disappeared in Russia and no one has heard from him since. Goettsche did not tell Weeks whether something was wrong with the BCN pool because of Yoshi's disappearance.

14. Around September 2019, Goettsche told Weeks that the $100 million of old mining equipment that he was looking to sell for $5 million was located in a data center in China. Yoshi had set up this equipment and now there was some sort of discrepancy. There was a lawsuit that involved Genesis Mining. BCN and Genesis Mining had mining equipment co-located in the same data center in China and the discrepancy was about the equipment. Weeks thinks that the equipment was pointed to both the BCN and Genesis Mining respective pools, but he does not know that for certain. Weeks added that on the www.bitclubpool.com website, it is possible to see which data center was hitting the blocks on the blockchain.