**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**United States of America,**
*Plaintiff,*
v.
**Jobadiah Weeks,**
*Defendant Pro Se*

**Case No. 19-cr-877-CCC**
**Hon. Claire C. Cecchi**

April 25, 2025

Honorable Claire C. Cecchi
United States District Judge
District of New Jersey
Martin Luther King Jr. Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101


**Re: United States v. Jobadiah Weeks, 19-cr-877 (CCC)**

Dear Judge Cecchi:

Defendant respectfully submits this reply in response to the Government's April 22, 2025
letter brief (Dkt. 417) and in advance of the May 8, 2025 hearing. It addresses the
Government's failure to respond to critical discovery requests, explain evidentiary omissions,
or justify its continued use of unverified materials in opposition to Defendant's motions. The
reply summarizes factual inconsistencies, procedural defects, and constitutional violations
that now require judicial intervention.

## Preliminary Note on the Government's Characterization

In its April 22, 2025 letter, the Government describes the Defendant's request as one for
"*recission of autograph*" [sic] on the plea agreement (Dkt. 417 at 1). The phrase — which
contains a spelling error in the word rescission — reflects both a dismissive tone and a lack
of precision in addressing the constitutional issues raised. The Defendant is not simply
seeking to undo a signature, but rather asserting that the plea agreement must be
**rescinded and treated as void ab initio**, due to structural due process violations,
suppression of material evidence, and coercive pretrial conditions. The Government's
rhetorical framing does not cure these defects, nor does it meaningfully engage with the
substance of the Defendant's arguments. **This response sets the record straight** and
demonstrates why full rescission — not just withdrawal — is the appropriate and
constitutionally mandated remedy.

## Executive Summary

This reply identifies four overarching legal and constitutional failures:

1. **The Government's continued withholding of discovery** — including Brady and Rule 16 materials — even after Defendant formally elected to proceed pro se on February 5, 2025;

2. **The lack of a verified factual basis for the plea agreement**, including missing proffer authentication, undisclosed discovery, and the unconfirmed instruction allegedly given by AUSA Hoxie;

3. **The imposition of unconstitutional pretrial restrictions**, which remain unjustified by the Government and unaddressed by the Court, despite multiple formal motions and correspondence;

4. **The Government's repeated failure to respond** to Defendant's motions and letters — a sustained pattern that now constitutes procedural default, waiver, and structural prejudice requiring redress.

Together, these failures support Defendant's requests for:

- **Withdrawal of the plea** under Rule 11(d)(2)(B);

- **Production of all withheld discovery**, including materials previously provided to former counsel;

- **Termination of unconstitutional pretrial restrictions**, consistent with Due Process and Equal Protection;

- **Return of seized assets**, including 8.67 BTC, in the absence of lawful forfeiture justification;

- **Dismissal of the indictment** or other sanctions, where warranted under Rule 48(b) or the Court's supervisory authority; and

- **Suppression or exclusion of any materials not disclosed** prior to the May 8 evidentiary hearing, in accordance with Rule 16 and Brady.

**Table of Contents**

- **I. Preliminary Clarification**
- **II. Factual Misstatements in the Government's April 22 Letter**
    - A. Mislabeling Weeks as a Founder
    - B. Inaccurate Role and Timeline Assertions
    - C. Misattribution of Intent and Culpability
    - D. Promotional Activity
    - E. Plea Timeline vs. Grand Jury Memo
    - F. Count One Dismissal and Risk Context
    - G. Pro Se Acknowledgment, But Continued Withholding
    - H. Omission of Detention and Grand Jury Issues
    - I. Discovery Violations and DOJ Policy Silence
    - J. Consequences of Narrative Distortion
    - K, Misrepresenting Plea Withdrawal Standard
    - L. Misuse of Plea Language to Block Review
    - M. Ignoring Grounds for Plea Withdrawal
    - N. Misuse of August 2020 Proffer
    - O. Dismissive Framing of Legal Arguments
    - P. Misstating Prejudice and Delaying Strategically
    - Q. Prejudice Claim Undermined by Disclosure Failures
    - R. Misstating Rule 16 and Brady Duties
    - S. Misleading Bail Compliance Argument
    - T. False Florida Event Claim (Concluding the List)

- **III. Mischaracterization of Motion Scope**
- **IV. Misuse of Plea Language to Avoid Review**
- **V. Rescission of the Plea Agreement Is the Appropriate Remedy**
- **VI. Brady and Rule 16 Failures**
- **VII. Hoxie Statement Issues**
- **VIII. Unsupported Victim Impact Claims**

- **IX. Bail Justification Failures**
- **X. April 12 Letter and DOJ Policy**
- **XI. Discovery Issues Raised**
- **XII. Pro Se Discovery Withholding and Constitutional Violations**
- **XIII. Government Silence as Waiver**
- **XIV. Pro Se Discovery Withholding**
- **XV. Conclusion**
- **XV! Hearing Framework**

# I. Procedural Clarifications and Filing Irregularities

Before addressing the Government's factual and legal misstatements, Defendant respectfully clarifies procedural and recordkeeping issues that are material to the Court's evaluation of the motions before it.

The Government's opposition mischaracterizes both the substance and the legal foundation of the relief sought. By reducing Weeks' motion to four oversimplified categories — including a vague reference to "*recision of autograph*" [sic]— the Government fails to address the constitutional violations, evidentiary inconsistencies, and due process failures raised.

Specifically, the motion is grounded in:

- **Rule 11(d)(2)(B):** Withdrawal of plea due to constitutional violations, including coercion and a lack of factual basis.

- **Brady and Giglio violations:** Withholding of material exculpatory evidence (e.g., SARs, plea deals, MOIs, crypto seizure memos).

- **Selective prosecution and unequal bail treatment:** Supported by clear disparities with co-defendants.

- **Prosecutorial misconduct:** Including failure to disclose Grand Jury materials, misrepresentations to the Court, and pressure tactics via prison transfers.

- **Violation of DOJ policy:** The April 7, 2025 directive restricts digital asset prosecutions to cases involving identifiable harm — which the Government has not substantiated here.

- **Remedy considerations:** Including not only discovery and bail relief, but potential **dismissal of the indictment** under **Rule 48(b)** or the Court's **supervisory authority** due to cumulative misconduct.

These are not minor procedural issues. They are systemic violations that go to the heart of fairness, due process, and the legitimacy of this prosecution.

4

# II. Factual Misstatements in the Government's April 22 Letter

**Preliminary Note on Filing Date:** Although the Government's letter is dated April 22, 2025, it was filed with the Court on April 21, 2025 (Dkt. 417). This discrepancy is noted for the record, particularly given the timeline sensitivities and the ongoing discovery issues detailed below.

## A. Mischaracterization of Weeks as a Founding Member

The Government's factual summary misleadingly conflates Defendant Weeks with the founding architects of the BitClub Network ("BCN"). By stating, *"Through the efforts of the co-conspirators, including Weeks,"* the Government implicitly suggests that Weeks was part of the founding core of BCN, alongside Matthew Goettsche, Russ Medlin, and Silviu Catalin Balaci—individuals who launched and designed BCN in 2014. This is factually inaccurate, legally misleading, and prejudicial.

This mislabeling skews the plea's factual foundation under Rule 11(b)(3) and elevates Weeks' alleged culpability beyond what the record supports.

## B. Misstatement of Weeks' Timing and Role

Weeks did not join BCN until after 2016—more than two years after its founding—and had no role in its creation, corporate structuring, compensation scheme, or technical development. He held no executive or decision-making position and had no involvement in the initial launch or strategy. The Government's framing creates a false equivalency that erases meaningful distinctions between a late-joining participant and the original architects of the scheme.

As further detailed in **Section III.**, this mischaracterization of Weeks' role undermines the entire basis of the Government's narrative and must be corrected before considering the motion's merits.

This distinction is critical in evaluating not just guilt, but prosecutorial fairness and proportionality in charging decisions.

## C. Improper Attribution of Central Intent and Culpability

This distinction is not academic. It directly impacts the fairness of proceedings, particularly in how culpability, intent, and sentencing exposure are assessed. Misrepresenting Weeks as a central figure distorts the narrative and risks improperly influencing the Court's interpretation of his role, especially in the context of a motion to withdraw his plea and challenge selective prosecution.

## D. Misleading Description of Promotional Activity and Tax Exposure

The Government further asserts that *"[d]espite making millions of dollars through his promotion of BCN,"* Weeks failed to report this income to the IRS. This phrasing—"*through his promotion of BCN*"—is likewise misleading. It implies that Weeks was the primary or exclusive promoter, when in fact, as the record shows, BCN relied on a wide network of promoters, including but not limited to F. Hidalgo, A. Fairclough, R.J. Oh, J. Vause, F. Rojo, and A. Onesimus, and others, many of whom engaged in similar or more extensive promotional conduct and were not charged.

This selective language amplifies a narrative of disproportionate culpability. It ignores the broader promotional infrastructure used by BCN and falsely isolates Weeks as a uniquely blameworthy figure. This mischaracterization undercuts the legitimacy of the Government's position and further supports the defense's claim that **the prosecution has employed a distorted and unfair presentation of facts.**

The selective enforcement reflected here undermines equal protection and supports Defendant's selective prosecution claims under Armstrong.

## E. Misleading Timeline and Suppression of the Grand Jury Memo

The Government states, *"On November 5, 2020, Weeks entered a guilty plea to (a) Count Two of the Indictment (conspiracy to offer or sell unregistered securities); and (b) an Information charging him with one count of tax evasion, in violation of Title 26, United States Code, Section 7201."* However, this account omits a crucial detail: the plea agreement itself was signed on September 21, 2020—several weeks before the October 8, 2020 Grand Jury Evaluation Memorandum (hereinafter, the 'Memo') was prepared. This raises significant concerns regarding the Government's timing and transparency.

The October 8 memo, which contains key factual assessments and characterizations relevant to discovery, plea considerations, and prosecutorial framing, was not available to the defense at the time of plea signing. Its creation after the agreement but before the formal plea hearing suggests a strategic delay in material production, potentially implicating Brady obligations and Rule 11(b)(3), which requires that a plea have a factual basis.

The Government's failure to disclose this Memo prior to the plea deprived Defendant of material evidence necessary to assess the merits and fairness of the plea — a core concern under Brady.

## F. Government Admission of Reduced Risk and Count One Dismissal

*"During the November 6 hearing, the Government consented to Weeks' release, citing a diminished flight risk resulting from Weeks' guilty plea and the dismissal of Count One of the Indictment, which carried a 20-year maximum sentence."* This acknowledgment is significant. Count One—wire fraud conspiracy—was the most serious charge in the

indictment, and its dismissal substantially altered both the sentencing exposure and the perceived necessity of pretrial detention.

The Government's failure to highlight this in its recent filings contributes to an inaccurate portrayal of the defendant's risk profile and legal posture at the time of the plea. This context is critical for assessing whether the plea was knowingly and voluntarily entered and whether the prosecution's narrative continues to overstate Weeks' alleged centrality and threat.

## G. Government Admission of Pro Se Status and Continued Withholding

*"On February 5, 2025, Judge Hammer held a hearing at which Weeks moved to proceed pro se. Following a Faretta colloquy, the Court granted Weeks' motion and continued the hearing regarding the Government's motion to revoke, which remains pending as of the date of this letter."* This statement reflects the Government's admission that Weeks has been representing himself since February 5, 2025.

Despite that acknowledgment, the Government has failed to provide Weeks with direct access to discovery materials that were previously in the possession of his former attorneys. Moreover, it has not responded to any of the motions Weeks filed after invoking his right to self-representation, nor to the numerous letters submitted (Exhibit B) in support of or requesting clarification and relief on those filings. As the Government itself notes, *"Between February 11, 2025 and March 7, 2025, Weeks filed several motions seeking the relief set forth above."* What the Government omits, however, is that Weeks also submitted multiple supporting letters during this period, requesting clarification and enforcement of his rights. **These, too, were disregarded.** The consistent refusal to acknowledge or address these filings reflects a broader neglect of the obligations owed to a pro se defendant and the Court.

This pattern of disregard not only undermines Weeks' ability to defend himself but also violates his due process rights. The selective and inconsistent treatment of Weeks' pro se status further supports the broader claim that the Government has adopted a narrative and prosecutorial strategy that distorts both legal standards and factual context.

## H. Imbalanced Emphasis on Bail Issues and Omission of Material Facts

Four of the thirteen paragraphs in the Government's Factual and Procedural Background are dedicated exclusively to alleged violations of bail conditions. This disproportionate emphasis attempts to frame the narrative around Weeks' pretrial conduct while omitting critical facts essential to a fair and complete understanding of the case.

Most notably absent is any acknowledgment of Weeks' transfer through approximately 20 detention facilities before entering into a plea agreement—a pattern of custodial disruption that raises serious questions about coercion and plea voluntariness. Equally absent is any reference to the Government's failure to inform legal counsel of critical developments, including plea negotiations, strategic decisions surrounding pretrial conditions, or discovery issues raised in contemporaneous correspondence. **These failures are well documented** in the memoranda and filings submitted by the defense and represent a material omission from the Government's account. These custodial transfers are detailed further in Sections M

and N, which outline how the Government's manipulation of detention placement and pre-proffer conditions coerced a plea and tainted subsequent statements.

Additionally, the Government fails to address its misrepresentations to the Grand Jury, including the omission of key exculpatory material and inaccurate portrayals of Weeks' role and involvement.

The selective inclusion of procedural history, limited almost entirely to pretrial release and bail condition violations, reflects a continued strategy to sideline the central constitutional issues raised in Weeks' filings. These omissions are not accidental; they reinforce a prosecution narrative built on distortion and exclusion. Section IX. The Government and Court Have Failed to Justify Continued Bail Restrictions: **Serious Constitutional and Factual Objections Remain Unanswered**

## I. Omission of Discovery Violations and Policy Constraints

The Government's factual narrative also omits two additional categories of material significance: discovery violations and the Department of Justice's own prosecutorial policy on digital assets. Nowhere in its background does the Government acknowledge its delayed production of key materials, including Suspicious Activity Reports (SARs), Memoranda of Interview (MOIs) from April and December 2019, or the December 2019 Crypto Seizure Memo—documents that speak directly to Brady and Giglio obligations and that were not disclosed until years after the plea agreement was signed. This policy oversight is fully addressed in Section X: *April 12, 2025 Letter to AUSA Torntore: Policy Grounds and Constitutional Failures Warrant Immediate Termination of Prosecution,* which outlines the DOJ's April 7, 2025 directive and the Government's failure to comply with its digital asset prosecution policy.

Equally absent is any mention of the Department of Justice's April 7, 2025 Digital Asset Enforcement Framework (Exhibit C), which mandates that prosecutions of digital asset offenses be limited to cases involving demonstrable harm or misuse. The Government's silence on its own policy constraints suggests a continued effort to litigate this case under outdated standards no longer endorsed by Main Justice.

These omissions further erode the reliability of the Government's account and reinforce the defense's position that the factual and procedural summary advanced is not only incomplete—it is legally and ethically insufficient.

## J. Consequences of Narrative Distortion

Recasting facts, omitting exculpatory context, and selectively emphasizing minor issues while ignoring constitutional violations has become typical of the Government's approach in this matter. **This includes its refusal to engage with more than 65 questions posed in post-hearing letters and motions**—none of which have been substantively addressed. The Government's failure to respond meaningfully to these filings from a pro se defendant—while simultaneously fabricating a procedural history that omits key facts and distorts the evidentiary record—is not merely negligent; **it is emblematic of a prosecution willing to ignore constitutional safeguards in favor of narrative control.** This conduct reflects not

8

an isolated oversight, but a consistent posture of evasion and strategic misrepresentation that has defined the Government's handling of this case.

Weeks' motion does not merely challenge the evidentiary sufficiency of the Government's case; it exposes a prosecutorial strategy built on omission, exaggeration, and distortion. **Correcting the record**—factually and procedurally—is essential to ensuring that further proceedings are rooted not in inference or delay, but in truth, fairness, and constitutional compliance.

## K. The Government Misrepresents the Legal Standard for Plea Withdrawal

The Government asserts that *"[b]ald assertions of innocence are insufficient to permit a defendant to withdraw his guilty plea,"* citing United States v. Jones, 336 F.3d 245, 252 (3d Cir. 2003). But this framing distorts both the facts and the law. Weeks has not simply claimed innocence. He has supported his motion with an extensive factual record: including the late disclosure of exculpatory materials, the failure to inform defense counsel of key developments, custodial coercion through repeated transfers, and demonstrable prosecutorial misconduct. These are not "*b]ald assertions.*" **They are documented constitutional violations.**

The Government further argues that because Weeks *"admitted to promoting and offering shares in BCN"* during his plea colloquy, withdrawal is precluded. This, too, misstates the standard. Under Rule 11(d)(2)(B), a plea may be withdrawn if it was not knowing or voluntary, or if it lacked a sufficient factual basis. Here, the Government failed to disclose materials essential to Weeks' decision-making, fabricated a factual narrative to induce the plea, and failed to correct misrepresentations before the Rule 11 hearing. **That renders the plea legally unsustainable**—not merely regrettable.

## L. The Government Misuses Formal Plea Language to Preclude Constitutional Review

The Government repeatedly cites the capitalized assertions in the plea application—e.g., *"I am GUILTY"*—as if these preprinted affirmations can foreclose constitutional inquiry. But this argument misstates the law. Rule 11(d)(2)(B) permits withdrawal of a guilty plea when it was not knowingly or voluntarily made or lacks a factual basis. That standard is not satisfied merely by the defendant signing boilerplate plea paperwork, especially where—as here—the record reflects systemic coercion, incomplete discovery, and misrepresentations by the prosecution.

The Government's argument goes further, suggesting that any attempt to challenge the plea could expose the defendant to perjury. This is not only legally unsupported; it chills the exercise of constitutionally protected rights. **Courts routinely permit plea withdrawal** where Brady material was withheld or where new evidence undermines the plea's factual basis—even when the defendant initially swore to guilt under oath.

Moreover, Weeks' filings do not simply assert innocence. They detail specific factual grounds for withdrawal, including the suppression of the October 8 Grand Jury Memo, undisclosed investigative materials, strategic custodial transfers near cooperating witnesses, and the use of falsified or post-dated SARs. This is more than sufficient to meet the threshold for withdrawal under controlling law.

## M. The Government Ignores the Defendant's Stated Grounds for Withdrawal and the Misconduct That Preceded the Plea

One of the most egregious examples of fraud on the court is the Government's effort to retroactively justify the plea using documents that were either not disclosed or not even created until after the plea was signed. This includes the October 8, 2020 Grand Jury Evaluation Memo and other key materials that should have been disclosed beforehand under Brady and Rule 16. The Government's use of these materials post hoc not only undermines the voluntariness of the plea, but also misleads the Court by constructing a post hoc factual narrative unsupported by contemporaneous evidence that did not exist at the time the plea was entered.

