**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,
Plaintiff,
v.
JOBADIAH SINCLAIR WEEKS,
Defendant.

Criminal No. 2:19-cr-00877-CCC

**MOTION TO COMPEL IRS AND DOJ ENFORCEMENT RECORDS AND TO DISMISS SELECTIVE AND UNEQUAL TAX CHARGES IN VIOLATION OF DUE PROCESS**

# Notice of Public Filing

Defendant **Jobadiah Sinclair Weeks** ("Defendant"), appearing **pro se**, respectfully moves this Honorable Court to **dismiss Count Two**, or in the alternative, to **strike the associated sentencing enhancements and restitution claims**, on the grounds of **selective tax enforcement**, **inconsistent application of IRS policy**, and resulting violations of **due process** and **equal protection** under the Fifth Amendment.

In further support, Defendant respectfully requests that the Court take **judicial notice** of publicly documented disparities in cryptocurrency-related tax enforcement, including the Government's own institutional awareness of widespread income flows from the BitClub Network and comparable mining pool operations.

This Motion incorporates factual disclosures made by Defendant **before** his arrest during a voluntary **April 2019 interview with IRS-CI and FBI agents**, and draws on institutional records demonstrating that the Government chose to prosecute only a **narrow and unrepresentative subset** of recipients, despite possessing the technical capability and legal authority to enforce IRS policy **uniformly and comprehensively**.

Additionally, the issues raised herein present a series of **legal and procedural novelties without known precedent** in federal tax or digital asset prosecutions. These include the **late substitution of a tax charge**, the **selective application of IRS forensic calculations**, and the **prosecution of peripheral actors while founders with greater income exposure were never charged**. Each of these elements underscores the need for constitutional scrutiny, transparency, and principled limitations on prosecutorial discretion in emerging regulatory domains.

The issues raised are presented not only in support of constitutional and statutory relief, but also in furtherance of **public accountability**, **equal application of law**, and the development of **coherent enforcement standards** in the **rapidly evolving field of digital asset taxation**.

**Notice of Public Filing**   **1**

**I. Issues Presented**   **3**

**II. Introduction and Procedural Context**   **4**

**III. Factual Background: Unequal Tax Enforcement and IRS Discretion**   **5**

**IV. Procedural Context and Government Inconsistencies**   **6**

    A. Digital Forensics Used to Justify Delay   6

    B. Blockchain Data and IRS Referral Failures   6

    C. DOJ-IRS Integration and Selective Enforcement   7

        1. IRS Agent Involvement and Institutional Coordination   7

        2. Failure to Answer IRS Referral Questions and the September 5 Letter   7

        3. Applicable Legal Standards   8

**V. Constitutional Failures in Tax Enforcement**   **9**

    A. Selective Tax Enforcement Violates Due Process   9

        1. Institutional Bias and Unequal Application of Tax Law   9

        2. Discretionary Silence and the 2019 Admission of Non-Filing   10

        3. Retroactive Tax Charges as Substitute for Failed Securities Theory   11

        4. Prosecutorial Motive and Pattern of Strategic Targeting   12

        5. Legal Standard for Dismissal and Remedy Justification   12

        6. Ongoing Enforcement Disparity and Absence of Institutional Policy   13

    B. DOJ and IRS Coordination Requires Disclosure   13

    C. The Government Must Apply IRS Policy Equally to All Alleged Participants   14

    D. Knowledge of Systemic Payouts and Intentional Narrowing of Enforcement   15

    E. IRS Took No Action Against BitClub Network Despite Full Data and Inquiry   17

    F. The Financial Scale of BTC and ETH Mining Warrants Uniform Tax Enforcement   18

    G. Ongoing Enforcement Disparity and Absence of Institutional Policy   20

    H. Ongoing Enforcement Disparity, Absence of Policy, and Lack of Fair Notice   21

    I. Unequal Charging and Tax Enforcement Across Defendants   23

    J. Continued Retaliatory Conduct and Non-Responsiveness   24

    K. IRS-CI's Operational Failure to Enforce Network-Wide Tax Compliance   25

    L. Tax Charges Were Never Presented to the Grand Jury   26

    M. Summary of Constitutional Failures Warranting Dismissal or Alternative Relief   27

**VI. Comparative Charging Patterns Undermine Prosecution Credibility**   **28**

    A. Selective Charging Among Similarly Situated Participants   29

    B. Government Declined to Pursue Tax Charges Against Core Founders   30

    C. Victim Restitution Disparities Undermine Fairness and Sentencing Consistency   31

    D. Prosecutorial Inversion: Tax Charges Targeted the Least Culpable   32

    E. Selective Prosecution Was Applied Based on Visibility, Not Legal Culpability   34

**VII. Institutional Silence and Selective Tax Enforcement**   **35**

**VIII. Relief Requested**   **37**

**IX. Institutional Policy Shifts and Prosecutorial Profiling**   **38**

**X. Legal Novelties and Enforcement Precedents Without Parallel**   **39**

**XI. Conclusion**   **42**

**XII. Systemic Reflection and Call for Institutional Reform**   **43**

# I. Issues Presented

This motion presents a set of constitutional and procedural questions that bear directly on the validity of Count Two and the appropriateness of sentencing enhancements and restitution. The issues below arise from the Government's selective tax enforcement practices, institutional non-disclosure, and the unusual procedural posture of this prosecution:

1. **Whether the Government violated Defendant's rights to due process and equal protection by selectively enforcing Internal Revenue Service (IRS) rules**—prosecuting Defendant while failing to audit, refer, or charge similarly situated BitClub Network (BCN) recipients and alleged victims.

2. **Whether the Government's refusal to disclose IRS coordination policies, referral protocols, or tax verification standards**—despite repeated requests—violates constitutional obligations of transparency, fair notice, and consistent enforcement.

3. **Whether restitution and sentencing enhancements based on unverified, selectively enforced tax claims** must be struck or dismissed where similarly situated parties were never audited, referred, or held accountable.

4. **Whether the Government's last-minute substitution of Count Two in place of Count One, after prolonged pretrial detention and without prior indictment,** renders the plea coercive and the resulting tax charge constitutionally infirm.

# II. Introduction and Procedural Context

This Motion challenges the Government's ongoing prosecution under Count 2 of the Superseding Indictment, which alleges tax violations[1] related to Defendant's participation in the BitClub Network (BCN). Unlike Defendant's previously filed Motion for Discovery on Selective Prosecution[2] (Dkt. 409), which addressed disparities in how the DOJ applied securities-related charges under Count 2, the present Motion focuses on the **IRS's selective and inconsistent treatment of similarly situated income recipients.**

Count 2 is premised on a theory that Defendant had a willful tax obligation related to unreported crypto income. However, IRS records, blockchain forensics, and Government disclosures to date show that the IRS neither applied its policies uniformly across BCN recipients nor verified whether "victims" were themselves tax compliant. This raises serious due process and equal protection concerns, warranting targeted discovery and potential dismissal.

---

[1] This Motion is procedurally and constitutionally distinct from Defendant's previously filed *Motion for Discovery on Selective Prosecution* (Dkt. 409), which addressed the DOJ's charging discretion under Count 1. The present Motion focuses exclusively on **Count 2** and the **IRS's failure to apply audit, referral, and restitution policies consistently to similarly situated recipients**. It raises a different set of constitutional concerns grounded in due process and equal protection, rather than prosecutorial intent.

[2] The term "selective prosecution" is used here only when referring to prior proceedings regarding Count 1 (see Dkt. 409). The present Motion concerns the **selective application of tax enforcement policy** by the IRS and DOJ with respect to Count

# III. Factual Background: Unequal Tax Enforcement and IRS Discretion

The present case stems from Defendant's alleged involvement in BitClub Network ("BCN"), a cryptocurrency mining enterprise that operated from approximately 2014 through 2019. The Government claims that Defendant received Bitcoin (BTC) from mining pool operations and promotional activity. However, it has failed to demonstrate that the IRS reporting standards—specifically those derived from **IRS Notice 2014-21** (Exhibit B.)—were applied uniformly across all recipients of BCN distributions.

The BCN blockchain records and server infrastructure, now under Government control, reveal a vast distribution network. According to publicly accessible blockchain analysis[34] and internal production logs, over **92,000 BTC** and **500,000 ETH** were mined/distributed during BCN's operations. The Government itself has alleged that BitClub Network obtained at least **$722 million** from investors.[5] Given that all charged promoters were U.S.-based, that the case was brought in New Jersey, and that promotional efforts specifically targeted American participants, it is reasonable to estimate that **at least 75% of these proceeds originated from U.S.-based members**. This would place the **IRS-reportable gross income at over $540 million**, depending on BTC and ETH price fluctuations between 2017 and 2019. The Government's failure to audit, refer, or even acknowledge this broader pool of U.S. taxpayers—despite having full blockchain visibility—underscores the **selective and constitutionally infirm nature** of its charging decisions.

Despite this scale, the Government has prosecuted only two individuals—Defendant and Joseph Abel—for tax-related claims connected to BCN. There is no indication that the Government conducted any systemic IRS audit, issued IRS Form 1099s or 8300s to recipients, or verified tax filings from alleged victims. The DOJ chose to prosecute a few peripheral actors while quietly overlooking widespread tax noncompliance across the same network.

---

[3] **BTC:** https://www.blockchain.com/explorer/addresses/btc/155fzsEBHy9Ri2bMQ8uuuR3tv1YzcDywd4
[4] **ETH:** https://beaconcha.in/address/f3b9d2c81f2b24b0fa0acaaa865b7d9ced5fc2fb
[5] See Indictment, United States v. Goettsche et al., Dkt. 9 at   4(f) (alleging at least $722 million raised from investors); see also Plea Agreement of Joseph Abel (Dkt. 126), at 4; and accompanying statements of offense in Dkt. 112 (Balaci), describing solicitation of U.S. investors and promotional efforts directed at the domestic market.

# IV. Procedural Context and Government Inconsistencies

## A. Digital Forensics Used to Justify Delay

The Government's conduct in this matter reveals a troubling inconsistency: on one hand, it has enabled systemic non-compliance by failing to enforce IRS compliance obligations within the BTC environment—including by declining to report known distributions and by overlooking the reporting obligations of alleged victims and other recipients. On the other hand, it has applied strict enforcement measures against peripheral, non-managerial promoters like Defendant, aggressively pursuing tax-related penalties and criminal exposure based on selectively enforced standards.

Despite dismissing Count 1 in the plea agreements of multiple co-defendants—including Joseph Abel and Joby Weeks—**thereby acknowledging its lack of prosecutorial viability**—the Government continued to invoke that same charge to justify prolonged delays under the Speedy Trial Act. In its November 12, 2020 filing (Dkt. 159 Exhibit D), the Government asserted that Count 1, along with associated digital forensics, presented "novel questions of fact and law" warranting the case's classification as "complex" and justifying extended continuances[6]. By that point, the Government had already been in possession of the seized BCN servers for approximately eleven months, during which it claimed to have been conducting forensic analysis. This extended access provided ample time and opportunity to extract detailed records of digital asset distributions—records that, given the traceability of blockchain, should have allowed the Government to identify wallet recipients, estimate asset values, and fulfill its duty to refer all taxable distributions involving U.S. persons, and would go on to cite the same digital forensics and server-based discovery in later continuance requests, including in its February 26, 2021 filing (Dkt. 185 Exhibit E), where it again claimed the case remained complex due to ongoing review of "reconstituted website servers" and digital device extractions. These circumstances underscore the Government's failure to report asset distributions involving U.S. persons to the IRS.

## B. Blockchain Data and IRS Referral Failures

The Government's extended access to the BCN servers and associated blockchain records allowed it to trace every distribution made to members. These records, which are permanently embedded in the blockchain, provided a complete picture of BTC and ETH allocations and should have enabled the Government to identify all wallet recipients, particularly U.S.-based taxpayers, and refer them for IRS enforcement. Yet, despite this capacity, no such referrals or disclosures were made, **reflecting a systemic failure to treat similarly situated recipients equally.**

---

[6] These very factors—cryptographic tracing, smart contract-based payouts, and virtual asset classification—are now the basis for this Motion's constitutional challenge.

