# Exhibit A

*Crypto Enforcement Process Failures: The BitClub Network Case Study & Institutional Audit* (June 15, 2025, prepared by Bradford Geyer, reviewed with the assistance of Professor Alan M. Dershowitz).

# THE EVOLUTION OF CRYPTO REGULATION AND DOJ ENFORCEMENT PRACTICES

# THE BITCLUB NETWORK PROSECUTION AS A CASE STUDY IN CHARGING DISCRETION AND INSTITUTIONAL PROCESS FAILURE

**A White Paper on Expansive Charging Theories, Selective Enforcement, and Regulatory Failure in Emerging Cryptocurrency Markets**

Prepared and Submitted by:

_____
Frederic E. Teboul
Bradford L. Geyer

Date: September 10, 2025

Foreword by Alan Dersowitz

**Contact Information:**

Bradford L. Geyer
Email: Brad@formerfedsgroup.com

Frederic E. Teboul
Email: ft1826@yahoo.com

1

I.  Executive Summary                                                                                         6

II. Policy Overview: Crypto Enforcement and DOJ Overreach                                                     8
   A. The Emergence of Crypto (2009–2013)                                                                     8
   B. The Rise of Crypto Enterprises (2013–2017)                                                              8
   C. The U.S. Government's Shift to Aggressive Enforcement (2017–2020)                                       9
   D. The Trump Administration Shift (2020–2021)                                                             10
   E. The Biden Administration Expansion (2021–2024)                                                         10
   F. Renewed DOJ Posture Under Trump (2025–Present)                                                         10

III. The Evolution of the U.S. Crypto Regulation (2009–2017)                                                 14
   A. 2009–2012: The Birth of Crypto and Regulatory Inattention                                              14
   B. 2013: FinCEN's Initial Money Transmission Guidance                                                     15
   C. 2014: IRS Issues Initial Virtual Currency Tax Guidance                                                 15
   D. 2015: CFTC Asserts Limited Commodity Jurisdiction                                                      16
   E. 2017: SEC DAO Report Introduces Securities Law Considerations                                          17
   F. DOJ Position: No Formal Criminal Enforcement Policies (2013–2017)                                      17
   G. Summary of Regulatory Evolution                                                                        19

IV. DOJ Charging Practices and Patterns of Discretion in Crypto Prosecutions                                 21
   A. DOJ Focused on Clear Fraud, Ponzi Schemes, and Traditional Financial Crimes                            21
   B. The Absence of Prior Criminal Prosecution of Mining Pools                                              21
   C. Inconsistent Treatment of ICOs, Token Offerings, and Crypto Startups                                   22
   D. The Expansion of DOJ's Conspiracy Model in BCN                                                         23
   E. DOJ's Charging Discretion and Selective Enforcement Implications                                       23

V. Case Study: The Prosecution of Jobadiah Weeks (U.S. v. Goettsche, et al.)                                 25
   A. Government Charging Theories and Overbroad Criminal Liability                                           25
   B. Comparative Enforcement: Selective Criminalization of BCN (2014–2017)                                  26
   C. DOJ's Indiscriminate Application of Conspiracy Liability                                               27
   D. Prosecutorial Overreach and Constitutional Implications                                                27
   E. SEC Enforcement Retraction (2024): Institutional Acknowledgment of Overreach                           28
   F. Case Study: United States v. Weeks – Selective Crypto Tax Enforcement                                  28
   G. Blockchain Analytics in Enforcement: Precision Tools Ignored in Weeks Case                             29
   H. Victim Restitution Trends: A Modern DOJ Emphasis Absent in the Weeks Case                              30
   I. Global Enforcement: Regulators Prioritize Clarity Over Criminalization                                 30
   J. Missed Use of Modern DOJ Tools and Institutional Safeguards                                            31
   K. Speedy Trial Act and Boilerplate Continuances                                                          33

VI. Post-2021 DOJ Enforcement Trends: Priorities, Restitution, and Recalibration                             34

VII. Compounding Discovery Failures and Constitutional Process Violations                                    36
   A. The Government's Discovery Obligations                                                                 37
   B. Key Categories of Withheld or Incomplete Discovery                                                     38
   C. Pattern of Compounding Constitutional Process Failures                                                 38
   D. The Constitutional Standard: Materiality and Fairness                                                  43
   E. Speedy Trial Act Violations (Institutional Process)                                                    43

VIII. Conclusion: Lessons, Remedies, and the Need for Regulatory Reform                                      45
   A. Lessons from the BCN Prosecution                                                                       45
   B. Remedies Available in This Case                                                                        46

    C. The Need for Broader Reform    47

**IX. The Broader Policy Failure: Institutional Drivers of Enforcement Breakdown    49**

    A. The Blanche Memo and Retroactive Liability    49

    B. Failure to Respect Individual Rights and Defense Access    50

    C. Unchecked Prosecutorial Discretion    51

    D. Erosion of Constitutional Due Process    52

    E. Systemic and Structural Drivers of Enforcement Failure    52

    F. Judicial Pushback on SEC Overreach and Token Classification Failures    53

**X. Policy Reform Recommendations    55**

    A. Department of Justice (DOJ)    55

    B. Internal Revenue Service (IRS)    57

    C. Securities and Exchange Commission (SEC)    58

    D. Financial Crimes Enforcement Network (FinCEN)    58

    E. Federal Courts    59

    F. Cross-Agency Coordination    59

**XI. Conclusion: Toward Institutional Restoration and Constitutional Alignment    61**

    A. Constitutional Imperatives Going Forward    61

    B. Constitutional Corrective Action for Past Cases    62

**Foreword**
**By Alan M. Dershowitz**

This White Paper is about the Constitution. Prosecuting citizens under laws that did not exist strips away due process, fair notice, and the rule of law. When those rights fall for one, they fall for all.

Having reviewed and advised on earlier drafts of this report, I am convinced that the prosecution of Jobadiah "Joby" Weeks raises fundamental constitutional questions. The White Paper documents a cascade of process failures—retroactive charging under unsettled securities theories, selective prosecution contrasting sharply with contemporaneous cases such as EOS, Tezos, Ripple, and Ethereum, coercive asset seizures that deprived the accused of untainted defense funds, years of discovery violations, and repeated delays eroding Speedy Trial protections. These are not technicalities but constitutional defects.

The Department of Justice has since acknowledged, through its 2025 Blanche Memo, that prosecutions based on unsettled digital-asset classifications should not be brought at all. By its own current standards, this case would not go forward today.

The rule of law is tested at its margins. When it bends for one, it breaks for all. Weeks was not a founder, owner, or manager. He was one of thousands—a peripheral promoter—yet prosecutors swept him into a felony conspiracy using retroactive theories. The danger is not only his conviction, but the precedent: if they can rewrite the law for him, they can rewrite it for anyone.

History teaches us that shortcuts metastasize. In the Red Scare, statutes were stretched to punish dissent. After 9/11, fear drove laws beyond their limits. Each time, liberties lost by the few endangered the many. Crypto is new, but the principles—fair notice, due process, proportionality—are timeless.

After a lifetime defending constitutional rights, I see here not just one case, but a warning. The prosecution of Jobadiah Weeks is not about crypto. It is about whether due process and fair notice remain the cornerstones of American justice.

*Alan M. Dershowitz*
*Felix Frankfurter Professor of Law, Emeritus*
*Harvard Law School*

## Prefatory Note

This submission is not offered to relitigate guilt or innocence, nor to impugn the professional conduct of individual prosecutors, but rather to assist DOJ leadership and institutional oversight bodies in evaluating how evolving enforcement practices intersected with unsettled legal standards in the cryptocurrency sector, creating process vulnerabilities warranting policy clarification. The goal is to strengthen institutional safeguards while preserving DOJ's long-term enforcement integrity.

## Acknowledgment

Professor Alan Dershowitz reviewed an earlier version of this White Paper and provided substantive feedback. While he did not serve as an author and was not involved in all aspects of its preparation, all of his comments were adopted and contributed meaningfully to the refinement of key legal and constitutional sections. His insights helped strengthen the White Paper's analysis of prosecutorial discretion, due process, and institutional safeguards.

## Author Role Statement

This White Paper, collaboratively authored by Bradford L. Geyer and Frederic E. Teboul, serves as an institutional policy analysis addressing constitutional protections, procedural fairness, and systemic accountability in U.S. digital asset enforcement. Drawing on their collective expertise—Geyer's 21 years of service in the U.S. Department of Justice, including roles as counsel to senior DOJ leadership, and Teboul's focus on legal compliance and financial regulation—the authors examine systemic vulnerabilities in the DOJ's approach to cryptocurrency enforcement through the lens of multiple historic prosecutions. Among these, the BitClub Network (BCN) case, and specifically the prosecution of Jobadiah Weeks, is taken as the primary case study due to its illustrative nature and its alignment with the institutional concerns outlined in the 2025 Blanche Memo. While none of the authors serve as litigation counsel of record for Mr. Weeks in his underlying criminal matter (United States v. Goettsche et al., Case No. 2:19-cr-00877, D.N.J.), they have undertaken limited advisory roles to support the U.S. Department of Justice (DOJ) and oversight entities. Their efforts aim to identify procedural deficiencies, ensure adherence to constitutional and statutory standards, and propose resolutions that align with the DOJ's long-term institutional goals and judicial integrity. This document is intended solely for policy-level review, internal DOJ process evaluation, and institutional oversight. It is not a substitute for litigation filings nor a direct representation in any active court case.

5

# I.  Executive Summary

At its core, this case is about the Constitution. When the government prosecutes citizens under laws that did not exist at the time of their conduct, it undermines due process, fair notice, and the rule of law itself. When those rights are compromised — as they were here — not just the accused who suffers, but every citizen who depends on the rule of law. The recent enactment of the GENIUS Act (2025) underscores that Congress itself now recognizes the dangers of retroactive enforcement in digital asset markets.

This White Paper presents both a historical overview of DOJ's policy development and a case study examining how gaps in formal guidance, charging discretion standards, and discovery compliance protocols led to compounding constitutional process vulnerabilities. While drawing on multiple enforcement examples, it uses the prosecution of the BCN—and in particular the case of Mr. Jobadiah Weeks[1]—as a central case study to illustrate these systemic institutional failures.

If this can happen in cryptocurrency prosecutions today, it could happen in any novel sector tomorrow — fintech, AI, biotech, or beyond. The point of this paper is not simply to critique crypto enforcement, but to defend the rule of law wherever emerging technologies test the limits of existing statutes.

Between 2009 and 2025, DOJ and federal financial regulatory agencies — including the Financial Crimes Enforcement Network (FinCEN), the Securities and Exchange Commission (SEC), the Commodity Futures Trading Commission (CFTC), and the Internal Revenue Service (IRS) — issued limited and often fragmented guidance concerning cryptocurrency mining cooperatives, profit-sharing arrangements, token offerings, and promotional activities. During this unsettled period, the DOJ pursued felony conspiracy charges against peripheral participants in BCN without first establishing internal institutional charging standards for promoters, marketers, or cooperative mining pool participants.

The rapid expansion of cryptocurrency markets between 2009 and 2017 outpaced the development of clear legal standards or institutional enforcement protocols. While federal agencies issued sporadic guidance—such as FinCEN's 2013 advisory on virtual currencies and the SEC's 2017 DAO Report—no comprehensive framework governed mining cooperatives, promotional activity, or digital asset classification. In this legal vacuum, the DOJ began selectively prosecuting actors in crypto-related projects, often without interagency coordination or pre-established criteria for applying conspiracy or securities liability.

The BCN prosecution is not only about cryptocurrency; it is about the danger of the government rewriting the rules after the fact. When prosecutors stretch statutes retroactively, seize untainted assets to coerce pleas, and withhold discovery, the injury is not limited to one defendant — it strikes at the foundation of constitutional justice itself. Every day these convictions stand is another day the Constitution is ignored.

---

[1] *U.S. vs Goettsche*, Case No. 19- CR-877 (U.S. District Court for the District of N.J. Dec 5, 2019).

## Key Findings

- **Retroactive prosecutions violate fair notice** – Multiple DOJ cases, including the BCN prosecution, relied on securities classifications and legal theories developed *after* the alleged conduct occurred. This breaches the Fifth Amendment's Due Process Clause.

- **DOJ's current policy would bar these cases** – The 2025 Blanche Memo now requires clear statutory or regulatory authority, proven misconduct, and Main Justice approval before filing charges in novel digital asset contexts. By those standards, the BCN case and similar prosecutions would not be brought today.

- **Defendants remain imprisoned under unconstitutional counts** – Individuals convicted under retroactive "Count Two" securities charges, often paired with broad conspiracy (Count One), are still serving sentences or facing severe penalties.

- **Enforcement was selective and inconsistent.** Larger projects—Tezos, EOS, Ripple, Ethereum, BitConnect, OneCoin—faced civil settlements or no charges, despite raising more money and posing greater investor risks.

- **Immediate remedies are needed**. Convictions based on retroactive theories should be vacated. Defendants should be released. Restitution should be considered for lost time and seized assets.

- **Institutional Speedy Trial Failures**. Years of boilerplate continuances—victims, Romanian servers, "complexity"—were granted without the contemporaneous, case-specific findings the law requires (see Section V.K).

**Core Recommendation:**
Legacy convictions based on retroactive securities theories must be vacated to restore institutional integrity and reaffirm constitutional protections.

**Call for Retrospective Justice:**
Justice cannot stop with policy reforms for the future. If the Department now admits these prosecutions would not be brought today, then the convictions that rest on retroactive charges must not be allowed to stand. Vacating them is not optional policy — it is retrospective justice required by the Constitution itself.

7

## II. Policy Overview: Crypto Enforcement and DOJ Overreach

This section traces DOJ's cryptocurrency enforcement from 2013 to 2025, with emphasis on the pre-2021 period of regulatory uncertainty. In that era, prosecutors often acted without clear statutory or agency guidance — raising serious constitutional concerns about fair notice and due process.

**Key Takeaway:** DOJ's early crypto prosecutions unfolded without statutory guidance or agency consensus, exposing defendants to criminal liability without fair notice. This created a constitutional risk: punishment by prosecution in a legal vacuum.

**This case is not about crypto. It is about the Constitution.**

## A. The Emergence of Crypto (2009–2013)

The introduction of BTC in 2009 marked the birth of decentralized digital assets, challenging traditional financial intermediaries and government control over currency issuance. This technological innovation attracted both global attention and regulatory uncertainty. During this early phase, cryptocurrency operated largely outside the scope of formal U.S. regulation, while governments debated whether — and how — these assets should be classified as currency, property, securities, or commodities.

## B. The Rise of Crypto Enterprises (2013–2017)

Between 2013 and 2017, the cryptocurrency sector experienced a surge in decentralized innovation. A wide range of crypto-related enterprises emerged globally, including mining pools, Initial Coin Offerings (ICOs), decentralized lending platforms, and token-based ecosystems. In parallel, the launch of the first stablecoins—such as BitUSD and Tether in 2014—marked a critical development in market infrastructure, offering mechanisms for relative value stability by pegging tokens to the U.S. dollar.[2] By 2017, centralized exchanges including Binance, Bitfinex, and Poloniex had become dominant players, accelerating global adoption of both stablecoins and speculative token instruments.[3]

---

[2] As of June 23, 2025, BitUSD is effectively defunct, with no significant trading, development, or community activity. Exchanges such as Binance, Kraken, or KuCoin show no active trading pairs, and BitUSD-related accounts (e.g., X, GitHub) appear inactive or unmaintained.

[3] As of July 2025, Binance remains the world's largest cryptocurrency exchange by volume. Under new CEO Richard Teng, the company has adopted a compliance-first strategy, securing regulatory licenses in over 20 jurisdictions and establishing a formal board of directors. Notably, in May 2025, the SEC moved to dismiss its lawsuit against Binance with prejudice, signaling a significant regulatory win for the platform. *SEC drops Binance lawsuit*, The Verge (May 2025), https://www.theverge.com/news/676949/sec-binance-lawsuit-dropped-crypto-trump-administration. Binance has also continued routine asset management by delisting underperforming tokens. *Binance announces delisting of five tokens*, Outposts (July 3, 2025), https://outposts.io/article/binance-announces-new-token-delistings-for-july-2025-cb653719
**Bitfinex** is fully operational and has reported no service interruptions. The platform's research division recently projected that BTC could reach $115,000 by July 2025 due to ETF inflows and institutional

During this period, U.S.-based entrepreneurs launched projects into a fragmented and ambiguous legal landscape. No comprehensive federal statutory framework governed the classification or operation of digital asset enterprises. Regulatory agencies such as the FinCEN, the SEC, the CFTC, and the IRS issued isolated and sometimes conflicting guidance. However, no harmonized or enforceable regime was adopted across agencies.

Cooperative mining pools relying on prevailing industry norms, informal interpretations, and limited agency advisories. For DOJ enforcement policy during this period, see Section II.F.

By the end of this period, institutional concerns began to emerge around certain actors. Notably, in 2019 the New York Attorney General accused Tether and its affiliate Bitfinex of covering up $850 million in losses by improperly accessing Tether's reserves without disclosure. While that case settled in 2021 with financial penalties and operational restrictions, Tether's practices continue to draw regulatory scrutiny—including ongoing reports of potential federal investigation for sanctions and anti-money-laundering violations.[4]

## C. The U.S. Government's Shift to Aggressive Enforcement (2017–2020)

Between 2017 and 2020, as cryptocurrency markets expanded and attracted significant capital, federal enforcement activity intensified. The SEC concentrated on ICOs and securities violations, while the DOJ pursued selected criminal cases, frequently using broad conspiracy statutes. As discussed in Section II.F, these prosecutions occurred in the absence of DOJ policy governing mining pools or peripheral promotional activity.

---

demand, though current market conditions reflect consolidation and caution.*Bitfinex Market Report*, CryptoNews (July 2025), https://cryptonews.com/news/bitfinex-btc-price-could-touch-115k-by-july **Poloniex** also remains active. On July 9, 2025, it delisted 12 trading pairs as part of platform optimization.*Poloniex to Remove 12 Trading Pairs*, Poloniex Support (July 9, 2025), https://support.poloniex.com/hc/en-us/articles/33224346102551.  The exchange simultaneously introduced new listings, such as LAIKA, demonstrating continued trading innovation.*New Listing: LAIKA*, Poloniex Support (July 8, 2025), https://support.poloniex.com/hc/en-us/articles/33291565022615

[4] In 2019, the New York Attorney General (NYAG) accused Tether and Bitfinex of concealing approximately $850 million in losses by transferring funds from Tether's reserves to cover Bitfinex's shortfall, without disclosing this to investors. New York Attorney General Press Release, April 25, 2019. The case was settled in 2021, with Tether and Bitfinex paying an $18.5 million fine and agreeing to cease trading activities with New Yorkers, while admitting no wrongdoing. New York Attorney General Press Release, February 23, 2021. Separately, in October 2021, the Commodity Futures Trading Commission (CFTC) fined Tether $41 million for misrepresenting that its stablecoin was fully backed by U.S. dollars, finding that only 2.9% of Tether's reserves were held in cash during parts of 2016–2018. CFTC Press Release, October 15, 2021, CFTC Orders Tether and Bitfinex to Pay Fines Totaling $42.5 Million | CFTC. As of October 2024, reports indicate Tether is under federal investigation for potential violations of sanctions and anti-money-laundering regulations, though no formal charges have been confirmed. Fortune, October 25, 2024, Tether blasts report that stablecoin giant is under investigation for money laundering, sanctions violations | Fortune Crypto.  But this prosecutorial approach illustrates the difference between allegations of traditional misrepresentation of financial results affecting investor decisions as contrasted with viewing the nature of crypto investments as *per se* unlawful or dubious in and of itself.

