# Exhibit A.

Discovery Clarification Letter to AUSAs dated September 23 2025

**By Email**
Trevor.Chenoweth@usdoj.gov
Robert.Moore3@usdoj.gov

Re: **U.S. v. Jobadiah Sinclair Weeks (2:19-cr-877)** – **Request for Discovery Production Information**

Dear Mr. Chenoweth and Mr. Moore:

I write as the pro se defendant in the above matter. As you are both newly assigned to this case, I want to ensure we are all working from the same record regarding any discovery productions that occurred **before my plea agreement was signed**.

As reflected in my **Supplemental Memorandum in Support of Motion to Vacate Plea for Lack of Discovery Access (Dkt. 488, filed September 16, 2025)**, I have formally raised these issues with the Court. These issues are also the subject of my pending Motion regarding continuances and discovery access (Dkt. 482, filed September 10, 2025). I understand that you are newly assigned to this case and may not yet have had the opportunity to review that filing in full. I therefore provide this letter to highlight the specific discovery issues raised in Dkt. 488 and to give you an opportunity to clarify what was produced to my former counsel before my plea and to resolve these issues without further motion practice.

## 1. Why this request is necessary

In criminal proceedings, the chain of custody of discovery materials is as important as the chain of custody of evidence. If the defense does not have the same materials the government provided to former counsel, it cannot meaningfully review the evidence or prepare filings. Because I personally have never received any discovery materials, I cannot verify what was produced, when, or in what format.

## 2. Information requested

To clarify the record, I respectfully request confirmation of the following:

- **Date(s) of production:** Whether any digital discovery was produced to my prior counsel and, if so, on what date(s), especially before September 21, 2020 when my plea agreement was signed.

1

- **Format:** Whether those productions consisted of raw forensic data, an indexed load file, a forensic report, Bates-numbered documents, or some combination thereof.

- **Indexing / cover materials:** Whether any cover letters, transmittals, or forensic extraction reports accompanied the production.

- **Internal working copy:** Whether the government itself is using a processed or indexed version of the evidence for its own case preparation.

## 3. Why this information matters

Rule 16(a)(1)(E) requires disclosure of evidence the government intends to use at trial, and Brady v. Maryland requires timely disclosure of exculpatory material. If prosecutors or agents worked from a processed, indexed copy but only a raw data dump was provided to defense, then discovery would not have been "reasonably usable" and the parties would not be on equal footing.

Billing records show my total communication with prior counsel was approximately 51.7 hours. In my view, that limited time, combined with my detention and the COVID-19 restrictions, made it impossible to access and understand any large discovery production that may have been made. It is therefore crucial to know exactly what my former counsel received. If their production was itself insufficient or incomplete, that would provide a second reason why my plea cannot stand.

Because my plea was entered without my personal access to any discovery, clarifying what was produced to my former counsel is essential to assessing whether my plea was knowing and voluntary. This information will help determine whether I received constitutionally adequate disclosure before signing the plea agreement.

## 4. Factual Basis of the Plea

Additionally, because my plea was entered without my personal access to discovery, **I respectfully request that you identify or provide the subset of materials, if any, that the government considered to form the factual basis for the plea at the time it was entered.** This request is **not** for a future trial exhibit list but for clarification of what materials were provided or relied upon in connection with the plea.

2

**5. Next steps**

Please confirm or clarify the above so that I may receive the same discovery my prior counsel may have received, along with any accompanying indexes or reports, and identify the materials the government viewed as the factual basis for my plea. This will help avoid misunderstandings and allow the case to proceed efficiently.

If you decline to provide this clarification, please confirm that position so I can advise the Court accordingly.

I would welcome a response within 14 days, consistent with the ordinary 7–14 day response window under the local rules.

I also respectfully request a brief acknowledgement of receipt of this letter within two (2) days, so that I may be assured it has reached your attention.

Sincerely,

**Jobadiah Sinclair Weeks**
Pro Se Defendant


September 23, 2025

Signed by:
Joby Weeks
87866A420DB4490...

3

# Exhibit B.

Email transmitting the September 23 letter (14-day response requested)



Silence Weeks <silenceweeks1@gmail.com>

## U.S. v. Jobadiah Sinclair Weeks (2:19-cr-877) – Discovery Clarification Request
1 message

**Silence Weeks** <silenceweeks1@gmail.com>                    Tue, Sep 23, 2025 at 8:33 PM
To: Trevor.Chenoweth@usdoj.gov, Robert.Moore3@usdoj.gov
Cc: Ernesto Cerimele <ernesto@klingemanlaw.com>

Dear Mr. Chenoweth and Mr. Moore,

Attached please find my letter dated September 23, 2025, titled *"Recovery Follow-Up"*, regarding discovery production issues in *United States v. Jobadiah Sinclair Weeks (2:19-cr-877)*.

As you are newly assigned to this case, I wanted to provide this document directly so that we are all working from the same record. The letter outlines specific questions concerning what discovery was produced to my former counsel prior to my plea, as well as related requests for clarification.

I would appreciate an acknowledgment of receipt within two days, and a substantive response within fourteen days, consistent with local practice.

Thank you for your attention.

