# Exhibit A

Government Correspondence to U.S. Probation Regarding my Presentence Objections

**Description**

Correspondence transmitted by the Government to the United States Probation Office responding to written objections and proposed clarifications to the Presentence Investigation Report, including the Government's stated positions concerning acceptance of responsibility, role, characterization of income sources, and asserted financial calculations.

**Purpose**

To identify the Government's factual concessions, disputed characterizations, and clarifications concerning my role, cooperation history, compensation sources, and sentencing-related financial assertions, and to provide the record directly addressed in this supplemental response.



**Silence Weeks <silenceweeks1@gmail.com>**

## FW: Jobadiah Weeks; Objections
2 messages

**Kelly Maciel** <Kelly_Maciel@njp.uscourts.gov>                          Mon, Apr 27, 2026 at 7:01 PM
To: "Moore, Robert (USANJ)" <robert.moore3@usdoj.gov>, "Andrew.Trombly@usdoj.gov" <andrew.trombly@usdoj.gov>,
"Trevor.Chenoweth@usdoj.gov" <trevor.chenoweth@usdoj.gov>, "Nathaniel.Botwinick@usdoj.gov"
<nathaniel.botwinick@usdoj.gov>
Cc: "silenceweeks1@gmail.com" <silenceweeks1@gmail.com>

Good afternoon,

In preparation for the completion of the revised final presentence report, I have noticed that Mr. Weeks
was not included in the Government's responses to his objections. Therefore, I have included him to this
email for his review. Thank you!

Kelly A. Maciel

U.S. Probation Officer

District of New Jersey

Office: (973) 645-4240

Cell: (973) 943-0378

Fax: (973) 681-6026

**From:** Moore, Taj (USANJ) <Robert.Moore3@usdoj.gov>
**Sent:** Monday, April 20, 2026 4:04 PM
**To:** Kelly Maciel <Kelly_Maciel@njp.uscourts.gov>
**Cc:** Trombly, Andrew (USANJ) <Andrew.Trombly@usdoj.gov>; Chenoweth, Trevor (USANJ)
<Trevor.Chenoweth@usdoj.gov>; Botwinick, Nathaniel (USANJ) <Nathaniel.Botwinick@usdoj.gov>
**Subject:** RE: Jobadiah Weeks; Objections

 **CAUTION - EXTERNAL:**

Hi Kelly,

Thank you for following up.

**Acceptance of Responsibility**. First, as previewed orally, the Government plans to withhold its grant of the one-point
deduction for acceptance of responsibility and objects to the Court granting a two-point deduction on this basis.

- Since at least early 2025, Mr. Weeks has sought to withdraw his guilty plea. Judge Cecchi reviewed and denied his first motion to withdraw. Mr. Weeks motioned for reconsideration and Judge Cecchi again denied Mr. Weeks's request to withdraw his guilty plea. Those attempts – coupled with recent online and media appearances in which Mr. Weeks appears to deny responsibility for his offense conduct – suggest to the Government that Mr. Weeks has not accepted responsibility for the crimes he committed. As a result, he should not receive any deductions on this basis.

**Weeks's Objections**. Second, the Government plans to prepare more detailed responses to Mr. Weeks's extensive objections. To start, however, the Government responds with the following.

- *Timeline of Participation in the Fraud*. Paragraph 12 of the PSR does not need to change. That paragraph and all others appear to be accurate with respect to capturing the timeline of Mr. Week's participation in the fraud. In fact, paragraph 12 makes clear that Weeks's participation in the scheme began "approximately one year after [the BitClubNetwork] was formed." The Government appreciates Mr. Weeks's desired clarification but does not believe changes are warranted; the text appears to be accurate in this regard.

- *Role.* The PSR does not imply that Mr. Weeks was the leader or manager of the fraud scheme. The descriptions Mr. Weeks takes issue with include (1) that he sold or caused to be sold BitClubNetwork mining packages to investors and (2) that he "worked directly under the two owners of BCN." The first is an accurate description of Mr. Week's role. And the Government does not believe that this description – or others – implies that Mr. Weeks developed the underlying platform or that he was an owner-operator of BCN. The Government, however, agrees that the second statement should be revised to remove "directly under," as it implies a traditional reporting relationship that does not fit the facts. Mr. Weeks did not have a direct-report relationship to Goettsche, even though Mr. Weeks did have a line of communication to Goettsche that normal BCN investors did not have. Mr. Weeks also understood – unlike most others – that Goettsche was a decision-maker.

- *Sources of Income*. It is the Government's understanding that Weeks's sources of income for work done in furtherance of the BitClub fraud scheme included, among other things, stock in BitFury. Mr. Weeks appears to have brokered deals between the two entities and, in part, was compensated in BitFury stock that it appears he would not have received but for him working to advance BitClub's mission.

  - The Government has identified at least three sources of income for Mr. Weeks during the relevant timeframe: (1) Mr. Weeks's withdrawals from his BitClubNetwork accounts; (2) payments received from BitFury (in the form of ownership shares and Bitcoin payments); (3) returns from investments in other, non-BCN mining pools.

  - Mr. Weeks received his BCN commissions by requesting that BCN send him bitcoin to his personal bitcoin wallets (this generated a withdrawal from his member back-office account) or by accepting cash from his investor-recruits.

    - Law enforcement analysis shows that Mr. Weeks received commissions from BCN to his personal bitcoin wallets in the equivalent USD amounts of $26,299 in 2015; $185,193 in 2016; $1,458,341 in 2017; and $1,211,643 for the 2018 tax year.

    - Law enforcement officials estimate that Mr. Weeks received a value of at least $29,530; $819,719; $15,477,357; and $2,073,603 for tax years 2015, 2016, 2017, and 2018, respectively, in income in the form of bitcoin, US currency, and Bitfury stock.

- *Loss Calculation*. With respect to the loss amount, the specific loss amount was calculated based on a review of the sources of income outlined above, which Mr. Weeks agreed to as part of his guilty plea. The loss amount was calculated by the IRS based on the sources of income summarized above and in accordance with IRS procedures on Form 4549, Revenue Agent Report.

Please let us know of any questions.


Thanks,


Taj

--

**Robert Taj Moore**

Assistant United States Attorney

United States Attorney's Office for the District of New Jersey

970 Broad Street, Newark, New Jersey 07102

D: (973) 297-2014 | C: (973) 856-3519

E: Robert.Moore3@usdoj.gov

---

**Silence Weeks** <silenceweeks1@gmail.com>                    Tue, Apr 28, 2026 at 12:35 PM
To: Wim Jagtenberg <miwjagtenberg@gmail.com>

Gov objections to the PSR
[Quoted text hidden]

# Exhibit B

Selected Contemporaneous Billing Entries Reflecting Government-Initiated Cooperation, Proffer Activity, and Plea / Financial Discussions (2020)

**Description**
Selected contemporaneous billing entries from prior counsel, Carlton Fields, reflecting communications with the Government, attorney proffers, negotiations concerning cooperation, preparation of cooperation agreements, and related strategic work concerning my engagement with prosecutors during the underlying proceedings.

**Purpose**
To demonstrate that the contemporaneous record reflects sustained cooperation-related engagement over an extended period, including proffer activity, cooperation discussions, and preparation of cooperation-related agreements, materially inconsistent with any characterization that I categorically refused responsibility or failed to engage constructively with the Government.

# EXHIBIT B

Selected Contemporaneous Billing Entries Reflecting Cooperation / Proffer Activity (2020)

| Date | Topic | Billing Description (excerpt) |
|---|---|---|
| February 6, 2020 | Initial cooperation discussions | Conference with AUSAs regarding bond issues and "potential cooperation." |
| February 27, 2020 | Government interest | Conference regarding Count Two and "Government's interest in Joby Weeks' cooperation." |
| March 13, 2020 | Government desire for cooperation | Conference with AUSA Jamie Hoxie regarding "their desire for Joby Weeks' cooperation" and with AUSA David Feder regarding "Government's desire for Joby Weeks to plead guilty and cooperate." |
| May 14, 2020 | Advance cooperation | Conferences regarding facts about BitClub "that we may be able to offer as advance cooperation." |
| May 25, 2020 | Plea proposal / cooperation / sentencing discussions | Conference with AUSA Jamie Hoxie about filing the detention appeal, plea proposal, cooperation, obtaining access to Joby Weeks' laptop and cell phones; conference regarding assessing loss for sentencing purposes. |
| June 16–17, 2020 | Cooperation tied to release | Discussions with Government regarding "release from detention as part of cooperation" and obtaining a letter that Government "won't oppose release if Joby Weeks cooperates." |
| July 22, 2020 | Plea / cooperation / attorney proffer | Conference with AUSA Jamie Hoxie and AUSA Anthony Thorntore regarding "potential plea deal, cooperation, and attorney proffer next week." |

| August 25, 2020 | Formal proffer | "Proffer with the U.S. Attorney's Office"; preparation for additional proffers and plea. |
| September 9–10, 2020 | Cooperation agreement analysis | "Analysis of plea and cooperation agreement" and related legal research. |
| September 29–30, 2020 | Signed cooperation documents | Signed documents including "plea and cooperation agreement" and transmission of "plea agreement and cooperation agreement" to Government; conference regarding "signed proffer letters." |
| september 29, 2020 | Income figures discussed with Government | Discussion with AUSA Anthony Torntore regarding income number for draft information. |

**Source**: Selected billing records of prior counsel at Carlton Fields (2020).

Representative contemporaneous billing entries from Carlton Fields reflecting Government-initiated cooperation discussions, attorney proffer preparation, and execution of cooperation-related documents (2020).

WEEKS, JOBADIAH SINCLAIR

RE:  **DEFENSE OF CRIMINAL CHARGES OF**
     **CONSPIRACY WIRE FRAUD & SECURITIES**
     **VIOLATIONS**

MARCH 31, 2020
REF NO.: 14629-42106
INVOICE NUMBER: 1051264

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|------|------|-------------|-------|--------|
| 02/06/20 | SL* | REVIEW CLIENT DOCUMENTS IN PREPARATION OF DEFENSE (REDUCED BY .5). | 0.60 | 165.00 |
| 02/06/20 | MLY | CORRESPONDENCE RE DETENTION HEARING AND GENESIS MINING(.1); CONFERENCES RE CASE MAP AND TIMELINE (.1). | 0.20 | 133.00 |
| 02/06/20 | AMH | CORRESPONDENCE RE: GENESIS MINING (REDUCED BY .2). | 0.20 | 115.00 NO CHARGE |
| 02/06/20 | SAG | SEND EMAIL TO AUSAS SEEKING RETURN OF RINGS BELONGING TO STEPHANIE AND LIBERTY WEEKS (0.1); MULTIPLE CALLS WITH DAVID RODMAN REGARDING AIRPLANE AND RANCH (0.3); CONFER WITH SAM LAMBE REGARDING EVIDENCE ABOUT MINING FACILITIES (0.3); CONFER WITH AUSAS ABOUT AIRPLANE AND POTENTIAL COOPERATION (0.3); CONFER WITH STEPHANIE WEEKS REGARDING BOND ISSUES--AIRPLANE AND ADDITIONAL PROPERTIES (0.2); CONFER WITH STEPHANIE WEEKS ABOUT FORFEITURE ISSUES   CONCERNING THE MEXICO HOUSE (0.2); CONFER WITH NAT WEEKS ABOUT USING HIS BROTHER'S HOUSE AS SECURITY FOR BOND (0.2); CONFER WITH PETER GALLIC ABOUT INTERVIEW WITH PRETRIAL SERVICES (0.3); CONFER WITH ADAM SCHWARTZ REGARDING BOND AND AIRPLANE ISSUES (0.4); EMAIL ADAM MCAFEE REGARDING VALUE OF THE AIRPLANE (0.1); REVIEW GEOSERVERS CONTRACT WITH BITFURY (0.4); REVIEW IMAGES AND VIDEOS PERTAINING TO BITCLUB'S DATA MINING CENTERS (0.8); CONFER WITH STEPHANIE WEEKS ABOUT AIRPLANE STATUS, MEXICO HOUSE, PRETRIAL SERVICES INTERVIEW (0.4); REVIEW VIDEOS OF JOBY WEEKS EXPLAINING BITCOIN, BITCLUB (ON CRUISE SHIP), GIVING RON PAUL HIS FIRST BITCOIN, ANARCHOPULCO 2019, INTERVIEW WITH TD JAKES, HACKER VIDEO, BITCOIN COMPENSATION PLAN, AND TWO ICELAND VIDEOS; DRAFT MINING VIDEO | 5.20 | 2,990.00 |

*Services designated with an * were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR
RE:  DEFENSE OF CRIMINAL CHARGES OF
     CONSPIRACY WIRE FRAUD & SECURITIES
     VIOLATIONS

MARCH 31, 2020
REF NO.: 14629-42106
INVOICE NUMBER: 1051264

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|------|------|-------------|-------|--------|
|  |  | (.9) (REDUCED BY .2). |  |  |
| 02/27/20 | MLY | CONFERENCES AND CORRESPONDENCE REGARDING THE DETENTION MOTION (.4); TELECONFERENCE WITH S. GAUGUSH RE CASE STRATEGY (.3). | 0.70 | 465.50 |
| 02/27/20 | SAG | CONFER WITH STEPHANIE WEEKS AND MICHAEL YAEGER REGARDING DETENTION, AIRPLANE, AND CHRISTMAS CARDS FOR THUMB DRIVE (0.2); CONFER WITH KATELYN SANDOVAL AND MIKE YEAGER REGARDING VISIT TO JAIL ON FRIDAY AND CONFER WITH DAVE RODMAN REGARDING ASSETS AND SHARES IN COMPANIES (0.2); REVIEW GOVERNMENT'S OPPOSITION TO MATT GOETTSCHE'S MOTION FOR BOND (1.3); CONFER WITH KATELYN SANDOVAL REGARDING TOPICS FOR DISCUSSION AT JAIL VISIT WITH JOBY WEEKS (0.2); CONFER WITH MICHAEL YAEGER REGARDING COUNT TWO AND GOVERNMENT'S INTEREST IN JOBY WEEKS' COOPERATION (0.4) (REDUCED BY .5). | 1.90 | 1,092.50 |
| 02/27/20 | KMS | REVIEW SEVERANCE MEMO AND OTHER DOCUMENTS IN PREPARATION FOR UPCOMING CLIENT VISIT (1.4) (REDUCED BY .5). | 0.90 | 360.00 |
| 02/28/20 | MLY | MEETING WITH J. WEEKS RE FACTS AND CASE STRATEGY (3.5); TRAVEL TO MEETING (.5) (REDUCED BY 2.1). | 2.50 | 1,662.50 |
| 02/28/20 | SAG | CONFER WITH KATELYN SANDOVAL REGARDING DETENTION ISSUES AND BITFURY CONTRACTS. | 0.60 | 345.00 |
| 02/28/20 | KMS | VISIT CLIENT AT ESSEX COUNTY JAIL (6.2); REVIEW APOSTILLE ISSUES IN NJ (.6)(REDUCED BY 3.3). | 3.50 | 1,400.00 |
|  |  | TOTAL FEES FOR PROFESSIONAL SERVICES |  | $171,118.50 |

*Services designated with an \* were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR
RE:  DEFENSE OF CRIMINAL CHARGES OF
     CONSPIRACY WIRE FRAUD & SECURITIES
     VIOLATIONS

MAY 7, 2020
REF NO.: 14629-42106
INVOICE NUMBER: 1056015

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|------|------|-------------|-------|--------|
| | | BY 1.6 HOURS). | | |
| 03/13/20 | AMH | CORRESPONDENCE RE: SCHEDULING ORDER; REVIEW ORDERS (REDUCED BY .2 HOURS). | 0.20 | 115.00 NO CHARGE |
| 03/13/20 | SAG | REVISE EMERGENCY MOTION AND SEND TRACK CHANGES TO KATELYN SANDOVAL AND ERIN HOYLE (1.5); CONFER WITH ERIN HOYLE REGARDING POLICIES OF ESSEX COUNTY JAIL AND DEVELOPMENTS AT THE JAIL (0.2); CONFER WITH AUSA JAMIE HOXIE REGARDING THEIR DESIRE FOR JOBY WEEKS' COOPERATION AND SCHEDULING ORDER ISSUES (0.2); CONFER WITH JOBADIAH WEEKS REGARDING NEED FOR MEDICAL RECORDS TO SUPPORT HIS CLAIMED CONDITIONS, ENCOUNTERS WITH DOCTOR AT THE JAIL, AND ISSUES WITH DR. KING (0.3); CONFER WITH ERIN HOYLE REGARDING OBTAINING MEDICAL RECORDS TO SUPPORT JOBY WEEKS' MEDICAL CONDITIONS AND TIMING FOR FILING OF COVID-19 MOTION (0.3); DRAFT ALTERNATIVE/COMPETING SCHEDULING ORDER TO PROVIDE TO JUDGE CECCHI (0.5); CONFERENCE CALL WITH JUDGE CECCHI REGARDING PROPOSED SCHEDULING ORDER (0.2); CONFER WITH RODNEY VILLAZOR REGARDING RUSS MEDLIN AND PROPOSED SCHEDULING ORDER (0.2); CONFER WITH JOBY WEEKS REGARDING JUDGE CECCHI'S RULING ON SCHEDULING ORDER AND SPEEDY TRIAL (0.1); CONFER WITH AUSA DAVID FEDER REGARDING DISCOVERY AND GOVERNMENT'S DESIRE FOR JOBY WEEKS TO PLEAD GUILTY AND COOPERATE (0.3). | 3.80 | 2,185.00 |
| 03/13/20 | KMS | REVISE MOTION FOR TEMPORARY RELEASE (1.7); DISCUSS CONTINUANCE ISSUE (.8) (REDUCED BY 1.5 HOURS). | 1.00 | 400.00 |
| 03/13/20 | EJH | UPDATE RESEARCH REGARDING COVID-19 AND VIRUS OUTBREAKS IN PRISONS AND JAILS (2.1); REVISE SUMMARY OF THE SAME (0.3); PREPARE EXHIBITS FOR MOTION FOR TEMPORARY RELEASE (0.5) (REDUCED BY | 1.50 | 592.50 |