The Government claims that Weeks *"lied to this Court while under oath during his plea hearing and falsely admitted that 2+2=5,"* citing his reference to duress, including threats to his health and safety, denial of bail, and separation from family. However, this framing mischaracterizes and grossly understates the actual basis for Weeks' Motion. The Government has not meaningfully addressed any of the legal or factual arguments presented in Weeks' Motion and supporting letters, including Brady violations, custodial coercion, and the fabrication of evidence.

This statement not only overlooks the broader context of duress and undisclosed information that led to the plea, but also ignores the substantial allegations of **fraud on the court** committed by the prosecution. The Government's assertion that Weeks "*lied to this Court*" — without addressing the withheld evidence, strategic coercion, and procedural irregularities that shaped the plea agreement — is itself an act of misrepresentation. **Fraud on the court is, at its core, lying to the court** — whether through false statements, omissions, or the suppression of material facts. As documented in Weeks' submissions, this includes, but is not limited to:

- **The suppression of the October 8 Grand Jury Evaluation Memo**, a document central to discovery and plea evaluation that was withheld until long after the plea was signed;
- **The presentation of a misleading factual basis for the plea**, omitting key context and overstating Weeks' role;
- **Failure to inform defense counsel of critical developments**, including custodial transfers and witness proximity;
- **Strategic manipulation of detention conditions**, including the use of repeated transfers and unsupervised placement near cooperating witnesses, designed to coerce a plea.

Each of these failures ties directly into the discovery violations and structural prejudice addressed in Sections XI and XII. (see, e.g., Motion to Compel, Exhibits A–C; Letter to

Court, Feb. 13, 2025). See also Section R for the specific categories of suppressed discovery materials that further support these claims.

The Government concludes its April 22 letter by urging the Court to "deny each of Weeks' pending motions and schedule this matter for sentencing." However, this position ignores the very foundation of the Defendant's objections: the plea was entered under conditions of **incomplete discovery, withheld exculpatory material, and coercive custodial tactics**.

As shown in Weeks' Motion to Compel and reinforced by the Government's own admissions in Dkt. 399, the **February 18, 2025 letter** was filed **after** the Government received Weeks' formal discovery request on **February 13, 2025**, and yet made **no effort to address those violations** before pushing for sentencing.

This timing—opposing plea withdrawal while remaining silent on known Brady and Rule 16 obligations—**raises serious Rule 11(b)(3) concerns** and falls squarely within the Court's **supervisory authority** to correct. The Government's insistence on sentencing without first curing these constitutional failures **only compounds the structural prejudice** already at issue.

## N. The Government's Use of the August 12, 2020 Proffer Ignores Its Own Misconduct in Securing It

The Government emphasizes, *"Perhaps most enlightening, however, is that Weeks made admissions about his knowledge of BCN's fraudulent activities during a proffer session on August 12, 2020, shortly after his arrest,"* and uses this as a cornerstone of its opposition. (Gov't Letter, Apr. 22, 2025, at 9.)

However, **no documentation of an August 12, 2020 proffer session has ever been disclosed to the defense**. The only known record is the **August 17, 2020 Memorandum of Interview** prepared by IRS-CI agents. If the Government did in fact conduct a session on August 12, its **omission from discovery constitutes a further Brady and Rule 16 violation**, as discussed in Section R.

If no such session occurred, then the Government's reliance on it is a **material misstatement to the Court**, calling into question the accuracy of its entire factual narrative. Defendant respectfully requests that the Government confirm whether any August 12, 2020 proffer session took place and, if so, **produce the full record thereof**.

The Government emphasizes that Weeks made admissions during an August 12, 2020 proffer session. What it omits, however, is how this session was tainted from the outset. Weeks had been moved through approximately 20 detention facilities prior to this session, and—most critically—**was placed in strategic proximity to BCN co-founders without court approval or defense counsel's knowledge.** This placement violated clear custodial separation norms and was used to facilitate unsupervised contact and information collection.

Furthermore, the proffer session was arranged and conducted while material discovery was still being withheld, and without ensuring that defense counsel had full awareness of Weeks'

placement or the facts to which he was being asked to respond. **To now use that proffer as dispositive evidence while ignoring the environment in which it was obtained is both legally and ethically indefensible.**

These omissions further demonstrate the Government's selective recitation of the record and its ongoing efforts to deflect from its own procedural misconduct. See also Section R, where these withheld materials are itemized in detail and shown to fall outside the protection of Rule 16(a)(2).

## O. The Government's Dismissive Framing of Defendant's Legal Arguments Is Unsupported and Improper

The Government's assertion that Weeks' motion is *"riddled with unintelligible and frivolous sovereign citizen-style rhetoric"* is not only inflammatory—it is false. **Weeks has consistently grounded his arguments in established constitutional doctrine**, including Rule 11(d), Brady, Giglio, and Department of Justice policy memoranda. This rhetoric serves to distract from the substance of the motion and avoid engagement with the factual and legal grounds presented. **Mislabeling serious legal claims as fringe ideology is itself a form of prosecutorial overreach and reflects the broader pattern of narrative distortion** addressed throughout this reply.

The Government asserts that *"nothing in Weeks' filings could be viewed as a legitimate basis for dismissal (e.g., an authentic argument regarding the constitutionality of the statutes under which Weeks has been charged)."* This language is not only inaccurate—it is offensive to the constitutional protections afforded to all criminal defendants.

Weeks has raised serious constitutional violations, including Brady violations, prosecutorial misconduct, improper custodial coercion, and suppression of exculpatory and impeachment material. He has also invoked statutory misapplication in the context of digital asset policy reforms and the DOJ's own internal charging criteria. To characterize these as *"inauthentic"* is to sidestep the Government's obligation to engage with the substance of the claims. **It is not for the prosecution to decide what is or is not "authentic" when the record clearly demands judicial review:**

- As the Supreme Court held in Class v. United States, 138 S. Ct. 798 (2018), a guilty plea does not bar later constitutional challenge where due process or structural error is raised.
- As the Supreme Court confirmed in *Class v. United States*, 138 S. Ct. 798 (2018), a defendant may raise constitutional challenges post-plea if the underlying process was flawed or rights were violated.

## P. The Government Misstates the Prejudice Standard and Ignores Its Own Strategic Delay

The Government argues that *"[b]ecause Defendant is 'unable to support claims of actual innocence or present adequate reasons for withdrawal of [his] guilty plea[], the government is not required to show prejudice.'"* This misstates both the law and the record. The

Government relies on a narrow reading of *United States v. Jones* and related cases while ignoring the broader standard set by Rule 11(d)(2)(B), which allows for plea withdrawal if the plea was not knowing or voluntary or lacked a factual basis—regardless of a formal showing of innocence.

Along with stating for the record his innocence with evidence 22 times in his Motion, Weeks has also provided detailed and well-supported grounds for withdrawal, including coercion via custodial manipulation, suppression of material discovery, misrepresentation of key plea facts, and strategic withholding of evidence. These raise serious constitutional concerns. To ignore those issues and lean on a procedural presumption of prejudice avoidance is to sidestep the Government's obligation to uphold due process.

Moreover, the Government's invocation of prejudice is undermined by its own conduct. It has engaged in delays, failed to address discovery obligations, ignored pro se filings, and strategically withheld information—behavior that prejudices both the defense and the integrity of the proceedings. If any party has been disadvantaged, it is Weeks, not the prosecution. **Prejudice caused by prosecutorial delay cannot be used to shield that same misconduct. The Government cannot now invoke trial prejudice from delays it created through its own failure to produce timely and complete discovery.**

## Q. The Government's Claim of Prejudice from Delay Ignores Its Own Recordkeeping and Disclosure Failures

The Government asserts that trial preparation would now be unduly burdensome, stating:
 *"The offense conduct in this case happened between six and ten years ago. Witnesses' memories have certainly faded and certain witnesses are no longer available. While preparation for every trial requires a significant amount of time and resources, preparing for a trial in this matter—which involved thousands of victims located around the world, among other complexities—would be particularly arduous."* (Gov't Letter, Apr. 22, 2025, at 11).

However, the Government's invocation of time-based prejudice ignores its own responsibility for the delays and evidentiary gaps it now cites — including late disclosures, custodial disruptions, and the failure to preserve or produce critical discovery when requested.

The Government had years to preserve evidence, maintain witness access, and disclose relevant materials. Instead, it suppressed key documents, delayed critical disclosures—including the Grand Jury Memo and digital asset seizure records—and refused to respond to multiple discovery demands and motions. If witnesses are now unavailable or evidence is incomplete, it is due not to the passage of time, but to prosecutorial neglect and strategic withholding.

It is inconsistent for the Government to claim prejudice while simultaneously benefiting from the delay it helped create. If anything, the prejudice runs in the other direction: Weeks has been denied full discovery, procedural fairness, and a timely opportunity to challenge the narrative that underpinned his plea.

## R. The Government Misstates the Scope of Rule 16 and Brady Obligations in Opposing the Motion to Compel

The Government asserts that "*Weeks has additionally moved to compel the Government to provide certain discovery to which he is not entitled under the Rules of Criminal Procedure.*" (Gov't Letter, Apr. 22, 2025, at 12.) But this claim **mischaracterizes the nature of the materials sought and misstates the scope of Rule 16(a)(2)**. Weeks does not request speculative work product or internal deliberations. Instead, his requests target **factual records**: DOJ communications related to **plea negotiations, charging decisions, custodial placements**, and other procedural matters central to his claims of **selective prosecution, coercion, and Brady violations**.

These categories are not shielded by Rule 16(a)(2). Courts have repeatedly held that **where factual documents support constitutional claims — particularly those involving prosecutorial misconduct, due process violations, or improper inducement of a plea — they are subject to disclosure**. Further, as a pro se litigant, Weeks is entitled to direct access to discovery previously shared with counsel, especially where such materials inform the **voluntariness and factual basis of his plea**.

The Government's blanket reliance on Rule 16(a)(2) — without identifying specific materials it deems protected or providing a privilege log — **precludes meaningful judicial review and fails to satisfy its Brady and due process obligations**. This pattern is further addressed in **Section XIV**, which outlines how the continued withholding of such records impairs Weeks' right to self-defense and undermines the integrity of the May 8 hearing.

The Government's blanket invocation of the work-product doctrine ignores the narrow exceptions for Brady material and the due process rights of a pro se litigant. It is not enough to recite the text of Rule 16; the Government must show that withholding these materials does not impair the defendant's right to a fair hearing on the Motion of withdrawal of the plea agreement. See also Section M, which outlines how these omissions contribute to an overall fraud on the court.

The Government also fails to specify which exact items fall within the Rule 16(a)(2) work-product exemption. General references to categories like 'DOJ communications' or 'charging rationale' are insufficient. If the Government wishes to assert privilege, it must do so with specificity and transparency. Without that, blanket denials cannot be meaningfully tested for compliance with Brady, Giglio, or due process standards.

To properly assess the voluntariness of Defendant's plea and the legality of the Government's conduct leading up to and following that plea, several outstanding discovery items remain necessary:

- **April 19, 2019 Meeting – Missing SAR and Related Records:** No SAR or contemporaneous memorandum has been produced despite the significance of this Ritz-Carlton meeting. Defendant requests any SAR, internal memoranda, emails, or field notes documenting this meeting and an explanation for the lack of Miranda warnings.

- **December 10, 2019 Interrogation – Missing SAR, MOI, and Video:** Defendant requests:
  - The full video recording of the interrogation;
  - The complete Memorandum of Interview (MOI);
  - Any SAR or FD-302 documenting the interaction;
  - Chain-of-custody records for any seized devices.
- **Other Critical Categories of Missing Discovery:**
  - Grand Jury expansion letters and communications related to tax charges;
  - All communications between prosecutors and former defense counsel;
  - Digital forensics reports related to wallet activity and deletions;
  - Full inventory logs and chain-of-custody documentation for all seized property.

These items are indispensable to assessing whether Weeks' plea was knowing and voluntary. They are factual records, not attorney work product, and the Government cannot lawfully shield them with a vague invocation of Rule 16(a)(2).

## S. The Government's Bail Argument

The Government states that "*Weeks has further requested that this Court eliminate the current conditions of Weeks' pretrial release. The Court should deny Weeks' motion.*" (Gov't Letter, Apr. 22, 2025, at 13.) But this conclusory dismissal **ignores the substantial constitutional and factual objections** raised by Defendant in his prior submissions, including the February 27 and March 27, 2025 letters and Motion to Modify Bail (Dkt. 411).

As addressed in **Section IX**, Weeks has presented **compelling evidence of disproportionate restrictions**, lack of individualized risk assessment, and ongoing hardship — none of which are acknowledged or rebutted in the Government's filing. Rather than engaging with the substance of Defendant's arguments, the Government **recycles generalized claims of noncompliance**, relying on outdated orders and **failing to address the intervening facts, DOJ policy shifts, or evidence of selective treatment compared to co-defendants**.

The continued reliance on Judge Hammer's earlier rulings — without acknowledging **the change in posture, the shift in DOJ policy on digital asset enforcement, and the lack of any new violations** — renders the Government's opposition **incomplete, unsupported, and constitutionally inadequate**.

## T. False Claim Regarding Florida Event (to conclude the foregoing list)

To conclude the foregoing list of misrepresentations and misconduct, the Government's April 2025 letter falsely alleges that "Weeks' attendance, without the knowledge of PTS, at an event in Florida titled '*The Past, Present, and Future of Cryptocurrency*'" constituted a violation of release conditions. This event did not occur. Mr. Weeks was never present — physically or virtually — at any such event in Florida, and no supporting evidence has been offered to justify the Government's claim.

This invented narrative exemplifies the Government's ongoing pattern of misstatements presented to the Court as fact. The inclusion of a fabricated event to justify increased

restrictions or justify the denial of relief is not a benign error — it is part of a sustained effort to distort the record and mislead the Court.

Accordingly, this latest falsehood reinforces the Defendant's position that the Government's conduct rises to the level of **fraud on the court**, and supports the need for both interim sanctions and long-term remedial action.

# III. The Government's Response Mischaracterizes the Scope and Legal Foundation of Defendant's Motion

The Government's response materially mischaracterizes the substance of Defendant Weeks' Motion by reducing it to four oversimplified categories, stating:

*"Weeks requests (1) recission of autograph on plea agreement; (2) dismissal of the charges contained in the Indictment and Information; (3) production of certain discovery materials; and (4) modification of pretrial conditions."* (Gov't Letter, Apr. 22, 2025, at 1.)

This reductive framing minimizes the legal gravity of the issues raised and obscures the broader constitutional and procedural violations at the core of this case. These include not only **Rule 11(d)(2)(B)** defects but also **sustained Brady and Giglio violations**, **selective enforcement**, **fraud on the court**, and the Government's **disregard of DOJ's April 7, 2025 enforcement guidance** on digital asset prosecutions.

The Government attempts to collapse a complex record into generic procedural categories. This fails to account for the substantive legal and constitutional basis of Defendant's filings, which include:

- **Rule 11(d)(2)(B):** A motion to withdraw the plea based on violations of constitutional rights, including a lack of factual basis, coercion, and misleading or withheld information from the Government.
- **Brady and Giglio Violations:** The Government has failed to produce critical exculpatory and impeachment materials, including MOIs, SARs, internal DOJ correspondence, the Crypto Seizure Memo, and information related to undisclosed plea deals with co-defendants.
- **Selective Prosecution and Disparate Treatment:** The motion provides detailed comparisons to similarly situated co-defendants who were afforded leniency, international travel, or minimal conditions while Weeks has remained under heavy pretrial restrictions.
- **Prosecutorial Misconduct and Due Process Violations:** These include the withholding of materials presented to the Grand Jury, misrepresentations to the

Court, potentially falsified or post-dated SARs, and an orchestrated pattern of coercion through excessive prison transfers.

- **Violation of Current DOJ Policy:** The April 7, 2025 directive from Main Justice makes clear that digital asset cases should be pursued only when involving identifiable harm or criminal misuse. The Government has not substantiated any such threshold in this case.
- **Judicial Remedies Beyond Discovery:** In addition to requesting discovery, Weeks seeks relief in the form of bail modification and potential dismissal of the indictment, either under Rule 48(b) or the Court's inherent supervisory powers due to cumulative misconduct.

The Government's oversimplification is not merely rhetorical—it strategically conceals patterns of misconduct that render the plea void and the continued prosecution constitutionally infirm.

These are not isolated issues. They reflect a systematic breakdown of constitutional protections and prosecutorial fairness. The Court should not accept the Government's characterization at face value. Instead, it must consider the full factual and legal record that supports Defendant's right to relief, including the withdrawal of plea and the imposition of judicial remedies where warranted.

# IV. The Government Misrepresents Defendant's BCN Role to Inflate Culpability

The Government's factual summary misleadingly conflates Defendant Weeks with the founding architects of the BitClub Network ("BCN"). Specifically, the Government states that the BCN scheme operated *"through the efforts of the co-conspirators, including Weeks,"* a formulation that **implicitly groups Weeks** with Matthew Goettsche, Russ Medlin, and Silviu Catalin Balaci — the individuals who **founded, funded, and structurally designed** BCN in 2014.

This implication is **factually inaccurate, legally misleading, and prejudicial**. Weeks **did not join BCN until after 2016**, over **two years after its founding**. He had **no role in its creation**, **corporate structuring**, **compensation model**, or **web development**. He held **no executive or managerial title**, and had **no participation** in the decision-making bodies that implemented or maintained the platform's alleged fraud mechanisms.

By erasing these distinctions, the Government improperly portrays Weeks as a founding actor when in fact he was a **later-joining member** — a difference with direct relevance to **culpability**, **sentencing exposure**, and **selective prosecution analysis**.

This misrepresentation is significant, particularly in a case where the Government seeks to attribute substantial investor losses, strategic intent, and alleged obstruction to Weeks personally. Grouping Weeks with the founders creates a false equivalence that may improperly influence sentencing, plea validity, and the assessment of prosecutorial conduct.

Weeks' motion explicitly challenges not only the evidentiary sufficiency of the Government's case but the selective and exaggerated narrative being advanced. Correcting the timeline and nature of Weeks' involvement is essential to ensuring any further proceedings are grounded in truth, not inference.

These mischaracterizations are not harmless; they misled prior counsel, distorted the plea record, and now serve as an unjust basis for ongoing liberty restrictions. A corrected factual record is essential for any fair determination on plea withdrawal and pretrial relief.

# V. Rescission/Withdrawal of the Plea agreement

In its April 22, 2025 letter, the Government asserts that "*bald assertions of innocence are insufficient*" to justify plea withdrawal and claims that Weeks "*pled under duress so that [he] could get bail… and not die of Covid*" (Dkt. 417 at 6–7). It argues that his guilty plea was knowing, intelligent, and voluntary, relying on the signed **Application to Plead Guilty**, the **plea colloquy transcript**, and a standard **waiver of rights form**. But this framing **reduces the motion to emotion** and **ignores the substantial legal defects** that rendered the plea involuntary and constitutionally invalid.