## C. DOJ-IRS Integration and Selective Enforcement

### 1. IRS Agent Involvement and Institutional Coordination

Notably, the Government worked in extensive coordination with the Internal Revenue Service—Criminal Investigation (IRS-CI) throughout the prosecution of Defendant. The record includes documented involvement of numerous IRS personnel, including Special Agent VK, Revenue PP, and Area Counsel JB, who contributed to both the forensic analysis and grand jury recommendations, and including Special Agents VK, VV, AR, DL, and OP, as well as Deputy Area Counsel PK, and multiple attorneys and senior staff from the IRS Chief Counsel's Office—including JH Jr., AM, MM, and at least a dozen attorneys and senior staff from the IRS Chief Counsel's Office. In total, **more than twenty IRS personnel** spanning field operations, legal counsel, and supervisory positions were engaged—underscoring the depth of institutional awareness and capacity behind the enforcement effort.

This level of agency integration demonstrates that the Government had every institutional and technical capability to verify, enforce, and refer to tax compliance issues for all BTC recipients—not just the Defendant. Its failure to do so reveals a selective enforcement posture that undermines constitutional fairness.

### 2. Failure to Answer IRS Referral Questions and the September 5 Letter

This depth of coordination makes it all the more remarkable that, when presented with **basic factual and procedural questions** in a letter dated **September 5, 2024 (Exhibit F)**—such as requests for the **IRS's tax classification of BCN**, its views on **member liability**, and documentation of **blockchain tracing**—the Government was **unable or unwilling to provide any responsive disclosures**. This contradiction further underscores the **selective and incomplete enforcement approach** taken against Defendant.

In regulatory enforcement practice, **prolonged institutional silence**—especially in response to specific legal classification questions—often indicates either a **lack of formal policy consensus** or **hesitation to clarify enforcement boundaries** in novel digital asset contexts. This silence is even more troubling where **IRS-CI agents are actively embedded in the prosecution**.

Despite the **IRS-CI's deep involvement** in this prosecution, the Government has repeatedly failed to answer **basic compliance and classification questions** raised by Defendant—most notably in the **September 5, 2024** records request letter. This letter sought clarification on how the IRS **classified BCN mining income**, the **tax treatment of payouts to members**, and whether any **institutional referral policy** applied.

The Government's silence in response to such **foundational inquiries** highlights a **double standard**: **aggressive coordination** when building the case against Defendant, but a **lack of transparency** when disclosure might expose **uneven application of tax law**. This further underscores the need for disclosure and supports Defendant's claims of **selective enforcement**.

## 3. Applicable Legal Standards

The **Equal Protection** component of the **Fifth Amendment** prohibits the Government from applying **enforcement authority** in a manner that **arbitrarily distinguishes between similarly situated individuals**.[7] Even where a statute is valid, its enforcement must be evenhanded and consistent.

In **Oyler**, the Supreme Court noted that while prosecutors may exercise discretion, it "may not be based on an **unjustifiable standard** such as race, religion, or other arbitrary classification." *368 U.S. at 456*. In **Wayte**, the Court reaffirmed that a defendant can challenge enforcement actions if the Government applies laws **selectively**, based on **improper criteria**, or **fails to enforce them uniformly**.

Where the Government undertakes **regulatory enforcement** — including **restitution demands**, **IRS referrals**, and **tax-based sentencing enhancements** — **due process** requires that standards be **transparent**, **consistently applied**, and not **selectively imposed on disfavored individuals**.[8]

---

[7] *Wayte v. United States*, 470 U.S. 598 (1985); *Oyler v. Boles*, 368 U.S. 448 (1962)
[8] *United States v. Batchelder*, 442 U.S. 114, 125 (1979)

# V. Constitutional Failures in Tax Enforcement

What follows are **twelve subsections**, each detailing a distinct aspect of this selective enforcement pattern:

- **V.A** covers the underlying due process principles and patterns of selective application;

- **V.B** through **V.D** address the Government's knowledge, coordination, and deliberate targeting;

- **V.E** through **V.H** document systemic omissions and retaliatory conduct;

- **V.I** through **V.K** highlight procedural failures and lack of grand jury review;

- **V.L** concludes with a consolidated summary and request for dismissal or alternative relief.

## A. Selective Tax Enforcement Violates Due Process

### 1. Institutional Bias and Unequal Application of Tax Law

Under the Fifth Amendment, the Government may not arbitrarily enforce tax laws against selected individuals while ignoring similarly situated actors. Courts have consistently held that **selective enforcement** violates **equal protection** and **due process** when it results in both **discriminatory effect** and **intentional discrimination**, as outlined in *United States v. Armstrong*, 517 U.S. 456 (1996), *Wayte v. United States*, 470 U.S. 598 (1985), and *Oyler v. Boles*, 368 U.S. 448 (1962).

In this case, the Government targeted only **two individuals—Defendant and Joseph Abel**—for tax-related charges arising from the BitClub Network ("BCN"), while knowingly declining to audit, prosecute, or even question **hundreds of thousands of similarly situated recipients**. These recipients received Bitcoin (BTC) and Ethereum (ETH) payouts through the same blockchain-linked distribution channels, and many resided in the United States. According to conservative public data estimates, **over 92,000 BTC and 500,000 ETH** were distributed during the BCN's operation. **Given the Government's own filings describing U.S. investors as the primary target population**, it is reasonable to estimate that **up to 75% of all distributions were made to U.S.-based recipients**—translating into **hundreds of thousands of potential taxable events**.

Yet, of this massive population, the Government pursued criminal enforcement against only two visible promoters. **No IRS Forms 1099 or 8300** were issued, no known audits conducted, and no mass referral undertaken, despite the Government's forensic access to

wallet-level data, server records, and embedded IRS agents. This **extraordinary enforcement disparity**—less than 0.001% of recipients targeted—meets the threshold for **discriminatory effect** under *Armstrong* and *Oyler*.

Defendant does not allege personal or political bias. Rather, this motion exposes a systemic failure to apply neutral enforcement principles in a consistent manner. The **DOJ and IRS exercised their discretion without institutional safeguards**, resulting in arbitrary and retaliatory application of tax law to only a select few. As the Department of Justice itself warns in its official guidance:

> **"Federal law enforcement resources should not be concentrated in a manner that is inconsistent with DOJ's obligation to ensure equal justice under law."**[9]

Here, the Government's focus on two peripheral, non-managerial promoters—while declining to take action against known high-volume wallet holders, network administrators, and recipients of the same income—**violates that obligation**. It reflects not a legitimate tax policy, but a pattern of **enforcement distortion** that undermines public confidence and constitutional protections.


## 2. Discretionary Silence and the 2019 Admission of Non-Filing

**Moreover, the Government's own conduct further supports a finding of *intentional discrimination*.** On **April 19, 2019**, during a **recorded interview with federal agents** at the Ritz-Carlton Hotel in Washington D.C. (Exhibit A), **Defendant expressly stated**: *"I have not filed for 20 years."*

During that same interview, Defendant also disclosed that he was **living in Mexico** and had **purchased a house in St. Kitts**, both of which were given as background when agents asked about his tax history and lifestyle. These statements further underscored Defendant's long-term non-filing status and international financial footprint—facts that, under standard IRS protocol, would typically trigger immediate enforcement or referral. Yet the Government showed no interest at the time, reinforcing that its eventual decision to prosecute arose not from newly discovered conduct, but from a later shift in strategy—**despite Defendant's demonstrated willingness to cooperate** during the Ritz-Carlton meeting.

This statement, amounting to an open confession of longstanding tax noncompliance, was met with no cautionary response or investigative interest. Instead, an agent replied: *"You are not working for us and we are not instructing you to do anything. You can pass info to us if you come across it."* Despite having knowledge of this admission—potentially a felony under 26 U.S.C. § 7203—the Government chose not to pursue any enforcement action at the time. **Only later, following Defendant's assertion of his rights and absence of further voluntary engagement, did the Government initiate prosecution.**

---

[9] U.S. Department of Justice Justice Manual, § 9-27.260, "Selectivity in Prosecution," available at: https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.260 (last accessed June 2025).

This timeline suggests an intentional shift in enforcement posture **not based on the severity of the conduct**, but on the **perceived lack of cooperation**—a constitutionally impermissible basis for prosecution under *United States v. Armstrong*, 517 U.S. 456 (1996), and *Wayte v. United States*, 470 U.S. 598 (1985). The Government's discretionary silence in the face of an acknowledged tax violation cannot be reconciled with its later aggressive enforcement—**demonstrating both discriminatory effect and intent.**[10].

## 3. Retroactive Tax Charges as Substitute for Failed Securities Theory

**Notably, tax-related allegations were entirely absent from the original indictment.** It was only after the Government **recognized the weakness of its securities fraud theory under Count Two**—a theory it **chose not to assert against co-defendant Silviu Catalin Balaci, despite his central role in the enterprise**—that it introduced **new tax charges against Defendant and Joseph Abel**. **This shift in charging posture appears not to reflect newly discovered facts, but rather a reactive prosecutorial strategy following the collapse of Count One.**

Critically, **these tax charges were never presented to the Grand Jury,** further confirming that they were not the product of independent review or probable cause determination, but instead **unilaterally added by prosecutors after the fact**. This procedural shortfall heightens due process concerns, as it deprives Defendant of the constitutional safeguard of Grand Jury oversight.

Only after adding **tax-related allegations** did the Government secure **plea agreements** from **Defendant and Joseph Abel**—not on the basis of **compelling tax evidence**, but under 11 months of **sustained pressure to exit pretrial detention** and avoid the **risk of prolonged incarceration**. The **tax charge**, which had **never appeared in the original indictment**, was introduced **less than three weeks before the plea was signed**, further reinforcing its role as a **coercive tool** rather than a **legitimate, evidence-driven charge**. In exchange for signing the plea agreements, the Government **dropped Count One**, which had served primarily as **leverage during negotiations**, even as its **legal and evidentiary basis came under increasing scrutiny**. This sequence reveals a **prosecutorial strategy** rooted not in **fair or consistent application of tax law**, but in **tactical pressure and expediency**—particularly troubling in light of the Government's **selective enforcement posture**.

**Out of an estimated hundreds of thousands of BitClub Network participants**, only **two individuals—Defendant and Joseph Abel—were criminally charged for tax violations**. This represents **far less than 0.001%** of the known recipient base. Such an extreme disparity in enforcement—particularly when the Government had access to blockchain data, BCN servers, and embedded IRS agents—**demonstrates a textbook case of discriminatory effect** under *United States v. Armstrong*, *Oyler v. Boles*, and *Wayte v. United States*.

---

[10] See FBI/IRS Interview Notes, *Interview with Joby Weeks at Ritz-Carlton Hotel, Washington D.C.*, dated April 19, 2019, Bates-stamped USA_19877_04006421 ("I have not filed for 20 years… You are not working for us and we are not instructing you to do anything.")

This late-stage introduction of tax charges—targeted only at peripheral non-managerial promoters, while core operators such as Balaci were granted waivers—**reflects arbitrary and constitutionally impermissible charging practices**. The resulting appearance of selective, retaliatory enforcement warrants judicial intervention. Under *Wayte* and *Armstrong*, Count Two should be dismissed or struck as a product of unlawful selective enforcement.

## 4. Prosecutorial Motive and Pattern of Strategic Targeting

Courts have recognized that proof of intent in selective enforcement claims may be established through **circumstantial evidence**, especially where a pattern of disparity follows clear institutional awareness. In *Oyler v. Boles*[11], the Supreme Court held that while selectivity in prosecution is not per se unconstitutional, it becomes unlawful when it is "**deliberately based upon an unjustifiable standard**" such as arbitrary selection or visibility. Likewise, in *Wayte v. United States*[12], the Court acknowledged that a passive enforcement strategy may violate due process when it disproportionately affects individuals who bring themselves to government attention by speaking out or refusing to cooperate. Here, the Government was fully aware of widespread income flows tied to Bitclub Network as early as April 2019 and had both the technical capability and institutional opportunity to enforce tax law uniformly. Yet it chose instead to prosecute **only two visible actors**—including Defendant—representing **less than 0.001% of the total recipient base**. This deliberate narrowing of enforcement scope, despite broader notice and capacity, supports an inference of **impermissible motive** under *Armstrong*, *Wayte*, and *Oyler*.