## D. The Trump Administration Shift (2020–2021)

By 2020, DOJ's digital asset enforcement accelerated through the formation of task forces and increased inter-agency cooperation. This period saw further expansion of prosecutorial theories, often applying felony conspiracy charges to individuals with minimal involvement in underlying crypto operations. Of special significance, the legal distinctions between decision-makers, developers, promoters, and passive participants were frequently disregarded as the DOJ pursued aggressive headline prosecutions to deter crypto models.

In 2020, DOJ leadership acknowledged these challenges by releasing its first formal Cryptocurrency Enforcement Framework through the Attorney General's Cyber-Digital Task Force. The report, issued in October 2020, recognized the complexities of applying existing criminal statutes to emerging digital asset markets, emphasized interagency coordination needs, and attempted to establish foundational principles for future enforcement. However, at the time of BCN's formation and prosecution, no such coordinated DOJ guidance existed.

## E. The Biden Administration Expansion (2021–2024)

Under the Biden Administration, DOJ expanded interagency coordination and cryptocurrency enforcement capacity, primarily through:

- Creation of the National Cryptocurrency Enforcement Team (NCET) in 2021, which centralized digital asset prosecutions under Main Justice supervision;
- Expanded focus on anti-money laundering (AML) compliance, sanctions enforcement, and cross-border exchange regulation;
- Greater integration with Treasury (OFAC), FinCEN, and foreign law enforcement partners;
- Prosecution focus shifted increasingly toward exchange operators, mixers, and cross-border financial crime.

While these developments enhanced federal capacity for certain crypto enforcement categories, no formal DOJ charging policy was adopted to govern prosecution discretion for peripheral promoters, mining pool participants, or cooperative mining ventures like BCN.

## F. Renewed DOJ Posture Under Trump (2025–Present)

As of 2025, DOJ cryptocurrency enforcement is in the midst of an active recalibration. Public statements and formal directives from senior DOJ officials reflect a renewed focus on investor fraud, consumer protection, and the dismantling of regulatory barriers to digital asset innovation.

Key institutional developments include:

- DOJ's 2020 Cryptocurrency Enforcement Framework, issued under Attorney General William P. Barr's Cyber-Digital Task Force, remains the most comprehensive internal

DOJ policy statement governing digital asset prosecutions.[5]

- The National Cryptocurrency Enforcement Team (NCET)—announced by DOJ in October 2021 and operational as of February 2022—was disbanded effective immediately on April 7, 2025, pursuant to a memorandum from Deputy Attorney General Todd Blanche.[6] NCET casework has since been redistributed to legacy divisions including the Money Laundering and Asset Recovery Section (MLARS) and the Computer Crime and Intellectual Property Section (CCIPS).[7]

- The GENIUS Act of 2025, passed by Congress and signed into law on July 18, 2025, establishes the first comprehensive U.S. regulatory framework for payment stablecoins—including reserve, transparency, and supervisory requirements—to bring clarity and consumer protection to digital asset markets.[1]

Against this institutional backdrop, the Blanche Memo, issued on April 7, 2025[8], and titled *"Ending Regulation by Prosecution,"* formally articulates a significant shift in DOJ crypto policy. It aligns with the Trump Administration's broader pro-innovation digital asset agenda, including Executive Order 14178 (January 2025) promoting blockchain development and the March 2025 directive to establish a Strategic BTC Reserve.

In April 2025, the DOJ issued the Blanche Memo, titled *"Ending Regulation by Prosecution."* The memorandum marked a formal institutional rejection of charging decisions based on ambiguous or unsettled regulatory frameworks in the digital asset space.

The Blanche Memo:

- Prohibits criminal prosecution for securities or money transmission violations **absent willful misconduct**;

- Requires **Deputy Attorney General approval** for charges based on contested asset classifications (e.g., whether a token is a "security" or "commodity");

- Directs prosecutors to **defer to the SEC and CFTC** on regulatory matters;

- Reorients enforcement toward **intent-based fraud, hacking, and illicit finance**;

- Ends prosecution of **passive ecosystem actors** such as miners, mixers, and wallet providers for user conduct alone;

- Aligns DOJ strategy with **Executive Order 14178**, which promotes blockchain innovation and regulatory reform.

---

[5] Office of Public Affairs | Attorney General William P. Barr Announces Publication of Cryptocurrency Enforcement Framework | United States Department of Justice (October 8, 2020).
[6] See footnote 8.
[7] Guiding and Establishing National Innovation for U.S. Stablecoins Act ("GENIUS Act of 2025"), S.1582, passed Senate June 17, 2025; passed House July 17, 2025; signed into law July 18, 2025.
[8] DOJ Memorandum, "Ending Regulation by Prosecution," Deputy Attorney General Todd Blanche, April 7, 2025, available at: dag-blanche-memo-ending-regulation-by-prosecution-20250407.pdf (last accessed July 13, 2025).

From 2013 through 2017 — the operative period for BCN's formation and Mr. Weeks' alleged conduct — the DOJ issued no formal policy, memorandum, or precedent addressing criminal liability for mining pools or peripheral promotional activity. Enforcement was inconsistent across projects, and there was no articulated standard for applying conspiracy statutes in the crypto sector. By DOJ's current standards, codified in the April 2025 Blanche Memo, cases like BCN would not proceed.

The memo also disbands the **National Cryptocurrency Enforcement Team (NCET)** and reallocates responsibility to legacy DOJ divisions. Notably, the **Market Integrity and Major Frauds Unit** has exited crypto enforcement entirely.

While the Blanche Memo does not mandate retroactive review of prior prosecutions, it implicitly calls into question earlier cases pursued during regulatory silence—especially those involving **peripheral participants**, **cooperative mining models**, or **conspiracy theories untethered from individualized misconduct**.

This evolving posture, while forward-looking in design, casts doubt on legacy prosecutions that would not meet today's internal DOJ standards.

### Early Selective Prosecution Snapshot

The DOJ's April 2025 Blanche Memo directs prosecutors to avoid criminal liability where no contemporaneous statute, regulation, or agency guidance provided fair notice of illegality, and to refrain from charging peripheral actors absent intent-based fraud.

By those standards, the BCN prosecution stands out as a legacy case that would not meet today's charging thresholds.

**Comparative Enforcement Snapshot:**

| Project | Period | Funds Raised | DOJ/SEC Outcome | Peripheral Promoters Charged? |
|---|---|---|---|---|
| **BCN** | 2014–2017 | ~$722M alleged (aggregate) | DOJ felony conspiracy indictments | Yes |
| **EOS** | 2017 | $4B | SEC civil settlement, no DOJ charges | No |
| **Tezos** | 2017 | $232M | SEC settlement/class action | No |
| **Ripple** | 2013–2020 | $1.3B alleged | SEC civil action, no DOJ charges | No |
| **Ethereum** | 2015 | $18M | No SEC or DOJ action | No |

**If prosecutors can invent crimes in crypto after the fact, they can do it in AI tomorrow.**

**Key Contrast:** BCN promoters went to prison; projects that raised billions walked away with civil fines or no charges at all.

For a detailed discussion of post-2021 DOJ enforcement patterns, see Section VI and Appendix II.

These enforcement choices were not just policy missteps; they represented departures from the Constitution's guarantees of notice, due process, and the right to counsel — failures that shaped every subsequent stage of the BitClub Network case.

**Policy Insight:** Enforcement in novel markets should follow **regulation-first, prosecution-second**. Where statutes or guidance do not exist, DOJ should defer to civil regulators (SEC, CFTC, FinCEN) before pursuing criminal charges. The Blanche Memo now codifies this approach, but its principles must also inform retrospective review.

# III. The Evolution of the U.S. Crypto Regulation (2009–2017)

DOJ relied on retroactive securities and fraud theories that had no clear basis at the time of the conduct. Such backward-looking prosecutions violate the Constitution's guarantee of fair notice and undermine the legitimacy of criminal law.

**Key Takeaway:** In 2009–2017, there was no clear crypto law. The DOJ filled the vacuum with retroactive fraud and securities theories, punishing conduct that people could not have known was illegal. That violates the Constitution's fair notice rule and erodes trust in criminal law itself. As the Supreme Court held in ***Bouie v. Columbia***, prosecutors may not define crimes after the fact.

**No notice, no crime.**

**This vacuum was not just about crypto. It was about stripping citizens of constitutional notice.**

## A. 2009–2012: The Birth of Crypto and Regulatory Inattention

BTC's launch in 2009 introduced decentralized digital currency to the global financial system. For its first several years, cryptocurrency operated entirely outside formal federal regulatory oversight. The U.S. Government Accountability Office ("GAO") acknowledged:

> *"No federal financial regulator has issued a comprehensive set of rules or guidance concerning virtual currencies.[9]"*

Federal agencies issued no rules, statutes, or binding guidance concerning the legality of mining, exchanging, or promoting cryptocurrency. GAO described this period as one in which:

> *"The unique characteristics of virtual currencies challenge existing regulatory frameworks.[10]"*

Law enforcement agencies also lacked tools to monitor or regulate these markets, as GAO reported:

> *"Law enforcement agencies have limited visibility into the identity and location of virtual currency users and operators.[11]"*

---

[9] GAO, Virtual Currencies: Emerging Regulatory, Law Enforcement, and Consumer Protection Challenges, GAO-14-496 (May 2014), page 5. (GAO link is no longer accessible).
[10] Id. at 4.
[11] Id. at 12.

No federal prosecutions, civil enforcement actions, or administrative rulemakings addressed BTC's legal status prior to 2013. The regulatory vacuum persisted despite early recognition of potential risks[12].

## B. 2013: FinCEN's Initial Money Transmission Guidance

On March 18, 2013, the FinCEN issued its first formal guidance interpreting the applicability of the Bank Secrecy Act ("BSA") to virtual currencies.[13]

The 2013 FinCEN guidance established for the first time that certain virtual currency actors could be classified as money services businesses ("MSBs") subject to AML obligations if they fell into specific categories of "administrators" or "exchangers." FinCEN stated:

> "*An administrator or exchanger that (1) accepts and transmits a convertible virtual currency or (2) buys or sells convertible virtual currency for any reason is a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person[14].*"

Thus, individuals or entities acting as "exchangers" or "administrators" of virtual currency may be deemed MSBs if they engaged in transmitting value for others.

However, FinCEN simultaneously excluded users and personal miners from MSB obligations:

> "*A user who obtains convertible virtual currency and uses it to purchase real or virtual goods or services is not an MSB under FinCEN's regulations and therefore is not subject to MSB registration, reporting, and recordkeeping regulations.*" [15]

Critically, the FinCEN guidance did not address the legal status of mining pool cooperatives, membership promoters, or profit-sharing mining arrangements like those used by BCN. The agency made no determination whether pooled mining or promotional activity would trigger MSB registration or criminal exposure. No discussion of criminal enforcement or conspiracy liability was included in the guidance. The guidance was purely interpretive under the BSA and did not purport to create or define criminal conduct for participants engaged in mining or mining pool marketing.

---

[12] Id. at 4–6.
[13] FinCEN, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, (Mar. 18, 2013), at 1.

[14] Id. at 3.
[15] Id.

## C. 2014: IRS Issues Initial Virtual Currency Tax Guidance

On March 25, 2014, the IRS issued Notice 2014-21, providing its first formal guidance on the federal tax treatment of virtual currencies[16].

The IRS confirmed that for federal tax purposes:

> *"Virtual currency is treated as property." [17]*

Thus, taxpayers receiving or transacting with virtual currencies were subject to existing property tax principles, including capital gain or loss treatment for dispositions.Importantly for mining participants, the IRS addressed income recognition for mining activities:

> *"When a taxpayer successfully 'mines' virtual currency, the fair market value of the virtual currency as of the date of receipt is includible in gross income." [18]*

The IRS also noted that virtual currency received by independent contractors or in connection with trade or business activity was subject to self-employment tax reporting.[19]

However, the 2014 IRS guidance was limited solely to tax reporting obligations. The Notice made no reference to the applicability of securities laws, anti-money laundering (AML) obligations, money transmitter status, or criminal enforcement consequences for participants engaged in mining pools, mining cooperatives, or promotional activity related to mining services. At no point did the IRS classify mining pool promoters, members, or marketers as subject to federal criminal statutes or financial regulations beyond general income tax reporting obligations.

## D. 2015: CFTC Asserts Limited Commodity Jurisdiction

On September 17, 2015, the CFTC formally asserted jurisdiction over virtual currencies by declaring that BTC and similar digital assets qualified as "commodities" under the Commodity Exchange Act.[20]

In its public order, the CFTC stated:

> *"The CFTC for the first time finds that BTC and other virtual currencies are properly defined as commodities."[21]*

The ruling was issued in connection with enforcement action against a BTC options trading platform operating without required registration.[22] The CFTC emphasized that its jurisdiction was limited to derivatives markets — specifically futures, options, and swaps — and did not

---

[16] IRS, Notice 2014-21, IRS Virtual Currency Guidance, (Mar. 25, 2014), at 1.
[17] Id.
[18] Id. at Q&A 8.
[19] Id. at Q&A 9.
[20] CFTC, In the Matter of: Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan," CFTC Docket No. 15-29, (September 17, 2015).
[21] CFTC, Press Release PR7231-15 (Sept. 17, 2015).
[22] CFTC, In the Matter of: re Coinflip, Inc., CFTC No. 15-29 (Sept. 17, 2015).

extend to spot-market activity, mining operations, mining cooperatives, or promotional arrangements such as those used by BCN.

Throughout this period, neither the CFTC nor any federal agency asserted direct regulatory authority over cooperative BTC mining pools or individuals promoting mining membership agreements. BCN operated entirely outside the scope of any CFTC registration or regulatory regime.

## E. 2017: SEC DAO Report Introduces Securities Law Considerations

On July 25, 2017, the SEC issued its DAO Report of Investigation, formally applying securities laws to certain token offerings for the first time.[23]

The SEC concluded:

> *"Based on the facts and circumstances set forth below, the Commission finds that the DAO Tokens are securities under the Securities Act of 1933." [24]*

The DAO Report marked a significant regulatory shift, but it was issued several years after BCN began operations. Moreover, the SEC's DAO Report focused solely on ICO fundraising models involving token sales to investors. It did not address BTC mining pools, cooperative mining agreements, or promotional activity related to mining membership recruitment. The SEC's legal analysis was limited to investment contract structures under Howey, as applied to token offerings, not to mining pools or marketing of mining pool participation.[25]

## F. DOJ Position: No Formal Criminal Enforcement Policies (2013–2017)

Between 2013 and 2017 — the entire period during which BCN operated — the DOJ  issued no formal guidance, internal memoranda, or published policies addressing the application of criminal statutes to cryptocurrency mining pools or the marketing of mining pool memberships.

### 1. DOJ Crypto Enforcement Prior to 2017 Focused on Classic Financial Crime Models

Throughout this period, DOJ's crypto-related prosecutions concentrated almost exclusively on:

- Ponzi and pyramid schemes;

---

[23] SEC, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Release No. 81207 (July 25, 2017), page 1.
[24] Id. at 11.
[25] Id.

- Narcotics trafficking and dark web markets using cryptocurrency as a payment medium; and

- Traditional money laundering cases.

For example, DOJ aggressively pursued high-profile prosecutions against:

**Silk Road (Ross Ulbricht,[26] 2014):**
 The DOJ indicted and convicted the Silk Road operator for narcotics trafficking, money laundering, and operating an illegal online black market that used BTC as payment.

> "*[Ulbricht ran] a sprawling black-market bazaar where unlawful goods and services, including illegal drugs of virtually all varieties….*"[27]

**OneCoin (2019):**
DOJ indicted the founder of OneCoin for running a multibillion-dollar fraudulent cryptocurrency scheme.

> "*OneCoin operated as a pyramid scheme that bilked investors worldwide.*" [28]

**BitConnect (2021–2022):**
DOJ indicted BitConnect's leadership for orchestrating a $2.4 billion Ponzi scheme based on fraudulent investment returns.

> "*BitConnect defrauded thousands of investors worldwide.*" [29]

Each of these prosecutions involved either:

      (a) fraud against investors;
      (b) narcotics or black-market activity; or
      (c) financial crimes involving the use of crypto as currency.

None involved criminal conspiracy charges based solely on participation in mining pool activities, mining pool promotion, or the cooperative pooling of mining assets.

## 2. DOJ Had No Published Criminal Policy on Mining Pool Activity

At no time prior to 2017 did DOJ publish any internal or external guidance addressing:

- Cooperative mining pool structures;

- The legality of marketing mining pool memberships;

---

[26] Trump pardons Ross Ulbricht, creator of the Silk Road dark web marketplace NPR (January 21, 2025).
[27] DOJ Press Release, Manhattan U.S. Attorney Announces Charges Against Alleged Owner and Operator of Silk Road (Feb. 4, 2014).
[28] DOJ Press Release, Charges Against Leaders Of "OneCoin," A Multibillion-Dollar Pyramid Scheme Involving The Sale Of A Fraudulent Cryptocurrency (Mar. 8, 2019).

[29] DOJ Press Release, Founder Of BitConnect Indicted In $2.4 Billion Cryptocurrency Scheme (Feb. 25, 2022).

- The application of conspiracy statutes to mining pool participants or promoters.

Review of DOJ's Criminal Resource Manual, which provides internal policy guidance to prosecutors, reveals that prior to 2017:

> *"No provisions existed addressing cryptocurrency mining pools, promotional marketing of mining pools, or the application of federal criminal statutes to such business models."* [30]

This absence of DOJ policy guidance left federal prosecutors without any clear, centralized framework for evaluating potential criminal exposure for mining pool participants such as Mr. Weeks.

### 3. The BCN Prosecution Marked DOJ's First Use of Broad Criminal Conspiracy Charges in the Mining Pool Context

The DOJ indictment of BCN participants — including peripheral promoters — marked the first known federal prosecution to apply criminal conspiracy statutes to non-founding participants engaged in promoting mining pool memberships. [31]

No prior DOJ case had charged marketing participants in mining pool cooperatives with wire fraud or conspiracy charges where the Government's theory was based on participation alone — without direct operational control, management authority, or ownership stake. The BCN prosecution extended criminal liability far beyond the models previously pursued by the DOJ in the cryptocurrency sector.

## G. Summary of Regulatory Evolution

The regulatory framework governing cryptocurrency from 2009 through 2017 was characterized by fragmented agency jurisdiction, incomplete statutory coverage, and the absence of coordinated federal policy. While multiple agencies issued limited guidance addressing discrete aspects of virtual currency — including tax treatment, money transmission obligations, or securities law considerations — no federal authority established clear, binding rules governing BTC mining pools, cooperative mining structures, or the marketing of mining pool memberships.

During this period, cooperative mining pools such as BCN operated in a legal gray zone. No federal agency provided formal notice, regulatory guidance, or criminal enforcement standards defining the legality or illegality of mining pool operations or promotional activity.

The DOJ's subsequent prosecution of Mr. Weeks under criminal conspiracy theories — without clear prior statutory or regulatory authority — constituted a retroactive application of

---

[30] DOJ Criminal Resource Manual, archived versions reviewed through 2017 (no cryptocurrency mining guidance issued pre-2017).
[31] DOJ Press Release, Five Defendants Indicted in Connection with $722 Million Cryptocurrency Fraud Involving BCN (Dec. 10, 2019).

ambiguous legal standards, in violation of constitutional principles of fair notice, due process, and proportional charging.

**Case Context:** For peripheral participants like Mr. Weeks, this regulatory silence mattered. Between 2014 and 2017, no federal authority issued clear guidance prohibiting or regulating cooperative mining pool promotion. FinCEN's 2013 advisory addressed money transmission, not mining cooperatives; the SEC's DAO Report was released years later; and DOJ published no policies defining criminal exposure for non-founding crypto participants. Weeks therefore operated in good faith during a period of legal uncertainty.