Sincerely,
Jobadiah Sinclair Weeks
Pro Se Defendant

📄 **23092025 AUSAs Recovery follow up.pdf**
88K

# Exhibit C.

Excerpt of Court's *Opinion and Order* (ECF 497) showing citations to materials not in Defendant's possession

### 1. Innocence

To satisfy the first factor, Defendant must make a credible showing of innocence supported by a factual record. *U.S. v. Ho-Man Lee*, 664 F. App'x 126, 128 (3d Cir. 2016). In his motion to withdraw his guilty plea, and in his supplemental submissions in support of his motion, Defendant appears to make five arguments in support of his innocence: (1) he is not guilty of trading unregistered securities because Bitcoin and Bitcoin mining equipment are not securities, and shares purchased with Bitcoin are not securities; (2) Defendant did not have notice that the charged activities were securities transactions; (3) Defendant is not aware of any victims of his conduct; (4) BCN is a private membership association, not a company, and so the Government has no authority over it; and (5) Defendant was living abroad at the time of alleged tax evasion, and so he was not required to pay taxes.

First, Defendant argues that he is not guilty of conspiring to trade unregistered securities because "computer equipment" and "Bitcoin" are not securities. ECF No. 401 at 42–47. However, Defendant is not charged with conspiring to trade computer equipment or Bitcoin; he is charged with, and pleaded guilty to, conspiring to promote and sell shares in BCN mining pools. ECF No. 1 at 12, 18–20 (Weeks explaining in promotion video that "whatever the mine finds each day is evenly disbursed in a daily dividend to our shareholders"); ECF No. 417-1 at 36:17–19 (THE GOVERNMENT: "Do you agree that these [BCN] shares were, in fact, securities?" THE DEFENDANT: "Yes."); ECF No. 417-1 at 36:24–37:2 (THE GOVERNMENT: "Did you also take money from investors as an investment for shares of mining pools that [BCN] purported to own and operate?" THE DEFENDANT: "Yes.").

BCN shares are securities as defined by 15 U.S.C. § 77b(a)(1) and *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946) (the "*Howey* test"). *See* ECF No. 1 at 15 ("Shares in BCN were

Courts have found that an investment of Bitcoin, rather than money, satisfies the "investment of money" prong of the *Howey* test.  *See Shavers*, 2014 WL 12622292, at *6 (finding that an investment of Bitcoin constitutes an "investment of money" under *Howey*); *In re BitConnect Sec. Litig.*, No. 18-80086, 2019 WL 9104318, at *7 (S.D. Fla. Aug. 23, 2019) (same).  This Court agrees, and finds that shares of BCN are securities even if investors purchased them with Bitcoin.

Second, Defendant contends that he had no "clear advance notice" that his conduct was illegal, because Count Two of the Indictment was "based on interpretations of federal securities law that did not exist at the time of the alleged conduct."  ECF No. 471 at 1.  Defendant argues that "[n]o federal agency had issued formal rules, notices, or policy statements applying securities registration requirements to cooperative mining pools."  ECF No. 452 at 3.  This position fails for two reasons.  First, as discussed in detail above, Defendant was not indicted based on a novel theory of securities law; he was charged with conspiring to offer and sell unregistered shares of BCN, which are securities as defined by the *Howey* test, established in 1946.  *See Howey*, 328 U.S. at 301; *Teshuater*, 2024 WL 1348432, at *4; *Shavers*, 2014 WL 12622292, at *7.  Second, Section 5 of the Securities Act of 1933—the statute underlying Count Two that prohibits the offering or sale of unregistered securities—"imposes strict liability."  *S.E.C. v. Current Fin. Servs., Inc.*, 100 F. Supp. 2d 1, 6 (D.D.C. 2000); *see also* ECF No. 1 at 15.  "Scienter is not required under Section 5 of the Securities Act," and so "[i]t therefore is irrelevant whether [Defendant] knew what he was selling was a security."  *Id.*; *S.E.C. v. U.S. Funding Corp.*, No. 02-2089, 2006 WL 995499, at *5 (D.N.J. Apr. 11, 2006) ("A showing of scienter is not required under Section 5.").  Therefore, Defendant's argument that he had no notice of the illegality of his conduct is unavailing.

Third, Defendant contends that he is innocent of Count Two because he is "not aware of anyone [he has] ever harmed in the context of [BCN]."  ECF No. 401 at 24; *see also* ECF No. 421

"Suspicious Activity Reports (SARs), Memoranda of Interview (MOIs) from April and December 2019, [and] the December 2019 Crypto Seizure Memo," which were allegedly not disclosed until years after the plea agreement was signed. *Id.* at 8. Lastly, Defendant states that he was never provided documentation of an August 12, 2020 proffer session, during which the Government claims Defendant admitted his knowledge of BCN's fraudulent activities. *Id.* at 11.