*Services designated with an \* were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR                                        JULY 29, 2020
RE:  DEFENSE OF CRIMINAL CHARGES OF CONSPIRACY                  REF NO.: 14629-42106
     WIRE FRAUD & SECURITIES VIOLATIONS                        INVOICE NUMBER: 1066891

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|------|------|-------------|-------|--------|
| | | TWO OF INDICTMENT | | |
| 05/12/20 | MLY | ANALYSIS OF COUNT TWO EVIDENCE AND LAW (1.5); TELECONFERENCE AND CORRESPONDENCE WITH A. GAUGUSH (.3) | 1.80 | 1,197.00 |
| 05/12/20 | SAG | DRAFT LETTER TO JOBY WEEKS REGARDING EVIDENCE PERTAINING TO COUNT TWO, AND PROVIDE JOBY WITH THE EVIDENCE REFERENCED BY THE GOVERNMENT (0.3); CONFER WITH JOBY WEEKS REGARDING MATT GOETTSCHE AFFIDAVIT AND FILING MOTION FOR RELEASE ON CONDITIONS (0.8); PROVIDE STATUS UPDATE TO     STEPHANIE WEEKS (0.4-NO CHARGE); CONFER WITH MICHAEL YAEGER REGARDING DETENTION APPEAL TO BE FILED ON FRIDAY, CONTINUING NEGOTIATIONS WITH THE GOVERNMENT, COOPERATION ISSUES, AND COUNT TWO EVIDENCE (0.3); ORGANIZE AND PRODUCE RECORDS TO JOBY WEEKS (0.3); REVIEW CORRESPONDENCE REGARDING THIRD DISCOVERY BATCH, CONFER WITH GOVERNMENT, AND CONFER WITH TEAM ABOUT DOWNLOADING (0.2); REVISE FUNDRAISING LETTER (0.4 - NO CHARGE). | 1.90 | 1,092.50 |
| 05/13/20 | SL* | REVIEW DOCUMENTS IN DOJ DOCUMENT PRODUCTIONS REFERENCED IN COUNT TWO OF INDICTMENT | 0.80 | 220.00 |
| 05/13/20 | SAG | REVIEW AND REVISE LEGAL DEFENSE FUNDRAISING LETTER, CONFER WITH MICHAEL YAEGER AND EMAIL PETE WINDERS ABOUT IT (1.1 - NO CHARGE); CONFER WITH PETE WINDERS ABOUT FUNDRAISING LETTER (0.2 - NO CHARGE); SEND REVISED LETTER TO STEPHANIE WEEKS (0.2 - NO CHARGE); REVIEW POST-MIRANDA INTERVIEW TO IDENTIFY AGENT QUESTIONS THAT REVEAL ISSUES FOR COOPERATION AND SEND NOTE TO MICHAEL YAEGER ABOUT STATEMENT CONCERNING "SECURITY" ISSUE (0.4); | 0.40 | 230.00 |
| 05/13/20 | FR* | CONFER WITH SAMANTHA LAMBE REGARDING 2020-05-12 DOJ PRODUCTION. | 0.70 | 178.50 |

*Services designated with an * were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR
RE:  DEFENSE OF CRIMINAL CHARGES OF CONSPIRACY
     WIRE FRAUD & SECURITIES VIOLATIONS

JULY 29, 2020
REF NO.: 14629-42106
INVOICE NUMBER: 1066891

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|------|------|-------------|-------|--------|
| | | RELEASE (1.0). | | |
| 05/20/20 | SAG | MAKE AMENDMENTS TO THE BRIEF (1,0); CONFER WITH JOBY WEEKS MULTIPLE TIMES REGARDING AMENDMENTS TO THE BRIEF AND WORK THROUGH CHANGES TO THE BRIEF (1.0). | 2.00 | 1,150.00 |
| 05/20/20 | FR* | CONFER WITH SAMANTHA LAMBE REGARDING DOJ PRODUCTION HARD DRIVE. ANALYZE, REMEDIATE ERRORS AND LOAD 12 OF 22 DOJ PRODUCTIONS FROM HARDRIVE TO RELATIVITY. REDUCED BY 2.2 HOURS) | 2.00 | 510.00 |
| 05/21/20 | FR* | ANALYZE, REMEDIATE ERRORS AND LOAD REMAINING DOJ PRODUCTIONS FROM HARDRIVE TO RELATIVITY. | 3.70 | 943.50 |
| 05/22/20 | AMH | REVIEW SCHEDULING ORDER (.2); DISCOVERY PRODUCTION CORRESPONDENCE (.2). | 0.40 | 230.00 |
| 05/24/20 | SAG | REVIEW AND REVISE APPEAL BRIEF OF DETENTION ORDER CONSISTENT WITH CHANGES MADE BY JOBY WEEKS, CHANGE FIGURES FOR BITCOIN, CHANGE INFORMATION FOR FLIGHTS IN AND OUT OF NEWARK, AND REVIEW PROTECTIVE ORDER REGARDING WHETHER THE MOTION NEEDS TO BE FILED UNDER SEAL. | 4.70 | 2,702.50 |
| 05/25/20 | MLY | REVISING APPEAL OF DETENTION ORDER. | 2.40 | 1,596.00 |
| 05/25/20 | MLY | TELECONFERENCE AND CORRESPONDENCE WITH S. GAUGUSH RE DETENTION APPEAL. | 0.70 | 465.50 |
| 05/25/20 | SAG | THREE PHONE CALLS WITH JOBY WEEKS REGARDING FILING THE APPEAL OF THE DETENTION BRIEF, FILING UNDER SEAL, POTENTIAL PLEA DEAL WITH THE GOVERNMENT, INABILITY TO MAKE JURY NULLIFICATION ARGUMENTS, NEED TO STILL CONSIDER THE GOVERNMENT'S PLEA PROPOSAL, AND LIMITATION ON    USING TRIAL AS A PLATFORM FOR A SOCIAL CAUSE (0.7); CONFER WITH AUSA JAMIE HOXIE ABOUT FILING THE APPEAL OF THE DETENTION ORDER, PLEA PROPOSAL, | 2.40 | 1,380.00 |

*Services designated with an * were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR                                      JULY 29, 2020
**RE:  DEFENSE OF CRIMINAL CHARGES OF CONSPIRACY**     REF NO.: 14629-42106
**WIRE FRAUD & SECURITIES VIOLATIONS**                INVOICE NUMBER: 1066891

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|------|------|-------------|-------|--------|
| | | COOPERATION, AND OBTAINING ACCESS TO JOBY WEEKS' LAPTOP AND CELL PHONES (0.8); CONFER WITH MICHAEL YAEGER REGARDING THE APPEAL BRIEF, ASSESSING LOSS FOR SENTENCING PURPOSES, AND SCHEDULING A DATE TO CONFER WITH JOBY OVER ZOOM (0.5); SEND VARIOUS EMAILS TO MICHAEL YAEGER AND ANGIE MARANTO REGARDING FILING OF BRIEF, IN PARTICULAR UNDER SEAL, AND SENTENCING LOSS ISSUES (0.4). | | |
| 05/26/20 | MLY | REVISING, FINALIZING, AND FILING BRIEF. | 1.80 | 1,197.00 |
| 05/26/20 | SAG | VARIOUS EMAILS REGARDING FILING OF MOTION APPEALING DETENTION ORDER AND GETTING ACCOMMODATION TO JOBY WEEKS FOR MORE COMPUTER TIME; CONFER WITH MICHAEL YAEGER REGARDING FILING OF BRIEF AND INSTANT MESSAGE JOBY WEEKS ABOUT FILING AND ASSESSMENT OF COUNT TWO. | 0.50 | 287.50 |
| 05/26/20 | EJH | FINALIZE APPEAL FOR FILING; REVIEW AND REVISE PROPOSED ORDER. | 1.90 | 750.50 |
| 05/26/20 | FR* | LOAD REPLACEMENT PRODUCTION DOCUMENTS PROVIDED BY DOJ. | 0.50 | 127.50 |
| 05/27/20 | MLY | CORRESPONDENCE RE VIDEOCONFERENCING. | 0.10 | 66.50 |
| 05/27/20 | SAG | CONFER WITH LEGAL ASSISTANT ABOUT CONTACTING THE JAIL TO SET UP CONFERENCE CALL TO REVIEW COUNT TWO EVIDENCE WITH JOBY WEEKS (0.2); CONFER WITH SAM LAMBE REGARDING DOWNLOADING OF ADDITIONAL DISCOVERY RECORDS (0.1). | 0.30 | 172.50 |
| 05/28/20 | SAG | CONFER WITH ANGIE MARANTO ABOUT MOTION TO REVOKE DETENTION ORDER AND SETTING UP VIDEO CONFERENCE WITH JOBY WEEKS AT THE JAIL (0.1). | 0.10 | 57.50 |
| 06/01/20 | MLY | PREPARATION FOR CALL WITH CLIENT RE COUNT TWO (1.0); TELECONFERENCES WITH CLIENT AND WITH S. GAUGUSH (2.0). | 3.30 | 2,194.50 |
| 06/01/20 | SAG | CONFER WITH MICHAEL YAEGER | 1.70 | 977.50 |

*Services designated with an * were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR                              JULY 29, 2020
**RE:  DEFENSE OF CRIMINAL CHARGES OF CONSPIRACY**     REF NO.: 14629-42106
**WIRE FRAUD & SECURITIES VIOLATIONS**                 INVOICE NUMBER: 1066891

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|------|------|-------------|-------|--------|
| 06/15/20 | MLY | CORRESPONDENCE WITH CO-DEFENDANTS' COUNSEL RE DETENTION. | 0.10 | 66.50 |
| 06/15/20 | AMH | CORRESPONDENCE RE: SCHEDULING ORDER. | 0.20 | 115.00 |
| 06/15/20 | SAG | CONFER WITH JOBY WEEKS REGARDING TIME OUT OF HIS CELL, GOVERNMENT RESPONSE TO MOTION FOR RELEASE, AND RETURN OF PROPERTY. | 0.20 | 115.00 |
| 06/16/20 | MLY | CORRESPONDENCE AND TELECONFERENCES RELATED TO NEGOTIATIONS WITH DOJ I'VE DETENTION AND POTENTIAL COOPERATION. | 1.70 | 1,130.50 |
| 06/16/20 | AMH | REVIEW SCHEDULING ORDER, CORRESPONDENCE RE: DISCOVERY MATTERS. | 0.30 | 172.50 |
| 06/16/20 | SAG | REVIEW ARTICLE ABOUT RUSS MEDLIN (0.1); TALK TO MICHAEL YAEGER ABOUT CALLS WITH AUSA FEDER REGARDING RETURN OF COMPUTER AND CELL PHONE, RELEASE FROM DETENTION AS PART OF COOPERATION, MOTION FOR BOND, AND POTENTIAL DELAY IN CASE BECAUSE OF RUSS MEDLIN AND BALACCI (0.2). | 0.30 | 172.50 |
| 06/17/20 | MLY | CORRESPONDENCE RE BAIL BRIEF AND HEARING. | 0.30 | 199.50 |
| 06/17/20 | AMH | CORRESPONDENCE RE: UNSEALING ORDER ON DEFENDANT 2, DISCOVERY ISSUES. | 0.30 | 172.50 |
| 06/17/20 | SAG | CONFER WITH MICHAEL YAEGER REGARDING ARREST OF RUSS MEDLIN, EXTRADITION OF BALACCI, GOVERNMENT'S POSITION ON JOBY WEEKS' MOTION FOR RELEASE AND OBTAINING A LETTER FROM THE GOVERNMENT THAT THEY WON'T OPPOSE RELEASE IF JOBY WEEKS COOPERATES, AND FOLLOW UP WITH THE GOVERNMENT ON THESE ISSUES (0.4); CONFER WITH ADAM SCHWARTZ ABOUT CIVIL SUIT IN NEVADA (0.2); | 0.60 | 345.00 |
| 06/18/20 | MLY | CORRESPONDENCE WITH CO-DEFENDANTS' COUNSEL. | 0.10 | 66.50 |

*Services designated with an * were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR
**RE: DEFENSE OF CRIMINAL CHARGES OF CONSPIRACY
WIRE FRAUD & SECURITIES VIOLATIONS**

AUGUST 28, 2020
REF NO.: 14629-42106
INVOICE NUMBER: 1071250

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|------|------|-------------|-------|--------|
| | | REVOCATION OF DETENTION ORDER. | | |
| 07/21/20 | MLY | ANALYSIS OF COUNT TWO EVIDENCE. | 0.20 | 133.00 |
| 07/21/20 | SAG | REVIEW COUNT TWO EVIDENCE AND CONTINUE WORKING ON ASSESSMENT MEMO (10.7); FINAL REVIEW OF REPLY BRIEF (0.6); CONFER WITH JOBY WEEKS ABOUT DETENTION ISSUES, APPLICABILITY OF FEDERAL LAW TO CORPORATIONS AND CITIZENS, APPLICABILITY OF THE SECURITIES LAWS, GOVERNMENT'S POSITION ON     DETENTION, MEETING TOMORROW ON SECURITIES LAWS (0.8); CONFER WITH DEFENSE TEAM REGARDING RESEARCH TASKS (0.2). | 12.30 | 7,072.50 |
| 07/21/20 | EJH | REVIEW AND REVISE CITATIONS TO RECENTLY FILED GOVERNMENT RESPONSE IN REPLY BRIEF (0.3); ANALYZE CASE LAW ON ARTICLE IV AND FRANCHISE COURTS (0.7); ANALYZE CASE LAW REGARDING APPLICATION OF SECURITIES LAWS TO FOREIGN COMPANIES (1.2); ANALYZE CASE LAW AND OTHER MATERIALS REGARDING CONSENTING TO POSITIVE LAW (1.3). | 3.50 | 1,382.50 |
| 07/22/20 | MLY | ANALYSIS OF COUNT TWO AND TAX EVIDENCE, AND POTENTIAL COOPERATION, AND COMMUNICATIONS WITH S. GAUGUSH RE SAME, AND TELECONFERENCE WITH CLIENT RE SAME. | 4.00 | 2,660.00 |
| 07/22/20 | SAG | CONTINUE REVIEWING COUNT TWO EVIDENCE AND DRAFTING COUNT TWO ASSESSMENT MEMO (2.0); CONFER WITH JOBY WEEKS AND MICHAEL YAEGER REGARDING COUNT TWO EVIDENCE ASSESSMENT (3.4); CONFER WITH JAMIE HOXIE AND ANTHONY TORNTORE ABOUT POTENTIAL PLEA DEAL, COOPERATION, AND ATTORNEY PROFFER NEXT WEEK (0.7); CONFER WITH MICHAEL YAEGER ABOUT DETAILS OF PRELIMINARY PLEA OFFER AND GOVERNMENT'S EXPECTATION FOR COOPERATION (0.8). | 6.90 | 3,967.50 |
| 07/23/20 | SAG | CONFER WITH JOBY WEEKS REGARDING CONVERSATION WITH THE GOVERNMENT | 0.70 | 402.50 |

*Services designated with an \* were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR                                    SEPTEMBER 30, 2020
**RE:  DEFENSE OF CRIMINAL CHARGES OF CONSPIRACY**          REF NO.: 14629-42106
**      WIRE FRAUD & SECURITIES VIOLATIONS**                INVOICE NUMBER: 1074031