A plea's voluntariness must be evaluated in context — not just through ritualized courtroom procedures, but against the full **factual and constitutional landscape**. This includes:

- The **Government's suppression of Brady material**;

- The **failure to authenticate or disclose proffer-related evidence**;

- **Misrepresentations regarding defendant's role and exposure**;

- And the **coercive effect of prolonged, strategically manipulated detention**.

As established in *Brady v. United States*, 397 U.S. 742 (1970), and reaffirmed in *United States v. Ruiz*, 536 U.S. 622 (2002), **a guilty plea is not knowing or voluntary if entered under circumstances of government misconduct, misrepresentation, or material omission**. This legal deficiency is **fatal** to the plea's validity.

Moreover, in light of the **DOJ's April 7, 2025 digital asset enforcement directive**, which limits such prosecutions to cases involving identifiable harm or criminal use, the continued pursuit of this case **raises serious constitutional and policy concerns** that must be factored into the Court's analysis. The plea cannot be separated from the **prosecutorial strategy that shaped it**.

**Under Rule 11(d)(2)(B), a defendant may withdraw a guilty plea if it was not entered knowingly or voluntarily.** This standard is not satisfied by the existence of a signed plea form or the mechanical completion of a plea colloquy. The U.S. Supreme Court in *Brady v. United States*, 397 U.S. 742 (1970), and *United States v. Ruiz*, 536 U.S. 622 (2002), made clear that a plea must be evaluated in light of the totality of the circumstances—including whether material facts were withheld or the plea was entered under improper pressure.

Here, the record shows that Defendant's plea was tainted by structural violations and prosecutorial omissions that denied him the opportunity to make an informed decision. Taken together, these circumstances strip the plea of constitutional integrity and violate the standards set by Brady, Ruiz, and Rule 11(b)(3). Specifically:

- Defendant was **never arraigned under Rule 10** on the tax charge that was introduced during plea negotiations;

- The Government **withheld material proffer evidence**, including the August 17 and 25, 2020 interview memos, which were never authenticated, signed by DOJ, or attached to the SAR submitted to the Tax Division;

- The Government **escalated charges mid-negotiation**, without a superseding indictment or Motion to the grand jury, depriving Defendant of due process;

- Defendant was **denied timely access to discovery**, including Brady material, forensic reports, and custody documentation critical to the defense (see Dkt. 403);

- Defendant remained under **coercive pretrial detention** for over a year without sentencing, repeatedly denied bail, and subjected to documented hardship conditions that placed unlawful pressure on the decision to plead;

- And he was represented by **ineffective counsel who failed to challenge the late-added tax charge, failed to preserve discovery objections, and failed to ensure the plea was supported by a complete evidentiary record**.

These procedural and factual violations directly support Defendant's request under Rule 11(d)(2)(B) and warrant an evidentiary hearing to resolve outstanding material disputes before any sentencing proceeds.

The Government's response does not meaningfully address these defects. It cites *United States v. Stewart*, 977 F.3d 381 (3d Cir. 2020), but ignores that Stewart requires courts to consider whether the plea was the product of "misunderstanding, misinformation, or misrepresentation" — all of which are present here. Moreover, the Government omits entirely that the SAR submitted with the plea was a **streamlined version** lacking any verified attachments. The very proffer statements the Government now relies on to oppose withdrawal were not included in the record the Court used to assess voluntariness and factual basis under **Rule 11(b)(3)**.

While the Government emphasizes the plea colloquy and Defendant's signed waiver forms, this reliance is misplaced. **A plea colloquy cannot cure a fundamentally flawed process**. The Supreme Court has held that **suppressed evidence, withheld Brady material, or ineffective assistance of counsel can render a plea involuntary and invalid**, even if the plea was formally accepted. See *Brady v. United States*, 397 U.S. 742 (1970); *Hill v. Lockhart*, 474 U.S. 52 (1985); *United States v. Ruiz*, 536 U.S. 622 (2002). Where, as here, the Government withheld material proffer documents, failed to authenticate the evidentiary basis, and presented the plea under coercive conditions, **no Rule 11 proceeding can retroactively make that plea knowing or voluntary**.

Defendant's Motion is not based on post hoc regret. It is grounded in the procedural reality that at the time of the plea:

- He lacked access to core evidence;

- He had not been formally charged or arraigned on one of the key allegations;

- He was under pressure resulting from unconstitutional pretrial conditions;

- And he was represented by **ineffective counsel who failed to challenge the Government's procedural shortcuts or protect Defendant's access to material discovery**.

### Requested Relief:

Defendant respectfully requests that the Court to grant his motion to **withdraw the plea agreement pursuant to Rule 11(d)(2)(B)**.

# VI. The Government Misapplies Rule 16 and Brady to Avoid Producing Critical Evidence

The Government argues that "*the majority of what Defendant seeks is internal Government material protected by Rule 16(a)(2)*" (Dkt. 417 at 9) and that it is under no obligation to produce internal notes, strategy documents, or charging communications. This argument fails to distinguish between **deliberative internal materials**, which may be protected, and **factual, exculpatory, or material records**, which are plainly discoverable under **Rule 16(a)(1)** and **Brady v. Maryland**, 373 U.S. 83 (1963).

Defendant's discovery requests are not aimed at protected opinion work product. They are focused on **factual records**, many of which the Government has either produced in part or relied upon elsewhere (e.g., in the Grand Jury Evaluation Memo, proffer summaries, plea exhibits). These include:

1. The August 17 and August 25, 2020 proffer interview summaries and any signed memoranda by DOJ officials (see Dkt. 403; March 31, 2025 letter see Exhibit B);

2. Forensic reports related to cryptocurrency analysis, wallet activity, and the supposed tax loss calculation cited in the plea;

3. The complete video and memoranda of the December 10, 2019 interrogation;

4. Custodial chain-of-custody records, device inventories, and SARs for April 19 and December 10, 2019;

5. Communications with former counsel regarding discovery, cooperation, and plea formation.

Courts have recognized that Brady applies pre-plea where suppressed evidence would be material to the defendant's decision. See *United States v. Nelson*, 979 F.3d 901 (2d Cir. 2020).

The Government's categorical refusal to produce these items — many of which were referenced in the **Grand Jury Evaluation Memo**, cited in the **IRS streamlined SAR**, or used to justify the plea's factual basis — undermines the legitimacy of both the plea and the post-plea proceedings.

Moreover, **Rule 16(a)(1)(E)** requires disclosure of any document "material to preparing the defense." This includes evidence relevant to:

- Whether the plea was voluntary,

- Whether Defendant was misled or misinformed,

- Whether the loss amount or factual basis was accurate, and

- Whether certain communications were fabricated or falsely attributed to Defendant.

The Government's reliance on Rule 16(a)(2) ignores that the **work product exception does not cover factual materials or communications with third parties**, especially where those materials are being used to support contested claims or sentencing enhancements.

Additionally, Defendant's repeated Brady-based requests for:

- A verified victim list,

- Internal evaluations of harm and restitution,

- and evidence that undermines the credibility or voluntariness of the plea,

have been left unanswered. The Government cites *United States v. Armstrong*, 517 U.S. 456 (1996), in passing, but Armstrong only bars discovery of selective prosecution claims without threshold showing. It does not allow the Government to withhold factual evidence tied to voluntariness, custody conditions, or prosecutorial misrepresentation.

Defendant has met his burden under **Brady**, **Rule 16**, and **Rule 11(b)(3)** to demonstrate that these materials are material to both his defense and the integrity of the plea. Their continued withholding — despite letters dated February 13, 21, 26, and 27; March 9, 12, 19, and 31; and motions filed under Dkt. 403 and 411 — is **both a constitutional violation and a structural defect** that demands remedy.

The Government's refusal to produce these non-privileged factual records undermines the plea's factual foundation under Rule 11(b)(3) and should result in exclusion of undisclosed materials at the May 8 hearing, or withdrawal of the plea.

While Rule 11(d)(2)(B) provides the procedural basis for plea withdrawal, the scope and nature of the Government's misconduct in this case warrant a more foundational remedy: **rescission** of the plea agreement. This is not a matter of post-plea regret, but of a plea entered under conditions that **void the agreement ab initio**. The Government's suppression of material evidence, misrepresentation of facts, escalation of charges without indictment, and coercive use of pretrial detention cumulatively render the plea **constitutionally invalid from the outset**.

Docusign Envelope ID: 09E22687-9B9C-461D-8A0D-050DF5B9AA81

In contract terms, rescission is appropriate when a party's consent was obtained by fraud, duress, or material nondisclosure — precisely the circumstances present here. This plea cannot be enforced because it was never knowingly and voluntarily made. As such, the Court should not merely allow withdrawal, but declare the plea agreement **null and void**, and restore the parties to their pre-plea positions.

The Defendant respectfully requests that the Court treat the plea as **void ab initio**, and grant all necessary relief, including full access to discovery, an evidentiary hearing, and the opportunity to proceed to trial or resolution without the taint of an unlawfully obtained plea.

### Requested Relief:

Defendant respectfully requests that the Court:

- Compel the Government to produce the specific categories of discovery detailed in Exhibits A;

- Order the Government to confirm which items remain withheld or unavailable, and on what basis;

- And bar the Government from relying on any document or factual assertion that has not been timely disclosed in compliance with Rule 16 and Brady.

# VII. The Government's Reliance on the Hoxie Statement Is Unsupported, Misleading, and Constitutionally Deficient

The Government's opposition centers on an unverified claim attributed to AUSA Jamie Hoxie—yet there is no authenticated record confirming this instruction was ever given, and repeated discovery requests have gone unanswered.

Crucially, neither memo was authored, signed, or certified by AUSA Hoxie or any DOJ official. Despite three separate and formal discovery demands for records confirming whether AUSA Hoxie issued this instruction — February 13, 2025, February 26, 2025 (Dkt. 403), and March 31, 2025 (Exhibit B) — the Government has not produced a single communication, declaration, email, or memorandum confirming that this advisement was ever given.

**Timeline of Discovery Requests Specifically Related to the Hoxie Instruction:**

- **February 13, 2025 (Clarification Letter):** Defendant formally requested any records confirming whether AUSA Hoxie or any other government official issued instructions regarding interactions with Goettsche and Abel. No response was received.

- **February 26, 2025 (Motion to Compel Discovery, Dkt. 403):** Defendant formally requested:
  "Any instructions given by AUSA Hoxie or any other government official regarding Defendant's interactions with co-defendants."
- **March 31, 2025 (Letter to AUSA Torntore):** Defendant again requested:
  "Records, reports, memoranda, or emails addressing the instructions allegedly issued by AUSA Hoxie, including the basis and timing of those instructions."

None of these requests were answered. The Government's failure to produce the requested documentation — even in the face of specific demands — supports the inference that no such instruction exists. This silence has serious implications for the validity of the proffer record, the integrity of the plea agreement, and the Government's narrative surrounding Defendant's cooperation and intent.

The timeline is telling: Weeks was housed with Goettsche and Abel in January 2020, following his arrest. The instruction attributed to Hoxie appears only in an IRS memo written in August 2020, more than seven months later, with no corroboration in contemporaneous DOJ records and no mention in the August 25 follow-up memo. There is no evidence that any warning was provided to Defendant or to his counsel at the time he was placed in contact with co-defendants. The Government's failure to document such an instruction — and its later reliance on that undocumented claim to deny cooperation or color Defendant's statements — constitutes a Brady violation, a Rule 16 violation, and an abuse of prosecutorial discretion.

In light of this defect, the Court should:

- **Suppress all statements derived from the August 17 and 25 proffer sessions** as unreliable and improperly documented;
- **Disregard any Government arguments that rely on the alleged Hoxie instruction** to discredit Defendant's cooperation or intent;
- **Compel immediate production of all records** relating to the alleged Hoxie instruction, including any DOJ communications, emails, and notes.

# VIII. The Government's Claimed Victim Impact Is Unsupported by the Record

The Government's reference to '*thousands of victims*' is both factually unsupported and procedurally misleading. **Despite repeated requests, it has failed to produce any verified evidence of actual victim harm attributed to Weeks.**

In its April 22, 2025 response, the Government asserts that preparing for trial would be burdensome because the alleged conduct occurred "*between six and ten years ago,*" and that "*thousands of victims located around the world*" would make preparation "*particularly arduous*" (Dkt. 417 at 10). However, this claim is both **factually unsupported** and **contradicted by the procedural record** of this case.

## 1. No Verified Victim List Has Been Produced

Despite multiple formal requests—made in Defendant's letters dated February 13, 26, and March 31, 2025, and referenced in the Motion to Compel (Dkt. 403)—the Government has failed to produce a single verified victim statement, report, or restitution request tied to Defendant specifically.

Notably:

- **No victim affidavits** were submitted in support of the Information or plea.

- **No restitution worksheet or victim impact memorandum** has been disclosed under Rule 32.

- **No Brady disclosures** have been made related to alleged victim identities, statements, or losses.

If "*thousands of victims*" exist, the Government has had over **five years** to document and disclose their identities. Instead, it has relied on generalized language, repeated across several filings, without evidentiary support.

## 2. Victim-Related Evidence Was Not Presented to the Grand Jury or Tax Division

The October 8, 2020 Grand Jury Evaluation Memo and the August 2020 IRS proffer memoranda contain **no victim-specific information**, restitution analysis, or evidence of individualized harm caused by Defendant. In fact, the memo includes only a vague reference to "*downline payouts*" and speculative associations with crypto transfers—not verified losses or complaints.

This omission further undermines the Government's opposition, particularly in light of its refusal to:

- Confirm whether any alleged victims were contacted or offered restitution;

- Provide victim complaint files submitted via the DOJ's BitClub Network website;

- Or explain why these materials were withheld in the lead-up to the plea and sentencing process.

## 3. The Government Ignored Defendant's April 12, 2025 Letter Requesting Victim Disclosure

On April 12, 2025, Defendant submitted a formal letter (**Exhibit C**) requesting that the Government confirm whether any victim-based restitution claims existed at the time of the plea and, if so, produce a verified list of individuals who submitted complaints to the FBI or DOJ. That letter specifically cited the DOJ's public victim intake process related to BitClub Network, requested confirmation by April 22, 2025, and included a formal demand that the Government either identify verified victims or return the 8.67 Bitcoin seized from Defendant

— as no victim-based claim or restitution obligation had been shown. The Government did not respond. As of this filing, the Government has failed to respond. This silence reinforces the inference that **no such victim disclosures or claims exist**, and that the Government's references to widespread victimization are **unsubstantiated**.

### 4. The Government's Trial Burden Argument Does Not Supersede Defendant's Constitutional Rights

The Government attempts to argue that preparing for trial now would be difficult due to the age of the case and the number of witnesses. But **this argument cannot override Defendant's constitutional right to withdraw a plea that was unlawfully or involuntarily entered**.

As the Supreme Court made clear in *Brady v. United States*, 397 U.S. 742 (1970), and reaffirmed in *United States v. Hyde*, 520 U.S. 670 (1997), courts must weigh the voluntariness and factual foundation of a plea **before procedural efficiency or convenience to the prosecution**.

If trial preparation is difficult now, that is a consequence of the Government's **charging decisions and delays**, not Defendant's request for relief.

## Requested Relief:

Given the absence of verified victim evidence, Defendant respectfully requests the Court to treat generalized claims of harm as inadmissible and unsupported.

Accordingly, Defendant further requests that the Court:

- Require the Government to confirm whether any verified victim statements, reports, or restitution materials exist and were ever disclosed;

- Exclude all generalized claims of victim harm from further opposition arguments absent proper documentation;

- Acknowledge the Government's failure to respond to Defendant's April 12, 2025 letter and treat this omission as a concession that no verified victim evidence was presented at the time of plea;

- And treat the absence of verified victim evidence as material to Defendant's claim that the plea was unsupported by a factual basis under Rule 11(b)(3).

# IX. The Government and Court Have Failed to Justify Continued Bail Restrictions: Serious Constitutional and Factual Objections Remain Unanswered

In its April 22, 2025 opposition, the Government claims that Defendant's bail conditions remain appropriate based on allegations of post-release conduct, including smartphone use, encrypted messaging, and cryptocurrency activity. However, these claims are unsupported by the record, untested in court, and fail to respond to Defendant's well-documented constitutional objections and motion practice.

Defendant has consistently raised **serious constitutional and factual objections** to the continuation of restrictive bail conditions that have now persisted for over five years. These objections are based on both legal principles and specific harms — including documented disparities with similarly situated defendants, due process violations, and physical and family hardship.

A letter submitted on **February 27, 2025**, Defendant formally requested disclosure of all records justifying his bail status, including:

- Internal DOJ, FBI, and BOP communications regarding Defendant's risk assessment and classification;

- Pretrial Services' rationale for denying alternative release options;

- Comparisons with BCN co-defendants such as **Silviu Balaci**, who was approved for international travel (Dkt. 302), and **Russ Medlin**, whose identity remained sealed for months (Dkt. 99);

- Legal justification for maintaining heightened restrictions in light of Government-initiated trial delays (Dkt. 118) and COVID-related postponements (Dkt. 95).

These issues were reinforced in follow-up correspondence dated **March 12** and **March 19, 2025** (**Exhibits B**), which emphasized:

- The lack of equal treatment in bail decisions;

- The coercive nature of Defendant's repeated prison transfers and proximity to witnesses;

- The adverse impact of continued restrictions on Defendant's **ability to proceed pro se** and prepare his defense;

- And the absence of any record showing that the Government or Pretrial Services conducted a comparative risk assessment.

On **April 12, 2025**, Defendant reiterated these concerns in a final memorandum (**Exhibit C**) requesting removal of the ankle bracelet, relief from geographic restrictions, and return of seized assets to support basic living and legal needs.

These concerns are not speculative; they are grounded in specific and **well-established constitutional principles**:

- **Fifth Amendment due process**, which prohibits continued deprivation of liberty without justification;

- **Sixth Amendment rights**, which guarantee meaningful access to counsel and preparation of one's own defense;

- **Equal protection principles**, under *United States v. Armstrong* and *United States v. Bass*, which forbid selective enforcement and arbitrary application of pretrial conditions.

Additionally, they were supported by **detailed factual evidence**, including:

- Documented health harms caused by the ankle monitor;

- Medical needs of Defendant's pregnant wife;

- Longstanding compliance with all court orders;

- The absence of any flight or danger concerns;

- And the contrast between Defendant's restrictions and those of other defendants with more direct roles in BCN.