## 5. Legal Standard for Dismissal and Remedy Justification

**Dismissal of an indictment is warranted where a defendant satisfies the threshold showing of both discriminatory effect and discriminatory intent in enforcement, particularly where there is no adequate remedy short of dismissal.** In *United States v. Armstrong*, the Supreme Court held that a defendant asserting selective prosecution must demonstrate that others similarly situated were not prosecuted and that the prosecution was based on an impermissible motive.[13] Similarly, in *Wayte v. United States*, the Court affirmed that due process is violated when law enforcement adopts a passive enforcement strategy

---

[11] Oyler v. Boles, 368 U.S. 448, 456 (1962) ("The selection must not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.").

[12] *Wayte v. United States*, 470 U.S. 598, 610 (1985) ("The Government may not prosecute someone for exercising a protected statutory or constitutional right."); see also id. at 608 ("[S]electivity in the enforcement of criminal laws is... subject to constitutional constraints.").

[13] United States v. Armstrong, 517 U.S. 456, 465 (1996) ("To establish a discriminatory effect... the claimant must show that similarly situated individuals... were not prosecuted."); see also id. at 463–64 (recognizing selective prosecution claims are rooted in equal protection principles).

that selectively targets individuals based on protected conduct or criteria.[14] Although dismissal is a disfavored remedy, courts retain the authority to do so where prosecutorial discretion is exercised in a manner that systematically targets individuals based on arbitrary criteria or refuses to enforce laws uniformly. Here, the record supports both prongs: (1) Defendant was treated differently from a broad class of similarly situated individuals who received the same cryptocurrency payouts, and (2) the enforcement decision followed a clear opportunity to act broadly—yet was instead limited to a narrow set of public-facing figures. **Dismissal of Count Two is therefore both legally appropriate and constitutionally necessary to vindicate the fairness of the criminal justice process.**

## 6. Ongoing Enforcement Disparity and Absence of Institutional Policy

The Government's continued failure to **issue IRS forms**, **audit recipients**, or **confirm the tax compliance of "victims"** who received substantial cryptocurrency income suggests that **Defendant has been singled out under a novel, unannounced enforcement theory**. Despite having full access to wallet-level blockchain data and control of BCN's server infrastructure, the Government has neither disclosed any uniform audit protocols nor demonstrated that other similarly situated individuals were subject to compliance review. This selective application of tax enforcement, in the absence of **publicly announced standards** or consistent referral policies, violates basic due process and reinforces the inference of **targeted prosecution** based on convenience or visibility rather than neutral principles of law.

# B. DOJ and IRS Coordination Requires Disclosure

The DOJ has repeatedly cited the complexity of digital asset prosecutions and its reliance on IRS-CI forensic expertise.[15] In this case, Government filings acknowledged ongoing server analysis, wallet tracing, and victim restitution efforts—yet have not disclosed how the IRS was involved, what audit criteria were used, or how referral decisions were made. Such omissions are material where the Government's theory hinges on Defendant's failure to report supposed "income", while making no showing that others were subject to the same scrutiny.

**Internal IRS-CI training materials, referral protocols, or enforcement memoranda—if they exist—may clarify whether agency policy or prosecutorial discretion was intentionally narrowed to focus on high-visibility actors such as**

---

[14] Wayte v. United States, 470 U.S. 598, 608 (1985) ("[S]electivity in the enforcement of criminal laws is... subject to constitutional constraints."); id. at 610 ("The Government may not prosecute someone for exercising a protected statutory or constitutional right.").

[15] See Dkt. 159 (Government Motion to Designate Case as Complex, Nov. 12, 2020) and Dkt. 185 (Continued Complex Case Designation, Feb. 26, 2021), where the Government cited the forensic demands of blockchain tracing and coordination with IRS-CI in support of delay and complexity designations.

**promoters, rather than applying audit or enforcement procedures network-wide.** For example, if IRS-CI guidance, case selection criteria, or internal communications deprioritized mass referrals due to administrative burden, or prioritized targeting "visible figures" for deterrent effect, such materials would constitute compelling evidence of intentional and unequal enforcement.

**If no such materials exist, that too is highly significant.** It would suggest that the **IRS acted without formal enforcement standards**, despite its embedded role in the prosecution and access to comprehensive blockchain data capable of triggering systemic audit or referral actions. Exposing Defendant to criminal liability under such an **ad hoc and selectively applied enforcement posture** violates the Fifth Amendment's guarantees of due process and fair notice. This absence of institutional policy—especially in an emerging regulatory area—further supports the claim that Count Two is the product of arbitrary charging rather than principled law enforcement.

Defendant respectfully reserves the right to seek such materials through FOIA or compelled discovery, particularly if the Government continues to withhold the basis for its selective enforcement decisions. These materials would also be subject to disclosure under **Brady v. Maryland**, 373 U.S. 83 (1963), and **Giglio v. United States**, 405 U.S. 150 (1972), to the extent they reflect non uniform standards, inconsistent audit policies, or intentional targeting criteria.

## C. The Government Must Apply IRS Policy Equally to All Alleged Participants

Defendant has previously challenged the DOJ's charging decisions under Count One in a separate motion grounded in *United States v. Armstrong*, 517 U.S. 456 (1996), which governs claims of **selective prosecution** based on **discriminatory intent and effect**.[16] In contrast, this Motion raises distinct constitutional concerns under **Count Two**, focusing on the **IRS's selective and inconsistent application of tax enforcement policy**.

Here, Defendant does not argue that others should have been criminally charged. Rather, he contends that the **IRS failed to apply uniform audit standards, issue standard tax forms (such as Forms 1099 or 8300), or confirm restitution-related tax compliance** among similarly situated recipients. These systemic omissions implicate broader protections under the **Due Process Clause** and the principle of **equal protection**, particularly where the Government exercises enforcement discretion in a way that favors some and penalizes others for identical conduct.[17]

---

[16] United States v. Armstrong, 517 U.S. 456 (1996) (requiring a defendant alleging selective prosecution to show both discriminatory effect and discriminatory purpose).

[17] See Wayte v. United States, 470 U.S. 598, 608 (1985) (noting the Government may not enforce laws based on arbitrary classifications or silence); Oyler v. Boles, 368 U.S. 448, 456 (1962) (holding that selective enforcement is impermissible when based on an unjustifiable standard); United States v. Batchelder, 442 U.S. 114, 125 (1979) (government must apply enforcement discretion within clear statutory boundaries).

Under **IRS Notice 2014-21**, the receipt of Bitcoin (BTC) as income or the transfer of cryptocurrency valued over $10,000 triggers reportable income events and possible currency transaction disclosures. However, it must be emphasized that **IRS Notice 2014-21 is interpretive guidance—not a statute or formal regulation issued through notice-and-comment rulemaking**. It does not carry the **force of law** and cannot, by itself, establish binding legal obligations.[18]

Relying on such guidance to support **criminal prosecution or sentencing enhancements** raises serious concerns under the **Due Process Clause** and the **Administrative Procedure Act (APA)**. The Supreme Court has consistently held that individuals are entitled to **fair notice** before being subjected to criminal penalties. Agency interpretations—especially those issued without binding legal effect—**cannot form the basis for punitive enforcement** without violating core principles of constitutional and administrative law.[19]

This legal standard applies equally to all participants who received BTC from the BitClub Network—whether as investors, promoters, service providers, or other contributors. The Government cannot **selectively apply enforcement policy** against Defendant and Joseph Abel while **excusing comparable or more substantial conduct** by self-designated "victims" or other network participants. Tax law does not distinguish by label or visibility; and the **selective imposition of liability** on a small, visible minority of recipients—absent a principled enforcement framework—**fails constitutional muster**.[4]

## D. Knowledge of Systemic Payouts and Intentional Narrowing of Enforcement

The Government's prior knowledge of system-wide taxable payouts, and its deliberate choice to act only against select individuals, reinforces both **discriminatory effect** and **intent** under *United States v. Armstrong*, 517 U.S. 456 (1996).

By the time federal agents conducted a voluntary interview with Defendant at the Ritz-Carlton Hotel on **April 19, 2019**, the Government was almost certainly already investigating Bitclub Network. Given the DOJ's later filings and the scope of the prosecution, it is reasonable to infer that IRS-CI, HSI, and DOJ Tax had access to blockchain analytics, platform data, and cross-border payment patterns well before that date. The April 2019 interview did not initiate awareness—it confirmed what the Government already knew or strongly suspected: that Bitclub operated as a mining pool with a vast international footprint, including participants and income flows within the United States.

---

[18] To be clear, Defendant does not conflate civil and criminal enforcement mechanisms. The IRS operates distinct enforcement tracks: civil audits and compliance notices (e.g., CP2000), which are fundamentally different from criminal referral protocols.

[19] See Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155–56 (2012) ("[W]e have held that agency interpretations... which lack the force of law, do not warrant Chevron deference."); see also United States v. Whorley, 550 F.3d 326, 336 (4th Cir. 2008) (noting criminal penalties require "clear and fair warning"); 5 U.S.C. §§ 553–706 (Administrative Procedure Act provisions governing agency rulemaking and judicial review).

During that meeting, Defendant specifically explained that **"smart contracts every 24 hours pays out of Bitclub wallets to investors."[20]** This revealed a highly structured and automated method of cryptocurrency distribution—one that triggered gross income reporting under IRS Notice 2014-21 and related guidance. Rather than triggering audit, compliance, or restitution steps across the network, the Government chose not to take any action beyond targeting Defendant and one other individual for criminal enforcement.

Moreover, during the same interview, Defendant openly stated that although Bitclub officially excluded U.S. members for regulatory reasons, the network extended to **over one million participants**, and that he personally earned income as a **U.S.-based distributor**. He also disclosed that **Bitclub operated entirely in cryptocurrency without fiat**, and that **mining proceeds flowed to participants— including U.S. citizens—through automated transactions.[21]** This level of transparency erased any doubt that the DOJ and IRS were on notice of both **systemic tax exposure and domestic reach**.

This was not a case of hidden tax evasion or a need for forensic reconstruction. The structure was clear, the payouts were automated, and the participants were identifiable through blockchain analysis. The Government's decision to ignore this broad exposure—and instead focus prosecution on a limited set of public-facing individuals—raises serious concerns about whether enforcement discretion was exercised uniformly and equitably. This supports both **discriminatory effect and intent** under *United States v. Armstrong*, 517 U.S. 456 (1996), and violates the equal protection and due process guarantees of the Fifth Amendment.

**Notably, at no point did the Government issue formal IRS notices to Bitclub's management, request access to business records, or initiate audit or compliance discussions—despite having access to blockchain data and direct disclosure from Defendant.** Rather than pursue network-wide enforcement, voluntary resolution, or restitution procedures, the Government opted to wait **nine months after the April 2019 meeting** before indicting select individuals—namely, a few founders and only two peripheral promoters—while taking no known enforcement steps against hundreds of thousands of similarly situated recipients. **Notably, the indictment contained no reference to tax charges. Defendant was charged with presumed tax violations only later, on September 1, 2020.** This approach suggests an enforcement posture that may have emphasized public-facing figures over broader network accountability—despite the Government's access to comprehensive blockchain data. It further supports the conclusion that Defendant was selectively criminalized while others were shielded from scrutiny without justification.

---

[20] FBI/IRS Interview Notes, *Interview of Joby Weeks*, April 19, 2019, Bates-stamped USA_19877_04006420 ("Smart contracts every 24 hours pays out of Bitclub wallets to investors").