# IV. DOJ Charging Practices and Patterns of Discretion in Crypto Prosecutions

As cryptocurrency markets grew between 2013 and 2017, DOJ's enforcement was inconsistent and selective. Projects raising billions faced only civil penalties, while BitClub Network promoters faced felony indictments. These disparities are not just policy differences — they raise constitutional concerns of equal protection and fair notice.

**Key Takeaway:** BCN defendants faced felony indictments while larger, riskier projects like EOS and Tezos resolved with minor civil fines. This disparity reflects not just policy inconsistency but a constitutional violation of equal protection.

**Equal conduct, unequal charges = injustice.**

## A. DOJ Focused on Clear Fraud, Ponzi Schemes, and Traditional Financial Crimes

As noted in Section III.F, DOJ had no formal policy framework governing mining pools or peripheral promotional activity during 2013–2017. In practice, its cryptocurrency prosecutions concentrated on traditional fraud and financial crime models, including:

- **Ponzi and pyramid schemes** – e.g., *OneCoin* (2019), a multibillion-dollar investment fraud; *BitConnect* (2021–2022), a $2.4 billion crypto lending Ponzi scheme.

- **Dark-web narcotics markets** – e.g., *Silk Road* (Ross Ulbricht, 2014), involving drug trafficking and money laundering via Bitcoin.

- **Market manipulation and money laundering** tied to centralized platforms or illicit online marketplaces.

In these cases, the DOJ focused almost exclusively on **core organizers, executives, or individuals exercising managerial control**. Peripheral actors, marketers, or participants without decision-making authority were rarely charged, and when they were, the charges generally followed clear evidence of intent to defraud and direct involvement in the scheme's design.

## B. The Absence of Prior Criminal Prosecution of Mining Pools

Prior to the BCN indictment, no DOJ criminal case had targeted BTC or cryptocurrency mining pools — whether cooperative or commercial — for conspiracy or fraud absent Ponzi-like fraud allegations. Specifically:

- Mining pools were widely understood to operate lawfully as resource-sharing arrangements enabling distributed mining;

- DOJ had not brought any criminal charges against marketing agents or pool participants who promoted mining participation;

- Regulatory bodies such as FinCEN and SEC had not issued rules or enforcement actions specifically targeting mining pools during this time.

BCN's prosecution marked the first known criminal conspiracy indictment premised on mining pool operations combined with sweeping conspiracy charges applied to non-founding participants such as Mr. Weeks.

## C. Inconsistent Treatment of ICOs, Token Offerings, and Crypto Startups

Simultaneously, multiple high-profile token offerings — which raised exponentially greater sums from retail investors — were handled through non-criminal resolutions. These include:

| Project | Time Period | Fundraising | Resolution |
|---------|-------------|-------------|------------|
| **Tezos** | 2017 | ~$232 million | SEC settlement, no criminal charges |
| **EOS** | 2017 | ~$4 billion | SEC settlement, no criminal charges |
| **Ripple (XRP)** | 2013–2020 | ~$1.3 billion alleged | SEC civil enforcement action partially resolved; no DOJ criminal charges |
| **Ethereum** | 2015 | ~$18 million | No SEC or DOJ action |

**Key Contrast:** Smaller BCN participants faced felonies; larger ICOs that raised billions paid settlements and moved on.

In each of these cases, founders, developers, and primary promoters directly responsible for structuring token sales avoided criminal prosecution, even when regulatory violations were alleged. By contrast, the DOJ's decision to pursue criminal conspiracy charges against BCN participants — including peripheral promoters without managerial authority — reflects a substantial exercise of charging discretion.

The significant disparity between the treatment of much larger, more prominent projects and BCN illustrates the absence of DOJ policy guardrails and the highly discretionary nature of charging decisions during this unsettled regulatory period.

## D. The Expansion of DOJ's Conspiracy Model in BCN

The BCN indictment reflects a significant expansion of the DOJ's theory of criminal liability, particularly in the application of conspiracy statutes to peripheral participants. The Government's approach included:

- Treating all participants equally culpable under conspiracy statutes, regardless of their individual role, control, or knowledge of any alleged misconduct;

- Sweeping in peripheral promoters and marketers, such as Mr. Weeks, who exercised no ownership, governance, or management authority within BCN;

- Asserting that limited promotional activity — including isolated efforts to encourage membership participation — was sufficient to establish criminal agreement to defraud.

The DOJ did not allege that Mr. Weeks personally participated in corporate decision-making, financial management, or internal misrepresentations. Mr. Weeks held no equity interest, had no role in company formation or design, and was not involved in preparing marketing materials or drafting investor communications. The Government's victim attribution data (12 victims, approximately $458,502.40) was not disclosed until nearly five years post-indictment.

By applying conspiracy liability in this undifferentiated manner, the charging approach effectively collapsed critical distinctions between BCN's founders, corporate insiders who directed company operations, and peripheral promoters whose activities were limited to membership referrals without managerial authority.

## E. DOJ's Charging Discretion and Selective Enforcement Implications

The disparate treatment between BCN and contemporaneous projects reflects DOJ's virtually unfettered charging discretion. While prosecutorial discretion is inherent to the criminal justice system, its exercise must comply with constitutional requirements of:

- Equal protection and non-selective enforcement;

- Fair notice under the Due Process Clause;

- Proportionality in the application of conspiracy statutes; and

- Consistency in the treatment of similarly situated defendants.

The DOJ's prosecution of Mr. Weeks and other peripheral BCN participants departed substantially from these constitutional norms.

**Equal law must mean equal charges.**

**Policy Insight:** DOJ should adopt **uniform charging standards across all districts** for digital asset cases. An internal review panel—similar to SEC's no-action process—could have ensured proportionality, avoided selective prosecution, and aligned outcomes with constitutional guarantees of equal treatment.

**This is not about digital assets. It is about equal protection under the Constitution.**

# V. Case Study: The Prosecution of Jobadiah Weeks (U.S. v. Goettsche, et al.)

The DOJ pursued criminal cases against BCN while declining to indict far larger projects. This selective prosecution highlights unequal application of the law and the absence of consistent constitutional safeguards.

## A. Government Charging Theories and Overbroad Criminal Liability

**Takeaway:** DOJ collapsed distinctions between founders and peripheral promoters, imposing equal liability without proof of scienter or managerial control.

BCN was founded in 2014 as a BTC mining pool cooperative, allowing members to contribute computing power and share in mining rewards. While certain individuals involved in BCN's internal operations may have engaged in misrepresentations, the Government charged not only founders but also peripheral promoters who had no role in the design or governance of the business.

Mr. Weeks, specifically:

- Had no ownership interest or equity stake in BCN;

- Held no position within BCN's governance or financial management;

- Had no involvement in the creation, dissemination, or structuring of any alleged misrepresentations; and

- Acted solely as a peripheral marketer without control over operational or corporate decisions.

Despite these facts, the DOJ indicted Mr. Weeks alongside founders and central organizers under a conspiracy theory that treated all participation as equally culpable.

The Government's charging model expanded criminal liability far beyond established standards by:

- Eliminating meaningful distinctions between levels of involvement;

- Equating remote promotional activity with principal fraud; and

- Invoking conspiracy liability to capture all participants under a single criminal enterprise theory.

24

## B. Comparative Enforcement: Selective Criminalization of BCN (2014–2017)

**Takeaway:** DOJ targeted BCN while far larger ICOs like EOS and Tezos faced only civil settlements, showing selective and inconsistent prosecution.

While the DOJ pursued criminal indictments in the subject BCN case, other contemporaneous cryptocurrency ventures that raised substantially greater funds were resolved without criminal charges. The comparative enforcement disparity is summarized below.

| Project | Start Year | Business Model | Enforcement Action | Forced to Cease Operations? |
|---|---|---|---|---|
| BitClub Network (BCN) | 2014 | Mining Pool Membership | DOJ Criminal Indictment (2019) | Yes |
| OneCoin | 2014 | Crypto Investment Scheme | DOJ Criminal Indictments (2017+) | Yes |
| BitConnect | 2016 | Lending Platform | SEC and DOJ Charges (2018+) | Yes |
| Tezos | 2017 | ICO | SEC Settlement (2020) | No |
| EOS (Block.one) | 2017 | ICO | SEC Settlement (2019) | No |
| Ripple (XRP) | 2012 | Token Sales | SEC Civil Litigation Partially Resolved (2023); No DOJ Criminal Charges | No |
| Ethereum | 2015 | ICO | No Formal Enforcement Action | No |

**Weeks faces decades; Ripple executives walked away with fines.**
**EOS raised $4 billion and paid a $24 million fine; BCN promoters went to prison for substantially less.**

**Key Contrast:** Only BCN's peripheral promoters were indicted; bigger, riskier ventures avoided DOJ prison terms.

This comparative framework illustrates that the DOJ selectively pursued criminal charges against BCN and its peripheral promoters without managerial authority while declining criminal prosecution in larger, higher-profile ICO projects.

## C. DOJ's Indiscriminate Application of Conspiracy Liability

**Takeaway:** When multiple due process failures converge, they do not cancel each other out — they compound, creating structural coercion. That is what happened here.

Peripheral promoters like Weeks were swept into felony conspiracy charges despite no evidence of intent, ownership, or direct misrepresentation.

The BCN prosecution was not marked by a single defect but by a cascade of constitutional failures. Retroactive charging theories, coercive asset seizures, and systematic discovery violations did not operate in isolation — they combined to strip Weeks of due process and meaningful defense rights. This cumulative effect matters: a plea induced under conditions of legal uncertainty, financial deprivation, and withheld evidence cannot meet the Fifth Amendment's standard of voluntariness.

Retroactive charges = retroactive injustice.

These overlapping violations are detailed in Appendix X, which catalogs the eight core failures (retroactive charging, seizure abuses, discovery withholding, grand jury omissions, and selective prosecution). Together, they show how prosecutorial discretion, unchecked by clear law or judicial remedy, produced a process that failed the Constitution at every stage. A plea extracted under those conditions cannot be valid. The Court in ***Brady v. United States*** made clear: a plea induced without disclosure cannot be voluntary.

**For Weeks, it was not one failure — it was every failure, stacked together.**

## D. Prosecutorial Overreach and Constitutional Implications

**Takeaway:** The prosecution retroactively applied securities law theories, undermining fair notice and violating due process.

Unlike contemporaneous ICO cases resolved civilly[32], the BCN prosecution imposed felony liability on a peripheral mining promoter without distinguishing between core organizers and peripheral actors. This selective enforcement, applied amid regulatory ambiguity, raised serious concerns about fairness and proportionality.

Prosecutors later analogized BCN participation agreements to unregistered securities offerings, even though neither the SEC nor DOJ had classified mining pools as securities before 2017. The SEC's *DAO Report*[33], often cited in hindsight, postdated BCN's operations and never addressed mining cooperatives or profit-sharing pools. Applying such post hoc theories expanded criminal liability without rulemaking or interagency guidance, undermining constitutional fair notice.

The charging posture also disregarded individualized scienter. Extending conspiracy liability to peripheral promoters—without proof of intent, ownership, or misrepresentation—conflicts

---

[32] See, e.g., *SEC v. Telegram Group Inc.*, No. 19-cv-9439 (S.D.N.Y. 2020); *SEC v. Kik Interactive Inc.*, No. 19-cv-5244 (S.D.N.Y. 2020).
[33] SEC Release No. 81207, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: *The DAO* (July 25, 2017).

with precedents like *Takhalov*[34], *Pirro*[35], and *Regent Office Supply*[36], which reject convictions where statutes are stretched beyond their intended scope. Just as conspiracy liability was stretched during the McCarthy era to target political associations, here it was expanded to sweep in peripheral actors without proof of intent.

This charging posture is out of step with DOJ's modern enforcement approach, which targets core organizers and emphasizes restitution. Section VI and **Appendix II catalog this institutional shift in detail.**

**This prosecution is not about crypto. It is about due process itself.**

## E. SEC Enforcement Retraction (2024): Institutional Acknowledgment of Overreach

**Takeaway:** TThe SEC's retreat proves BCN-style prosecutions were an anomaly.

In 2024–2025, the SEC scaled back or dismissed enforcement actions against Coinbase[37], Kraken[38], and Binance.US[39] after courts raised due-process concerns, noted conflicting CFTC jurisdiction, and emphasized the absence of token-specific rulemaking. These retreats mark a clear institutional reassessment of expansive securities theories in the digital-asset space (see **Appendix III** for comparative SEC case outcomes).

**Implications for the Weeks Prosecution**
 The contrast is stark: Weeks was criminally prosecuted for mining-pool promotion without any SEC or DOJ guidance; no agency had classified such pools as securities before 2017; and the Government nonetheless imposed retroactive liability. If centralized exchanges operating under ambiguous frameworks no longer face unchecked liability, prosecuting a peripheral mining promoter from 2014–2017 is indefensible.

**BCN is not just a case of prosecutorial overreach — it is an institutional audit failure underscoring the need for urgent DOJ reform in digital-asset prosecutions.**

## F. Case Study: United States v. Weeks – Selective Crypto Tax Enforcement

**Takeaway:** IRS pursued Weeks while ignoring thousands of similarly situated BCN participants, illustrating selective enforcement.

---

[34] *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016).

[35] *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000).

[36] *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970).

[37] [US securities regulator files to dismiss lawsuit against Coinbase | Reuters](#) (February, 27, 2025).

[38] [Kraken Is Latest Crypto Firm to Say SEC Agrees to Drop Lawsuit - Bloomberg](#) (March 3, 2025).

[39] [US SEC dismisses lawsuit against Binance crypto exchange | Reuters](#) (May 29, 2025).

The 2025 prosecution of Jobadiah Sinclair Weeks illustrates the dangers of DOJ and IRS discretion unchecked by policy safeguards. Weeks voluntarily disclosed 20 years of non-filing to federal agents in 2019, prompting no immediate enforcement. Only after he declined to cooperate was he prosecuted—despite thousands of other BCN participants receiving daily BTC and Ethereum (ETH) distributions, traceable on-chain. The IRS issued no 1099s or audit notices, nor did it verify whether restitution-seeking "victims" themselves complied with IRS disclosure rules. The same pattern has appeared before: during the Civil Rights era, tax prosecutions were sometimes used selectively against activists, not to enforce the law evenly but to silence dissent. Selectivity in enforcement erodes both fairness and legitimacy.

As detailed in Section X.M, the IRS failed to issue 1099s, initiate audits, or refer comparable BCN participants—despite having full blockchain visibility. Yet only Weeks and Abel were criminally charged, illustrating selective enforcement.

As catalogued in **Appendix V**, DOJ has repeatedly structured digital asset resolutions around restitution. The failure to apply that approach in Weeks' case underscores how outdated and coercive his prosecution was.

**Policy Insight:** When blockchain provides complete visibility, enforcement should be consistent across all recipients—not focused solely on cooperation status or public visibility.


## G. Blockchain Analytics in Enforcement: Precision Tools Ignored in Weeks Case

**Takeaway:** DOJ failed to use available blockchain forensics, relying instead on generalized allegations and incomplete victim data.

In recent years, the DOJ has embraced blockchain analytics to improve enforcement precision, enabling attribution of digital asset flows, victim identification, and loss quantification. These tools offer forensic capabilities unmatched in traditional financial investigations.

Despite this evolution, such tools were notably **underutilized in the Weeks/BCN prosecution**. While blockchain data was available, the Government:

- Produced **no forensic report or wallet attribution analysis** prior to plea;
- **Did not segregate tainted from untainted assets**;
- Failed to **confirm links between Mr. Weeks and the 12 alleged victims**;
- Provided **no loss reconciliation based on on-chain records**, and
- Made **no effort to use seized assets for restitution**.

In contrast, blockchain analytics have been central in prosecutions like Bitfinex (119,754 BTC traced), Silk Road (Zhong forfeiture), and BitConnect (victim loss mapping). These cases highlight how forensic tracing enhances both fairness and restitution.

**The omission of such analysis in the BCN case resulted in investigative asymmetry.** The Government had tools to distinguish involvement, intent, and benefit—but chose generalized allegations instead. This failure undermined due process and plea voluntariness.

Today, such an omission would be viewed as investigative malpractice. In the Weeks case, it compounded the prejudicial impact of incomplete discovery, asset deprivation, and coercive charging. The institutional failure was not technological—it was strategic.

## H. Victim Restitution Trends: A Modern DOJ Emphasis Absent in the Weeks Case

**Takeaway:** Modern DOJ policy emphasizes restitution, but Weeks' assets were seized without victim reconciliation or compensation.

Since 2021, DOJ cryptocurrency cases have shifted toward restitution-oriented outcomes. In BitConnect, Silk Road, Bitfinex, and the 2024 Tether seizure (see **Appendix V**), the Department prioritized asset recovery and victim compensation rather than punitive conspiracy charges against peripheral actors. These cases illustrate DOJ's emerging preference for remedial justice over carceral punishment.

The contrast with Weeks is stark. His case involved no identified victims pre-plea, no forensic wallet analysis, no validated loss model, and no attempt to consider restitution as an alternative resolution. Assets including crypto devices, fiat funds, and business property were seized but never inventoried or applied to compensation. Instead of pursuing remedial justice, prosecutors relied on coercive leverage to secure a plea.

This outdated approach conflicts with DOJ's current institutional values and underscores the need for post-conviction reconsideration—especially where no verified victims have emerged and no restitution process was ever provided.

**No victims were paid. No restitution. Only prison.**

## I. Global Enforcement: Regulators Prioritize Clarity Over Criminalization

**Takeaway:** Other major jurisdictions resolved regulatory gaps with forward-looking rules, not retroactive prosecutions.

International regulators—including the EU, UK, Japan, and South Korea—adopted licensing, registration, and compliance frameworks rather than retroactive criminalization. The EU's *Markets in Crypto-Assets Regulation (MiCA)* created a unified licensing regime without retroactive penalties.[40] The UK's Financial Conduct Authority emphasized exchange registration and guidance over prosecution.[41] Japan's Financial Services Agency[42] and South Korea's Financial Services Commission[43] mandated real-time compliance for exchanges and custodians, but did not criminalize historic mining or promotion absent fraud.

Global norms reinforce this approach. The United Nations' Basic Principles on Criminal Law caution against retroactive application of unclear economic regulations,[44] while the OECD emphasizes proportionality, clarity, and individual culpability in financial crime enforcement.[45]

By contrast, the United States imposed expansive criminal liability during a period of regulatory silence, targeting peripheral actors in cooperative mining pools in ways unseen elsewhere. This divergence highlights the BCN prosecution as a global anomaly and underscores the urgent need for DOJ reform aligned with international norms.

This divergence highlights the BCN prosecution as a global anomaly and underscores the urgent need for DOJ reform aligned with international norms (see **Appendix XI** for comparative international frameworks).

## J. Missed Use of Modern DOJ Tools and Institutional Safeguards

**Takeaway:** DOJ ignored emerging safeguards like forensic attribution and intent-based liability, prosecuting Weeks under outdated methods.

Modern DOJ enforcement emphasizes precision, restitution, and a clear distinction between managerial and peripheral roles. These priorities—reflected in post-2021 prosecutions and the 2025 Blanche Memo—stand in stark contrast to the methods employed in the prosecution of Mr. Weeks.