As an initial matter, to the extent Defendant argues that he was entitled to government work product—for example, "plea considerations and prosecutorial framing"—a criminal defendant "may not examine Government work product in connection with his case." *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 257 (3d Cir. 2005) (quoting *United States v. Armstrong*, 517 U.S. 456, 463 (1996)). But in any event, Defendant provides no elaboration as to what each of the purported documents contain, how they are material to his guilt and favorable to his defense, why he did not have access to the information contained in the documents prior to his plea, or how the documents would have altered his plea entry. Instead, Defendant provides vague descriptions of the importance of the documents, such as describing documents as "central to discovery and plea evaluation," "significan[t]," "critical," and "indispensable." *Id.* at 10, 14–15. And even if Defendant did not receive these materials before entering his guilty plea, his submissions provide no indication that they constitute *Brady* or *Giglio* material. Without more, the Court cannot determine that Defendant's lack of access to these documents before signing his plea agreement is a "strong reason[]" to justify a withdrawal of a "solemn admission" of guilt. *King*, 604 F.3d at 139; *Ho-Man-Lee*, 664 F. App'x at 128.

Ninth, and lastly, Defendant argues that his prosecution violates an April 7, 2025 enforcement memorandum issued by the DOJ, which he believes "makes clear that digital asset cases should be pursued only when involving identifiable harm or criminal misuse." ECF No. 421

# Exhibit D

IRS-CI Report-SAR-Weeks, Jobadiah – Streamlined (transmitted Dec 6, 2024 via AUSA Torntore)

JOBADIAH SINCLAIR WEEKS
Arvada, CO 80005
SSN: 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
1000293264

Years: 2015, 2016, 2017, 2018

Violation(s):Title 26, United States Code, Section 7201

Special Agent:     Veniamin Karavchuk
Revenue Agent:   James P. Pack

# Table of Contents

Introduction ............................................................................................................. 1

    Recommended Charges And Prosecution Years ......................................... 1

    Returns Filed And Statute Of Limitations ................................................... 2

    Venue ............................................................................................................. 2

    Investigative Contact(S) With Subject(S) And/Or Representative(S) .......... 2

    Other Pertinent Data .................................................................................... 2

Theory Of The Investigation ................................................................................ 3

Books And Records And Preparation Of Tax Return(S)....................................... 5

Elements Of The Offense(S) ............................................................................... 5

    Elements Of 26 U.S.C. § 7201 .................................................................... 5

List Of Appendices .............................................................................................. 6

Disposition Of Proceeds...................................................................................... 6

Relevant Conduct................................................................................................. 7

Current Lifestyle .................................................................................................. 7

Explanation And Defense Of Subject .................................................................. 7

Conclusions And Recommendations.................................................................... 7

List Of Witnesses And Exhibits

**Internal Revenue Service**

Department of the Treasury
Criminal Investigation
300 N. Los Angeles St
Los Angeles, CA  90012

Ryan L. Korner
Special Agent in Charge
300 N. Los Angeles St.
Los Angeles, CA  90012

Person to Contact:
Veniamin Karavchuk
Telephone Number:
(702) 467-5787
Agent Cell Phone
(702) 467-5787
Refer Reply to:
SE:CI:WA:LA:09
Date:

IN RE:  JOBADIAH SINCLAIR WEEKS
11627 W 74th Way
Arvada, CO 80005
SSN:  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
DOB:  08/25/1981
1000293264

REPRESENTATIVE:  Adam P. Schwartz
4221 W. Boy Scout Rd.
Tampa, F 33607
Ph. (813) 229-4336

FINAL:  Prosecution

# INTRODUCTION

**Recommended Charges and Prosecution Years**

JOBADIAH SINCLAIR WEEKS - 26 U.S.C. § 7201 - 1 Count - 2015-2018

**Returns Filed and Statute of Limitations**

WEEKS did not file returns during the period under investigation. In such a case, the the statute of limitations is based on when the return should have been filed. The tax return for the earliest period under investigation, the 2015 tax year, would have been due on April 18, 2016. Therefore, the statue of limitations on the earliest tax year charged expires on April 18, 2022.

**Venue**

Although the defendant was a permanent resident in the District of Colorado during the charged tax period, he agrees in his signed guilty plea to waive and forego any and all challenges to venue in the District of New Jersey. Furthermore, the defendant understands and agrees that the charge in the Information will be filed and adjudicated in the District of New Jersey. He further agrees not to assert in any appeal, motion or collateral attack, including a motion brought pursuant to 28 U.S.C. Section 2255, any claim or argument challenging venue in the District of New Jersey to the charge in the Information, as set forth above.

**Investigative Contact(s) with Subject(s) and/or Representative(s)**

Defendant was indicted and arrested in December 2019 on charges of 18 USC 371, defrauding the government with respect to selling unregistered securities. Defendant was advised of his rights on December 10, 2019 and made custodial statements to agents on the day of his arrest.   Defendant has since proffered with agents on multiple occasions.

**Other Pertinent Data**

Plea Agreement Information – The defendant has signed a guilty plea to charges of Title 26 USC §7201. The signed plea is attached with this report.

Search Warrants – Agents conducted electronic search warrants of WEEKS' stored communications during the course of the investigation as well as a physical search warrant of his residence on December 10, 2019.

Citizenship – WEEKS is a United States citizen.

Criminal History
    1999 – Westminster, CO – Obstructing police, assault and battery.
    2004 – Boulder, CO – DUI.
    2014 – Las Vegas, NV – DUI.
    2015 – Las Vegas, NV - Reckless driving.