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|---|
| | | WEEKS PREPARING FOR SECOND PROFFER SESSION ON TUESDAY AND SEND JOBY A LIST OF TOPICS REGARDING CONVERSATIONS WITH MATT GOETTSCHE (1.4); CONFER WITH MICHAEL YAEGER REGARDING ISSUES WITH PROFFER SESSION (0.2). | | |
| 08/24/20 | MLY | PREPARING CLIENT FOR PROFFER WITH US ATTORNEY'S OFFICE. | 2.50 | 1,662.50 |
| 08/24/20 | SAG | EIGHT TELEPHONE CONVERSATIONS WITH JOBY WEEKS AND MICHAEL YAEGER IN PREPARATION FOR PROFFER TOMORROW, INCLUDING COMMUNICATIONS WITH MATTHEW GOETTSCHE SINCE ARREST (2.2); CONFER WITH MICHAEL YAEGER REGARDING PROFFER ISSUES (0.3); REVIEW NEW PROFFER LETTER AND SEND FULLY EXECUTED PROFFER LETTER FOR THE AUGUST 17 PROFFER ALONG WITH THE AUGUST 24 PARTIALLY EXECUTED PROFFER LETTER TO THE GOVERNMENT (0.2); REVIEW RECENT ORDER RENDERING ENDS OF JUSTICE FINDING FOR NEW JERSEY CASES (0.2); TWO TELEPHONE CONVERSATIONS WITH JOBY WEEKS IN PREPARATION FOR PROFFER SESSION TOMORROW MORNING (0.5). | 3.40 | 1,955.00 |
| 08/25/20 | MLY | PROFFER WITH THE US ATTORNEY'S OFFICE (2.0); PREPARATION FOR POTENTIAL ADDITIONAL PROFFERS, AND PLEA (1.5); TELECONFERENCE WITH USAO RE POTENTIAL COOPERATION (.3). | 3.80 | 2,527.00 |
| 08/25/20 | SAG | PREPARE FOR PROFFER AND ATTEND PROFFER OF JOBY WEEKS (2.4); CONFER WITH MICHAEL YAEGER POST-PROFFER REGARDING FOLLOW UP ISSUES, POTENTIAL MATTERS TO CORRECT, ANTICIPATED PLEA NEGOTIATIONS (0.5); CONFER WITH STEPHANIE WEEKS REGARDING PROFFER (0.2); DEBRIEF JOBY WEEKS   ABOUT OUTCOME OF PROFFER (0.3); CONFER WITH AUSA JAMIE HOXIE REGARDING PROFFER AND GOVERNMENT'S INTENTION TO PROPOSE A PLEA OFFER | 3.80 | 2,185.00 |

*Services designated with an * were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR                                OCTOBER 30, 2020
**RE:  DEFENSE OF CRIMINAL CHARGES OF CONSPIRACY**        REF NO.: 14629-42106
**     WIRE FRAUD & SECURITIES VIOLATIONS**                INVOICE NUMBER: 1080205

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|------|------|-------------|-------|--------|
| | | THIRD CIRCUIT. | | |
| 09/06/20 | MLY | ANALYSIS OF RESEARCH RE CONCURRENT SENTENCES. | 0.10 | 68.50 |
| 09/06/20 | EJH | FURTHER RESEARCH APPLICATION OF 18 U.S.C. 3584 TO CONCURRENT SENTENCING IN THE THIRD CIRCUIT; SUMMARIZE AND DISTRIBUTE THE SAME. | 2.60 | 1,066.00 |
| 09/07/20 | SAG | REVIEW AND WORK TO RESOLVE PLEA AGREEMENT ISSUES. | 1.10 | 660.00 |
| 09/07/20 | EJH | ANALYZE FEDERAL CASE LAW REGARDING CALCULATING LOSS AMOUNTS AND DETERMINING CONCURRENT OR CONSECUTIVE SENTENCES. | 1.30 | 533.00 |
| 09/08/20 | SL* | REVIEW DOCUMENTS FROM GOVT. | 0.30 | 85.50 |
| 09/08/20 | MLY | CORRESPONDENCE WITH GOVERNMENT, AND TELECONFERENCE WITH S. GAUGUSH RE PLEA OFFER. | 0.60 | 411.00 |
| 09/08/20 | SAG | REVIEW PLEA OFFER MATERIALS FROM THE GOVERNMENT AND CALCULATE RESTITUTION AMOUNT FOR TAX PURPOSES (1.3); CONFER WITH MICHAEL YAEGER ABOUT THE TERMS OF THE PROPOSED PLEA AGREEMENT (0.3); CONFER WITH JOBY WEEKS ABOUT NEVADA CASE AND FORMAL PLEA OFFER (0.3). | 1.90 | 1,140.00 |
| 09/09/20 | APS | REV AND DISCUSS PLEA AGREEMENT | 0.90 | 558.00 |
| 09/09/20 | RPR | REVIEW AND RESPOND TO EMAIL FROM M. YAEGER RE SEYCHELLES CORP FOR SERVICES INCOME FROM BITFURY COMMISSION PAYMENT. | 0.20 | 149.00 |
| 09/09/20 | MLY | ANALYSIS OF PLEA AND COOPERATION AGREEMENT AND RELATED RESTITUTION ISSUES AND TELECONFERENCE WITH S. GAUGUSH RE SAME. | 1.30 | 890.50 |
| 09/09/20 | SAG | REVIEW MATT GOETTSCHE'S REBUTTAL TO GOVERNMENT'S ARGUMENTS ABOUT FRAUD PERPETRATED BY BITCLUB AND CONFER WITH MICHAEL YAEGER ABOUT MATT GOETTSCHE'S NOTES AND THE PLEA (0.8); PUT TOGETHER MOTION FOR | 3.80 | 2,280.00 |

*Services designated with an * were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR
**RE:  DEFENSE OF CRIMINAL CHARGES OF CONSPIRACY
       WIRE FRAUD & SECURITIES VIOLATIONS**

OCTOBER 30, 2020
REF NO.: 14629-42106
INVOICE NUMBER: 1080205

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|------|------|-------------|-------|--------|
| | | EXTENSION OF TIME FOR JOBY WEEKS TO RESPOND TO CIVIL CASE (0.7); CONFER WITH ADAM SCHWARTZ AND MICHAEL YAEGER ABOUT THE TERMS OF THE PLEA OFFER (1.2); CONFER WITH MATTHEW MUELLER REGARDING TAX FORMS, FRAUD PENALTIES, AND TAX EVASION ISSUES (0.8); PUT TOGETHER RESEARCH ASSIGNMENTS AND ISSUES ASSOCIATED WITH THE PROPOSED PLEA OFFER AND ASSIGN OUT TASKS (0.3). | | |
| 09/10/20 | SL* | REVIEW DOCUMENTS RECEIVED FROM THE GOVT. | 0.30 | 85.50 |
| 09/10/20 | MLY | ANALYSIS OF PLEA AND COOPERATION AGREEMENTS, AND RELATED LEGAL RESEARCH. | 0.70 | 479.50 |
| 09/10/20 | AMH | MULTIPLE CORRESPONDENCE RE: ABEL PLEA; REVIEW WEEKS PROPOSED PLEA. | 0.40 | 230.00 |
| 09/10/20 | SAG | CONFER WITH JOBY WEEKS ABOUT NEVADA CASE AND PROPOSED TAX ASSESSMENT BY THE GOVERNMENT (0.3); REVIEW JOE ABEL PLEA MATERIALS (0.7); REVIEW RESEARCH ABOUT SECURITIES LOSS ISSUES AND CONFER WITH ERIN HOYLE REGARDING REMAINING ISSUES (0.5). | 1.50 | 900.00 |
| 09/10/20 | EJH | ANALYZE AND SUMMARIZE FEDERAL CASE LAW REGARDING CALCULATING LOSS AMOUNTS AND RESTITUTION TO DETERMINE IF THE GOVERNMENT CALCULATIONS ARE APPLICABLE TO THE CHARGED OFFENSES. | 1.50 | 615.00 |
| 09/10/20 | EJH | ANALYZE AND SUMMARIZE FEDERAL CASE LAW REGARDING IDENTIFYING VICTIMS TO DETERMINE IF GOVERNMENT LOSS CALCULATIONS ARE APPLICABLE TO THE CHARGED OFFENSES. | 1.70 | 697.00 |
| 09/11/20 | MLY | TELECONFERENCE WITH CLIENT RE PLEA NEGOTIATIONS, TAX COUNTS, AND PLEA AGREEMENT. | 2.70 | 1,849.50 |
| 09/11/20 | AMH | CORRESPONDENCE RE: ABEL BOND. | 0.20 | 115.00 |
| 09/11/20 | SAG | CALL WITH JOBY WEEKS AND MICHAEL | 1.80 | 1,080.00 |

*Services designated with an * were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

WEEKS, JOBADIAH SINCLAIR                                      OCTOBER 30, 2020
RE:  DEFENSE OF CRIMINAL CHARGES OF CONSPIRACY               REF NO.: 14629-42106
      WIRE FRAUD & SECURITIES VIOLATIONS                     INVOICE NUMBER: 1080205

| DATE | INIT | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|---|
| | | AND SEND PACKAGE TO JOBY WEEKS (.3). | | |
| 09/29/20 | MLY | TRIP TO THE JAIL FOR SIGNED DOCUMENTS, INCLUDING PLEA AND COOPERATION AGREEMENT (1.0); ANALYSIS OF DOCUMENTS (.5); TELECONFERENCE WITH GOVERNMENT RE BAIL (.5); TELECONFERENCE WITH S. GAUGUSH RE BAIL (.3). | 2.30 | 1,575.50 |
| 09/29/20 | SAG | CONFER WITH MICHAEL YAEGER REGARDING PLEA AGREEMENT AND DISCUSSION WITH AUSA TONY TORNTORE REGARDING INCOME NUMBER FOR DRAFT INFORMATION. | 0.20 | 120.00 |
| 09/30/20 | SAG | SEND GOVERNMENT PLEA AGREEMENT AND COOPERATION AGREEMENT (0.1); SEND JOBY WEEKS MESSAGE ABOUT BOND ISSUES (0.1); CONFER WITH GOVERNMENT ABOUT SIGNED PROFFER LETTERS (0.1). | 0.30 | 180.00 |
| | | TOTAL FEES FOR PROFESSIONAL SERVICES | | $57,269.50 |

ATTORNEY FEE SUMMARY

| APS | ADAM P. SCHWARTZ | 1.10 | hours at | $620.00 | = | 682.00 |
|---|---|---|---|---|---|---|
| CCK | CRISTIN C. KEANE | 0.60 | hours at | $735.00 | = | 441.00 |
| RPR | RAHUL P. RANADIVE | 0.70 | hours at | $745.00 | = | 521.50 |
| MLY | MICHAEL YAEGER | 35.60 | hours at | $685.00 | = | 24,386.00 |
| KMS | KATELYN M. SANDOVAL | 4.40 | hours at | $415.00 | = | 1,826.00 |
| EJH | ERIN J. HOYLE | 13.90 | hours at | $410.00 | = | 5,699.00 |
| SL* | SAMANTHA LAMBE* | 0.90 | hours at | $285.00 | = | 256.50 |
| AMH | ANDREW M. HINKES | 0.60 | hours at | $575.00 | = | 345.00 |
| SAG | SIMON A. GAUGUSH | 38.30 | hours at | $600.00 | = | 22,980.00 |
| FR* | FRANCISCO J. RODRIGUEZ* | 0.50 | hours at | $265.00 | = | 132.50 |
| | TOTALS | 96.60 | | | | $57,269.50 |

TOTAL FEES FOR PROFESSIONAL SERVICES                          $57,269.50

*Services designated with an * were performed by persons not admitted to practice law, under the supervision of admitted attorneys.*
*Carlton Fields practices law in California through Carlton Fields, LLP*

# Exhibit C

Chronology of my Participation Reflected in Government Records

**Description**

Compilation of Government charging materials, investigative memoranda, interview records, and prior record-supported submissions reflecting the timing, nature, and progression of participation in matters associated with BitClub Network, including later entry into the enterprise, commission-based compensation, limited operational visibility, and material cessation of active participation after August 2018.

**Purpose**

To demonstrate that Government records reflect my participation beginning materially after formation of BCN, functioning principally in a commission / intermediary capacity rather than in a founding or operational design role, with materially reduced participation after 2018 and cessation of active involvement before the terminal period of the broader charged conspiracy.

# EXHIBIT C

Chronology of Defendant's Participation Reflected in Government Records

| Date / Period | Source | Quoted Record / Record Description | Role / Significance |
|---|---|---|---|
| apr. 2014 | Indictment (Dkt. 9 ¶2, PageID 49) | "From at least in or around April 2014 through in or about December 2019…" | Overall charged enterprise predates Defendant's involvement |
| Approx. Aug. 2015 | Prior Sentencing Submission (Dkt. 403 at 7, PageID 5056) | "Defendant joined BCN as a member 16 months after it started." | Clear later entry into existing enterprise |
| aug. 2015 | IRS Memorandum (CT-122627-20 at 6) | "Weeks joined BCN in August 2015 after being introduced to BCN promoter Joseph Abel." | Government records independently confirm later entry |
| 2014–2015 | Indictment (Dkt. 9 ¶4(b)–(d), PageID 50–51) | Foundational operational conduct—including enterprise structuring, mining presentation, and manipulated earnings display—is attributed principally to others | Foundational operational design attributed to others |
| dec. 2015 | Indictment (Dkt. 9 ¶1(xi), PageID 56) | "It's not transparent enough for the big big money guys." | Early attributed communication concerns transparency / investor-facing information |
| 2015–2018 | Ritz Interview Notes (at 6) | "Joby does not know all of the internal workings …" | Limited operational visibility |

| Date | Source | Record | Significance |
|---|---|---|---|
| 2015–2018 | Ritz Interview Notes | Record reflects Defendant sought transparency and supporting information concerning mining operations and enterprise activity | Consistent with intermediary access and limited operational visibility rather than owner / operator status |
| June / July 2018 | Ritz Interview Notes (at 5) | "In June/July 2018, Bitclub stopped paying the power bill for the mining data center in the Republic of Georgia." | Material operational disruption during relevant period |
| 2018 | Ritz Interview Notes (at 7) | Record reflects exclusion from later-stage commercial arrangements and material cessation of active participation thereafter | Reduced involvement in later-stage activity |
| Approx. Aug. 2018 | Ritz Interview Notes (at 8) | "No referrals in 8 months." | Referral / recruiting activity had ceased |
| Post-2018 | Prior Sentencing Submission (Dkt. 403 at 4, PageID 5053) | "Defendant's role in BCN diminished after 2018, while others maintained significant control." | Reduced terminal participation while others retained control |
| 2019 | Ritz Interview Notes (at 9) | "Not actively doing Bitclub anymore." | No active participation by that point |
| 2019 | Ritz Interview Notes (at 9) | "Not actively doing Bitclub anymore." | Record reflects no active BCN participation by that point |

Overall chronology reflected in Government records shows materially later entry into BCN, no participation in BCN's formative creation period or early operational development, a commission / intermediary role with limited operational visibility, and cessation of active involvement before the terminal period of the broader charged conspiracy.

# Exhibit D

Government Records Reflecting my Functional Relationship to BCN Principals

**Description**

Compilation of Government interview memoranda, investigative notes, and related records reflecting my communications with BCN principals and associated parties, including requests for transparency, requests for operational information, communications concerning mining statistics, and statements reflecting limited access to core internal operational knowledge.

**Purpose**

To demonstrate that Government records reflect intermediary access, repeated requests for transparency, and limited visibility into internal operations, technical infrastructure, and enterprise decision-making, materially inconsistent with characterization of me as occupying a traditional managerial or operational role.

# EXHIBIT D

## Government Records Reflecting Defendant's Functional Relationship to BCN Principals

| Record Citation | Quoted Record | Functional Significance |
| --- | --- | --- |
| Government email to Probation (Apr. 27, 2026) | "Mr. Weeks did not have a direct-report relationship to Goettsche … [but] did have a line of communication to Goettsche that normal BCN investors did not have." | Government expressly confirms intermediary access / communication—not formal reporting authority, management, or enterprise control |
| Aug. 17, 2020 Proffer Memo ¶ 2 | "Abel had direct access to Medlin … Weeks liked to get to know the 'inner-circle' so he could provide the best support to new members he brought to the MLM." | Access reflected efforts to obtain information needed to support recruited members, not formal managerial or operational authority |
| Aug. 17, 2020 Proffer Memo ¶ 7 | "Medlin told Weeks that he would need to speak with Goettsche about this deal." | Contact with Goettsche arose through equipment sourcing / intermediary commercial dealings |
| Aug. 17, 2020 Proffer Memo ¶ 27 | "Weeks never got a direct answer as to how many members there were or how many shares were outstanding … Only Goettsche and Medlin would know that." | Limited operational visibility; core metrics remained with principals |
| Aug. 25, 2020 Proffer Memo ¶ 8 | "Weeks asked Goettsche if he can prove that they spent 40% on mining equipment …" | Repeated requests for substantiation / transparency |
| Aug. 25, 2020 Proffer Memo ¶ 13 | "Weeks was asking Goettsche if what the indictment said is true …" | Inquiry-driven relationship, not reporting hierarchy |

| | | |
|---|---|---|
| Aug. 25, 2020 Proffer Memo ¶ 19 | "Weeks did not and still does not know what script mining is." | No technical operational role |
| Ritz Interview Notes, at 6 | "Joby does not know all of the internal workings of Bitclub … Russ and Matt would not tell him." | Exclusion from core internal operational knowledge |

This exhibit compiles Government statements and interview memoranda reflecting that Defendant's relationship to BCN principals involved limited communication access, repeated requests for transparency and substantiation, exclusion from core operational information, and no formal reporting, managerial, ownership, or technical operational role within BCN.