On **March 27, 2025**, Defendant also filed a formal motion with the Court (**Dkt. 411**) requesting temporary bail modification to relocate with his family and remove the ankle bracelet. That motion included a sworn letter from Defendant's wife detailing the health risks, family hardship, and irreparable damage caused by the restrictions — and specifically invoked **Judge Hammer's February 5th invitation** for Defendant to submit his requests in writing. The **"Ex Parte"** requests was filed on Feb 11th, **(Dkt 396)** Judicial inaction on a fully briefed and uncontested motion is inconsistent with the due process obligations owed to any pretrial detainee—particularly a pro se litigant. Despite being properly docketed and unopposed by the Government, **the Court has not responded.**

## Court Inaction Further Reinforces the Absence of Any Lawful Justification

The Court's failure to respond to **Dkt. 411**, despite a complete record and time-sensitive personal and constitutional concerns, is not a neutral omission. It **further reinforces the conclusion that no lawful, factual, or policy-based justification exists** for the continued restrictions. Courts have a duty to promptly evaluate constitutional challenges to pretrial conditions, especially when raised by a self-represented defendant in an ongoing prosecution. When both the Government and the Court remain silent in the face of repeated, specific, and well-supported objections, that silence becomes **affirmative evidence that no valid basis exists** to continue depriving Defendant of his liberty under such conditions.

**Relief Requested**

Defendant respectfully requests that the Court:

- **Immediately terminate all pretrial supervision and monitoring requirements**, including removal of the ankle bracelet and travel restrictions;

- Find that the Government's failure to respond to the letters submitted as **Exhibit B**, and the Court's inaction on **Dkt. 411**, confirm that there is no continuing legal basis for these restrictions;

- And in the alternative, **schedule a hearing on bail conditions prior to or in conjunction with the May 8, 2025 hearing**, to address the constitutional and practical harm posed by ongoing restrictions.

This relief is necessary to ensure fairness, protect Defendant's constitutional rights, and restore confidence in these proceedings.

# X. April 12, 2025 Letter to AUSA Torntore: Policy Grounds and Constitutional Failures Warrant Immediate Termination of Prosecution

Defendant incorporates by reference his **April 12, 2025 letter** to **AUSA Anthony Torntore**, which is attached as **Exhibit C**. That letter requests **immediate termination of prosecution** based on (1) the **Department of Justice's April 7, 2025 enforcement directive**, and (2) the **cumulative constitutional violations, prosecutorial misconduct, and due process failures** already documented in this matter.

The **April 7 DOJ memorandum** (**Exhibit C**) explicitly limits federal prosecution of digital asset activity to cases that involve either (a) demonstrable financial harm to victims, or (b) the use of digital assets to facilitate other criminal conduct. Defendant's case falls into neither category. No verified victim reports have been submitted in connection with Defendant, and no evidence has been produced showing that cryptocurrency was used to further trafficking, terrorism, or other criminal activity. These facts were presented in full in the April 12 letter and are now part of the record.

The letter also raised critical factual and legal discrepancies, including:

- The absence of a verified victim list, despite five years of Government solicitation for such claims;

- The DOJ's failure to disclose exculpatory victim information before or during plea negotiations;

- The selective nature of the tax charges brought against Defendant — charges not pursued against other, more central BitClub Network figures;

- The introduction of new tax charges during plea negotiations, rather than through a superseding indictment or grand jury process;

- And the continued failure to return **8.67 Bitcoin** that was acknowledged as seized, with no forensic audit or reconciliation to date.

The Government's silence in the face of these issues — particularly after being explicitly asked to respond by **April 22, 2025** — is telling. It confirms that the DOJ cannot identify victims, substantiate willfulness, or justify this case under its own revised enforcement policy. This inaction compounds the underlying due process and discovery violations already pending before the Court.

### Requested Relief:

Defendant respectfully requests that the Court:

- Take judicial notice of the **April 12, 2025 letter** and the **DOJ's April 7, 2025 policy**;

- Consider the Government's failure to rebut the April 12 letter as **tacit confirmation that it cannot identify victims, prove willful intent, or justify continued prosecution** under DOJ policy;

- Grant Defendant's motion to withdraw the plea; and

- Consider whether dismissal of the indictment, suppression of tainted evidence, or other appropriate sanctions are warranted — not only based on the Government's failure to respond to the April 12 letter, but also in light of the **totality of violations across this case**, including:

  - The unverified and improperly used proffer interview summaries;

  - The absence of a traditional SAR with evidentiary attachments;

  - The fabricated or undocumented Hoxie instruction;

  - The undisclosed victim records;

  - And the consistent pattern of selective enforcement, plea coercion, major constitutional and due process violations and withheld discovery.

# XI. Discovery Issues Raised and Unanswered

As detailed in Defendant's prior filings — including the **Motion to Compel Discovery (Dkt. 403)**, the **Supplemental Motion to Compel (Dkt. 401)**, and multiple letters dated **September 5, 2024; February 13, 21, 26, and 27, 2025; and March 9, 12, 19, 31, and April 12, 2025** — the Government was placed on clear and repeated notice of its discovery obligations under **Federal Rule of Criminal Procedure 16** and **Brady v. Maryland**, 373 U.S. 83 (1963). Despite this, a substantial number of discovery questions remain unanswered, and the Government's April 22, 2025 opposition fails to meaningfully engage with these requests.

## 1. Unanswered Discovery by Letter: A Pattern of Nonresponse

The following chart summarizes, by date, the number of formal discovery questions raised by Defendant and the number answered by the Government. These inquiries were specific, material, and tied directly to motions already filed and issues central to the upcoming May 8, 2025 hearing.

| Letter Date | Questions Raised | Questions Answered |
|---|---|---|
| September 5, 2024 | 23 | 3 |
| March 9, 2025 | 3 | 0 |
| March 12, 2025 | 16+ | 0 |
| March 19, 2025 | 6 | 0 |
| March 31, 2025 | 7 | 0 |
| April 12, 2025 | ~10 | 0 |

**Total Discovery Questions Raised:** 65+
**Total Questions Answered:** 3

The **March 12, 2025 letter**, in particular, grouped discovery requests into categories directly tied to Defendant's pending motions — yet received no response. Similarly, the **April 12, 2025 letter** included a formal deadline for response (April 22), which was ignored. At no point did the Government object, narrow the scope, or offer any form of clarification.

## 2. The Government Has Not Distinguished Between Work Product and Factual Discovery

Rather than substantively addressing the discovery requests, the Government relies on **Rule 16(a)(2)** to suggest that the majority of requested materials are protected internal documents. But **Defendant has not requested strategic memoranda or internal deliberations**. The letters and motions request:

- Factual materials such as proffer recordings, tax loss documents, audit workpapers, forensic reports, inventory records, and interview summaries;

- Communications with former defense counsel regarding withheld evidence and cooperation status;

- BOP, USMS, and DOJ communications on co-defendant placement and post-arrest transfers.

Under **Rule 16(a)(1)(E)**, and as required by **Brady**, these items must be disclosed if they are material to the defense — especially where they impact plea voluntariness, factual basis, or sentencing exposure.

### 3. Material Prejudice and Constitutional Impact

The Government's continued failure to answer or clarify these discovery questions — despite multiple opportunities — has materially impaired Defendant's ability to:

- Understand what evidence was withheld or misrepresented during plea negotiations;

- Assess whether cooperation was falsely discredited;

- Prepare for the May 8 hearing in a meaningful and constitutionally protected way;

- And assert his rights pro se under **Faretta v. California**, 422 U.S. 806 (1975).

As of the filing of this reply, the Government has not produced:

- A privilege log,

- A single written objection,

- Or any declaration certifying that discovery is complete.

### Requested Relief:

Defendant respectfully requests that the Court:

- Direct the Government to respond, line by line, to the discovery categories outlined in Exhibits A and B;

- Compel the immediate production of all factual materials raised in the March 5 Supplemental Motion (Dkt. 401) and related letters;

- Require the Government to confirm what remains withheld or unavailable, and on what basis;

- And preclude the Government from relying on any undisclosed material during or after the May 8 hearing.

# XII. Categories of Withheld or Incomplete Discovery and Expected Hearing Outcomes

The outstanding discovery violations outlined above are not isolated oversights — they represent a **systematic failure to meet constitutional, statutory, and procedural disclosure obligations** that have directly impacted Defendant's ability to evaluate the plea, prepare for the hearing, and assert his defense pro se.

To ensure a productive and fair hearing on May 8, Defendant has compiled a detailed **Overview of Discovery and Procedural Violations (Exhibit A)**. These materials document the scope and nature of the Government's noncompliance, and track the relevant legal authority under **Brady**, **Rule 16**, **Rule 11(b)(3)**, and constitutional due process principles.

The withheld or incomplete categories fall into the following areas:

- **Brady Violations**: Failure to disclose exculpatory materials, including non-seized assets, rejected restitution claims, and withheld records concerning alleged victim reports;

- **Rule 16 Violations**: Failure to disclose forensic records, wallet tracing, chain-of-custody logs, device-level activity, and proffer session recordings or transcripts;

- **Fraud on the Court**: Use of post-dated SARs and unauthenticated proffer summaries to establish plea basis and willfulness, without confirming Tax Division review;

- **Selective Prosecution Evidence**: Omission of charging memoranda or declinations involving central BitClub Network figures, including Medlin, Fairclough, and Hidalgo;

- **Due Process Violations**: Coercive plea environment created by custodial threats, delayed arraignment on tax charges, and fabricated Government narratives regarding cooperation;

- **Denial of Effective Assistance of Counsel**: Prior counsel's failure to demand Brady material, challenge plea fact-finding, or secure discovery preserved under Rule 16(d)(2).

Each of these categories is supported by citations in Exhibits A and B..

# XIII. The Government's Repeated Failure to Respond Must Be Treated as a Concession or Waiver

Throughout this litigation, Defendant has submitted detailed motions and formal discovery letters requesting clarification, production, or confirmation from the Government on a wide range of legal, factual, and constitutional issues. These include (but are not limited to):

- Bail justification;

- Discovery compliance under Rule 16 and Brady;

- Clarification on plea-related evidence and post-dated materials;

- Victim disclosures, proffer authentication, and selective enforcement.

Despite these submissions — many of which included specific deadlines and were formally docketed or emailed to the prosecution — the Government has repeatedly failed to respond. It has not filed written objections, sought extensions, or provided privilege logs. Nor has it offered any explanation for withholding or delay.

This pattern of silence has become especially acute since **February 5, 2025**, when Defendant began representing himself pro se. At that point, the Government's duty to provide access to all discovery materials previously given to counsel became both procedural and constitutional under *Faretta v. California*, 422 U.S. 806 (1975). Yet despite that, and despite multiple follow-up letters and motions (including Dkts. 401, 403, and 411), the Government has failed to respond, object, or seek judicial clarification.

## This silence has two legal consequences:

### 1. It Constitutes a Concession of the Issues Raised

Under well-established legal principles, when a party fails to oppose or answer a material claim or discovery request — particularly after being placed on formal notice — courts may treat that silence as a **tacit admission or waiver of objection**. This is especially true when:

- The issue is central to constitutional fairness (e.g., plea validity, bail status);

- The Government bears the burden (e.g., to justify detention or prove compliance);

- The Defendant is pro se and has acted diligently.

### 2. It Prejudices Defendant's Right to Prepare and Litigate

Every unanswered request — from the missing proffer documentation, to the motion to lift bail restrictions, to the repeated calls for authenticated plea materials and victim disclosure — limits Defendant's ability to:

- Prepare his defense;

- Challenge the plea;

- Seek release or dismissal based on unequal treatment;

- And fully brief the Court ahead of the May 8, 2025 hearing.

The Government's silence must therefore be treated not as harmless delay, but as a **prejudicial failure to engage with critical, constitutionally grounded objections**. This undermines the integrity of the plea, the hearing process, and the prosecution's evidentiary standing.

Docusign Envelope ID: 09E22687-9B9C-461D-8A0D-050DF5B9AA81

**Requested Relief:**

Defendant respectfully requests that the Court:

- **Treat the Government's continued silence as a waiver of objection** and a **concession of the key factual disputes raised**;

- **Preclude the Government from introducing any materials not produced before the May 8 hearing**;

- **Order immediate clarification from the Government** on the status of all withheld or undisclosed materials identified in Exhibit A;

- And **impose appropriate remedies** including suppression of tainted evidence, discovery sanctions, and plea withdrawal under **Rule 11(d)(2)(B)**.

# XIV. Government's Withholding of Discovery Violates Pro Se Rights and Due Process

Despite that obligation, the Government has continued to **withhold key evidence** already in its possession. This includes not only materials previously disclosed to former defense counsel but also additional case-critical documents central to Defendant's pending motions. On **March 5, 2025**, Defendant submitted a **Supplemental Motion to Compel Discovery (Dkt. 401)**, formally requesting:

- Access to all discovery and case files previously provided to Carlton Fields, Stone Magnanini, and Boies Schiller;

- Communications between the Government and former counsel relating to withheld evidence or strategic decisions;

- Delivery of all such materials in usable digital format to enable Defendant to prepare for the May 8 hearing.

As of the filing of this reply, the Government has neither complied with that request nor provided any justification for its continued obstruction. **This is not merely a Rule 16 violation — it is a constitutional breach** of Defendant's rights under:

- **Brady v. Maryland**, 373 U.S. 83 (1963) – by withholding evidence material to the defense;

- **Faretta v. California**, 422 U.S. 806 (1975) – by interfering with the right to represent oneself meaningfully;

- **The Fifth and Sixth Amendments** – by denying due process and the effective ability to prepare for trial or evidentiary hearing.

The Government's refusal to provide access to its own previously shared materials—particularly after it became aware of Defendant's pro se status—cannot be

excused as administrative delay or oversight. It is a **tactical and unconstitutional impairment of Defendant's right to prepare his defense**.

This failure supports both:

- Defendant's pending **Motion to Compel**, and

- His broader claim that the **plea process was structurally tainted by the denial of evidence, misrepresentation of facts and many due process violations**.

### Requested Relief:

Defendant respectfully requests that the Court:

- **Order immediate production** of all discovery previously provided to former counsel;

- **Require certification from the Government** that no categories of evidence remain withheld;

- And **treat the Government's continued failure to provide these materials as a due process violation** relevant to both the plea withdrawal motion and any future sanctions.

# XV. Conclusion

For the reasons detailed in Sections I through VIII of this Reply, the Government's April 22, 2025 response fails to address — and in many cases, affirmatively avoids — the core legal and constitutional violations raised by Defendant's motions and discovery correspondence.

The Government has not:

- Verified the authenticity or evidentiary use of proffer interview summaries;

- Addressed the Hoxie instruction or its post hoc introduction into the plea narrative;

- Provided a victim list, restitution claim, or evidence of financial harm to support its opposition;

- Responded to the March 27 bail modification motion (Dkt. 411) or to multiple pro se discovery letters;

- Or complied with its Brady, Rule 16, or Rule 11 obligations — either before or after Defendant's pro se election on February 5, 2025.

The cumulative impact of these failures is structural. They undermine the factual basis for the plea, obstruct Defendant's ability to prepare for the May 8 hearing, and reflect a pattern of prosecutorial conduct that warrants judicial correction. Silence is not a defense; it is prejudice.

## Requested Relief

Defendant respectfully asks the Court to:

- **Grant Defendant's Motion to Withdraw Plea** under Rule 11(d)(2)(B) based on due process violations, incomplete discovery, and a materially defective factual basis;

- **Compel the Government to immediately produce all discovery materials** requested in Dkts. 401 and 403, and those identified in the letters (Exhibit B);

- **Preclude the Government from relying on any undisclosed or unauthenticated material** at or following the May 8 hearing;

- **Terminate all pretrial supervision and bail restrictions**, including the ankle bracelet, based on the Government's waiver of opposition to Dkt. 411 and ongoing failure to justify continued restraint;

- **Order the immediate return of all seized assets**, including 8.67 BTC, in the absence of any lawful forfeiture basis or substantiated victim claims;

- **Consider dismissal of the indictment** pursuant to Rule 48(b) or the Court's supervisory authority, in light of the cumulative pattern of prosecutorial misconduct and constitutional violations; and

- **Enter any further relief or sanctions the Court deems necessary** to restore fairness and ensure the integrity of these proceedings.


### Referral for Disciplinary Review

In light of the cumulative misconduct, discovery violations, and misrepresentations documented throughout these proceedings, Defendant respectfully requests that the Court consider referring the Government's conduct to the **Department of Justice Office of Professional Responsibility (OPR)** and/or the relevant **state bar disciplinary authorities**. Such a referral is warranted to ensure appropriate review of potential ethical violations, including:

- The suppression of exculpatory materials in violation of *Brady v. Maryland* and *Giglio v. United States*;

- Repeated failure to comply with *Rule 16* and constitutional disclosure obligations;

- Misleading statements made to the Court in opposition to Defendant's motions;

- Disregard of DOJ's April 7, 2025 digital asset enforcement directive.

Docusign Envelope ID: 09E22687-9B9C-461D-8A0D-050DF5B9AA81

This step is necessary to protect the integrity of the judicial process and to deter future prosecutorial misconduct.

# XVI. Proposed Hearing Framework and Judicial Relief

## Expected Hearing Outcomes

To ensure a focused and efficient evidentiary hearing on **May 8, 2025**, Defendant proposes that the Court require the Government to:

- **Identify** on the record which categories of discovery it intends to produce post-hearing, including **specific delivery timelines**;

- **Disclose** which materials are **unavailable or intentionally withheld**, and the **legal or policy basis** for doing so;

- **Clarify** whether it intends to rely on any **undisclosed evidence**, and if so, **produce it in advance** or be barred from doing so;

- **Address** whether the **proffer summaries** cited were **formally adopted** by the Department of Justice or reviewed by the **Tax Division**;

- **Confirm** whether any **victim statements, affidavits, restitution claims, or tax loss declarations** were submitted to the Court or former defense counsel during plea review.

These steps will clarify contested facts, reduce ambiguity, and safeguard the integrity of the hearing.

Additional **itemized discovery issues**—including missing SARs, interrogation footage, grand jury materials, and forensic reports—are detailed in **Exhibit A** and incorporated by reference.

## Requested Relief:

Defendant respectfully asks that the Court:

- **Adopt the above categories** as a framework for evaluating discovery compliance during the May 8 hearing;

- **Direct the Government** to submit a written roadmap responding to **Exhibits A and B**;

- **Preclude post-hearing submissions** unless accompanied by full production or a certified explanation justifying any withholding under applicable law.

Defendant stands ready to assist the Court in preparing for the May 8, 2025 hearing and to answer any procedural or evidentiary questions necessary to resolve the outstanding constitutional and factual issues.

The standards of prosecution have long since been abandoned in this case. The only just outcome now is rescission, restitution, release, and dismissal of the indictment.