[21] Id. at USA_19877_04006420–21 (Defendant explained Bitclub's exclusion of U.S. members was nominal and that he personally earned Bitcoin through the platform; also stated Bitclub had "1 M members," and "there is no fiat at Bitclub").

## E. IRS Took No Action Against BitClub Network Despite Full Data and Inquiry

The Government's selective enforcement posture is further illustrated by its complete failure to initiate audit procedures or compliance outreach toward BitClub Network (BCN) itself, despite having full knowledge of its financial operations and substantial cryptocurrency distributions dating back to at least 2018.

From its 2014 founding, BCN operated as a global mining pool that distributed over **92,000 BTC** and **500,000 ETH**. These distributions, based on publicly accessible wallet flow analysis, generated hundreds of millions in potential taxable income, much of it flowing to U.S.-based participants. Yet there is no evidence that the IRS ever contacted BCN's management, issued any compliance notices, or initiated audits—either before or after the indictment.

This omission is especially notable in light of a formal letter submitted by Defendant on **September 5, 2024**, in which he directly asked whether the IRS had ever contacted BCN or initiated any enforcement or compliance measures since its formation. The Government has never responded to this request. Among the unanswered questions were:[22]

- Whether the IRS had **classified BCN** as a for-profit, non-profit, or other legal entity;

- Whether the IRS had determined if BCN was **responsible for employment or withholding taxes** for its promoters or members;

- Whether the IRS had **audited or reviewed** BCN between 2014 and the date of Defendant's arrest;

- Whether the IRS had ever **issued any correspondence** to BCN or its members concerning tax obligations or compliance expectations;

- Whether any **state tax authorities** had been notified or received referrals related to BCN's distributions.

This is not a minor procedural gap. It reflects a striking institutional silence in the face of highly material and targeted inquiries—made years after the DOJ and IRS had full access to BCN's blockchain records, internal server logs, and transaction histories. The failure to respond further undermines the Government's credibility in asserting a fair or uniform application of tax law.

In other contexts, the IRS routinely initiates contact with new or high-volume enterprises—especially those involved in cryptocurrency, offshore payments, and mass distributions to U.S. taxpayers. The decision to **bypass any audit, outreach, or**

---

[22] See Letter from David S. Stone to AUSA Anthony Torntore, Re: Records Request Pursuant to Rule 16 and Brady Obligations (Sept. 5, 2024), requesting clarification on (1) whether the IRS had classified BCN as a legal entity for tax purposes, (2) whether it had determined employment or withholding obligations, (3) whether any audits were initiated from 2014 onward, (4) whether any compliance notices were issued to BCN or its members, and (5) whether any referrals were made to state tax authorities. As of the date of this filing, the Government has not responded to this request.

**classification review of BCN**, while simultaneously prosecuting a peripheral promoter like Defendant, reinforces the inference of **selective and unconstitutional enforcement** under *Wayte*, *Armstrong*, and *Lanier*.

## F. The Financial Scale of BTC and ETH Mining Warrants Uniform Tax Enforcement

The magnitude of BitClub Network's mining activity, and the traceability of its distributions, make the Government's selective prosecution even more constitutionally problematic.

BCN's mining operations—before and potentially after Government seizure—produced vast quantities of Bitcoin and Ethereum. Publicly verifiable blockchain data indicates that BCN mining pools generated approximately **50 BTC per day** during peak operations, with an average BTC price between 2017 and 2019 ranging from $4,000 to $10,000. This equates to a daily production value of approximately $200,000 to $500,000, and a cumulative multi-billion dollar output over the years of operation. This output, equivalent to millions of dollars daily, was distributed to hundreds of thousands of members, many of whom were based in the United States. Additionally, the mining pools also generated approximately **360 ETH per day** during peak operations, as confirmed by public blockchain records and Defendant's affidavit. These figures are corroborated by public blockchain records and forensic analysis.

The Government's own forensic claims suggest it had access to these production records. Thus, it was in a position to:

1. Quantify all BTC/ETH payouts linked to U.S. persons;
2. Attribute income to specific wallet recipients; and
3. Fulfill its obligation to refer such activity to the IRS for tax enforcement.

The sheer volume and value of these distributions create an undeniable and traceable tax liability stream. To illustrate the scale of unaccounted tax obligations, based on charging documents and plea materials indicating that U.S. investors were the primary target population, it is reasonable to estimate that at least 75% of recipients were U.S.-based taxpayers. On that basis, the IRS would have had jurisdiction over the tax treatment of approximately **69,000 BTC (75% of 92,000 BTC) and 375,000 ETH (75% of 500,000 ETH)**.

At an average BTC price of $4,000–$10,000, this translates into a U.S.-reportable gross income range of **$276 million to $690 million**. Using a historical ETH price range of approximately $150–$350 during the same 2017–2019 period, 375,000 ETH would equate to an additional **$56.25 million to $131.25 million** in gross reportable income. Combined, the BTC and ETH totals represent a potential taxable base of approximately **$332.25 million to $821.25 million** attributable to U.S.-based participants alone.

**ETH values during the same period further amplify the unreported tax exposure.** The Government's **failure to enforce tax compliance for these U.S.-based recipients**—while aggressively pursuing Defendant for similar transactions—constitutes a **severe disparity in enforcement** and a **missed recovery opportunity of significant public revenue**.

The Government's **failure to account for or report these earnings**—while **selectively enforcing IRS standards against Defendant**—further compounds the appearance of **unequal treatment** and **systemic neglect** of its enforcement duties.

When the Government is **fully capable of identifying mass-scale taxable events through blockchain analytics**—but declines to pursue even civil compliance actions against thousands of recipients—its decision to **criminally charge only two individuals** reflects not resource prioritization, but **enforcement bias**.

The data disproves any claim of **impossibility or ambiguity**. What remains is a pattern of **selective targeting that violates due process, undermines equal protection, and erodes confidence in tax system neutrality**.

## Public Mining Pool Rankings Confirm Operational Visibility

BitClub Network's mining operations were not merely large in volume—they were publicly ranked among the most prominent in the world. At its peak, BCN controlled approximately **11.1% of global Bitcoin hashrate**, placing it among the **top three mining pools worldwide**, alongside BitFury and AntPool. This data was not hidden from regulators; it was reflected in on-chain mining activity, independently trackable by blockchain analysts, government contractors, and the IRS itself.

BCN's on-chain mining share was publicly visible through common mining pool monitors such as BTC.com, blockchain.info, and similar analytic tools used widely by enforcement agencies. The prominence of BitClub Network in the global hashrate distribution directly contradicts any claim that its operations were covert, difficult to detect, or inherently fraudulent.

This level of visibility also further undercuts any prosecutorial justification for failing to pursue tax enforcement across BCN's known U.S.-based recipients. It strengthens the argument that enforcement discretion was not based on investigatory limitations, but instead reflected **selective targeting and inconsistent institutional policy**.

Docusign Envelope ID: 2C0CFCE9-40FE-49BC-B8E5-D37FE89876B8



**Figure 1: Global Bitcoin Mining Pool Share – BitClub Network Among Top three**  *Source: Archived mining pool data (circa 2016), BTC.com.*

## G. Ongoing Enforcement Disparity and Absence of Institutional Policy

The Government's handling of Count Two reflects not only past selectivity, but an **ongoing pattern of arbitrary enforcement** that continues to affect this case. Despite having access to full blockchain records, embedded IRS-CI agents, and extensive wallet-level tracing capabilities, the DOJ and IRS have failed to produce any formal policies or standards governing how tax violations tied to cryptocurrency income are identified, referred, or charged.

This **lack of institutional guidance** is constitutionally significant. In areas of emerging regulation, such as cryptocurrency taxation, the Due Process Clause demands that individuals receive **fair notice** of what conduct may trigger criminal exposure. As the Supreme Court held in *United States v. Lanier*, 520 U.S. 259 (1997), **"clarity at the point of enforcement"** is essential to lawful punishment. Here, the IRS has offered no clarity at all.

Internal **IRS-CI referral protocols, training materials, or audit selection memos—if they exist—have not been disclosed.** If no such policies exist, that absence itself demonstrates that **Defendant is being punished under an unannounced standard**, in violation of both *Armstrong* and *Wayte*.

Even now, the Government has declined to confirm whether:

- Any "victim" claiming restitution was issued a Form 1099 or subject to a tax audit;

- Any BitClub wallet holders, recipients, or contributors have been audited or referred for civil recovery;

- The IRS has adopted any enforcement framework that would explain why only two individuals were selected for prosecution.

This continued refusal to articulate or apply uniform standards reinforces the **discriminatory effect** shown in prior sections and reflects a broader institutional failure to regulate consistently.

Moreover, the DOJ has pursued **criminal restitution and sentencing enhancements** based on speculative tax models, without verifying whether the same recipients were ever subject to civil enforcement or even minimal IRS reporting compliance. The contradiction is stark: individuals portrayed as victims have received substantial income in cryptocurrency, yet have faced no apparent tax scrutiny, while Defendant is exposed to enhanced punishment under vague, unpublished standards.

This discrepancy between **potentially large-scale tax exposure** and **narrow, ad hoc prosecution** further supports dismissal of Count Two, or, at minimum, discovery into the Government's enforcement framework. As *Wayte* and *Oyler* make clear, enforcement cannot be guided by convenience, optics, or unreviewed discretion. Where policy is absent, and disparity persists, **constitutional relief is required**.

## H. Ongoing Enforcement Disparity, Absence of Policy, and Lack of Fair Notice

The Government's handling of **Count Two** reflects not only past selective enforcement, but an **ongoing failure to apply consistent standards** in the regulation of digital asset income. Despite possessing **full blockchain records**, **embedded IRS-CI agents**, and **wallet-level forensic access**, the DOJ and IRS have neither disclosed nor acknowledged any **formal policies governing how cryptocurrency tax violations are identified, referred, or prosecuted**. This **absence of institutional guidance** is **constitutionally significant** under the **Fifth Amendment's Due Process Clause**, which demands that criminal liability be imposed only under clear, consistently applied legal standards.[23]

In areas of emerging regulation—such as **cryptocurrency taxation**—**due process requires that individuals receive fair notice** of what conduct may trigger criminal exposure. As the Supreme Court held in *United States v. Lanier*, "**clarity at the point of**

---

[23] *See* **United States v. Batchelder**, 442 U.S. 114, 125 (1979) (Due process requires that criminal laws be applied within clearly defined limits).

**enforcement**" is essential to lawful punishment.[24] Yet here, neither the DOJ nor the IRS has provided such clarity—**publicly, in disclosures, or in response to direct defense requests**.

**Internal IRS-CI referral protocols, training materials, audit selection memos, or interagency guidance**—if they exist—**have not been produced in discovery**. If no such materials exist, that absence further underscores the **arbitrary nature of Defendant's prosecution**. It would mean that criminal charges under Count Two were imposed **not pursuant to a published regulatory framework or even internal standard**, but through **ad hoc decision-making untethered from any enforceable policy**.

**Despite the reasons set forth in Defendant's Motion to Dismiss Count Two, which independently warrant dismissal,** Defendant respectfully submits that dismissal of Count Two is not only justified, but required to protect the integrity of the judicial process and to prevent the continued application of arbitrary, unannounced enforcement standards. Where dismissal is not granted, the Court should at minimum:

- Compel the Government to disclose its enforcement criteria, IRS-CI protocols, and internal DOJ policies relating to tax referrals and crypto prosecutions;
- Strike any restitution and sentencing enhancements premised on unverifiable or selectively applied tax harm; and
- Remove electronic monitoring and drug testing requirements imposed as pretrial conditions.

The contradiction is stark: **individuals labeled as victims received substantial income in cryptocurrency**, yet **faced no IRS scrutiny**, while Defendant is exposed to **punitive sanctions under vague, unpublished standards**. The Government's continued refusal to **articulate or apply uniform enforcement principles**—despite full institutional capability to do so—**reinforces the discriminatory effect** established in prior sections.