**1. Tax Enforcement and IRS Selectivity**
Despite having blockchain-level visibility into over 90,000 BTC and 650,000 ETH distributed through BCN, the IRS:

---

[40] Regulation (EU) 2023/1114 of the European Parliament and of the Council of 31 May 2023 on Markets in Crypto-Assets, OJ L 150, 9.6.2023, p. 40–205.
[41] UK Financial Conduct Authority, *Cryptoassets: AML/CTF registration regime for cryptoasset businesses*, available at: https://www.fca.org.uk/cryptoassets
[42] Japanese Financial Services Agency, *Payment Services Act and related guidelines for virtual currency exchange services* (2017, updated 2020), available at: https://www.fsa.go.jp/
[43] Financial Services Commission (South Korea), *Amendments to the Act on Reporting and Using Specified Financial Transaction Information (Special Act)*, March 2021.
[44] United Nations, *Basic Principles of Criminal Law: Legality and Non-Retroactivity*, UNODC Criminal Justice Handbook Series (2018).
[45] OECD, *Effective Enforcement of Economic Crimes: Proportionality, Clarity and Individual Culpability in Financial Crime Enforcement*, OECD Policy Guidance (2019).

- Issued no 1099s,

- Conducted no network-wide audits,

- Referred only two promoters—Weeks and Abel—for criminal charges.

This indicates that enforcement decisions were influenced more by cooperation posture than by consistent application of tax enforcement policy. Mr. Weeks' voluntary disclosure of non-filing in 2019 triggered no audit—only a prosecution after he declined cooperation.

### 2. Failure to Apply Blockchain Analytics
Tools like Chainalysis, TRM, and Elliptic have been central in tracing illicit crypto flows and victim restitution (e.g., Bitfinex, BitConnect, Silk Road). Yet in the BCN case:

- No blockchain forensic report was produced pre-plea.

- No analysis confirmed any link between Mr. Weeks' promotional activity and the 12 alleged victims.

- No audit of seized wallets or devices was disclosed.

Had these tools been applied, they may have undermined the Government's loss attribution theory and clarified the limited nature of Mr. Weeks' role.

### 3. DOJ Policy Evolution Ignored
The **2025 Blanche Memo** codifies DOJ's current position:

- Rejecting prosecutions in areas of regulatory uncertainty,

- Requiring intent-based liability,

- Deferring to the SEC or CFTC for classification disputes.

Had this policy been in place in 2019, Mr. Weeks' case likely would not have proceeded. The BCN prosecution fails every standard outlined in the Blanche Memo, including lack of managerial control, absence of willful fraud, and no verified loss model.

### 4. Lack of Restitution Framework
Modern DOJ prosecutions prioritize victim restitution over punishment. In cases like Bitfinex and BitConnect, seized assets were traced and returned. By contrast:

- Mr. Weeks' seized assets were never inventoried for restitution purposes.

- No victim-level reconciliation was performed.

- No restitution model was presented prior to the plea.

**If retroactive charging is tolerated here, it will be tolerated in every emerging field tomorrow.**

## K. Speedy Trial Act and Boilerplate Continuances

From indictment onward, the prosecution relied on recycled "ends-of-justice" continuances citing **complexity**, **voluminous discovery**, and **Romanian servers**. None of these rationales were grounded in contemporaneous, case-specific findings, as the Speedy Trial Act requires.[46]

The government's stated justifications collapse under scrutiny. The recycled rationales were mainly:

- **Victims.** The indictment alleged $722 million in losses; subsequent filings inflated the figure to $2 billion. Yet more than five years later, not one verifiable victim has been produced. The Draft PSR of October 2024 identified only 12 individuals, with less than $500,000 in aggregate losses, and none tied to Weeks.

- **Romanian servers.** Prosecutors invoked "2 million of data" as a barrier to timely prosecution, without ever specifying what that "data" was. In reality, the seized Romanian servers were mining rigs, not accounting systems. Mining servers run hashing software that produces Bitcoin; they do not store user or victim information. Every Bitcoin mined is recorded on the public blockchain. The rationale that these servers delayed prosecution was illusory.

- **Complexity / novelty.** "Complex case" continuances were justified by portraying cooperative Bitcoin mining as a novel securities-fraud theory. In reality, the case exemplifies the retroactive application of unsettled law to conduct that was lawful and widely practiced at the time.

By layering these narratives, the government secured years of delay without ever satisfying the statutory requirement of contemporaneous, case-specific findings.[47] These are not harmless technical defects; they are **structural failures of enforcement and adjudication**. Boilerplate continuances permitted prosecution to inflate its case in the press while avoiding the discipline of Speedy Trial scrutiny.

Other courts have emphasized that exclusions must be narrowly construed and supported by specific findings.[48] The burden rests with the government to justify tolling, and plea negotiations or generic appeals to "complexity" are insufficient.[49]

This pattern illustrates how institutional incentives allowed weak cases to persist. When "victim" numbers fluctuate from $722 million to $2 billion without substantiation, when "2 million of data" is waved as a justification without explanation, and when "complexity" simply means criminalizing a novel industry retroactively, the Speedy Trial Act's protections collapse.

---

[46] Zedner v. United States, 547 U.S. 489 (2006) (continuances must be supported by contemporaneous, case-specific findings; boilerplate or retroactive findings are inadequate).
[47] Id.
[48] United States v. Guzman, 85 F.3d 823, 829 (1st Cir. 1996) (government bears burden of proving time is excludable).
[49] United States v. Larson, 417 F.3d 741, 745–46 (7th Cir. 2005) (plea negotiations not a valid basis for exclusion absent statutory support).

# VI. Post-2021 DOJ Enforcement Trends: Priorities, Restitution, and Recalibration

**Key Takeaway:** Since 2021, DOJ's crypto cases shifted from broad, punitive conspiracy charges to **targeted, evidence-driven enforcement** that prioritizes *role-based culpability, forensic attribution, and restitution*, while deferring classification fights to civil regulators. This calibrated model stands in sharp contrast to the approach used in BCN.

The government seized untainted assets to deprive defendants of resources needed for counsel and defense. Such tactics undermine the Sixth Amendment right to counsel of choice and distort the adversarial process.

## A. Defining Characteristics of the Post-2021 Model

Compared to the charging posture applied in the BCN prosecution, post-2021 enforcement is marked by:

| Pre-2021 (e.g., BCN) | Post-2021 |
|---|---|
| **Sweeping conspiracy charges** applied to all participants, including peripheral promoters | Charges focused on executives, founders, and actors with direct decision-making authority |
| Limited or **no use of blockchain analytics** pre-plea | Routine forensic attribution to link conduct to specific losses and victims |
| **No individualized loss models**; delayed or incomplete victim attribution | Early disclosure of validated loss models and victim matrices |
| Emphasis on **punitive prosecution**, even in regulatory gray zones | Emphasis on restitution, remediation, and policy clarity before charging |
| Criminalization in **absence of clear SEC/CFTC/Federal guidance** | Deference to regulatory agencies and avoidance of classification disputes without consensus |

**Key Contrast:** *Pre-2021:* sweeping conspiracies, delayed/uncertain loss models, punitive posture in gray zones. **vs.** *Post-2021:* role-based charging, early validated loss/victim data, restitution-first, and regulator deference.

## B. Institutional Implications

This recalibration reflects a broader institutional recognition that enforcement integrity requires:

- **Fair notice** before criminalization in emerging sectors.
- **Individualized culpability** based on role, intent, and control.

- **Asset recovery and victim compensation** as primary enforcement goals.

- **Avoidance of collateral prosecutions** for passive ecosystem actors.

Congress has now codified this principle in the GENIUS Act (2025), which prohibits agencies from imposing retroactive penalties in the stablecoin context. The same principle should govern prosecutions across all digital assets.

**C. Relevance to This Case**

These patterns stand in stark contrast to the DOJ's earlier approach in the BCN prosecution, where peripheral participants were charged under sweeping conspiracy theories without verified loss models, forensic attribution, or individualized scienter.

For detailed case examples illustrating this post-2021 enforcement framework — including FTX, Celsius, Bitfinex, and others — see **Appendix II**.

**Policy Insight:** Adopt this post-2021 model as a **formal charging baseline**: (i) require early, validated loss/victim matrices; (ii) demand blockchain-forensic attribution before indictment; (iii) presume civil-first coordination with SEC/CFTC when asset classification is unsettled; and (iv) focus charges on decision-makers, not peripheral actors.

**This contrast shows: it is not about crypto. It is about constitutional fairness.**

# VII. Compounding Discovery Failures and Constitutional Process Violations

**Key Takeaway:** Systematic Brady, Giglio, and Rule 16 violations denied defendants access to critical evidence, rendering pleas involuntary and trials constitutionally defective. These were not isolated mistakes but a pattern of structural failure.

Withheld evidence = coerced plea.

Brady, Giglio, and Rule 16 obligations were repeatedly violated, depriving defendants of evidence necessary to mount a defense. The pattern of withheld discovery compounded into a systemic denial of due process.

This is not about blockchain. It is about the Bill of Rights.

| Category | Discovery Material Withheld/Delayed | Institutional Impact |
|---|---|---|
| 1. Internal Policy Records | DOJ charging memos; inter-agency correspondence; early deliberations on mining pool status | Blocked defense from challenging legal basis and regulatory ambiguity |
| 2. Seized Asset Records | Blockchain data; wallet inventories; cold storage records | Prevented tracing; impaired loss models; denied untainted funds for defense |
| 3. IRS Filings & Workpapers | Forms 1099-B, Form 4684; IRS CI audit files | Prevented independent tax loss review; impaired financial exposure analysis |
| 4. SAR Files | Suspicious Activity Reports; retroactive summaries; incomplete narratives | Blocked defense review of investigative sufficiency; impaired financial crime challenge |
| 5. Victim Attribution | Individual loss lists; model formulas; victim-by-victim disclosures (delayed until 2024) | Denied timely review of loss attribution to Weeks; impaired plea negotiations |
| 6. Loss Models | DOJ worksheets; data inputs; calculation formulas | Prevented verification of plea loss figures; undermined accuracy of stipulations |
| 7. Witness Statements | Exculpatory interviews; governance summaries | Blocked innocence defenses regarding Weeks' limited role |
| 8. Charging Communications | DOJ internal memos; inter-divisional deliberations | Concealed selective charging discretion against peripheral actors |
| 9. Grand Jury Expansion | Records on inclusion of peripheral promoters | Impaired sufficiency challenges under Costello v. United States (1956) |
| 10. Pro Se Access | Withholding of prior discovery after pro se invocation | Sixth Amendment impairment; blocked independent case evaluation |
| 11. Defense Correspondence | Formal requests (Feb 2025 onward) unanswered | Ongoing process failure; discovery deficiencies persisted post-plea |

35

**Key Contrast:** In comparable white-collar prosecutions, systematic Brady and Rule 16 violations have triggered dismissal or suppression; in BCN, identical failures drew no sanction, instead weaponized to coerce pleas.

## A. The Government's Discovery Obligations

The Government's obligations to disclose evidence to defendants are well-established under federal law, including:

- ***Brady v. Maryland,* 373 U.S. 83 (1963):** Requiring disclosure of all exculpatory evidence favorable to the defense. *United States v. Bagley,* 473 U.S. 667, 682 (1985): Defining materiality under *Brady* as whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.  Materiality includes not merely outright direct proof of innocence but information which might lead to identifying and locating witnesses in the defendant's behalf.  Disclosure of any information which addresses some, not even all, of the charges, helps establish a defense, shows extenuating circumstances, or may argue for a lesser charge or a lesser punishment is mandated under *Brady*.  A prosecution may be subject to dismissal or being vacated even without a showing of any bad faith.  Prosecutors and investigators have an affirmative duty to reach out to any agency or officer, State or Federal, which could reasonably be suspected of having exculpatory information.  In *Brady*, the U.S. Supreme Court recognized a requirement under the U.S. Constitution, including due process.  This is not merely a rule by the Supreme Court, but a constitutional command which the Court recognized.  Thus, it applies to all levels of Federal and State courts.  Subsequent legislation has made clear that the requirement embraces "all of government" to the extent that any government office or agency might reasonably be thought to hold relevant exculpatory information.  The absence of information that should exist, such as the failure in crypto prosecutions to identify victims or losses of the accused's alleged misconduct, could constitute exculpatory information, including tending to show that the alleged misconduct did not occur or has not been proven beyond a reasonable doubt.

- **Giglio v. United States, 405 U.S. 150 (1972):** Requiring disclosure of evidence that may impeach Government witnesses.

- **Federal Rule of Criminal Procedure 16:** Mandating the production of documents, data, reports, and evidence material to prepare the defense.

- **The Due Process Clause of the Fifth Amendment:** Guaranteeing fundamental fairness in criminal proceedings, including access to relevant evidence.

These obligations are heightened in complex, document-heavy financial cases involving novel charging theories such as those presented in BCN.

## B. Key Categories of Withheld or Incomplete Discovery

The Government's failure to provide timely and complete discovery played a central role in distorting the pretrial process and undermining Mr. Weeks' defense posture. This included delays and omissions involving critical financial records, grand jury exhibits, IRS tax documents, and exculpatory witness statements. As detailed in Section VI.C, these discovery violations—rooted in failures under *Brady*, *Giglio*, and Rule 16—compromised Mr. Weeks' ability to evaluate the factual basis of the charges, develop defenses, and assess plea options. The resulting informational asymmetry skewed the adversarial process and compounded the constitutional deficiencies already present in the prosecution's asset restraint and charging strategy.

## C. Pattern of Compounding Constitutional Process Failures

The BCN prosecution rested on a constitutional defect: **retroactive charges that did not exist at the time.**

That defect was then compounded by a coerced plea — extracted through asset seizures and discovery denials.

Together, these failures violate the **Due Process Clause** (*Bouie v. City of Columbia; United States v. Lanier*) and the voluntariness requirement for pleas (*Brady v. United States*).

Comparable prosecutions with the same retroactivity problem are listed in **Appendix IV.** A full breakdown of each constitutional obligation, violation, and prejudice appears in **Appendix XII.**

**Key Takeaway:** Retroactive charges plus coerced pleas equal unconstitutional convictions. The Constitution requires vacatur, not reform talk.

### 1. Retroactive Wire Fraud Theory

Prosecutors turned ordinary mining pool participation into "wire fraud" years after the fact. At the time (2013–2017), no statute, no precedent, no policy treated it as criminal.

That is retroactivity. And retroactivity violates the **Fifth Amendment's Due Process Clause** (*Bouie v. City of Columbia; United States v. Lanier*).

Defendants had no notice. Pleas were extracted under theories that did not exist. That makes them coerced, not voluntary (*Brady v. United States*).

**Key Takeaway:** Retroactive wire fraud charges are unconstitutional. Convictions based on them must be vacated.

## 2. Retroactive Securities Charge

Count Two in BCN charged "unregistered securities sales." But at the time of conduct, no SEC rule, no court precedent, and no DOJ guidance defined mining pool shares as securities. The classification emerged only later.

That is retroactive liability. Retroactivity strips citizens of fair notice, violating the **Due Process Clause**.

For Weeks and others, it meant pleading guilty to crimes that were not crimes when committed. That is not voluntary. That is unconstitutional.

**Key Takeaway:** Retroactive securities charges collapse under due process. Pleas based on them cannot stand.

## 3. Charging Discretion Failures

DOJ policy requires consistency and fairness in charging. Prosecutors must avoid new theories without notice. In BCN, that rule was ignored.

Prosecutors invented conspiracy charges against minor promoters. No statute, no precedent, no policy covered such activity at the time.

The result: liability created after the fact. That denies fair notice and undermines trust in the even application of federal law.

**Key Takeaway: When discretion becomes invention, the rule of law disappears.** Charges created after the fact cannot stand.

## 4. Asset Seizure Failures

The government may not freeze untainted assets if doing so blocks a defense. The Supreme Court has said: defendants must be able to hire counsel and prepare a case (*Luis v. United States*).

In BCN, prosecutors froze nearly everything Weeks had — cash, crypto, metals, business records. No forfeiture judgment was entered. Assets remain unreleased years later.

Nine months into the freeze, under mounting pressure, Weeks signed a plea. Repeated jail transfers made defense work nearly impossible.

**Key Takeaway:** *Asset seizure became a weapon, not a safeguard. Depriving a defendant of resources to fight is unconstitutional coercion. The Supreme Court said it **plainly in Luis v. United States**: freezing untainted assets is unconstitutional.*

## 5. Cryptocurrency Seizures: Chain of Custody Without Rules

The Weeks case highlights a constitutional gap in the government's handling of cryptocurrency seizures. With traditional assets such as bank accounts, the amount seized can be verified against account balances and transaction records. By contrast, cryptocurrency requires specific documentation — wallet addresses, balances at the time of seizure, and the number of devices or cold wallets taken — to ensure integrity and accountability.

In Weeks's case, a seizure report was prepared at his residence, but it failed to reflect a transfer of cryptocurrency that occurred immediately before screenshots were taken. As a result, part of the holdings disappeared from the record. The number of cold wallets seized was never properly logged, and no post-seizure inventory was produced showing the cryptocurrency amounts. Weeks repeatedly requested the return of his computer and wallets; the government agreed in writing on three occasions, yet nothing was ever returned.

Unlike with cash or bank accounts, there appear to be **no binding rules governing cryptocurrency seizure, custody, or return.** Without affidavits, sworn inventories, or chain-of-custody documentation, defendants are left with no reliable record of what was seized. This not only deprives them of the ability to contest the accuracy of the seizure but also creates the risk of permanent loss of assets through official neglect or misconduct.

Such practices violate fundamental constitutional protections. The **Fourth Amendment** requires reasonableness in searches and seizures. The **Fifth Amendment** prohibits deprivation of property without due process of law. Both protections collapse when the government seizes assets in a manner that cannot be verified or challenged.

The Weeks case illustrates that the problem is systemic, not isolated. As digital assets become a larger part of the economy, the absence of seizure standards leaves every holder vulnerable to unreviewable takings. Clear rules for inventory, custody, and return are not optional — they are constitutional necessities.

**Crypto without chain of custody = Constitution without teeth.**

## 6. Discovery Production Failures

The Constitution requires the government to hand over all material evidence — especially evidence that helps the defense (*Brady v. Maryland; Giglio v. United States*).

In BCN, prosecutors withheld it for years, — and many remain undisclosed today. Among them:

- Blockchain records.

- IRS Forms 1099-B and 4684.

- IRS audit workpapers.

- Internal DOJ/agency memos.

- SARs, some back-dated.

- Charging communications.

- Victim data (12 victims, $458,502.40) — produced five years late.

- Exculpatory witness statements.

When Weeks went pro se in 2025, prosecutors still refused to give him discovery they had given his prior lawyers. Requests were ignored.

**Key Takeaway:** Serial Brady and Rule 16 violations crippled the defense. In most white-collar cases, that means dismissal. Here, it meant coercion.

## 7. Pre-Plea Disclosure Failures

A plea must be knowing and voluntary. That requires disclosure of material evidence before it is signed (*United States v. Ruiz*).

In BCN, prosecutors withheld critical evidence until years after Weeks' plea:

- Investigative reports.

- Asset tracing.

- Victim attribution data.

- Loss models tied to his conduct.

Weeks made a binding legal decision without access to the full record.

**Key Takeaway:** *A plea without disclosure is not voluntary. It is unconstitutional by definition.*

## 8. Grand Jury Presentation Failures

The grand jury must hear a fair and complete account. Probable cause cannot rest on half-facts or omissions (*United States v. Williams*).

In BCN, prosecutors' discovery failures meant the grand jury likely never saw:

- Complete financial loss figures.

- Verified victim attribution.

- Full SAR summaries.

- Internal charging documents.

Some of this material was produced years later. Some has still never been produced. That means the defense cannot know whether the grand jury was given an accurate basis for indictment.

**Key Takeaway:** When grand juries hear only part of the record — and defendants are denied the rest — indictments lose their constitutional foundation.