## THEORY OF THE INVESTIGATION

From in around 2014 until December 2019, The Bitclub Network (BCN) was a cryptocurrency cloud mining pool that used a multi-level marketing (MLM) referral structure to recruit investors worldwide. In an indictment dated December 5, 2019, out of the District of New Jersey, BCN and the indicted defendants are alleged to have been operating BCN as an illegal pyramid Ponzi scheme that generated over $722 million from investors. In addition, the indictment alleges that the defendants conspired to sell unregistered securities.

During tax years 2015 through 2018, JOBADIAH SINCLAIR WEEKS (WEEKS) was a recruiter and promoter for BCN. He sold or caused to be sold by those he recruited, BCN mining pool packages to investors all over the world. WEEKS joined as a recruiter for BCN approximately a year after it was formed, but when the scheme was still small and growing. He interacted directly with the two owners of BCN, RUSS MEDLIN (MEDLIN) and MATTHEW GOETTSCHE (GOETTSCHE). As a result, WEEKS had a rank inside BCN as a Mega-Monster, the highest rank that a BCN recruiter can have, and earned millions of dollars in MLM commissions.

WEEKS is one of the indicted principal operators of BCN. On December 10, 2019, WEEKS was arrested on charges of 18 USC 371, Conspiracy to Defraud the U.S. in violation of 15 USC 77e and 77x, selling unregistered securities. WEEKS was detained and remains incarcerated. In the course of his incarceration, WEEKS has proffered with agents on multiple occasions and has shown the ability and willingness to cooperate with the government against his co-defendants, as well as other yet to be charged co-conspirators.

The government, WEEKS and his attorneys engaged in plea negotiations and all parties have agreed that WEEKS will plead guilty to the initial charge of 18 USC 371 and to 26 USC 7201, Tax Evasion for tax years 2015-2018.

The Specific Item Method of Proof was used to compute WEEKS; unreported and corrected taxable income. The cash basis method of accounting was used for all computations.

## SOURCES OF INCOME

WEEKS received his MLM commissions in two primary methods. One way was to request for BCN to send him bitcoin to his personal bitcoin wallets by generating a withdrawal from his member back office account on the BCN website. Notably, the BCN website did not actually hold bitcoin for its members. The back-office account balances were simply internal ledger entries made by a computer programming script that did not

3

correspond with the actual bitcoin blockchain unless a BCN member actually generated a withdrawal request.

Another way for WEEKS to receive his commissions was to accept fiat currency directly from investors and then to credit those investors with mining pool packages by using his existing balance of earnings inside his member back office account on the BCN website. This practice is commonly referred to as "Pay-It-Forward" in the MLM industry; it is a way to withdraw earnings without having to pay transaction fees.

Agents have analyzed a copy of the BCN web server database that was obtained in the course of the investigation. The web server data with respect to WEEKS' BCN accounts was compared to the bitcoin public blockchain transactions that occurred on known WEEKS bitcoin wallets. The result of this analysis showed that WEEKS received commissions from BCN to his personal bitcoin wallets in the equivalent USD amounts of $26,299 in 2015; $185,193 in 2016; $1,458,341 in 2017; and $1,211,643 for the 2018 tax year.

Agents have analyzed bank accounts owned and operated by WEEKS from 2015 through 2018. Using a conservative approach of only confirmed investor deposits, this analysis showed that WEEKS accepted fiat currency from investors for BCN mining pool packages, in the form of Pay-It-Forward withdrawals, in the amounts of at least $25,265 for 2016 and $43,350 for 2017. In addition, WEEKS started a side business with an individual named Steven Snyder to create CBD soft gel pills for sale. WEEKS invested directly into the business, and he also redirected some "Pay-It-Forward" payments directly to Snyder. WEEKS caused $154,565 in payments to be sent directly to Snyder in 2017. As with the other "Pay-It-Forward" payments, agents are only including amounts confirmed with investor deposits.

WEEKS also earned income through other means. The main operator of BCN, GOETTSCHE, did not want his name associated purchases and contracts for equipment or mining. This afforded WEEKS the opportunity to act as a middleman, as well take a finder's fee for putting together parties interested in making deals with BCN. WEEKS primarily took his "commissions" by up charging BCN and keeping the difference between the payment received from BCN and the amounts he paid for the equipment or services. In this manner, WEEKS earned $606,850 in 2016; $9,930,584 in 2017; and $553,718 in 2018. Furthermore, WEEKS at times included stock purchases in the contracts to purchase equipment from Bitfury. These purchases were lumped together with the purchase of equipment, so it would look like the entire payment was for equipment. However, WEEKS received Bitfury stock that he did not send or disclose to GOETTSCHE or MEDLIN. In this way, WEEKS increased the "commission" he received through the equipment purchases. WEEKS received $3,102,364 worth of stock from Bitfury in 2017.

Finally, WEEKS received mining earnings from mining pools other than BCN. The main pool operators that paid WEEKS were Bitfury, Genesis Mining, and SlushPool. Agents attributed these earnings through blockchain analysis of wallets belonging to WEEKS

and sourcing deposits to mining pools. WEEKS received at least $111 in 2016; $788,154 in 2017; and $308,707 in 2018 from mining earnings.