# Exhibit E

BCN Participation and Cessation Chronology

**Description**

Chronology reflecting the timing, duration, and cessation of Weeks' participation in BCN relative to BCN's formation, promotional activity, and cessation of involvement, based on Treasury memoranda of interview, contemporaneous Government interview notes, and the chronology reflected in PSR ¶12.

**Purpose**

To assist Rule 32 evaluation of chronology, role assessment, proportionality, and individualized sentencing under 18 U.S.C. §3553(a), including timing and duration of participation relative to BCN's founders and principal operators.

# EXHIBIT E

Government Records Reflecting Defendant's Willingness to Provide Cooperation

| Record Citation | Quoted Record | Significance |
| --- | --- | --- |
| Ritz Interview Notes, at 8 | "Joby is open to suggestions as to who to provide information on." | Express willingness to provide information |
| Ritz Interview Notes, at 9 | "If he gets a list of persons of interest, Joby can look into assisting the government with information." | Offer to assist Government investigation |
| Ritz Interview Notes, at 10 | "Joby wants to help the government get … real bad guys." | Affirmative cooperation posture |
| Ritz Interview Notes, at 10 | "In exchange for providing information on criminals …" | Record reflects discussion of providing information to assist Government investigation |
| Carlton Fields billing records (Mar. 13, 2020) | Conference with AUSA Jamie Hoxie regarding "their desire for Joby Weeks' cooperation" and conference with AUSA David Feder regarding "Government's desire for Joby Weeks to plead guilty and cooperate." | Government contemporaneously sought Defendant's cooperation |

| Carlton Fields billing records (July–Aug. 2020) | Potential plea deal, cooperation, and attorney proffer … formal proffer preparation and signed proffer letters. | Concrete cooperation process, including attorney proffer activity and execution of cooperation-related documents |

Taken together, these Government records and contemporaneous counsel records reflect repeated willingness by Defendant to provide information, engage in cooperation-related discussions, and assist Government investigative efforts.

# Exhibit F

IRS Office of Chief Counsel Memorandum (October 8, 2020)

**Description**

Memorandum generated by the Internal Revenue Service Office of Chief Counsel dated October 8, 2020, addressing analytical treatment of asserted income, including references to tax characterization methodology and the "Streamlined SAR," prepared after execution of my plea agreement.

**Purpose**

To demonstrate that portions of the developed analytical tax framework later relied upon by the Government post-date execution of my plea agreement, supporting my position that the later-developed analytical methodology was not part of the contemporaneous explanatory framework presented at plea.



**OFFICE OF
CHIEF COUNSEL**

**DEPARTMENT OF THE TREASURY**
**INTERNAL REVENUE SERVICE**
**OFFICE OF DIVISION COUNSEL/ASSOCIATE CHIEF COUNSEL**
**CRIMINAL TAX**
**GREEN-BYRNE FEDERAL OFFICE BUILDING**
**600 ARCH STREET, SUITE 03-L14-01**
**PHILADELPHIA, PENNSYLVANIA 19106-1611**
**(267) 941-6200**

## ATTORNEY WORK PRODUCT

CT-122627-20                                                            October 8, 2020
CC:CT:PHI:JHHarris

To:        Ryan L. Korner                    **GRAND JURY MATTER**
           Special Agent in Charge          **DOUBLE SEALED MAILING**
           IRS, Criminal Investigation
           Los Angeles Field Office
           300 North Los Angeles Street
           Los Angeles, CA 90012

From:      James N. Beyer
           Area Counsel, Criminal Tax
           Area 1

Subject:   Evaluation of Grand Jury Expansion Request and Special Agent's Report
           in a Grand Jury Plea case

## CRIMINAL SUBJECT(S)

           Name:       Jobadiah Sinclair Weeks
           Address:    11627 West 74th Way
                       Arvada, CO 80005
           CIMIS#:     1000293264

## SPECIAL AGENT'S RECOMMENDATION

| Charge | Year(s) | Count(s) | Tax Loss |
|---|---|---|---|
| 26 U.S.C. § 7201 | 2015, 2016 2017, 2018 | 1 | $7,128,987.00 |

We believe that the presently available evidence establishes a factual basis to support the plea of guilty to the count considered for referral and is sufficient to meet the requirements of Rule 11 of the Federal Rules of Criminal Procedure.  *See* Fed. R. Crim P. 11(b)(3).  Further, we believe that the charge adequately addresses the crimes committed by the target.  *See* CCDM §§ 38.2.1.7(2) and 38.2.2.6(1).

CT-122627-20                              **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

**Venue:**        District of New Jersey[1]

**Statute of Limitations:**     April 15, 2022[2]

## EXECUTIVE SUMMARY

Jobadiah Sinclair Weeks (Weeks) was a promoter and broker for the Bitclub Network (BCN).  BCN was a cryptocurrency cloud mining pool which operated from 2014 through December 2019 when Weeks and others were arrested and charged with conspiring to offer and sell unregistered securities.  Weeks has remained in federal custody since he was arrested.  Weeks has signed a plea agreement wherein he admits to a conspiracy charge in violation of 18 U.S.C. § 371[3] for violating securities laws as well as evading the proper assessment of his personal income tax in violation of 26 U.S.C. § 7201 *Spies* for the taxable years 2015, 2016, 2017, and 2018.  Weeks failed to file a personal federal income tax return for the taxable years 2015 through 2018.  During these four years, Weeks failed to report more than $18 million of taxable income through his involvement with BCN.  The income was paid to Weeks partially in fiat currency, partially in bitcoin, and partially in stock.

**GRAND JURY EXPANSION**

By letter dated July 23, 2020, the U.S. Attorney's Office (USAO) for the District of New Jersey (DNJ) requested to expand the existing grand jury investigation of Weeks to include potential Title 26 charges.  During the grand jury investigation, the USAO DNJ obtained an ex parte order for Weeks' personal income tax returns.  It was determined that Weeks has not filed a federal income tax return in over a decade.  This information coupled with the evidence of Weeks' BCN compensation made it clear that Weeks had not reported his BCN compensation on filed personal income tax returns for the taxable years 2015, 2016, 2017, and 2018.  Evidence obtained in the grand jury investigation revealed that Weeks failed to report $18.4 million of income between 2015 and 2019.

---

[1] Weeks waived venue in his plea agreement which was entered into with the U.S. Attorney's Office for the District of New Jersey.

[2] There is a six-year limitation period for the offense of willfully attempting to  evade or defeat any tax. I.R.C. § 6531(2).  The general rule is that the limitation period begins to run six years from the date of the  last affirmative act that took place or the statutory due date of the return, whichever is  later.  The statutory due date is used where no return is filed.   *United States v. Butler*, 297 F.3d 505, 511 (6th Cir. 2002), *cert. denied*, 123 S.Ct. 2074  (2003); *United States v. Myerson*, 368 F.2d 393, 395 (2d Cir. 1966), *cert. denied*,  386 U.S. 991 (1967).  Here, Weeks failed to file a return for the earliest year recommended for prosecution, 2015.  The taxable year 2015 return of Weeks would have been due on April 15, 2016.  Therefore, the statute of limitations will expire six years later on April 15, 2022.

[3] As the 18 U.S.C. § 371 charge is not tax-related, our office will not opine on the charge.

2

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

In evaluating this referral request, Counsel must determine: 1) whether there are articulable facts supporting a reasonable belief that a crime has been committed; 2) whether referral for grand jury investigation would be necessary and appropriate in the circumstances; and 3) whether there are legal impediments or other factors that substantially detract from or negate the prospect of ultimately developing admissible evidence necessary to establish guilt beyond a reasonable doubt and a reasonable probability of conviction.  IRM 38.2.2.2.2.

We believe there are articulable facts supporting a reasonable belief that Weeks committed criminal tax violations and that expanding the existing grand jury investigation to include Title 26 violations is an expeditious way to proceed.  There do not appear to be any legal impediments or other factors that would substantially detract from or negate the prospect of ultimately developing admissible evidence necessary to establish guilt beyond a reasonable doubt and a reasonable probability of conviction. Based on our review of the evidence obtained in the grand jury investigation, we agree with IRS-CI's decision[4] to expand the grand jury investigation to include potential Title 26 charges for the taxable years 2015, 2016, 2017, 2018, and 2019.  We note that the signed plea does not address the taxable year 2019.

## FACTS

The USAO DNJ, with the assistance of the Internal Revenue Service-Criminal Investigation (IRS-CI) and the Federal Bureau of Investigation, conducted a grand jury investigation of BCN and its principals, including Weeks.

### Bitcoin

As per the Special Agent, a bitcoin is a form of digital currency, a convertible virtual currency that is created and held electronically.  It is the first relatively widely used example of a growing category of money known as cryptocurrency.  A single bitcoin is the basic unit of the currency although a single bitcoin may be electronically divided into smaller parts.  Launched in 2009, bitcoins only exist online and are not controlled by any kind of central authority, such as the U.S. Federal Reserve, and can be sent to anyone who has a web connection.  Bitcoin has been utilized by people suspicious of financial institutions and central banks; those who want to keep their financial transactions private; and speculators.  It has been used both in legitimate and illegal financial transactions.

Bitcoins are created or "mined" using high-powered computers all around the world, using software that solves mathematical problems.  The algorithm that generates bitcoins is set to stop producing bitcoins once 21 million are in circulation.  As of

---

[4] Our office was provided with a Form 9131, Request for Grand Jury Investigation, for Weeks dated September 22, 2020.

3

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

October 2020, over 18.5 million bitcoins exist.  Anyone with a powerful enough computer can create a bitcoin, but the computational power required is enormous and there are many individuals and groups that are competing to get the next bitcoin.  It is generally accepted that mining bitcoins is not cost effective.  Most bitcoin owners do not create them; they buy them.  In order to buy bitcoins, an individual can go to a bitcoin exchange, a place where funds from traditional currencies are exchanged for bitcoins.  In addition to the bitcoin exchanges, bitcoins are traded in face-to-face transactions for cash.  Once an individual has purchased a bitcoin or bitcoins they can be held for investment or utilized to purchase goods and services from businesses which accept them or from private parties.[5]

### Multi-level Marketing

Multi-level Marketing (MLM) is a business model wherein a product is advertised and sold by the business founders to individuals who are then encouraged to pitch and sell the product to other individuals.  This cycle can continue indefinitely.  The business founders get a percentage of each sale made by individuals whom they have recruited.  Further, they get a percentage of each sale made by those further removed from their initial recruits.  A series of "chains" are created wherein the business founder is at the top and those individuals whom the founder first recruited are the next link, and the individuals recruited by the first recruits are the next links.  Theoretically, the chain could go on indefinitely.  When viewed as a chart, these chains from the founders to the newest recruits form a pyramid with the founders at the top and the newest recruits at the base and give MLMs their more common name: "Pyramid Schemes."  This business model enriches those at the top and provides little to no benefit to those at the bottom.  There are many laws which regulate MLMs, but such structures are not illegal per se.

### Bitclub Network

BCN was founded in 2014 after discussions throughout 2013 among its founders led to its business model.  It was an MLM which marketed the ability to mine bitcoin at a profit for investors.  BCN sold investor packages to its customers which purportedly equated to their investment in server farms[6] dedicated to mining bitcoin.  The server farms, known as "mining pools", allegedly pooled the computing power of thousands of

---

[5] Bitcoins have fluctuated wildly in value since their inception in 2009 from relatively worthless to almost $20,000 per bitcoin.  The calendar year 2017 was particularly volatile.  As of January 2017, each bitcoin was valued at $1,000.  By May 2017, they were valued at $2,500 and by November 2017, they were valued at $7,000.  From November 2017 to December 2017, their value increased to over $19,000.  This peak was followed by a crash.  During most of 2018, bitcoin's value was between $6,000 and $7,000 until mid-November when it dropped below $6,000.  The price per bitcoin dropped below $4,000 by the end of 2018.  During 2020, bitcoin has traded for between $5,000 and $12,000 per bitcoin.

[6] A server farm is a collection of computer servers usually maintained by an organization to supply server functionality far beyond the capability of a single machine.  Server farms often consist of thousands of computers which require a large amount of power to run and to keep cool.

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

computers to mine bitcoin.  BCN allegedly leased the servers it used for its mining pools from large overseas server farms on behalf of its investors.

The BCN investments of its members allegedly grew each time a BCN mining pool successfully solved an algorithm and was awarded a bitcoin or a share of a bitcoin. Initial BCN investment packages cost members between $600 and $3,600 based on the share of the mining pool that the member wanted to purchase.  BCN members were also encouraged to recruit new members.  It operated like a traditional MLM wherein a percentage of the buy-in cost and earnings of each new member recruited were passed up to the recruiter and to those BCN members above the recruiter.

**BCN Fraud**

As stated above, mining bitcoin is generally not considered cost effective.  The grand jury investigation into BCN determined that BCN was a fraudulent enterprise.  Beginning at its inception in 2014 through December 2019, BCN falsified its bitcoin mining results and manipulated the earnings of its members for the purpose of attracting additional investments.

In emails obtained via search warrants, BCN founders discussed fabricating mining results in order to attract more members.  Two of the founders exchanged emails wherein one directed another to make sure that the fabricated results created were inconsistent to make them look real stating: "inconsistent numbers daily so its not perfect."  The second agreed stating: "if we pay consistent numbers it will be fake."  This fabrication of data continued.  For example, on September 10, 2017, a BCN founder sent an email to another BCN founder stating that BCN should "[d]rop mining earnings significantly starting now."

BCN members noticed discrepancies in their earnings based on the date that they purchased their mining share.  Specifically, equal shares purchased on different dates should have earned the same amount each time a BCN mining pool earned a bitcoin or a portion of a bitcoin.  Multiple BCN members noted that older BCN mining shares produced lower earnings than more recent BCN mining shares.  Further, the members noted that every BCN mining share followed the same exact pattern.  On November 29, 2017, a BCN member posted the following to a Facebook chatroom: "…I have been carefully watching everything that happens in them, in each and every one of them there is a very strange pattern and it is that they all start earning a quantity of bitcoins around 0.00049 and as the days go by the number starts to go down.  In each and every one of these accounts, the pattern is the same…" and later states "I do not want to think badly but I can not think well about this that seems more like a mathematical exercise than an authentic mining."  The foregoing quote from the BCN member conveyed his concern that the pattern he noticed was unusual, because this pattern held no matter what bitcoin was trading for on the open market.  The BCN member believed that the pattern meant that BCN was fabricating its mining results.

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

The BCN founders knew that they could not make money by mining bitcoin.  On November 4, 2014, one founder told another: "just so you know, this model is not sustainable at all…this is a PONZI."  Financial records and electronic communications were used to determine that the BCN founders took the investments of its members and used them to enrich themselves personally.  BCN also made it very difficult for its members to cash out their memberships.  If a member was cashed out, that member was not paid with bitcoin mining earnings.  Instead, the member was paid via investment funds of new members.

As BCN conducted its fraud in many countries and through many different individuals, the exact number of BCN members defrauded has not been determined nor has the exact amount of financial harm been determined.  To date, investigators have determined that at least $722 million was stolen from BCN investors based on the fraudulent scheme.

   **Weeks**

Weeks was interviewed on multiple occasions.[7]  Each interview conducted after he was arrested in December 2019 was pursuant to a proffer agreement.  Weeks joined BCN in August 2015 after being introduced to BCN promoter Joseph Abel (Abel).[8]  Abel promoted BCN in the United States and was one of its first members.  Abel explained the basics of BCN to Weeks and encouraged Weeks to join.  While Abel was Weeks' original contact at BCN, Weeks eventually began dealing with Matthew Goettsche (Goettsche) and Russ Medlin, the two principal founders of BCN.  Weeks determined that the mining portion of BCN was not actually profitable but that the MLM side still allowed him to make money by attracting new members to BCN.

Weeks had several different revenue streams through his involvement with BCN.  He not only earned MLM fees, he also earned broker commissions for negotiating deals to purchase bitcoin mining hardware.  Weeks' BCN income was received in U.S. Dollars (USD), bitcoin, and stock.  The bitcoin income was transferred into two bitcoin wallets owned by Weeks: 1JobyWkspb4BDdznWSmsrnE6cMzwV5qRRp (1Joby) and 19rFxgEXH8z6RfqT7hbR8XU4h9BTpeqh7a (19rFx).