**Referral for disciplinary review is warranted and should be initiated.**

**Respectfully submitted,**
**Jobadiah Weeks**
*Defendant Pro Se*
Electronically Signed via DocuSign
**Date:** April 24 2025
**Address:**
11627 West 74th Way, Arvada, Colorado 80005



**Attached Exhibits:**

- **Exhibit A** – Overview of Discovery and Procedural Violations
- **Exhibit B** – March 2025 Letters to the Government (March 5, 12, 19, 31)
- **Exhibit C** – April 12, 2025 Memorandum to AUSA Torntore with attached the **DOJ April 7, 2025 Policy Memorandum** (Digital Asset Enforcement Directive)

# Exhibit A

Overview of Discovery and Procedural Violations

| No. | Category | Specific Failure / Misconduct | Legal Impact |
|---|---|---|---|
| 1 | Discovery Violations | Failure to produce the April 19, 2019 Special Agent's Report (SAR). | Brady violation; Rule 16 violation; Due Process violation. |
| 2 | | Failure to produce Grand Jury Expansion Request Letter (July 23, 2020). | Grand Jury irregularity; selective prosecution evidence withheld. |
| 3 | | Failure to produce video & MOI of December 10, 2019 interrogation. | Suppression of key evidence; Due Process violation. |
| 4 | | Failure to produce IRS CI Reports, internal audit workpapers. | Brady violation; impairment of defense preparation. |
| 5 | | Failure to provide list of discovery sent to former counsels. | Impaired ability to prepare defense pro se. |
| 6 | | Failure to produce secret recordings with co-defendants in custody. | Concealed potentially exculpatory conversations. |
| 7 | | Failure to produce all plea negotiation communications and records with Defendant and co-defendants. | Due process violation; supports plea coercion and selective prosecution claims. |
| 8 | | Failure to produce internal communications regarding charging decisions, selective prosecution, and addition of tax charges. | Fifth Amendment violation; supports selective prosecution claim. |
| 9 | | Failure to produce communications and correspondence between the Government and Defendant's former defense counsel. | Due process violation; obstruction of defense preparation and motions. |
| 10 | | Failure to produce complete inventory and chain of custody records of seized cryptocurrency, gold, silver, and cash. | Fifth Amendment violation; Rule 41(g) violation; property deprivation. |
| 11 | | Failure to produce transaction logs of seized digital assets. | Rule 41(g) violation; impaired ability to seek return of property and review financial records. |

| | | |
|---|---|---|
| 12 | Failure to produce records, emails, and communications related to Defendant's detention, prison transfers, and joint placement with co-defendants during pretrial custody. | Due process violation; supports plea coercion claim; Government misconduct in detention conditions. |
| 13 | Failure to disclose any cooperation agreements, immunity deals, or non-prosecution agreements with BitClub Network promoters and third parties. | Due process violation; Brady violation; supports selective prosecution claim. |
| 14 | Failure to produce a complete and verified list of alleged victims and related financial loss information, despite formal requests. | Rule 16 violation; due process violation; impaired defense preparation and ability to challenge sentencing exposure and plea coercion. |
| 15 | Failure to timely respond to Defendant's discovery motions and requests. | Obstruction of defense preparation; prolonged litigation and unnecessary burden. |
| 16 | Failure to disclose outcome of follow-up cryptocurrency investigations referenced in December 10, 2019 IRS memo. | Ongoing Rule 16 and Brady violation; creates uncertainty about whether Government pursued or suppressed additional evidence. |
| 17 | Failure to include all agents and participants in December 10, 2019 MOI/MOA records. | Undermines reliability of seizure documentation; prejudices Defendant's ability to assess investigative conduct. |
| 18 | Withholding IRS Memorandum until December 2024 despite defense requests and no record of prior disclosure to successor counsel. | Due process and Rule 16 violation; key exculpatory and forensic information withheld during plea negotiations. |

| | | | |
|---|---|---|---|
| **Plea Coercion & Misconduct** | 1 | Addition of tax charges after fraud indictment despite prior knowledge since 2019. | Coercive plea tactics; selective enforcement. |
| | 2 | Withholding plea negotiations and deals made with other BitClub Network members. | Undermined voluntariness of plea. |
| | 3 | Strategic placement of Defendant near government witnesses during pretrial detention (approx. 20 prison transfers). | Coercion; undermined plea voluntariness. |
| | 4 | False claims that AUSA Hoxie instructed Defendant not to speak with co-defendants before January 2020. | Misrepresentation; created false narrative. |
| **Selective Prosecution & Disparate Treatment** | 1 | Charging Defendant with tax evasion while similarly situated co-defendants (e.g., Abel) were charged only with lesser offenses or not charged at all. | Equal protection violation; selective prosecution claim. |
| | 2 | Offering Joseph Abel a more favorable plea agreement without tax evasion charges, despite his higher known tax liabilities compared to Defendant. | Arbitrary enforcement; disparate treatment; supports selective prosecution claim. |
| | 3 | Failure to charge other major BitClub Network promoters (Hidalgo, Fairclough, Vause, Pujol, Rhett Weeks, and others) despite evidence of their leadership roles and financial gains. | Arbitrary enforcement; unequal treatment. |

| # | | Description | Implication |
|---|---|---|---|
| 4 | | Failure to charge other major BitClub Network promoters (Hidalgo, Fairclough, Vause, Pujol, Rhett Weeks, and others) despite evidence of their leadership roles and financial gains. | Arbitrary enforcement; unequal treatment. |
| 5 | | Delayed indictment of Russ Medlin despite his leadership role in BitClub Network. | Unequal treatment; selective prosecution. |
| 6 | | Addition of tax charges against Defendant exclusively during plea negotiations, after initial indictment, to increase leverage and pressure Defendant into a global plea. | Coercive plea tactics; selective enforcement; due process violation. |
| 1 | Grand Jury Misconduct | Failure to disclose materials reviewed by the Grand Jury. | Possible fraud on the Grand Jury; due process violation. |
| 2 | | Misleading the Grand Jury by withholding exculpatory evidence. | Impaired integrity of indictment. |
| 3 | | Failure to timely inform the Grand Jury of Defendant's alleged tax conduct known to the Government since April 2019; Grand Jury informed only in July 2020. | Due process violation; strategic delay prejudiced Defendant; supports plea coercion claim. |
| 4 | | Failure to produce the Grand Jury Expansion Request Letter (July 23, 2020) and related internal communications, which were used to selectively and belatedly expand the Grand Jury investigation to include tax charges without timely disclosure to Defendant. | Due process violation; Rule 16 and Brady violation; impaired integrity of indictment; supports selective prosecution and plea coercion claims. |

| Category | # | Description | Legal Implication |
|---|---|---|---|
| Asset Seizure Irregularities | 1 | Missing 4.99995661 BTC from seizure record. | Illegal retention of property; Fifth Amendment violation. |
| | 2 | No accounting of seized cryptocurrency wallets, gold, silver, and other assets. | Rule 41(g) violation; possible unlawful conversion. |
| | 3 | No forensic audit of seized assets despite request. | Violates Defendant's right to property return. |
| | 4 | Failure to return $7,500 in cash seized from Defendant's belt and improperly logged as transported to prison. | Fifth Amendment violation; unaccounted seizure; possible unlawful conversion. |
| Asset Seizure Misconduct | 1 | Government repeatedly acknowledged Defendant's entitlement to return of seized assets but failed to comply, including after confirming in January 2025. | Fifth Amendment violation; Rule 41(g) violation; ongoing obstruction of Defendant's rights. |
| | 2 | No disclosure or completion of intended forensic audit on seized wallets and hardware devices. | Ongoing Rule 16 and Brady violation; prevents defense from tracing or verifying asset integrity. |
| Fraud on the Court & Misrepresentations | 1 | Government's February 18, 2025 letter misstated discovery compliance and flight risk. | Misled the Court by omitting ongoing violations and overstating flight risk; undermined plea validity and bail decisions. |
| | 2 | Presentation of post-dated reports as contemporaneous evidence supporting plea. | Retroactively justified plea with documents not provided or created until after the plea was signed; undermines voluntariness. |
| Post-Plea Misconduct | 1 | Government's misrepresentations to the Court regarding discovery compliance and risk assessment in 2025 filings; continued refusal to comply with discovery orders. | Due process violation; obstruction of Defendant's ability to litigate motions and recover rights. |

| | | | |
|---|---|---|---|
| 1 | Defense Counsel Misconduct | Refusal by Defendant's former counsel at Carlton Fields (Michael Yaeger, Simon Gaugush) to provide Defendant with access to the complete discovery file and Government correspondence, despite repeated direct requests. | Sixth Amendment violation; deprived Defendant of access to critical discovery; impaired defense preparation and ability to challenge plea. |
| 2 | | Refusal by Carlton Fields to assist Defendant in answering key questions and factual issues raised by the Court and in Defendant's post-plea motions, by withholding discovery materials and information. | Ongoing obstruction of Defendant's ability to litigate motions for recovery, including discovery sanctions, plea withdrawal, and prosecutorial misconduct claims. |
| 1 | Ineffective Assistance of Counsel | Failure by Defendant's former counsel at Stone & Magnanini LLP (David Stone, Robert Magnanini) to file a motion to withdraw Defendant's guilty plea despite Defendant's clear instructions and provision of legal grounds. | Sixth Amendment violation; ineffective assistance; structural defect in proceedings; plea obtained without proper legal challenge. |
| 1 | Withholding of Government Communications | Failure by the Government to disclose communications with Defendant's former defense counsel regarding detention instructions, discovery production, Brady material, and defense preparation. | Fifth and Sixth Amendment violations; Due process violation; Obstruction of defense preparation and plea challenge. |

# Exhibit B

March 2025 Letters to the Government (March 5, 12, 19, 31)

**March 9, 2025**

AUSA Anthony Torntore
United States Attorney's Office
District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

**Subject: Fraud, Perjury, and Prosecutorial Misconduct in Grand Jury Proceedings and Plea Negotiations**

Dear Mr. Torntore,

I am writing to formally address serious concerns regarding fraud, perjury, and prosecutorial misconduct related to my indictment and plea process in *United States v. Jobadiah Weeks.* As you are aware, I have already filed a **Motion to Compel Discovery** on February 26, 2025, a **Motion on Selective Prosecution** on March 2, 2025, and a **Motion to Compel for Supplementary Information** on March 5, 2025, to retrieve further evidence. None of these motions have received a response, nor have my previous letters.

This letter serves to raise additional misconduct concerns.

On July 14, 2024, my former legal counsel, David Stone, contacted your office to request information on the tax charges against me in order to facilitate a settlement with the IRS. Following this request, your office sent the Grand Jury Report dated October 8, 2020—a report I had never seen before.

Subsequently, on September 5, 2024, David Stone sent a letter based on the Grand Jury Report with 23 specific questions. In December 2024, your office responded by answering only three of these questions, leaving the majority unanswered.

Additionally, the email sent by your office in December 2024 included the **Streamlined Special Agent's Report (SAR).** This document has no date and was suggested to have been presented to the Grand Jury, yet it was actually created in 2021 or later—meaning it could not have been presented to the Grand Jury before my indictment.

Since the Streamlined SAR was not presented to the Grand Jury, and neither was the Grand Jury Report of October 8, 2020, the critical question remains: **What information, if any, was actually given to the Grand Jury?** Was any information presented at all? The failure to present accurate and complete evidence before the Grand Jury resulted in a deprivation of my constitutional rights, violating my right to due process under the Fifth Amendment.

To fully understand what transpired, I request that you provide:

- A copy of the email sent to David Stone in July 2024 that contained the Grand Jury Report and any related correspondence.
- A copy of the email sent to David Stone in December 2024 containing the Streamlined SAR and the search and seizure warrant from December 10, 2019, including the detailed inventory of items removed by the IRS, which contains significant discrepancies regarding Bitcoin transfers.

# 1. Legal Basis for Fraud on the Court, Fraud, and Perjury & Grounds for Dismissal

Fraud on the court, fraud, and perjury occur when the government knowingly misleads the Grand Jury, withholds material evidence, makes false statements, or fabricates evidence to obtain an indictment or plea agreement. The following legal principles apply:

- **Fraud on the Court**: If the government knowingly misrepresented facts to the Grand Jury or withheld critical evidence, it deprived me of a fair legal process.
- **Fraud**: Misrepresentation of evidence occurred, including the suggestion that the Streamlined SAR and October 8, 2020 Grand Jury Report were part of the Grand Jury's review when they were not.
- **Perjury**: If government officials knowingly provided false statements to the Court or in official filings, this constitutes perjury under **18 U.S.C. § 1621** and **18 U.S.C. § 1001** (False Statements).
- **Misrepresentation or Concealment of Material Evidence**: The Grand Jury was not given the completed investigative report before approving the indictment, meaning they made a decision without full and accurate information.
- **Improper Influence on the Grand Jury's Decision**: If the plea was signed before the Grand Jury's review was complete, then the prosecution effectively predetermined the outcome, invalidating the indictment.
- **Prosecutorial Misconduct as a Basis for Dismissal**: Under *United States v. Basurto*, **497 F.2d 781 (9th Cir. 1974),** an indictment must be dismissed if based on misleading or false evidence. The concealment of this Grand Jury Report from my legal counsel until July 2024 could qualify as such misconduct.
- **Due Process Violation**: If I was denied access to material evidence that would have influenced my plea decision, this constitutes a direct violation of *Brady v. Maryland*, **373 U.S. 83 (1963),** and undermines the voluntariness of my plea. The Supreme Court has consistently held that withholding exculpatory or material evidence from a defendant prior to entering a plea results in constitutional infirmities that require judicial intervention.

Given the procedural and constitutional violations, dismissal is the appropriate remedy. I rely on the motions already filed with the court to fully address the need for further factual development, including any potential evidentiary hearing, should the court deem it necessary.

Initial

2

## 2. Questions the Government Must Answer to Disprove Fraud and Perjury

Given the facts, I request that your office provide clear, documented responses to the following:

1. Why did your office answer only three of the 23 questions posed in David Stone's September 5, 2024 letter?
2. Provide copies of the email sent to David Stone in July 2024 and December 2024 regarding the Grand Jury Report and the Streamlined SAR.
3. Confirm and provide documentation regarding what evidence, if any, was actually presented to the Grand Jury. If the government contends that the Grand Jury was properly informed, produce a sworn declaration attesting to what was submitted, as well as a complete record of all documents reviewed.

The remaining legal and factual questions regarding the Grand Jury Report, the Streamlined SAR, withheld evidence, and prosecutorial misconduct have already been addressed in my **Motion to Compel Discovery** filed on February 26, 2025, and my **Motion on Selective Prosecution** filed on March 2, 2025. I expect a full response to the demands outlined in that motion.

## 3. Settlement

Given the substantial evidence of fraud, perjury, and prosecutorial misconduct, I urge the government to consider resolving this matter through voluntary dismissal of the indictment. A withdrawal at this stage would not only serve the interests of justice but also prevent unnecessary litigation that could further burden the Department of Justice and expose significant procedural violations to judicial scrutiny.

If the government does not address these issues in good faith, I will be left with no choice but to escalate the matter through formal complaints with the Office of Professional Responsibility, seek court-imposed sanctions, and pursue all available legal remedies. The government has an opportunity to resolve this matter now rather than prolong unnecessary litigation that may further expose these procedural violations.

I also recognize that decisions regarding a potential settlement may require discussion and approval from senior officials. If the government is seriously considering this option, I expect **immediate action to remove the ankle bracelet as an interim measure** while discussions are ongoing. Given the substantive legal deficiencies in this case, continued imposition of this restriction is unjustified.

## Conclusion

The government has an obligation to uphold the integrity of the judicial process and ensure that indictments are based on lawful and accurate evidence. The facts strongly indicate that fraud on the court, perjury, and prosecutorial misconduct have tainted these proceedings. If my indictment was based on misleading or incomplete information, the only just remedy is the **dismissal of the indictment and vacatur of my plea.**

If the government wishes to resolve this matter through a settlement, I am open to discussions that would provide a fair resolution. Any such resolution must address the procedural concerns raised, ensuring that constitutional and statutory rights are upheld. I welcome an opportunity to engage in constructive dialogue toward that end.

Given the severity of these issues, I expect a formal written response within **five days** if the government is considering a settlement. If no settlement is being considered, I expect a full response by **March 19, 2025**, addressing the government's position, intended corrective actions, or its decision regarding voluntary dismissal. Failure to respond will compel me to escalate this matter before the court through further motions and official complaints with the Office of Professional Responsibility.

Respectfully submitted,
**Jobadiah Weeks** Pro Se
Electronically Signed via DocuSign

**Address:**
11627 West 74th Way
Arcada, Colorado 80005

**E-mail:**
silenceweeks1@gmail.com

**Dated:** March 9, 2025

Signed by:
*Joby Weeks*
87866A420DB4490...

4

**March 12, 2025**

**VIA EMAIL**

AUSA **Anthony Torntore**
United States Attorney's Office
District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

## Subject: Request for Prioritizing outstanding questions

Dear AUSA Torntore,

Judge Cecchi has scheduled a hearing for **May 8, 2025,** and I intend to focus on a few key issues during the proceedings. To ensure that both parties can adequately prepare, I request that the government **prioritize responses as listed** in this letter of  the pending Motions.

# I.      Motion on Selective Prosecution

At the hearing, I seek clarity on:

- The government's targeted prosecution of me, while similarly or more culpable individuals received leniency.
- The government's disclosure (or non-disclosure) of exculpatory materials, including any withholding of key evidence.
- Whether the government knowingly presented false or misleading testimony in the case.
- Whether my pretrial detention conditions were disproportionately harsh compared to other BCN defendants.
- Whether my prior counsel failed to challenge selective prosecution and coercive plea tactics, affecting the fairness of my case.

## Priority Questions for Government Response

I request that the government provide clear and specific answers to the following:

**Declination Memo:** Internal DOJ/SEC/IRS/FBI communications regarding why Federico Hidalgo, J. Oh, Jason Vausē, Francisco Rojo, and Ayodele Onesimus Adeoye were not prosecuted. (#2)

**Plea & Charging Decisions:** Any records confirming whether Russ Medlin was offered a plea deal, a non-prosecution agreement, or was otherwise treated differently from other BCN members. He still has not been arrested. (#3)

**Prosecution Strategy & Case Delays:** Internal communications regarding the government's decision to prosecute me while delaying or dismissing charges for others. (#5)

**Full Prosecution Memorandum (PMA):** Why were Richard J. Oh, Jason Vausē, Francisco Rojo, and Ayodele Onesimus Adeoye, who played significant roles in managing customers and operations or promoting BCN, not prosecuted? (#8)

**Pretrial Detention Justification:** Any DOJ or BOP records explaining why I have been detained for over five years without sentencing. (#20) and Any DOJ or Pretrial Services communications discussing why I remained in custody while similarly situated defendants received pretrial release, including Medlin and Balaci. (#22)

**Plea Negotiations & Sentencing Disparities:** All DOJ, IRS, and SEC internal records regarding plea negotiations, charging decisions, and sentencing recommendations for BCN co-defendants. (#33)

# II.   Taxes

The tax-related issues are a key pillar of my plea agreement, yet many fundamental questions regarding the IRS's assessment of BCN and its members remain unanswered. My legal counsel formally raised these issues in his **Letter of September 5, 2024**, but **20 out of 23 questions** were ignored. The government has yet to provide critical records, including:

- How the IRS viewed the relationship between BCN leadership and its members in terms of tax liability and responsibility.
- Whether BCN applied for or was classified under a specific tax designation (e.g., for-profit or non-profit).
- How the IRS determined the tax obligations of BCN, particularly in relation to its business activities.
- Whether the IRS classified earnings from BCN as wages, commissions, or other taxable income for its members.