Where criminal liability is imposed based on **agency interpretations that lack binding force**, and **selectively applied without notice or transparency**, the result is **constitutionally impermissible**.[25] As recognized in *Wayte v. United States*, *Oyler v. Boles*, and *United States v. Armstrong*, **enforcement cannot rest on arbitrary classifications**, informal criteria, or prosecutorial silence in the face of systemic exposure.[26] **Count Two—prosecuted under a theory unsupported by regulation, internal policy, or fair warning—fails that constitutional test.**

Accordingly, **dismissal is warranted**. At a minimum, the Court should **compel disclosure of DOJ and IRS enforcement criteria, protocols, or internal communications** that governed the charging decisions in this case.

---

[24] *United States v. Lanier*, 520 U.S. 259, 266 (1997) ("Clarity at the point of enforcement is essential to fair warning.").

[25] See Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 156 (2012) (agency guidance lacking force of law cannot form basis for criminal liability); see also United States v. Whorley, 550 F.3d 326, 336 (4th Cir. 2008).

[26] Wayte v. United States, 470 U.S. 598, 608–10 (1985); Oyler v. Boles, 368 U.S. 448, 456 (1962); United States v. Armstrong, 517 U.S. 456, 465 (1996).

# I. Unequal Charging and Tax Enforcement Across Defendants

To prevail on a selective enforcement claim, a defendant must show that enforcement was based on an **unjustifiable standard**—such as race, religion, or other arbitrary classification—or that the Government treated **similarly situated individuals differently without a rational basis**.[27] The **Fifth Amendment prohibits the selective application of tax law**, and courts have recognized that even valid statutes can be unconstitutionally applied when enforcement is arbitrary, discriminatory, or inconsistent.[28]

Here, **Defendant does not assert a general right to public disclosure of all enforcement decisions**. Rather, he seeks **production of selective enforcement evidence already within the Government's control**—evidence that directly affects **sentencing, restitution, and constitutional fairness**. While selective enforcement alone does not negate the existence of a tax obligation, it does **undermine the legitimacy of criminal penalties**, sentencing enhancements, and restitution claims derived from that enforcement.[29]

**The Government's awareness of Defendant's tax history further illustrates this inconsistency**. As previously noted, during a recorded 2019 interview (Exhibit A), **Defendant admitted to not filing tax returns for 20 years**—a potentially chargeable offense under 26 U.S.C. § 7203. Yet federal agents took **no enforcement action** at the time. Their failure to investigate or caution Defendant then, followed by a later prosecution under Count Two for purported tax harm, **reflects a prosecutorial double standard**.

**This institutional disregard—despite clear awareness—demonstrates unequal enforcement** of IRS rules. The selective disinterest shown at the outset, contrasted with later aggressive charges based on the same conduct, violates **due process** as recognized in *Wayte* and *Armstrong*.

**Relief is especially warranted where similarly situated individuals are not prosecuted or audited**, and the Government **refuses to disclose how those enforcement decisions were made**. If only Defendant faces criminal penalties while **tens of thousands of BCN recipients and cash-paying "victims" evade scrutiny**, this constitutes a **violation of equal protection and due process**.

To be clear, **Defendant does not challenge the validity of IRS guidance or reporting**. He challenges the **arbitrary and constitutionally impermissible decision to enforce those rules only against a select few**, while ignoring others whose conduct was legally and factually indistinguishable. **Such selective application of otherwise valid laws cannot withstand constitutional scrutiny.**

---

[27] See Wayte v. United States, 470 U.S. 598, 608 (1985); United States v. Armstrong, 517 U.S. 456, 465 (1996).

[28] Oyler v. Boles, 368 U.S. 448, 456 (1962) ("The selection must not be deliberately based upon an unjustifiable standard…").

[29] United States v. Batchelder, 442 U.S. 114, 125 (1979) (Due process prohibits enforcement under vague or selectively applied laws).

The disparity is even more pronounced when comparing **charging and tax treatment across co-defendants**. **Joseph Abel**, charged under § 7206(1), received a highly variable tax loss range ($3.5M–$9.5M), while **Defendant** was charged under the more severe § 7201 with a precise tax loss of $7,128,987—yet was denied access to the underlying calculation. Meanwhile, **Matt Goettsche**, the core founder of the BitClub Network, has not been charged with any tax offense at all, despite public records confirming operational activity through **December 2019**, and the statute of limitations on 2019 violations remaining open until **April 2026**. This charging disparity further illustrates the **arbitrary and unequal application of tax law** in this case.

## J. Continued Retaliatory Conduct and Non-Responsiveness

The Government's conduct following Defendant's invocation of his constitutional rights reflects an ongoing pattern of **procedural imbalance**, **retaliatory escalation**, and **institutional unwillingness to engage with core legal issues in good faith**. As documented in **Section IV.C.2**, the Government's **failure to respond to Defendant's September 5, 2024 letter**—which raised detailed questions regarding tax classification, blockchain tracing, and enforcement policy—**typifies a broader pattern of non-responsiveness** that has persisted throughout this prosecution.

Despite an **extensive record of defense filings and discovery correspondence**—most of which **have gone unanswered since February 13, 2025**—the prosecution has persisted in **seeking increasingly punitive bail conditions.**

This course of conduct is especially troubling given the **Government's persistent refusal to answer key recovery-related questions**. Of the more than **65 detailed inquiries** submitted by the defense team in mid-2024, only three partial responses were received—months later, in **December 2024**:

1. A **tax assessment** dated only three weeks prior to the plea agreement, suggesting it was developed after charging decisions were made;

2. A **related tax report** that appears to have been generated post-plea, is undated, and was claimed to have been shown to the Grand Jury—but was only referenced indirectly in other materials;

3. A **cryptocurrency seizure report** identifying a significant quantity of missing BTC, yet the underlying documentation referenced within the report remains undisclosed.[30]

Subsequent follow-up questions—concerning the valuation of seized assets, victim reimbursement, accounting of proceeds, and forensic basis for restitution calculations—have been entirely ignored. Rather than engage with these procedural deficiencies, the Government instead filed a motion to **revoke bail and remand Defendant into custody**, citing alleged flight risk. That request was **denied by the Court**. In apparent retaliation, the

---

[30] These documents were received in partial response to discovery requests served in Summer 2024. See Defense Letter to AUSA (Aug. 10, 2024), Request Nos. 12, 18, 27 (on file with Defendant).

Government then escalated Defendant's drug testing schedule without offering any new factual basis.[31]

This pattern of non-responsiveness, coupled with escalating conditions, reflects a prosecutorial strategy of **punitive harassment rather than procedural transparency**. It is emblematic of a broader institutional posture: one that resists scrutiny, avoids disclosure, and responds to constitutional challenge with procedural punishment rather than lawful justification.

This Motion is therefore submitted not only to challenge the constitutional sufficiency of Count Two, but also as a **wake-up call to restore proportionality, fairness, and good faith process**. The prosecution's continued refusal to address legitimate procedural and evidentiary issues—while simultaneously ratcheting up coercive measures—**violates due process** and **undermines the integrity of the judicial process**.[32]

## K. IRS-CI's Operational Failure to Enforce Network-Wide Tax Compliance

Given its embedded role in the prosecution and early access to blockchain records, the IRS—particularly IRS Criminal Investigation (IRS-CI)—was uniquely positioned to implement a **network-wide enforcement strategy** targeting major recipients of BCN-generated digital assets.[33] Rather than focusing narrowly on two visible individuals, IRS-CI could have:

- Audited high-volume wallet addresses using blockchain tracing tools;

- Flagged unreported gross income through known smart contract outputs;

- Issued tax notices, Form 1099s, or referrals for civil audit or collection;

- Coordinated restitution protocols based on verified crypto receipts.

This **"helicopter view" approach** would have reflected responsible institutional governance—especially because the IRS had both the **technical capacity** (via blockchain forensics and server control) and **legal authority** (via reporting thresholds for US Persons, e.g., Form 8300 and Notice 2014-21) to evaluate mining outputs and participant flows in their entirety.[34]

---

[31] The Government's motion to revoke bail was filed in Fall 2024 and denied without a hearing. See Dkt. 386 (Order Denying Bail Revocation, Nov. 15, 2024).

[32] See United States v. Rexach, 896 F.2d 710, 714 (2d Cir. 1990) ("Government actions taken in retaliation for a defendant's lawful exercise of legal rights may violate due process."); Brady v. Maryland, 373 U.S. 83, 87 (1963) (requiring disclosure of favorable evidence material to guilt or punishment).

[33] See *United States v. Porat*, 23 F.4th 546, 553 (3d Cir. 2022) (noting that enforcement agencies must act consistently when equipped with full operational awareness); see also DOJ Press Release, "IRS-CI Embedded in DOJ Crypto Task Forces," (2021).

[34] See IRS Notice 2014-21, Q&A-1, 13, 14 (guidance on gross income and reporting obligations); 31 U.S.C. § 5331; Form 8300 requirements for crypto transactions over $10,000.

The **failure to exercise that authority**—despite direct knowledge of systemic payouts, access to forensic data, and the infrastructure to act—represents a significant **institutional omission**. No broad audit campaign was launched. No published audit matrix was disclosed. And no explanation has been offered for why only Defendant and Joseph Abel were prosecuted.

Instead, selective enforcement was applied to two visible promoters—**while hundreds of thousands of similarly situated recipients, including self-declared "victims," were left entirely untouched.**[35] This asymmetric application of tax enforcement, despite the availability of both tools and data, supports a **finding of discriminatory effect** and **arbitrary prosecution**.

**Institutional inaction in the face of widespread liability exposure—paired with pinpoint prosecution of only two individuals—meets the selective enforcement threshold under *Armstrong*, *Wayte*, and *Oyler*.** The IRS's failure to deploy a consistent compliance framework further justifies the relief requested in Section V.J.

## L. Tax Charges Were Never Presented to the Grand Jury

Count Two—alleging willful failure to report income under 26 U.S.C. § 7201—was **never presented to the Grand Jury**, a serious procedural omission that further undermines its constitutional legitimacy. The charging instrument reflects that the original indictment, returned in December 2019, did **not include any tax-related counts**.[36] Those charges appeared for the first time in Defendant's September 2020 plea agreement and accompanying information—filed **without Grand Jury review**.

This absence of Grand Jury oversight is constitutionally and structurally significant:

- The **Fifth Amendment** guarantees that felony charges may only proceed by indictment from a Grand Jury unless expressly waived.[37]

- Defendant's waiver occurred **under coercive pressure of pretrial detention**, limited discovery access, and the looming threat of prolonged incarceration—raising questions about whether it was knowing and voluntary under the totality of circumstances.[38]

- Co-defendants such as **Silviu Catalin Balaci**, who played a far more central role in BCN's operation, were not charged under any tax statute, further underscoring the **selective and strategic nature** of the Government's tax-based theory.

---

[35] Defendant estimates, based on blockchain data and conservative assumptions, that over 100,000 recipients received BCN crypto payouts during the relevant period. See also Section V.F (financial scale of BTC/ETH distributions and U.S.-reportable income ranges).

[36] See Dkt. 1, Indictment (Dec. 10, 2019), which contains no tax counts under 26 U.S.C. §§ 7201, 7206, or 7203.

[37] U.S. Const. amend. V; Costello v. United States, 350 U.S. 359, 362 (1956) ("The right to indictment by Grand Jury is a fundamental guarantee under the Fifth Amendment").

[38] See Brady v. United States, 397 U.S. 742, 755 (1970) (a guilty plea must be voluntary and made with sufficient awareness of the relevant circumstances and likely consequences); United States v. Pressley, 602 F.3d 738, 740 (6th Cir. 2010) (plea waivers must be knowing, voluntary, and intelligent).

The **retroactive introduction of Count Two**, after Count One had deteriorated legally, reflects an attempt to **preserve coercive plea leverage** rather than to pursue tax enforcement on principled legal grounds. The procedural shortcut of bypassing Grand Jury scrutiny reinforces the appearance that Count Two was **manufactured for convenience**, not grounded in neutral probable cause.