## 9. Comparative Enforcement Discretion Failures

Equal protection requires consistent charging. DOJ's own manual requires fairness in prosecutorial discretion.

In BCN, peripheral promoters like Weeks — no managerial role, no control over funds, limited loss attribution — faced felony conspiracy charges.

In other major crypto cases (Tezos, EOS, Ripple, Ethereum, BitConnect, OneCoin), founders and financial beneficiaries resolved liability civilly. No prison. No felony conspiracy.

**Key Takeaway:** Equal conduct, unequal charges. That is selective prosecution — and it shreds equal protection under the law.

**Cumulative Impact:**
The convergence of these systemic failures — spanning charging discretion, asset seizures, discovery noncompliance, plea disclosure deficiencies, grand jury omissions, and selective enforcement — compounded pretrial pressures, impaired defense preparation, and eroded the voluntariness of the plea, resulting in a process that failed to meet constitutional standards for due process and fair trial.

**Summary of Discovery and Process Failures**

| Failure Type | Impact on Defense |
|---|---|
| **Brady Violations** | Exculpatory materials withheld; deprived Weeks of evidence to challenge charges |
| **Rule 16 Failures** | Key records delayed/omitted; impaired case preparation |
| **Loss/Victim Data Withheld** | Prevented independent review of loss figures; inflated plea exposure |

| | |
|---|---|
| **IRS/Financial Records Suppressed** | Blocked tax loss recalculations; obscured financial context |
| **Witness Evidence Withheld** | Neutral/exculpatory statements concealed; impaired factual defenses |
| **Discovery Access Post–Pro Se** | Withheld prior disclosures from Weeks directly; Sixth Amendment impairment |
| **Unanswered Defense Requests** | Formal requests ignored; deficiencies persisted even post-plea |

**Key Contrast:** Comparable white-collar cases often see **dismissal or suppression** for repeated Brady/Rule 16 lapses; here, **serial violations drew no meaningful sanction**, magnifying coercive plea pressure.

**If Weeks can be denied evidence needed for his defense, any defendant in a novel case can face the same fate.**

## D. The Constitutional Standard: Materiality and Fairness

Under Brady, a due process violation exists where withheld evidence is material to guilt or punishment and undermines confidence in the outcome. Here:

- The undisclosed discovery directly implicated Mr. Weeks' knowledge, intent, and level of participation — central elements of the charges against him;
- The withheld information would have significantly altered the defense's evaluation of the Government's case strength;
- The combined Discovery process failures created a fundamentally unfair proceeding, violating both the Fifth and Sixth Amendments.

**Policy Insight:** Complex digital asset prosecutions require **independent DOJ discovery monitors**—internal compliance officers tasked with auditing evidence production. Such safeguards would ensure transparency, protect due process, and prevent convictions resting on withheld or distorted data.

**If Weeks can be denied discovery needed to defend himself, any defendant in any novel case can face the same fate.**

## E. Speedy Trial Act Violations (Institutional Process)

The Speedy Trial Act requires that continuances be justified by contemporaneous, case-specific findings and that courts monitor deadlines with precision.[50] Yet in Weeks, the government secured years of delay through orders recycling three rationales: inflated victim claims, vague assertions of "2 million of data" from Romanian servers, and generalized "complexity" tied to unsettled securities theories.

---

[50]Zedner v. United States, 547 U.S. 489 (2006) (continuances must be supported by contemporaneous, case-specific findings; boilerplate or retroactive findings are inadequate).

As explained in Section V.K, none of these rationales satisfied the statutory requirement of individualized findings. Instead, they illustrate how courts and prosecutors, by habitually re-using stock justifications, erode a safeguard designed to protect both the defendant and the public interest in timely justice.

Courts in other circuits have emphasized that exclusions must be narrowly construed and supported by specific findings.[51] The burden rests with the government to justify tolling, and negotiations or generic appeals to "complexity" are insufficient.[52]

Framing this as an institutional issue is critical: waiver doctrines prevent defendants from litigating pre-plea violations, leaving recurring abuses unreviewed. When courts tolerate boilerplate exclusions, they signal that statutory deadlines are optional, undermining congressional intent and the rule of law. (See Section V.K for detailed case-study analysis.)

---

[51] United States v. Guzman, 85 F.3d 823, 829 (1st Cir. 1996) (government bears burden of proving time is excludable).

[52] United States v. Larson, 417 F.3d 741, 745–46 (7th Cir. 2005) (plea negotiations not a valid basis for exclusion absent statutory support).

# VIII. Conclusion: Lessons, Remedies, and the Need for Regulatory Reform

Loss calculations and victim data were withheld or distorted, leaving courts and defendants without reliable figures. This failure undermined both due process and the principle that criminal restitution must be grounded in verified harm.

**Key Takeaway:** The BCN case illustrates how inconsistent charging, discovery failures, and coercive plea practices erode due process. Remedies here are constitutionally compelled — and broader reform is essential to prevent recurrence.

**The lesson is simple: This is not about crypto. It is about the Constitution.**

## A. Lessons from the BCN Prosecution

### 1. Regulatory Clarity Must Precede Criminalization

Criminal prosecution should not serve as the mechanism for resolving legal ambiguities in new industries. When statutory definitions, regulatory guidance, and agency interpretations remain unsettled — as they were during 2014–2017 for cryptocurrency mining pools — criminal liability should not attach to conduct undertaken in good faith reliance on incomplete or non-existent guidance. This view is now formally adopted in DOJ policy through the **April 2025 Blanche Memo**, which prohibits prosecution for conduct undertaken amid unresolved regulatory classification issues.[53]

### 2. Charging Theories Must Respect Individualized Culpability

The indiscriminate use of conspiracy statutes to impose equal criminal liability on founders, managers, employees, marketers, and peripheral promoters without managerial authority collapses basic distinctions in culpability and intent that are central to fair criminal adjudication.

This approach collapses the core constitutional distinctions between actors with decision-making authority and those with peripheral roles. Federal courts have repeatedly emphasized that criminal liability must rest on individualized intent, knowledge, and materiality. As in *Takhalov*, convictions cannot stand where the Government fails to prove actual deceit or criminal purpose.[54] The use of conspiracy statutes in this context conflicts with longstanding precedent and converts promotional conduct in a legally ambiguous space into a strict liability offense.

### 3. Asset Seizure Powers Must Be Constrained by Constitutional Limits

---

[53] DOJ Memorandum, "Ending Regulation by Prosecution," Deputy Attorney General Todd Blanche, April 7, 2025 (on file with Main Justice Policy Division; excerpted in DOJ Justice Manual, Ch. 9-1100).

[54] United States v. Takhalov, 827 F.3d 1307, 1312 (11th Cir. 2016).

Pretrial seizure of untainted defense assets undermines the Sixth Amendment right to counsel and converts prosecutorial discretion into unchecked coercive leverage. Judicial oversight must rigorously enforce constitutional protections before assets are frozen or forfeited.

Incomplete grand jury disclosures and late-stage revelation of alleged loss figures further distorted the plea process, denying Mr. Weeks a fair opportunity to evaluate the strength of the government's case.

### 4. Discovery Obligations Must Be Strictly Enforced

Brady, Giglio, and Rule 16 obligations exist to ensure that defendants have access to material evidence necessary to defend themselves and make informed decisions. Systematic discovery failures undermine public confidence in the integrity of the justice system.

As shown in the detailed summary of withheld categories in Section XI above[55], the violations in this case were extensive and structurally prejudicial.

### 5. Equal Enforcement Across Comparable Cases Is a Constitutional Imperative

DOJ's disparate treatment of BCN participants compared to other contemporaneous cryptocurrency ventures — including Tezos, EOS, Ripple, and Ethereum — demonstrates the unconstitutional consequences of unprincipled charging discretion. Comparative global enforcement models (e.g., EU MiCA, UK FCA, Japan FSA) reflect a clear preference for civil registration over retroactive criminalization—further underscoring the outlier status of the Weeks prosecution.[56]

## B. Remedies Available in This Case

These are not reforms to consider. They are constitutional obligations. Vacatur is not optional. Release is not discretionary. Every day these convictions stand, the Constitution is violated again. The courts are not being asked for mercy; they are being asked to enforce the Fifth and Sixth Amendments:

- **Vacatur of the guilty plea** — because a coerced plea under retroactive charges is void ab initio under the Constitution.

- **Dismissal of unconstitutional counts** — because selective, retroactive charges cannot stand in any U.S. court.

- **Return of seized assets** — because the Sixth Amendment forbids depriving a defendant of untainted defense funds.

---

[55] See Section XI: Compounding Discovery Failures and Constitutional Process Violations, including the Discovery Violations Table.
[56] See Section VII.N: Global Enforcement: Regulators Prioritize Clarity Over Criminalization.

- **Judicial findings of violation** — because the judiciary has a constitutional duty to recognize and correct process failures.

These remedies are **constitutionally grounded, not discretionary**. The prosecutorial model used in this case conflicts with fair notice principles under *Regent Office Supply* and *Pirro*, and collapses due process protections central to individualized guilt. Institutional redress is necessary to protect the structural integrity of criminal enforcement in emerging industries.

Federal courts possess the **inherent authority** to enforce these remedies directly. Dismissal, vacatur, suppression, restitution orders, and sanctions for discovery failures all lie within the judiciary's supervisory power to protect due process. As elaborated in **Appendix X (Implementation Notes for Federal Courts Reforms)**, these remedial tools are not novel policy prescriptions but existing judicial mechanisms that can be applied here to realign proceedings with constitutional standards.

In light of DOJ's evolving internal standards, **post-conviction review** may also be appropriate under channels such as the DOJ Office of the Pardon Attorney, Conviction Integrity Units located within certain U.S. Attorney's Offices, or via special petitions for reconsideration in outdated or policy-conflicted prosecutions. Where institutional norms have changed — as reflected in the 2025 Blanche Memo and Executive Order 14178 — DOJ retains discretionary authority to revisit legacy cases and realign enforcement outcomes with present-day standards.

The Government failed to provide IRS Form 4684 or equivalent documentation tracing victim loss to tax reporting obligations. Without IRS confirmation of theft loss, restitution calculations are speculative and inconsistent with criminal tax enforcement policy.

Finally, the charging approach in this case implicates numerous judicial decisions warning against the overextension of conspiracy liability to peripheral participants without individualized proof of intent, materiality, or misrepresentation, including *United States v. Chandler*, 376 F.3d 1303 (11th Cir. 2004); *United States v. Weatherspoon*, 581 F.2d 595 (7th Cir. 1978); *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016); *United States v. Regent Office Supply*, 421 F.2d 1174 (2d Cir. 1970); and *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000).

These recommended remedies do not rest on allegations of prosecutorial misconduct, but on **institutional safeguards** necessary to ensure due process compliance and preserve DOJ enforcement integrity.

**Justice means more than policy change. It means giving back years of life unjustly taken.**

## C. The Need for Broader Reform

The issues raised by this case reflect institutional vulnerabilities in DOJ's evolving enforcement of cryptocurrency markets, and highlight policy gaps that place both defendants

46

and the Department itself at legal and reputational risk. To prevent future injustices of this nature:

- Congress and DOJ leadership should prioritize comprehensive statutory frameworks governing cryptocurrency operations, while DOJ should adopt internal charging protocols that protect institutional integrity by ensuring consistent prosecutorial discretion in legally unsettled areas.

- Regulatory agencies should issue clear, binding guidance before initiating criminal investigations or referring matters for prosecution.

- DOJ should adopt internal charging guidelines specifically addressing emerging financial technologies, ensuring that criminal prosecutions are narrowly and consistently applied.

- Judicial oversight must remain vigilant to ensure that fundamental due process protections are preserved in complex financial prosecutions.

DOJ's current policy, as formalized in the 2025 Blanche Memo and Executive Order 14178,[57] now discourages charging conduct undertaken in periods of regulatory ambiguity—highlighting the need for retroactive consistency and institutional integrity.

Without such reforms, the risk of future expansive charging theories in rapidly evolving financial markets remains unacceptably high.

**If remedies are treated as optional here, they will be treated as optional in every sector where law lags behind technology.**

---

[57] Executive Order 14178, "Promoting Blockchain Innovation and Regulatory Reform," January 20, 2025, Sec. 3(b)(iv).

# IX. The Broader Policy Failure: Institutional Drivers of Enforcement Breakdown

**Key Takeaway:** The BCN prosecution illustrates systemic enforcement breakdown: unchecked discretion, political pressure, and fragmented regulatory authority converged to produce unconstitutional outcomes.

Process failures are not matters of policy debate; they are constitutional defects that demand vacatur. Policy failures, by contrast, highlight structural vulnerabilities that require reform to preserve institutional legitimacy. Together, they produced unconstitutional outcomes that courts cannot ignore.

| Process Failures (Constitutional) | Policy Failures (Institutional) |
|---|---|
| Retroactive charges (Bouie) | Selective enforcement (BCN vs. ICOs) |
| Coerced plea / asset freezes (Brady, Luis) | Charging discretion without standards |
| Discovery violations (Brady/Giglio/Rule 16) | Fragmented inter-agency authority |
| Grand jury omissions / denial of pro se access | Political pressure / headline-driven charging |

**Process failures = unconstitutional. Policy failures = reform needed. Together, they produced unlawful convictions.**

## A. The Blanche Memo and Retroactive Liability

The BitClub Network (BCN) case shows what happens when prosecutors act in a legal vacuum. They applied new theories retroactively, without rules, and without clear notice.

In April 2025, the DOJ issued the Blanche Memo. It rejected "regulation by prosecution" and set four rules for digital asset cases:

1. **No charges without notice.** Conduct must be illegal under a statute, regulation, or agency rule at the time.

2. **Prove fraud or intent.** No more cases built only on unsettled theories.

3. **Let regulators decide.** The DOJ will not charge when SEC and CFTC disagree.

4. **Get approval first.** Main Justice must sign off before any novel crypto case is filed.

Between 2013 and 2017 — when BCN was active — none of these protections existed. No U.S. agency had rules on mining pools or cooperative profit-sharing. Defendants had no roadmap.

Count Two of the indictment proves the point. It alleged "unregistered securities sales" based on legal definitions that did not exist during the conduct. That is classic retroactivity. It

violates due process because the Constitution requires fair notice before conduct is criminalized.

Congress sees the same problem. The GENESIS Act would bar agencies from punishing past digital-asset transactions when no binding rules existed. The principle is the same: no notice, no crime.

Despite this, the DOJ filed felonies in BCN. No statute. No regulator consensus. No precedent.

Courts in later cases have warned against this. Agencies cannot invent violations after the fact. Even the DOJ now admits that under today's rules, BCN would not be prosecuted.

That makes the issue constitutional, not just policy. Prosecuting under a theory that did not exist — and forcing a plea through resource deprivation and coercion — violates the Fifth Amendment's Due Process Clause and the voluntariness standard of *Brady v. United States.*

The Blanche Memo proves the point. Retroactive prosecutions like BCN were unconstitutional when filed. They remain unconstitutional today. Prior convictions based on those theories must be vacated.

## B. Failure to Respect Individual Rights and Defense Access

The prosecution of Mr. Weeks was not a one-off mistake. It exposed deeper structural failures in the federal enforcement system.

### 1. No clear DOJ standards.
After 2017, DOJ leaders promised tougher crypto enforcement. But they issued no binding guidance. No memos on mining pools. No rules for cooperative ventures. No criteria to separate managers from promoters. Prosecutors had unchecked discretion.

### 2. Fragmented regulatory authority.
FinCEN, SEC, CFTC, IRS, and DOJ all claimed a piece of crypto. None coordinated. No unified statute. No shared protocol. This created:

- Conflicting definitions of "security," "commodity," and "money services business."

- Overlaps with no resolution.

- Criminal cases brought without civil-agency clarity.

As a result, outcomes varied wildly. Some crypto projects paid SEC fines. Others — like BCN — faced felony conspiracy charges. The difference was not the law. It was which agency got there first.

### 3. International contrast.
Other jurisdictions took the opposite path:

- **EU (MiCA 2023)**: forward-looking compliance.

- **UK (FCA registry)**: licensing, not prison.

- **Japan (FSA)**: disclosures for miners.

- **Canada (CSA guidance)**: civil remedies.

Globally, only clear frauds or security threats led to criminal prosecution. By contrast, DOJ charged Weeks — a non-managerial promoter — with felonies despite no verified victims, no settled standards, and no fraud.

**4. Political pressure.**
 DOJ also faced pressure to "show leadership." They wanted headlines, indictments, and jurisdictional expansion. Strategy replaced law. Novel theories filled the void of settled standards.

**Key Takeaway:** The Weeks prosecution was not an isolated error. It was the product of systemic gaps — no DOJ rules, fractured agencies, global divergence, and political pressure. Those gaps allowed prosecutors to criminalize gray-zone conduct without safeguards.

**When law is fragmented and politics drive charging, discretion becomes retroactivity — and constitutional rights collapse**.


## C. Unchecked Prosecutorial Discretion

Perhaps most troubling, DOJ exercised its charging discretion inconsistently across the crypto sector:

- No criminal charges were filed against participants in large-scale ICOs such as EOS, Tezos, Ripple, or Ethereum.

- Peripheral promoters without managerial authority in those projects — including promoters, marketers, and early-stage fundraisers — avoided criminal prosecution entirely.

- Only BCN participants were subjected to felony conspiracy charges based on roles that, in parallel projects, triggered no criminal liability.

This inconsistency reflects an unconstitutional application of prosecutorial discretion, violating equal protection principles and undermining the legitimacy of federal enforcement actions in emerging technology sectors.

Correcting these systemic vulnerabilities would allow DOJ to strengthen enforcement integrity in emerging financial markets while preserving public confidence in institutional fairness.

## D. Erosion of Constitutional Due Process

At the core of due process are principles of **fair notice, access to material evidence, proportional charging, and the right to enter a plea free from coercion**. Each was compromised here:

- **Fair notice.** Weeks was charged under securities theories that were unsettled at the time of the conduct, with prosecutors effectively applying law retroactively.[58]

- **Discovery.** Key financial records, blockchain audits, IRS filings, and suspicious activity reports were withheld, preventing a meaningful defense.

- **Counsel and resources.** Asset seizures extended to untainted funds, depriving the defendant of counsel of choice and skewing the plea process.

- **Coercive pleas.** Faced with inflated loss figures, unverified "victims," and the prospect of decades in prison if he went to trial, defendants were pressured into plea agreements.

The government substituted constitutional clarity with coercion, opacity, and unchecked discretion. The absence of verified victims, the recycling of boilerplate continuances, and the denial of timely access to seized assets compounded these violations.

This is not a case-specific anomaly but an institutional failure. When due process yields to prosecutorial narratives of "complexity" and "novelty," defendants lose protections that were meant to guard against arbitrary power. The result is not merely prejudice to one defendant, but erosion of constitutional limits in emerging-technology prosecutions more broadly.

## E. Systemic and Structural Drivers of Enforcement Failure

The prosecution of Mr. Weeks was not a one-off mistake. It exposed deeper structural failures in the federal enforcement system.

**1. No clear DOJ standards.**
After 2017, DOJ leaders promised tougher crypto enforcement. But they issued no binding guidance. No memos on mining pools. No rules for cooperative ventures. No criteria to separate managers from promoters. Prosecutors had unchecked discretion.

**2. Fragmented regulatory authority.**
FinCEN, SEC, CFTC, IRS, and DOJ all claimed a piece of crypto. None coordinated. No unified statute. No shared protocol. This created:

---

[58] See also the GENIUS Act of 2025, S.1582, 118th Cong. (enacted July 18, 2025), which bars agencies from imposing retroactive penalties in the stablecoin context—reflecting Congress's recognition that retroactive enforcement in digital asset markets violates fundamental due process principles.