WEEKS also had some minor amounts reported to the IRS from 3rd party institutions, including earnings from previous MLMs in which he participated as well as capital gains and losses from financial institutions. WEEKS was reported to have received $3,231 in 2015; $2,300 in 2016; and a net loss of $465 in 2018.

In total, agents can conservatively summarize that WEEKS received a value of at least $29,530; $819,719; $15,477,357; and $2,073,603 for tax years 2015, 2016, 2017, and 2018, respectively, in income in the form of bitcoin, US currency, and Bitfury stock.

WEEKS did not file tax returns for any of the years under investigation. WEEKS committed affirmative acts of evasion to facilitate hiding his earnings from the IRS.

WEEKS signed a plea deal pleading guilty to one count of Title 26 USC §7201 for the tax years 2015-2018, and one count of Title 18 USC §371. WEEKS has agreed in his guilty plea to sign a Form 870, Waiver and Acceptance of Tax Assessment, accepting responsibility for his tax liability for all four years prior to sentencing.

### BOOKS AND RECORDS AND PREPARATION OF TAX RETURN(S)

Agents have analyzed WEEKS' BCN accounts on the BCN web server and compared this data with the transactions that occurred on the bitcoin public blockchain on known WEEKS bitcoin wallets. Agents have also analyzed bank accounts owned and operated by WEEKS from 2015 through 2018, as well as communications and contracts with other individuals involved with BCN and bitcoin mining. Please see the attached tax loss schedule.

### ELEMENTS OF THE OFFENSE(S)

### ELEMENTS OF 26 U.S.C. § 7201

1. An attempt to evade or defeat a tax or the payment thereof:

- WEEKS told individuals who invested with his business to deposit their funds in accounts in other people's names, or in the name of WEEKS' charity account. WEEKS did so in order to avoid having deposits into his personal bank account.

- WEEKS purchased a property in St. Kitts in order to obtain a St. Kitts citizenship. He told agents he did so to stop from having to pay US taxes.

- WEEKS used bitcoin to receive payments and pay for expenses in order to avoid using financial institutions and having his earnings reported to the IRS.

2. An additional tax due and owing:

- WEEKS has a tax due and owing, as established by the Specific Item Method of Proof and corroborated by witness statements, of $7,128,987 for the 2015 to 2018 tax years. Please see the Form 4549, Revenue Agent Report, and Tax Loss Schedule for the full calculations.

3. Willfulness:

- At all times relevant to the investigation, WEEKS had access and control over the bank accounts, his bitcoin wallets, and his BCN account used when calculating the tax loss.

- WEEKS has not filed returns for the 2015-2018 tax years. When questioned about it, WEEKS admitted to agents that he knew he owed taxes on his earnings and did not file or pay income tax.

- WEEKS bought a St. Kitts property in order to get a St. Kitts citizenship. WEEKS told agents that he wanted to avoid issues with his US taxes.

- BCN created year-end statements for investor activity for BCN accounts. WEEKS told agents he knew these statements were like 1099s, and they were created in order for account holders to pay taxes.

- On September 24, 2020 WEEKS signed a plea agreement accepting responsibility for his role in evading his taxes for the 2015 to 2018 tax years.

Additionally, for all elements referenced above, please see the attached Tax Loss Schedule, Form 4549 (Revenue Agent Report), signed Guilty Plea, and Draft Information.


## LIST OF APPENDICES

Please see attached master file transcript for WEEKS, Form 4549 (Revenue Agent Report), Tax Loss Schedule, Signed Guilty Plea, and Draft Information.


## DISPOSITION OF PROCEEDS

During the investigative period and including tax year 2015-2018, WEEKS lived a lavish lifestyle as a result of his earnings from BCN. WEEKS travelled all over the world and purchased property in the U.S. and internationally.

## RELEVANT CONDUCT

There is relevant conduct from the 2019 tax year in the amount of $445,395.96 in unreported income and a tax due of $130,296.00 Please see the attached Tax Loss Appendix and Revenue Agent Report for more information.

## CURRENT LIFESTYLE

WEEKS has been detained in Essex County jail without bail since his arrest on December 10, 2019. As part of his guilty plea, WEEKS will seek a bail package that will include close monitoring from pretrial services.

## EXPLANATION AND DEFENSE OF SUBJECT

None.

## CONCLUSIONS AND RECOMMENDATIONS

Veniamin Karavchuk
Special Agent
Cellular (702) 467-5787

**Approved:**

Oleg Pobereyko
Supervisory Special Agent, Criminal Investigation
300 N. Los Angeles St
Los Angeles, CA  90012
Cellular (213) 256-3307

# Exhibit E

Treasury/IRS-CI Memorandum of Interview (August 17, 2020 Proffer Memo – Redacted Version)



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

---

**Investigation #:**        <span>████████</span>      **Location:**  **via Conference Call**

**Investigation Name:**  JOBADIAH SINCLAIR WEEKS
**Date:**  August 17, 2020
**Time:**  Approx. 9:00 - 10:58 a.m.
**Participant(s):**  JOBADIAH SINCLAIR WEEKS, Defendant
Simon Gaugush, Attorney for Mr. WEEKS
Michael Yeager, Attorney for Mr. WEEKS
Jamie Hoxie, Assistant U.S. Attorney
Anthony Torntore, Assistant U.S. Attorney
Hanna Yang, Special Agent, FBI
Leo Rovensky, Special Agent, IRS-CI
Ven Karavchuk, Special Agent, IRS-CI
Jonathan Helmstetter, Special Agent, IRS-CI