---

[7] We note that a traditional Special Agent's Report (SAR) with exhibits attached was not created for this case.  A streamlined SAR was created and supplemented with documents which corroborate the allegations in the SAR.  Therefore, the Weeks interviews are not officially identified as evidentiary exhibits or attached to the report.  Our office requested copies of these interviews from the Special Agent and they were provided.  We would advise including these interviews with the plea recommendation when it is sent to the Tax Division.

[8] Our office reviewed and concurred with a plea recommendation for Abel by memorandum dated August 24, 2020 wherein Abel agreed to plead guilty to securities fraud and to filing a false federal tax return in violation 26 U.S.C. § 7206(1).

6

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

### Recruiting and mining commissions in bitcoin

Weeks received compensation for recruiting new members of BCN by receiving a portion of member investments from those he recruited.  Weeks withdrew this compensation from BCN in several ways.  He withdrew funds directly from BCN in the form of bitcoin which was transferred to his personal bitcoin wallets.  These withdrawals represented both MLM commissions for recruiting members and earnings from BCN's mining of bitcoin.  The MLM commissions amounted to approximately $2.7 million between 2015 and 2018 while the mining earnings totaled approximately $1.1 million for the same period.  These earnings were deposited into the 1Joby and 19rFx bitcoin wallets.

### Investor funds in USD

In addition to the direct earnings from BCN, Weeks also had BCN investors pay him directly for their BCN memberships.  Weeks used an MLM structure known as "Pay it Forward" to convert his MLM earnings into fiat currency.  Pay it Forward allowed recruiters to take BCN MLM earnings out of BCN.  When Weeks recruited new members, he received a commission in bitcoin which was deposited in a BCN bitcoin wallet linked to Weeks.  BCN only accepted bitcoin from its investors to open their investor account.  Nevertheless, Weeks and other recruiters took fiat currency from new members whom they recruited and then transferred bitcoin, which they had earned previously for recruiting other members, to open the investor accounts for the new members.  This process allowed Weeks to convert his BCN bitcoin into fiat currency.

One of the methods employed by Weeks to receive fiat currency from his recruited investors involved the use of an MLM entity.  Weeks advised individuals to remit funds to a business bank account he maintained in the name of the MLM.  Weeks further advised the individuals to identify the checks and wires used to invest in BCN as "donations" to a "charity" operated by Weeks, because banks had closed several bank accounts held by Weeks due to their involvement in the purchase of bitcoin.  The "charity" is called Mannatech and is an MLM in which he and his mother have been involved.  Mannatech markets a nutrient powder.  Once the "donations" were deposited into the bank account under Weeks' control, Weeks transferred bitcoin from his BCN MLM earnings account to open investor accounts in the name of the newly recruited investors.

The second method employed by Weeks to receive fiat currency from his recruited investors had BCN investors transfer funds directly to an individual named Steve Snyder (Snyder).  Snyder and Weeks were involved in a cannabidiol or CBD start-up.  The funds Weeks had BCN investors transfer to Snyder represented Weeks' investment in the CBD business.  Like the BCN investments deposited directly into a bank account under his control, Weeks transferred bitcoin from his previously earned BCN MLM commissions to open investment accounts in the names of these investors.

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

Using these two methods, Weeks was able to withdraw over $200,000 from BCN between 2015 and 2019.

### Broker income

The most lucrative method Weeks had for extracting money from BCN was by acting as a broker for BCN's mining equipment purchases.  BCN purchased a significant amount of computer hardware to mine cryptocurrency.  Much of the mining equipment was purchased through Bitfury, a company which sells cryptocurrency mining hardware and invests in blockchain technology.  The Bitfury process described below also applied to other BCN transactions brokered by Weeks.

Goettsche directed Weeks to negotiate deals with Bitfury on behalf of BCN.  Goettsche did not want his name associated with purchases of mining equipment.  As a result, Weeks functioned as a middleman between BCN and Bitfury for hardware purchases. Weeks received commissions on these hardware purchases in two ways.  First, BCN intentionally transferred more bitcoin than was required for Weeks to purchase BCN hardware from Bitfury.  The additional bitcoin transferred from BCN were Weeks' commission.  Second, Weeks received shares of stock in Bitfury in addition to the hardware from Bitfury as compensation from Bitfury for brokering the transaction. Weeks transferred the hardware to BCN and kept the shares of stock.  Bitfury provided records documenting the purchases pursuant to subpoena.  The bitcoin transfers involved in the transactions were also documented through blockchain tracing software.

> For example, BCN transfers 100 in bitcoin to Weeks for the purchase of hardware from Bitfury.  Weeks keeps 10 bitcoin and purchases the hardware from Bitfury for 90 bitcoin.  In addition to the hardware, Bitfury sends $5 of stock to Weeks.  Weeks sends the equipment to BCN and keeps the stock.  Thus, Weeks earns 10 bitcoin as a direct cut from the funds transferred from BCN and $5 of stock for brokering the transaction.

Between 2015 and 2018, Weeks earned the bitcoin equivalent of $11 million as commissions and received Bitfury stock with a fair market value (FMV) of $3.1 million at the time of receipt.

The chart below details the compensation which Weeks received directly from BCN and the stock which Weeks received from Bitfury.  The chart lists USD equivalents for the bitcoin and stock which are based on the FMV of bitcoin and stock which Weeks received as of the date and time he received each.[9]

---

[9] *See* Tax Loss Appendix.

8

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

| Income | Source | 2015 | 2016 | 2017 | 2018 | Totals |
|---|---|---|---|---|---|---|
| BCN commissions for Bitfury deals | 1Joby wallet | $0.00 | $0.00 | $8,324,970.83 | $455,945.46 | $8,780,916.29 |
| BCN commissions for Bitfury deals | 19rFx wallet | $0.00 | $606,850.34 | $0.00 | $0.00 | $606,850.34 |
| BCN commissions for other brokered deals | 1Joby wallet | $0.00 | $0.00 | $1,605,613.05 | $97,772.63 | $1,703,385.68 |
| BCN Withdrawals | 1Joby wallet | | | $1,383,335.34 | $1,064,415.54 | $2,447,750.88 |
| BCN Withdrawals | 19rFx wallet | $26,299.42 | $185,193.10 | $75,005.33 | $147,227.73 | $433,725.58 |
| Mining Earnings | 1Joby wallet | $0.00 | $0.00 | $788,153.88 | $288,209.25 | $1,076,363.13 |
| Mining Earnings | 19rFx wallet | $0.00 | $110.58 | $0.00 | $20,497.52 | $20,608.10 |
| Bitfury Stock | Bitfury Subpoena Return & Weeks' email | $0.00 | $0.00 | $3,102,364.00 | $0.00 | $3,102,364.00 |
| Pay It Forward | Chase 4847 | $0.00 | $25,265.00 | $43,350.00 | $0.00 | $68,615.00 |
| Steve Snyder CBD | Facebook | $0.00 | $0.00 | $154,565.00 | $0.00 | $154,565.00 |
| | | | | | | |
| **Total income** | | **$26,299.42** | **$817,419.02** | **$15,477,357.43** | **$2,074,068.13** | **$18,395,144.00** |

**Weeks' federal income taxes**

Weeks has not filed a federal income tax return in almost two decades.  He is currently 39 years old and stated that the last time he filed a federal income tax return was when he worked at a restaurant which withheld tax from his wages.  Weeks stated that he had received some advice that he was not liable for personal income taxes, because he was not a federal employee.  He also stated that he purchased an interest in a timeshare in Saint Kitts and Nevis so that he would no longer be liable for taxes in the U.S.  Finally, Weeks stated that BCN provided its investors year-end statements which reported their earnings which he described as "like 1099s" for tax purposes.  During an interview pursuant to a proffer agreement on August 17, 2020, Weeks acknowledges that he owes income taxes on the millions he made through BCN.

Despite his failure to file federal income tax returns, the IRS has been in contact with Weeks for over a decade concerning his income tax liabilities.  Weeks has current liabilities with the IRS totaling $566,740.10 as of September 20, 2020 for the taxable years 2007 and 2009 through 2012.  These liabilities are based on substitute returns prepared by the IRS.  Further, Weeks filed a pro se petition with the U.S. Tax Court contesting his liability for income taxes related to his taxable year 2003.[10]  The petition alleges that the IRS failed to take into account his deductions and expenses prior to

---

[10] Docket No. 29937-08

9

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

computing his alleged tax liability.  The case was dismissed in 2010 based on Weeks' failure to prosecute the case.  Thus, Weeks has been in contact with the IRS concerning his personal income tax obligations for over a decade and his 2008 petition did not appear to challenge the taxability of his income.  Weeks knows of his obligation to file federal income tax returns and to pay federal income taxes.

## CRIMINAL VIOLATIONS AND DISCUSSIONS OF THE LAW

### Title 26 U.S.C. § 7201

The elements for the willful attempt to evade or defeat an assessment of tax, a violation of § 7201, are:

1)      An attempt to evade or defeat a tax;
2)      An additional tax due and owing; and
3)      Willfulness.

*Sansone v. United States*, 380 U.S. 343, 351 (1965); *United States v. Farnsworth*, 456 F.3d. 394, 401-03 (3d Cir. 2006).  This section requires proof of the existence of a deficiency.

### Element 1

### The defendant attempted to evade or defeat the assessment of a tax.

Failure to file return coupled with an affirmative act of evasion is commonly referred to as a "*Spies* evasion."  Passive failure to file tax returns is not tax evasion. If the taxpayer failed to file a return, an evasion case can be maintained only if the taxpayer engaged in an affirmative act to conceal or mislead.  *Spies v. United States*, 317 U.S. 492,  498-99 (1943).  By way of illustration, and not by way of limitation, the Supreme Court in  *Spies* set out examples of conduct which can constitute affirmative acts of evasion:

(A) Keeping a double set of books.

(B) Making false or altered entries.

(C) Making false invoices.

(D) Destruction of records.

(E) Concealing sources of income.

(F) Handling transactions to avoid usual records.

10

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

(G) Any other conduct likely to conceal or mislead.

*See also, United States v. Brooks*, 174 F.3d 950, 954-56 (8th Cir. 1999); *United States v. Meek*, 998 F.2d 776, 779 (10th Cir. 1993).

The taxpayer must undertake some action, that is, engage in an affirmative act for the purpose of attempting to evade or defeat the assessment of a tax.  This element requires more than passive neglect of a statutory duty.  A mere act of willful omission does not satisfy the affirmative act requirement of I.R.C. § 7201.  *United States v. Masat*, 896 F.2d 88, 97-99 (5th Cir. 1990).  Here, Weeks engaged in affirmative acts to evade his income tax liabilities by handing transactions to avoid the usual records and by concealing the source of his income.

Weeks had BCN investors make deposits into a bank under his control for the purpose of opening a BCN account, but told the investors to denote the deposits as donations to a charity.  Weeks also had BCN investors pay his business partner directly.  Weeks then used his BCN bitcoin holdings to open BCN investor accounts for these individuals.  Both activities allowed Weeks to convert the bitcoin he earned for BCN MLM commissions to USD without leaving a paper trail.  Further, Weeks received undocumented commissions from BCN and Bitfury for brokering deals for the purchase of cryptocurrency mining equipment.  The commissions were in the form of bitcoin and stock, which were not reported on Forms 1099 by either BCN or Bitfury.  Handling transactions to avoid the usual records in an affirmative act of evasion.  *Spies* 317 U.S. at  498-99.  Further, these activities were also an attempt to conceal BCN as a source of Weeks income.  Concealing a source of income is an affirmative act of evasion.  *Id.*  We believe that this element has been met.

### Element 2

### The defendant has an additional tax due and owing.

Weeks did not file a federal income tax return for the taxable years 2015 through 2018.  The threshold gross income required to file a return for the years in question was under $25,000 for each year.  Weeks had $26,299.42 of income in 2015; $817,419.02 of income in 2016; $15,477,357.43 of income in 2017; and $2,074,068.13 of income in 2018.  The total income tax due and owing on these amounts is $7,128,987.00.

### Element 3

### The defendant willfully attempted to evade or defeat a tax.

Section 7201 is a specific intent crime requiring a showing of willfulness.  "Willfulness" is "a voluntary, intentional violation of a known legal duty."  *Cheek v. United States*, 498

11

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

U.S. 192, 200 (1991).  The evidence establishes the willfulness of Weeks.  Willfulness may be inferred from "any conduct, the likely effect of which would be to mislead or conceal."  *Spies*, 317 U.S. at 499.  The evidence leads to an inference that Weeks was willfully trying to evade his proper income tax liabilities.

Weeks failed to file returns and reported none of his $18.4 million of income from 2015 through 2018.  A substantial understatement of income in successive years is a sign of willfulness.  *United States v. Kim*, 884 F.2d 189, 192-93 (5th Cir. 1989).  Weeks also failed to file returns in 2007, and 2009 through 2013.  The IRS prepared substitute returns for these years and Weeks has income tax liabilities for these years which exceed $560,000.  His prior failure to file and pay his federal income taxes due and owing is evidence of willfulness.  *United States v. Johnson*, 386 F.2d 630, 631 (3d Cir. 1967).  Finally, Weeks admitted his willfulness by signing the plea agreement.

The admissions in the plea are corroborated by documents seized through the execution of multiple search warrants.  These documents corroborate the fraudulent nature of Weeks' actions and the amount of income he received from BCN.  Further, the bitcoin transactions in which Weeks engaged were tracked via blockchain tracing software.

**TAX LOSS, COMPUTATIONS, METHOD OF PROOF AND TECHNICAL TAX ISSUES**

The tax loss is based on the specific item method of proof.  The income which Weeks received is detailed in the Tax Loss Appendix.

Gross income includes income from whatever source derived, including income received as compensation for services, income derived from business, and gains from dealings in property.  26 U.S.C. §§ 61(a)(1) – (3), 83.  This basic premise incorporates and includes any type of payment, whether it is made in fiat currency or any other item of value, including stock or virtual currency.  It is well-settled "that stock received as compensation for services rendered to the issuing corporation is taxable as ordinary income of an amount equal to the value of the stock at the date of issuance."  *Champion v. Comm'r*, 303 F.2d 887, 891 (5th Cir. 1962).  Although virtual currencies are relatively new, the IRS issued guidance in 2014 which stated that virtual currencies which are received as payment for services are gross income.  The gross income is measured in USD as the FMV of the virtual currency as of the date that the virtual currency was received for federal income tax purposes.[11]  Further, mining proceeds are also measured in USD as the FMV of the virtual currency as of the date that the virtual

---

[11] Q-3:  Must a taxpayer who receives virtual currency as payment for goods or services include in computing gross income the fair market value of the virtual currency?
A-3:  Yes.  A taxpayer who receives virtual currency as payment for goods or services must, in computing gross income, include the fair market value of the virtual currency, measured in U.S. dollars, as of the date that the virtual currency was received.  See Publication 525, Taxable and Nontaxable Income, for more information on miscellaneous income from exchanges involving property or services. *Notice 2014-21*, 2014-16 I.R.B. 938 (2014).

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

currency was received.[12]  Although bitcoin is treated as property and, therefore, generally, a capital asset after its receipt,[13] there are no questions concerning basis or holding period implicated in the instant case.

From 2015 through 2018, Weeks received $15.1 million of income based on the FMV of bitcoin which he received as compensation from BCN, $3 million of income in the form of stock from Bitfury, and just over $200,000 of income in USD.  A Revenue Agent determined tax losses for 2015, 2016, 2017, and 2018 of $2,423.00, $294,947.00, $6,099,134.00, and $732,483.00, respectively.  The total tax loss is $7,128,987.00 for the four-year period from 2015 through 2018.

## CURRENT LIFESTYLE

Weeks is 39 years old and married.  He has daughter under the age of five.  We note that his wife has filed federal income tax returns during the past several years.  It is believed that Weeks still has interests in several MLM schemes.  Weeks is in good health.  He has been in federal custody since his arrest on December 10, 2019.  He is currently not eligible for bail.

## SENTENCING

Weeks is pleading to a single count of conspiracy in violation of 18 U.S.C. § 371 and a single count of tax evasion for the taxable years 2015, 2016, 2017, and 2018 in violation of 26 U.S.C. § 7201.  The plea proposes grouping the two criminal violations for sentencing purposes pursuant to U.S.S.G. § 3D1.2(d).  Although we believe that these two charges may not be closely related enough to group them for sentencing purposes, it was addressed by the parties and agreed to in the signed plea.  After analyzing all the remaining sentencing factors, the plea agreement recommends an adjusted offense level of 28 for Weeks.  The parties have agreed to a monetary loss in excess of $3,500,000 but less than $9,500,0000.  We agree with the adjusted offense level as

---

[12] Q-8:  Does a taxpayer who "mines" virtual currency (for example, uses computer resources to validate Bitcoin transactions and maintain the public Bitcoin transaction ledger) realize gross income upon receipt of the virtual currency resulting from those activities?
A-8:  Yes, when a taxpayer successfully "mines" virtual currency, the fair market value of the virtual currency as of the date of receipt is includible in gross income.  See Publication 525, Taxable and Nontaxable Income, for more information on taxable income.  *Id.*

[13] Q-7:  What type of gain or loss does a taxpayer realize on the sale or exchange of virtual currency?
A-7:  The character of the gain or loss generally depends on whether the virtual currency is a capital asset in the hands of the taxpayer.  A taxpayer generally realizes capital gain or loss on the sale or exchange of virtual currency that is a capital asset in the hands of the taxpayer.  For example, stocks, bonds, and other investment property are generally capital assets.  A taxpayer generally realizes ordinary gain or loss on the sale or exchange of virtual currency that is not a capital asset in the hands of the taxpayer.  Inventory and other property held mainly for sale to customers in a trade or business are examples of property that is not a capital asset.  See Publication 544 for more information about capital assets and the character of gain or loss.  *Id.*

13

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

computed in the plea.  The plea provides for Weeks to pay restitution to the IRS for the full amount of the tax loss in the amount of $7,128,987.