## Key Internal IRS Reports That Address These Issues

The IRS maintains **internal reports** that should provide direct answers to these tax-related questions. Specifically, I request:

1. **IRS Criminal Investigation (CI) Reports** – Since BCN was flagged for tax fraud, these reports likely contain findings on BCN's financial structure.
2. **Internal IRS Audit Workpapers** – These documents cover the tax filings of BCN members, and I specifically request the **workpapers for Abel** to compare enforcement inconsistencies.
3. **IRS Third-Party Summons Logs** – The IRS had access to BCN member lists from **banks and payment processors**, which provide insight into how tax obligations were assessed.

**Request for Government to Provide These Internal Reports**

Since many of the September 5, 2024 letter questions can be answered through these existing IRS reports, I request that the government prioritize their disclosure before the May 8 hearing.

**Priority Questions from the Motion on Selective Prosecution**

Additionally, the following discovery requests from the Motion on Selective Prosecution remain unanswered:

1. Why were tax charges selectively applied to me after the fraud indictment, while others with similar tax liabilities were only subjected to civil enforcement? (#14)
2. What internal government discussions evaluated why supposed tax-related charges were used only against me, while others with known tax liabilities faced only civil penalties? (#27)

# III.  Motion to Compel Discovery

In the hearing I want to focus and proof on the fraud and perjury that the government has engaged in, like the plea agreement was coerced, The government engaged in prosecutorial misconduct by withholding or altering evidence, the non disclosure of any evidence material to the defense.failure to disclose exculpatory evidence violates due process.

For this reason I want to have the following questions answered with priority.

- **Full Special Agent's Report (SAR)** from April 19, 2019 (#1.3)
- **Grand Jury Materials** – All grand jury transcripts and exhibits related to tax enforcement decisions against Defendant, including records on the government's delay in bringing tax charges. (#1.4)
- **Transport Logs** – All records documenting Defendant's prison transfers and placement near key government witnesses. (#2.1)
- **Use of Transport to Pressure Defendant**  (#2.2)
- **Proffer Session Transcripts** – Any and all interview transcripts or summaries of proffer sessions from co-defendants in this matter. (#.3.2)
- **Conduct an independent forensic audit** to verify whether seized cryptocurrency was misappropriated or unlawfully transferred.(#4.2)
- **Discovery Requests** – Defendant requests: (#5.4)
  - Any instructions given to Defendant regarding discussions with co-defendants while in detention.
  - Internal DOJ, FBI, or Bureau of Prisons (BOP) communications discussing the decision to place Defendant near key witnesses.
  - Records showing whether Defendant's legal counsel was informed of these interactions before plea negotiations.
  - Any documentation confirming that Defendant was properly advised of his rights in relation to these interactions.

3

# IV.  Motion on Supplementary information

The questions from the Supplementary Motion are intended to further substantiate my claims and obtain critical missing discovery that the government has failed to provide. These materials are essential to confirming prosecutorial misconduct, selective evidence disclosure, and the suppression of exculpatory materials.

## Priority Discovery Requests

1. **Exact Email Confirming Limited Document Disclosure**
   - The government must provide the exact email in which it provided only 3 out of the 23 requested documents, including the Streamlined SAR.
   - This email was sent on or around December 6, 2024, in response to the September 5, 2024, letter to David Stone.
   - This is necessary to verify whether the government deliberately withheld key evidence and failed to comply with Brady v. Maryland disclosure obligations.

2. **Communications Between Prosecution & Former Counsel (Stone Magnanini)**
   - The government must provide all notes, memos, or summaries of phone calls between the prosecution and former defense attorneys at Stone Magnanini.
   - These records should cover the period from July 2024 to January 2025 and focus on discussions related to the September 5, 2024, discovery request.
   - This is critical to assessing whether former defense counsel properly pursued discovery requests and whether the prosecution misled the defense regarding available evidence.

3. **Full Grand Jury Expansion Request Letter (July 23, 2020)**
   - The government must disclose the full Grand Jury Expansion Request Letter submitted by the U.S. Attorney's Office on July 23, 2020.
   - This document is critical to determining whether the government manipulated the grand jury process by selectively presenting evidence.

4. **Confirmation of Prior Legal Counsel's Discovery Requests (#5)**
   - The government must confirm whether the Streamlined SAR, the full Grand Jury Expansion Request Letter (July 23, 2020), and all interviews conducted with Joby Weeks were ever requested by former defense counsel.
   - If requested, the government must disclose:
     - Who requested these documents.
     - When the requests were made.
     - Any responses provided by the government.

In regard to the phrase *"...and all interviews conducted with Joby Weeks,"* I specifically request the production of the **interview conducted on December 10, 2019**—the day of my arrest. This interview lasted approximately six hours and was attended by Amjad and Leo, both of whom were also present at the Ritz meeting on April 19, 2019, along with four additional government officials.

The government must:

- Provide the Special Agent's Report (SAR), FD-302, Memorandum of Interview (MOI), or any other official record documenting this interview.
- Whether any modifications, omissions, or suppressions were made to the original interview record.
- All internal DOJ, FBI, or IRS communications regarding the preparation, handling, or disclosure of this interview's documentation.

Given the significance of these issues, it is in the interest of both parties to be well-prepared for the hearing so that the proceedings can remain focused and conducted fairly.

It would be highly appreciated if the government could provide **clear and substantive responses** before the **April 8 deadline set by the court**, ensuring that both parties can adequately prepare for a **focused and fair hearing on May 8**.

**Sincerely,**

**Jobadiah Weeks, Pro Se**

Electronically Signed via DocuSign

Date: March 2, 2025

**Subject:** Request for SAR and Video Recording of December 10, 2019 Interrogation

Dear AUSA Torntore,

I am following up on my previous email regarding my request for specific information.

As stated in my email dated March 12, 2025, I requested the **Suspicious Activity Report (SAR)** related to my interrogation on **December 10, 2019**. Upon reviewing documents provided by my former legal counsel, David Stone, I noticed that a **Memorandum of Interview (MOI)** exists regarding my request to contact Enzo during that interrogation. In this MOI, **Mr. Amjad Qaqish** is listed as a participant alongside me. The memorandum states:

*"SA CIS Jason Leighton provided SA Jonathan Helmstetter with a number for Enzo from the digital evidence seized from Weeks,"*

which confirms that **additional agents were present** during the interrogation.

During this interview, I did indeed request permission to contact Enzo. While my legal counsel apparently received a Memorandum of Interview documenting this request, **there is no MOI covering the entirety of the interrogation**.

I recall that **six agents** were present in total. The only other name I remember is **Leo Rovensky**, yet the MOI does not list him or the other agents as participants. The MOI itself, however, indicates the presence of additional agents. Please note that **all participating agents should be listed in the MOI**.

Furthermore, the interrogation lasted approximately **six hours**, and **a video recording was made**. Therefore, I formally request that you provide me with:

1. The **full video recording** of my interrogation on December 10, 2019.
2. The **complete Memorandum of Interview** covering the entire interrogation.
3. The **SAR** related to this interrogation.

Upon reviewing the **Memorandum of Interview dated August 25, 2020**, it is evident from the details provided that during my time in custody with **Mr. Goettsche and Mr. Abel**, our conversations were secretly recorded.

These recordings constitute **exculpatory and/or impeaching evidence**, creating a legal obligation to disclose them. Therefore, I formally request the following:

1. **All recordings** of my conversations with Mr. Goettsche and Mr. Abel.
2. **All memoranda** or reports derived from these recordings.


Initial

1

Docusign Envelope ID: 87B7D9B5-7FF2-45A7-866D-758800312C9F

Please confirm receipt of this request and provide a timeline for the production of these materials.

Sincerely,
**Jobadiah Weeks**
Pro Se
*Electronically Signed via DocuSign*
*Date: March 19, 2025*

Signed by:

Joby Weeks

87866A420DB4490...

2

Docusign Envelope ID: CDB520C3-1311-400A-88AB-1DCC47B230B9

**March 31, 2025**

**VIA EMAIL**

AUSA Anthony Torntore
 United States Attorney's Office
 District of New Jersey
 970 Broad Street, 7th Floor
 Newark, New Jersey 07102
 Anthony.Torntore@usdoj.gov

**Re: Request for Disclosure Regarding AUSA Hoxie Instructions and Related
Discovery U.S. v. Jobadiah Weeks (19-cr-877-CCC)**

Dear AUSA Torntore,

I write to follow up on the outstanding discovery requests addressed in the pending **Motion
to Compel Discovery** and specifically related to the instructions allegedly issued by AUSA
Hoxie concerning my interactions with co-defendants Matthew Goettsche and Joseph Abel.

In the Motion to Compel and in question 6.5 of the Questions to the Court, I have requested
the disclosure of **any instructions given by AUSA Hoxie or other government officials
regarding my placement with Mr. Goettsche and Mr. Abel, as well as any
communications surrounding our joint detention and transport following our arrests
on December 10, 2019.**

Over the past weeks, I have also contacted my former legal counsel from Carlton Fields,
**requesting all documents and correspondence exchanged with the Government in
general and specifically related to this matter. Unfortunately, my repeated inquiries
were ignored.**

Specifically, I have asked my former counsel the following questions, which remain
unanswered:

1. Were you informed that Mr. Goettsche, Mr. Abel, and I were detained together and
   transported together following our arrests on December 10, 2019? If so, please
   provide all related communications, statements, or reports.

2. Were you informed by AUSA Hoxie or any government official that I was instructed
   not to solicit information from Mr. Goettsche and Mr. Abel during our joint detention,
   as referenced in the Memorandum of Interview dated August 17, 2020?

3. Did AUSA Hoxie seek your consent or communicate with you regarding the decision
   to place Mr. Abel, Mr. Goettsche, and me together in the same detention facilities or
   during transport?

4. When did you first learn that I was detained with Mr. Abel and Mr. Goettsche?

Initial

1

As my former legal counsel have refused to provide this information, I hereby formally
request that the Government disclose:

- Any communications between the United States Attorney's Office and my former
  legal counsel regarding these matters;

- Any records, reports, memoranda, or emails addressing the instructions allegedly
  issued by AUSA Hoxie, including the basis and timing of those instructions;

- Any documentation or correspondence regarding the decision to place me together
  with co-defendants Mr. Goettsche and Mr. Abel.

This information is essential to the pending motions, for my ability to prepare my defense,
and for the hearing of May 8, 2025.

Respectfully submitted,
 **Jobadiah Weeks, Pro Se**
 Electronically Signed via DocuSign
 Date: March 31, 2025
 Address: 11627 West 74th Way, Arvada, Colorado 80005
 E-mail: silenceweeks1@gmail.com

Signed by:

*Joby Weeks*

87866A420DB4490...

# Exhibit C

April 12, 2025 Memorandum to AUSA Torntore with attached the DOJ April 7, 2025 Policy Memorandum (Digital Asset Enforcement Directive)

**VIA EMAIL**
AUSA Torntore
United States Attorney's Office
District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov


Dear Mr. Torntore,

I respectfully request that the Government withdraw from further prosecution of this matter, based on the Department's revised enforcement policy and the cumulative constitutional and procedural violations documented herein.

In light of the **attached April 7, 2025 Department of Justice Memorandum** from the Deputy Attorney General (Exhibit A), we request immediate reconsideration of all pending restraints and prosecutorial actions in this matter. You have been requesting continuance after continuance for close to 6 years. It's time for this to end.


## 1. DOJ Policy Now Bars Prosecution Absent Fraud or Criminal Intent

The April 7 DOJ policy directive makes clear:

> "Prosecutors shall prioritize cases that hold accountable individuals who (a) cause financial harm to digital asset investors and consumers; and/or (b) use digital assets in furtherance of other criminal conduct."
> – *DOJ Memo, p. 2–3 (Exhibit A)*

The prosecution against me does **not fall within either priority**. I have **not been accused of victimizing investors**, nor has the Government shown I used digital assets to promote terrorism, narcotics trafficking, or any such enterprise.


## 2. No Victims – No Legal Basis for Fraud or Laundering Charges

Despite publicly soliciting victim reports through the DOJ website beginning in December 2019, the Government received **no verified victim claims** that were caused by myself before I entered my plea on **September 21, 2020**.

- No victim submissions were disclosed or verified prior to the plea. You read the pre-sentence report. I created no victims.

1

- The Government failed to inform me or my counsel that **zero victim responses had been received that were attributed to me**. This failure is not merely procedural — it **undermines the entire legal foundation of the Government's case**.

In financial crimes such as **wire fraud** and related offenses, the **existence of actual victims and measurable loss** is **essential** to:

- Establishing the elements of the offense;
- Applying sentencing enhancements;
- Justifying restitution orders.

Under the **Mandatory Victim Restitution Act (MVRA)**, restitution can only be imposed where there are **identifiable victims** who suffered **actual pecuniary loss**. The Government's failure to disclose any such information — despite having publicly requested it — raises serious questions about:

- The **factual basis for the charges**;
- The **accuracy of representations made to the Court and defense**;
- The overall **fairness of the proceedings**.

The **absence of verified victim and loss information** supports my claim that my plea was **coerced and based on misrepresentation**, and highlights a broader **pattern of discovery misconduct**.

Further illustrating this is the Government's handling of **Gordon Brad Beckstead's plea agreement (attached as Exhibit C)**:

- Beckstead, a CPA involved in preparing false tax returns and so called "laundering" of Matt Getch funds, **was not required to pay restitution to victims**.
- His plea only included obligations tied to **tax loss and laundering proceeds**, not any identified individual fraud victims.
- Whoever these so called victims are, were "victims" because of illegal government intervention. The governments action against Bitclub created approximately 1 million victims. You need to give the members their Bitcoin back.

This inconsistency supports the defense's concern that the **Government lacks a verified victim list** and has not substantiated claims of widespread financial harm.

Finally, the Government's ongoing refusal to produce this victim information **violates my rights** under the:

- **Fifth Amendment Due Process Clause**,
- **Rule 16** of the Federal Rules of Criminal Procedure,
- And **Brady v. Maryland**, 373 U.S. 83 (1963).

This data is critical to evaluating the scope of alleged criminal conduct, any sentencing exposure, and the validity of my false and coerced plea statement. Its suppression further

2

Initial

Docusign Envelope ID: 83891498-9715-4F6B-92A2-1EFCE6A5B610

justifies reconsideration of all restraints and charges now falling outside DOJ's new enforcement framework.

**In case the Government claims that there are victims, I request that it produce a verified and complete list of all individuals who submitted victim claims to the FBI or U.S. Attorney's Office — the list that existed and was used at the time of my coerced plea on September 21, 2020 — no later than April 22, 2025.**

## 3. The Record Shows No Willful Misconduct – Only Regulatory Ambiguity

There is no allegation that I **knowingly violated a specific registration or licensing requirements** — nor that I acted with fraudulent intent. Although I was neither a founder nor an owner of BitClub Network and joined the project two years after its founding. My prosecution was driven by:

- **Ambiguity around BitClub Network's tax and entity classification**, and
- The Government's **selective addition of tax charges** to coerce a guilty plea.

The DOJ policy now prohibits such prosecutions unless **willfulness** can be shown — which is absent here.

The Government did not disclose how or why it singled me out for additional tax charges, which were introduced only during plea negotiations, not by indictment. Notably, these tax charges were not brought against any of the original founders or early operators of BitClub Network, further highlighting the selective nature of the prosecution.

The **tax charge** was not the result of a new discovery, but was based on information already known to the Government since the **April 19, 2019** meeting with IRS-CI agents. Nevertheless, it was added at the last moment — only weeks before my plea in **September 2020** — and used as a coercive tool during negotiations. This timeline is clearly documented in **internal IRS and DOJ records**, which show that the Government knew of my alleged tax status as early as **April 19, 2019**, during an in-person meeting. However, the tax charges were not presented to the Grand Jury until **July 2020**, and were not communicated to me until plea negotiations in **September 2020**. This **16-month delay** — despite no new evidence — demonstrates the strategic use of the tax allegations as leverage to coerce a guilty plea statement which has since been rescissioned.

This selective and irregular conduct served to apply pressure on me and ultimately influenced my plea without proper legal foundation as also mentioned in my notice on Feb 21st. (dkt 401)

I was selectively prosecuted: Co-defendants and other key individuals who played central roles in the launch and operation of BitClub Network were not charged with equivalent offenses despite their greater involvement in tax or financial support and structuring related to the network. Specifically:

- **Russ Medlin** – Founder, involved in operations and leadership,
- **Federico Hidalgo** – heavily involved in financial structuring,
- **Keith Fairclough** – central to operations and client management,
- **Gordon Brad Beckstead** – financial structuring, tax reporting, and operational involvement,
- **Jason Caramantis** – original investor who helped fund BitClub Network's initial capital in 2014,
- **Brian McMullen** – financial backer and key partner in the founding of the project in 2014,
- **Travis Bott** – involved in customer services and platform operations, working with a BCN team.

The Government's failure to charge these individuals — who had significant roles in the network — further highlights the selective and arbitrary nature of my prosecution.

## 4. Government Misconduct Undermines Continued Prosecution

**Key Misconduct Events**

- The following summary highlights specific examples of government misconduct detailed in *Exhibit B – Overview of Discovery and Procedural Violations*. This document, enclosed with this letter, catalogs over 30 discovery, plea-related, and selective prosecution failures across multiple categories, including:
- Discovery and Brady violations
- Grand jury misconduct
- Asset seizure irregularities
- Prosecutorial misrepresentations
- Improper plea coercion tactics
- Unequal charging decisions

The following Government conduct supports my claims of due process violations, misconduct, and a lack of fairness in the plea process:

- The Government withheld the April 19, 2019 Special Agent's Report (SAR), the video and memorandum of interview (MOI) from my December 10, 2019 interrogation, and follow-up IRS reports. These materials were material to my defense and should have been disclosed under Rule 16 and Brady.

- Grand jury irregularities included failure to disclose the July 23, 2020 Grand Jury Expansion Request Letter and internal charging communications, which added tax charges despite the Government knowing about the underlying facts more than a year earlier.

- During my detention, I was subjected to approximately 20 prison transfers and repeatedly placed near Government witnesses — a tactic that supports my claim of

4

Initial

plea coercion.

- Asset seizure records were incomplete and misleading. 4.999 BTC is still missing, no forensic audit was conducted, and there has been no explanation of the fate of seized wallets, cash, and other personal property. I was told assets would be returned but that never occurred.

- Misrepresentations were made to the Court, including the presentation of post-dated documents created after the plea was signed. These documents were cited as if they justified the plea at the time, undermining the plea's voluntariness.

These violations not only prejudiced my defense but also violated the DOJ's revised enforcement standards, which aim to correct "regulation by prosecution" strategies implemented by the prior administration.