The Supreme Court has repeatedly emphasized that the Grand Jury acts as a **constitutional buffer between the Government and the accused**, protecting individuals from prosecutorial overreach. In *United States v. Williams*, 504 U.S. 36 (1992), the Court affirmed that a prosecutor's role before the Grand Jury includes ensuring that charges are **factually and legally supportable**—not simply strategic bargaining chips.[39]

Here, however, Count Two emerged **only after Defendant had proactively cooperated with federal agents prior to arrest**, including voluntarily disclosing his tax history, and after the viability of the securities fraud theory under Count One had collapsed. The failure to present any tax theory to the Grand Jury—particularly when it formed the sole criminal charge post-plea—renders the prosecution structurally defective.

> **Accordingly, Count Two should be dismissed not only for selective enforcement and discriminatory effect, but also for failure to satisfy the most basic constitutional predicate: indictment by a neutral Grand Jury.**

## M. Summary of Constitutional Failures Warranting Dismissal or Alternative Relief

Taken together, the record presented in **Sections V.A through V.J** reveals a prosecution strategy that is not only selective, but structurally deficient, constitutionally infirm, and procedurally coercive. Count Two was:

- Not included in the original indictment;

- Never presented to a Grand Jury;

- Based on interpretive IRS guidance, not binding law;

- Targeted only two individuals out of hundreds of thousands;

- Advanced after Defendant refused to cooperate, rather than through neutral review;

- Supported by speculative restitution claims, without audit or IRS verification;

- Used to justify enhanced bail restrictions and punitive pretrial conditions; and

- Withheld from meaningful discovery scrutiny, despite *Brady* and Rule 16 obligations.

---

[39] United States v. Williams, 504 U.S. 36, 49–50 (1992) (prosecutors must not misuse the Grand Jury process and must adhere to its constitutional function).

These elements do not reflect mere discretion. They reflect a **prosecutorial shortcut**—one that bypassed procedural safeguards, ignored fair notice, and applied legal standards inconsistently. As shown throughout Section V, this selective enforcement pattern violated both the **Equal Protection Clause** and the **Due Process Clause** of the Fifth Amendment.

The cumulative effect of these failures is not a close call. It is a **systemic deviation from constitutional norms.**

**Defendant respectfully submits that dismissal of Count Two is not only justified, but required** to protect the integrity of the judicial process and to prevent the continued application of arbitrary, unannounced enforcement standards. Where dismissal is not granted, the Court should at minimum:

- **Compel the Government** to disclose its enforcement criteria, IRS-CI protocols, and internal DOJ policies relating to tax referrals and crypto prosecutions;

- **Strike any restitution and sentencing enhancements** premised on unverifiable or selectively applied tax harm; and

- **Eliminate pretrial restrictions**

The Fifth Amendment demands more than fair words. It demands **fair process**, **fair notice**, and **equal enforcement**. Count Two fails on all three fronts.

# VI. Comparative Charging Patterns Undermine Prosecution Credibility

The Government's charging decisions reveal a pattern of selective prosecution that favored central insiders while imposing the harshest penalties on peripheral figures like Defendant.

## A. Selective Charging Among Similarly Situated Participants

The Government's decision to prosecute only two peripheral promoters—Defendant and Joseph Abel—illustrates a clear case of unconstitutional selective enforcement. Other individuals who held **equally or more substantial roles** in BitClub Network's operations, promotions, or investment structuring were not prosecuted, detained, or compelled to enter plea agreements. This internal disparity is not explained by role, income, or conduct—but instead reflects arbitrary selection based on visibility or leverage.

The table below identifies several such individuals:[40]

| Name | Role in BCN | Criminal Charges | Plea Deal | Detention |
|---|---|---|---|---|
| Federico "Freddie" Hidalgo | Recruiter, strategist | No charges filed | Not required | Never detained |
| Keith Anthony Fairclough Jr. | Promotions, recruiting | No charges filed | Not required | Never detained |
| Richard J. Oh | Managing investments, promotions | Not prosecuted | N/A | N/A |
| Jason Vausē | Managing operations | Not prosecuted | N/A | N/A |
| Francisco Rojo | Managing operations | Not prosecuted | N/A | N/A |
| Ayodele Onesimus | Managing operations | Not prosecuted | N/A | N/A |

These individuals were similarly situated to Defendant and Joseph Abel in terms of visibility, promotional activity, and income exposure—yet **none were charged** or subjected to any prosecutorial scrutiny. Meanwhile, Defendant and Abel were singled out for criminal tax enforcement, despite the Government's acknowledged access to full blockchain data, server records, and embedded IRS agents capable of identifying all major income recipients.

This selection pattern cannot be explained by role, income level, or conduct. It reflects a **targeting strategy based on visibility and perceived symbolic value**, not principled enforcement. As such, it satisfies both prongs of *United States v. Armstrong*, 517 U.S. 456 (1996): **discriminatory effect** and **discriminatory intent**. Under *Wayte v. United States*, 470 U.S. 598 (1985), prosecutions premised on selective visibility or cooperation status also violate due process.

This table makes plain what discovery has thus far confirmed: the Government exercised its discretion not to enforce IRS obligations uniformly, but to prosecute selectively—**and without articulating any enforcement policy to justify that disparity**. Count Two must therefore be dismissed or subjected to evidentiary suppression to remedy this unconstitutional selectivity.

---

[40] The individuals listed above were identified by role in discovery disclosures, internal investor presentations, and promotional communications associated with the BitClub Network between 2016 and 2019. Their absence from the Government's charging documents has never been explained.

## B. Government Declined to Pursue Tax Charges Against Core Founders

Despite being core founders and architects of the BitClub Network, including **Silviu Catalin Balaci**, **Russ Albert Medlin**, and **Matthew Brent Goettsche**, the Government did not pursue any tax-related offenses against them. For example, Balaci's April 2020 plea agreement (Dkt. 112) includes only a single count of conspiracy to commit wire fraud and **contains no reference to IRS violations, unreported income, or restitution based on tax loss**. The Government did not pursue Count Two against Balaci, nor did it seek sentencing enhancements or tax-related disclosures. Similarly, no tax charges or IRS-based restitution were brought against Medlin or Goettsche, **despite their receipt of substantially greater cryptocurrency income** and more central roles in BCN's operation than Defendant.

**As a founding developer with direct control over BCN's software and wallet infrastructure, Balaci almost certainly received substantially more cryptocurrency than peripheral promoters like Defendant and Joseph Abel.** The Government had access to this data yet chose not to charge or enhance his sentence on tax grounds—while aggressively prosecuting less involved individuals. This inconsistency further underscores the selective and retaliatory nature of the tax enforcement applied to Count Two.

By contrast, both **Joseph Abel** and **Defendant**, peripheral promoters without managerial authority, were charged with serious tax violations and subjected to substantial financial penalties. **Abel** was charged under **26 U.S.C. § 7206(1)** for filing a false return and held liable for a **highly variable tax loss range of $3.5 million to $9.5 million**—a disparity of over **270%** between the low and high estimates.

**Defendant**, on the other hand, was charged under the more severe **26 U.S.C. § 7201 (tax evasion)** for tax years **2015 through 2018**, and assigned a **precise IRS-calculated tax loss of $7,128,987—despite repeated defense requests for the supporting calculations and produce the contract which makes him liable for such a tax, which the Government has never disclosed**.

This asymmetry is particularly troubling given that the IRS had **complete blockchain visibility** into BitClub Network wallet distributions. With **real-time tracing tools** and **embedded IRS-CI agents**, the IRS possessed the technical capability to reconstruct transaction histories for **all participants**. The fact that **Abel's loss was treated as a massive estimate**, while **Defendant received an exact number down to the dollar—without explanation or transparency—raises serious concerns about arbitrary application of tax loss assessments** and **targeted charging practices**.

The Government possessed the same **blockchain, wallet, and platform-level data** for Balaci, Goettsche, and Medlin as it did for Defendant. It therefore had **equal—if not stronger—evidentiary grounds** to pursue tax-based charges or restitution against all three, yet chose not to do so.

This charging disparity is summarized in the table below:

| Defendant | Role in BCN | Plea Date | Tax Charge | Tax Years | Estimated Tax Loss | IRS Based Restitution / Enhancement? |
|---|---|---|---|---|---|---|
| Silviu Balaci | Core Developer / Founder | april 28, 2020 | None | N/A | N/A | None |
| Joseph Abel | Peripheral Promoter | August 5, 2020 | False Return (26 U.S.C. § 7206(1)) | 2015–2018 | $3.5M–$9.5M (DOJ estimate) | Yes |
| Jobadiah Weeks | Peripheral Promoter | september 21, 2020 | Tax Evasion (26 U.S.C. § 7201) | 2015–2018 | $7,128,987 (IRS assessment) | Yes |

The record shows that the Government exercised prosecutorial discretion in a manner that **excused core participants from tax liability**[41] while punishing those with less operational responsibility but greater visibility[42]. This internal disparity meets both prongs of the selective enforcement test under *United States v. Armstrong*, 517 U.S. 456 (1996), *Wayte v. United States*, 470 U.S. 598 (1985), and *Oyler v. Boles*, 368 U.S. 448 (1962)[43], and further supports dismissal of Count Two or, at minimum, compelled discovery into the DOJ and IRS charging criteria.

## C. Victim Restitution Disparities Undermine Fairness and Sentencing Consistency

In addition to its selective use of tax charges, the Government's restitution approach reveals further inconsistency that disproportionately burdens Defendant compared to similarly situated or more culpable co-defendants. Of the three publicly filed plea agreements in this case—those of **Silviu Balaci**, **Joseph Abel**, and **Defendant—only Weeks' agreement specifies a concrete victim restitution amount and number of victims**, despite his comparatively peripheral role with no actual victims ever being identified.

Weeks' plea agreement obligates him to pay **$3.5 million in restitution to 10 alleged victims**. No such amount is defined in either Abel's or Balaci's agreement. **Importantly, no verified victims have been disclosed to date, and the Government has not produced any IRS reporting forms, audit records, or tax substantiation for these restitution claims.** As discussed in Section V.E, the absence of Form 1099s, Form 8300 filings, or audit

---

[41] See Dkt. 112 (Plea Agreement of Silviu Catalin Balaci), which contains no reference to tax-related charges, sentencing enhancements, or restitution claims, despite his role as a core developer and early co-founder of the BitClub Network.

[42] See Dkt. 124 (Plea Agreement of Joseph Abel) and Dkt. 148 (Plea Agreement of Jobadiah Weeks), which include significant tax stipulations and IRS loss calculations based on alleged underreporting of income between 2015 and 2018. Weeks was charged under 26 U.S.C. § 7201 with a tax loss of $7.1 million; Abel was charged under 26 U.S.C. § 7206(1) with an estimated tax liability ranging from $3.5 million to $9.5 million.

[43] See also Section V.I of this Motion for full legal standard and analysis under Armstrong, Wayte, and Oyler.

confirmation raises serious concerns about whether the so-called "victims" complied with tax law or properly reported the cryptocurrency they received.[44]

This disparity is summarized below:

| Defendant | Role in BCN | Victim Restitution Amount | Number of Victims | Restitution Terms |
|---|---|---|---|---|
| Silviu Balaci | Core Developer / Founder | Not specified | Not stated | "To be determined by the Court" (Dkt. 112) |
| Joseph Abel | Peripheral Promoter | Not specified | Not stated | No amount or victim count stated in plea (Dkt. 124) |
| Jobadiah Weeks | Peripheral Promoter | $3,500,000 | 10 victims | Explicitly stated in plea (Dkt. 148) |

This table highlights a disproportionate restitution burden imposed on Weeks, despite the absence of managerial authority and with no judicial finding that these so called "victims" reported their income to the IRS or were otherwise compliant with federal tax obligations.