- Conflicting definitions of "security," "commodity," and "money services business."

- Overlaps with no resolution.

- Criminal cases brought without civil-agency clarity.

As a result, outcomes varied wildly. Some crypto projects paid SEC fines. Others — like BCN — faced felony conspiracy charges. The difference was not the law. It was which agency got there first.

**3. International contrast.**
 Other jurisdictions took the opposite path:

- **EU (MiCA 2023)**: forward-looking compliance.

- **UK (FCA registry)**: licensing, not prison.

- **Japan (FSA)**: disclosures for miners.

- **Canada (CSA guidance)**: civil remedies.

Globally, only clear frauds or security threats led to criminal prosecution. By contrast, DOJ charged Weeks — a non-managerial promoter — with felonies despite no verified victims, no settled standards, and no fraud.

**4. Political pressure.**
 DOJ also faced pressure to "show leadership." They wanted headlines, indictments, and jurisdictional expansion. Strategy replaced law. Novel theories filled the void of settled standards.

**Key Takeaway:** The Weeks prosecution was not an isolated error. It was the product of systemic gaps — no DOJ rules, fractured agencies, global divergence, and political pressure. Those gaps allowed prosecutors to criminalize gray-zone conduct without safeguards.

**When law is fragmented and politics drive charging, discretion becomes retroactivity — and constitutional rights collapse.**


# F. Judicial Pushback on SEC Overreach and Token Classification Failures

This retraction was not merely a policy recalibration but was precipitated by multiple federal court rulings that criticized the SEC's overreach and failure to provide clear statutory basis for treating digital assets as securities.

In SEC v. Ripple Labs Inc.[59]: the U.S. District Court for the Southern District of New York held in 2023 that sales of XRP on secondary markets did not constitute securities transactions, dealing a significant blow to the SEC's expansive interpretation of the Howey test.

Similarly, in SEC v. Coinbase, Inc.[60]: the court raised serious questions about due process and fair notice, observing that the SEC had failed to clearly articulate which tokens constituted securities and had offered no prior rulemaking.

These rulings reinforced what the Ripple court called "a regulatory vacuum filled by enforcement posturing"—a critique equally applicable to the Weeks prosecution, where no SEC guidance existed regarding mining pool memberships and no legal framework had been promulgated to define securities implications.

The SEC's retreat, coupled with judicial skepticism, underscores that criminal or civil liability should not precede regulatory clarity—a principle that the DOJ failed to follow in Weeks' case.

These rulings underscore the constitutional limits of the SEC's authority to impose ex post liability on actors who lacked regulatory notice or agency classification. Unlike token presales or ICOs, the BCN structure involved membership in a non-tokenized mining pool, for which the SEC has never issued interpretive guidance—raising fair notice and selective enforcement concerns.

**Policy Insight:** Congress should consider a **Crypto Enforcement Coordination Act**, mandating cross-agency consensus before DOJ files charges in legally unsettled sectors. By requiring joint SEC–CFTC–FinCEN–IRS signoff, such a statute would align U.S. practice with international norms (EU MiCA, UK FCA) and prevent selective prosecution.

---

[59] *SEC v. Ripple Labs Inc., No. 20-cv-10832 (S.D.N.Y. 2023)*
[60] *SEC v. Coinbase, Inc., No. 23-cv-04738 (S.D.N.Y. 2024)*

# X. Policy Reform Recommendations

Preventing a recurrence of the constitutional breakdowns exposed in the BitClub Network prosecution requires more than administrative policy shifts. These reforms are constitutional imperatives — essential to upholding due process, equal protection, and the Sixth Amendment right to counsel. Without them, the same failures will repeat in future cases involving emerging technologies and unsettled law.

**Top 5 Constitutional Imperatives**

- **Ban retroactive securities charges — because the Constitution forbids punishing citizens under laws that did not exist at the time of their conduct.**

- **Prohibit seizure of untainted defense assets — because the Sixth Amendment guarantees the right to counsel of choice.**

- **Mandate early blockchain forensic analysis — because due process requires reliable evidence of loss and victims before a plea or conviction.**

- **Adopt uniform charging standards across agencies — because equal protection requires consistent application of law, not selective prosecution.**

- **Judicial review of legacy cases — because convictions obtained under retroactive theories remain unconstitutional until vacated.**

Congress has already endorsed these principles legislatively. The GENIUS Act of 2025, which created the first comprehensive U.S. framework for stablecoins, explicitly prohibits retroactive penalties for periods without clear statutory or regulatory guidance.[61] That case study underscores that the Weeks prosecution—built on unsettled, retroactive theories—is not only unconstitutional, but also contrary to Congress's current policy direction.

## A. Department of Justice (DOJ)

The **2025 Blanche Memo** ended the "regulation by prosecution" strategy once used in cases like BCN.

It set four clear rules for all future crypto prosecutions:

- **No charges without clear notice** – Conduct must have been illegal under a statute, regulation, or agency guidance at the time it happened.

- **Prove intent and actual misconduct** – Cases must be based on fraud or misappropriation, not disputed classifications.

---

[61] GENIUS Act of 2025, S.1582, 118th Cong. (enacted July 18, 2025). See Congressional Record, June 17, 2025 (Senate passage); July 17, 2025 (House passage).

- **Let regulators decide definitions** – DOJ will not prosecute when the SEC and CFTC disagree on whether an asset is a security or a commodity.

- **Get Main Justice's approval first** – Any novel crypto case must be reviewed in Washington before charges are filed.

**Between 2013 and 2017 — when BCN was active — none of these safeguards existed.** No U.S. agency had binding rules on mining pools, cooperative profit-sharing, or similar models. Participants had no official roadmap to follow.

Yet DOJ still filed:

- **Count One – Fraud/Conspiracy**
- **Count Two – Unregistered Securities (retroactive)**

These charges came:

- **Without a statute** making the conduct illegal.
- **Without regulator consensus**.
- **Without prior DOJ precedent**.

**Retroactive application** of law violates the Fifth Amendment's Due Process Clause (*Bouie v. City of Columbia*, *United States v. Lanier*).
 **Coerced pleas** under such charges fail the voluntariness standard in *Brady v. United States*.

**By DOJ's own rules today, these cases would not be brought.** The Department must therefore:

- **Vacate convictions obtained under retroactive securities theories.**

- **Prohibit future prosecutions where statutes or regulations provided no fair notice.**

- **Implement uniform internal standards to ensure that digital asset cases comply with the Blanche Memo and constitutional limits.**

**Illustrative Defendant Outcomes**

The consequences of retroactive charging are stark. Defendants who accepted coerced pleas received short sentences; those who went to trial received decades.

| Case | Defendant | Plea? | Sentence / Status |
|------|-----------|-------|-------------------|
| **BCN** | Jobadiah Weeks | Yes – withdrawal pending | Not yet sentenced |
| **BCN** | Joseph Abel | Yes | Not yet sentenced |
| **BCN** | Matt Goettsche | No | No |
| **John DeMarr** | John DeMarr | Yes | 5 years |
| **Maksim Zaslavskiy** | Maksim Zaslavskiy | Yes | 18 months |

(*See Appendix IV for the full list of cases with retroactive Count Two securities charges.*)

**Crypto Asset Seizures & Custody Failures**

As detailed in the DOJ Notes reproduced in the Appendix V, these omissions are not abstract. They appear in DOJ's own policy statements, where references to digital assets are framed as discretionary choices rather than constitutional mandates. The absence of binding safeguards confirms that reforms remain incomplete and inadequate.

**DOJ's own policy guidance contains no standards for cryptocurrency seizure reporting.** Unlike cash or bank accounts, there are no requirements for sworn inventories, wallet address logging, or post-seizure custody reports. This omission leaves digital assets uniquely vulnerable to loss, dispute, or denial, as illustrated in Weeks's case.

**Policy promises mean little without constitutional guarantees.**

# B. Internal Revenue Service (IRS)

The IRS plays a central role in digital asset enforcement. Its handling of tax records and investigative data is not merely administrative — it is a constitutional obligation. Failure to disclose tax data or audit workpapers in a timely and complete manner deprives defendants of their due process and Brady rights, while undermining accurate loss calculations. (See Annex VII for detailed implementation notes.)

Accordingly:

- **The IRS must share tax records immediately** — any tax data the government intends to use must be produced to the defense without delay, as required by Brady.

- **IRS must provide complete audit files** — defendants are entitled to the full audit workpapers, not selective summaries, to test government calculations and protect their right to a fair trial.

- **IRS must align reporting with digital asset realities** — tax forms must clearly address crypto transactions, conversions, and collateral liquidations to prevent retroactive liability.

- **The IRS must coordinate with the DOJ before indictments** — tax interpretations must be consistent across agencies so defendants are not subject to contradictory theories in parallel proceedings.

These obligations are not optional policies. They flow directly from due process, Brady, and the constitutional requirement that criminal liability be based on fair notice and transparent evidence.

## C. Securities and Exchange Commission (SEC)

The SEC shapes how digital assets are classified and regulated. Its guidance must be transparent, accessible, and consistently applied to give market participants fair notice *(See Annex VIII for detailed implementation notes).*

1. **SEC must publish the record** — a public, searchable list of every SEC action on tokens and fundraising since 2017, so participants have constitutionally required notice of what conduct is considered unlawful.[62]

2. **SEC must provide a safe path for legacy projects** — tokens that no longer trade or projects that have shut down must be eligible for formal no-action relief, preventing retroactive liability for past conduct.[63]

3. **SEC must focus enforcement where culpability lies** — action must be limited to promoters or managers who actually controlled token economies and engaged in misconduct, ensuring liability tracks individual responsibility as required by due process.[64]

Fair notice is not optional. The SEC's role in digital asset regulation carries a constitutional obligation to ensure clarity before punishment.

---

[62] SEC "Framework for 'Investment Contract' Analysis of Digital Assets" (2019); SEC enforcement archives.

[63] SEC No-Action Letters: TurnKey Jet, Inc. (Apr. 3, 2019); Pocketful of Quarters, Inc. (July 25, 2019).

[64] SEC Enforcement Manual § 2.3; Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010).

## D. Financial Crimes Enforcement Network (FinCEN)

FinCEN's guidance determines how AML and MSB rules apply to digital assets. Its role is not limited to regulatory policy — it carries constitutional weight. Without clear and prospective rules, legitimate participants face arbitrary enforcement, violating due process and equal protection. (See Annex IX for detailed implementation notes.)

1. **FinCEN must draw a clear line for miners and pools** — explicitly define when mining pools and validators are considered money services businesses, so participants are not exposed to retroactive liability.[65]

2. **FinCEN must set custody thresholds for pools** — establish clear criteria for when control of pooled assets becomes "custodial" under law, ensuring constitutionally required notice before penalties are imposed.[66]

3. **FinCEN must coordinate with DOJ before cases** — positions must align with DOJ charges so defendants are not subjected to conflicting agency theories in violation of due process.[67]

Arbitrary enforcement of vague financial crime statutes cannot stand.

## E. Federal Courts

Federal courts are the final safeguard of constitutional rights in digital asset prosecutions. When courts fail to enforce timely disclosure, allow retroactive theories, permit seizure of untainted defense assets, or tolerate boilerplate continuances that undermine Speedy Trial protections, they abdicate their constitutional role. (See Annex X for detailed implementation notes.)

1. **Courts must enforce timely discovery** — Brady, Giglio, and Rule 16 obligations must be applied rigorously to ensure defendants receive all material evidence.[68]

2. **Courts must protect the right to counsel of choice** — untainted assets cannot be seized to coerce pleas or deprive defendants of effective representation under the Sixth Amendment.[69]

3. **Courts must reject retroactive prosecutions** — convictions based on laws or interpretations that did not exist at the time of conduct must be vacated as violations of the Fifth Amendment's Due Process Clause.[70]

4. **Courts must enforce Speedy Trial protections** — continuances may be granted only with contemporaneous, case-specific findings; recycled rationales such as "complexity," unverified victims, or unspecified data cannot justify delay (see Section

---

[65] 31 C.F.R. § 1010.100(ff); FinCEN Guidance FIN-2019-G001.
[66] 31 C.F.R. § 1010.100(ff)(5); FinCEN Rulings 2008-R005, 2014-R011.
[67] FinCEN–DOJ MOU; DOJ Justice Manual § 9-27.000.
[68] DOJ Justice Manual § 9-27.000; Blanche Memo (Apr. 2025).
[69] Fed. R. Crim. P. 11(b)(3); Brady v. Maryland, 373 U.S. 83 (1963).
[70] Fed. R. Crim. P. 16; Kyles v. Whitley, 514 U.S. 419 (1995).

V.K).

**Courts should require sworn inventories and chain-of-custody records for cryptocurrency seizures, just as they already do for cash and bank accounts.** Without such rules, defendants cannot verify what was taken or obtain the return of property. Judicial vigilance is essential to prevent omissions like those in Weeks's case and to ensure digital assets receive the same constitutional safeguards as traditional property.

Federal judges are not passive arbiters; they are constitutional guardians. Their vigilance is essential to prevent miscarriages of justice wherever prosecutorial overreach threatens constitutional rights.

These reforms are not optional policies; they are constitutional necessities. Unless the DOJ, IRS, SEC, FinCEN, and the courts adopt them, the injustices exemplified by the BCN case will recur in other contexts as well. Federal judges are not passive arbiters; they are constitutional guardians. Their vigilance is essential to prevent miscarriages of justice wherever prosecutorial overreach threatens fundamental rights. To restore public trust, constitutional limits must guide both future prosecutions and retrospective review of past convictions.

**Crypto without sworn inventories is property without due process.**

## F. Cross-Agency Coordination

Digital asset enforcement spans multiple agencies. Without consistent standards and communication, defendants are exposed to contradictory rules and selective enforcement — outcomes that violate due process and equal protection. (See Annex XI for detailed implementation notes.)

1. **Agencies must speak with one voice** — DOJ, SEC, CFTC, IRS, and FinCEN must coordinate positions before charging so defendants are not subjected to conflicting interpretations of the law.[71]

2. **Agencies must share investigative data across boundaries** — all materials must be exchanged before charges are filed, ensuring Brady compliance and preventing suppression of exculpatory evidence.[72]

3. **Agencies must adopt joint charging standards** — common criteria for digital asset prosecutions are required to guarantee equal protection and predictable enforcement.[73]

**Cross-agency reform is not a matter of efficiency; it is a constitutional necessity. Without it, selective enforcement will recur, and public trust in financial regulation will continue to erode.**

---

[71] Interagency MOU frameworks; DOJ Justice Manual § 1-13.000.
[72] DOJ Discovery Guidelines; Brady v. Maryland, 373 U.S. 83 (1963).
[73] Executive Order 14178 (2025); DOJ Justice Manual § 9-27.000.

# XI. Conclusion: Toward Institutional Restoration and Constitutional Alignment

The failures documented in this paper are not isolated mistakes of judgment; they are constitutional breakdowns that cut across prosecutorial discretion, judicial oversight, and inter-agency coordination. They reveal how, in the absence of clear rules and constitutional guardrails, individuals were prosecuted under theories that did not exist at the time of their conduct, deprived of untainted resources needed for their defense, and pressured into pleas that cannot withstand constitutional scrutiny.

At this stage, debate about policy design is not enough. The Constitution itself demands correction. To restore institutional legitimacy and to prevent recurrence, two imperatives must now guide both the judiciary and the Department of Justice: (1) enforcing constitutional boundaries in all future prosecutions, and (2) providing corrective action for past convictions obtained under retroactive or unconstitutional theories.

## A. Constitutional Imperatives Going Forward

The BitClub Network prosecution marks a constitutional breaking point. Retroactive charging, asset seizures that deprived defendants of counsel, and systematic discovery violations are not mere policy mistakes — they are structural violations of the Fifth and Sixth Amendments.

The Department of Justice itself now admits through the Blanche Memo that such prosecutions would not be brought today. That admission carries consequences: it is not a matter of future policy correction but of present constitutional duty.

**These are not reforms to consider. They are constitutional obligations. Vacatur is not optional. Release is not discretionary. Every day these convictions stand, the Constitution is violated again.**

This paper does not accuse individual prosecutors of misconduct. It documents systemic failures that left citizens convicted under legal theories that did not exist at the time of their conduct. Such convictions are void ab initio — nullities under the Constitution. Courts cannot allow them to stand without becoming complicit in their perpetuation. The Court has long recognized this principle: no retroactive crime (*Bouie*), no coerced plea (*Brady*), no seizure of defense assets (*Luis*). Each failure in Weeks's case is already marked as unconstitutional by the Supreme Court itself.

Accordingly, this paper calls for:

- **Immediate vacatur** of convictions resting on retroactive securities or conspiracy theories;
- **Release of defendants still imprisoned under those counts**, because confinement without constitutional authority is unlawful detention;

- **Return of untainted assets seized in violation of the Sixth Amendment**, so defendants may be restored to the position they were in before constitutional injury; and

- **Formal judicial findings** recognizing that these failures occurred, because transparency is itself a constitutional safeguard.

Corrective action is not optional. The Constitution requires that courts, Congress, and the Department of Justice itself move swiftly to remedy past violations. The judiciary's role is not passive — it is to guard the boundaries of due process.

**If convictions can stand on retroactive theories here, no citizen is safe from the same abuse.**

## B. Constitutional Corrective Action for Past Cases

Any prosecution that relied on retroactive legal theories — particularly Count Two securities charges in digital asset cases — is unconstitutional and must be vacated. Appendix IV provides an overview of such prosecutions and the individuals affected. Where convictions rest on conduct that was not clearly prohibited at the time, defendants must be released immediately.

Convictions obtained under these circumstances are not "flawed" or "outdated"; they are void. Confinement under such charges is unlawful detention, and every day it continues is a new constitutional violation.

The Department of Justice must also establish a mechanism for compensating defendants for time served, seized assets, and other harms resulting from unconstitutional prosecutions. While compensation of this kind is rare in U.S. practice, it is essential to restore public trust and to reaffirm that constitutional boundaries are not optional, even in politically charged enforcement arenas.

Immediate review is not discretionary — it is required by the Due Process Clause.