On the above date and time, AUSAs and agents met via teleconference with JOBADIAH SINCLAIR WEEKS (hereinafter "WEEKS") and his attorneys. AUSA Hoxie explained the terms of the proffer agreement and WEEKS confirmed that he had reviewed it with his attorneys. The proffer letter dated August 6, 2020 referenced a proffer date of August 12, 2020. All parties acknowledged that the agreement would be valid for the conversation on August 17, 2020. Defense counsel agreed to change the August 12, 2020 date to August 17, 2020 and initial that change. WEEKS confirmed that he still wished to continue and voluntarily provided the following information:

1. WEEKS initially heard about BITCLUB NETWORK (hereinafter "BCN") from his friend John Hammock. John Hammock had been in network marketing for more than 20 years and had known WEEKS for about 10 years at that time. WEEKS gave John Hammock his first bitcoin. WEEKS also heard about BCN from his friend Hayden Stevens (WEEKS is not positive if the last name Stevens is correct) who is an internet marketer in Japan. WEEKS also heard about BCN from Ryan Conley, who lived in the U.S., and had previously joined BCN.

2. Ryan Conley introduced WEEKS to JOE ABEL around August of 2015 in Washington. Conley offered to share a position within BCN with WEEKS which ABEL supported. ABEL was friends with RUSS MEDLIN. ABEL was referred to as the "master distributor" within BCN. Whenever WEEKS joins any MLM, he likes to get to know the "inner-circle" of members so he will be able to

provide the best support to the new members that he brings to the MLM.  BCN was no different as he felt comfortable having direct access to ABEL who had direct access to MEDLIN.

3.  When ABEL explained BCN to WEEKS, ABEL told him that WEEKS would be buying computer equipment to mine BTC for a term of 1,000 days.  Every 24 hours, WEEKS and other members would receive a portion of what was mined the previous day in the form of a credit to his back-office account.  WEEKS used the analogy of purchasing the "goose who laid the golden egg," in this instance the "golden egg" being BTC and the "goose" being mining equipment.  WEEKS was "excited to buy machines that print money."  WEEKS formally joined BCN in August of 2015.

4.  ABEL never claimed that WEEKS would make a set percentage or dollar amount per day from BCN because the price of BTC fluctuated drastically.  WEEKS explained that you could earn your investment back faster if you referred friends to BCN.

5.  WEEKS felt comfortable that BCN was purchasing equipment in bulk because they were able to get it at a cheaper price which left more profit for the compensation plan.  WEEKS also liked that individual members did not need to host their own machines or pay for power.  BCN handled those aspects of mining.

6.  WEEKS was told that BCN needed access to mining equipment to grow.  WEEKS had access to equipment through Bitfury.  WEEKS felt that it would be best for BCN to have options, such as Bitfury, for purchasing equipment to keep prices competitive.

7.  A few months after joining, WEEKS met MEDLIN via telephone to propose that BCN purchase Bitfury equipment.  This call was arranged by ABEL.  MEDLIN told WEEKS that he would need to speak with MATTHEW GOETTSCHE about this deal.  The entire conversation happened over the phone.

8.  WEEKS was aware of the MLM component of BCN.  BCN was a way for anyone with any money to earn BTC through crowdfunding.  The MLM portion allowed individuals who recruited new members to earn BTC by selling mining packages.  Like other MLMs, BCN split investments as 40% for equipment, 40% for the MLM portion, and 20% for operating the business.  According to WEEKS, most MLMs only put 40% of investments towards the product.  WEEKS liked that BCN only took 20% of investments for operating the company.  WEEKS further explained that his friends who own MLMs told him that most networks need to mark-up their products 7 times for retail to earn a 60% / 40% split.

9.  WEEKS met a former IRS agent named Joe Bannister who "messed-up," WEEKS' thinking.  Bannister told WEEKS that there was no requirement to pay taxes on earnings.  WEEKS is comfortable pleading guilty to a tax charge.

WEEKS has not paid personal income tax because Bannister told him that he is not subject to or liable for personal income tax. WEEKS has not paid federal income taxes since he was younger and filled-out W-4 forms. He last filed when he was working at Macaroni Grill and Old Chicago Restaurant where taxes, including FICA and Social Security, were withheld from his paychecks. This was approximately 18-19 years ago. WEEKS was enrolled in Social Security by his mother. WEEKS has a Social Security number. WEEKS has not filed a tax return for the past 10 years because his income was not connected to a trade or business per Bannister's recommendation. In the past 10 years, WEEKS earned millions of dollars in the form of BTC. WEEKS had millions of dollars stolen from him in BTC as well. WEEKS lost BTC when Silk Road was taken down by the government and also lost BTC to hackers. WEEKS still earned millions in BTC. WEEKS acknowledged that he did not file a return despite earning millions of dollars. WEEKS did not file because Bannister told him that he did not have an obligation to file.