With a criminal history level of I, Weeks is facing a potential jail term of 78 to 97 months and a fine of between $12,500.00 and $125,000.00.[14]

## CONCLUSION

The evidence presented is sufficient to support the proposed plea of Weeks under the requirements of Rule 11 of the Federal Rules of Criminal Procedure.  Further, we believe that the charge adequately addresses the crimes committed by the target.

If for any reason, however, the guilty plea for a violation of 26 U.S.C. § 7201 is not accepted, further development will be necessary to establish sufficient evidence to support a prosecution recommendation before we can opine on whether there is proof beyond a reasonable doubt and that there is a reasonable probability of conviction.

We are closing our file in this case as of the date of this memorandum.  Please be advised that the "referral" of this matter will remain in effect until terminated within the meaning of 26 U.S.C. § 7602(d)(2)(B).

Access to and knowledge of grand jury material will be restricted solely to those Counsel personnel who provided assistance to the grand jury.  The following Counsel personnel in this office have had access to grand jury material in this case: James N. Beyer, Area Counsel; Patricia B. Krajewski, Deputy Area Counsel; Andrew J. Mandell, Senior Counsel; Mark M. Mulligan, Senior Counsel; Rosemarie D. Schellas, Senior Counsel; James H. Harris, Jr., Attorney (CT); and Sharon Young, Legal Assistant.  The following personnel may also have access to such grand jury material: Richard T. Lunger, Division Counsel/Associate Chief Counsel (CT); Elizabeth C. Hadden, Acting Deputy Division Counsel/ Deputy Associate Chief Counsel (CT); Martin Needle, Senior Level Counsel (CT); C. Teddy Li, Branch Chief (CT); Allison Menkes, Special Counsel (CT); Marta Yanes, Senior Counsel (CT); Katia Fano, Attorney (CT); Lauren R. Breaux, Attorney (CT); Linda K. Galanis, Executive Assistant (CT); Hartley M. Barnes, Program Analyst (CT); Dawn Caldwell, Executive Secretary (CT); and Diamond L. Ward, Management Assistant (CT).

---

[14] The fine is based on the version of the U.S.S.G. in effect during the years in which the crime was committed. U.S.S.G. § 5E1.2(h)(1).

14

CT-122627-20                    **[CAUTION: CONTAINS GRAND JURY INFORMATION]**

Should you have any questions about this memorandum, please contact Jim Harris at (267) 941-6535.

Sincerely,

 /s/ James N. Beyer
JAMES N. Beyer
Area Counsel, Area 1
Criminal Tax

cc:    Darren Lian
       Assistant Special Agent in Charge

       Oleg Pobereyko
       Supervisory Special Agent

       Veniamin Karavchuk
       Special Agent

       Patricia Krajewski
       Deputy Area Counsel
       Criminal Tax

# Exhibit G

Later-Produced IRS Analytical Report Concerning Income Characterization and Reconstructed Tax Loss

**Description**

Later-produced Internal Revenue Service analytical materials addressing asserted income categorization, valuation methodology, reconstructed receipts, and asserted tax-loss calculations attributed to me.

**Purpose**

To demonstrate that asserted financial exposure depends upon developed analytical reconstruction, categorization, valuation methodology, and attribution assumptions requiring transparent supporting schedules and explanatory materials for independent evaluation.

# Exhibit H

JOBADIAH SINCLAIR WEEKS
Arvada, CO 80005
SSN: 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
1000293264

Years: 2015, 2016, 2017, 2018

Violation(s):Title 26, United States Code, Section 7201

Special Agent:    Veniamin Karavchuk
Revenue Agent:  James P. Pack

## Table of Contents

Introduction ........................................................................................................ 1
   Recommended Charges And Prosecution Years ........................................... 1
   Returns Filed And Statute Of Limitations ..................................................... 2
   Venue ........................................................................................................... 2
   Investigative Contact(S) With Subject(S) And/Or Representative(S) ........... 2
   Other Pertinent Data ................................................................................... 2

Theory Of The Investigation ............................................................................... 3

Books And Records And Preparation Of Tax Return(S) ..................................... 5

Elements Of The Offense(S) .............................................................................. 5
   Elements Of 26 U.S.C. § 7201 .................................................................... 5

List Of Appendices ............................................................................................ 6

Disposition Of Proceeds .................................................................................... 6

Relevant Conduct ............................................................................................... 7

Current Lifestyle ................................................................................................. 7

Explanation And Defense Of Subject .................................................................. 7

Conclusions And Recommendations ................................................................... 7

List Of Witnesses And Exhibits

**Internal Revenue Service**

Department of the Treasury
Criminal Investigation
300 N. Los Angeles St
Los Angeles, CA  90012

Ryan L. Korner
Special Agent in Charge
300 N. Los Angeles St.
Los Angeles, CA  90012

Person to Contact:
Veniamin Karavchuk
Telephone Number:
(702) 467-5787
Agent Cell Phone
(702) 467-5787
Refer Reply to:
SE:CI:WA:LA:09
Date:

IN RE:  JOBADIAH SINCLAIR WEEKS
11627 W 74th Way
Arvada, CO 80005
SSN:  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
DOB:  08/25/1981
1000293264

REPRESENTATIVE:  Adam P. Schwartz
4221 W. Boy Scout Rd.
Tampa, F 33607
Ph. (813) 229-4336

FINAL:  Prosecution

**INTRODUCTION**

**Recommended Charges and Prosecution Years**

JOBADIAH SINCLAIR WEEKS - 26 U.S.C. § 7201 - 1 Count - 2015-2018

**Returns Filed and Statute of Limitations**

WEEKS did not file returns during the period under investigation. In such a case, the the statute of limitations is based on when the return should have been filed. The tax return for the earliest period under investigation, the 2015 tax year, would have been due on April 18, 2016. Therefore, the statue of limitations on the earliest tax year charged expires on April 18, 2022.

**Venue**

Although the defendant was a permanent resident in the District of Colorado during the charged tax period, he agrees in his signed guilty plea to waive and forego any and all challenges to venue in the District of New Jersey. Furthermore, the defendant understands and agrees that the charge in the Information will be filed and adjudicated in the District of New Jersey. He further agrees not to assert in any appeal, motion or collateral attack, including a motion brought pursuant to 28 U.S.C. Section 2255, any claim or argument challenging venue in the District of New Jersey to the charge in the Information, as set forth above.

**Investigative Contact(s) with Subject(s) and/or Representative(s)**

Defendant was indicted and arrested in December 2019 on charges of 18 USC 371, defrauding the government with respect to selling unregistered securities. Defendant was advised of his rights on December 10, 2019 and made custodial statements to agents on the day of his arrest.   Defendant has since proffered with agents on multiple occasions.

**Other Pertinent Data**

Plea Agreement Information – The defendant has signed a guilty plea to charges of Title 26 USC §7201. The signed plea is attached with this report.

Search Warrants – Agents conducted electronic search warrants of WEEKS' stored communications during the course of the investigation as well as a physical search warrant of his residence on December 10, 2019.

Citizenship – WEEKS is a United States citizen.

Criminal History
        1999 – Westminster, CO – Obstructing police, assault and battery.
        2004 – Boulder, CO – DUI.
        2014 – Las Vegas, NV – DUI.
        2015 – Las Vegas, NV - Reckless driving.

2

## THEORY OF THE INVESTIGATION

From in around 2014 until December 2019, The Bitclub Network (BCN) was a cryptocurrency cloud mining pool that used a multi-level marketing (MLM) referral structure to recruit investors worldwide. In an indictment dated December 5, 2019, out of the District of New Jersey, BCN and the indicted defendants are alleged to have been operating BCN as an illegal pyramid Ponzi scheme that generated over $722 million from investors. In addition, the indictment alleges that the defendants conspired to sell unregistered securities.

During tax years 2015 through 2018, JOBADIAH SINCLAIR WEEKS (WEEKS) was a recruiter and promoter for BCN. He sold or caused to be sold by those he recruited, BCN mining pool packages to investors all over the world. WEEKS joined as a recruiter for BCN approximately a year after it was formed, but when the scheme was still small and growing. He interacted directly with the two owners of BCN, RUSS MEDLIN (MEDLIN) and MATTHEW GOETTSCHE (GOETTSCHE). As a result, WEEKS had a rank inside BCN as a Mega-Monster, the highest rank that a BCN recruiter can have, and earned millions of dollars in MLM commissions.

WEEKS is one of the indicted principal operators of BCN. On December 10, 2019, WEEKS was arrested on charges of 18 USC 371, Conspiracy to Defraud the U.S. in violation of 15 USC 77e and 77x, selling unregistered securities. WEEKS was detained and remains incarcerated. In the course of his incarceration, WEEKS has proffered with agents on multiple occasions and has shown the ability and willingness to cooperate with the government against his co-defendants, as well as other yet to be charged co-conspirators.

The government, WEEKS and his attorneys engaged in plea negotiations and all parties have agreed that WEEKS will plead guilty to the initial charge of 18 USC 371 and to 26 USC 7201, Tax Evasion for tax years 2015-2018.

The Specific Item Method of Proof was used to compute WEEKS; unreported and corrected taxable income. The cash basis method of accounting was used for all computations.

## SOURCES OF INCOME

WEEKS received his MLM commissions in two primary methods. One way was to request for BCN to send him bitcoin to his personal bitcoin wallets by generating a withdrawal from his member back office account on the BCN website. Notably, the BCN website did not actually hold bitcoin for its members. The back-office account balances were simply internal ledger entries made by a computer programming script that did not

correspond with the actual bitcoin blockchain unless a BCN member actually generated a withdrawal request.

Another way for WEEKS to receive his commissions was to accept fiat currency directly from investors and then to credit those investors with mining pool packages by using his existing balance of earnings inside his member back office account on the BCN website. This practice is commonly referred to as "Pay-It-Forward" in the MLM industry; it is a way to withdraw earnings without having to pay transaction fees.

Agents have analyzed a copy of the BCN web server database that was obtained in the course of the investigation. The web server data with respect to WEEKS' BCN accounts was compared to the bitcoin public blockchain transactions that occurred on known WEEKS bitcoin wallets. The result of this analysis showed that WEEKS received commissions from BCN to his personal bitcoin wallets in the equivalent USD amounts of $26,299 in 2015; $185,193 in 2016; $1,458,341 in 2017; and $1,211,643 for the 2018 tax year.

Agents have analyzed bank accounts owned and operated by WEEKS from 2015 through 2018. Using a conservative approach of only confirmed investor deposits, this analysis showed that WEEKS accepted fiat currency from investors for BCN mining pool packages, in the form of Pay-It-Forward withdrawals, in the amounts of at least $25,265 for 2016 and $43,350 for 2017. In addition, WEEKS started a side business with an individual named Steven Snyder to create CBD soft gel pills for sale. WEEKS invested directly into the business, and he also redirected some "Pay-It-Forward" payments directly to Snyder. WEEKS caused $154,565 in payments to be sent directly to Snyder in 2017. As with the other "Pay-It-Forward" payments, agents are only including amounts confirmed with investor deposits.

WEEKS also earned income through other means. The main operator of BCN, GOETTSCHE, did not want his name associated purchases and contracts for equipment or mining. This afforded WEEKS the opportunity to act as a middleman, as well take a finder's fee for putting together parties interested in making deals with BCN. WEEKS primarily took his "commissions" by up charging BCN and keeping the difference between the payment received from BCN and the amounts he paid for the equipment or services. In this manner, WEEKS earned $606,850 in 2016; $9,930,584 in 2017; and $553,718 in 2018. Furthermore, WEEKS at times included stock purchases in the contracts to purchase equipment from Bitfury. These purchases were lumped together with the purchase of equipment, so it would look like the entire payment was for equipment. However, WEEKS received Bitfury stock that he did not send or disclose to GOETTSCHE or MEDLIN. In this way, WEEKS increased the "commission" he received through the equipment purchases. WEEKS received $3,102,364 worth of stock from Bitfury in 2017.

Finally, WEEKS received mining earnings from mining pools other than BCN. The main pool operators that paid WEEKS were Bitfury, Genesis Mining, and SlushPool. Agents attributed these earnings through blockchain analysis of wallets belonging to WEEKS

4

and sourcing deposits to mining pools. WEEKS received at least $111 in 2016; $788,154 in 2017; and $308,707 in 2018 from mining earnings.

WEEKS also had some minor amounts reported to the IRS from 3rd party institutions, including earnings from previous MLMs in which he participated as well as capital gains and losses from financial institutions. WEEKS was reported to have received $3,231 in 2015; $2,300 in 2016; and a net loss of $465 in 2018.

In total, agents can conservatively summarize that WEEKS received a value of at least $29,530; $819,719; $15,477,357; and $2,073,603 for tax years 2015, 2016, 2017, and 2018, respectively, in income in the form of bitcoin, US currency, and Bitfury stock.

WEEKS did not file tax returns for any of the years under investigation. WEEKS committed affirmative acts of evasion to facilitate hiding his earnings from the IRS.

WEEKS signed a plea deal pleading guilty to one count of Title 26 USC §7201 for the tax years 2015-2018, and one count of Title 18 USC §371. WEEKS has agreed in his guilty plea to sign a Form 870, Waiver and Acceptance of Tax Assessment, accepting responsibility for his tax liability for all four years prior to sentencing.

**BOOKS AND RECORDS AND PREPARATION OF TAX RETURN(S)**

Agents have analyzed WEEKS' BCN accounts on the BCN web server and compared this data with the transactions that occurred on the bitcoin public blockchain on known WEEKS bitcoin wallets. Agents have also analyzed bank accounts owned and operated by WEEKS from 2015 through 2018, as well as communications and contracts with other individuals involved with BCN and bitcoin mining. Please see the attached tax loss schedule.

**ELEMENTS OF THE OFFENSE(S)**

**ELEMENTS OF 26 U.S.C. § 7201**

1. An attempt to evade or defeat a tax or the payment thereof:

- WEEKS told individuals who invested with his business to deposit their funds in accounts in other people's names, or in the name of WEEKS' charity account. WEEKS did so in order to avoid having deposits into his personal bank account.

- WEEKS purchased a property in St. Kitts in order to obtain a St. Kitts citizenship. He told agents he did so to stop from having to pay US taxes.

5

- WEEKS used bitcoin to receive payments and pay for expenses in order to avoid using financial institutions and having his earnings reported to the IRS.

2. An additional tax due and owing:

- WEEKS has a tax due and owing, as established by the Specific Item Method of Proof and corroborated by witness statements, of $7,128,987 for the 2015 to 2018 tax years. Please see the Form 4549, Revenue Agent Report, and Tax Loss Schedule for the full calculations.

3. Willfulness:

- At all times relevant to the investigation, WEEKS had access and control over the bank accounts, his bitcoin wallets, and his BCN account used when calculating the tax loss.

- WEEKS has not filed returns for the 2015-2018 tax years. When questioned about it, WEEKS admitted to agents that he knew he owed taxes on his earnings and did not file or pay income tax.

- WEEKS bought a St. Kitts property in order to get a St. Kitts citizenship. WEEKS told agents that he wanted to avoid issues with his US taxes.

- BCN created year-end statements for investor activity for BCN accounts. WEEKS told agents he knew these statements were like 1099s, and they were created in order for account holders to pay taxes.

- On September 24, 2020 WEEKS signed a plea agreement accepting responsibility for his role in evading his taxes for the 2015 to 2018 tax years.

Additionally, for all elements referenced above, please see the attached Tax Loss Schedule, Form 4549 (Revenue Agent Report), signed Guilty Plea, and Draft Information.

## LIST OF APPENDICES

Please see attached master file transcript for WEEKS, Form 4549 (Revenue Agent Report), Tax Loss Schedule, Signed Guilty Plea, and Draft Information.

## DISPOSITION OF PROCEEDS

During the investigative period and including tax year 2015-2018, WEEKS lived a lavish lifestyle as a result of his earnings from BCN. WEEKS travelled all over the world and purchased property in the U.S. and internationally.