## 5. Documented Violations Undermine the Integrity of the Case

I have compiled and attached an internal document titled *Exhibit B – Overview of Discovery and Procedural Violations*. This summary is based on motions filed and documented conduct by the Government from December 10, 2019 through the present.

These violations include discovery and Brady violations, misconduct in the grand jury process, prosecutorial misrepresentations, improper coercion during the plea process, irregularities in asset seizures, and interference by former defense counsel.

These omissions materially prejudice my defense and impact the validity of the coerced plea and post-plea proceedings. This cumulative prejudice undermines the legitimacy of the indictment and compels dismissal as the only adequate remedy.

The Government's failure to provide a timely and complete response will reinforce my position that this case should be dismissed in its entirety and reconsidered under the principles laid out in the April 7, 2025 memorandum issued by the Deputy Attorney General. These same violations, as documented in my motions, justify dismissal of the indictment based on selective prosecution, coercive plea tactics, and sustained due process violations. Continuing to prosecute this case contradicts the Department's stated policies and risks misallocating resources better directed toward enforcement efforts involving clear criminal intent and identifiable victims.

## 6. Requested Relief

### A. Immediate Actions Requested Before May 8, 2025

1. I respectfully refer to my recent **letter submitted to Judge Hammer**, which outlined reasonable requests for modification of pretrial conditions, including the removal of the ankle bracelet and allowance for travel. These requests are aimed at enabling me to continue representing myself **pro se**, attend essential meetings, and manage important family responsibilities. A similar approach is respectfully requested here, as these requests are consistent with both **the principles laid out in the April 7, 2025**

Initial

**DOJ memorandum** and my ongoing efforts to ensure fairness and justice in this matter.

2. **I request** the Government to return the **8.67041881 Bitcoin (BTC)** before the hearing scheduled for May 8, 2025. Of this amount, **3.6704622 BTC** was transferred to the government wallet and documented in the report, while the remaining **4.99995661 BTC** was also transferred but not reflected in the report, for a total of **8.67041881 BTC**. The returned BTC will allow me to meet **essential costs of living**, **support my family, pay outstanding debts**, and continue my **legal process**.

**B. Relief Following April 22, 2025 Response and Hearing**

3. **Confirm that no victim-based restitution claim exists**, or produce the verified list of individuals the Government relied on when representing victim harm during my plea negotiations;

4. **Reconsider your position** on my pending motion to withdraw my plea.

I will present this memorandum and all supporting exhibits to the Court at the hearing scheduled for May 8, 2025. If the Government fails to take the corrective actions outlined above or provide adequate justification by **April 22, 2025**, I will seek full dismissal of the indictment, discovery sanctions, and all appropriate judicial remedies.

This letter is submitted without prejudice to any other legal remedies I may pursue, including claims for damages or other relief arising from ineffective assistance of counsel or related misconduct.

**Respectfully submitted,**
Jobadiah Weeks, Pro Se
Electronically Signed via DocuSign
Date: April 12, 2025
Address: 11627 West 74th Way, Arvada, Colorado 80005
E-mail: silenceweeks1@gmail.com



**Attachments:**

**Exhibit A:** April 7, 2025 DOJ Memorandum – Ending Regulation By Prosecution
**Exhibit B:** Overview of Discovery and Procedural Violations (Internal Summary)
**Exhibit C:** Beckstead Plea Agreement

6

# EXHIBIT A.

U.S. Department of Justice

Office of the Deputy Attorney General

---

The Deputy Attorney General

*Washington, D.C. 20530*

April 7, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                    THE DEPUTY ATTORNEY GENERAL

SUBJECT:               Ending Regulation By Prosecution

    The digital assets industry is critical to the Nation's economic development and innovation. Thus, as noted in Executive Order 14178, clarity and certainty regarding enforcement policy "are essential to supporting a vibrant and inclusive digital economy and innovation in digital assets." President Trump has also made clear that "[w]e are going to end the regulatory weaponization against digital assets."

    The Department of Justice is not a digital assets regulator.  However, the prior Administration used the Justice Department to pursue a reckless strategy of regulation by prosecution, which was ill conceived and poorly executed.  The Justice Department will no longer pursue litigation or enforcement actions that have the effect of superimposing regulatory frameworks on digital assets while President Trump's actual regulators do this work outside the punitive criminal justice framework.  Rather, consistent with President Trump's directives and the Justice Department's priorities, the Department's investigations and prosecutions involving digital assets shall focus on prosecuting individuals who victimize digital asset investors, or those who use digital assets in furtherance of criminal offenses such as terrorism, narcotics and human trafficking, organized crime, hacking, and cartel and gang financing.[1]

## I.    Digital Assets Enforcement Priorities

    Executive Order 14178 tasks the Justice Department and others with "protecting and promoting" (1) "the ability of individual citizens and private-sector entities alike to access and use for lawful purposes open public blockchain networks without persecution"; and (2) "fair and open access to banking services for all law-abiding individual citizens and private-sector entities alike." In response to those taskings, the Justice Department will stop participating in regulation by prosecution in this space.  Specifically, the Department will no longer target virtual currency exchanges, mixing and tumbling services, and offline wallets for the acts of their end users or unwitting violations of regulations—except to the extent the investigation is consistent with the priorities articulated in the following paragraphs.

---

[1] This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Memorandum from the Deputy Attorney General                                         Page 2
Subject: Ending Regulation By Prosecution

The policy outlined in Executive Order 14178 requires the Justice Department to prioritize investigations and prosecutions that involve conduct victimizing investors, including embezzlement and misappropriation of customers' funds on exchanges, digital asset investment scams, fake digital asset development projects such as rug pulls, hacking of exchanges and decentralized autonomous organizations resulting in the theft of funds, and exploiting vulnerabilities in smart contracts. Such enforcement actions are important to restoring stolen funds to customers, building investor confidence in the security of digital asset markets, and the growth of the digital asset industry.

Pursuant to the "total elimination" policy set forth in Executive Order 14157, entitled *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, the Justice Department will also prioritize cases involving use of digital assets in furtherance of unlawful conduct by cartels, Transnational Criminal Organizations, Foreign Terrorist Organizations, and Specially Designated Global Terrorists. For example, cartels and human trafficking and smuggling rings have increasingly turned to digital assets to fund their operations and launder the proceeds of their illicit businesses. The same is true of fentanyl production: increasingly dangerous precursors purchased from China and used in the production of fentanyl in Central and South America are often paid for using digital assets. Terrorist groups, such as Hamas and ISIS, and nation states subject to US sanctions, like North Korea, also continue to transact using digital assets in an attempt to conceal their financing from law enforcement. As part of the Justice Department's ongoing work against fentanyl trafficking, terrorism, cartels, and human trafficking and smuggling, the Department will pursue the illicit financing of these enterprises by the individuals and enterprises themselves, including when it involves digital assets, but will not pursue actions against the platforms that these enterprises utilize to conduct their illegal activities.

Ongoing investigations that are inconsistent with the foregoing should be closed. The Office of the Deputy Attorney General will work with the Criminal Division and EOUSA to review ongoing cases for consistency with this policy. All previously issued policies and directives that are inconsistent with any of the foregoing are rescinded, effective today.

## II.    Digital Assets Charging Considerations

Based on the foregoing priorities—while charging decisions must be based upon the facts and evidence of each particular case—federal prosecutors are directed to consider the following factors when deciding whether to pursue criminal charges involving digital assets:

Prosecutors shall prioritize cases that hold accountable individuals who (a) cause financial harm to digital asset investors and consumers; and/or (b) use digital assets in furtherance of other criminal conduct, such as fentanyl trafficking, terrorism, cartels, organized crime, and human trafficking and smuggling. Seeking accountability from individuals who perpetrate these types of wrongdoing deters future illegal activity, compensates victims, and promotes the public's confidence in the digital asset markets and broader industry. On the other hand, criminal matters premised on regulatory violations resulting from diffuse decisions made at lower levels of digital asset companies often fail to advance the priorities of the Department.

Prosecutors should not charge regulatory violations in cases involving digital assets—including but not limited to unlicensed money transmitting under 18 U.S.C. § 1960(b)(1)(A) and (B), violations of the Bank Secrecy Act, unregistered securities offering violations, unregistered

broker-dealer violations, and other violations of registration requirements under the Commodity Exchange Act—unless there is evidence that the defendant knew of the licensing or registration requirement at issue and violated such a requirement willfully. This priority is not required by law, but is being imposed as a matter of discretion, in recognition of the Justice Department's priorities and the fact that the Biden Administration created a particularly uncertain regulatory environment around digital assets.[2]

Prosecutors should not charge violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the Commodity Exchange Act, or the regulations promulgated pursuant to these Acts, in cases where (a) the charge would require the Justice Department to litigate whether a digital asset is a "security" or "commodity," and (b) there is an adequate alternative criminal charge available, such as mail or wire fraud. The following types of positions are permissible under this policy in connection with proposed prosecutions that would otherwise be consistent with the guidance in this memorandum: (i) taking the position that bitcoin or ether is a "commodity" under the Commodity Exchange Act; and (ii) filing securities fraud charges where the "security" at issue is the equity or stock in a digital asset company. Any exceptions to this policy must be approved by the Deputy Attorney General, or his designee(s). Relevant considerations for such an exception include whether the digital asset is widely accepted to be a "security" or "commodity," whether the parties to the litigation have an interest in defending the position that a digital asset is a "security" or "commodity," and whether there is no alternative criminal charge under Title 18.

### III.    Compensating Victims In The Digital Assets Space

Following the prolonged period of price decline in the digital asset market in 2022, multiple companies with custody of investors' digital assets collapsed and entered bankruptcy, including FTX, Voyager Digital, Celsius Network, Genesis Global, BlockFi, and Gemini Trust. In some instances, investor losses have been directly attributable to fraud and theft. In those cases, and others, prosecutors have been able to forfeit proceeds of criminal activity including digital assets that in some instances became worth billions of dollars. However, as a result of regulations, some digital asset investor victims have only been able to recover the value of their digital assets at the time the fraud was perpetrated. *See* 28 C.F.R. § 9.8(c). The effect: digital asset investors' losses may be calculated at a value when the digital asset market was at a lower point, and victims who bore the risk of loss are unable to benefit from corresponding gains that occurred during or after the period in which they were victimized and would otherwise have possessed the asset. Accordingly, the Office of Legal Policy and the Office of Legislative Affairs are directed to evaluate and propose legislative and regulatory changes to address this concern and improve asset-forfeiture efforts in the digital assets space.

---

[2] This guidance does not reflect a view by the Department that the criminal offense set forth in 18 U.S.C. § 1960 requires proof of willfulness in other contexts, and it casts no doubt on existing case law. Moreover, 18 U.S.C. § 1960(b)(1)(C) requires that the transmission of funds "are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity," and is therefore outside the scope of this policy.

**IV.    Shifting Resources Relating To Digital Assets**

U.S. Attorneys' Offices will use long-recognized criminal justice tools to lead appropriate prosecutions consistent with the foregoing enforcement priorities and charging consideration. Consistent with the narrowing of the enforcement policy relating to digital assets, the Market Integrity and Major Frauds Unit shall cease cryptocurrency enforcement in order to focus on other priorities, such as immigration and procurement frauds.    The National Cryptocurrency Enforcement Team (NCET) shall be disbanded effective immediately.    The Criminal Division's Computer Crime and Intellectual Property Section (CCIPS) will continue to provide guidance and training to Department personnel and serve as liaisons to the digital asset industry.

**V.    The President's Working Group on Digital Asset Markets**

The Justice Department will fully participate in President Trump's Working Group on Digital Asset Markets, which was established in Executive Order 14178, via attorneys designated by the Justice Department's senior leadership.    As directed by President Trump, the Department's designees will identify and make recommendations regarding regulations, guidance documents, orders, or other items that affect the digital asset sector.    Additionally, the Department will participate in the preparation of a report to President Trump recommending regulatory and legislative proposals that advance the policies and priorities set forth in the President's Executive Order.    Following the submission of the report, the Justice Department will take all steps necessary to implement the recommendations in the report that President Trump adopts.

# EXHIBIT B.

| No. | Category | Specific Failure / Misconduct | Legal Impact |
|-----|----------|-------------------------------|--------------|
| 1 | Discovery Violations | Failure to produce the April 19, 2019 Special Agent's Report (SAR). | Brady violation; Rule 16 violation; Due Process violation. |
| 2 | | Failure to produce Grand Jury Expansion Request Letter (July 23, 2020). | Grand Jury irregularity; selective prosecution evidence withheld. |
| 3 | | Failure to produce video & MOI of December 10, 2019 interrogation. | Suppression of key evidence; Due Process violation. |
| 4 | | Failure to produce IRS CI Reports, internal audit workpapers. | Brady violation; impairment of defense preparation. |
| 5 | | Failure to provide list of discovery sent to former counsels. | Impaired ability to prepare defense pro se. |
| 6 | | Failure to produce secret recordings with co-defendants in custody. | Concealed potentially exculpatory conversations. |
| 7 | | Failure to produce all plea negotiation communications and records with Defendant and co-defendants. | Due process violation; supports plea coercion and selective prosecution claims. |
| 8 | | Failure to produce internal communications regarding charging decisions, selective prosecution, and addition of tax charges. | Fifth Amendment violation; supports selective prosecution claim. |
| 9 | | Failure to produce communications and correspondence between the Government and Defendant's former defense counsel. | Due process violation; obstruction of defense preparation and motions. |
| 10 | | Failure to produce complete inventory and chain of custody records of seized cryptocurrency, gold, silver, and cash. | Fifth Amendment violation; Rule 41(g) violation; property deprivation. |
| 11 | | Failure to produce transaction logs of seized digital assets. | Rule 41(g) violation; impaired ability to seek return of property and review financial records. |

| # | | |
|---|---|---|
| 12 | Failure to produce records, emails, and communications related to Defendant's detention, prison transfers, and joint placement with co-defendants during pretrial custody. | Due process violation; supports plea coercion claim; Government misconduct in detention conditions. |
| 13 | Failure to disclose any cooperation agreements, immunity deals, or non-prosecution agreements with BitClub Network promoters and third parties. | Due process violation; Brady violation; supports selective prosecution claim. |
| 14 | Failure to produce a complete and verified list of alleged victims and related financial loss information, despite formal requests. | Rule 16 violation; due process violation; impaired defense preparation and ability to challenge sentencing exposure and plea coercion. |
| 15 | Failure to timely respond to Defendant's discovery motions and requests. | Obstruction of defense preparation; prolonged litigation and unnecessary burden. |
| 16 | Failure to disclose outcome of follow-up cryptocurrency investigations referenced in December 10, 2019 IRS memo. | Ongoing Rule 16 and Brady violation; creates uncertainty about whether Government pursued or suppressed additional evidence. |
| 17 | Failure to include all agents and participants in December 10, 2019 MOI/MOA records. | Undermines reliability of seizure documentation; prejudices Defendant's ability to assess investigative conduct. |
| 18 | Withholding IRS Memorandum until December 2024 despite defense requests and no record of prior disclosure to successor counsel. | Due process and Rule 16 violation; key exculpatory and forensic information withheld during plea negotiations. |

| | | | |
|---|---|---|---|
| **Plea Coercion & Misconduct** | 1 | Addition of tax charges after fraud indictment despite prior knowledge since 2019. | Coercive plea tactics; selective enforcement. |
| | 2 | Withholding plea negotiations and deals made with other BitClub Network members. | Undermined voluntariness of plea. |
| | 3 | Strategic placement of Defendant near government witnesses during pretrial detention (approx. 20 prison transfers). | Coercion; undermined plea voluntariness. |
| | 4 | False claims that AUSA Hoxie instructed Defendant not to speak with co-defendants before January 2020. | Misrepresentation; created false narrative. |
| **Selective Prosecution & Disparate Treatment** | 1 | Charging Defendant with tax evasion while similarly situated co-defendants (e.g., Abel) were charged only with lesser offenses or not charged at all. | Equal protection violation; selective prosecution claim. |
| | 2 | Offering Joseph Abel a more favorable plea agreement without tax evasion charges, despite his higher known tax liabilities compared to Defendant. | Arbitrary enforcement; disparate treatment; supports selective prosecution claim. |
| | 3 | Failure to charge other major BitClub Network promoters (Hidalgo, Fairclough, Vause, Pujol, Rhett Weeks, and others) despite evidence of their leadership roles and financial gains. | Arbitrary enforcement; unequal treatment. |

| # | Category | Description | Consequence |
|---|---|---|---|
| 4 | | Failure to charge other major BitClub Network promoters (Hidalgo, Fairclough, Vause, Pujol, Rhett Weeks, and others) despite evidence of their leadership roles and financial gains. | Arbitrary enforcement; unequal treatment. |
| 5 | | Delayed indictment of Russ Medlin despite his leadership role in BitClub Network. | Unequal treatment; selective prosecution. |
| 6 | | Addition of tax charges against Defendant exclusively during plea negotiations, after initial indictment, to increase leverage and pressure Defendant into a global plea. | Coercive plea tactics; selective enforcement; due process violation. |
| 1 | Grand Jury Misconduct | Failure to disclose materials reviewed by the Grand Jury. | Possible fraud on the Grand Jury; due process violation. |
| 2 | | Misleading the Grand Jury by withholding exculpatory evidence. | Impaired integrity of indictment. |
| 3 | | Failure to timely inform the Grand Jury of Defendant's alleged tax conduct known to the Government since April 2019; Grand Jury informed only in July 2020. | Due process violation; strategic delay prejudiced Defendant; supports plea coercion claim. |
| 4 | | Failure to produce the Grand Jury Expansion Request Letter (July 23, 2020) and related internal communications, which were used to selectively and belatedly expand the Grand Jury investigation to include tax charges without timely disclosure to Defendant. | Due process violation; Rule 16 and Brady violation; impaired integrity of indictment; supports selective prosecution and plea coercion claims. |

| Category | # | Description | Legal Implication |
|---|---|---|---|
| Asset Seizure Irregularities | 1 | Missing 4.99995661 BTC from seizure record. | Illegal retention of property; Fifth Amendment violation. |
| | 2 | No accounting of seized cryptocurrency wallets, gold, silver, and other assets. | Rule 41(g) violation; possible unlawful conversion. |
| | 3 | No forensic audit of seized assets despite request. | Violates Defendant's right to property return. |
| | 4 | Failure to return $7,500 in cash seized from Defendant's belt and improperly logged as transported to prison. | Fifth Amendment violation; unaccounted seizure; possible unlawful conversion. |
| Asset Seizure Misconduct | 1 | Government repeatedly acknowledged Defendant's entitlement to return of seized assets but failed to comply, including after confirming in January 2025. | Fifth Amendment violation; Rule 41(g) violation; ongoing obstruction of Defendant's rights. |
| | 2 | No disclosure or completion of intended forensic audit on seized wallets and hardware devices. | Ongoing Rule 16 and Brady violation; prevents defense from tracing or verifying asset integrity. |
| Fraud on the Court & Misrepresentations | 1 | Government's February 18, 2025 letter misstated discovery compliance and flight risk. | Misled the Court by omitting ongoing violations and overstating flight risk; undermined plea validity and bail decisions. |
| | 2 | Presentation of post-dated reports as contemporaneous evidence supporting plea. | Retroactively justified plea with documents not provided or created until after the plea was signed; undermines voluntariness. |
| Post-Plea Misconduct | 1 | Government's misrepresentations to the Court regarding discovery compliance and risk assessment in 2025 filings; continued refusal to comply with discovery orders. | Due process violation; obstruction of Defendant's ability to litigate motions and recover rights. |

| # | Category | Description | Legal Violation |
|---|----------|-------------|-----------------|
| 1 | Defense Counsel Misconduct | Refusal by Defendant's former counsel at Carlton Fields (Michael Yaeger, Simon Gaugush) to provide Defendant with access to the complete discovery file and Government correspondence, despite repeated direct requests. | Sixth Amendment violation; deprived Defendant of access to critical discovery; impaired defense preparation and ability to challenge plea. |
| 2 | | Refusal by Carlton Fields to assist Defendant in answering key questions and factual issues raised by the Court and in Defendant's post-plea motions, by withholding discovery materials and information. | Ongoing obstruction of Defendant's ability to litigate motions for recovery, including discovery sanctions, plea withdrawal, and prosecutorial misconduct claims. |
| 1 | Ineffective Assistance of Counsel | Failure by Defendant's former counsel at Stone & Magnanini LLP (David Stone, Robert Magnanini) to file a motion to withdraw Defendant's guilty plea despite Defendant's clear instructions and provision of legal grounds. | Sixth Amendment violation; ineffective assistance; structural defect in proceedings; plea obtained without proper legal challenge. |
| 1 | Withholding of Government Communications | Failure by the Government to disclose communications with Defendant's former defense counsel regarding detention instructions, discovery production, Brady material, and defense preparation. | Fifth and Sixth Amendment violations; Due process violation; Obstruction of defense preparation and plea challenge. |

EXHIBIT C.