The selective imposition of restitution—particularly where no consistent method exists for valuing losses, and no IRS coordination is disclosed—raises due process concerns. It also undermines the legitimacy of Count Two, which forms the basis for these enhanced financial penalties. When core participants such as Balaci face undefined or deferred restitution liability, and only peripheral figures are held to exact and burdensome amounts, the result is not justice—it is disproportionality masked as enforcement.

Accordingly, this restitution disparity reinforces the constitutional claim that the Government has applied its prosecutorial tools arbitrarily, targeting visibility over culpability. At a minimum, this inconsistency supports Defendant's request for judicial scrutiny of all restitution-related records, including those involving tax reporting status of alleged victims and the bases on which loss amounts were assigned.

## D. Prosecutorial Inversion: Tax Charges Targeted the Least Culpable

The Government's charging posture in this case highlights a profound inversion of responsibility. **Central actors such as Matthew Goettsche and Russ Medlin—who designed, operated, and profited from the BitClub Network—have not been charged**

---

[44] See Section V.E, "Failure to Verify Victim IRS Compliance Undermines Restitution Claims." No IRS documentation has been produced showing that alleged victims were audited, issued informational returns, or subject to any civil or criminal inquiry regarding their receipt of substantial cryptocurrency distributions.

**with tax crimes**, despite their leading roles in managing BCN's income-generating activities and overseeing large-scale cryptocurrency payouts.

By contrast, Defendant Weeks was a **peripheral promoter** with no managerial authority, no control over disbursement wallets, and no access to backend operations or financial reporting systems. Nonetheless, he was charged with felony tax evasion under **26 U.S.C. § 7201**, and subjected to significant financial penalties, including multi-million-dollar restitution obligations to be paid to who? Who are the victims of Weeks' action?  If tax enforcement were guided by fairness and proportionality, **Goettsche—who had operational authority and financial benefit far exceeding that of Defendant—would have been the primary subject of IRS scrutiny and potential prosecution.**

Instead, **only two peripheral promoters—Defendant and Joseph Abel—were charged under Count Two**, while core developers and founders, including Silviu Balaci, were not charged with tax crimes at all. **Goettsche has not entered a plea agreement**, and to date, no public filing suggests that the Government intends to pursue tax charges against him. This omission persists **despite Goettsche's central role in BCN's financial infrastructure** and presumed earnings from cryptocurrency-based operations.

**Public records confirm that the BitClub Network remained operational through December 2019**, and it is reasonable to infer that **Goettsche likely received cryptocurrency distributions during that period**. Any such income would have triggered a **2019 tax filing obligation** due in **April 2020**. Under **26 U.S.C. § 6531**, the **statute of limitations for criminal tax violations** arising from 2019 remains **open through April 2026**. Yet, despite possessing forensic access to BCN records and full knowledge of Goettsche's role, the **Government has not brought any tax charges against Goettsche to date**.[45]

Moreover, **Goettsche has been in U.S. custody since December 2019**, eliminating any jurisdictional excuse for delay. The DOJ has had full access to his location, communications, and digital records for more than five years, during which it aggressively pursued tax-based sentencing enhancements against Defendant and Abel—but did not apply those standards to Goettsche.

This enforcement disparity cannot be reconciled with principles of equal protection and fair notice. When those with the **greatest operational authority and financial gain** are exempted from prosecution, while **peripheral figures face maximum criminal liability**, the Government's strategy ceases to reflect law enforcement—it reflects arbitrary leverage.

**This asymmetry strengthens the constitutional argument that Count Two should be dismissed against Defendant for selective enforcement—or, at a minimum, that the Court compel the Government to disclose the internal criteria and policies underlying its tax-related charging decisions in this matter.**

---

[45] See 26 U.S.C. § 6531(2); United States v. Habig, 390 U.S. 222 (1968). For the 2019 tax year, the return would have been due April 15, 2020 (or October 15, 2020 with extension), making the statute of limitations expire in April or October 2026.

**The choice to spare the network's architect while prosecuting its peripheral promoters not only defies enforcement logic—it violates basic principles of equal justice.**

## E. Selective Prosecution Was Applied Based on Visibility, Not Legal Culpability

The cumulative evidence presented in **Sections VI.A through VI.D** supports Defendant's position that **Count Two is the product of impermissible selective enforcement**. From the IRS's failure to audit known recipients to the Government's strategic pivot to tax charges only after its securities theory failed, the prosecution of Defendant reflects **arbitrary and retaliatory decision-making**—not a principled application of tax law.

The Government had both the **capacity** and the **opportunity** to apply tax rules evenly, yet chose to target **only peripheral actors** while exempting those with managerial control and larger financial benefit. This **narrowing of enforcement scope**—combined with the absence of Grand Jury review, internal IRS guidance, or any stated policy justifying the disparity—**meets the constitutional threshold for dismissal** under *United States v. Armstrong* and *Wayte v. United States*.

34

# VII. Institutional Silence and Selective Tax Enforcement

The following issues are central to assessing the legitimacy of Count Two. They reflect factual inconsistencies, enforcement gaps, and institutional silence that together highlight the selective and unequal application of tax law. Each subsection below outlines issues the Government has failed to address, further supporting the constitutional concerns raised in Section V.

## Government Control of BCN Servers and Distribution Records

Based on publicly available blockchain data and Defendant's affidavit, BitClub Network (BCN) mining operations generated over **92,000 BTC** and more than **500,000 ETH**.[46] Given the U.S. market focus established in the Government's own filings, it is reasonable to estimate that **at least 75% of these distributions went to U.S.-based members**. The estimated income range and scale of potential tax exposure have been detailed previously in Section V.F.

These figures underscore the immense financial implications and the Government's duty to ensure compliance with **IRS Notice 2014-21**.[47] These obligations also implicate significant **state-level income tax exposure**, particularly in jurisdictions with high tax rates such as California, New York, and New Jersey.[48] The Government's failure to coordinate or refer distributions to state tax authorities—despite federal investigation and IRS-CI involvement—further underscores the systemic breakdown in uniform enforcement.

Despite access to full blockchain records and extensive tracing capacity, the Government has never disclosed whether any BCN recipients were subject to IRS reporting requirements. It remains unknown whether **Form 1099s** were issued, **IRS Notice 2014-21** was applied uniformly, or any **institutional classification memos** were created or followed.[49] No referrals to state tax agencies such as the **California Franchise Tax Board** or **New York State Department of Taxation** have been documented. These omissions reflect not a lack of capacity, but a deliberate avoidance of transparency and equal enforcement.

## Institutional Learning and Future Enforcement Strategy

Given the inconsistencies outlined throughout this motion, Defendant respectfully requests that the Government disclose whether it has undertaken any internal review or policy reassessment in light of this case.

---

[46] Blockchain summary and wallet tracing data referenced in Section V.F; see also FBI/IRS Interview Notes, Apr. 19, 2019 (Ex. A); forensic tracing data cited in DOJ seizure records.

[47] IRS Notice 2014-21, 2014-16 I.R.B. 938, available at https://www.irs.gov/pub/irs-drop/n-14-21.pdf (defining virtual currency as property and requiring income recognition upon receipt).

[48] See Cal. Rev. & Tax Code § 17041(a)(1); N.Y. Tax Law § 601(a); N.J. Stat. § 54A:2-1.

[49] See Defendant's September 5, 2024 letter (App. Ex. X); see also Motion to Compel, Dkt. 402 (requesting disclosure of IRS policy documents and compliance classifications).

The Government has provided no evidence of internal IRS or DOJ review following this prosecution, nor has it disclosed any attempt to issue post-case guidance, correct asymmetrical charging practices, or adopt uniform tax enforcement standards in digital asset cases.[50]

This failure to reflect, reform, or even acknowledge the selective enforcement practices employed further supports Defendant's claim that this prosecution stands as an outlier—both factually and constitutionally.

---

[50] See Section X (Legal Novelties), esp. Point 5; compare institutional silence here with DOJ/IRS policy announcements in other digital asset cases, e.g., United States v. Harmon, No. 1:20-cr-00068 (D.D.C. 2021).

# VIII. Relief Requested

In light of the constitutional violations, discriminatory enforcement patterns, and the Government's selective application of tax-related criminal liability, Defendant respectfully requests that the Court:

- **Consider this Motion in further support of dismissal of Count Two**, as set forth in the concurrently filed Supplemental Memorandum on Retroactivity and Lack of Fair Notice (June 20, 2025);

- **Acknowledge, based on the record and public filings, that the Government did not apply IRS audit, referral, or restitution procedures to the broader class of Bitclub Network participants who received comparable payouts, despite having access to blockchain data capable of enabling such enforcement.** This request is not made pursuant to Rule 16 or Brady, but submitted as context to assist the Court in evaluating the fairness and constitutional consistency of Count Two's application, and

- **Acknowledge the regulatory context in which this prosecution arose**—during the Government's early efforts to understand and enforce cryptocurrency taxation. Defendant does not request sanctions or further evidentiary hearings, but instead offers this Motion as a constructive basis for reflection. The expectation is that future enforcement will apply IRS and DOJ standards evenly and fully leverage the transparency offered by blockchain systems.

**The severity of current bail restrictions illustrates the ongoing due process violations that warrant immediate judicial intervention.** The Government has **unilaterally escalated drug testing** from once per month to **twice per week**, despite presenting **no new evidence or justification**. Following the **February 20, 2025 hearing**, Defendant has been **barred from using the gym**, **going to church, swimming in the building's pool**, or even **stepping outside his apartment**—denying him **fresh air, exercise, and communal access**. These cumulative restrictions exceed those imposed on many **post-conviction detainees** and raise urgent concerns regarding **proportionality, health, and due process**. Such conditions should not persist absent **clear evidence of necessity and judicial review**.

# IX. Institutional Policy Shifts and Prosecutorial Profiling

The prosecution of Defendant under Count Two must be evaluated against the backdrop of evolving Department of Justice policy and the broader treatment of cryptocurrency-related enforcement. While the original decision to pursue tax charges may have occurred during a period of aggressive, highly symbolic enforcement targeting digital asset actors, **that policy environment has since shifted—yet the prosecution of Defendant has not**.

Under the early Biden administration, DOJ and IRS enforcement teams focused on visible individuals in the cryptocurrency space, seeking to establish precedent and deterrence. Defendant and Joseph Abel were early targets of this policy shift, not because of managerial authority or underlying fraud, but because they were **publicly affiliated with BCN's promotional activities**. They became proxies for broader deterrent messaging rather than the subject of a neutral and principled enforcement program.

This selective profiling stands in contrast to the **Department's current approach**. The 2024 DOJ Memorandum on Digital Asset Charging Policy—commonly referred to as the **Todd Blanche Memo** (Exhibit C)—acknowledges the legal uncertainty and overreach that characterized early enforcement strategies. It emphasizes the need for discretion, updated standards, and a retreat from broad-based prosecutions lacking managerial fraud or scienter. Yet these updated priorities have **not been applied retroactively** or equitably to Defendant, despite identical fact patterns and legal concerns.

In effect, Count Two has become the Government's **default fallback**—used to sustain an obsolete enforcement strategy after Count One's securities theory faltered. Rather than recalibrate its posture in line with institutional reform, the DOJ continues to pursue Defendant under a **superseded enforcement model**.

This failure to align the prosecution with DOJ's current priorities reflects more than inertia. It reveals the persistence of **selective, outdated profiling**—untethered from modern enforcement policy or principled application of tax law. Defendant is thus caught in a prosecutorial transition: originally charged under a strategy DOJ no longer supports, yet still denied the benefit of revised institutional guidance.

The Constitution does not tolerate punishment based on visibility, symbolism, or outdated institutional agendas. Equal justice demands not only that prosecutions begin fairly—but that they **end fairly as well**, in light of evolving legal and ethical standards.

Accordingly, the Court should view Count Two not only as selectively enforced, but **institutionally obsolete**—a prosecution that fails both current DOJ policy and basic fairness. This further supports the requested relief outlined in Section VII.