**This is not about digital coins. It is about human liberty.**

**Today crypto, tomorrow AI — the Constitution must hold.**

**If the law can be rewritten after the fact for Joby Weeks, it can be rewritten for anyone. That is not a crypto problem. That is a constitutional crisis. The Constitution demands we say: never again.**

# Exhibits to the White Paper

*Crypto Enforcement Process Failures: BCN Case Study & Institutional Audit*

**Prepared by:** Bradford L. Geyer and Frederic E. Teboul

**Date:** September 10, 2025

This volume contains the full set of appendices referenced in the White Paper. Each appendix provides supporting case studies, comparative enforcement data, and implementation notes.

| Appendix | Title | Why It Matters |
|---|---|---|
| I | **Comparative DOJ Charging Practices** | Shows DOJ's inconsistent treatment of major crypto cases; BCN stands out as selectively prosecuted. |
| II | **Post-2021 DOJ Enforcement Trends and Case Examples** | Highlights DOJ's shift to precision targeting, restitution, and intent-based fraud, contrasting with BCN. |
| III | **Select SEC Crypto Enforcement Cases** | Provides comparative SEC outcomes in ICOs/crypto projects, underscoring BCN's outlier status. |
| IV | **DOJ Criminal Cases: Retroactive Count Two Securities Charges and Defendant Outcomes** | Catalogues cases where defendants remain imprisoned under retroactive charges; underscores urgency for vacatur. |
| V | **Post-2021 Enforcement Actions Summary** | Provides detailed case studies (FTX, Celsius, Bitfinex, BitConnect, etc.), illustrating DOJ's calibrated focus on executive culpability and restitution. |
| VI | **Implementation Notes for DOJ Reforms** | Details procedural reforms DOJ can implement to prevent future retroactive or overbroad prosecutions. |
| VII | **Implementation Notes for IRS Reforms** | Explains how IRS handling of audits, tax forms, and blockchain data must change to ensure fairness. |
| VIII | **Implementation Notes for SEC Reforms** | Outlines transparency and enforcement limits needed to give market participants fair notice. |
| IX | **Implementation Notes for FinCEN Reforms** | Clarifies AML/MSB rules for miners, pools, and validators to prevent arbitrary enforcement. |
| X | **Implementation Notes for Federal Courts Reforms** | Provides courts with tools to enforce discovery, protect due process, and review outdated convictions. |
| XI | **Implementation Notes for Cross-Agency Coordination Reforms** | Proposes mechanisms for DOJ, SEC, CFTC, IRS, and FinCEN to align enforcement and avoid contradictions. |

# Appendix I. Comparative DOJ Charging Practices

**Comparative DOJ Charging Practices in Major Cryptocurrency-Related Prosecutions**

| Case | Time Period | DOJ Charges | Business Model | Defendant Role | Core Conduct | Enforcement Outcome |
|---|---|---|---|---|---|---|
| BitClub Network (BCN) | 2014–2019 | Wire Fraud, Conspiracy | Cooperative Bitcoin Mining Pool | Peripheral Promoter (Weeks) | Mining Membership Sales | Criminal Conspiracy Charges Applied Broadly |
| OneCoin[1] | 2014–2019 | Wire Fraud, Securities Fraud, Money Laundering | Fraudulent Cryptocurrency Pyramid Scheme | Founders and Executives | Global Ponzi Fraud (No Blockchain) | Full Criminal Prosecution |
| BitConnect[2] | 2016–2018 | Wire Fraud, Commodity Price Manipulation, MSB Violations, Money Laundering | Crypto Lending Ponzi | Founder and Promoters | Investment Fraud, Market Manipulation | Full Criminal Prosecution |
| Silk Road (Ulbricht)[3] | 2011–2013 | Narcotics Trafficking, Money Laundering, Murder-for-Hire Conspiracy | Darknet Narcotics Marketplace | Operator | Drug Sales via Bitcoin, Contract Killings | Full Criminal Prosecution |

**Key Takeaway:** BCN alone was criminalized for mining memberships while bigger, riskier schemes drew civil or traditional fraud charges. Selective prosecution violates equal protection.

---

[1] DOJ Press Release, *Manhattan U.S. Attorney Announces Charges Against Leaders of "OneCoin," A Multibillion-Dollar Pyramid Scheme* (Mar. 8, 2019).

[2] DOJ Press Release, *Founder Of BitConnect Indicted In Global $2.4 Billion Cryptocurrency Scheme* (Feb. 25, 2022); DOJ Press Release, *$56 Million In Seized Cryptocurrency Being Sold As First Step To Compensate Victims Of BitConnect Fraud Scheme* (Nov. 16, 2021).

[3] DOJ Press Release, *Manhattan U.S. Attorney Announces The Indictment Of Ross Ulbricht, The Creator And Owner Of The "Silk Road" Website* (Feb. 4, 2014).

# Appendix II. Post-2021 DOJ Enforcement Trends and Case Examples

Since 2021, DOJ cryptocurrency enforcement has evolved sharply toward precision targeting, focusing on core managerial fraud, national security risks, and high-value restitution—departing from earlier models that imposed sweeping conspiracy liability. Key enforcement cases reflect this shift:

| Case | Year(s) | Core Conduct | DOJ Focus | Outcome / Restitution | Key Contrast |
|---|---|---|---|---|---|
| **FTX / Sam Bankman-Fried**[4] | 2022–2023 | ~$8B fraud; exec misappropriation, bribery, securities fraud | Founder + core execs only | SBF convicted, sentenced; restitution central | Executives charged. Minor promoters untouched. BCN promoters still face felonies. |
| **Celsius / Alex Mashinsky**[5] | 2023–2025 | Securities fraud; false investor statements | CEO conduct | 12-year sentence (May 2025); restitution prioritized | CEO punished. BCN peripheral actors punished the same as founders. |
| **Bitfinex Hack / Lichtenstein & Morgan**[6] | 2022–2024 | 119,754 BTC hack (~$3.6B) | Direct hackers; attribution of stolen funds | Asset recovery emphasized; restitution to victims | Hackers targeted. In BCN, non-hackers indicted as fraudsters. |
| **Nashwan Chetal / SIM-Swap Theft**[7] | 2023 | $245M ID theft + crypto wallet theft | Individualized conduct | Conviction + restitution coordination | Direct theft punished. BCN participants punished for undefined "promotion." |
| **Gleb Gugnin / Stablecoin Sanctions Evasion**[8] | 2024 | Sanctions violations; cross-border evasion | National security risk focus | Case centered on foreign influence + export control | Real national security risks prosecuted. BCN treated as if it were. |
| **$225M USDT Seizure**[9] | 2024 | Human trafficking proceeds | Illicit finance disruption | Seizure coordinated with victim | Victims compensated here. BCN victims minimal — but assets still frozen. |

[4] U.S. v. Bankman-Fried, No. 1:22-cr-00673 (S.D.N.Y.); DOJ Press Release, "FTX Founder Sentenced to 25 Years in Prison for Multibillion-Dollar Fraud," March 28, 2024.
[5] DOJ Press Release, "Founder of Crypto Lending Platform Celsius Charged with Fraud," July 13, 2023.
[6] DOJ Press Release, "DOJ Seizes $3.6 Billion in Stolen BTC and Arrests Couple in Connection with 2016 Hack," February 8, 2022.
[7] U.S. v. Chetal, No. 2:23-cr-00291 (E.D. Cal.); see also DOJ Cybercrime Task Force Briefing Memo (2023), available via FOIA request.
[8] DOJ Press Release, "DOJ Disrupts Stablecoin-Based Sanctions Evasion Network Involving Russian Entities," May 9, 2024.

| | | | | support + asset return | |
|---|---|---|---|---|---|

**Key Takeaway:** Post-2021 cases show DOJ knows how to do it right: charge decision-makers, use blockchain forensics, and focus on restitution. BCN proves the opposite — overbroad conspiracy, no forensics, no restitution.

**Yesterday's policy failure is today's constitutional injury: Weeks is in prison for conduct the DOJ now admits it would not charge."Appendix III. Select SEC Crypto Enforcement Cases**

---

[9] U.S. Department of Justice, *Justice Department Seizes $225 Million in Cryptocurrency Linked to Transnational Human Trafficking Network*, Press Release, Nov. 21, 2023, available at: https://www.justice.gov/opa/pr/justice-department-seizes-225-million-cryptocurrency-linked-transnational-human-trafficking-network

# Appendix III. Selective SEC Crypto Enforcement Cases

This appendix summarizes key SEC enforcement actions against major digital asset projects. Despite raising significantly more capital than BCN, these projects generally faced **civil resolutions** and **no criminal charges**, highlighting the disparity in treatment compared to the felony prosecution of Mr. Weeks.

| Project / Entity | Year | Allegations | Resolution | Key Contrast |
|---|---|---|---|---|
| Tezos (2017 ICO)[10] | 2017–2020 | Unregistered securities offering (ICO) | SEC settlement, $25M fine; no DOJ charges | Tezos paid a fine. BCN promoters face prison. |
| EOS / Block.one | 2019 | Unregistered securities (ICO raising $4B) | SEC settlement, $24M penalty; no DOJ charges | EOS raised billions. No jail. BCN went to prison. |
| Ripple (XRP)[11] | 2020–2023 | SEC alleged ongoing securities violations | Still civil litigation; no DOJ prosecution | Ripple fought civilly in court. BCN was criminalized. |
| Ethereum (ETH pre-Merge sales)[12] | 2015–2020 | Unclear classification; SEC/CFTC split | No SEC/DOJ enforcement; asset treated as commodity by CFTC | Ethereum got ambiguity. BCN got indictments. |
| BlockFi | 2021–2022 | Unregistered interest-bearing accounts | SEC/CFTC settlements, $100M fines | BlockFi wrote a check. BCN defendants face decades. |
| Telegram / TON[13] | 2018–2020 | Unregistered securities (token offering, $1.7B | SEC injunction blocked launch; Telegram refunded investors and | Telegram raised $1.7B, refunded investors. No jail. BCN defendants remain prosecuted. |

[10] SEC Response to Tezos FOIA Request (2018): In February 2018, the SEC denied a public information request related to its investigation of the Tezos ICO, citing an exemption to protect potential enforcement activity. Though the $232 million ICO drew scrutiny for its "non-refundable donation" structure, no charges were ultimately filed. SEC Chair Jay Clayton stated at the time: "To the extent that digital assets like ICOs are securities... our federal securities laws apply." SEC says releasing Tezos documents could hurt enforcement activities (February 9, 2018).
[11] *SEC v. Ripple Labs, Inc.*: Filed in December 2020, the SEC alleged Ripple raised $1.3 billion via unregistered XRP sales. In July 2023, Judge Torres ruled that institutional sales violated securities laws, but secondary market sales did not. In March 2025, the SEC dropped its appeal. In June 2025, Ripple and the SEC jointly moved to dissolve the injunction and distribute a reduced $125 million penalty—$75 million of which would be returned to Ripple.
 SEC Press Release, "SEC Charges Ripple and Two Executives with Conducting $1.3 Billion Unregistered Securities Offering," Dec. 22, 2020. https://www.sec.gov/news/press-release/2020-338
[12] William Hinman, "Digital Asset Transactions: When Howey Met Gary (Plastic)," June 14, 2018, https://www.sec.gov/news/speech/speech-hinman-061418
[13] SEC v. Telegram Group Inc., No. 1:19-cv-9439 (S.D.N.Y.); Final Judgment and SEC Press Release, https://www.sec.gov/news/press-release/2020-146

| | | | | |
|---|---|---|---|---|
| | | raised) | shut down project | |
| **TurnKey Jet / Pocketful of Quarters**[14] | 2019 | Token issuance | Received SEC no-action letters confirming tokens not securities under conditions | Some tokens got a green light. BCN got indictments. |
| **Paragon / Munchee**[15] | 2017–2018 | Unregistered securities offerings (~$12M / $15M) | SEC settlements; small civil penalties; no fraud findings | Munchee paid pennies. Paragon paid pennies. BCN defendants face felonies. |
| **Coinbase** | 2024 | Alleged unregistered securities exchange & staking services | Claims narrowed after judicial criticism; SEC deferred remedies pending Congressional deliberations; no DOJ charges | Even the largest U.S. exchange avoided criminal liability. BCN's peripheral promoters were indicted. |

**Key Takeaway:** The SEC let billion-dollar projects walk with small fines while BCN's peripheral promoters were criminalized.

---

[14] SEC No-Action Letters: TurnKey Jet (April 3, 2019) and Pocketful of Quarters (July 25, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets
[15] SEC Orders: Paragon Coin, Inc. and Munchee Inc., https://www.sec.gov/news/press-release/2017-227; https://www.sec.gov/litigation/admin/2018/33-10574.pdf

# Appendix IV. DOJ Criminal Cases: Retroactive Count Two Charges and Outcomes

## Table 1 – Case-Level Overview

| Case | Court / Year Filed | Conduct Period | Count One | Count Two | Outcome / Status | Relevance for Retroactivity Review |
|---|---|---|---|---|---|---|
| **United States v. Matthew Brent Goettsche, et al. (BitClub Network)** | D.N.J. 2019 | 2014–2019 | Conspiracy to Commit Wire Fraud | Conspiracy to Offer/Sell Unregistered Securities | Multiple defendants pled; one conviction pending; one trial pending; some released; Weeks' plea withdrawal motion pending | Count Two based on post-2017 theory; digital-asset classification unsettled during conduct |
| **United States v. Maksim Zaslavskiy** | E.D.N.Y. 2017 | 2016–2017 | Conspiracy to Commit Securities Fraud | — | Pleaded guilty (Nov 2018); sentenced to 18 months (Nov 2019) | Plea predates formal SEC/DOJ framework; potential § 2255 argument |
| **United States v. John DeMarr** | E.D.N.Y. 2021 | 2017–2018 | Conspiracy to Commit Securities Fraud | — | Pleaded guilty (Jul 2021); sentenced to 60 months (Feb 2023) + $3.5M forfeiture | Charge theory matured after conduct; retroactivity challenge possible |
| **United States v. Braden John Karony, Kyle Nagy, Thomas Glenn Smith, et al. (SafeMoon Executives)** | E.D.N.Y. 2023 | 2021–2022 | Conspiracy to Commit Securities Fraud | Conspiracy to Commit Wire Fraud | Karony convicted (May 2025); Smith pled guilty; Nagy fugitive | Securities-fraud theory evolved during conduct; retroactivity challenge possible |
| **United States v. Joshua David Nicholas, Emerson Pires, and Flavio Goncalves (EmpiresX Promoters)** | S.D. Fla. 2022 | 2020–2022 | Conspiracy to Commit Wire Fraud | Conspiracy to Commit Securities Fraud | Nicholas pled guilty; sentenced to 51 months (2023); Pires & Gonçalves fugitives | Conduct occurred during evolving regulatory posture; retroactivity challenge possible |

**Key Takeaway:** Count Two was invented after the fact. Punishing Weeks and Goettsche for securities violations no one could have known about in 2014–2017 is a textbook violation of the Due Process Clause.

Table 2 – Defendant-Level Detail

| Case | Defendant | Plea? (Y/N) | Sentence / Status | Charges / Notes |
|------|-----------|-------------|-------------------|-----------------|
| **United States v. Matthew Brent Goettsche, et al. (BitClub Network)** | Jobadiah Weeks | Yes – withdrawal motion pending | Not yet sentenced | Conspiracy to commit wire fraud; conspiracy to sell unregistered securities (retroactive Count Two); claims plea was coerced; awaiting ruling |
| | Joseph Abel | Yes | 2 years (served) | Conspiracy to offer and sell unregistered securities; sentenced pre-Blanche Memo; released |
| | Matthew Brent Goettsche | No | Trial pending | Facing conspiracy to commit wire fraud and conspiracy to sell unregistered securities; rejected plea; in custody |
| | Silviu Catalin Balaci | Yes | Pending sentencing | Programmer; pled guilty to conspiracy to commit wire fraud |
| | Russ Albert Medlin | No | Status unclear | Charged with conspiracy to commit wire fraud and conspiracy to sell unregistered securities; also facing unrelated charges in Indonesia |
| **United States v. Maksim Zaslavskiy** | Maksim Zaslavskiy | Yes | 18 months (11/18/2019) | Conspiracy to commit securities fraud; first criminal ICO case (REcoin & Diamond) |
| **United States v. John DeMarr** | John DeMarr | Yes | 60 months (02/06/2023) | Conspiracy to commit securities fraud in Coindeal scheme; ~$3.5M forfeiture |
| **United States v. Braden John Karony, et al. (SafeMoon Executives)** | Braden John Karony | No (convicted) | Sentencing pending | Convicted May 2025 of securities fraud, wire fraud, money laundering; faces decades in prison |
| | Thomas Smith | Yes | Sentencing pending | Pled guilty; conspiracy charges; cooperated with prosecution |
| | Kyle Nagy | No (fugitive) | At large | Founder; charged with securities fraud, wire fraud; fugitive |
| **United States v. Joshua David Nicholas, et al. (EmpiresX Promoters)** | Joshua David Nicholas | Yes | 51 months (2023) | Head Trader; conspiracy to commit securities fraud; $3.38M restitution |
| | Emerson Pires | No (fugitive) | Fugitive | Charged with conspiracy to commit securities fraud and wire fraud |
| | Flavio Goncalves | No (fugitive) | Fugitive | Charged with conspiracy to commit securities fraud and wire fraud |

**Key Takeaway:** Equal protection is shredded here: Weeks faces decades, while Zaslavskiy, DeMarr, and others walked with months or years. Same conduct, different outcomes — law by geography and timing.

**Retroactive Count Two charges must fall — they are unconstitutional by definition.**

# Appendix V. Post-2021 Enforcement Actions

This appendix summarizes DOJ's post-2021 digital asset enforcement actions, which reflect a marked shift from the pre-2021 BitClub Network prosecution model toward role-based charging, blockchain-forensic attribution, and victim restitution.

| Case Name | Year(s) | Defendant(s) | Alleged Conduct | DOJ Focused On | Victim Restitution? | Notes |
|---|---|---|---|---|---|---|
| **FTX / Sam Bankman-Fried** | 2022–2023 | SBF (Founder/CEO) | Fraud, misuse of customer funds | Executive fraud & bribery | Yes | Multi-billion fraud; focused on leadership culpability |
| **Celsius / Alex Mashinsky** | 2023 | Mashinsky (CEO) | Misleading investors, market manipulation | Executive misstatements | Partial | DOJ emphasized financial transparency post-crisis |
| **Bitfinex Hack** | 2022–2023 | Lichtenstein, Morgan | Laundering $4B in BTC from 2016 hack | Blockchain tracing & asset recovery | Yes | 119,754 BTC recovered; emphasis on restitution |
| **BitConnect** | 2021–2023 | Arcaro, others | Ponzi scheme, deceptive lending program | Investment fraud | Yes | Over $56M in seized crypto returned to victims |
| **USDT/Tether Seizure** | 2024 | Unnamed (linked to trafficking) | Seizure linked to illicit finance | Illicit network disruption | Yes | $225M seized; no prosecution of passive holders |
| **Chetal BTC Theft** | 2023 | Nashwan Chetal | SIM-swap-based crypto theft | Direct crypto theft | No | Focused on digital access fraud and identity theft |
| **Gugnin Sanctions Case** | 2024 | Gleb Gugnin | Stablecoin-based sanctions evasion | National security finance | No | Russian-linked cross-border flows targeted |
| **SEC v. Coinbase / Kraken / Binance** | 2024 (civil) | Corporate exchanges | Alleged unregistered securities offerings | Judicial restraint on SEC | N/A | SEC narrowed scope after judicial criticism |

**Key Contrast:** Unlike the BCN prosecution, which relied on **sweeping conspiracy counts and opaque loss models**, post-2021 cases have focused on **leadership culpability, validated loss data, and restitution.**

**Policy Insight:** Formal adoption of this **post-2021 enforcement template** would align DOJ practice with constitutional due process and international regulatory norms.

# Appendix VI. Implementation Notes for DOJ Reforms

*These notes expand on Section XI.A recommendations with procedural detail, case law, and current policy references.*

## 1. Fair Notice Rule

**Procedural detail:**

- Require DOJ prosecutors to obtain **Main Justice approval** before initiating prosecutions involving:

  - Novel or unsettled digital asset classifications.

  - Lack of SEC/CFTC consensus on asset status.

  - No individualized fraud allegations or managerial conduct.

- Prohibit retroactive application of conspiracy statutes in contexts where regulatory status was unresolved at the time of conduct.

**Legal authority:**

- U.S. Const. art. I, § 9, cl. 3 (Ex Post Facto Clause).

- *Bouie v. City of Columbia*, 378 U.S. 347 (1964) (due process prohibits unforeseeable judicial expansion of criminal statutes).

- *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) (fraud requires intent to harm or deceive).

- *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) (criminal statutes require specific, material misrepresentation).

## 2. Retroactive Application Review

**Procedural detail:**

- Establish a DOJ **review process for legacy digital asset prosecutions** brought before April 2025 to determine compliance with the Blanche Memo.

- Vacate or modify convictions where:

  - Charges relied on contested asset classifications without willful misconduct.

  - The defendant had no managerial role or financial control.

  - Charging theories have since been formally disavowed.