WEEKS spoke privately with his counsel from approximately 9:36 a.m. through 9:49 a.m. All other parties disconnected from the call during this time and rejoined at approximately 9:49 a.m.

10. WEEKS earned millions of dollars over the years and was liable for the taxes on this income. WEEKS did not file or pay any taxes on the income that he earned from BCN or elsewhere.

11. When WEEKS first became involved with BCN, he believed that he was purchasing physical machines. He was told that 40% of what was invested would be used to purchase equipment. GOETTSCHE told WEEKS that he could receive physical equipment as a "return." ABEL told WEEKS about a system where serialized BTC miners would send mined BTC directly to member's personal wallets. This was a system that was used by Dunamis.

12. Although BCN'S website showed that they had 3 separate pools operating, BCN only had 1 mining pool. The 3 pools each had different mandatory reinvestment splits. Pool 1 was a 50/50 split, pool 2 was a 60/40 split, and pool 3 was a 70/30 split. If a member were to purchase a "founder's position" for $3,500, they were told that they would receive a share in each of the 3 pools but, in reality, they would receive 7 shares in BCN'S only pool. BCN represented that there were three different pools on their website to give members incentive to invest more and purchase more shares.

13. The BCN website represented that BCN was operating 3 separate pools. 3 separate pools were also promoted by MEDLIN'S YouTube videos. WEEKS learned that BCN only had 1 pool by looking at bitclubpool.com as the mining equipment in Canada, Iceland, and Georgia all mined into 1 pool. WEEKS called ABEL to clarify that there was only 1 pool and a founder's position would actually result in 7 shares in BCN'S only pool. WEEKS learned within weeks of joining BCN that there was only 1 pool operating.

14. While WEEKS was promoting BCN, he encouraged people to purchase founder's positions in BCN. When WEEKS promoted this, he did not tell them that there was only 1 pool. He encouraged people to watch the videos on the BCN site and told them that a founder's position would give them access to all 3 of BCN'S pools. This is consistent with what is represented on the BCN website. WEEKS did not tell people that there was only 1 pool.

15. WEEKS stated that the site bitclubpool.com would show members all of the mining earnings going into 1 pool. WEEKS continued to promote throughout his time with BCN that a founder's position would give the purchaser a share in all 3 pools despite knowing that this would really result in 7 $500 shares being purchased.

16. According to WEEKS, the BCN platform did not allow WEEKS to see who was in his downline. He was not able to see their names, usernames, contact information, or even how many members he had in his downline. This was very different from any other MLM that WEEKS has promoted as communication with members is key for MLMs to work.

17. At some point, WEEKS learned that BCN was not registered with the SEC. WEEKS recalled that BCN mined a large block, somewhere around 200 BTC, but it was not claimed. WEEKS encouraged GOETTSCHE to donate this BTC to the Bitcoin Foundation. Brock Pierce operated The Bitcoin Foundation.

18. WEEKS attended a dinner at the World BTC Conference in Las Vegas. There were about a dozen people at the dinner table with Pierce and WEEKS. At the dinner, WEEKS wanted to introduce GOETTSCHE and MEDLIN to Pierce and others in the BTC industry. Pierce had a conversation with GOETTSCHE at the table about BCN operating in the U.S. and the complications that could arise from it. WEEKS does not remember if he overheard their conversation or if GOETTSCHE told him later, but Pierce indicated that he believed that the SEC would see BCN as selling securities. Pierce said this was because of the Gaw Mining cases being litigated by the SEC and the SEC'S "crackdown" on BTC. This is around the time where WEEKS learned about the SEC rules governing securities, cryptocurrency, and the Howey test. WEEKS learned that the SEC could consider BCN a security despite BCN'S claim that it would ship members physical equipment if requested. WEEKS believes that BCN blocked U.S. IP addresses shortly after GOETTSCHE'S conversation with Pierce.

19. After the World BTC Conference, BCN banned U.S. citizens from participating in the network. At this time, WEEKS encouraged new members to use a VPN to access BCN because, "BCN did not want to deal with Americans." BCN banned U.S. IP addresses from accessing its site. WEEKS encouraged existing members who were U.S. citizens to use a VPN to avoid this restriction. WEEKS recalls telling more than 2 new members to use a VPN when joining BCN. He learned about the VPN loophole when trying to log in to his own account. WEEKS stated that this loophole was used by U.S. citizens to gamble online at offshore casinos. WEEKS stated that other BTC companies did not do

business in the U.S.

20. WEEKS does not recall direct conversations with GOETTSCHE or MEDLIN about the VPN loophole.  MEDLIN and GOETTSCHE threatened to suspend all U.S. accounts.

21. BCN did not collect any KYC information on its members until after the U.S. IP address block was implemented.  At that time, members were required to upload KYC documents.  BCN would block anyone who was identified as a U.S. citizen during the KYC process.

22. WEEKS promoted this on Facebook, at conventions, and in public.  Some of the people who WEEKS promoted BCN to were U.S. residents.  WEEKS was aware of this because some U.S. citizens told him that they lived in the U.S.  WEEKS continued to promote BCN in the U.S. and to U.S. citizens after he learned that BCN would be considered a security by the SEC.  WEEKS remembered sending MEDLIN an article about Gaw Mining.  MEDLIN responded that BCN was selling equipment and not securities.  WEEKS replied with, "okay."  None of the individuals promoting BCN were licensed broker/dealers.  MEDLIN continued to explain to WEEKS that they were selling equipment and not securities.