## RELEVANT CONDUCT

There is relevant conduct from the 2019 tax year in the amount of $445,395.96 in unreported income and a tax due of $130,296.00 Please see the attached Tax Loss Appendix and Revenue Agent Report for more information.

## CURRENT LIFESTYLE

WEEKS has been detained in Essex County jail without bail since his arrest on December 10, 2019. As part of his guilty plea, WEEKS will seek a bail package that will include close monitoring from pretrial services.

## EXPLANATION AND DEFENSE OF SUBJECT

None.

## CONCLUSIONS AND RECOMMENDATIONS

Veniamin Karavchuk
Special Agent
Cellular (702) 467-5787

**Approved:**

Oleg Pobereyko
Supervisory Special Agent, Criminal Investigation
300 N. Los Angeles St
Los Angeles, CA  90012
Cellular (213) 256-3307

# Exhibit H

Chronology of Charging, Tax-Evasion Characterization, and Sentencing Methodology (2019–2026)

**Description**

Chronology of charging materials, plea-related communications, IRS analytical materials, and sentencing-related records relevant to tax-related sentencing issues.

**Purpose**

To document chronology relevant to Rule 32 evaluation of sentencing methodology, attribution, and reliability of sentencing calculations reflected in PSR ¶¶169–181.

## Exhibit H — Chronology of Charging, Tax-Evasion Characterization, and Sentencing Methodology (2019–2026)

| Date | Source Exhibit / Citation | Event / Characterization | Observation | |
|---|---|---|---|---|
| apr. 19, 2019 | Exhibit C | IRS interview notes do not reflect the element-by-element treatment of §7201 issues, attribution methodology, compensation characterization, or sentencing-related treatment later reflected in Exhibits F and G. | Relevant chronology point where later sentencing-related materials reflect attribution, compensation characterization, and sentencing treatment not reflected in contemporaneous interview materials. | |
| dec. 2019 | H-1 (Indictment, Dkt. 9) | Indictment charging Count One (wire-fraud conspiracy) and Count Two (unregistered securities conspiracy) centered on BCN mining pools, investor solicitation, and securities-related conduct; no charged 26 U.S.C. §7201 tax-evasion count. | Cryptocurrency-mining / securities-centered charging structure preceding later negotiated tax component. | |
| aug. 12, 2020 | H-2 | Plea discussions relayed by counsel reference anticipated negotiated resolution involving "Count Two of the Indictment and a tax charge." | First documented introduction of tax-related charging into plea negotiations before formal §7201 Information. | |
| Sept. 8–9, 2020 | Exhibit B | Counsel reviewed plea materials and draft plea/cooperation structure, analyzed restitution "for tax purposes," discussed Seychelles/BitFury compensation issues, and evaluated attribution and compensation treatment in connection with the proposed negotiated plea resolution. | Contemporaneous implementation of draft plea structure reflecting introduction of tax-evasion resolution before execution of final plea agreement. | |
| Sept. 21/24, 2020 | H-3 | Written plea agreement incorporates plea to Count Two together with an Information charging one count of tax evasion under 26 U.S.C. §7201 and dismissal of Count One pursuant to negotiated resolution. | §7201 tax-evasion charge formally incorporated through negotiated plea exchange. | |

| | | | | |
|---|---|---|---|---|
| Oct. 8, 2020 | Exhibit F (at pp. 2, 10–14) | IRS Office of Chief Counsel memorandum states Weeks "has signed a plea agreement" and addresses evidentiary support for the plea, asserted §7201 elements (affirmative acts, tax due and owing, willfulness), compensation characterization, grouping, and sentencing treatment. | Post-plea IRS memorandum addressing attribution, compensation characterization, and sentencing treatment after execution of plea agreement. | |
| | | | | |
| Undated (later produced in Dec. 2024) | Exhibit G | IRS analytical report addresses asserted §7201 elements, affirmative acts, compensation attribution (bitcoin, fiat currency, BitFury stock), Form 4549 references, compensation characterization, and related sentencing methodology. | Later-produced sentencing-related material addressing attribution, compensation characterization, and methodology relevant to Rule 32 reliability and chronology. | |
| | | | | |
| apr. 22, 2025 | Dkt. 417 at 1–3 | Government describes the matter as involving participation in "a worldwide fraud scheme predicated on cryptocurrency mining" while separately referencing plea to Count Two and §7201 tax evasion. | Hybrid characterization: cryptocurrency/securities-centered conduct together with tax-evasion plea component. | |
| | | | | |
| nov. 19, 2025 | Dkt. 522 at 11–13 | Government states: "The prosecution never criminalized cryptocurrency mining or promotional activity—it was concerned with a conspiracy to defraud investors… Then Weeks deceived the Government to avoid paying taxes on top of his other crime. Weeks had adequate notice that fraud and tax evasion could be prosecuted criminally—just like any other defendant." | Generalized fraud/tax characterization responding to notice and foreseeability arguments. | |
| | | | | |
| May 8, 2026 | Revised PSR ¶¶169–181 | Revised PSR incorporates expanded offense narrative, attribution methodology, sentencing characterization, revised offense descriptions, and sentencing calculations. | Relevant to Rule 32 evaluation of sentencing methodology, attribution, chronology, and reliability. | |

# Exhibit H-1

Relevant Excerpts of Indictment (Dkt. 9)

**Description**

Relevant excerpts of the December 2019 Indictment reflecting the charging structure of Count One and Count Two and the absence of a charged 26 U.S.C. §7201 tax-evasion count in the Indictment.

**Purpose**

To document the charging framework reflected at indictment and provide context for later plea-related incorporation of a §7201 Information.

RECEIVED

2017R00826/DWF/JLH

DEC 06 2019

AT 8:30_____M
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

FILED

DEC 05 2019

AT 8:30_____4:00____P M
WILLIAM T. WALSH
CLERK

UNITED STATES OF AMERICA   :   Hon.

                v.   :

MATTHEW BRENT GOETTSCHE,   :   Criminal Number: 19-877 (CCC)

████████████████   :

JOBADIAH SINCLAIR WEEKS,   :   18 U.S.C. § 371
JOSEPH FRANK ABEL, and   :   18 U.S.C. § 1349
SILVIU CATALIN BALACI   :

## INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark,

charges:

### COUNT ONE
(Conspiracy to Commit Wire Fraud – 18 U.S.C. § 1349)

1. At times relevant to this Indictment:

### Individuals and Entities

a. BitClub Network ("BCN") was a worldwide fraudulent scheme that solicited money from investors in exchange for shares of pooled investments in cryptocurrency mining and that rewarded existing investors for recruiting new investors.

b. Defendant MATTHEW BRENT GOETTSCHE created and operated BCN.

c. Defendant ████████████████ created, operated, and promoted BCN.

## COUNT TWO
(Conspiracy to Offer and Sell Unregistered Securities – 18 U.S.C. § 371)

1.    Paragraphs 1 and 4 of Count One of this Indictment are re-alleged and incorporated herein.

2.    At times relevant to Count Two of this Indictment:

a.    Defendant JOSEPH FRANK ABEL promoted BCN.

### BCN

b.    BCN held itself out as a profit-seeking business venture. Investors paid a $99 membership fee to be a part of BCN and then were provided the option to pay additional money for shares in what BCN purported were three mining pools. According to BCN's website, investors could "earn passive income" through investment in the pools. Specifically, BCN represented:

> You can purchase a share in 3 different mining pools and all Bitcoin mined from each pool will be paid and shared with all members eligible for the pool. You pay either $500, $1,000, or $2,000 worth of Bitcoin for a share of the mining pool.
>
> With your purchase you will receive Bitcoin for 600 days! A percentage of all Bitcoin mined and paid to you will be used to pay for mining costs and to purchase new mining equipment.
>
> *No Sponsoring Required to Earn Mining Pool Payouts

12

CASE NUMBER: *19-cr-811-CCC*

## United States District Court
## District of New Jersey

### UNITED STATES OF AMERICA

v.

**MATTHEW BRENT GOETTSCHE,**

**JOBADIAH SINCLAIR WEEKS,
JOSEPH FRANK ABEL, and
SILVIU CATALIN BALACI**

## INDICTMENT FOR
18 U.S.C. § 371
18 U.S.C. § 1349

A True Bill

**CRAIG CARPENITO**
*UNITED STATES ATTORNEY*
*NEWARK, NEW JERSEY*

DAVID W. FEDER
ANTHONY P. TORNTORE
JAMIE L. HOXIE
*ASSISTANT U.S. ATTORNEY*
*NEWARK, NEW JERSEY*
*(973) 645-2700*

USA-48AD 8
(Ed. 1/97)

# Exhibit H-2

August 12, 2020 Plea Communication Referencing "Tax Charge"

**Description**

Plea-related communication dated August 12, 2020 reflecting counsel's transmission of Government plea discussions describing a negotiated resolution involving Count Two of the Indictment together with "a tax charge."

**Purpose**

To document the chronology through which tax-related charging first appeared in plea discussions before later formal incorporation of a §7201 Information through the written plea agreement.

# RE: Joby's decision

From:   Gaugush, Simon A. (sgaugush@carltonfields.com)

To:      natweeks@aol.com

Cc:      silencewks@aol.com

Date:   Wednesday, August 12, 2020 at 05:27 PM GMT+2

Nat,

    Thank you for your note.  The government has not formally offered Joby a deal.  But they want to talk to him in anticipation of offering him a plea to Count Two of the Indictment and a tax charge.  Both charges have a statutory maximum penalty of 5 years in prison.  So, Joby's exposure would go from 25 years in prison (where it's now with the current Indictment) down to a statutory maximum of 10 years.  But the government is proposing to either have both charges run concurrent--which means 10 years goes down to a 5-year maximum--or they will propose a loss amount low enough that the 10-year statutory max for both charges under the sentencing guidelines scores out to no more than 5 years.  Essentially, what the government is proposing is that Joby plead guilty to two charges and go from a potential 25-year sentence down to a sentence of 5 years or less.

    The government is also offering Joby the opportunity to cooperate, meaning he can get cooperation credit.  The benefit of cooperation credit is that Joby could go from 5 years (assuming the guidelines score even comes out to 5 years) to 4 years, 3 years, or something less.  Of course, Joby gets credit for time-served while he has been in pretrial detention.  There is a lot of uncertainty with respect to how a sentence will turn out.  It depends on factors such as the facts in the plea agreement, the cooperation Joby may provide, whether the government can charge other people with Joby's information, the loss amount, and how the judge views the offense conduct.  On top of being able to resolve this matter, the government may change its position on detention if Joby pleads.  That means Joby would get out of jail while this case is litigated.

    We have not agreed to any deal.  A formal offer has not been made.  We are merely exploring it.  The government has produced over 1 million documents to us. We have been reviewing those records and discussing them with Joby.  Ultimately, we won't recommend that Joby plead guilty to anything unless, after weighing the evidence and assessing the probability of prevailing at trial, we think the offer is reasonable and in Joby's best interest.

    It goes without saying that everything I have shared with you is confidential.  We will keep you apprised of how these discussions with the government play out.  And please eat something.  Nothing with the government happens quickly.  I don't want you starving.  I think we'll have a good sense within the next 2 weeks whether this is going to happen.  Take care.

Simon A Gaugush
Attorney at Law | Carlton Fields
4221 W. Boy Scout Blvd., Ste. 1000 | Tampa, Florida 33607-5780
Direct: 813.229.4227 | Fax: 813.229.4133
SGaugush@carltonfields.com

-----Original Message-----
From: Nat Weeks <natweeks@aol.com>
Sent: Tuesday, August 11, 2020 4:00 PM

Case 2:19-cr-00877-CCC   Document 590-1   Filed 05/29/26   Page 63 of 79 PageID: 7979

To: Gaugush, Simon A. <SGaugush@carltonfields.com>
Cc: Nat Weeks <natweeks@aol.com>; Silence Weeks <silencewks@aol.com>
Subject: Joby's decision

Hi Simon,
Thanks again for all your efforts.  On behalf of Joby, Silence and I are praying and fasting now until we hear one way or the other.  Apparently, Joby has to plead guilty to both charges which could land him 25 years in jail plus fines before he learns what they are willing to offer him?  What kind of bargaining is that?  I'd think you'd have an impossible task trying to advise him.  Has the court system now made all that $500,000 completely wasted?  Has the prosecution even shared with you what they've found which is even in the slightest way incriminating?  Don't they have to?  Why would we now trust scoundrels who ignored Joby's Constitutional Speedy Trial and seven months later still haven't set a date?  Is this par for the course?
Joining you in your frustration,
Nat & Silence

Case 2:19-cr-00877-CCC   Document 590-1   Filed 05/29/26   Page 64 of 79 PageID: 7980

# Exhibit H-3

Relevant Plea Agreement Excerpts Concerning Count Two and §7201 Information

## Description

Relevant excerpts of the September 2020 plea agreement (pp. 1, 2, and 11) reflecting negotiated resolution involving Count Two of the Indictment together with a separate Information charging one count of tax evasion under 26 U.S.C. §7201 and dismissal of Count One pursuant to the plea agreement.

## Purpose

To document the formal incorporation of a §7201 Information into the negotiated plea structure and provide chronology relevant to later sentencing characterization and methodology.



U.S. Department of Justice

United States Attorney
District of New Jersey

Craig Carpenito
United States Attorney

970 Broad Street, Suite 700
Newark, New Jersey 07102

(973) 645-2700

September 21, 2020

**VIA EMAIL**
Simon A. Gaugush, Esq.
Michael L. Yaeger, Esq.
Corporate Center Three at International Plaza
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, Florida 33607-5780
SGaugush@carltonfields.com
MYaeger@carltonfields.com

Re: <u>Plea Agreement with Jobadiah Sinclair Weeks</u>
19-cr-877 (CCC)-03

Dear Counsel:

This letter sets forth the plea agreement between your client, Jobadiah Sinclair Weeks ("Weeks"), and the United States Attorney for the District of New Jersey ("this Office"). This Office's offer to enter into this plea agreement will expire on September 25, 2020 if it is not accepted in writing by that date.

Charges

Conditioned on the understandings specified below, this Office will accept a guilty plea from Weeks to: (a) Count Two of the Indictment, (Crim. No. 19-877), which charges Weeks with conspiring to offer and sell unregistered securities, contrary to Title 15, United States Code, Sections 77e and 77x, in violation of Title 18, United States Code, Section 371; and (b) an Information charging Weeks with one count of tax evasion, in violation of Title 26, United States Code, Section 7201. If Weeks enters a guilty plea to, and is sentenced on the above, charges, this Office will not initiate any further criminal charges against Weeks based upon (a) his involvement in the BitClub Network, as further detailed in the Indictment; or (b) his non-filing of taxes during the taxable periods 2015 through 2018. In addition, if Weeks fully complies with all of the terms of this agreement, at the time of sentencing in this matter, this Office will move to dismiss Count One of the Indictment against Weeks. Further, in the event that a guilty plea in this matter is not entered for any reason or the judgment of conviction entered as a result of this guilty plea does not remain in full force and effect, Weeks agrees that any dismissed charges and any other charges that are

not time-barred by the applicable statute of limitations on the date this agreement is signed by Weeks may be commenced against him, notwithstanding the expiration of the limitations period after Weeks signs the agreement.

Sentencing

The violation of 18 U.S.C. § 371 alleged in Count Two to which Weeks agrees to plead guilty carries a statutory maximum prison sentence of five years and a statutory maximum fine equal to the greatest of: (1) $250,000; (2) twice the gross amount of any pecuniary gain that any persons derived from the offense; or (3) twice the gross amount of any pecuniary loss sustained by any victims of the offense.

The violation of 26 U.S.C. § 7201 charged in Count One of the Information to which Weeks agrees to plead guilty carries a statutory maximum prison sentence of 5 years imprisonment and a statutory maximum fine of not more than $100,000.

The sentence on each count may run consecutively. Fines imposed by the sentencing judge may be subject to the payment of interest.

The sentence to be imposed upon Weeks is within the sole discretion of the sentencing judge, subject to the provisions of the Sentencing Reform Act, 18 U.S.C. §§ 3551-3742, and the sentencing judge's consideration of the United States Sentencing Guidelines. The United States Sentencing Guidelines are advisory, not mandatory. The sentencing judge may impose any reasonable sentence up to and including the statutory maximum term of imprisonment and the maximum statutory fine. This Office cannot and does not make any representation or promise as to what guideline range may be found by the sentencing judge, or as to what sentence Weeks ultimately will receive.