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

*Philip R. Sellinger*
*United States Attorney*

*970 Broad Street, Suite 700*
*Newark , New Jersey 07102*

*(973) 645-2700*

January 12, 2022

**<u>VIA EMAIL</u>**

Mary E. Toscano, Esq.
Sills Cummis & Gross, P.C.
One Riverfront Plaza
Newark, NJ 07102
mtoscano@sillscummis.com

Thomas Ericsson, Esq.
Oronoz & Ericsson LLC
1050 Indigo Drive, Suite 120
Las Vegas, Nevada 89145
tom@oronozlawyers.com

> Re: <u>Plea Agreement with Gordon Brad Beckstead</u>
>      22-CR_204 (CCC)

Dear Counsel:

This letter sets forth the plea agreement between your client, Gordon Brad Beckstead ("Beckstead"), and the United States Attorney for the District of New Jersey ("this Office"). This Office's offer to enter into this plea agreement will expire on January 14, 2022 if it is not accepted in writing by that date.

<u>Charges</u>

Conditioned on the understandings specified below, this Office will accept a guilty plea from Beckstead to Counts One and Three of an Information that charges him: (1) in Count One with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h); and (2) in Count 3 with aiding and assisting in the preparation of a false tax return for calendar year 2018, in violation of Title 26, United States Code, Section 7206(2).

If Beckstead enters a guilty plea to, and is sentenced on the above charges, this Office will not initiate any further criminal charges against Beckstead based upon: (a) his laundering of funds derived from the BitClub Network, described more particularly in the Indictment filed in *United States v. Goettsche, et al.*, Crim. No. 19-877(CCC), from in or around 2014 through in or around December

2019; or (b) his aiding in the preparation of, or preparation of, false tax returns on behalf of Matthew Goettsche and any entities controlled by Matthew Goettsche, provided that Beckstead admits under oath at the time of his guilty plea: (1) to aiding in the preparation of false income tax returns on behalf of Goettsche for the calendar years 2017 and 2018; and (2) that this conduct is taken into account as relevant conduct by the Court at the time of sentencing pursuant to U.S.S.G. § 1B1.2(c).  In addition, if Beckstead fully complies with all the terms of this agreement, at the time of sentencing in this matter, this Office will move to dismiss Count Two of the Information.

Further, in the event that a guilty plea in this matter is not entered for any reason or the judgment of conviction entered as a result of this guilty plea does not remain in full force and effect, Beckstead agrees that any dismissed charges and any other charges that are not time-barred by the applicable statute of limitations on the date this agreement is signed by Beckstead may be commenced against him, notwithstanding the expiration of the limitations period after Beckstead signs the agreement.

<u>Sentencing</u>

The violation of 18 U.S.C. § 1956(h) alleged in Count One of the Information to which Beckstead agrees to plead guilty carries a statutory maximum prison sentence of twenty years and a statutory maximum fine equal to the greater of:  (1) $500,000; or (2) twice the gross amount of any pecuniary gain that any persons derived from the offense.

The violation of 26 U.S.C. § 7206(2) charged in Count Three of the Information to which Beckstead agrees to plead guilty carries a statutory maximum prison sentence of three years and a statutory maximum fine of not more than $100,000, together with the costs of prosecution. Beckstead may be subject to an alternative statutory maximum fine pursuant to 18 U.S.C. § 3571 equal to the greatest of: (1) $250,000; (2) twice the gross amount of any pecuniary gain that any persons derived from the offense; or (3) twice the gross amount of any pecuniary loss sustained by any victims of the offense.

The sentences for Counts One and Three may run consecutively.  Fines imposed by the sentencing judge may be subject to the payment of interest.

The sentence to be imposed upon Beckstead is within the sole discretion of the sentencing judge, subject to the provisions of the Sentencing Reform Act, 18 U.S.C. §§ 3551-3742, and the sentencing judge's consideration of the United States Sentencing Guidelines.  The United States Sentencing Guidelines are advisory, not mandatory.  The sentencing judge may impose any reasonable sentence up to and including the statutory maximum term of imprisonment and

the maximum statutory fine. This Office cannot and does not make any representation or promise as to what guideline range may be found by the sentencing judge, or as to what sentence Beckstead ultimately will receive.

Further, in addition to imposing any other penalty on Beckstead, the sentencing judge: (1) pursuant to 18 U.S.C. § 3013, will order Beckstead to pay an assessment of $100 per count ($200 total), which assessment must be paid by the date of sentencing; (2) with respect to both counts, must order Beckstead to pay restitution pursuant to 18 U.S.C. § 3663 *et seq.* and; (3) pursuant to 18 U.S.C. § 3583 may require Beckstead to serve a term of supervised release for each count of conviction of (a) not more than three years for Count One of the Information; and (b) not more than one year for Count Three of the Information, which terms will begin at the expiration of any term of imprisonment imposed. Should Beckstead be placed on a term of supervised release and subsequently violate any of the conditions of supervised release before the expiration of its terms, Beckstead may be sentenced to: (a) not more than two years' imprisonment for Count One of the Information; and (b) not more than one year for Count Three of the Information, which terms are in addition to any prison term previously imposed regardless of the statutory maximum term of imprisonment set forth above and without credit for time previously served on post-release supervision, and may be sentenced to an additional term of supervised release.

Rights of This Office Regarding Sentencing

Except as otherwise provided in this agreement, this Office reserves its right to take any position with respect to the appropriate sentence to be imposed on Beckstead by the sentencing judge, to correct any misstatements relating to the sentencing proceedings, and to provide the sentencing judge and the United States Probation Office all law and information relevant to sentencing, favorable or otherwise. In addition, this Office may inform the sentencing judge and the United States Probation Office of: (1) this agreement; and (2) the full nature and extent of Beckstead's activities and relevant conduct with respect to this case.

Stipulations

This Office and Beckstead agree to stipulate at sentencing to the statements set forth in the attached Schedule A, which hereby is made a part of this plea agreement. This agreement to stipulate, however, cannot and does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties. To the extent that the parties do not stipulate to a particular fact or legal conclusion, each reserves the right to argue the existence of and the effect of any such fact or conclusion upon the sentence. Moreover, this agreement to stipulate on the part of this

- 3 -

Office is based on the information and evidence that this Office possesses as of the date of this agreement. Thus, if this Office obtains or receives additional evidence or information prior to sentencing that it determines to be credible and to be materially in conflict with any stipulation in the attached Schedule A, this Office shall not be bound by any such stipulation. A determination that any stipulation is not binding shall not release either this Office or Beckstead from any other portion of this agreement, including any other stipulation. If the sentencing court rejects a stipulation, both parties reserve the right to argue on appeal or at post-sentencing proceedings that the sentencing court was within its discretion and authority to do so. These stipulations do not restrict this Office's right to respond to questions from the Court and to correct misinformation that has been provided to the Court.

<u>Waiver of Appeal and Post-Sentencing Rights</u>

As set forth in Schedule A, this Office and Beckstead waive certain rights to file an appeal, collateral attack, writ, or motion after sentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255.

<u>Restitution</u>

Pursuant to 18 U.S.C. §§ 3663(a)(3) and 3663A(b)(1)(B), this Office and Beckstead agree that Beckstead shall pay restitution for all losses resulting from the offense of conviction charged in Count One of the Information in such amounts as the parties will agree or, if no agreement can be reached, the Court shall determine following an evidentiary hearing. Beckstead understands and agrees that the losses and restitution computed may exceed the loss amount agreed upon by the Government for purposes of the advisory Sentencing Guidelines computation, and the Government is permitted to provide the Court with information about the loss and restitution that will exceed the figures reflected in the negotiated, agreed-upon range reflected in Schedule A used to determine Beckstead's advisory guidelines range of imprisonment.

In addition to the foregoing, and pursuant to 18 U.S.C. § 3663(a)(3), Beckstead agrees to pay restitution to the Internal Revenue Service ("IRS") based on the offense conduct charged in Count Three of the Information in an amount to be determined prior to the date of sentencing. Beckstead understands and agrees that this figure does not include interest under 26 U.S.C. § 6601, which will be assessed by the IRS pursuant to Title 26. Beckstead agrees that the total amount of restitution reflected in this Agreement results from his criminal conduct. The restitution amount is based upon the total amount of loss associated with tax returns prepared on behalf of Matthew Goettsche for calendar years 2017 and 2018 and shall be paid according to a payment plan

established by the Court. If the Court orders Beckstead to pay restitution to the IRS for aiding and assisting in the preparation of a false tax return, either directly as part of the sentence or as a condition of supervised release, the IRS will use the restitution order as the basis for a civil assessment. *See* 26 U.S.C. § 6201(a)(4)(a). Beckstead does not have the right to challenge the amount of this assessment. *See* 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor Beckstead's timely payment of restitution according to that schedule will preclude the IRS from administrative collection of the restitution-based assessment, including levy and distraint under 26 U.S.C. § 6331.

If the Court imposes a schedule of payments regarding restitution, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods available to the United States to enforce the judgment.

Waiver of Appeal and Post-Sentencing Rights

As set forth in Schedule A, this Office and Beckstead waive certain rights to file an appeal, collateral attack, writ, or motion after resentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255.

Waiver of Venue

Beckstead agrees to waive and forego any and all challenges to venue in the District of New Jersey. Beckstead understands and agrees that the charges in the Information will be filed and adjudicated in the District of New Jersey. Beckstead further agrees not to assert in any appeal, motion or collateral attack, including a motion brought pursuant to 28 U.S.C. § 2255, any claim or argument challenging venue in the District of New Jersey to the charges in the Information, as set forth above.

Immigration Consequences

Beckstead understands that, if he is not a citizen of the United States, his guilty plea to the charged offenses will likely result in him being subject to immigration proceedings and removed from the United States by making him deportable, excludable, or inadmissible, or ending his naturalization. Beckstead understands that the immigration consequences of this plea will be imposed in a separate proceeding before the immigration authorities. Beckstead wants and agrees to plead guilty to the charged offenses regardless of any immigration consequences of this plea, even if this plea will cause his removal from the United States. Beckstead understands that he is bound by his guilty plea regardless of any immigration consequences of the plea. Accordingly, Beckstead waives any

and all challenges to his guilty plea and to his sentence based on any immigration consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction, or sentence, based on any immigration consequences of his guilty plea.

<u>Other Provisions</u>

This agreement is limited to the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities. However, this Office will bring this agreement to the attention of other prosecuting offices, if requested to do so.

This agreement was reached without regard to any civil or administrative matters that may be pending or commenced in the future against Beckstead. This agreement does not prohibit the United States, any agency thereof (including the Internal Revenue Service, the U.S. Securities and Exchange Commission, and Immigration and Customs Enforcement) or any third party from initiating or prosecuting any civil or administrative proceeding against Beckstead.

No provision of this agreement shall preclude Beckstead from pursuing in an appropriate forum, when permitted by law, an appeal, collateral attack, writ, or motion claiming that Beckstead received constitutionally ineffective assistance of counsel.

No Other Promises

This agreement constitutes the plea agreement between Beckstead and this Office and supersedes any previous agreements between them. No additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties.

Very truly yours,

PHILIP R. SELLINGER
United States Attorney

By:    Anthony P. Torntore
       Jamie L. Hoxie
       Assistant U.S. Attorneys

APPROVED:

/s/ Sean Farrell
_____

Sean Farrell
Chief, Cybercrime Unit

- 7 -

I have received this letter from my attorneys, Mary E. Toscano, Esq. and Thomas Ericsson, Esq., and I have read it. My attorneys and I have discussed it and all of its provisions, including those addressing the charges, sentencing, stipulations, restitution, and waiver. I understand this letter fully. I hereby accept its terms and conditions and acknowledge that it constitutes the plea agreement between the parties. I understand that no additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties. I want to plead guilty pursuant to this plea agreement.

AGREED AND ACCEPTED:


_____     Date: 1/18/2022
Gordon Brad Beckstead


I have discussed with my client this plea agreement and all of its provisions, including those addressing the charges, sentencing, stipulations, restitution, and waiver. My client understands this plea agreement fully and wants to plead guilty pursuant to it.


_____     Date: 1/18/22
Mary E. Toscano, Esq.


_____     Date: 1/18/2022
Thomas Ericsson, Esq.


- 8 -

Plea Agreement with Gordon Brad Beckstead

Schedule A

1. This Office and Beckstead recognize that the United States Sentencing Guidelines are not binding upon the Court. This Office and Beckstead nevertheless agree to the stipulations set forth herein, and agree that the Court should sentence Beckstead within the Guidelines range that results from the total Guidelines offense level set forth below. This Office and Beckstead further agree that neither party will argue for the imposition of a sentence outside the Guidelines range that results from the agreed total Guidelines offense level.

2. The version of the United States Sentencing Guidelines effective November 1, 2021 applies in this case.

Count One of the Information

3. The applicable guideline is U.S.S.G. § 2S1.1 because Count One of the Information charges conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h). U.S.S.G., App'x A.

4. Because Beckstead did not commit the underlying offense from which the laundered funds were derived, the base offense level is 8, plus the number of offense levels from the table in U.S.S.G. § 2B1.1. U.S.S.G. § 2S1.1(a)(2).

5. Specific Offense Characteristic U.S.S.G. § 2B1.1(b)(1)(K) applies because the value of the laundered funds was more than $9,500,000 but not more than $25,000,000. This results in an increase of 20 levels.

6. Specific Offense Characteristic U.S.S.G. § 2S1.1(b)(2)(B) applies because defendant was convicted under 18 U.S.C. § 1956. This results in an increase of 2 levels.

7. Specific Offense Characteristic U.S.S.G. § 2S1.1(b)(3) applies because the offense involved sophisticated laundering. This results in an increase of 2 levels.

8. Under U.S.S.G. § 3B1.2(b), a two-level decrease is appropriate because defendant was a minor participant in the underlying criminal activity.

9. The total offense level for Count One of the Information is 30.

Count Three of the Information

10.  The applicable guidelines are U.S.S.G. §§ 2T1.1 and 2T4.1, because Count Three of the Information charges a violation of Title 26, United States Code, Section 7206(2).  U.S.S.G., App'x A.

11. The parties agree that the combined tax loss for the relevant false returns in tax years 2017 and 2018 is greater than $9,500,000, but less than $25,000,000, corresponding to an Offense Level of 26 pursuant to U.S.S.G. § 2T4.1(K).

12.  The total offense level for Count Three of the Information is 26.

Grouping Analysis

13.  The parties agree that Counts One and Three of the Information group pursuant U.S.S.G. § 3D1.2(d).  Pursuant to U.S.S.G. § 3D1.3(b), the parties further agree that when the grouped counts are covered by different Guidelines, the offense guideline that produces the highest offense level should be applied.  Thus, the offense level is 30.

Acceptance of Responsibility

14.  As of the date of this letter, it is expected that Beckstead will enter a plea of guilty prior to the commencement of trial, will truthfully admit his involvement in the offenses and related conduct, and will not engage in conduct that is inconsistent with such acceptance of responsibility.  If all of these events occur, and Beckstead's acceptance of responsibility continues through the date of sentencing, a downward adjustment of 2 levels for acceptance of responsibility will be appropriate.  *See* U.S.S.G. § 3E1.1(a).

15.  As of the date of this letter, it is expected that Beckstead will assist authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting this Office to avoid preparing for trial and permitting this Office and the Court to allocate their resources efficiently.  At sentencing, this Office will move for a further 1-point reduction in Beckstead's offense level pursuant to U.S.S.G. § 3E1.1(b) if the following conditions are met:  (a) Beckstead enters a plea pursuant to this agreement, (b) this Office in its discretion determines that Beckstead's acceptance of responsibility has continued through the date of sentencing and Beckstead therefore qualifies for a 2-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and (c) Beckstead's offense level under the Guidelines prior to the operation of § 3E1.1(a) is 16 or greater.

Agreed Total Guidelines Offense Level

16. In accordance with the above, the parties agree that the total Guidelines offense level applicable to Beckstead is 27 (the "agreed total Guidelines offense level").

17. The parties agree not to seek or argue for any upward or downward departure, adjustment or variance not set forth herein. The parties further agree that a sentence within the Guidelines range that results from the agreed total Guidelines offense level is reasonable.

Waiver

18. Beckstead knows that he has and, except as noted below in this paragraph, voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results from the agreed total Guidelines offense level. This Office will not file any appeal, motion, or writ which challenges the sentence imposed by the sentencing court if that sentence falls within or above the Guidelines range that results from the agreed total Guidelines offense level. The parties reserve any right they may have under 18 U.S.C. § 3742 to appeal the sentencing court's determination of the criminal history category. The provisions of this paragraph are binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, if the sentencing court accepts a stipulation, both parties waive the right to file an appeal, collateral attack, writ, or motion claiming that the sentencing court erred in doing so.

19. Both parties reserve the right to oppose or move to dismiss any appeal, collateral attack, writ, or motion barred by the preceding paragraph and to file or to oppose any appeal, collateral attack, writ or motion not barred by the preceding paragraph.