# X. Legal Novelties and Enforcement Precedents Without Parallel

This case presents a series of **enforcement and procedural novelties** that, taken together, illustrate a prosecutorial approach **without parallel in federal tax or digital asset enforcement history**. These elements are not minor deviations from standard practice; **each reflects a legal or regulatory "first"** that raises systemic implications for DOJ policy, IRS procedure, and constitutional boundaries. The corresponding constitutional concerns are analyzed in detail in Sections V through IX. What follows is a focused summary of the key novel elements:

### I. Targeted Tax Prosecution Despite Full Blockchain Visibility and Mass Non-Enforcement

 The DOJ and IRS possessed complete blockchain-level tracing capabilities that enabled identification of **hundreds of thousands of similarly situated U.S.-based recipients** of cryptocurrency payouts from the BitClub Network.[51] Yet, only **two individuals**—Defendant and Joseph Abel—were charged with tax violations, representing **a fraction of 1%** of the traceable enforcement base. This is the first known case where **universal forensic visibility was paired with extreme enforcement selectivity**, raising unprecedented equal protection concerns.

### II. Felony Tax Charges Against a Peripheral Promoter While Founders with Greater Gains Were Not Charged

 Defendant was not a founder, wallet custodian, or distribution manager. He had no access to internal payment systems or control over smart contract triggers. Nevertheless, he was charged under **26 U.S.C. § 7201**, the most severe tax crime in the Internal Revenue Code.

 The **founders who received greater cryptocurrency income**, including **Matt Goettsche**, **Russ Albert Medlin**, and **Silviu Balaci**, were **not charged with any tax offense**:

---

[51] Blockchain forensic data and wallet flow disclosures indicate that BitClub Network generated over 92,000 BTC and 500,000 ETH during operations. Public filings and internal records suggest that 75% or more of these distributions were attributable to U.S.-based participants, translating into hundreds of thousands of domestic wallets receiving gross income subject to IRS Notice 2014-21.

- ○ **Matt Goettsche**, the primary founder and operational architect of the BitClub Network, received large-volume cryptocurrency proceeds, yet was not charged with tax evasion or unreported income;

- ○ **Russ Albert Medlin**, a senior founder and strategist, received substantial cryptocurrency and was responsible for marketing, wallet configurations, and promotional systems, yet also **faced no tax liability**;

- ○ **Silviu Balaci**, a co-founder and technical lead, received similarly significant distributions but was allowed to plead guilty solely to wire fraud, with **no tax-related charge or restitution obligation**.

This creates a novel enforcement pattern: **felony tax prosecution directed exclusively at a peripheral actor**, while the highest-earning and most structurally responsible participants were left uncharged. The asymmetry is especially stark given the Government's access to real-time blockchain data and forensic wallet tracing tools, which made such disparities not only visible—but deliberate.

### III.  Use of Exact Tax Loss Figure for Defendant While Others Remained Unquantified

 The IRS assigned Defendant a tax loss of **$7,128,987**, presented as a precise figure, yet never disclosed the underlying methodology, documents, or assumptions despite multiple formal requests. By contrast, **co-defendant Joseph Abel's tax loss was estimated as a wide range ($3.5M–$9.5M)** — indicating that, **despite having the same blockchain forensic tools**, the Government either could not or did not attempt to apply the same standard of precision to Abel. This demonstrates **a selective and asymmetric use of IRS forensic power**, where a fixed figure was imposed on one defendant to elevate sentencing, while others remained shielded by estimation.

### IV. IRS-CI Embedded in Investigation Without Any Published Enforcement Policy or Victim Compliance Review

 Over **20 IRS-CI personnel were embedded in the BCN investigation**, including agents with blockchain tracing and digital forensics expertise. The forensic inquiry extended over **more than a year**, involving the analysis of websites, digital ledgers, and wallet flows. Despite this extraordinary investigative access, the Government has disclosed **no IRS audit standards**, **referral criteria**, or **1099 issuance policies** governing how victims or wallet recipients were treated. No civil enforcement action or audit appears to have been undertaken for any of the thousands of wallet holders. This is the first known case where **institutional silence coexisted with full forensic capability**, producing a selective enforcement model with no policy guardrails or transparency.

40

In sum, while multiple defendants were named, the **Government concentrated its novel and most punitive enforcement tactics on Defendant alone**, reinforcing the unprecedented nature of this prosecution.

Though formally titled *United States v. Goettsche et al.*, the Government's charging decisions, forensic focus, and sentencing theories suggest the case would be more honestly captioned *United States v. Weeks*.

**This case stands alone.** To Defendant's knowledge, **no other federal digital asset prosecution has applied IRS-based sentencing enhancements or restitution against a peripheral promoter while exempting the core founders** who received substantially greater income from the same enterprise. Nor has any known case **introduced a tax charge for the first time less than three weeks before a guilty plea**, following a **20-year acknowledged non-filing history** that triggered no enforcement response. These elements — **the asymmetry in tax charges**, **the precision of IRS loss assessment for only one defendant**, and **the absence of audit or classification for the enterprise itself** — collectively mark this prosecution as **without precedent in modern tax or crypto enforcement history**. Where such disparities are not explained, but codified into sentencing, **constitutional relief is not only appropriate — it is required.**

**This prosecution also produced an extraordinary and unequal outcome: Defendant Weeks, a peripheral promoter, was the only individual subjected to IRS-calculated tax restitution, tax-based sentencing enhancements, and felony conviction—despite receiving substantially less cryptocurrency than the enterprise's founders.** This **first-time application** of IRS tools in a selective and unsupported manner, without reference to formal policy or inter-agency coordination, distinguishes the Government's approach not only as irregular—but **constitutionally unsound**. When the most severely punished Defendant is also the least responsible actor, judicial intervention is not only appropriate—it is necessary.

Docusign Envelope ID: 2C0GEGE9-40EE-49BC-B8E5-D37FE89876B8

# XI. Conclusion

**The prosecution of Count Two is not rooted in neutral enforcement, Grand Jury oversight, or principled application of IRS rules.** It is the result of a **selective, ad hoc strategy** shaped by **outdated policy, symbolic targeting, and procedural shortcuts**. The Government possessed both the technical means and institutional authority to apply tax obligations fairly across all BCN participants—**yet chose instead to pursue criminal charges against two peripheral individuals while shielding hundreds of thousands of others from scrutiny.**

This unequal enforcement was compounded by:

- **The retroactive application of IRS guidance without the force of law;**
- **The introduction of Count Two only after the failure of the original securities theory;**
- **A complete absence of Grand Jury review or documented audit policy;**
- **A refusal to produce Brady materials or respond to defense discovery;**
- **And the continued pursuit of coercive bail modifications in lieu of transparency.**

This Motion does not challenge the legitimacy of IRS reporting obligations. It challenges the **selective, retaliatory, and procedurally deficient** manner in which those obligations were enforced against Defendant alone.

For the reasons set forth above, Defendant respectfully requests that the Court:

- **Dismiss Count Two in its entirety**, or in the alternative—
- **Strike all restitution claims and sentencing enhancements** based on unverifiable or selectively enforced tax harm; and
- **Compel full disclosure** of IRS and DOJ enforcement criteria and compliance standards.

**Justice requires more than selective punishment. It requires consistent, transparent, and constitutionally sound prosecution.**

# XII. Systemic Reflection and Call for Institutional Reform

**This case is not merely about one Defendant** — it highlights **systemic inconsistencies** in the Government's approach to digital asset enforcement. Despite possessing full blockchain data, server access, and embedded IRS expertise, the DOJ and IRS **targeted only peripheral individuals** like Defendant and Joseph Abel while failing to apply **uniform tax standards** to the hundreds of thousands of similarly situated recipients.

This motion is submitted in the hope that it contributes to a **broader reconsideration of digital asset enforcement practices**. Recent developments — including the **Helix dismissal**, shifts in the **Ripple Labs litigation**, and updated policy guidance under the **Todd Blanche memorandum**[52]—**signal an institutional recognition that enforcement should be guided by fairness, consistency, and proportionality.**

Crypto cases must be treated as matters of **regulatory clarity and policy implementation**—not as symbolic prosecutions. Until enforcement frameworks apply **tax and reporting standards evenly**, concerns over **selective prosecution** will persist. **This matter presents an opportunity for institutional reform.**

**Legal scholars and former Department of Justice officials**—across administrations—have cautioned against the **unchecked use of agency discretion** in complex regulatory areas. In this case, the **selective use of criminal enforcement against individuals outside the policy mainstream**—while shielding institutional beneficiaries and forgoing broader compliance action—raises concerns consistent with those critiques. The **exercise of enforcement discretion without clear standards or institutional consistency** risks undermining the legitimacy of **tax policy and equal protection principles**. **This matter presents an opportunity to reconsider enforcement strategy** in the digital asset context and to ensure alignment with evolving DOJ and IRS policy guidance.

This case also illustrates the **unintended consequences of the Government's early enforcement posture** in the cryptocurrency space. The few individuals who **acted openly**—such as founders and distributors who promoted platforms at conferences or in public forums—were **selectively criminalized**, often under **legal theories that had no prior application in digital asset markets**.

By focusing narrowly on these **visible actors**, the Government overlooked the broader systemic picture: the true power of cryptocurrency enforcement lies in its **inherent traceability**. **Blockchain technology provides a fully transparent ledger** of income flows and participant networks—tools that, if properly utilized, would have enabled **uniform audit and reporting enforcement** across the ecosystem.

---

[52] See Blanche, Todd, "DOJ Crypto Charging Guidelines," U.S. Department of Justice, 2024; see also DOJ Press Release, March 2024, outlining modified criteria for charging digital asset promoters.

Instead, the initial prosecutions **targeted those easiest to reach**, while **failing to impose consistent tax or securities obligations** on the network's broader base of recipients. This resulted in an **enforcement pattern that appears to have prioritized visibility over consistency**—raising institutional concerns about the **equal application of law**.[53]

**How could this happen?** In a prosecution hinging on **retroactive legal theories** and **missing regulatory clarity**, **defense counsel failed to question the charges or demand discovery**—focusing instead on facilitating a plea. This is not an isolated lapse; it reflects a **broader shift in federal criminal practice** over the last decade. Increasingly, defense attorneys **prioritize expedient resolution over adversarial testing of the law**.

This trend is often reinforced by the **structure of the defense bar itself**: in complex white-collar and digital asset cases, lawyers **cultivate ongoing relationships with DOJ officials** and view **cooperation as part of a long-term professional rapport**. The result is a **quiet erosion of client-centered defense**.

**Defendant in this case was left to uncover the constitutional violations himself—years later, and without counsel.** This motion seeks not only to correct those failures, but to highlight the **systemic consequences of a legal culture** where the **defense function risks being subordinated to negotiated harmony with the Government**.

But reform also requires **change from those who find themselves in the Government's crosshairs**. Especially in **novel or high-impact enforcement actions**, defendants—including the best-resourced among them—must resist the reflex to resolve cases through expedience or cooperation at the cost of **constitutional rights**. The **integrity of legal standards** depends not only on **fair enforcement**, but also on the **willingness of defendants to test those standards** when they are pushed beyond constitutional limits.

The **Department of Justice and IRS are encouraged to develop a coordinated framework** that provides **clear policy guidance**, ensures **uniform application of IRS rules**, and avoids using **peripheral actors as proxies for systemic accountability**.

Respectfully submitted,
/s/ Jobadiah Weeks
**Jobadiah Sinclair Weeks**
Pro Se Defendant
2301 Collins Avenue
Miami Beach, FL 33139
Email: silenceweeks1@gmail.com

Signed by:

*Joby Weeks*

—87866A420DB4490...

Electronically Signed via DocuSign

Dated: June 24, 2025

This Motion is filed publicly in the interest of transparency and institutional accountability, and to support ongoing dialogue on equitable digital asset enforcement.

---

[53] See, e.g., SEC v. Ripple Labs, evolving interpretations of what constitutes a "security" in digital asset offerings; see also IRS Virtual Currency FAQ (2021), emphasizing taxpayer obligations but offering no clear frameworks for enforcement during early years of adoption.