**Legal authority:**

- DOJ Justice Manual § 9-27.000 et seq. (Principles of Federal Prosecution).

- Blanche Memo (Apr. 2025) — prohibits criminal prosecution absent willful misconduct; mandates review for contested classifications.

## 3. Asset Seizure Safeguards

**Procedural detail:**

- Ban pretrial seizure of **untainted assets** without prompt judicial review and a timely forfeiture determination.

- Require forensic taint review before seizure of mixed-asset accounts or cryptocurrency wallets.

- If the government fails to meet these requirements, mandate immediate return of assets.

**Legal authority:**

- Sixth Amendment right to counsel of choice.

- *Luis v. United States*, 578 U.S. 5 (2016) (seizure of untainted assets violates Sixth Amendment).

- *Kaley v. United States*, 571 U.S. 320 (2014) (limits on pretrial restraint of assets).

- DOJ Asset Forfeiture Policy Manual (2023).

## 4. Charging Consistency

**Procedural detail:**

- Create a **DOJ Crypto Charging Review Panel** to ensure case recommendations meet:

  - Blanche Memo standards.

  - Consistency across districts.

  - Consideration of interagency positions (SEC/CFTC).

- Amend DOJ Justice Manual Ch. 9-1100 to codify:

  - Individualized culpability requirements.

  - Standards for cases involving asset classification uncertainty.

  - Interagency referral procedures specific to crypto cases.

**Legal authority:**

- DOJ Justice Manual § 9-1100 (proposed amendment for Digital Asset Guidance).

- Executive Order 14178 (2025) — promotes interagency coordination in digital asset enforcement.

**Key Takeaway:** DOJ's reforms are not optional — they are constitutional necessities. Retroactive charges, asset seizures, and selective prosecutions violate the Fifth and Sixth Amendments.

Without vacating old convictions, DOJ's promises of reform are empty — the Constitution is still being broken today.

# Appendix VII. – Implementation Notes for IRS Reforms

*These notes expand on Section XI.B recommendations with procedural detail and legal authority.*

**1. Share Tax Records Immediately**

- *Procedural detail:* Require IRS Criminal Investigation (CI) to produce all taxpayer data relevant to a criminal allegation as soon as DOJ signals an intent to charge. Include all forms (e.g., 1099-B, 4684) and transaction-level records.

- *Legal authority:* Brady v. Maryland, 373 U.S. 83 (1963); Fed. R. Crim. P. 16.

**2. Provide Complete Audit Files**

- *Procedural detail:* Deliver full IRS audit workpapers, internal memos, and calculation spreadsheets — not only summary reports.

- *Legal authority:* IRS Manual 4.10.2; Treasury Reg. § 601.702(c) (FOIA obligations).

**3. Align Reporting with Digital Asset Realities**

- *Procedural detail:* Amend IRS guidance to clarify reporting of cryptocurrency conversions, staking rewards, mining income, and collateral liquidations (e.g., SALT Lending transactions).

- *Legal authority:* IRS Notice 2014-21; IRS Rev. Rul. 2019-24; Form 1099-B and 1099-MISC reporting requirements.

**4. Coordinate with DOJ Before Charges**

- *Procedural detail:* Implement a mandatory interagency review before charging, ensuring IRS loss figures, asset valuations, and tax positions match DOJ's prosecution theory and SEC/CFTC classifications.

- *Legal authority:* IRS CI–DOJ coordination protocols; DOJ Justice Manual § 9-27.000 (Principles of Federal Prosecution).

**Key Takeaway:** Suppressing tax records and audit workpapers denied defendants due process. IRS obligations flow from Brady and the Constitution, not administrative convenience.

Tax law by ambush is unconstitutional — yet that is how Weeks was charged.

# Appendix VIII. – Implementation Notes for SEC Reforms

*These notes expand on Section XI.C recommendations with procedural detail and legal authority.*

**1. Publish the Record**

- *Procedural detail:* Finalize and publish a searchable index of SEC actions since 2017, showing how various tokens and fundraising events have been classified (security vs. non-security). Include links to settlement orders, litigation releases, and administrative decisions.

- *Legal authority:* SEC "Framework for 'Investment Contract' Analysis of Digital Assets" (2019); FOIA transparency obligations.

**2. Give Old Projects a Safe Path**

- *Procedural detail:* Create a formal no-action letter pathway for projects that:

  - Ceased operations before 2020.

  - Have tokens that no longer trade.

  - Have no remaining managerial team.

- *Precedent:* Extend the logic from *TurnKey Jet, Inc.* and *Pocketful of Quarters, Inc.* letters to legacy projects meeting defined conditions.

**3. Focus Enforcement Where It Matters**

- *Procedural detail:* Publicly commit that enforcement will target only those with managerial control or who engaged in material misrepresentations, not passive advisors, developers, or community members.

- *Legal authority:* SEC Enforcement Manual § 2.3 (Principles of Effective Enforcement); *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).

**Key Takeaway:** Fair notice is a constitutional mandate, not a policy choice. Without published classifications, SEC enforcement becomes retroactive punishment.

If even the SEC couldn't say what was a security, how could Weeks?

# Appendix IX. – Implementation Notes for FinCEN Reforms

*These notes expand on Section XI.D recommendations with procedural detail and legal authority.*

**1. Draw a Clear Line for Miners and Pools**

- *Procedural detail:* Issue interpretive guidance clarifying when mining pools, staking pools, or validator nodes meet the MSB definition, with specific exclusions for cooperative models without custody or control of participant assets.

- *Legal authority:* 31 C.F.R. § 1010.100(ff); FinCEN Guidance FIN-2019-G001 ("Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies").

**2. Set Custody Thresholds for Pools**

- *Procedural detail:* Define quantitative or functional thresholds for "custodial" classification — e.g., holding customer assets for more than a set period, unilateral control of withdrawal keys, or ability to reallocate funds without consent.

- *Legal authority:* 31 C.F.R. § 1010.100(ff)(5); FinCEN Rulings 2008-R005, 2014-R011.

**3. Coordinate with DOJ Before Cases**

- *Procedural detail:* Require formal interagency consultation before DOJ files charges relying on FinCEN regulatory interpretations, to ensure charging theories align with FinCEN's current guidance.

- *Legal authority:* FinCEN–DOJ Memorandum of Understanding; DOJ Justice Manual § 9-27.000.

**Key Takeaway:** Vague AML rules applied after the fact turn financial regulation into unconstitutional retroactivity. FinCEN must draw clear lines before liability attaches.

Mining pools cannot be crimes one day only because regulators re-labeled them years later.

# Appendix X. – Implementation Notes for Federal Courts Reforms

*These notes expand on Section XI.E recommendations with procedural detail and legal authority.*

**1. Go Back and Check**

- *Procedural detail:* Establish judicial review mechanisms to evaluate convictions in light of the Blanche Memo and updated agency guidance. This could include post-conviction motions, habeas corpus petitions, or court-initiated case reviews.

- *Legal authority:* DOJ Justice Manual § 9-27.000; Blanche Memo (Apr. 2025).

**2. Make Loss Evidence Transparent**

- *Procedural detail:* Require that before accepting a guilty plea, the court confirms the government has disclosed a verified loss model and full victim attribution data to the defense.

- *Legal authority:* Fed. R. Crim. P. 11(b)(3); Brady v. Maryland, 373 U.S. 83 (1963).

**3. Enforce Timely Discovery**

- *Procedural detail:* Use court orders, sanctions, or exclusion of evidence to enforce discovery deadlines. Require the government to log all withheld materials and provide justifications.

- *Legal authority:* Fed. R. Crim. P. 16; Kyles v. Whitley, 514 U.S. 419 (1995).

**Key Takeaway:** Judges are not passive; they are constitutional guardians. Allowing retroactive charges and asset seizures without scrutiny abdicates that role.

When courts tolerate retroactive prosecutions, they erode due process and the Sixth Amendment itself.

# Appendix XI. – Implementation Notes for Cross-Agency Coordination Reforms

*These notes expand on Section XI.F recommendations with procedural detail and legal authority.*

**1. Speak with One Voice**

- *Procedural detail:* Require an interagency coordination meeting before DOJ files charges in a digital asset case. Representatives from SEC, CFTC, IRS, and FinCEN must confirm alignment on asset classification, regulatory interpretations, and enforcement posture.

- *Legal authority:* DOJ Justice Manual § 1-13.000 (Interagency Coordination); Interagency MOUs.

**2. Share Data Across Agencies**

- *Procedural detail:* Create a shared evidence repository accessible to all involved agencies to prevent withholding or delayed production of material evidence. Require certification that all known evidence has been shared across agencies and with the defense.

- *Legal authority:* Brady v. Maryland, 373 U.S. 83 (1963); DOJ Discovery Guidelines.

**3. Adopt Joint Charging Standards**

- *Procedural detail:* Publish a unified set of charging criteria for digital asset cases, jointly agreed upon by DOJ, SEC, CFTC, IRS, and FinCEN. Criteria should cover asset classification certainty, individual culpability, victim harm thresholds, and proportionality in charging decisions.

- *Legal authority:* Executive Order 14178 (2025); DOJ Justice Manual § 9-27.000.

**Key Takeaway:** Conflicting agency theories leave defendants without fair notice. The Constitution requires a single, consistent rule of law.

If the SEC says no, the CFTC says yes, and DOJ prosecutes anyway, due process has already been lost.

# Appendix XII. Detailed Constitutional Defects in the BCN Prosecution

This appendix provides a structured breakdown of the constitutional obligations violated in the prosecution of the BitClub Network and comparable digital asset cases. Each entry follows the format: **Obligation Violated → How DOJ Violated It → Prejudice to the Defense.**

## 1. Retroactive Wire Fraud Theory

- **Obligation Violated**
  The Fifth Amendment's Due Process Clause requires fair notice of what conduct is criminal.[16] Prosecutors may not apply existing statutes in a novel or unforeseeable way to past conduct, especially where no prior case law, agency guidance, or DOJ policy gave warning.[17]

- **How DOJ Violated It**
  In BCN and other digital asset cases brought before 2020, prosecutors applied wire fraud statutes to cooperative mining pool participation and promotional activity. At the time of these events (2013–2017), no DOJ charging policy, judicial precedent, or agency guidance treated such activity as criminal. These theories of liability only emerged later, making their application retroactive.

- **Prejudice to the Defense**
  Market participants had no way to anticipate that cooperative mining participation could be prosecuted as wire fraud. Forcing a defendant to plead guilty under a theory that had no legislative or regulatory basis is unconstitutional — it deprives the plea of voluntariness and renders it the product of coercion, not informed choice. This lack of fair notice undermines the legitimacy of the charges and heightened coercive pressure to plead in multiple cases, not just BCN.

## 2. Retroactive Securities Charge

- **Obligation Violated**
  The Fifth Amendment's Due Process Clause requires fair notice of what conduct is criminal.[18] Laws and legal interpretations cannot be applied retroactively to punish conduct that was lawful when performed.

- **How DOJ Violated It**
  In BCN and other pre-2020 digital asset cases, prosecutors alleged unregistered securities sales based on interpretations that had not been issued by the SEC or

---

[16] Bouie v. City of Columbia, 378 U.S. 347 (1964).
[17] United States v. Lanier, 520 U.S. 259 (1997).
[18] Bouie v. City of Columbia, 378 U.S. 347 (1964).

adopted by any court during the relevant period. The classification theory emerged later, as part of evolving enforcement positions in the digital asset space.

- **Prejudice to the Defense**

  By charging under classifications that did not exist at the time, the government deprived defendants of the ability to conform conduct to the law. Forcing a plea under such conditions is both coercive and unconstitutional, as it violates due process and the requirement that guilty pleas be knowing, intelligent, and voluntary. This retroactivity undermines the validity of such charges under constitutional standards and contributed to coercive plea dynamics across multiple prosecutions.

### 3. Charging Discretion Failures

- **Obligation Violated**

  The Fifth Amendment's Due Process Clause guarantees fair notice of what conduct is criminal.[19] DOJ policy also requires prosecutors to follow established charging guidelines and avoid retroactively applying new or untested legal theories.[20]

- **How DOJ Violated It**

  In the BCN case, prosecutors applied unprecedented conspiracy charges to cooperative mining pool participation and promotional activity — even though, at the time, there was no DOJ guidance, published legal precedent, or internal policy addressing such conduct. No statute or agency rule clearly prohibited the activities in question during the relevant period.

- **Prejudice to the Defense**

  By creating liability after the fact, the government exposed Weeks to felony charges he could not have reasonably anticipated. This retroactive criminalization undermined the fairness of the prosecution and eroded confidence in the even-handed application of federal law.

### 4. Asset Seizure Failures

- **Obligation Violated**

  The government may not seize untainted assets before trial if doing so prevents a defendant from hiring counsel or preparing a defense.[21] Such seizures must be promptly reviewed by a court and justified by proof the assets are tied to criminal activity.[22]

- **How DOJ Violated It**

  In the BCN case, prosecutors froze nearly all of Mr. Weeks' accessible resources — cash, cryptocurrency, precious metals, and business records — before trial. No court ever issued a forfeiture judgment, and those assets remain unreleased to this day. About nine months after the seizures began, Weeks signed a plea agreement under

---

[19] U.S. Const. amend. V.
[20] DOJ Justice Manual § 9-27.230 (Selecting Charges); Bouie v. City of Columbia, 378 U.S. 347 (1964).
[21] Fifth Amendment; U.S. Const. amend. V.
[22] Sixth Amendment; Luis v. United States, 578 U.S. 5 (2016); Kaley v. United States, 571 U.S. 320 (2014).

mounting pressure. The asset freeze was accompanied by other coercive tactics, including repeated transfers between detention facilities, which further disrupted his ability to prepare a defense.

- **Prejudice to the Defense**

  Without access to his assets, Weeks could not hire forensic experts, challenge the government's financial claims, or conduct a full review of discovery. The prolonged deprivation of resources, combined with the disruption of frequent transfers, created a coercive environment that left a plea as the only realistic option.

## 5. Discovery Production Failures

- **Obligation Violated**

  The prosecution must give the defense all material evidence in its possession — especially evidence that could help prove innocence or reduce guilt.[23] This includes timely disclosure of exculpatory information, financial records, and investigative materials.[24]

- **How DOJ Violated It**

  In the BCN case, the government withheld key categories of evidence for years after indictment, including:

  - Blockchain transaction data.

  - IRS Forms 1099-B and 4684.

  - IRS Criminal Investigation audit workpapers.

  - Internal agency memos discussing regulatory uncertainty.

  - Suspicious Activity Reports (SARs), some incomplete or created after the fact.

  - Communications about charging decisions and grand jury expansions.

  - Victim attribution data (12 victims, approx. $458,502.40) — not disclosed until nearly five years post-indictment.
  - Exculpatory witness statements

  When Mr. Weeks began representing himself (pro se) and sought to withdraw his plea, the government still refused to give him full access to discovery — including materials it had previously provided to his lawyers — despite repeated written requests from February 2025 onward.

- **Prejudice to the Defense**

  The delayed and incomplete production prevented Weeks from fully understanding the case against him, verifying loss calculations, or challenging the credibility of government witnesses. The lack of timely access also crippled his ability to prepare

---

[23] Brady v. Maryland, 373 U.S. 83 (1963).
[24] Fed. R. Crim. P. 16; Kyles v. Whitley, 514 U.S. 419 (1995).

motions, develop an alternative theory of the case, or present exculpatory evidence at trial.

## 6. Pre-Plea Disclosure Failures

- **Obligation Violated**
  Before a guilty plea is accepted, the prosecution must disclose all material evidence relevant to the defendant's decision — including financial loss calculations, victim lists, and investigative reports.[25] This ensures the plea is made knowingly and voluntarily.[26]

- **How DOJ Violated It**
  In the BCN case, prosecutors failed to disclose critical evidence before securing Weeks' plea, including:
  - Investigative reports on the alleged misconduct.
  - Full asset tracing records.
  - Verified victim attribution data.
  - Complete loss models tied to Weeks' own conduct.

  Much of this information was produced years after the plea was signed, meaning Weeks made a binding legal decision without access to the full evidentiary record.

- **Prejudice to the Defense**
  Without this information, Weeks could not accurately assess the strength of the government's case or the scope of alleged financial harm. This deprived him of the ability to make an informed choice about whether to accept the plea or go to trial, undermining the voluntariness of the plea agreement.

## 7. Grand Jury Presentation Failures

- **Obligation Violated**
  The prosecution must present the grand jury with a fair and complete account of the evidence so it can decide whether probable cause exists.[27] This includes providing accurate financial loss calculations, verified victim data, and relevant investigative summaries.[28]

- **How DOJ Violated It**
  In the BCN case, the government's discovery omissions meant the grand jury may never have received:
  - Complete financial loss calculations.
  - Verified victim attribution.
  - Summaries of suspicious activity reports (SARs).
  - Communications or documents explaining charging decisions.

---

[25] Fed. R. Crim. P. 11(b)(3); Brady v. United States, 397 U.S. 742 (1970).
[26] McCarthy v. United States, 394 U.S. 459 (1969).
[27] Fifth Amendment; United States v. Williams, 504 U.S. 36 (1992).
[28] DOJ Justice Manual § 9-11.233.

These gaps prevented the defense from later evaluating whether the grand jury had been given an accurate factual basis for the charges — and whether the indictment was secured in compliance with constitutional standards.

- **Prejudice to the Defense**
  By withholding this information from disclosure, the prosecution made it impossible to challenge the sufficiency or accuracy of the evidence presented to the grand jury. This undermined Weeks' ability to contest the indictment or to pursue remedies for grand jury abuse.

### 8. Comparative Enforcement Discretion Failures

- **Obligation Violated**
  The DOJ should apply charging standards consistently, avoiding selective prosecution of peripheral actors when similarly situated individuals in comparable cases receive lesser or no criminal charges.[29]

- **How DOJ Violated It**
  In the BCN case, peripheral promoters like Weeks — with no managerial authority, no control over project funds, and limited loss attribution — faced felony conspiracy charges. In other large cryptocurrency matters (e.g., Tezos, EOS, Ripple, Ethereum, BitConnect, OneCoin), founders and major financial beneficiaries often resolved cases through civil or regulatory settlements without criminal liability.

- **Prejudice to the Defense**
  This inconsistent charging practice amplified the perception that Weeks was targeted for reasons unrelated to culpability. It also deprived him of the equal protection and fair notice that come from uniform enforcement, increasing the coercive pressure to plead rather than face trial under disproportionate charges.

**Cumulative Impact:**
The convergence of these systemic failures — spanning charging discretion, asset seizures, discovery noncompliance, plea disclosure deficiencies, grand jury omissions, and selective enforcement — compounded pretrial pressures, impaired defense preparation, and eroded the voluntariness of the plea, resulting in a process that failed to meet constitutional standards for due process and fair trial.

---

[29] Fifth Amendment; DOJ Justice Manual § 9-27.260 (Selection of Charges).

# Exhibit B

Transmittal Letter of Professor Alan M. Dershowitz endorsing the White Paper.

**From the Desk of Alan Dershowitz**

**Alan M. Dershowitz, Esq.**
*Felix Frankfurter Professor of Law, Emeritus*
*Harvard Law School*
*45 Sutton Place South*
*New York, NY 10022, USA*
*Tel: +1 (617) 319-9892*
*Email: alandersh@gmail.com*

September 10, 2025

**Ed Martin**

cc: Pam Bondi
cc: Alina Habba

Dear Ed,

I had the opportunity to review this compelling white paper. I encourage you to read it carefully. If you have any questions, do not hesitate to call me.

Sincerely,

**Alan M. Dershowitz, Esq.**
Felix Frankfurter Professor of Law, Emeritus
Harvard Law School