23. WEEKS recalls expressing concerns to MEDLIN that BCN was not transparent enough to attract large investors.  WEEKS explained that anyone wishing to invest a large sum of money would need to know how much they were going to make and, without knowing the number of outstanding shares, expenses, total mined coin, and other factors, that would not be possible.  Being able to calculate ROI would be important, especially for larger investors.

24. GOETTSCHE told WEEKS that there would be a 10 day lag reporting mining earnings to members because BCN needed that time to determine the expenses associated with mining that coin.  WEEKS stated that people were trying to reverse engineer how many members there were in BCN based on their daily payout versus what BCN claimed as mined.  WEEKS was asked these questions frequently, specifically how many shares were outstanding.  WEEKS told MEDLIN to publish these statistics to be more transparent.

25. WEEKS wanted to know that the BCN pool was not becoming diluted.  WEEKS felt comfortable continuing to refer people to BCN because he kept seeing the hashing power grow on bitclubpool.com.  WEEKS could see BCN'S mining wallet being funded by mined coins.  He also knew that BCN was buying equipment from Bitfury through WEEKS.  WEEKS also sold Bitfury equipment directly to others at this time.

26. BCN had a data center in Iceland where GOETTSCHE and MEDLIN invited WEEKS to go to physically see BCN'S equipment.

27. WEEKS asked GOETTSCHE for the ability to send messages to everyone in

his downline but WEEKS was unable to do that.  WEEKS would periodically ask GOETTSCHE for this ability.  WEEKS never got a direct answer as to how many members there were or how many shares were outstanding.  GOETTSCHE told WEEKS at one point, BCN had over 300,000 members holding over 1,000,000 shares.  WEEKS felt comfortable continuing to promote BCN because he could see their hashing power and also because BCN was purchasing equipment.  Unless someone knew how many shares were outstanding, there would be no way to know if the pool was being diluted.  Only GOETTSCHE and MEDLIN would know that.  WEEKS continued to promote BCN because the price of BTC continued to rise.

28. WEEKS asked ABEL if anyone ever mined more BTC than they invested.  ABEL showed WEEKS accounts where people earned more BTC than they invested.  WEEKS saw the daily payouts into his back-office wallet and BCN purchasing equipment.  WEEKS continued to refer new members to BCN.

29. WEEKS earned money from BCN'S compensation plan.  WEEKS was able to see a breakdown of this in his BCN back-office account which was broken into earnings from mining by each pool, binary cycle credits, and personal referral or direct bonus credits.  WEEKS earned BTC from the MLM side of BCN however he lost BTC on the mining side of BCN.  Over 1,000 days, WEEKS earned 8 BTC from mining despite investing 13 BTC, losing 5 BTC on mining endeavors.  WEEKS explained that the fiat value increased however that had nothing to do with BCN'S activities but rather the fluctuation in the price of BTC over the 1,000 day timeframe.

30. WEEKS earned BTC through the MLM portion of BCN, at one point in excess of $2,000 per day.  There was a cycle bonus where you could earn up to 10 cycles per day which was credited in his back-office account as $200 in BTC.  Regardless of whether or not an investor decided to participate in the MLM portion of BCN, only 40% of their investment would go towards mining.

31. When WEEKS was promoting BCN, he did not tell anyone that he lost BTC on the mining portion of the business because he knew that they would not sign-up.  WEEKS wanted everyone to earn money with BCN but continued to promote that he did not know what would happen to the market price of BTC during the course of their investment.  WEEKS never volunteered the fact that he lost BTC through the mining portion of BCN.

32. Mark Weiss, an attorney from Arizona, was frustrated with his return from BCN.  WEEKS had a conversation with him about how many BTC he mined.  Weiss purchased a founder's position in BCN.  WEEKS believes that he may have told Weiss about the fiat valuation of his 13 BTC to 8 BTC mining ratio but he does not recall for sure.  Weiss wanted to sue MEDLIN but WEEKS told him that it would be difficult because MEDLIN was somewhere in Asia.

33. WEEKS believes that he had about 15 accounts with BCN.  Many people who joined BCN did not have BTC prior to joining.  WEEKS had approximately 15-20

accounts that were paid for by BCN'S "pay-it-forward," feature.  BCN only wanted members to have one account each but some people wanted to invest more.  BCN had a $10,000 cap on each account.

WEEKS has had conversations with GOETTSCHE since their arrests in December of 2019.  AUSA Hoxie explained that WEEKS should not solicit any information from GOETTSCHE and that WEEKS does not have a cooperation agreement with the government.  If GOETTSCHE initiates a conversation with WEEKS, he can listen but cannot solicit any information from GOETTSCHE.  WEEKS stated that he understood this distinction.  The interview was concluded at approximately 10:58 a.m.


I prepared this memorandum on August 17, 2020, after refreshing my memory from notes made during and immediately after the interview with JOBADIAH SINCLAIR WEEKS.


Jonathan Helmstetter
Special Agent