Further, in addition to imposing any other penalty on Weeks, the sentencing judge: (1) pursuant to 18 U.S.C. § 3013, will order Weeks to pay an assessment of $100 per count ($200 total), which assessment must be paid by the date of sentencing; (2) with respect to both counts, must order Weeks to pay restitution pursuant to 18 U.S.C. § 3663 et seq.; (3) with respect to Count One of the Information, may order Weeks to pay the costs of prosecution and; (4) pursuant to 18 U.S.C. § 3583 may require Weeks to serve a term of supervised release for each count of conviction of not more than three years for Count Two of the Indictment and Count One of the Information, which terms will begin at the expiration of any term of imprisonment imposed. Should Weeks be placed on a term of supervised release and subsequently violate any of the conditions of supervised release before the expiration of its terms, Weeks may be sentenced to not more than two years' imprisonment on the supervised release for Count

- 2 -

Count One of the Information ("The Information Count")

10. The applicable guidelines for Count One of the Information, charging a violation of Title 26, United States Code, Section 7201, are U.S.S.G. §§ 2T1.1 and 2T4.1. Weeks agrees that he willfully evaded tax reporting requirements for the taxable periods 2015 through 2018. The parties agree that the combined tax loss for the calendar years 2015 through 2018 is greater than $3,500,000, but less than $9,500,000. This corresponds to an Offense Level of 24 pursuant to U.S.S.G. § 2T4.1(J).

11. Because Weeks failed to report and correctly identify the source of income exceeding $10,000 in any year from criminal activity, a two level upward adjustment is warranted pursuant to U.S.S.G. § 2T1.1(b)(1).

12. The total adjusted level for Count One of the Information is 26.

Grouping Analysis

13. The parties agree that Count Two of the Indictment and Count One of the Information group pursuant U.S.S.G. § 3D1.2(d). Pursuant to U.S.S.G. § 3D1.3(b), when the counts involve offenses of the same general type to which different guidelines apply, the offense guideline that produces the highest offense level should be applied. Thus, the offense level is 28.

Acceptance of Responsibility

14. As of the date of this letter, it is expected that Weeks will enter a plea of guilty prior to the commencement of trial, will truthfully admit his involvement in the offenses and related conduct, and will not engage in conduct that is inconsistent with such acceptance of responsibility. If all of these events occur, and Weeks' acceptance of responsibility continues through the date of sentencing, a downward adjustment of 2 levels for acceptance of responsibility will be appropriate. See U.S.S.G. § 3E1.1(a).

15. As of the date of this letter, it is expected that Weeks will assist authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting this Office to avoid preparing for trial and permitting this Office and the Court to allocate their resources efficiently. At sentencing, this Office will move for a further 1-point reduction in Weeks' offense level pursuant to U.S.S.G. § 3E1.1(b) if the following conditions are met: (a) Weeks enters a plea pursuant to this agreement, (b) this Office in its discretion determines that Weeks' acceptance of responsibility has continued through the date of sentencing and Weeks therefore qualifies for a 2-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and (c) Weeks' offense level under the Guidelines prior to the operation of § 3E1.1(a) is 16 or greater.

- 11 -

# Exhibit I

Government Victim and Loss Narratives Reflected in Charging and Sentencing Filings

**Description**

Compilation of Government filings, court records, and sentencing materials reflecting Government descriptions of investor losses and victim impact, including references to "thousands of victims," large-scale investor losses, and related victim and loss narratives advanced during prosecution and sentencing proceedings.

**Purpose**

To document the Government's evolving victim and loss narratives and provide context for comparison to the individualized claimant record reflected in Revised PSR ¶¶110–118.

| Dkt. / Date | Gov't Claim | Reality / Contradiction |
|---|---|---|
| 34 (Jan 2020) | "Thousands of victims," ask to notify via DOJ website. | No victim list ever produced. Publication order proves gov't couldn't identify individuals. |
| 70 (Mar 2020) | "Nine-figure fraud, countless victims" to oppose bail. | No affidavits or records. Narrative inflated for detention. |
| 112 (Jul 2020, Balaci plea) | Fraud harmed investors. | Balaci pled under §371, max 5 years; restitution undefined; no $722M loss figure. |
| 124 (Sep 2020, Abel plea) | Gov't claimed global fraud. | Gov't accepted only $3.5–9.5M tax loss, not victim losses. |
| 184 (Feb 2021) | Court order: "thousands of investors" → notice by publication. | Still no victim identities, just generic posting. |
| 264 (Sep 2022) | Gov't: "$2 billion pyramid scheme, thousands of victims." | Narrative inflation (from $722M to $2B). No proof. |
| 371 (Oct 2024, Draft PSR) | Victim losses tied to Weeks. | Only 12 victims, $458k total (<0.1%); probation note: "verification awaited." None mention Weeks. |
| 1206/2025 Motion to Dismiss Count | DOJ still cites "thousands of victims, $722M losses." | Motion proves no verified affidavits, IRS records, or bank data; losses caused by DOJ seizure of servers; miners were true victims. |

## Victim Narrative Errors & Inconsistencies Table

| Dkt. / Filing | Gov't Claim re: Victims | Actual Record / Defense Proof | Error / Inconsistency |
|---|---|---|---|
| **34 (Jan 30, 2020) Gov't motion for alternative notification** | "Likely thousands of victims" → impracticable to notify individually; ask to use DOJ website | Gov't admitted it had not identified or located victims, relied only on assumption of "thousands." | Used inflated victim count to justify "complex case" status without evidence. |
| **70 (Mar 24, 2020) Gov't bail opposition** | "Nine-figure fraud," "countless victims," huge losses | No affidavits, IRS records, or victim list produced; claims based on speculation. | Inflated rhetoric to oppose bail while discovery incomplete. |
| **94 (May 28, 2020) Weeks bail appeal** | Gov't implied dangerousness and investor harm | Defense showed mistaken facts: foreign accounts closed, no ongoing ties; Weeks was IRS-cooperative. | Undercuts gov't credibility on victims and risk narrative. |
| **112 (Jul 9, 2020) Balaci plea** | Gov't claimed fraud harmed many investors | Balaci pled only to §371 conspiracy with max 5 years; no $722M loss figure; restitution "to be determined." | Victim/loss claims did not survive into plea; undermines complexity claim. |
| **124 (Sep 3, 2020) Abel plea** | Gov't narrative: global fraud, thousands of victims | Gov't accepted tax loss only ($3.5M–$9.5M), not investor loss; no restitution tied to "victims." | Contradicts $722M/$2B fraud claims; Abel's plea shrinks loss scope dramatically. |
| **184 (Feb 11, 2021) Court order alt. victim notice** | "Thousands of investors," impracticable to notify | Still no verified list of victims; continued use of website posting only. | Gov't still unable to identify victims two years in. |
| **264 (Sep 30, 2022) Gov't opposes Goettsche bail** | BCN = "$2 billion pyramid scheme," "thousands of victims" | Number suddenly doubled (from $722M to $2B); no documentation filed; no restitution records. | Narrative inflation without proof; prejudicial exaggeration. |

| | | | |
|---|---|---|---|
| **371 Draft PSR (Oct 25, 2024)** | Alleged victims tied to Weeks | Lists only 12 victims, $458,502.40 total losses (<0.1% of indictment's $722M); probation note: "verification from gov't awaited." | Completely undermines "thousands of victims / $722M" story. |
| **1206/2025 Motion to Dismiss Count 1 (Weeks)** | Gov't continued to rely on "thousands of victims" and "hundreds of millions lost" | Motion shows: no verified affidavits, only 12 victims cited (none tied to Weeks); Abel implicated instead; losses caused by gov't seizure of mining servers; miners = true victims; ~90,000 BTC + 650,000 ETH unaccounted for. | Demonstrates gov't never substantiated victim claims; DOJ itself caused financial harm by seizures; Count 1 used only as leverage, not supported by evidence. |

# EXHIBIT J

Illustrative Tax-Loss Sensitivity Analysis and Attribution Issues

**Description**

Illustrative demonstrative reflecting categories of asserted reconstructed income, disputed attribution and valuation issues, sensitivity assumptions, and related observations concerning reconstructed tax-loss treatment reflected in Revised PSR ¶¶169–181.

**Purpose**

To illustrate the sentencing significance of disputed attribution assumptions, Seychelles-related ownership treatment, categorized compensation, and reconstructed tax-loss methodology reflected in the Revised PSR. This exhibit is illustrative only and does not concede the Government's attribution methodology, asserted income treatment, or criminal tax-evasion liability under 26 U.S.C. §7201.

Case 2:19-cr-00877-CCC    Document 590-1    Filed 05/29/26    Page 74 of 79 PageID: 7990

## Exhibit J. Government Reconstruction and Illustrative Attribution Analysis

| Category | Government Claimed Income | Rule 32 Attribution Issue | Illustrative Adjustment | 20% Sensitivity Example |
|---|---|---|---|---|
| BCN commissions — BitFury deals | $9,387,766 | Estimated pricing, brokerage characterization, and attribution disputed | — | $7,510,213 |
| BCN commissions — other brokered deals | $1,703,386 | Brokerage characterization and attribution disputed | — | $1,362,709 |
| BCN withdrawals | $2,881,476 | Personal income attribution disputed | — | $2,305,181 |
| Mining earnings | $1,096,971 | Timing, attribution, and valuation disputed | — | $877,577 |
| BitFury stock | $3,102,364 | Seychelles entity ownership, realization, valuation, and personal attribution disputed | $0 | $0 |
| Pay It Forward | $68,615 | Not personal income; attribution disputed | $0 | $0 |
| Steve Snyder CBD | $154,565 | Attribution and compensation treatment disputed | — | $123,652 |
| Travel, lodging, conferences, and related costs (P.M.) | — | Worldwide promotional and intermediary activity not accounted for in reconstructed income treatment | P.M. | Further reduction |
| TOTAL RECONSTRUCTED INCOME | $18,395,144 | | | $12,000,788 |

| Illustrative Tax Effect (28%) | $5,150,640 | Government methodology illustration | $3,360,221 |
| --- | --- | --- | --- |
| Guideline Threshold Observation | >$3.5M band | | Below $3.5M threshold |

# EXHIBIT K

2016 "Antarctica Trip" Payment Instruction (Supporting Record for Dkt. 517-1)

**Description**

Relevant excerpt of the verified Facebook business-record communication and related clarification concerning the 2016 "Antarctica trip" payment memo referenced in the Government's January 15, 2020 bail filing (Dkt. 24).

**Purpose**

To reflect that no verified instruction identified concealment of bitcoin payments or characterization of transfers as "donations," and that the only verified communication referenced an "Antarctica trip" memo concerning identification of a private expedition-related transfer.

**Exhibit F – Memorandum on Record Misstatements and Clarifications Relating to Government's January 15 2020 Bail Filing (ECF 24) (Supplement to Dkt 501 Submission)**

**Jobadiah Sinclair Weeks**
Crim. No. 19-877 (CCC)

Table of contents

I. INTRODUCTION                                                                                      1
II. MISSTATEMENTS AND CLARIFICATIONS                                                                 3
    A. 2015 Gaw Miners Discussion (ECF 24 p. 12)                                      3
    B. January 2016 Mining-Expense Chat (ECF 24 p. 13)                               3
    C. 2016–2018 Press-Release / VPN / Risk Messages (ECF 24 p. 14)                 4
    D. 2017 "Golden Egg" Conversation (ECF 24 p. 15)                                 5
    E. 2016 "Stinkin Thinkin" Motivational Chat (ECF 24 p. 16)                      5
    F. 2016 "Antarctica Trip" Payment Instruction (ECF 24 p. 17)                    6
    G. 2017 "Meme" Reference (ECF 24 p. 17)                                         6
    H. April 19, 2019 IRS-CI Meeting (Ritz-Carlton, Arlington VA) (ECF 24 p. 18)   7
    I. 2018 Operational Payment via Octagon Exchange (ECF 24 pp. 18–19)            7
    J. 2017 Brokerage Chat ($1 M Jakarta → Singapore) (ECF 24 p. 19)                8
    K. 2017 Hardware-Wallet References (ECF 24 p. 19)                               9
    L. 2015 "Atlantis / Madeira" Micro-Nation Chat (ECF 24 p. 23)                  9
    M. Alleged "Mexican Passport" Chat (ECF 24 pp. 33–34)                          10
    Summary Table – Section II Overview                                             11
III. BROADER MISSTATEMENTS AFFECTING BAIL DETERMINATION                                              12
IV. CONCLUSION                                                                                       14

**I. INTRODUCTION**

Defendant Jobadiah Sinclair Weeks respectfully submits this memorandum to clarify the record concerning several communications cited in the Government's *Opposition to Bail* (ECF No. 24, filed January 15, 2020). That filing served as the factual foundation for the Government's subsequent bail arguments and, by citation and repetition, for portions of the Court's later *Opinion and Order* addressing Defendant's pre-trial release and the alleged "August 12, 2020 proffer session." As the record now confirms, no such proffer occurred; the reference originated from mis-dated materials first introduced in ECF 24.

1

**F. 2016 "Antarctica Trip" Payment Instruction (ECF 24 p. 17)**

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| Defendant told investors to hide bitcoin payments ("Put donation / don't mention bitcoin"). | No such instruction. | Unsupported and not found in the record. | The cited language does not exist in the Facebook business records or any related correspondence. The only verified exchange is a single 2016 chat with one individual arranging a wire transfer, where Defendant wrote only: "Make sure to put 'Antarctica trip' in the memo so I know which one it is." That note concerned travel-fund identification, not concealment of bitcoin or investor payments. |
| Defendant said to label payment "Antarctica Trip." | "Make sure to put 'Antarctica trip' in the memo so I know which one it is." | Accurate quotation, used twice in Dkt. 24 for different purposes. | Appears once only, in a single August 2016 chat about a wire transfer. The note identified which personal transfer related to an upcoming expedition; it was not connected to bitcoin or investment payments. Dkt. 24 later cited the same message both as a labeling example and as alleged concealment, though it referred to a single, benign instruction. |

The only verified reference to "Antarctica trip" appears once in an August 2016 chat about a personal wire transfer. The memo line identified a payment for Defendant's private South Pole expedition, during which he placed a U.S. flag, and bore no relation to BitClub or investor funds. ECF 24's suggestion that this reflected concealment or money-laundering intent is unsupported by any record evidence. A photograph of the expedition (Exhibit __) confirms the legitimate purpose of the trip.

**G. 2017 "Meme" Reference (ECF 24 p. 17)**

| ECF 24 Statement | Actual Communication | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| "Weeks sent a meme showing his belief that cryptocurrency is harder to freeze." | Sticker image repeatedly shared in 2017 threads (same Photo ID 369239263222822). | Accurately noted that a sticker was sent; mischaracterized significance. | Casual emoji-style sticker used in multiple friendly chats; contains no text or admission about freezing funds. |

6

The cited "meme" was an ordinary Facebook sticker—a default Messenger image used by millions of users in 2017. It carries no text or financial meaning and provides no insight into Defendant's intent or conduct.

### H. April 19, 2019 IRS-CI Meeting (Ritz-Carlton, Arlington VA) (ECF 24 p. 18)

| ECF 24 Statement | Actual Event | Accuracy Assessment | Clarification / Context |
|---|---|---|---|
| "Weeks reached out to law enforcement in 2019 when the Government's investigation was already underway and still covert. Weeks claimed that he was well-situated to provide information on international money laundering through his contacts and association with others involved in the flow of large sums of funds through overseas cryptocurrency exchanges." | On April 19 2019, Defendant voluntarily met with IRS-CI agents Leo Rovensky and Amjad Qaqish at the Ritz-Carlton in Arlington, VA. He offered general background about cryptocurrency markets and compliance challenges but made no statements concerning BitClub Network's involvement in money-laundering activity. | Accurate that a meeting occurred, but inaccurate and misleading regarding its content. | The discussion concerned Defendant's general industry knowledge and willingness to assist law enforcement. No admission or reference to criminal conduct was made, and no record shows that BitClub Network or any associates were discussed as participants in money-laundering schemes. Verification: See "Notes April 19 2019 Ritz.pdf" and investigator's memorandum filed as Exhibit A to Dkt. 402. |

The April 2019 Ritz-Carlton meeting was a voluntary conversation about cryptocurrency compliance, not a discussion of BitClub Network or money laundering. ECF 24 misstates the substance of that exchange by suggesting that Defendant described BitClub's role in illicit activity. No such statement appears in the contemporaneous notes or any other record. The meeting reflected cooperation, not admission.

### I. 2018 Operational Payment via Octagon Exchange (ECF 24 pp. 18–19)

| ECF 24 Statement | Actual Record | Accuracy | Clarification / Context |
|---|---|---|---|
| Defendant "caused Octagon to transfer approximately $1.2 million from its account at California-based Silvergate Bank to the Bank of Georgia on | Treasury records show that on April 30 2018, BitClub's Octagon (OSL) exchange account converted BTC to fiat and wired ≈ $1.2 million via Silvergate Bank to Geo | Amount/date correct, but source and purpose mischaracterized. The transfer was handled by OSL through Silvergate, | OSL (Octagon Strategy Ltd., now OSL Digital Securities Ltd.) was a licensed crypto exchange using Silvergate as its U.S. bank. Defendant sent BitClub's mined BTC to his verified OSL account; the exchange issued the fiat wire to Geo Servers LLC to pay hosting and power costs managed by director Irakli [ |